1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DWIGHT J. FREENEY, an individual; and )   CASE NO. CV 15-02376 MMM (PJWx)
ROOF GROUP LLC, a California limited )
liability company, )
)
Plaintiffs, )
)   ORDER GRANTING DEFENDANTS BANK
vs. )   OF AMERICA, N.A. AND BANK OF
)   AMERICA CORPORATION'S 12(b)(6)
BANK OF AMERICA CORPORATION, a )   MOTION TO DISMISS; GRANTING
Delaware corporation; BANK OF )   DEFENDANT BOCK'S 12(b)(2) MOTION
AMERICA, NATIONAL ASSOCIATION, a )   TO DISMISS
nationally chartered banking association; )
MICHAEL J. BOCK, an individual; and )
DOES 1-20, inclusive, )
)
Defendants. )
)

On February 23, 2015, Dwight J. Freeney and Roof Group LLC ("RG") (collectively, "plaintiffs") filed this action in Los Angeles Superior Court against Bank of America Corporation ("BAC"), Bank of America, N.A. ("BANA") (collectively, "BofA"), Michael J. Bock, and various fictitious defendants (collectively, "defendants").[1]  Defendants were served with the state court summons and complaint on March 2, 2015,[2] and timely removed the action on March 31, 2015, invoking

---

[1]Notice of Removal ("Removal"), Docket No. 1 (Mar. 31, 2015), Exh. A ("Complaint") at 1.

[2]Removal, ¶ 15.

the court's federal question and diversity jurisdiction.[3]  The case was initially assigned to Judge R. Gary Klausner, but was transferred to this court's calendar under General Order 14-03 as related to an earlier proceeding.[4]

On May 7, 2015, BofA filed a motion to dismiss plaintiffs' complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[5]  The same day, Bock filed a motion to dismiss the complaint for lack of personal jurisdiction under Rule 12(b)(2) or alternatively, for failure to state a claim under Rule 12(b)(6).[6]  Plaintiffs oppose the motions.[7]

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the court finds the matters appropriate for decision without oral argument; the hearing calendared for July 20, 2015, is therefore vacated, and the matter is taken off calendar.

# I. FACTUAL BACKGROUND

## A. Facts Alleged in the Complaint

### 1. General Background Facts

#### a. Dwight J. Freeney

Dwight J. Freeney is a professional football player who has played thirteen seasons as a defensive end in the National Football League ("NFL") – from 2002 to 2012, for the Indianapolis Colts

---

[3]Removal at 2-5.

[4]Notice of Assignment to District Judge R. Gary Klausner and Magistrate Judge Paul L. Abrams, Docket No. 5 (Apr. 1, 2015); Order Re: Transfer Pursuant to General Order 14-03, Docket No. 11 (Apr. 6, 2015).

[5]Notice of Motion and Motion to Dismiss Case by Defendants Bank of America Corporation and Bank of America, National Association ("BofA MTD"), Docket No. 22 (May 7, 2015).

[6]Notice of Motion and Motion to Dismiss Case by Defendant Michael Bock ("Bock MTD"), Docket No. 24 (May 7, 2015).

[7]Opposition to Motion to Dismiss Case by Defendants Bank of America Corporation and Bank of America, National Association ("BofA MTD Opposition"), Docket No. 32 (June 30, 2015); Opposition to Motion to Dismiss Case by Defendant Michael Bock ("Bock MTD Opposition"), Docket No. 26 (June 29, 2015).

and in 2013 and 2014, for the San Diego Chargers.[8]  Freeney has been selected to the NFL's Pro-Bowl seven times, was a member of the 2006 and 2009 AFC Championship teams, and a member of the 2007 Super Bowl Championship team.[9]

In 2007, Freeney allegedly entered into a six-year contract with the Indianapolis Colts.[10]  At the time he became a BofA client in February 2010, he purportedly had three years remaining on his contract with the Colts; the three remaining contract years had a value of $34,280,000 before taxes – $8,825,000 for the 2010 season; $11,420,000 for the 2011 season; and $14,035,000 for the 2012 season.[11]

Freeney allegedly has no expertise in financial matters and limited investment experience.[12]  As a result, he purportedly relied on professional financial managers and investment advisors to manage his assets and income.[13]  Because Freeney had allegedly had a number of bad experiences with financial managers throughout his career, he purportedly turned to BofA, a large, well-established financial institution that he believed was best suited to handle his financial affairs competently.[14]

### b.    Roof Group

RG was founded in 2009 by two entrepreneurs – Joe Altounian and Niall Donnelley – to own and operate the *Rolling Stone Los Angeles* ("RSLA") restaurant, café, and lounge in Los Angeles, California.[15]  RG had purportedly secured a license from *Rolling Stone* magazine to open RSLA and

---

[8]Complaint, ¶¶ 2, 37.

[9]*Id.*

[10]*Id.*, ¶ 38.

[11]*Id.*

[12]*Id.*, ¶ 39.

[13]*Id.*

[14]*Id.*, ¶¶ 39-40.

[15]*Id.*, ¶¶ 41-42.

several additional theme restaurants in other cities throughout the United States.[16]

Freeney first became a member of RG in September 2009, when he acquired a 20 percent ownership interest in the company in exchange for an investment of $1.5 million.[17]   In May 2010, Freeney allegedly increased his ownership interest to 51 percent; in January 2012, he became a 100% owner of the company, purportedly at the direction and urging of BofA.[18]

Construction of RLSA allegedly began in late 2009; the restaurant was completed in 2010.[19] RSLA purportedly opened in February 2011, but shortly thereafter began to experience operating deficits.[20]   Freeney alleges that he invested approximately $7.1 million in RSLA during 2011 to fund the operating deficits and keep the restaurant operating.[21]   RG was ultimately forced to close RSLA in February 2013; this allegedly resulted from the purported financial scheme charged in this litigation.[22]

### c.    Bank of America

BofA is the second largest banking institution in the United States.[23]   In January 2009, it purchased Merrill Lynch & Co. ("ML"), which was then the nation's third largest investment bank and operated the nation's largest retail brokerage, for approximately $50 billion.[24] Following the transaction, ML allegedly merged into BofA.[25]   Freeney asserts, on information and belief, that ML's employees

---

[16]*Id.*

[17]*Id.*, ¶ 44.

[18]*Id.*

[19]*Id.*, ¶ 43.

[20]*Id.*, ¶¶ 43-45.

[21]*Id.*, ¶¶ 45-47.

[22]*Id.*

[23]*Id.*, ¶ 48.

[24]*Id.*, ¶ 49.

[25]*Id.*

became employees of BofA following the purported merger.[26]

At all relevant times, BofA allegedly had five divisions; one of these was the Global Wealth & Investment Management ("GWIM") Division.[27]  BofA's GWIM Division was purportedly designed to provide financial and investment services to high net worth individuals like Freeney.[28]  BofA's promotional materials allegedly stated that GWIM was "the leading provider of comprehensive wealth management and investment services for individuals and businesses" and "among the largest businesses of its kind in the world."[29]  Freeney asserts that BofA represented that GWIM's financial advisors could provide "tailored solutions to ultra-affluent clients, offering both the intimacy of a boutique and the resources of a premier global financial services company."  The division's resources purportedly included "experts in areas such as investment management, concentrated stock management, and intergenerational wealth transfer strategies."[30]

### d.   Michael Stern

Michael Stern, also known by the alias Michael Millar and/or David Michael Millar, was born and raised in southern Florida and allegedly spent most of his adult life in and around Miami, Florida.[31]  The complaint asserts that Stern became involved in the construction industry in the early 2000s, and shortly thereafter, became actively involved in residential and commercial real estate development.[32]  In 2003, Stern allegedly acquired controlling ownership interests in a number of Miami and Miami Beach properties; Freeney asserts that Stern obtained the financing required to acquire these ownership

---

[26] *Id.*

[27] *Id.*, ¶ 50.

[28] *Id.*

[29] *Id.*, ¶ 51.

[30] *Id.*

[31] *Id.*, ¶ 55.

[32] *Id.*, ¶ 56.

interests by forging and falsifying title, loan, and corporate documents.[33]

The complaint alleges that Stern paid more than $100,000 in bribes to Miami Beach city officials to obtain demolition and construction permits for properties he was developing.[34]  Stern's wrongful conduct was purportedly revealed in 2005 and widely publicized in the press.[35]  As part of his scheme, Stern purportedly acquired millions of dollars in new mortgages and loans by using over-encumbered properties as security and diverting the loan proceeds to his own use.[36]  Freeney alleges that, in furtherance of the mortgage flipping scheme, Stern wrote hundreds of thousands of dollars of insufficient funds checks, forged documents, made misrepresentations to lenders and investors, and misapplied loan proceeds.[37]  Near the end of 2008, Stern allegedly defaulted on several loans.[38]  As a result, lenders and investors purportedly learned of Stern's fraudulent scheme and filed more than 35 civil lawsuits against him the following year.[39]  Freeney alleges that, as a result of these lawsuits, overwhelming evidence of Sterns' fraudulent practices came to light; these included use of insufficient funds checks, forgery of title, loan, and corporate records, falsification of closing documents, and theft of loan proceeds.[40]

In February 2009, Stern and his wife, Layne Harris Stern, purportedly sought personal bankruptcy protection in the United States Bankruptcy Court for the Southern District of Florida.[41]  The financial disclosures Stern submitted in the bankruptcy proceeding allegedly showed total liabilities of

---

[33]*Id.*

[34]*Id.*, ¶ 57.

[35]*Id.*

[36]*Id.*

[37]*Id.*

[38]*Id.*, ¶ 59.

[39]*Id.*, ¶¶ 59-61.

[40]*Id.*, ¶ 61.  See also *id.*, ¶¶ 62-65 (describing specific lawsuits).

[41]*Id.*, ¶ 66.

$67.1 million, total assets of -$2.4 million, bank balances of -$22,697, and the pendency of nineteen civil lawsuits naming him as defendant.[42]  During the bankruptcy proceeding, Stern allegedly engaged in bankruptcy fraud by, *inter alia*, violating numerous court orders requiring the production of documents to the bankruptcy trustee and U.S. Trustee, giving false testimony, concealing bank account and financial information concerning one of his investment properties, and failing to disclose transfers to third parties totaling more than $1.0 million prior to his bankruptcy filing.[43]  In May 2009, Stern allegedly fled to Uruguay to live with his stepson.[44]  As a result of Stern's failure to appear, a bankruptcy judge held Stern in contempt and issued a body attachment for his arrest.[45]  In January 2010, the *South Florida Business Journal* interviewed Stern and published an article detailing his bankruptcy and the allegations of fraud against him.[46]  Stern returned in March 2010 and was arrested, but later released on a surety bond on condition that he not leave Miami-Dade County, Florida.[47]

**e.      Michael Bock and Eva Weinberg**

Michael Bock is a stock broker and investment advisor with more than thirty years of experience.[48]  He allegedly began his career at E.F. Hutton & Company in 1984, and thereafter worked at Lehman Brothers, Morgan Stanley, and Smith Barney/Citigroup.[49]  Bock purportedly holds Series 3, 7, 63, and 65 licenses, which allow him to buy and sell securities on behalf of clients and to give clients financial advice.[50]

---

[42]*Id.*, ¶ 67.

[43]*Id.*, ¶ 68.

[44]*Id.*, ¶¶ 69-70.

[45]*Id.*, ¶¶ 71-73.

[46]*Id.*, ¶ 74.

[47]*Id.*, ¶¶ 73-74.

[48]*Id.*, ¶ 75.

[49]*Id.*

[50]*Id.*

Eva Weinberg allegedly graduated from Boston University in 1984 with a bachelor's degree in finance.[51] She then attended Hofstra Law School, graduating in 1987, and worked as a money manager at Lehman Brothers from 1987 to 1995.[52] The complaint alleges that Weinberg moved to South Florida in 1995, where she worked for Prudential Securities and Morgan Stanley until 2005.[53] In 2005, Weinberg purportedly left the financial services industry and allowed her securities licenses to lapse.[54]

Bock and Weinberg have married twice and divorced twice, most recently in June 2009.[55] They purportedly first met Stern in 2004, when they hired him to build a house for them in Boca Raton, Florida.[56] In 2008, Bock, Weinberg, and Weinberg's brother, Richard, allegedly loaned Stern $350,000; they made the loan, which was purportedly secured by a promissory note, so that Stern could make payments due under a settlement agreement in one of the civil cases filed against him in 2008.[57] Bock and Weinberg also allegedly helped Stern find investors for his properties.[58]

Plaintiffs alleges, on information and belief, that beginning in January 2009, Weinberg and Stern became romantically involved.[59] While Stern was in Uruguay, Weinberg allegedly managed one of his properties and, in that capacity, fraudulently induced various individuals to invest in Stern's real estate deals. She also purportedly wrote insufficient funds checks to creditors in an effort to forestall a collection action against Stern.[60] In addition, plaintiffs assert, Bock and Weinberg pressured an

---

[51] *Id.*, ¶ 76.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*, ¶ 77.

[56] *Id.*, ¶ 78.

[57] *Id.*, ¶ 79.

[58] *Id.*, ¶ 80.

[59] *Id.*, ¶ 82.

[60] *Id.*, ¶¶ 83-85.

individual who testified against Stern to recant testimony that Stern had forged her signature on various loan documents.[61]

In April 2009, Bock and Weinberg purportedly joined ML's Coral Gables office, and thereafter became BofA employees under the supervision of branch manager Matthew Liebman.[62]  Upon joining ML/BofA in 2009, Bock was purportedly given the title Senior Vice President – Wealth Management and Senior Financial Advisor – a title he allegedly still holds today.[63]  Bock was purportedly Weinberg's supervisor and head of the GWIM financial advisory team, which included him, David Sugarman, an Assistant Vice President and Financial Advisor, and Weinberg, who was an Investment Associate.[64]

Between March and June 2009, Weinberg allegedly leased an apartment in Fisher Island, Miami, and moved out of the house she shared with Bock.[65]  While living on Fisher Island, Weinberg purportedly arranged meetings between Stern and potential purchasers of his real estate holdings.[66]

Plaintiffs allege, on information and belief, that in January 2010, Bock, Liebman, Surgarman, and Weinberg were transferred from the ML office in Coral Gables to the BofA branch located on Brickell Avenue in Miami Beach, Florida.[67]

### f.    Richard Weinberg

Richard Weinberg, who is Eva Weinberg's brother, purportedly obtained a license to sell life insurance in New Jersey in May 2010, shortly after Freeney became a BofA client.[68]  In June 2010, Richard obtained a license to sell life insurance in Indiana so that he could receive commissions on the

---

[61]*Id.*, ¶ 86.

[62]*Id.*, ¶ 87.

[63]*Id.*, ¶ 88.

[64]*Id.*

[65]*Id.*, ¶ 90.

[66]*Id.*, ¶¶ 91-92.

[67]*Id.*, ¶¶ 93-94.

[68]*Id.*, ¶ 95.

sale to Freeney of a $55 million life insurance policy.[69]  Richard purportedly allowed his licenses to lapse in June 2012.[70]

### 2.    The Alleged Scheme to Defraud Freeney

### a.    BofA Recruits Freeney

Plaintiffs allege that the scheme to defraud Freeney began in January 2010, when Bock's team purportedly recruited him to become a BofA client.[71]  Sugarman had allegedly attempted to recruit Freeney for almost one year previously before he retained BofA to provide financial and investment services in early 2010.[72]  In attempting to bring Freeney to BofA as a client, BofA, Bock, and Weinberg purportedly made various false and misleading representations and false promises; these representations and promises were made both directly to Freeney and through friends such as Aaron West.[73] Specifically, BofA, Bock, and Weinberg allegedly represented, *inter alia*, that (1) Bock's team had the qualifications, expertise, and experience to manage Freeney's assets, investments, and income competently, when, in fact, they were not true financial managers or planners and their experience principally involved the purchase and sale of conventional investments, such as publicly traded securities; (2) Bock's team could help Freeney find new investors and obtain loans for RSLA, when, in fact, the team had no such ability; (3) Bock's team could help Freeney dispose of non-performing or otherwise inappropriate investments, when, in fact, they had no intent or ability to do so; and (4) Bock's team could help Freeney obtain the return of a $1.2 million deposit he had made toward the purchase of a condominium in South Beach, when, in fact, they did not have the ability or intent to do so.[74]

While recruiting Freeney to become a BofA client, and during the execution of defendants' scheme to defraud, BofA, Bock, and Weinberg also purportedly concealed various material facts from

[69]*Id.*

[70]*Id.*

[71]*Id.*, ¶ 102.

[72]*Id.*

[73]*Id.*, ¶ 103.

[74]*Id.*

Freeney.  These include that (1) Weinberg was only a part-time BofA employee; (2) Weinberg was not licensed to give investment advice to clients; (3) Weinberg was not competent to manage Freeney's assets, investments, or income; (4) Weinberg had twice been married to Bock and had an acrimonious working relationship with him; (5) there was an outstanding $1.6 million judgment against Weinberg for issuing $400,000 in worthless checks; (6) the judgment creditors had served a petition to garnish Weinberg's wages in an effort to satisfy the judgment on BofA; (7) Weinberg had helped Stern commit bankruptcy fraud; (8) Bock's team had no experience or expertise in managing or operating a restaurant; (9) Bock's team had no ability to maintain the books and records of, or prepare budgets or financial projections for, a restaurant; and (10) Bock's team had no experience supervising the staffing, opening, or operation of a restaurant.[75]

Had Freeney had known these facts and known the falsity of defendants' purported representations while he was being recruited, he allegedly would have never agreed to become a BofA client or to entrust the management of his assets, investments, and income to BofA.[76]

### b.    BofA Refers Freeney to Stern

While recruiting Freeney, BofA and Weinberg allegedly introduced him to Stern, who was using the alias Michael Millar.[77]  Freeney was purportedly told that Millar was a wealthy and successful Miami Beach businessman who did consulting work for BofA, that he might be interested in investing in RSLA, and that he could help Freeney dispose of non-performing and inappropriate investments.[78] BofA, Bock, and Weinberg allegedly made various false and misleading representations directly to Freeney, and through his friends West and Jason Edmonds, including, *inter alia*, that Stern's name was "David Michael Millar"; that Millar was a wealthy businessman (despite the fact that Stern had sought bankruptcy protection a year earlier, declaring liabilities of more than $65 million); and that Millar

---

[75]*Id.*, ¶ 104.

[76]*Id.*, ¶ 105.

[77]*Id.*, ¶ 106.

[78]*Id.*

would invest in RSLA and advise Freeney how to supervise and build the restaurant.[79]

BofA, Bock, and Weinberg also purportedly concealed various material facts about Stern including, *inter alia*, that he had declared personal bankruptcy in 2009; that he was a defendant in more than twenty civil lawsuits filed by individuals who asserted that, as a result of Stern's fraud, they had lost more than $20 million; and that all of his real estate assets were in receivership such that he did not have the ability to invest in RSLA.[80] BofA, Bock, and Weinberg also purportedly did not tell Freeney that Stern had paid more than $100,000 in bribes to Miami Beach officials, or that Weinberg had misappropriated the money Stern had used to lease a private jet from Freeney's BofA accounts.[81]

Finally, BofA, Bock, and Weinberg allegedly concealed material facts regarding Bock's and Weinberg's relationship with Stern, including the fact that they had loaned Stern more than $1 million, which had not been repaid, and the fact that Bock and Weinberg had previously attempted to find investors for Stern's real estate holdings.[82] Stern falsely told Freeney that his name was Michael Millar, that he was a wealthy and successful businessman, and that he had the financial resources to invest in RSLA and help Freeney recover a $1.2 million deposit Freeney had made on the purchase of a condominium.[83]

Had Freeney known the true facts regarding Stern, and Bock's and Weinberg's involvement with Stern, he purportedly would not have agreed to become a BofA client or to have his assets, investments, and income managed by BofA or its employees.[84]

---

[79] *Id.*, ¶ 107.

[80] *Id.*, ¶ 108.

[81] *Id.*

[82] *Id.*, ¶ 109.

[83] *Id.*, ¶ 110.

[84] *Id.*, ¶ 111.

      **c.**    **Freeney Becomes a BofA Client And Transfers Management of His Assets, Investments, and Income to BofA**

In February 2010, Freeney allegedly agreed to become a BofA client and transfer management of his financial affairs to Bock's team.[85]  Plaintiffs allege that, although Weinberg was a part-time employee who was not licensed to give investment advice, she became Freeney's principal contact at BofA, as well as his private banker, financial manager, and investment advisor.[86]  Bock and Liebman purportedly knew that Weinberg had assumed control of Freeney's financial affairs and approved of her actions.[87]

In her role as Freeney's banker, Weinberg purportedly oversaw the transfer of assets and investments from his prior financial manager and investment advisor to BofA.[88]  Plaintiffs allege that the assets and investments were thereafter exclusively under the control of Bock's team at BofA.[89]  As part of BofA's management of Freeney's assets and investments, Freeney, BofA, Bock, and Weinberg purportedly agreed that BofA would handle, *inter alia*, payment of Freeney's bills; preparation and filing of his federal and state tax returns; research and recommendation of new investment opportunities; disposal of unprofitable investments; management of RG; and identification of additional investors and/or loan financing for RSLA so that Freeney was not the sole source of funds.[90]

In reliance on BofA's, Bock's, Weinberg's, and Stern's misrepresentations and non-disclosures, Freeney allegedly authorized Stern to work with Bock's team to negotiate the return of sums loaned by Freeney to several entities as investments, to dispose of unprofitable land investments, to increase

---

[85]*Id.*, ¶ 112.

[86]*Id.*

[87]*Id.*

[88]*Id.*, ¶ 113.

[89]*Id.*, ¶ 114.

[90]*Id.*, ¶¶ 115-17.

Freeney's ownership interest in RG, and to oversee the build-out and operation of RSLA.[91]

### d.    Stern Establishes Arms Reach Consulting LLC

On February 18, 2010, with Bock and Weinberg's assistance, Stern purportedly incorporated Arms Reach Consulting LLC ("ARC") in Delaware.[92] The same day, he allegedly established two email accounts – "davidmichaelmillar@yahoo.com" and "armsreachconsultingllc@yahoo.com." Stern purportedly used these accounts to communicate with Freeney.[93] Nine days later, on February 27, 2010, Stern purportedly opened a business checking account for ARC in a business associate's name in order to evade a bankruptcy seizure of all of his funds and bank accounts.[94] Plaintiffs allege that ARC had no assets, employees, clients, or legitimate business operations, and that it was incorporated to further defendants' scheme to defraud Freeney and conceal Stern's theft of his funds from Freeney, the bankruptcy court, the bankruptcy trustee, and the U.S. Trustee.[95] Plaintiffs assert that approximately $2.2 million was withdrawn from RG's BofA account and laundered through the ARC bank account.[96]

### e.    BofA Refers Freeney to Weinberg's Brother

Approximately one month after joining BofA as a client, BofA allegedly advised Freeney that he should obtain whole life insurance as part of his overall investment portfolio.[97] At the time BofA suggested that Freeney obtain life insurance, it purportedly knew that Freeney already owned two life insurance policies – a $10 million policy through Minnesota Mutual Life Insurance Company ("Minnesota Mutual") and a $3 million policy through Lincoln Financial Life Insurance Company

---

[91]*Id.*, ¶ 120.

[92]*Id.*, ¶¶ 122-24.

[93]*Id.*, ¶ 125.

[94]*Id.*, ¶ 126.

[95]*Id.*, ¶¶ 127-28.

[96]*Id.*, ¶ 128.

[97]*Id.*, ¶ 129.

("Lincoln Financial").[98]

To facilitate Freeney's purchase of a new life insurance policy, Weinberg purportedly introduced Freeney to her brother, Richard Weinberg.[99] Weinberg allegedly represented that Richard had extensive knowledge and experience in purchase of life insurance as an investment despite the fact that Richard had not even obtained a license to sell life insurance at the time.[100] Richard also allegedly offered and agreed to act as Freeney's advisor in connection with his purchase of whole life insurance for investment purposes, despite the fact that Richard had no relevant qualifications, expertise, or experience.[101]

Based on BofA's, Weinberg's, and Richard's encouragement and representations that it would be a prudent and beneficial long-term investment, Freeney purportedly purchased up to $60 million in whole life insurance.[102] Weinberg and Richard allegedly contacted a family friend who was a senior life insurance agent to issue the life insurance policy to Freeney.[103] They purportedly agreed to split the commission on Freeney's purchase of life insurance, and instructed the life insurance agent to issue multiple policies rather than a single policy in order to generate larger commissions.[104]

### f.    BofA Refers Freeney to a Florida Attorney

In late March 2010, BofA, Weinberg, and Stern allegedly referred Freeney to an attorney and law firm in Florida (the "Florida Attorney") to provide legal advice and services related to RG and RSLA.[105] Freeney allegedly met the Florida Attorney on March 24, 2010, on his way to meet Weinberg,

---

[98] *Id.*, ¶ 130.

[99] *Id.*, ¶ 131.

[100] *Id.*

[101] *Id.*, ¶ 132.

[102] *Id.*, ¶ 133.

[103] *Id.*, ¶¶ 135-36.

[104] *Id.*, ¶¶ 134-37.

[105] *Id.*, ¶ 138.

Stern, and an associate in the Bahamas.[106]  The Florida Attorney purportedly did not reveal Stern's true name and made misleading statements suggesting that Stern was a wealthy businessman Freeney could trust.[107]   BofA, Weinberg, Stern, and the Florida Attorney purportedly represented falsely that the Florida Attorney had the experience and expertise to give Freeney legal advice regarding RG and RSLA, and concealed from him the fact that the Florida Attorney had conflicts of interest – specifically, that the attorney had represented Stern in the civil fraud suits and also represented Weinberg.[108]   Freeney allegedly relied on the misrepresentations and non-disclosures in agreeing to retain the Florida Attorney in April 2010 to revise RG's operating agreement and increase Freeney's ownership in RG.[109]

### g.   Purported Embezzlement of Funds from Freeney's Personal BofA Account

The complaint alleges that, between March and June 2010, Weinberg, acting as a BofA employee, misappropriated approximately $160,000 from one of Freeney's personal BofA accounts.[110] Weinberg purportedly directed that the funds be transferred to ARC without Freeney's knowledge or authorization.[111]   Weinberg allegedly offered various false reasons for the funds transfer;[112] plaintiffs assert the funds were not transferred for Freeney's benefit, but solely for Stern's benefit.[113]  BofA, Bock, and Liebman purportedly permitted Weinberg to transfer Freeney's funds negligently.[114]

---

[106]*Id.*

[107]*Id.*, ¶ 139.

[108]*Id.*, ¶¶ 140-41.

[109]*Id.*, ¶¶ 142-43.

[110]*Id.*, ¶ 144.

[111]*Id.*

[112]The complaint does not allege what these purported justifications were.

[113]*Id.*, ¶ 145.

[114]*Id.*, ¶ 146.

### h. Purportedly Unauthorized Purchases and Sales of Securities

Plaintiffs allege, on information and belief, that between February and April 2010, Bock, acting as a BofA employee, purchased approximately $890,000 in securities on Freeney's behalf without Freeney's knowledge or authorization.[115]  They also assert, on information and belief, that on June 11, 2010, Bock directed that the securities be sold, again without Freeney's knowledge or authorization.[116]  The sale allegedly resulted in a loss to Freeney of more than $45,000.[117]  At the time Bock sold the securities, Weinberg was purportedly planning to leave BofA and relocate to California with Stern.[118]

### i. Stern's Use of a Private Jet

During the relevant period, Stern purportedly used a private jet, tail number N900JF, which he claimed to own; Stern allegedly allowed Freeney to use the jet regularly for the cost of fuel as a gesture of goodwill and friendship.[119]  In fact, Stern purportedly did not own the aircraft and had used approximately $750,000 in funds misappropriated from Freeney's RG BofA account to lease it and pay pilots to fly it.[120]  BofA, Weinberg, and Stern allegedly misrepresented that Stern owned the aircraft and concealed the fact that he did not own it and had leased it using funds from the RG BofA account.[121]

### j. Freeney Purchases Life Insurance from Richard Weinberg

In July and August 2010, after Freeney was introduced to Richard, he purchased three whole life insurance policies with a total value of $55 million.[122]  Plaintiffs contend that the policies were selected by BofA, Weinberg, and Richard because of the high premiums they required Freeney to pay and the

---

[115]*Id.*, ¶ 147.

[116]*Id.*, ¶ 148.

[117]*Id.*

[118]*Id.*, ¶ 149.

[119]*Id.*, ¶¶ 150-51.

[120]*Id.*, ¶ 152-53.

[121]*Id.*, ¶¶ 154-55.

[122]*Id.*, ¶ 156.

high commissions Weinberg and Richard were going to earn.[123]  The first year the policies were in force, Freeney allegedly paid $510,000 in premiums; this purported generated approximately $450,000 in commissions for Richard that he allegedlyl shared with Weinberg.[124]  Weinberg and Richard purportedly allowed the policies to lapse in September or October 2011 upon learning that future premium payments would not result in further commissions for Richard.[125]

In an attempt to defraud Freeney, BofA, Weinberg, and Richard allegedly made various misleading representations to induce Freeney to purchase the policies and pay approximately $500,000 in premiums.  These included, *inter alia*, that Weinberg and her brother had experience and expertise selecting and purchasing insurance for investment purposes and that the purchase of the policies was in Freeney's financial interests.[126]  BofA, Weinberg, and Richard allegedly concealed Weinberg's and Richard's lack of experience selecting life insurance policies and Weinberg's alleged plan, with her brother, to share commissions on the sale of the policies.[127]

### k.    Weinberg and Stern Manage RSLA

Beginning in March 2010, BofA, Weinberg, and Stern purportedly made various false and misleading representations to Freeney and concealed certain facts to induce him to allow BofA, Weinberg, and Stern to assume management and control of RSLA and to allow Weinberg to become the *de facto* Chief Financial Officer ("CFO") of RG.[128]  Certain alleged misrepresentations and omissions concerned Stern's intention to invest in RLSA despite his inability to do so; Weinberg and Stern also represented that they would handle RSLA's operations notwithstanding their lack of ability

---

[123]*Id.*, ¶¶ 156-57.

[124]*Id.*, ¶¶ 160-61.

[125]*Id.*, ¶¶ 162-63.

[126]*Id.*, ¶ 158.

[127]*Id.*, ¶ 159.

[128]*Id.*, ¶¶ 164-65.

1    and intent to do so.[129]

2              **l.       Freeney Becomes the Sole Owner of RG**

3         After Freeney became a BofA client, BofA, Weinberg, and Stern purportedly urged him to

4    purchase the ownership stake of the two other owners of RG.[130]   As a result, and based on Sterns'

5    representations that he would invest in RSLA, Freeney allegedly authorized Stern and the Florida

6    Attorney to increase his ownership share in RG to 100%.[131]   Freeney allegedly agreed to buy other

7    owners' interests for $875,000, despite the fact that their shares were allegedly worthless given RSLA's

8    severe undercapitalization.[132]   Freeney asserts that Weinberg's and Stern's sole motivation in urging him

9    to buy out the other owners was to remove them from the day-to-day operation of RSLA to prevent them

10   from discovering their fraudulent  scheme.[133]

11             **m.      RG's Hiring and Termination of Sal and Stacy Feli**

12        In May 2010, after Freeney had become the sole owner of  in RSLA, Stern purportedly signed

13   a "Term Sheet" as "David M. Millar" on RG's behalf with Salvatore and Stacy Feli, and their company

14   SalandStacy Corp., to oversee RSLA's daily operations.[134]   The Term Sheet allegedly set forth the terms

15   of the Felis' five year employment, including their compensation and benefits.[135]   Plaintiffs allege that

16   the Felis' compensation was unreasonably high and that Weinberg and Stern hired them because they

17   believed it would be easier to continue the fraudulent scheme if the Felis oversaw RSLA's day-to-day

18   operations.[136]   Following execution of the Term Sheet, Freeney's legal counsel allegedly sought to

---

20        [129]*Id.*

21        [130]*Id.*, ¶ 167.

22        [131]*Id.*

23        [132]*Id.*, ¶¶ 168-72.

24        [133]*Id.*, ¶ 172.

25        [134]*Id.*, ¶ 173.

26        [135]*Id.*

27        [136]*Id.*, ¶¶ 174-75.

1    reduce the Felis' compensation; when the Felis would not agree to a reduction, RG purportedly

2    terminated their services.[137]  Weinberg allegedly insisted that the Felis' services be terminated; plaintiffs

3    assert this was due to the fact that the Felis had suggested RSLA's finances be audited by an outside

4    firm.[138]  Following their termination, the Felis allegedly sued RG, Freeney, Stern, and Weinberg for

5    breach of contract, fraud, conversion, breach of fiduciary duty, tortious interference with contract, and

6    an accounting.[139]  The lawsuit was purportedly settled in December 2012 on plaintiffs' agreement to pay

7    the Felis more than $825,000.[140]

8                        **n.      RG Opens an Account at BofA**

9            Plaintiffs allege, on information and belief, that at Weinberg's request, Josephine Del Campo,

10   a BofA Assistant Vice President, opened a BofA business checking account for RG in May 2010,

11   without necessary documentation or internal authorization to do so.[141]  Weinberg allegedly told Freeney

12   the account would be a temporary account to pay invoices associated with RSLA; based on this

13   representation, Freeney purportedly authorized BofA to transfer $200,000 from his personal accounts

14   to the RG account.[142]  Plaintiffs allege that Freeney never authorized the transfer of any other funds to

15   the RG account.[143]

16           Plaintiffs allege, on information and belief, that after opening the BofA RG account, Weinberg,

17   acting as a BofA employee, gave Stern confidential account information so that he could access the

18   account remotely and transfer funds from it without Freeney's knowledge.[144]   They assert, on

19

20   _____

         [137]*Id.*, ¶¶ 176-78.

21
         [138]*Id.*

22
         [139]*Id.*, ¶¶ 179-81.

23
         [140]*Id.*

24
         [141]*Id.*, ¶ 182.

25
         [142]*Id.*, ¶ 183.

26
         [143]*Id.*

27
         [144]*Id.*, ¶¶ 184-86.

28

1  information and belief, that Weinberg also asked Del Campo to remove a ninety day security hold on

2  certain wire transfers to and from the account that were made by Stern.[145]  BofA, Weinberg, and Del

3  Campo purportedly concealed from plaintiffs the fact that the account was not temporary, and that it was

4  opened to conceal the proceeds of Weinberg's and Stern's fraudulent scheme.[146]

5  ### o.    Weinberg Opens Citibank Accounts

6  In June 2010, Weinberg, allegedly acting as a BofA employee, purportedly opened two accounts

7  at Citibank in Freeney's name, using a signed power of attorney form.[147]  The following month,

8  Weinberg allegedly added herself as a signatory on the accounts.[148]  Plaintiffs allege, on information and

9  belief, that Weinberg gave Stern confidential account access information so that he could access the

10  Citibank accounts online and transfer funds to and from the accounts without Freeney's knowledge.[149]

11  ### p.    Defendants Create Global Wealth Management

12  Plaintiffs also assert, on information and belief, that beginning in February 2010, Bock and

13  Weinberg began to make plans for Weinberg to leave BofA and start her own company with Freeney

14  as a client.[150]  They contend, on information and belief, that Bock encouraged Weinberg to move to

15  California to form a company with a name similar to GWIM and assisted her move.[151]

16  On June 2, 2010, Weinberg, purportedly acting as a BofA employee, incorporated Global Wealth

17  Management, LLC ("GWM") in Delaware and opened a business checking account in GWM's name

18  at a Wells Fargo Bank branch in Los Angeles, California.[152]  One week later, Weinberg purportedly

19

20  [145]*Id.*, ¶ 187.

21  [146]*Id.*, ¶ 188.

22  [147]*Id.*, ¶ 189.

23  [148]*Id.*

24  [149]*Id.*, ¶¶ 190-91.

25  [150]*Id.*, ¶ 192.

26  [151]*Id.*, ¶¶ 193-94.

27  [152]*Id.*, ¶¶ 195-96.

28

signed a lease for a "virtual office" located at 8484 Wilshire Boulevard in Los Angeles, which offered telephone answering services, as well as mail receipt, sorting, and forwarding services.[153]  GWM was purportedly a sham entity that had no assets, employees, or legitimate business operations.[154]

Plaintiffs assert, on information and belief, that Bock and Weinberg selected the name GWM because it was similar to GWIM; they purportedly did so to create the false impression that Weinberg was still employed by BofA.[155]  Plaintiffs also contend, on information and belief, that BofA knew Weinberg had formed GWM.[156]  BofA, Bock, and Weinberg purportedly concealed the fact that GWM was not the same entity as GWIM and was not a division of BofA from Freeney.  They also allegedly concealed the fact that GWM had no employees and was created to promote Weinberg's and Stern's scheme to defraud Freeney.  Finally, they purportedly concealed the fact that Stern had access to mail of Freeney's that was forwarded through GWM's office address.[157]

### q.     The Purportedly Fraudulent Scheme Relocates to Los Angeles

In June 2010, Weinberg and Stern allegedly made plans to move from Miami Beach, Florida, to Los Angeles, California, so that they could continue their alleged fraud on Freeney.[158]  The complaint alleges that, after filing a false lease application, Weinberg and Stern moved into a house in Hancock Park, California, where they planned and implemented their fraudulent scheme.[159]

On June 10, 2010, Weinberg purportedly faxed a handwritten note to BofA in which she announced she would resign from the bank effective July 2010.[160]  BofA, Bock, and Liebman

---

[153]*Id.*, ¶ 197.

[154]*Id.*, ¶ 198.

[155]*Id.*, ¶ 199.

[156]*Id.*

[157]*Id.*, ¶ 200.

[158]*Id.*, ¶ 201.

[159]*Id.*, ¶¶ 202-05.

[160]*Id.*, ¶ 206.

purportedly concealed this fact from Freeney and made no effort to transition him to a different investment advisor after Weinberg's departure.[161]  Plaintiffs allege, on information and belief, that BofA, Bock, and Liebman never conducted an exit interview with Weinberg, documented why she was leaving, or asked her to sign a non-disclosure agreement.[162]  They also contend that BofA, Bock, and Liebman permitted Weinberg to function as Freeney's banker, financial advisor, and investment supervisor following her resignation in July 2010, making it appear that she was still employed by and an agent of BofA.[163]

In connection with Weinberg's relocation to Los Angeles, she and Bock purportedly agreed, as part of their marital settlement agreement, that Weinberg would pay Bock the first $100,000 of any amount that she recovered from Stern in repayment for Weinberg and Bock's loan to Stern.[164]  BofA, Bock, and Weinberg allegedly concealed this agreement from Freeney.[165]

### r. Purportedly Unauthorized Transfers to and from the BofA RG Account

Plaintiffs allege, on information and belief, that between June 2010 and October 2011, Weinberg deposited approximately $15.7 million – Freeney's salary from the Colts for the 2010 and 2011 NFL seasons – in the Citibank accounts.[166]  Weinberg also purportedly deposited Freeney's income tax refunds and proceeds from the liquidation of certain investments in the Citibank accounts.[167]  During the same period, BofA, Bock, and Liebman allegedly allowed Weinberg to continue to access Freeney's

---

[161]*Id.*, ¶ 207.

[162]*Id.*, ¶ 208.

[163]*Id.*, ¶¶ 209-10.

[164]*Id.*, ¶¶ 211-12.

[165]*Id.*, ¶ 212.

[166]*Id.*, ¶ 213.

[167]*Id.*, ¶¶ 214-15.

and RG's BofA accounts;[168] Stern purportedly transferred approximately $9.3 million from the Citibank accounts to the BofA RG account and $90,000 directly to GWM.[169]   In addition, Stern allegedly accessed Freeney's BofA RG account between June 2010 and October 2011 and made wire transfers totaling almost $8.5 million from that account, allegedly in furtherance of the fraudulent scheme.[170]

Weinberg and Stern purportedly used RSLA to conceal and disguise the actual purpose of these wire transfers; notations provided with the transfers suggested that they concerned RSLA business; plaintiffs assert that none of the purported payments were made for that purpose, however.[171]

### s.    The Liquidation of Freeney's Investments

Plaintiffs allege, on information and belief, that BofA, Bock, Weinberg, and Stern began to liquidate Freeny's investments in March 2010; this was purportedly done so that there would be sufficient liquid assets that Weinberg and Stern could misappropriate Freeney's funds without raising suspicions.[172]   The following investments were allegedly liquidated in furtherance of Weinberg and Stern's fraudulent scheme:[173]

(1)    Defendants purportedly sold Advisors Disciplined municipal bonds in March 2010 for approximately $490,000; $161,000 of this amount was purportedly transferred from the RG account to ARC;

(2)    Defendants purportedly negotiated the return of $441,000 of Freeney's $1.5 million principal from Success Trade in March 2010; $190,000 of this amount was allegedly transferred from the RG account to ARC;

(3)    Defendants purportedly negotiated the return of approximately $1.6 million in principal

---

[168]*Id.*, ¶ 216.

[169]*Id.*, ¶ 217.

[170]*Id.*, ¶¶ 218-20.

[171]*Id.*, ¶¶ 221-23.

[172]*Id.*, ¶¶ 224-25.

[173]*Id.*, ¶¶ 226-32.

from CFP in May 2010; the majority of these funds were allegedly transferred to ARC, GWM, and Stern;

(4)     Defendants purportedly surrendered Freeney's Pacific Life annuity in June 2010 for $1.5 million; $850,000 of this amount was purportedly transferred to Freeney's RG account;

(5)     Defendants purportedly liquidated Freeney's investment in American Realty In April 2011 for $195,000; Stern allegedly wire transferred more than $180,000 of this amount to ARC.

### t.     The Snap Advances Transactions

Plaintiffs allege, on information and belief, that in August 2011, BofA, Bock, Weinberg, and Stern liquidated almost all of Freeney's investments and depleted almost all of his available cash.[174]  As a result, Weinberg purportedly negotiated a $300,000 line of credit for RG from Snap Advances, a factoring company in Queens, New York.[175]  As consideration for the line of credit, Weinberg allegedly urged Freeney to provide a personal guaranty requiring that he pay Snap Advances $435,000.[176]  The following month, Weinberg allegedly negotiated a second $150,000 line of credit from Snap Advances on the same terms and conditions.[177]  Freeney allegedly had to pay approximately $215,000 in interest and costs on these credit advances.[178]  To convince him that the transactions were necessary, Weinberg purportedly concealed from Freeney the fact that the lines of credit were only necessary because BofA, Bock, Weinberg, and Stern had depleted Freeney's available cash and liquid assets.  They also allegedly concealed the fact that, if RG defaulted on the lines of credit, Freeney stood to lose more than $25 million because he had personally guaranteed RG's credit facilities.[179]

---

[174]*Id.*, ¶ 233.

[175]*Id.*, ¶ 234.

[176]*Id.*, ¶¶ 234-35.

[177]*Id.*, ¶ 237.

[178]*Id.*, ¶ 238.

[179]*Id.*, ¶ 239.

u.      **The W Hotel Investment**

In January 2006, Freeney purportedly entered into an agreement to purchase a penthouse condominium in a W Hotel being constructed in South Beach; Freeney paid $1.2 million of the $6.0 million purchase price at that time and was to pay the balance upon completion of construction.[180] Freeney's unit was allegedly completed in June 2009,[181] and Freeney hired a lawyer to negotiate certain issues related to purchase of the unit with the developer.[182]  In February 2010, BofA, Weinberg, and Stern purportedly promised to intervene in the ongoing negotiations so they could help Freeney obtain additional financing to complete the purchase or negotiate the return of his $1.2 million deposit.[183] Plaintiffs allege, on information and belief, that notwithstanding their promises, BofA, Weinberg, and Stern did nothing to help him close the sale or obtain a return of his deposit.[184]

v.      **The North Carolina Land Investment**

In December 2004, Freeney allegedly purchased 8.5 acres of undeveloped lakefront land in Mecklenburg County, North Carolina for investment purposes at a price of $1.53 million.[185]  In the intervening years prior to February 2010, Freeney allegedly made mortgage payments of $9,500 per month, and suffered substantial losses on the property.[186]  While trying to recruit Freeney as a client, BofA, Weinberg, and Stern told him that the investment was losing a great deal of money and that he should dispose of it.  They purportedly promised that they would dispose of the property for him.[187]  As a result, Freeney allegedly authorized Stern to negotiate a workout of the existing mortgage; BofA,

---

[180]*Id.*, ¶ 240.

[181]*Id.*, ¶¶ 241-42.

[182]*Id.*

[183]*Id.*, ¶¶ 244-45.

[184]*Id.*, ¶¶ 245-46.

[185]*Id.*, ¶¶ 247-48.

[186]*Id.*, ¶ 249.

[187]*Id.*, ¶ 250.

Weinberg, and Stern purportedly took no steps to do so, however.[188]  BofA also purportedly failed to pay Freeney's quarterly homeowner's association dues, notwithstanding the fact that it was responsible for paying his bills.[189]

### w.      Defendants' Purported Cover-Up

Beginning in 2011, BofA, Weinberg, and Stern purportedly took various steps to conceal and cover up their scheme to defraud Freeney.[190]  Among these were:[191]

(1)      Weinberg and Stern allegedly entered into a sham marriage in February 2011 so Weinberg could assert the spousal and marital communication privileges and refuse to testify against Stern in pending lawsuits;

(2)      Weinberg and Stern, allegedly in an attempt to redirect scrutiny after it became known that they were under investigation for fraud, accused Freeney's business associates of having stolen from him and fabricated account statements listing incorrect balances for each of Freeney's accounts;

(3)      Beginning in November 2011, Stern allegedly began to create fraudulent documents that exonerated him and Weinberg, including, *inter alia*, a forged "Business Management Engagement Letter" between Weinberg, on GWM's behalf, and Freeney;

(4)      In March 2012, Stern allegedly paid a confidential informant working with the Federal Bureau of Investigation ("FBI") to destroy a laptop hard drive that purportedly contained evidence incriminating him and Weinberg;

(5)      Following Stern's and Weinberg's arrests on March 23, 2012, they allegedly made false statements to the FBI in an attempt to cover up the fraudulent scheme.

### x.      Freeney Learns of Weinberg and Stern's Theft

In November 2011, Freeney allegedly became concerned that Weinberg was misusing funds in

---

[188]*Id.*, ¶¶ 251-52.

[189]*Id.*

[190]*Id.*, ¶ 254.

[191]*Id.*, ¶¶ 255-83.

the RSLA bank accounts.[192]  Four months later, in March 2012, he was shown account statements for the RG account that had been subpoenaed by the FBI, and purportedly learned for the first time that Weinberg and Stern had misappropriated funds from that account.[193]  In April 2012, Freeney allegedly retained counsel to investigate BofA's role in the fraudulent scheme.[194]  Despite Freeney's requests, BofA purportedly refused to cooperate by producing account records and other relevant documents; it allegedly articulated no reason for its refusal.[195]

> **y.     BofA's Allegedly Efforts to Cover Up Its Employees' Criminal Activities**

Plaintiffs allege, on information and belief, that despite the fact that hundreds of wire transfers totaling more than $17 million were made into and out of the BofA RG account during 2010 and 2011, BofA never filed a Suspicious Activity Report ("SAR") concerning the transactions.[196]  In addition, they assert, again on information and belief, that BofA never filed a SAR concerning Bock's, Weinberg's, or Stern's activities despite their apparently criminal nature.[197]

Notwithstanding its Financial Industry Regulatory Authority ("FINRA") reporting obligations, BofA also purportedly delayed filing a Form U4 reporting Freeney's complaints of wrongdoing against Bock, Liebman, and Del Campo, and ultimately filed such a report only because it was concerned that Freeney would sue it.[198]  Plaintiffs allege, on information and belief, that the Form U4's filed by BofA concerning Bock, Liebman, Del Campo, and Weinberg part of efforts to cover up its employees'

---

[192]*Id.*, ¶ 284.

[193]*Id.*, ¶¶ 284-85.

[194]*Id.*, ¶ 285.

[195]*Id.*

[196]*Id.*, ¶¶ 287-88.

[197]*Id.*

[198]*Id.*, ¶¶ 289-90.

1    criminal activities because they falsely stated that BofA had investigated Freeney's allegations.[199]

2    **z.      Mitigation of Losses and Tolling Agreements**

3         Plaintiffs allege that, following discovery of the fraudulent scheme, Freeney took steps to

4    mitigate his losses by, *inter alia*, closing RSLA, settling the dispute related to the condominium in the

5    W Hotel, and repaying the mortgage loan on the North Carolina investment property.[200]  They assert

6    that, prior to the filing of this action, the parties entered into a series of tolling agreements, pursuant to

7    which the statutes of limitations on the claims asserted in the complaint were tolled from September 19,

8    2013 to January 30, 2015.[201]

9    **aa.      Plaintiffs' Claims**

10        Based on the preceding facts, plaintiffs allege the following claims: (1) violation of the Racketeer

11   Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and 1964(c);[202] (2) civil RICO

12   conspiracy in violation of 18 U.S.C. §§ 1962(d) and 1964(c);[203] (3) violation of RICO, 18 U.S.C. §§

13   1962(b) and 1964(c);[204] (4) violation of RICO, 18 U.S.C. §§ 1962(c) and 1964(c);[205] (5) civil RICO

14   conspiracy in violation of 18 U.S.C. §§ 1962(d) and 1964(c);**[206]** (6) violation of California Penal Code

15   § 496;[207] (7) conspiracy to defraud;[208] (8) fraudulent misrepresentation and false promise;[209] (9)

16   ──────────────

17        [199]*Id.*, ¶ 291.

18        [200]*Id.*, ¶¶ 292-96.

19        [201]*Id.*, ¶ 297.

20        [202]*Id.*, ¶¶ 298-323.

21        [203]*Id.*, ¶¶ 324-27.

22        [204]*Id.*, ¶¶ 328-33.

23        [205]*Id.*, ¶¶ 334-36.

24        [206]*Id.*, ¶¶ 337-39.

25        [207]*Id.*, ¶¶ 340-49.

26        [208]*Id.*, ¶¶ 350-55.

27        [209]*Id.*, ¶¶ 356-60.

28

fraudulent concealment;[210] (10) negligent misrepresentation;[211] (11) aiding and abetting conversion;[212] (12) breach of fiduciary duty;[213] (13) aiding and abetting breach of fiduciary duty;[214] (14) professional negligence;[215] (15) negligent hiring, supervision, and retention;[216] and (16) negligent referral.[217]

## B.    Requests for Judicial Notice

### 1.    BofA's Request

BofA asks the court to take judicial notice of several documents.  In deciding a Rule 12(b)(6) motion, courts generally look only to the face of the complaint and documents attached thereto.  *Van Buskirk v. Cable News Network, Inc*., 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990).  A court must normally convert a Rule 12(b)(6) motion into a Rule 56 motion if it "considers evidence outside the pleadings. . . .  A court may, however, consider certain materials – documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice – without converting the motion to dismiss into a motion for summary judgment."  *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).  See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (a court may consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Branch v. Tunnell* 14 F.3d 449, 453 (9th Cir. 1994) (noting that a court may consider a document whose contents are alleged in a complaint, so

---

[210]*Id.*, ¶¶ 361-68.

[211]*Id.*, ¶¶ 369-73.

[212]*Id.*, ¶¶ 374-82.

[213]*Id.*, ¶¶ 383-87.

[214]*Id.*, ¶¶ 388-96.

[215]*Id.*, ¶¶ 397-401.

[216]*Id.*, ¶¶ 402-05.

[217]*Id.*, ¶¶ 406-09.

1   long as no party disputes its authenticity), overruled on other grounds by *Galbraith v. County of*

2   *Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

3       Thus, in deciding a motion to dismiss, a court can consider material that is the proper subject

4   of judicial notice under Rule 201 of the Federal Rules of Evidence.  FED.R.EVID. 201.  Under Rule

5   201, the court can judicially notice "[o]fficial acts of the legislative, executive, and judicial

6   departments of the United States," and "[f]acts and propositions that are not reasonably subject to

7   dispute and are capable of immediate and accurate determination by resort to sources of reasonably

8   indisputable accuracy."  Courts have held that "[j]udicial notice is appropriate for records and

9   'reports of administrative bodies.'"  *United States v. 14.02 Acres of Land More or Less in Fresno*

10  *County*, 547 F.3d 943, 955 (9th Cir. 2008) (quoting *Interstate Natural Gas Co. v. Southern*

11  *California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1954)).  The court can take judicial notice of the

12  regulation.  It is available at the federal register website, and neither party questions its authenticity.

13  Courts routinely take judicial notice of documents available on government websites because the

14  documents are not subject to reasonable dispute.  *In re Epogen & Aranesp Off Label Mktg. & Sales*

15  *Practices Litigation*, 590 F.Supp.2d 1282, 1286 (C.D. Cal. 2008) ("The Court grants DaVita's request

16  as to Exhibits 1-4, labels for Epogen that are publicly available on the FDA website, finding that the

17  labels are documents not subject to reasonable dispute"); *In re Amgen Inc. Securities Litigation*, 544

18  F.Supp.2d 1009, 1023 (C.D. Cal. 2008) (same).

19      First, BofA asks the court to notice a Merrill Lynch Client Relationship Agreement signed by

20  Freeney and dated February 11, 2010.  "A district court ruling on a motion to dismiss may consider a

21  document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily

22  relies." *Parrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th Cir.1998), superseded by statute on other grounds

23  as recognized in *Abrego Abrego v. The Dow Chem. Co.,* 443 F.3d 676, 681 (9th Cir. 2006). This is so

24  even if the plaintiff does not "explicitly allege the contents of th [e] document[s] in the complaint."

25  *Knievel v. ESPN,* 393 F.3d 1068, 1076 (9th Cir.2005) ("We have extended the 'incorporation by

26  reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document,

27  the defendant attaches the document to its motion to dismiss, and the parties do not dispute the

28  authenticity of the document, even though the plaintiff does not explicitly allege the contents of that

document in the complaint"). Here, the client agreement is essential to Freeney's claim, because but for the agreement, he would not have been a Merrill Lynch client, and thus these claims would never have arisen. Because Freeney does not dispute the authenticity of the document, the court will consider it under the incorporation by reference doctrine.[218] See *Singer ex rel. Singer v. Paul Revere Life Ins. Co.*, No. CV 14 08700 MMM MRWX, 2015 WL 3970284, *2 (C.D. Cal. June 30, 2015).

Second, BofA asks that the court notice two annual audit report forms X17A-5, which were filed with the Securities Exchange Commission on March 1, 2011 and March 2, 2015, respectively. Because the documents are on file with the SEC, they are judicially noticeable as undisputed matters of public record. See *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1064 n. 7 (9th Cir. 2008) ("Defendants sought judicial notice for Corinthian's reported stock price history and other publicly available financial documents, including a number of Corinthian's SEC filings. In its dismissal order, the court granted Defendants' unopposed requests for judicial notice. Metzler does not contest the propriety of the noticing of these documents on appeal, which in any event was proper"); *Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, 50 F.Supp.3d 1328, 1349 (C.D. Cal. 2014) ("Courts can consider securities offerings and corporate disclosure documents that are publicly available.").[219] The court therefore judicially notices the forms.[220]

### 2.   Freeney's Request

As discussed *infra*, Freeney requests that the court take judicial notice of a number of documents in support of a theory of relief not pled in his complaint. Because this is improper, the court declines to take judicial notice of the documents.

---

[218]Plaintiffs filed an objection to BofA's request for judicial notice, but it does not dispute the authenticity of the document. Because the court finds that plaintiffs' claims *do* depend on the client agreement, plaintiffs' objections lack merit and are overruled.

[219]Plaintiffs' objection to the SEC filings is discussed and rejected *infra*.

[220]BofA requests that the court notice a series of tolling agreements between plaintiffs and Merrill Lynch. The court does not rely on these documents and thus declines to judicially notice them.

## II.  DISCUSSION

**A.       BofA's Motion to Dismiss**

### 1.       Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint.  A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacific Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party.  *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

The court need not, however, accept as true unreasonable inferences or legal conclusions cast in the form of factual allegations.  See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").  Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . .  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); see also *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausible suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

### 2.       Whether BofA Is a Proper Defendant

#### a.       Merger Allegations

BAC and BANA first assert that they are not proper defendants because the complaint does not

plausibly plead that Weinberg, Bock, and Liebman were BofA employees.[221]  Plaintiffs allege that Bock and Weinberg "joined the M[errill Lynch] Coral Gables office" in April 2009.[222]  Freeney entered into a client relationship with Merrill Lynch, not either BofA entity.  The client relationship agreement he signed was with Merrill Lynch, not BANA or BAC.[223]  Plaintiffs concede in their complaint that BofA and Merrill Lynch were distinct entities; they contend, however, in "January 2009, [BofA] purchased Merrill Lynch [ ]for $50 billion, and [it] was merged into [BofA]."[224]  Plaintiffs assert, on information and belief, "that as a result of the purchase and merger, ML's employees, including its stock brokers and investment advisors, became [BofA] employees."[225]

The court does not find plaintiffs' allegation that "BofA" employed Weinberg, Bock, and Liebman plausible.  "It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  "Only in unusual circumstances will the law permit a parent corporation to be held either directly or indirectly liable for the acts of its subsidiary."  *Bowoto v. Chevron Texaco Corp*., 312 F.Supp.2d 1229, 1234 (N.D. Cal. 2004).  Here, "plaintiffs have failed to allege any facts from which [it can be] infer[red] that these exceptions apply," and do not argue that any of the traditional bases for disregarding corporate separateness, e.g., alter ego, apply.  See *IndyMac Mortgage Backed Sec. Litig*., 718 F.Supp.2d 495, 508 (S.D.N.Y. 2010); *Bowoto*, 312 F.Supp.2d at 1235 ("The party seeking to disregard the corporate form bears the burden of showing that there are good reasons for doing so").

Instead, plaintiffs allege that BofA purchased Merrill Lynch in 2009, and that Merrill Lynch then merged into BofA.  In essence, the complaint alleges that BofA is Merrill Lynch's successor-in-interest.  This is a mere legal conclusion.  See *Buchanan v. Neighbors Van Lines*, No. CV 10 6206 PSG (RCx),

---

[221]Motion at 4.

[222]Complaint, ¶ 87.

[223]See Lucas Decl., Exh. A ("Client Relationship Agreement") at 1.

[224]Complaint, ¶ 49.

[225]*Id*., ¶ 49.

1   2010 WL 4916644, *3 (C.D. Cal. Nov. 29, 2010) ("The only allegations made by Plaintiff – that 'at all

2   relevant times each of the Defendants was the agent, employee, [and] . . . successor-in-interest of each

3   of them, and of each other, and has, in such capacity or capacities, participated in the acts or conduct

4   alleged' in the Complaint – are nothing more than  legal conclusions of the type prohibited by *Iqbal* and

5   *Twombly.*  Plaintiff's argument that the conduct of Golden Hand is imputed to Neighbors therefore must

6   fail"); *In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F.Supp.2d at 508 ("The successor-in-interest

7   allegation, however, is nothing more than a legal conclusion without any factual amplification and so

8   is 'not entitled to the assumption of truth'"); see also *Ortiz v. Green Bull, Inc.*, No. CV 10-3747 ADS

9   ETB, 2011 WL 5554522, *9 (E.D.N.Y. Nov. 14, 2011) ("Plaintiff only alleges in the complaint the

10  legal conclusion that Werner is successor in interest to Green Bull"); *Sullivan v. Dollar Tree Stores, Inc*.,

11  No. CV 07-5020 EFS, 2008 WL 1730079, *3 (E.D. Wash. Apr. 10, 2008) ("As an initial matter, the

12  DOL's conclusion that Defendant is a successor in interest is a legal conclusion").  None of plaintiffs'

13  factual allegations plausibly suggests that BofA merged with and became Merrill Lynch's successor in

14  interest, or that Merrill Lynch ceased to exist as a going concern.  The complaint "instead predicates

15  B[of]A's liability solely on an [implied] allegation that it is a "*successor-in-interest* " to . . . Merrill[ ]

16  Lynch." *In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F.Supp.2d at 508.  As a result, the complaint

17  fails to state a plausible claim for relief against BofA.

18      Plaintiffs' conclusory allegations are especially problematic given the existence of case law

19  clearly noting that Merill Lynch and BANA "are wholly owned subsidiaries of [BAC]" and that Merrill

20  Lynch is "a completely separate entity."  *Stansell v. Rev. Armed Forces of Col*., 771 F.3d 713, 747-48

21  (11th Cir. 2014).  They are also contradicted by annual audit reports filed with the SEC on March 1,

22  2011 and March 2, 2015.[226]  Although judicial notice is limited to the "existence and contents of the SEC

23  filings, not the truth of information contained in them," *In re American Apparel, Inc. Shareholder Litig*.,

24  855 F.Supp.2d 1043, 1062 (C.D. Cal. 2012), the mere existence of the audit reports confirms that Merrill

25  Lynch continued to exist as a separate entity during the relevant time period.  Finally, the client

26  relationship agreement Freeney signed on February 11, 2010 – *after* Merrill Lynch allegedly merged

27

28      [226]Lucas Decl., Exhs. C and D (2010 and 2014 Merrill Lynch Annual Audit Reports).

with BofA – also contradicts the merger allegations; it states, in capital letters, that Merrill Lynch is a "wholly owned subsidiary of Bank of America Corporation."[227]   For these reasons as well, the allegations are deficient.  See *Oklahoma Firefighters Pension & Ret. Sys. v. Ixia ("Ixia II")*, No. CV 13-08440 MMM (SHx), 2015 WL 1775221, *39 (C.D. Cal. Apr. 14, 2015) ("Where a plaintiff's own allegations are contradicted by other documents and matters asserted, relied upon, or incorporated by reference by plaintiff in the complaint, the district court is not obligated to accept the complaint's allegation as true in deciding a motion to dismiss," citing *Collins v. Wells Fargo Bank,* No. CV 12 2284 PHX LOA, 2013 WL 3808097, *7 (D. Ariz. July 23, 2013) (in turn citing *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002)).

In point of fact, the complaint fails even to allege which BofA entity merged with and became the successor in interest to Merrill Lynch.  The complaint alleges that BofA (or "BOA" as it is described in the complaint) is two distinct entities, BANA and BAC.  Plaintiffs do not identify the entities between or among which the merger took place.  This too renders the merger allegations deficient, and requires dismissal of plaintiffs' claims against BANA and BAC.  *Walsh v. Kindred Healthcare*, 798 F.Supp.2d 1073, 1083 (N.D. Cal. 2011) ("Nor have Plaintiffs alleged facts to show how Hillhaven, Rossmoor LLC, or Smith Ranch LLC fit into this corporate structure and that they should be held liable for the acts of the other defendants or have the other defendants be held liable for their acts"); see also *Lewis v. County of San Diego*, No. 13 CV 2818 L JMA, 2014 WL 3527719, *6 (S.D. Cal. July 15, 2014) ("Plaintiffs vaguely lump all defendants together without providing any factual allegations that specify separate acts of O'Malley and Cline that would subject them to liability"); *Anthony v. Harmon*, No. CIV 09 2272 WBSKJM, 2009 WL 4282027, *2 (E.D. Cal. Nov. 25, 2009) ("A number of averments in plaintiffs' complaint certainly appear to have been made without *Iqbal* in mind.  For example, plaintiffs' allegations repeatedly lump defendants together, referring to them as 'Advisors,' and do not plead facts that plausibly suggest that each defendant is liable for the claims in the Complaint").

For the same reason, any assertion that Merrill Lynch employees were BofA employees is unavailing.  See *Richard v. Bell Atl. Corp.*, 946 F.Supp. 54, 59-60 (D.D.C. 1996) ("Given the plaintiffs'

---

[227]Client Relationship Agreement at 1.

earlier definition of the term 'Bell Atlantic,' the complaint in effect alleges that each plaintiff was or is employed not only by BAC, but also by each of the subsidiaries.  Such an allegation is nonsensical. Accordingly, the plaintiffs shall be ordered to file an amended complaint by the close of a sixty-day, limited discovery period, in which they identify each BAC subsidiary for which each named plaintiff worked or works"); see also *Blackwell v. Bank of Am. Corp.*, No. CV 12-02783 JMC, 2013 WL 2181040, *3 (D.S.C. May 20, 2013) (recommending dismissal where BAC "argue[d] that it should be dismissed from th[e] action because the plaintiff was not employed by it but was instead employed by Merrill Lynch, which is a wholly owned subsidiary of [BAC]" and "[t]he plaintiff state[d] in his complaint that he was employed 'by the defendant[, i.e., BAC,] in the Merrill Lynch branch located in Spartanburg'"); *Menashe v. Bank of N.Y.*, 850 F.Supp.2d 1120, 1135 (D. Haw. 2012) (concluding that allegations that "[a]s a successor in interest to Countrywide, Defendant[s] BOA and BAC have hired, directed and controlled the actions of Countrywide in its capacity as originator broker of the mortgage loan in this case" were insufficient to establish the existence of an employment relationship).

### b.    Plaintiffs' Opposition and the Joint Employer Theory

Plaintiffs dispute that BAC and BANA are not proper parties. In their opposition, plaintiffs disavow the merger theory, and assert that a "parent corporation (in this case, BAC) may be liable for the actions of the employees of a subsidiary (in this case, [Merrill Lynch]) if the parent is a joint employer."[228]  The Ninth Circuit's joint employer, or "economic reality" test, considers "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and  (4)  maintained  employment  records."    *Adedapoidle-Tyehimba  v.  Crunch,  LLC*  No. 13–cv–00225–WHO, 2013 WL 4082137, *4 (N.D. Cal. Aug. 9, 2013) (quoting *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), disapproved on other grounds in *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985)).  Plaintiffs allege no facts "in the complaint [that] would permit the court to assess any of these factors], . . . and it is axiomatic that 'a court may not look

---

[228]Opposition at 3; see also *id*. n. 1 ("Defendants assert that Plaintiffs' claims against BAC and BANA are premised on the Merger.  Not so.  The Complaint mentions the Merger only by way of background, not as a basis of liability").

1  beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a
2  defendant's motion to dismiss.'"  See *Ixia II*, 2015 WL 1775221 at *39 (quoting *Broam v. Bogan*, 320
3  F.3d 1023, 1026 n. 2 (9th Cir. 2003) (in turn citing *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194,
4  1197 n. 1 (9th Cir. 1998)).

5       Plaintiffs seek to circumvent the fact that they have pled no facts indicating that BAC and Merrill
6  Lynch are joint employers by asking that the court take judicial notice of twenty-seven documents, only
7  eighteen of which they cite or discuss.  Plaintiffs' attempt to amend their complaint through judicial
8  notice to include facts purportedly demonstrating joint employment is improper.  See *Oklahoma*
9  *Firefighters Pension & Ret. Sys. v. IXIA* ("*Ixia I*"), 50 F.Supp.3d 1328, 1350 (C.D. Cal. 2014)
10 ("Plaintiffs cannot utilize the [judicially noticeable] documents to amend the complaint and defeat
11 defendants' motions to dismiss"); *In re Turbodyne Technologies, Inc. Sec. Litig.*, No. CV
12 99–00697–MMM–BQRx, 2000 WL 33961193, *10 (C.D. Cal. Mar. 15, 2000) ("Plaintiffs' complaint
13 alleges much of the information contained in Exhibit Q, including Turbodyne's stock price on certain
14 days and the dates the stock's upward and downward price swings began.  The complaint lacks any
15 allegations regarding Turbodyne's daily trading volume, however, and plaintiffs clearly seek to have
16 the court take judicial notice of Exhibit Q to cure this omission.  In deciding a motion to dismiss, courts
17 may not 'take into account additional facts asserted in a memorandum opposing the motion to dismiss,
18 because such memoranda do not constitute pleadings under Rule 7(a).'  The effect of plaintiffs' request
19 that the court take judicial notice of Exhibit Q is the same, and the court declines to do so for that
20 reason" (internal citation omitted)); see also *Harrell v. United States*, 13 F.3d 232, 236 (7th Cir. 1993)
21 (party "cannot cure [pleading deficiencies] by inserting the missing allegations in a document that is not
22 either a complaint or an amendment").  Thus, the court need not address plaintiffs' joint employer
23 arguments.

24       It does so nonetheless, because even had the allegations in plaintiffs' opposition been pled in the
25 complaint, the claims against BofA would be deficient.  Plaintiffs' joint employer theory does not appear
26 to have application here, because the theory, and the case law plaintiffs cite in support of it, apply where
27 an employee seeks to hold multiple entities liable on labor law and ADEA and ADA claims.  See
28 *E.E.O.C. v. Pac. Mar. Ass'n*, 351 F.3d 1270, 1275 (9th Cir. 2003) (applying "joint employer" test in

1   Title VII case); *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 992-93 (6th Cir. 1997)

2   ("It is undisputed that Barnes & Noble, not TTU, was plaintiffs' direct employer.  Although a direct

3   employment relationship provides the usual basis for liability under the ADEA or ADA, courts have

4   fashioned various doctrines by which a defendant that does not directly employ a plaintiff may still be

5   considered an 'employer' under those statutes.  In one approach, courts examine whether two entities

6   are so interrelated that they may be considered a 'single employer' or an 'integrated enterprise.'  In

7   another approach, courts consider whether one defendant has control over another company's employees

8   sufficient to show that the two companies are acting as a 'joint employer' of those employees");

9   *Bonnette*, 704 F.2d at 1469 ("Two or more employers may jointly employ someone for purposes of the

10  [Fair Labor Standards Act].  All joint employers are individually responsible for compliance with the

11  FLSA.  Regulations issued by the Department of Labor give the following examples of joint

12  employment situations. . .."); *Rivas v. Federacion de Asociaciones Pecuarias de Puerto Rico*, 929 F.2d

13  814, 819-20 (1st Cir. 1991) ("In the labor relations context, the Supreme Court, in *Boire v. Greyhound

14  Corp.*, 376 U.S. 473, 480-81 (1964), recognized as an issue of fact whether an entity possesses sufficient

15  indicia of control over employees so as to constitute a 'joint employer' under § 9(c) of the NLRA, 29

16  U.S.C. § 159(c)").  Plaintiffs cite, and the court has located, no case in which a non-employee plaintiff

17  successfully held an entity vicariously liable on a joint employer theory.

18      Assuming *arguendo* the theory is viable in a situation such as this, a plaintiff seeking to hold

19  multiple entities liable as joint employers must plead specific facts that explain how the defendants are

20  related and how the conduct underlying the claims is attributable to each.  The opposition does not

21  contain such facts, however.  See *Adedapoidle-Tyehimba*, 2013 WL 4082137 at *5 ("Here, Mr.

22  Adedapoidle–Tyehimba has failed to allege facts sufficient to hold NEV and NEFC liable as his joint

23  employers.  As the Court previously noted, the allegations in paragraph 25 of the SAC (identical to the

24  allegations in paragraph 24 of the FAC) are imprecise and conclusory. The supplemental allegations in

25  paragraph 25 of the SAC do not cure these deficiencies.  Regarding NEV, the allegation that it focuses

26  on 'fitness clubs' says nothing about its relationship with Crunch, LLC or with Mr.

27  Adedapoidle–Tyehimba."); *U.S. E.E.O.C. v. Am. Laser Centers LLC*, No. CV 09-02247 AWI DLB,

28  2010 WL 3220316, *5 (E.D. Cal. Aug. 13, 2010) ("EEOC has not alleged any specific facts to support

1   its claim that the Defendants were alter egos, joint-employers, successors, or an integrated enterprise.

2   EEOC's allegation that the conduct at issue is attributable to all Defendants because each acted 'as a

3   successor, alter ego, joint employer, integrated enterprise, agent, employee . . .' or 'under the direction

4   and control of the others' is merely a conclusory allegation.  EEOC does not plead any specific factual

5   allegations that explain how the four Defendant companies are related to each other.  The Court is not

6   required 'to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or

7   unreasonable inferences'").

8           Plaintiffs assert only that the evidence they seek to have the court judicially notice demonstrates

9   that BAC owned, managed and oversaw, appointed directors, co-marketed, administered benefit plans

10  for, and was generally interdependent with Merrill Lynch.[229]  This is insufficient because general facts

11  concerning BAC's relationship with Merrill Lynch do not indicate whether it controlled the specific

12  individuals whose conduct is at issue here.  See *Doe I v. Wal Mart Stores, Inc*., 572 F.3d 677, 683 (9th

13  Cir. 2009) ("Here, Plaintiffs' allegations do not support the conclusion that Wal–Mart is Plaintiffs'

14  employer.  Plaintiffs' general statement that Wal–Mart exercised control over their day-to-day

15  employment is a conclusion, not a factual allegation stated with any specificity.  We need not accept

16  Plaintiffs' unwarranted conclusion in reviewing a motion to dismiss.  Plaintiffs allege specifically that

17  Wal–Mart contracted with suppliers regarding deadlines, quality of products, materials used, prices, and

18  other common buyer-seller contract terms.  Such supply contract terms do not constitute an 'immediate

19  level of day-to-day' control over a supplier's employees so as to create an employment relationship

20  between a purchaser and a supplier's employees"); *Adedapoidle-Tyehimba*, 2013 WL 4082137 at *5

21  ("The allegations as to NEV and NEFC lack sufficient facts to hold them liable under the FLSA.  Even

22  assuming that NEV and NEFC co-owned Crunch, LLC and played some role in the management or

23  oversight of Crunch, LLC's operations, Mr. Adedapoidle–Tyehimba must still plead *facts* addressing

24  the economic reality of his relationship to NEV or NEFC, for example indicating that they in any way

25  controlled his employment conditions or the nature of his work.  He does not.  A mere allegation that

26  a defendant co-owns the business where the plaintiff works does not, without more, establish the

27

28          [229]Opposition at 4-5.

economic reality of an employer-employee relationship for purpose of the FLSA.  Bare allegations that a defendant managed or oversaw a direct employer's operations are likewise insufficient").

Accordingly, even were the court permitted to consider arguments in plaintiffs' opposition that are not alleged in the complaint, it would conclude that BAC and BANA are not proper defendants. BofA's motion to dismiss must therefore be granted.[230]

**B.      Bock's Motion to Dismiss for Lack of Personal Jurisdiction**

**1.      Legal Standard Governing Motions to Dismiss Under Rule 12(b)(2)**

When a defendant moves to dismiss under Rule 12(b)(2), the plaintiff bears the burden of demonstrating that the court may properly exercise personal jurisdiction over the defendant.  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006); *Bohara v. Backus Hosp. Medical Benefit Plan*, 390 F.Supp.2d 951, 961 (C.D. Cal. 2005) (citing *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995)).  Absent formal discovery or an evidentiary hearing, the plaintiff need only make a *prima facie* showing that jurisdiction exists to survive a Rule 12(b)(2) motion to dismiss.  *Pebble Beach*, 453 F.3d at 1154; *Rio Properties, Inc. v. Rio International Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002); *Ziegler*, 64 F.3d at 473.

To make this showing, the plaintiff can rely on the allegations in its pleadings to the extent they are not controverted by the moving party.  See, e.g., *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001) ("Where not directly controverted, plaintiff's version of the facts is taken as true for the purposes of a 12(b)(2) motion to dismiss").  If defendants adduce evidence controverting the allegations, however, the plaintiff cannot rely on his pleadings, but must "'come forward with facts, by affidavit or otherwise, supporting personal jurisdiction.'"  *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986) (quoting *Amba Marketing Systems, Inc. v. Jobar International, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)).  "Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor."  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004); see also *American Telephone & Telegraph Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) ("In

---

[230]Because the court concludes that, as presently alleged, BANA and BAC are not proper parties, it declines to address their alternate argument that the claims against them are not adequately pled.

determining whether [the plaintiff] has met this burden, uncontroverted allegations in [the] complaint must be taken as true, and 'conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor for purposes of deciding whether a *prima facie* case for personal jurisdiction exists,'" quoting *WNS Inc. v. Farrow*, 884 F.2d 200, 203 (5th Cir. 1989)).

"The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Pebble Beach*, 453 F.3d at 1154-55 (citing *Fireman's Fund Ins. Co. v. Nat'l Bank of Coop.*, 103 F.3d 888, 893 (9th Cir. 1996)); see also *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 243 F.Supp.2d 1073, 1082 (C.D. Cal. 2003) (citing *Aanestad v. Beech Aircraft Corp.*, 521 F.2d 1298, 1300 (9th Cir. 1974)). Because California authorizes jurisdiction to the full extent permitted by the Constitution, see CAL. CODE CIV. PROC. § 410.10, the only question the court must ask here is whether the exercise of jurisdiction over Bock would be consistent with due process. *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003); *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1317 n. 2 (9th Cir. 1998).

To satisfy due process, a defendant must have sufficient "minimum contacts" with the forum state that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). There are two recognized bases for exercising personal jurisdiction over a nonresident defendant: (1) "general jurisdiction," which arises where defendant's activities in the forum are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over it in all matters; and (2) "specific jurisdiction," which arises when a defendant's specific contacts with the forum give rise to the claim in question. *Helicopteros Nacionales de Columbia S.A. v. Hall*, 466 U.S. 408, 414-16 (1984); *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1050-51 (9th Cir. 1997).

### 2.    Waiver

Plaintiffs assert that Bock waived his right to challenge personal jurisdiction by making a general appearance. Under Rule 12(h)(1) of the Federal Rules of Civil Procedure, a defendant waives any personal jurisdiction defense he might otherwise have if he does not raise it in a responsive pleading or in a motion to dismiss that precedes the responsive pleading. See

1   FED.R.CIV.PROC. 12(h)(1) ("A party waives any defense listed in Rule 12(b)(2)-(5) by: (A) omitting

2   it from a motion in the circumstances described in Rule 12(g)(2); or (B) failing to either: (i) make

3   it by motion under this rule; or (ii) include it in a responsive pleading or in an amendment allowed

4   by Rule 15(a)(1) as a matter of course").  Although "Rule 12(h)(1) specifies the minimum steps that

5   a party must take in order to preserve a defense," it does not follow "that a party's failure to satisfy

6   those minimum steps constitutes the only circumstance under which a party will be deemed to have

7   waived a defense." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1318 (9th Cir.1998).  A court

8   can find that a defendant has waived a personal jurisdiction defense if its litigation conduct amounts

9   to "deliberate, strategic behavior" or "sandbagging," e.g., "raising the issue of personal jurisdiction

10  on a motion to dismiss, deliberately refraining from pursuing it any further when [the] motion is

11  denied in the hopes of receiving a favorable disposition on the merits, and then raising the issue

12  again on appeal only if [defendant] were unhappy with the district court's ultimate decision." *Id.*

13       A defendant's election to remove a case to federal court does not waive a personal jurisdiction

14  defense.  See *Nationwide Eng'g & Control Sys. v. Thomas*, 837 F.2d 345, 347-48 (8th Cir. 1988)

15  ("[r]emoval, in itself, does not constitute a waiver of any right to object to lack of personal

16  jurisdiction"); *Fields v. Sedgwick Associated Risks, Ltd.*, 796 F.2d 299, 300-01 (9th Cir.1986)

17  (dismissing a removed federal action for lack of personal jurisdiction); *Team Enterprises, LLC v. W. Inv.*

18  *Real Estate Trust*, No. CV 08-1050LJOSMS, 2008 WL 4367560, *2 (E.D. Cal. Sept. 23, 2008) ("A

19  defendant's choice to first remove an action to federal court before seeking to challenge personal

20  jurisdiction does not constitute a waiver of objections to personal jurisdiction"); *Dielsi v. Falk*, 916

21  F.Supp. 985, 994 (C.D. Cal. 1996) ("a defendant does not waive jurisdictional challenges by removing

22  the case to federal court"); see also *Webb v. Sitzes*, 82 F.3d 424, 1996 WL 169298, *3 (9th Cir. Apr. 10,

23  1996) (Unpub. Disp.) ("The district court properly held that the motion to remove did not waive the

24  objection to personal jurisdiction").

25       Plaintiffs contend that Bock waived any right to challenge personal jurisdiction by filing a notice

26  of related cases that sought to have this case transferred from the calendar of Judge Gary Klausner to

27  this court; filing two stipulations asking that the court continue the deadline for the filing of a response

28  to the complaint; and filing a notice of appearance designating Paul S. Malingagio as his counsel of

record and requesting that additional attorneys be admitted *pro hac vice*.[231]   None of these actions

constitutes a waiver under Rule 12(h)(1).  Bock's conduct does not amount to "deliberate, strategic

behavior" or "sandbagging" designed to seek affirmative relief from the court.  See *Peterson*, 140 F.3d

at 1318.  Indeed, in the notice of removal, Bock specifically reserved the right to seek dismissal for lack

of personal jurisdiction.[232]

Courts, moreover, have repeatedly and consistently rejected waiver arguments similar to those

raised by plaintiffs.  Bock's "counsels' filing of initial appearances or motions for admission *pro hac*

*vice* are not the defensive moves in which a waiver of personal jurisdiction can occur."  See *Springer*

*v. Balough*, 96 F.Supp.2d 1250, 1256 (N.D. Okla. 2000); see also *Coe v. Philips Oral Healthcare Inc*.,

No. C13–518–MJP, 2014 WL 585858, *2 (W.D. Wash. Feb. 14, 2014) (holding that defendant's entry

of a notice of appearance before filing a motion to dismiss did not constitute a waiver of personal

jurisdiction objections); *Martin v. United States*, No. CV 13-03130, 2014 WL 3493233, *3 (C.D. Ill.

July 14, 2014) (filing a notice of appearance and motion for extension of time to answer did not

constitute a waiver if the defense was preserved in the first responsive pleading or pre-pleading motion

filed).  Second, "a motion to extend time to respond gives no hint that the answer will waive personal

jurisdiction defects, and is probably best viewed as a holding maneuver while counsel consider how to

proceed."  See *Benny v. Pipes*, 799 F.2d 489, 493 (9th Cir. 1986) (defendant did not waive personal

jurisdiction challenge by filing three stipulations to extend time); *Heller v. Cepia, LLC*, No. CV 11-

01146 JSW, 2012 WL 13572, *10 (N.D. Cal. Jan. 4, 2012) ("A–Tech and The Bean filed a stipulation

to extend the time for them to respond to Heller's complaint. Although it would have been a better

practice had they specifically stated that they were not waiving any affirmative defenses, it would be

a harsh result if the Court were to find the filing of this stipulation constituted a general appearance.  The

---

[231]Notice of Related Case, Docket No. 4 (Mar. 31, 2015); Stipulation to Extend Time to Respond, Docket No. 9 (Apr. 2, 2015); Notice of Appearance, Docket No. 13 (Apr. 8, 2015); Stipulation to Extend Time to Respond, Docket No. 20 (Apr. 30, 2015).

[232]Removal at 5 ("By removing this case to federal court, defendants do not consent to personal jurisdiction, do not concede that this Court is a convenient forum, and do not waive any of their defenses or objections under Federal Rule of Civil Procedure 12(b) or otherwise, including their right to have this dispute arbitrated or decided by other means of alternative dispute resolution").

1  filing of this stipulation did not demonstrate a 'clear purpose to defend the suit'").  Finally, filing a

2  notice of related case, which Bock did with BofA, was required under the Local Rules,[233] and does not

3  evidence an effort to secure affirmative relief from the court.

4  As a consequence, the court concludes that Bock did not waive his right to challenge personal

5  jurisdiction by filing a Rule 12(b)(2) motion.

6  ### 3.  General Jurisdiction

7  A court can exercise general jurisdiction over a defendant if the defendant's contacts with the

8  forum are "substantial" or "continuous and systematic."  *International Shoe Co.*, 326 U.S. at 316; *Data

9  Disc, Inc. v. Systems Technology Assocs., Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1977); see also

10 *Schwarzenegger*, 374 F.3d at 801 (plaintiff must show that defendant engaged in "'continuous and

11 systematic general business contacts' that 'approximate physical presence' in the forum state," quoting

12 *Helicopteros*, 466 U.S. at 416; *Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d 1082, 1086

13 (9th Cir. 2000)).  "The standard is met only by 'continuous corporate operations within a state [that are]

14 thought so substantial and of such a nature as to justify suit against [the defendant] on causes of action

15 arising from dealings entirely distinct from those activities.'"  *King v. American Family Mutual Ins. Co.*,

16 632 F.3d 570, 579 (9th Cir. 2011) (quoting *International Shoe Co.*, 326 U.S. at 318).  When properly

17 invoked, general jurisdiction allows a federal court to hear *any* cause of action, even one unrelated to

18 defendant's activities in the state.  See *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 445

19 (1952).

20 To determine if a defendant's activities in the forum are "continuous and systematic" or

21 "substantial," the court must examine all of his activities impacting the state.  See *Helicopteros*, 466

22 U.S. at 411; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980); *Perkins*, 342 U.S.

23

24 [233]CA CD L.R. 83-1.3.1 ("At the time a civil action (including a notice of removal or bankruptcy

25 appeal) is filed, or as soon as known thereafter, the attorney shall file and serve on all parties who have appeared a Notice of Related Case(s), stating whether any action previously filed or currently pending

26 in the Central District and the action being filed appear: (a) To arise from the same or a closely related transaction, happening or event; or (b) To call for determination of the same or substantially related or

27 similar questions of law and fact; or (c) For other reasons would entail substantial duplication of labor if heard by different judges; or (d) To involve the same patent, trademark or copyright, and one of the

28 factors identified above in a, b or c is present").

at 445-49.   "Factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." *Bancroft & Masters*, 223 F.3d at 1086 (citing *Hirsch v. Blue Cross, Blue Shield*, 800 F.2d 1474, 1478 (9th Cir. 1986)); *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1224 (9th Cir. 2011) ("To determine whether a nonresident defendant's contacts are sufficiently substantial, continuous, and systematic, we consider their '[l]ongevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets,'" quoting *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1172 (9th Cir. 2006)).

Bock contends that even specific jurisdiction is lacking because he has no contacts with California.  *A fortiori*, therefore, he asserts that the court cannot exercise general jurisdiction over him because his contacts fall far short of "continuous and systematic" and do not "approximate physical presence" in California.  See *Bancroft & Masters*, 223 F.3d at 1086.  Plaintiffs do not contend that the court can exercise general jurisdiction over Bock.  Given the paucity of allegations and evidence, and plaintiffs' failure to argue that the court can exercise general jurisdiction over Bock, the court considers only whether it is appropriate to exercise specific jurisdiction over him.  See, e.g., *Ziegler*, 64 F.3d at 473 ("There are two types of personal jurisdiction: general and specific.  General jurisdiction exists if the nonresident's contacts with the forum are continuous and systematic, and the exercise of jurisdiction satisfies 'traditional notions of fair play and substantial justice.'  *Ziegler does not contend that the district court had general jurisdiction; [therefore,] only specific jurisdiction is at issue*" (citations omitted and emphasis added)); *Abokasem v. Royal Indian Raj International Corp.*, No. C-10-01781 MMC, 2010 WL 635222, *2 n. 3 (N.D. Cal. Feb. 11, 2011) ("General jurisdiction typically requires 'continuous and systematic general business contacts' with the forum.  Plaintiffs do not argue the RIRIC defendants are subject to general personal jurisdiction"); *Allstar Marketing Group, LLC v. Your Store Online, LLC*, 666 F.Supp.2d 1109, 1118 (C.D. Cal. 2009) ("Plaintiffs assert conclusorily that defendants are subject to general jurisdiction.  The analysis in their opposition to defendants' motion addresses specific jurisdiction only, however.  Therefore, the court considers only whether specific jurisdiction exists"); *American Auto Ass'n, Inc. v. Darba Enterprises, Inc.*, No. C 09-00510 SI, 2009 WL 1066506, *3 (N.D. Cal. Apr. 21, 2009) ("Because plaintiff argues only that specific jurisdiction is warranted, the

Court does not address whether general jurisdiction would be appropriate here"); *Nissan Motor Co., Ltd. v. Nissan Computer Corp.*, 89 F.Supp.2d 1154, 1158 (C.D. Cal. 2000) ("In this case, the plaintiffs do not argue that the Court has general personal jurisdiction over the defendant.  Moreover, there is no evidence that the defendant has 'substantial' or 'continuous and systematic' contacts with California. The defendant has offices and employees only in North Carolina, offers only local Internet access, and apparently limits its sales and advertising to the East Coast.  Accordingly, the Court finds that the plaintiffs have not established a basis for general personal jurisdiction over the defendant"); *Colt Studio, Inc. v. Badpuppy Enterprise*, 75 F.Supp.2d 1104, 1109 n. 3 (C.D. Cal. 1999) (noting that "[p]laintiffs do not argue that defendants' contacts with the state are so substantial, continuous, and systematic . . . as to render any of the defendants subject to general personal jurisdiction in this forum," and considering only whether defendants were subject to specific jurisdiction).[234]

### 4.    Specific Jurisdiction

The Ninth Circuit applies a three-prong test to determine whether a court can exercise specific jurisdiction over a defendant:

---

[234]The conclusion that general jurisdiction is lacking is reinforced by the fact that the Supreme Court has upheld general jurisdiction only once, in a case involving contacts that were much more comprehensive than those present here.  See *Perkins*, 342 U.S. at 437.  The Ninth Circuit has commented that "the *Perkins* holding that the cause of action need not arise out of the defendant's activities in the forum is limited to its unusual facts," *Congoleum Corp. v. DLW Aktiengesellschaft*, 729 F.2d 1240, 1242 (9th Cir. 1984), and has regularly declined to find general jurisdiction even where a defendant's contacts with the forum were extensive, see, e.g., *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 381 (9th Cir. 1990) (holding that a cruise line's contacts were insufficient to support the exercise of general jurisdiction by a Washington court despite the fact that it had advertised in the local media, mailed brochures and paid commissions to travel agents in the state, conducted promotional seminars there, and obtained 1.06% to 1.29% of its business from the state), rev'd on other grounds, 499 U.S. 585 (1991); *Cubbage v. Merchent*, 744 F.2d 665, 667-68 (9th Cir. 1984) (holding that a California court could not exercise general jurisdiction over Arizona doctors despite the fact that a significant number of the doctors' patients came from California, the doctors received Medi-Cal numbers from California to secure reimbursement from the state for services to eligible patients, and maintained a white page listing in California); see also *Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.*, 1 F.3d 848, 851 n. 3 (9th Cir. 1993) ("The Supreme Court has upheld general jurisdiction only once, in a case involving contacts significantly more comprehensive than those presented here. . . .  We have stated that 'the *Perkins* holding that the cause of action need not arise out of the defendant's activities in the forum is limited to its unusual facts,' . . . and regularly have declined to find general jurisdiction even where the contacts were quite extensive").

"'(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.'" *Schwarzenegger*, 374 F.3d at 802 (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).

The plaintiff bears the burden of satisfying the first two prongs of this test. *Id.* If it does, "the burden then shifts to the defendant[s] to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

"Purposeful availment analysis examines whether the defendant's contacts with the forum are attributable to his own actions or are solely the actions of the plaintiff." *Sinatra v. Nat'l Enquirer*, 854 F.2d 1191, 1195 (9th Cir. 1988). To demonstrate purposeful availment, plaintiffs must show that Bock "engage[d] in some form of affirmative conduct allowing or promoting the transaction of business within the forum state." *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990) (citing *Shute*, 897 F.2d at 381); see also *Burger King*, 471 U.S. at 475 ("This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, . . . or of the 'unilateral activity of another party or a third person. . .'"). Bock's contacts must be such that he should "reasonably [have] anticipate[d] being haled into court [ ]here." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Courts distinguish between contract and tort cases in assessing whether a defendant has purposefully availed itself of the benefits of conducting activities in the forum. See *Roth v. Garcia-Marquez*, 942 F.2d 617, 621 (9th Cir. 1991); see *Schwarzenegger,* 374 F.3d at 802 (noting that "purposeful availment" is often used "in shorthand fashion, to include both purposeful availment and purposeful direction[, the jurisdictional test in tort cases.] [B]ut availment and direction are, in fact, two distinct concepts").

48

Purposeful availment analysis is most often used in suits sounding in contract." *Schwarzenegger,* 374 F.3d at 802.  The fact that the defendant entered into a contract with a forum resident, standing alone, is not sufficient to establish purposeful availment. See *Burger King,* 471 U.S. at 478; *Gray & Co.*, 913 F.2d at 760; *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990).  Rather, the court must utilize "a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.' . . .  It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King*, 471 U.S. at 479.

In tort cases, by contrast, courts can exercise jurisdiction over defendants who have engaged in an act that is purposefully directed at, and has an effect in, the forum state, even if the act itself takes place outside state boundaries.  See *Schwarzenegger,* 374 F.3d at 802-03.  The Supreme Court recently clarified that "although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State – either by the defendant in person or through an agent, goods, mail, or some other means – is certainly a relevant contact."  *Walden v. Fiore*, __ U.S. __, 134 S. Ct. 1115, 1122 (2014).  As a result, it stated, "a 'mere injury to a forum resident is not a sufficient connection to the forum.'  Rather, 'an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State.'"  *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (quoting *Walden*, 134 S. Ct. at 1122).  This is because "'minimum contacts' analysis looks to the *defendant's* contacts with the forum State itself, not the defendant's contacts with persons who reside there."  *Walden*, 134 S. Ct. at 1122 (emphasis added); *id.* at 1123 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State").  Thus, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  *Id*. at 1123.

Applying this general principle, the Court explained that the purposeful direction or "effects test" enunciated in *Calder v. Jones*, 465 U.S. 783 (1984), reflected the fact that

49

"the reputation-based 'effects' of the alleged libel [in that case] connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to (and read and understood by) third persons. Accordingly, the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens. Indeed, because publication to third persons is a necessary element of libel, the defendants' intentional tort actually occurred in California. In this way, the 'effects' caused by the defendants' article – i.e., the injury to the plaintiff's reputation in the estimation of the California public – connected the defendants' conduct to California, not just to a plaintiff who lived there. That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction."

*Walden*, 134 S. Ct. at 1123 (citations omitted).

As noted, the complaint alleges twelve claims, all of which sound in tort. Neither party disputes that the purposeful direction test applies. The court must therefore examine whether it can be said that Bock purposefully directed his activities toward California such that his contacts with the state make it proper to exercise personal jurisdiction over him in this forum.

"In analyzing whether a court has specific personal jurisdiction over a tort claim, [the Ninth Circuit applies a] three-part 'effects' test derived from *Calder*[, . . .] 465 U.S. 783. . . . Under this test, a defendant purposefully directed his activities at the forum if he: '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *Picot*, 780 F.3d at 1213-14 (citations omitted). As both the Supreme Court and Ninth Circuit have recently clarified, "applying this test, [courts] must 'look[ ] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" *Id.* at 1214 (quoting *Walden*, 134 S. Ct. at 1122). The parties' arguments focus principally on the express aiming requirement.

### a.      Whether the Fraud Was Aimed at California

Plaintiffs contend the allegations in the complaint readily demonstrate that Bock, Weinberg, and Stern were part of an elaborate scheme to defraud Freeney, which began in January 2010 and continued until Stern's and Weinberg's arrests in March 2012.[235]   In their opposition, they assert that Bock was "instrumental in helping Weinberg move to Los Angeles, take Freeney with her as a client, set up the sham company she used to perpetuate the fraud, carry on the ruse that she was still affiliated with [BofA], and escape detection until after she had defrauded plaintiffs out of several million dollars."[236] The complaint, however, does not contain such allegations.   Most of the paragraphs of the complaint plaintiffs cite do not involve Bock.   Of those that do, only paragraphs 192 and 193 even arguably allege that Bock directed any conduct towards California.[237]   Paragraph 192 pleads that "Bock (acting in his capacity as a [BofA] employee and agent) encouraged Weinberg to move to California and form a new company with a name similar to 'Global Wealth and Investment Management.'"[238]   The court notes, initially, that other allegations indicate that GWIM was formed on June 2, 2010,[239] preceding Weinberg's move to California in "mid-June."[240]   Thus, the fact that Bock allegedly helped Weinberg create GWIM is not, in and of itself, evidence of contacts with California.   The fact he encouraged her to move to California may be, however, and is addressed in tandem with the allegations in paragraph 193.

Paragraph 193 alleges the contents of filings *by Weinberg* in Bock's and Weinberg's divorce

---

[235]Complaint, ¶ 5, 10, 12.

[236]PJ Opposition at 26.

[237]The opposition cites paragraphs 10, 12, 149, 165, 192-193, 199-200, 207-210, 216, 225. Paragraphs 10 and 12 are background paragraphs that discuss the alleged fraudulent scheme; they make no mention of California and reference only "Bock's team," not Bock himself.   Paragraph 149 mentions Weinberg's move to California, but does not mention Bock.   Paragraph 165 contains no reference to Bock.   None of paragraphs 199-200, 207-210, 216 or 225 link any conduct to California.   They merely provide background on the fraud.

[238]Complaint, ¶ 192.

[239]*Id.*, ¶ 195.

[240]*Id.*, ¶ 204.

proceedings.  It pleads that Weinberg represented that her "relocation to Los Angeles was carefully planned with major input from [Bock]"; that "[Bock] was also instrumental in [Weinberg's] resignation from [Merrill Lynch] and start-up of her own company because he stressed to her that relocating to Los Angeles would be good for her business as there [were] great business opportunit[ies] to be found there"; that "[Bock] further told her that because he [was] a stock broker at Merrill Lynch, he [could] work out of any office so he would be in Los Angeles, California at least once a month"; and that "[Bock] . . . helped [Weinberg] design her business plan/strategize [Bock]'s future business goals for her in California."

Notably, the complaint does not allege that Bock made any of these statements; it asserts that Weinberg made them about Bock.  In an effort to impute the statements to Bock, plaintiffs allege that he "did not dispute any of these statements in the responsive papers he filed in the divorce proceedings."[241] The documents *plaintiffs* proffer in opposition to the motion to dismiss, however, make clear that Bock did dispute the allegations.  In an emergency motion to prevent the travel out of state of the couple's minor children filed August 4, 2010, Bock sought an order preventing Weinberg from moving to California with their three children.[242]  In the pleading, he contended that he came "to learn only through his children that [Weinberg] intend[ed] to imminently take the children to California on a pre-planned trip."[243]  He stated that he "harbor[ed] deep misgivings with respect to any proposed move and the thousands of miles that would be placed between him and his children."[244]  This suggests that Bock did dispute Weinberg's statements in her divorce filings that he was the impetus for her move to California.

Moreover, even if Bock encouraged Weinberg to move to California, there are no allegations – conclusory or otherwise – that show Bock knew Weinberg was moving to California to engage in a fraudulent scheme.  Merely encouraging Weinberg to move to California does not rise to the level of

[241]Complaint, ¶ 194.

[242]Exh. 3 (Emergency Motion to Prevent Out of State Travel).

[243]*Id.* at 1.

[244]*Id.* at 2.

1   purposeful direction.  "Due process requires that a defendant be haled into court in a forum State based

2   on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he

3   makes by interacting with other persons affiliated with the State."  *Walden*, 134 S. Ct. at 1123.  Stated

4   differently, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient

5   basis for jurisdiction."  *Id.*

6          The Supreme Court's recent decision in *Walden* is instructive.  There, the Court determined that

7   a police officer's search of respondents and his seizure of U.S. currency in Georgia did not provide a

8   basis for exercising personal jurisdiction over him in Nevada.  The Court concluded that even if the

9   officer caused harm to respondents in Nevada knowing that they lived there, that fact alone did not

10  confer jurisdiction.  *Id.* at 1124.  It noted that it was

11         "undisputed that no part of petitioner's course of conduct occurred in Nevada.  Petitioner

12         approached, questioned, and searched respondents, and seized the cash at issue, in the

13         Atlanta airport.  It is alleged that petitioner later helped draft a 'false probable cause

14         affidavit' in Georgia and forwarded that affidavit to a United States Attorney's Office

15         in Georgia to support a potential action for forfeiture of the seized funds.  Petitioner

16         never traveled to, conducted activities within, contacted anyone in, or sent anything or

17         anyone to Nevada.  In short, when viewed through the proper lens – whether the

18         *defendant's* actions connect him to the *forum* – petitioner formed no jurisdictionally

19         relevant contacts with Nevada."  *Walden*, 134 S. Ct. at 1124.

20  In so concluding, the Supreme Court expressly rejected the approach of the Court of Appeals, which

21  "shift[ed] the analytical focus from petitioner's contacts with the forum to his contacts with respondents.

22  Rather than assessing petitioner's own contacts with Nevada, the Court of Appeals looked to petitioner's

23  knowledge of respondents' 'strong forum connections.'"  *Id.* at 1125.  The Court explained that this

24         "approach to the 'minimum contacts' analysis impermissibly allows a plaintiff's contacts

25         with the defendant and forum to drive the jurisdictional analysis.  Petitioner's actions in

26         Georgia did not create sufficient contacts with Nevada simply because he allegedly

27         directed his conduct at plaintiffs whom he knew had Nevada connections.  Such

28         reasoning improperly attributes a plaintiff's forum connections to the defendant and

53

makes those connections 'decisive' in the jurisdictional analysis.   It also obscures the reality that none of petitioner's challenged conduct had anything to do with Nevada itself." *Id.* at 1125.

*Walden* controls the disposition of Bock's motion.   The only allegations in the complaint indicating that Bock engaged in the fraudulent scheme concern misstatements and omissions "[i]n the course of recruiting Mr. Freeney to become a [BofA] client."[245]   There is no dispute that Freeney "open[ed] a brokerage account at Merrill Lynch in Miami, Florida at a time when [he] was a resident of Indiana."[246]   Moreover, Bock has submitted a declaration stating that he "traveled [to California] periodically [after Weinberg moved there in 2010] for the main purpose of visiting [his] children until March 2012 when they moved back to South Florida"; he asserts that his "visits to California did not in any way involve Mr. Freeney, his restaurant, his work with Ms. Weinberg or anything to do with" Freeney.[247]   There are no allegations or evidence before the court suggesting otherwise.   Thus, as alleged, none of the purported fraud in which Bock engaged connected him to California.

*Walden* mandates that courts determine whether they can exercise personal jurisdiction by "look[ing] to the defendant's contacts with the forum State itself, *not the defendant's contacts with persons who reside there*."   134 S. Ct. at 1122 (emphasis added); *Bixby v. KBR, Inc.*, 603 Fed. Appx. 605, 606 (9th Cir. May 14, 2015) (Unpub. Disp.) ("The district court reasoned that the defendants had 'expressly aimed' their conduct at Oregon because they 'knew the persons to whom they intentionally directed their misrepresentations and failures to disclose were soldiers of the Oregon National Guard.' *Walden*, which was decided while this case was pending on appeal, makes clear that the personal jurisdiction analysis 'looks to the defendant's contacts with the forum State itself, *not the defendant's contacts with persons who reside there*.'   After *Walden,* it is clear that 'the plaintiff cannot be the only link between the defendant and the forum.'   Because the district court expressly found that the plaintiffs are the only link between KBR and Oregon, we hold that the defendants are not subject to personal

[245]Complaint, ¶¶ 103-104, 106-109.

[246]Declaration of Michael J. Bock, Docket No. 41 (July 6, 2015).

[247]*Id.*, ¶ 8.

jurisdiction in Oregon for their actions in Iraq"); *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc*., 751 F.3d 796, 802 (7th Cir. 2014) ("The district court also thought personal jurisdiction proper because Real Action knew that Advanced Tactical was an Indiana company and could foresee that its misleading emails and sales would harm Advanced Tactical in Indiana. *Walden*, however, shows the error of this approach.  There the defendant knew that the plaintiffs were going to Nevada, and it was foreseeable that they would want the use of their money there, but the Court squarely rejected this as a permissible basis for jurisdiction.  The 'mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction.'  The relation between the defendant and the forum 'must arise out of contacts that the "defendant himself" creates with the forum State'"); *Pelican Commc'ns, Inc. v. Schneider*, No. CV-14-4371 EMC, 2015 WL 527472, *3 (N.D. Cal. Feb. 6, 2015) (" Based on the record before the Court, Mr. Schneider's contact with California appears to be random or fortuitous – i.e., resulting simply because Pelican happens to be a California resident.  Nothing in the complaint establishes the kind of contact with California (as opposed to mere contact with a California resident) required by *Walden*"); *Tresona Multimedia LLC v. Legg,* No. CV–14–02141–PHX–DGC, 2015 WL 470228, *3 (D. Ariz. Feb. 4, 2015) (post-*Walden* "personal jurisdiction does not exist merely because a defendant engages in wrongful conduct targeted at a plaintiff whom the defendant knows to be located in a particular state").

The Ninth Circuit recently applied the "the principles of Walden" in *Picot*, and determined that specific jurisdiction was lacking because defendant's "actions did not connect him with California in a way sufficient to support the assertion of personal jurisdiction over him." 780 F.3d at 1215.  The case involved an alleged oral agreement between three men, one of whom was a California resident, to develop an electrolyte for use in hydrogen fuel cells. *Id.* at 1209. After the California resident and one of the non-Californians sold the technology to a third party, the other non-Californian asserted he was entitled to a one-third share of the proceeds under the agreement. *Id.*  The third party had agreed to pay the sales price to two pass-through trusts. *Id.* at 1210.  The California resident and one of the non-Californians sued the other non-Californian in California; they sought a declaration that there was no oral agreement that entitled him to any portion of the sales proceeds, and damages for intentional interference with the sales contract. *Id.*

1    Plaintiffs argued that the defendant was subject to personal jurisdiction in California on the

2    intentional interference claim under the *Calder* effects test. *Id.* at 1213-14. Specifically, they argued

3    that defendant had expressly aimed his interference at California "because [he had] targeted [one of the

4    plaintiffs,] a California resident." *Id.* at 1214. Defendant's allegedly tortious conduct consisted of

5    making statements to an Ohio resident that caused a Delaware corporation with offices in Ohio to cease

6    making payments to two trust accounts located in Wyoming and Australia. Defendant "did all this from

7    his residence in Michigan, without entering California, contacting any person in California, or otherwise

8    reaching out to California." *Id.* at 1215. The Ninth Circuit explained that "none of [defendant's]

9    challenged conduct had anything to do with [California] itself." *Id.* (quoting *Walden*, 134 S. Ct. at

10   1125). It held that, "as in *Walden*, [the California plaintiff's] injury, an inability to access out-of-state

11   funds, [wa]s not tethered to California in any meaningful way. Rather, his injury [was] entirely personal

12   to him and would [have] follow[ed] him wherever he . . . cho[se] to live or travel. The effects of

13   [defendant]'s actions [we]re therefore 'not connected to the forum State in a way that ma[de] those

14   effects a proper basis for jurisdiction.'" *Id.* (quoting *Walden*, 134 S. Ct. at 1125).

15   Neither the complaint nor the evidence proffered by plaintiffs demonstrates that Bock's conduct

16   was connected to California, as opposed to Weinberg, who resided here. As *Walden* makes clear, a

17   defendant's "relationship with a plaintiff or third party, standing alone, is an insufficient basis for

18   jurisdiction." *Walden*, 134 S. Ct. at 1123-24. At most, plaintiffs have alleged that Bock encouraged

19   Weinberg to move to California, and that she engaged in fraud in the state. That will not suffice to hale

20   a Florida resident into court in California. Moreover, like the plaintiff in *Picot*, Freeney's "injury is

21   entirely personal to him and would follow him wherever he might choose to live or travel. The effects

22   of [Bock]'s actions [we]re therefore 'not connected to the forum State in a way that ma[de] those effects

23   a proper basis for jurisdiction.'" *Picot*, 780 F.3d at 1215 (quoting *Walden*, 134 S. Ct. at 1125). Plaintiffs

24   have therefore failed to allege jurisdictionally significant conduct by Bock directed at, and connected

25   to, California. Bock's motion to dismiss therefore must be granted.

26   **5.      Jurisdictional Discovery**

27   In their opposition, plaintiffs seek leave to conduct jurisdictional discovery concerning Bock's

28   contacts with California. District courts have "a significant amount of leeway" in deciding whether

1   to grant plaintiffs leave to conduct jurisdictional discovery while a motion to dismiss is pending.

2   *Orchid Biosciences, Inc. v. St. Louis University*, 198 F.R.D. 670, 672 (S.D. Cal. 2001).   Cf.

3   *Blackburn v. United States*, 100 F.3d 1426,1436 (9th Cir. 1996) ("The district court has wide

4   discretion in controlling discovery").   In the Ninth Circuit, jurisdictional discovery "should

5   ordinarily be granted where 'pertinent facts bearing on the question of jurisdiction are controverted

6   or where a more satisfactory showing of the facts is necessary.'"   *Butcher's Union Local No. 498*

7   *v. SDC Investment, Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) (quoting *Data Disc, Inc.*, 557 F.2d at

8   1285 n. 1; *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n. 24 (9th Cir. 1977));

9   see also *Harris Rutsky*, 328 F.3d at 1135 (holding that a district court abused its discretion in

10  denying a motion for jurisdictional discovery regarding corporate alter ego liability).

11      Jurisdictional discovery need not be allowed, however, where the request amounts to a

12  "fishing expedition." *Johnson v. Mitchell*, No. CIV S–10–1968 GEB GGH PS, 2012 WL 1657643,

13  *7 (E.D. Cal. May 10, 2012) (citation omitted); see also *Boschetto v. Hansing*, 539 F.3d 1011, 1020

14  (9th Cir. 2008) (affirming the denial of a request for jurisdictional discovery "based on little more than

15  a hunch that [discovery] might yield jurisdictionally relevant facts"); *Butcher's Union Local No. 498*,

16  788 F.2d at 540  (upholding the denial of a request for jurisdictional discovery where plaintiffs stated

17  only that they "believed" discovery would enable them to demonstrate sufficient California contacts to

18  establish personal jurisdiction); *Videx, Inc. v. Micro Enhanced Tech., Inc.*, No. 12-0065, 2012 WL

19  1597380, *2 (D. Or. May 4, 2012) (denying jurisdictional discovery "[i]n light of [plaintiff's] purely

20  speculative allegations of attenuated jurisdictional contacts"); *Mackovich v. U.S. Government*, No.

21  06-cv-00422-SMS (PC), 2008 WL 2053978, *1 (E.D. Cal. May 13, 2008) (denying discovery where

22  plaintiff made "no showing that if further discovery were allowed, the outcome of the motion to

23  dismiss would be affected," citing *Laub v. United States Dept. of the Interior*, 342 F.3d 1080, 1093

24  (9th Cir. 2003)).

25      Plaintiffs have adduced no evidence that Bock has contacts with California, nor demonstrated

26  that Bock targeted California in any relevant way.   Their request that the court permit discovery so

27  that they can discover additional contacts that might subject Bock to jurisdiction in this forum is

28  non-specific, and in light of the showing they have made, speculative.   See *Boschetto*, 539 F.3d at

1  1020 (affirming the denial of a request for jurisdictional discovery "based on little more than a hunch

2  that [discovery] might yield jurisdictionally relevant facts"); *Butcher's Union Local No. 498 v. SDC*

3  *Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) (upholding the denial of a request for jurisdictional

4  discovery where plaintiffs stated only that they "believed" discovery would enable them to

5  demonstrate sufficient California contacts to establish personal jurisdiction); *Videx, Inc.*, 2012 WL

6  1597380 at *2 (denying jurisdictional discovery "[i]n light of [plaintiff's] purely speculative

7  allegations of attenuated jurisdictional contacts").

8        Plaintiffs identify no specific discovery they seek to conduct that will be helpful in the

9  jurisdictional analysis, nor do they describe the evidence of contacts they believe they can uncover.

10  See *Getz v. Boeing Co.*, 654 F.3d 852, 860 (9th Cir. 2011) (upholding the denial of jurisdictional

11  discovery, where plaintiffs' allegations of jurisdictional contacts were "purely speculative," and

12  plaintiffs failed to identify any "specific facts, transactions, or conduct" that might give rise to

13  personal jurisdiction); *Peter Strojnik, P.C. v. Signalife, Inc.*, No. 08-1116, 2009 WL 605411, *4 (D.

14  Ariz. Mar. 9, 2009) (denying jurisdictional discovery because plaintiff "[did] not describe what

15  evidence it reasonably hope[d] to discover").  "[W]here a plaintiff's claim of personal jurisdiction

16  appears to be both attenuated and based on bare allegations in the face of specific denials made by

17  the defendants, the Court need not permit even limited discovery. . . ."  *Pebble Beach*, 453 F.3d at

18  1160 (citing *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 562 (9th Cir. 1995)).  The court therefore

19  declines to authorize jurisdictional discovery.  The court will, however, grant plaintiffs leave to

20  amend the jurisdictional allegations in the complaint to clarify the nature and extent of Bock's

21  involvement in the purported scheme to defraud plaintiffs and how it connected him to the forum.

22

23                       **III.  CONCLUSION**

24        For the reasons stated, the court grants BofA's motion to dismiss the complaint for failure to

25  state a claim on which relief can be granted.  The court also grants Bock's motion to dismiss for lack

26  of personal jurisdiction.  Dismissal is with leave to amend.  See *In re Daou Sys., Inc.*, 411 F.3d 1006,

27  1013 (9th Cir. 2005) ("Dismissal without leave to amend is improper unless it is clear . . . that the

28  complaint could not be saved by any amendment"); *California ex rel. California Department of Toxic*

58

1  *Substances Control v. Neville Chemical Co.*, 358 F.3d 661, 673 (9th Cir. 2004) ("[D]enial of leave to

2  amend is appropriate if the amendment would be futile," citing *Foman v. Davis*, 371 U.S. 178, 182

3  (1962)).  Plaintiffs may file an amended complaint within twenty (20) days of the date of this order if

4  they are able to remedy the deficiencies in the claims and jurisdictional allegations the court has noted.

5  Plaintiffs may not plead additional claims, add additional parties, or add allegations that are not

6  intended to cure the specific defects the court has noted.  Should any amended complaint exceed the

7  scope of leave to amend granted by this order, the court will strike the offending portions under Rule

8  12(f).  See FED.R.CIV.PROC. 12(f) ("The court may strike from a pleading an insufficient defense or any

9  redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own; or (2) on

10 motion made by a party either before responding to the pleading or, if a response is not allowed, within

11 21 days after being served with the pleading."); see also *Barker v. Avila*, No. 2:09-cv-00001-GEB-JFM,

12 2010 WL 3171067, *1-2 (E.D. Cal. Aug. 11, 2010) (striking an amendment to federal law claim where

13 the court had granted leave to amend only state law claims).

14

15 DATED:  July 15, 2015

16 MARGARET M. MORROW
   UNITED STATES DISTRICT JUDGE