1   Jeffrey B. Isaacs, Esq., SBN 117104
2   Jerome H. Friedberg, Esq., SBN 125663
    John T. Sheehan, Esq., SBN 273994
    **ISAACS FRIEDBERG & LABATON LLP**
3   555 South Flower Street, Suite 4250
    Los Angeles, California 90071
4   Telephone: (213) 929-5550/Facsimile: (213) 955-5794
    Email:  jisaacs@iflcounsel.com
5            jfriedberg@iflcounsel.com
             jsheehan@iflcounsel.com
6
7   *Attorneys for Plaintiffs Dwight J. Freeney and*
    *Roof Group LLC*

8
                    **UNITED STATES DISTRICT COURT**
9
                   **CENTRAL DISTRICT OF CALIFORNIA**
10

| 11 | DWIGHT J. FREENEY, an individual; ROOF GROUP LLC, a California limited liability company;<br><br>Plaintiffs,<br><br>vs.<br><br>BANK OF AMERICA CORPORATION, a Delaware corporation; BANK OF AMERICA, NATIONAL ASSOCIATION, a nationally chartered banking association; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, a Delaware corporation; and MICHAEL J. BOCK, an individual,<br><br>Defendants. | Case No. 2:15-CV-02376- MMM-PJW<br><br>**SECOND AMENDED COMPLAINT FOR MONETARY AND OTHER RELIEF FOR:**<br><br>1)  **CONSPIRACY TO DEFRAUD;**<br><br>2)  **FRAUD;**<br><br>3)  **VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(b), (c) & (d));**<br><br>4)  **AIDING AND ABETTING CONVERSION;**<br><br>5)  **VIOLATION OF CALIFORNIA PENAL CODE SECTION 496;**<br><br>6)  **BREACH OF FIDUCIARY DUTY;**<br><br>7)  **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br><br>8)  **NEGLIGENT MISREPRESENTATION;**<br><br>9)  **PROFESSIONAL NEGLIGENCE;** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**10)  NEGLIGENT HIRING, RETENTION AND SUPERVISION;**

**11)   NEGLIGENT REFERRAL; and**

**12)  AN ACCOUNTING.**

**DEMAND FOR JURY TRIAL**

Complaint Filed:     February 23, 2015
FAC Filed:            August 14, 2015

**SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

**I.      PRELIMINARY STATEMENT.** .................................................... 1

**II.     THE PARTIES** .......................................................................... 4

**III.    JURISDICTION AND VENUE.** ................................................ 5

**IV.     BACKGROUND** ....................................................................... 7

    **A.**       Relevant Laws and Reporting Requirements. ...................... 7

    **B.**       Dwight Freeney ................................................................... 9

    **C.**       Roof Group and RSLA. ..................................................... 11

    **D.**       BofA, BAC, BANA and MLPFS. ...................................... 12

    **E.**       BAC's Acquisition of Merrill Lynch and the
            Ensuing Corporate Restructuring. ..................................... 13

    **F.**       BAC Absorbs and Becomes Successor-in-Interest
            to Merrill Lynch. .............................................................. 15

    **G.**       BAC Creates the Global Wealth & Investment Management
            Division and the Merrill Lynch Global Wealth Management
            Subdivision ...................................................................... 15

    **H.**       Michael Stern (aka Michael Millar, David Michael Millar). ............... 20

    **I.**        Michael BOCK and Eva Weinberg ....................................... 25

         **1.**     *Professional Backgrounds and Relationships to Stern.* ............... 25

         **2.**     *Employment with BAC, BANA and MLFPS.* .............................. 28

    **J.**        David Sugarman .................................................................. 30

    **K.**       Matthew Liebman. .............................................................. 30

    **L.**       Jodi Del Campo .................................................................. 31

    **M.**      Weinberg's Brother ............................................................ 32

    **N.**       The Florida Attorney and the Florida Law Firm. ............... 32

**V.      THE SCHEME TO DEFRAUD.** ............................................. 33

    **A.**       Sugarman Recruits Mr. Freeney as a Client. ..................... 33

    **B.**       BOCK and Weinberg Recruit Mr. Freeney as a Client. ............ 34

    **C.**       Weinberg Refers Mr. Freeney to "Michael Millar" for
            Consulting Services and as a Potential Investor in RSLA ............... 36

i

D.    Liebman and BOCK Give Weinberg Exclusive Authority to Serve as Mr. Freeney's Wealth Manager. ...................................... 41

E.    Mr. Freeney Becomes a BofA/Merrill Lynch Client and Transfers Management of His Assets, Investments and Income to BAC and MLPFS. ...................................... 42

F.    The Creation of Arms Reach Consulting LLC. ...................................... 45

G.    Weinberg Refers Mr. Freeney to Her Brother for Insurance Services. ...................................... 46

H.    Weinberg Refers Mr. Freeney to the Florida Attorney and the Florida Law Firm for Legal Services. ...................................... 48

I.    Weinberg's Misappropriation of Funds from Mr. Freeney's Brokerage Account. ...................................... 51

J.    BOCK's Unauthorized Purchases and Sales of Securities. ...................................... 52

K.    Stern and Weinberg's Use of a Private Jet in Furtherance of the Scheme to Defraud. ...................................... 53

L.    Weinberg and Weinberg's Brother Fraudulently Induce Mr. Freeney to Purchase $55 Million in Unsuitable and Worthless Life Insurance. ...................................... 54

M.    Weinberg Fraudulently Assumes Management Control of RSLA. ...................................... 58

N.    Weinberg and Stern Fraudulently Induce Mr. Freeney to Buy Out Altounian and Donnelly's Worthless Interests in Roof Group for $1.1 Million. ...................................... 60

O.    The Hiring and Termination of Sal and Stacy Feli. ...................................... 63

P.    Weinberg and Del Campo Open the BofA Roof Group Account. ...................................... 66

Q.    Weinberg Opens the Citibank Accounts. ...................................... 69

R.    Weinberg and Stern's Mounting Legal Problems in Florida. ...................................... 70

S.    Weinberg, with BOCK's Advice and Encouragement, Creates Global Wealth Management LLC. ...................................... 72

T.    Weinberg and Stern Relocate the Scheme from Miami to Los Angeles. ...................................... 75

U.    Weinberg's Secret Resignation from BofA/Merrill Lynch. ...................................... 76

V.    Mr. Freeney and Roof Group Continue as Remain Clients of BofA/Merrill Lynch. ...................................... 80

W.   Fraudulent and Unauthorized Transfers of Mr. Freeney and Roof Group's Funds to and from the BofA Roof Group Account. ........................................................................... 81

X.   BOCK and Weinberg, Acting in Concert with Stern, Liquidate Mr. Freeney's Existing Investments to Generate Additional Funds to Misappropriate. ...................................... 84

1.   *Advisors Disciplined.* ................................... 85

2.   *Success Trade.* ............................................ 85

3.   *CFP.* ........................................................... 85

4.   *Pacific Life Annuity.* .................................. 86

5.   *American Realty.* ........................................ 86

Y.   The Snap Advances Transactions ........................ 87

Z.   The W Hotel Investment. .................................... 88

AA.  The North Carolina Land Investment. ................ 90

BB.  Efforts at Cover Up and to Obstruct Justice. ....... 92

1.   *Weinberg and Stern Secretly Marry.* ......... 92

2.   *Weinberg and Stern's Efforts to Misdirect Scrutiny.* ................... 92

3.   *Weinberg and Stern's Creation of False and Forged Documents.* ........................... 93

4.   *Weinberg and Stern's Attempted Destruction and Secreting of Evidence* ........................... 95

VI.  **AFTERMATH OF THE SCHEME**. ........................... 97

A.   Weinberg and Stern's Arrests ............................ 97

B.   The Criminal Prosecutions. ................................ 98

C.   Mr. Freeney's Discovery of Weinberg and Stern's Thefts From the BofA Roof Group Account. .................. 99

D.   BofA/Merrill Lynch's Attempts to Cover Up Their Employees' Wrongdoing ........................................... 101

E.   BofA/Merrill Lynch's Ratification of the Conduct of Their Present and Former Employees and Agents .............. 102

F.   Mitigation of Losses ......................................... 103

1.   *The Closure of RSLA.* ............................. 103

2.   *Settlement of the W Hotel Dispute.* ......... 104

iii

**SECOND AMENDED COMPLAINT**

        3.      Repayment of the North Carolina Loan. ................................... 104

    G.      Tolling of the Statute of Limitations. ................................................ 104

        1.      The Tolling Agreements. ............................................. 104

        2.      Delayed Discovery and Active Concealment. ............................ 105

**FIRST CAUSE OF ACTION**
**(For Conspiracy to Defraud)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA, MLPFS and BOCK) ......................................................... 109

    A.      Formation and Operation of the Conspiracy. ..................................... 109

    B.      Wrongful Acts in Furtherance of the Conspiracy. .............................. 110

    C.      Resulting Damages. ............................................................................ 126

**SECOND CAUSE OF ACTION**
**(For Fraud)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA, MLPFS and BOCK) ......................................................... 127

    A.      False and Misleading Representations and False Promises. ............... 127

    B.      Concealment of Material Facts. .......................................................... 131

    C.      Resulting Damages. ............................................................................ 143

**THIRD CAUSE OF ACTION**
**(Civil RICO in Violation of Title 18, United States Code,**
**Sections 1962(c) and 1964(c))**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS) ...................................................................... 144

    A.      The "Criminal Enterprise." ................................................................ 144

    B.      The Racketeering Acts. ....................................................................... 145

        1.      Wire Fraud. ............................................................... 145

        2.      Mail Fraud. ................................................................ 148

        3.      Access Device Fraud. .................................................. 150

        4.      Transactional Money Laundering ................................ 153

        5.      Concealment Money Laundering. ................................ 155

        6.      Promotional Money Laundering. ................................. 156

iv

**SECOND AMENDED COMPLAINT**

7.    *Obstruction of Justice.* ...............................................159

  C.    Injury to Business and Property.........................................161

**FOURTH CAUSE OF ACTION**
**(For Cvil RICO Conspiracy in Violation of Title 18, United States Code,**
**Sections 1962(d) and 1964(c))**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)...................................161

**FIFTH CAUSE OF ACTION**
**(For Cvil RICO Conspiracy in Violation of Title 18, United States Code,**
**Sections 1962(b) and 1964(c))**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)...................................162

  A.    The "Victim Enterprise."....................................................162

  B.    The Racketeering Acts........................................................162

  C.    Injury to Business and Property.........................................163

**SIXTH CAUSE OF ACTION**
**(For Cvil RICO Conspiracy in Violation of Title 18, United States Code,**
**Sections 1962(c) and 1964(c))**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)...................................163

**SEVENTH CAUSE OF ACTION**
**(For Cvil RICO Conspiracy in Violation of Title 18, United States Code,**
**Sections 1962(d) and 1964(c))**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)...................................164

**EIGHTH CAUSE OF ACTION**
**(For Aiding and Abetting Conversion)**
(By Plaintiffs Freeney and Roof Group Against Defendant BANA)......................164

  A.    The Conversions. ...............................................................165

  B.    Aiding and Abetting. .........................................................165

**NINTH CAUSE OF ACTION**
**(For Violation of California Penal Code section 496)**
(By Plaintiffs Freeney and Roof Group Against Defendant BANA)......................168

v

183128.11

**TENTH CAUSE OF ACTION**
**(For Breach of Fiduciary Duty)**
(By Plaintiff Freeney Against
Defendants BAC, BANA, MLPFS and BOCK)........................................................170

**ELEVENTH CAUSE OF ACTION**
**(For Aiding and Abetting Breach of Fiduciary Duty by Weinberg)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA, MLPFS and BOCK)........................................................173

**TWELFTH CAUSE OF ACTION**
**(For Aiding and Abetting Breach of Fiduciary Duty by Stern)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)........................................................177

**THIRTEENTH CAUSE OF ACTION**
**(For Negligent Misrepresentation)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)........................................................181

**FOURTEENTH CAUSE OF ACTION**
**(For Professional Negligence)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)........................................................182

**FIFTEENTH CAUSE OF ACTION**
**(For Negligent Hiring, Retention and Supervision of Weinberg)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)........................................................184

**SIXTEENTH CAUSE OF ACTION**
**(For Negligent Referral Stern)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)........................................................188

**SEVENTHEETH CAUSE OF ACTION**
**(For an Accounting by BAC, BANA and MLPFS)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)........................................................191

**PRAYER FOR RELIEF** ........................................................192

vi

**SECOND AMENDED COMPLAINT**

183128.11

Plaintiffs Dwight J. Freeney and Roof Group LLC (collectively, "Plaintiffs"), complaining of the above-named Defendants, allege as follows, which allegations are based upon information and belief insofar as they pertain to the Defendants' identities and conduct:

## I.    PRELIMINARY STATEMENT.

1.    This is a case of conspiracy, criminal fraud, theft and breach of trust in which the nation's second largest bank, Bank of America, participated in and aided and abetted a scheme to defraud one of its clients, causing him more than $20 million in out-of-pocket losses and leading to the closure of his business.

2.    The plaintiffs in this case are Dwight J. Freeney and his company, Roof Group LLC ("Roof Group").

3.    Defendants are (a) Bank of America Corporation ("BAC"), acting through its Global Wealth & Investment Management division ("GWIM") and its Merrill Lynch Global Wealth Management subdivision ("MLGWM"), and as successor-in-interest to Merrill Lynch & Co., Inc. ("Merrill Lynch"); (b) Bank of America, N.A. ("BANA"), a wholly owned direct subsidiary of BAC; (c) Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"), also a wholly owned direct subsidiary of BAC; and (d) Michael J. Bock ("BOCK"), a Senior Vice President – Wealth Management and Senior Financial Advisor of Global Wealth Management, a subdivision of BAC, and the head of Mr. Freeney's BofA/Merrill Lynch financial advisory team.  BAC, BANA and MLPFS are more commonly known as "Bank of America" or "BofA," the registered trademarks of BAC, and collectively are referred to herein as "BofA/Merrill Lynch."

4.    Mr. Freeney is an accomplished and highly respected professional athlete.  He played college football for Syracuse University, where he was an All-American defensive end.  He entered the NFL in 2002 as the Indianapolis Colts' first-round draft pick and played defense for the Colts for eleven seasons.  For the past two seasons, he played for the San Diego Chargers.

1

**SECOND AMENDED COMPLAINT**

5.      Mr. Freeney's company Roof Group owned and operated the *Rolling Stone Los Angeles* restaurant, café and lounge ("RSLA") in the popular Hollywood and Highland complex in Los Angeles.  Roof Group had a licensing agreement with *Rolling Stone* Magazine to open several additional theme restaurants in New York and other cities.  RSLA was forced to close its doors in February 2013, due to the irreparable financial damage to both the restaurant and Mr. Freeney resulting from the fraudulent scheme described below.

6.      In January 2010, at the height of his NFL career, and having just played in his second Super Bowl, Mr. Freeney made the fateful decision to entrust management of his finances to BofA/Merrill Lynch.  Over the next two years, Mr. Freeney became the victim of an elaborate and malevolent scheme to defraud.

7.      The scheme was devised, implemented and executed by present and former BofA/Merrill Lynch insiders acting in concert with a number of bank outsiders to whom BofA/Merrill Lynch had referred Mr. Freeney.  The scheme involved three parts: first, to fraudulently gain control of Mr. Freeney's assets, investments and income, valued at over $40 million at the time; then, to misappropriate as much of Mr. Freeney's funds as possible while avoiding detection; and, finally, to cover up the thefts and other wrongdoing and minimize the civil and criminal liability of Defendants and their co-schemers.

8.      The scheme began in January 2010, when Mr. Freeney became a client of BofA/Merrill Lynch.  It continued through March 2012, when Eva Weinberg and Michael Stern, two of the principal co-schemers, were arrested by federal authorities.

9.      The scheme involved, among other things: false and misleading representations; false promises; the concealment of material facts; engendering false trust and confidence; use of false identities; conflicts of interest; breaches of fiduciary duty; the unauthorized purchase and sale of securities; the sale of worthless life insurance; kickback payments; the misappropriation of funds and conversion of assets; access device fraud; money laundering; creation of forged and falsified documents;

2

**SECOND AMENDED COMPLAINT**

1    and obstruction of a federal investigation.

2         10.    BAC, BANA and MLPFS participated in and aided and abetted the

3    scheme through the negligent, wrongful and, in some instances, criminal conduct of

4    its employees and agents, including BOCK, Eva Weinberg, Matthew Liebman and

5    Josephine (Jodi) Del Campo.  Through them:

6         (a)    BAC, BANA and MLPFS referred Mr. Freeney, who was only

7    29-years-old at the time, to Michael Stern for consulting services, knowing him to be a

8    financial predator with a past steeped in fraud that included personal and corporate

9    bankruptcies, mortgage fraud, theft of loan proceeds, passing worthless checks,

10   bribery, forgery, violation of court orders and witness tampering.

11        (b)    BAC, BANA and MLPFS introduced Mr. Freeney to Stern as

12   "Michael Millar," which was a false identity that Stern and the co-schemers used to

13   conceal his past as a bankrupt swindler from Mr. Freeney.

14        (c)    BAC, BANA and MLPFS used misrepresentations, false promises

15   and the concealment of material facts to convince Mr. Freeney to become a

16   BofA/Merrill Lynch client and to induce him to transfer management of his assets,

17   investments and income to their exclusive control.

18        (d)    Having fraudulently induced Mr. Freeney to repose his trust and

19   confidence in them, BAC, BANA and MLPFS committed numerous and flagrant

20   breaches of fiduciary duty, including disclosing Mr. Freeney's private and

21   confidential personal and financial information to Stern.

22        (e)    BAC, BANA and MLPFS purchased $890,000 in securities using

23   Mr. Freeney's funds without his authorization and knowledge, generating large

24   commissions for BOCK, and then sold them all a few weeks later, again without

25   Mr. Freeney's authorization or knowledge, at a $45,000 loss to Mr. Freeney, which

26   they also concealed from him.

27        (f)    BAC and MLPFS referred Mr. Freeney to Weinberg's brother,

28   who, together with Weinberg, fraudulently convinced Mr. Freeney to purchase

3

**SECOND AMENDED COMPLAINT**

1    $55 million in unsuitable and worthless life insurance and then secretly and illegally

2    kicked back half of the $450,000 in commissions he received to Weinberg.

3           (g)    BANA opened an account in the name of Roof Group and then

4    gave the confidential account access information to Weinberg, even though she was

5    not a signatory on the account, who gave it to Stern, who used it to misappropriate

6    more than $8.5 million of Mr. Freeney's funds.

7           (h)    To aid and abet these misappropriations, BANA opened this

8    account, and allowed it to remain open, without the required documentation,

9    appropriate authorization, or sufficient due diligence; overrode the account's security

10   features on repeated occasions at Weinberg's request; and refrained from filing

11   suspicious activity reports with federal regulators, as required by federal banking law,

12   notwithstanding the hundreds of highly suspicious wire transfers from the account to

13   unknown recipients, all originating online by Stern using the stolen account access

14   information.

15   11.    The scheme reached virtually every aspect of Mr. Freeney's financial

16   life.  It resulted in out-of-pocket losses to him and Roof Group of more than

17   $20 million; brought him to the verge of personal bankruptcy; caused the eventual

18   closure of RSLA; and deprived him and his family of the financial security that he had

19   worked so hard to attain during his thirteen-year NFL career and which was the reason

20   he became a BofA/Merrill Lynch client in the first place.

21                    **II.    THE PARTIES**

22   12.    At the time this action was commenced, Plaintiff Dwight J. Freeney was

23   a resident of San Diego County, California.

24   13.    Plaintiff Roof Group LLC ("Roof Group") is a limited liability company

25   organized and existing under the laws of the State of California with its principal place

26   of business located in Torrance, California.

27   14.    Defendant Bank of America Corporation ("BAC") is a corporation

28   organized and existing under the laws of the State of Delaware with its principal place

4

**SECOND AMENDED COMPLAINT**

of business in Charlotte, North Carolina.  BAC is sued here both for its own acts and omissions giving rise to this action and for such acts and omissions of Merrill Lynch & Co., Inc. ("Merrill Lynch") as the successor-in-interest to Merrill Lynch.  As described further below, in or about January 2009, BAC acquired Merrill Lynch, which was merged into BAC and became a wholly owned subsidiary of BAC.  Thereafter, in or about October 2013, BAC absorbed Merrill Lynch, assumed all of its obligations and liabilities, and became the successor-in-interest to Merrill Lynch.  Therefore, all references in this Second Amended Complaint to BAC include BAC as the successor-in-interest to Merrill Lynch.

15.     Defendant Bank of America, National Association ("BANA") is a federally chartered national banking association headquartered in Charlotte, North Carolina, which is, and at all relevant times was, a wholly-owned direct subsidiary of BAC.

16.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  Prior to October 2013, MLPFS was a wholly owned indirect subsidiary of BAC; in October 2013, it became a wholly owned direct subsidiary of BAC.

17.     Defendant Michael J. Bock ("BOCK") is a resident of the State of Florida.  He is registered as a broker-dealer agent in the State of California under the broker-dealer license of MLPFS.  He is also licensed as an insurance producer in the State of California.

18.     References in this Second Amended Complaint to "BofA/Merrill Lynch" are to BAC, GWIM, MLGWM, BAC as successor-in-interest to Merrill Lynch, BANA and MLPFS.

### III.   JURISDICTION AND VENUE.

19.     This Court has subject matter jurisdiction over this matter pursuant to Title 28, United States Code, section 1331, in that it arises under the laws of the

5

**SECOND AMENDED COMPLAINT**

United States, and pursuant to Title 28, United States Code, section 1332, in that there is a complete diversity of citizenship between all of the Plaintiffs and all of the Defendants.

20.    This Court has personal jurisdiction over BAC, BANA and MLPFS in this action pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure section 410.10, in that BAC, BANA and MLPFS have offices and branches and do substantial business within the State of California.

21.    This Court has personal jurisdiction over BOCK in this action pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure section 410.10, in that BOCK purposefully directed his activities toward, consummated transactions within and/or purposefully availed himself of the privilege of conducting business in the State of California; Plaintiffs' claims against him are related to those activities, transactions and businesses; and the exercise of personal jurisdiction over him is reasonable and comports with traditional notions of fair play and substantial justice.

22.    Plaintiffs are informed and believe, and on that basis allege, that this Court also has personal jurisdiction over BOCK, in that he consented to such jurisdiction when he registered to be an agent of MLPFS in the State of California, prior to the events giving rise to this action.  *See Petrowski v. Hawkeye-Security Ins. Co.*, 350 U.S. 495, 495-96 (1956); *Mulata v. Wells Fargo Bank, N.A.*, 76 F. Supp. 3d 929, 943 (N.D.Cal. 2014).

23.    Plaintiffs are informed and believe, and on that basis allege, that in registering as an agent of MLPFS in California, BOCK executed the following consent to the jurisdiction of California courts:

> I irrevocably appoint the administrator of each *jurisdiction* indicated in Item 11 [which included California] . . , or such other person designated by law, . . . my attorney upon whom may be served any notice, process, pleading, subpoena or other document in any action or *proceeding* against me arising out of or in connection with the offer or sale of securities . . . , or out of the violation or alleged violation of the laws of such *jurisdictions*.  I consent that any such action or *proceeding* against me may be commenced in any court of competent

**SECOND AMENDED COMPLAINT**

*jurisdiction* and proper venue by service of process upon the appointee as if I were a resident of, and had been lawfully served with process in the *jurisdiction*. . . .

(Italics in original.)

24.     Venue for this matter properly lies within the Central District of California pursuant to Title 18, United States Code, section 1391(b)(2), in that a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.    BACKGROUND.

**A.     Relevant Laws and Reporting Requirements.**

25.     At all relevant times, BofA/Merrill Lynch was under mandatory reporting requirements to the Financial Industry Regulatory Authority ("FINRA").  FINRA provides information on all current, and many former, registered broker-dealers. When a firm hires a broker-dealer, an investment advisor, or an associate, it is required to file a Form U4 with FINRA ("FINRA Report"), disclosing a variety of information about the new hire, including pending criminal, regulatory, or civil actions; customer complaints; employment history; adverse employment actions; and financial problems, such as bankruptcies or unsatisfied judgments.  Firms are under a continuing duty to file an updated Form U4 whenever they become aware of any such events involving their broker-dealers, investment advisors, or associates. Additionally, firms are required to file a Form U5 with FINRA when a broker-dealer, investment advisor, or associate ends his or her employment with the firm.

26.     At all relevant times, BofA/Merrill Lynch was also under mandatory reporting requirements to the U.S. Securities and Exchange Commission ("SEC"). The SEC requires that a person or firm meeting the definition of "investment adviser" under the Investment Advisers Act of 1940 (Title 15, United States Code, sections 80b-1 *et seq*.) register with it, disclosing information about the adviser's business, ownership, clients, employees, business practices, affiliations and any disciplinary events involving the adviser or its employees.  Advisers must file a Form

7

**SECOND AMENDED COMPLAINT**

183128.11

1   ADV ("SEC Report") and keep it current by filing annual and periodic amendments.

2        27.    At all relevant times, the federal law known as the Bank Secrecy Act

3   (Title 31, United States Code, section 5311 *et seq.*) required BofA/Merrill Lynch to

4   file a Suspicious Activity Report ("SAR") with the Financial Crimes Enforcement

5   Network ("FinCEN") of the U.S. Department of the Treasury whenever it suspected

6   fraud, money laundering, or other criminal activity involving any of its clients, any

7   client accounts, or any of its employees and agents.  The regulations promulgated

8   under this law explain that the types of "suspicious activity" that trigger the filing

9   requirement include: (a) apparent bogus business accounts; (b) abnormal transactions

10  based on a client's history; and (c) multiple transactions for amounts smaller than

11  $10,000, seemingly designed to avoid reporting requirements.  *See* Title 12, Code of

12  Federal Regulations, section 21.11.  The Bank Secrecy Act applies to banks, bank

13  holding companies, their subsidiaries and brokerage firms.  *See* Title 17, Code of

14  Federal Regulations, section 240.17a-8.

15       28.    Under the Bank Secrecy Act, the institution or firm is "required to file a

16  SAR no later than 30 calendar days after the date of initial detection of facts that my

17  constitute a basis for filing a SAR," but "in situations involving violations requiring

18  immediate attention, such as when a reportable violation is on-going, the financial

19  institution shall immediately notify, by telephone, an appropriate law enforcement

20  authority and the [Office of the Comptroller of Currency] in addition to filing a timely

21  SAR."  *Id*., sections 21.11(d) and 208.62(d).

22       29.    At all times relevant hereto, the Investments Advisors Act of 1940 (the

23  "IAA") defined an "investment adviser" as a firm or individual "who, for

24  compensation, engages in the business of advising others . . . as to the value of

25  securities or as to the advisability of investing in, purchasing, or selling securities."

26  Title 15, United States Code, section 80b-2(a)(11) and (16).  The IAA makes it

27  unlawful for "any investment adviser . . . to employ any device, scheme, or artifice to

28  defraud . . . [or] to engage in any transaction, practice, or course of business which

**SECOND AMENDED COMPLAINT**

1  operates as a fraud or deceit upon any client or prospective client . . . ." *Id*.,

2  section 80b-6.

3    30.    Under the IAA, both individuals and firms registered with the SEC as

4  investment advisers owe their clients the full panoply of fiduciary duties, including the

5  duty to avoid conflicts of interest; exercise good faith; fully and fairly disclose all

6  material facts; and use reasonable care to avoid misleading clients. *See Transamerica*

7  *v. Lewis*, 444 U.S. 11, 17 (1979); *SEC v. Capital Gains Research Bureau, Inc*., 375

8  U.S. 180, 191-92 (1963); *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008); *SEC v.*

9  *K.W. Brown and Co*., 555 F. Supp. 2d 1275, 1308-09 (S.D. Fla. 2007); *SEC v. Bolla*,

10  401 F. Supp. 2d 43, 696-67 (D.D.C. 2005); *Norman v. Salomon Smith Barney, Inc*.,

11  350 F. Supp. 2d 382, 391 (S.D.N.Y. 2004); *Morris v. Wachovia Securities, Inc*., 277

12  F. Supp. 2d 622, 643-45 (E.D. Va. 2003).

13    31.    At all times relevant hereto, both California and Florida common law

14  also imposed fiduciary duties on individuals and firms registered with the SEC as

15  broker-dealers. *See Duffy v. Cavalier*, 215 Cal.App.3d 1517, 1536 n. 10 (1989);

16  *Twomey v. Mitchum, Jones & Templeton*, 262 Cal.App.2d 690, 709 (1968); *Ward v.*

17  *Atlantic Sec. Bank*, 777 So.2d 1144, 1147 (Fla. App. 2001).  A firm or individual

18  registered as a broker-dealer violates these duties by making materially false or

19  misleading statements to convince a client to make an investment; placing a client in

20  an unsuitable investment; churning a client's account; engaging in transactions

21  without the client's permission; or failing to advise a client of substantial losses. *See*

22  *Hobbs v. Bateman Eichler, Hills Richards, Inc.*, 164 Cal. App. 3d 174, 201 (1985).

23  **B.    Dwight Freeney.**

24    32.    Mr. Freeney is a highly accomplished and well respected NFL player

25  who played the past two seasons for the San Diego Chargers franchise.  Prior to

26  joining the Chargers for the 2013 season, he played eleven seasons with the

27  Indianapolis Colts.  His many achievements as an NFL player include:

28    •    Seven-time Pro-Bowl selection;

9

**SECOND AMENDED COMPLAINT**

1        •     Three-time First Team All-Pro;

2        •     Member 2006 and 2009 AFC Championship Teams;

3        •     Member 2007 Super Bowl Championship Team; and

4        •     Chosen to NFL All-Decade Team.

5       33.     In 2007, Mr. Freeney entered into a six-year contract with the Colts,

6 which, at the time, was one of the largest contracts for a defensive player in NFL

7 history. When Mr. Freeney became a BofA/Merrill Lynch client in or about

8 January 2010, he still had three years remaining on this contract, which guaranteed

9 him, before taxes, $8,825,000 for the 2010 season, $11,420,000 for the 2011 season,

10 and $14,035,000 for the 2012 season, for a total of $34,280,000. As is typical with

11 NFL contracts, Mr. Freeney was paid his entire annual salary over the course of the

12 17-week regular season, between roughly the beginning of September and ending the

13 first week of the following January.

14       34.     When Mr. Freeney became a BofA/Merrill Lynch client in or about

15 January 2010, he was 29-years-old and had no expertise in financial matters and very

16 limited investment experience. Moreover, during the 17-week regular season when

17 Mr. Freeney received his entire annual salary, and in the two months leading up to the

18 start of the season, his time and attention was devoted exclusively to football. As a

19 result, like many professional athletes, he relied upon professional financial managers

20 and investment advisors to manage his assets and income, pay his bills, prepare and

21 file his tax returns and recommend and manage his investments.

22       35.     Before becoming a BofA/Merrill Lynch client, Mr. Freeney had a

23 number of bad experiences with prior financial managers and investment advisors,

24 which gave him reason to doubt their honesty and the wisdom of some of the

25 investments they had made on his behalf. As a result, in 2009, Mr. Freeney began

26 searching for a new financial manager/investment advisor. Because of these past

27 problems, Mr. Freeney focused his search on large, well-established financial

28 institutions, having decided not to entrust his financial affairs and future to another

**SECOND AMENDED COMPLAINT**

1  small firm that purported to cater to professional athletes.

2  **C.      Roof Group and RSLA.**

3       36.    Roof Group is a California limited liability company that owned and

4  operated the now-closed RSLA in Hollywood.

5       37.    Roof Group was founded in 2009 by two hospitality industry

6  entrepreneurs, Joe Altounian ("Altounian") and Niall Donnelly ("Donnelly").  In or

7  about September 2009, Roof Group entered into a licensing agreement with

8  *Rolling Stone* Magazine, which granted it the right to construct and operate a

9  *Rolling Stone*-themed restaurant in Los Angeles and an option to do the same in

10 New York and other cities.  It also entered into a lease with the real estate company

11 CIM for a 10,400 square foot space in the Hollywood and Highland complex in which

12 to build out the restaurant.

13      38.    The build out of RSLA began in late 2009.  The general contractor for

14 the build out was Brodin Design.  The restaurant opened briefly in November 2010 to

15 host the American Music Awards after-party, and then opened to the public in

16 February 2011.

17      39.    Mr. Freeney became a member of Roof Group in or about September

18 2009, acquiring a 20 percent ownership interest in return for investing approximately

19 $1.5 million, which was supposed to fund the beginning of the build out of RSLA.  At

20 BofA/Merrill Lynch's urging, he increased his ownership interest to 51 percent,

21 becoming the managing member in May 2010 by committing to invest at least an

22 additional $1.6 million.  Thereafter, also at BofA/Merrill Lynch's urging, he increased

23 his ownership interest to 100 percent, completing the purchases of Altounian and

24 Donnelly's shares in Roof Group in January 2012 for approximately $1.1 million.

25      40.    Mr. Freeney, through Roof Group, invested approximately $4.2 million

26 of his own money in RSLA in 2010, most of which was intended to pay for

27 completion of the build out, and an additional approximately $3.7 million in 2011,

28 most of which was intended to fund operating deficits (which, as is now known, were

**SECOND AMENDED COMPLAINT**

183128.11

largely caused by Weinberg and Stern's misappropriation of funds in a Roof Group
BofA account belonging to Mr. Freeney).

41.     After the scheme to defraud began to unravel in or about December 2011,
Mr. Freeney infused another approximately $3.4 million of his own money into RSLA
in an effort to undo the harm caused by the scheme and to keep the restaurant open.
Ultimately, those efforts proved unavailing.  Although Roof Group was able to avert
bankruptcy, the damage to Mr. Freeney and RSLA financially was too great, and the
restaurant was forced to close in February 2013.

42.     RSLA was more than a financial investment for Mr. Freeney.  The
opportunity to own and operate a series of theme restaurants associated with the music
industry appealed to his desire to own his own business and to promote young,
undiscovered music talent.  As a result, the collapse of RSLA because of the criminal
actions of BofA/Merrill Lynch, a seemingly well-heeled financial institution to which
Mr. Freeney had entrusted his financial future, was devastating to him, not only
financially, but also emotionally.

**D.     BofA, BAC, BANA and MLPFS.**

43.     "Bank of America" and "BofA" are registered trademarks that BAC uses
in marketing the banking, brokerage, advisory and other products and services BAC
and its various subsidiaries and affiliates offer.

44.     BAC is a Delaware corporation, a bank holding company and a financial
holding company.  As described in BAC's 2010 Annual Report:  "Through our
banking and various non-banking subsidiaries throughout the United States and in
certain international markets, we provide a diversified range of banking and
nonbanking financial services and products through six business segments:  *Deposits,
Global Card Services, Home Loans & Insurance, Global Commercial Banking,
Global Banking and Markets (GBAM)* and *Global Wealth & Investment Management
(GWIM).*"  (Italics in original.)

45.     BANA is a federally chartered, national banking association and the

12
**SECOND AMENDED COMPLAINT**

primary banking subsidiary of BAC.  As described in a BAC report to its regulator, the Board of Governors of the Federal Reserve System, "Bank of America, N.A. ('BANA') is the flagship national full-service commercial bank and primary bank subsidiary of Bank of America Corporation."

46.    MLPFS is a registered broker-dealer and a registered investment adviser with the SEC, and a member firm of FINRA.  Prior to October 2013, it was a wholly owned direct subsidiary of Merrill Lynch, and a wholly owned indirect subsidiary of BAC.  With BAC's absorption of Merrill Lynch in October 2013 (described further below), MLPFS became a wholly owned direct subsidiary of BAC.

**E.    BAC's Acquisition of Merrill Lynch and the Ensuing Corporate Restructuring.**

47.    Merrill Lynch is the former holding company for various Merrill Lynch subsidiaries and affiliates, including MLPFS.

48.    In January 2009, BAC acquired Merrill Lynch and its operating subsidiaries and affiliates.  Merrill Lynch was merged with a wholly owned subsidiary of BAC, with Merrill Lynch continuing as the surviving corporation and a wholly owned subsidiary of BAC.  MLPFS remained a subsidiary of Merrill Lynch and became a wholly owned indirect subsidiary of BAC.

49.    In a news release accompanying the merger, BAC's Chairman and Chief Executive Officer at the time, Ken Lewis, described the merger as resulting in a "new organization," created "because we believe that wealth management and corporate and investment banking represent significant growth opportunities, especially when combined with our leading capabilities in consumer and commercial banking."

50.    In its 2010 Annual Report, BAC reported:  "On January 1, 2009, we acquired Merrill Lynch & Co., Inc. (Merrill Lynch) and, as a result, we now have one of the largest wealth management businesses in the world with nearly 17,000 wealth advisors, an additional 3,000 client-facing professionals and more than $2.2 trillion in client assets."

13

**SECOND AMENDED COMPLAINT**

51.     Following the acquisition and merger, BAC engaged in a massive corporate restructuring aimed at integrating Merrill Lynch and its operations into BAC.  As part of this restructuring:

(a)     Merrill Lynch adopted BAC's risk management and governance practices "to maintain consistent risk measurement and disciplined risk taking";

(b)     The BAC Corporate Benefits Committee assumed overall responsibility for the administration of all of Merrill Lynch's employee benefit plans;

(c)     Merrill Lynch's qualified retirement and defined contribution plans were closed to new participants and newly hired Merrill Lynch employees who were eligible participated in BAC plans;

(d)     BAC assumed Merrill Lynch's stock-based compensation plans, and awards under those plans became payable in BAC common stock;

(e)     BAC began rebranding all of its corporate and investment banking activities under the marketing name "Bank of America Merrill Lynch";

(f)     Merrill Lynch's principal executive offices were moved to the Bank of America Corporate Center in Charlotte, North Carolina, which is owned by a BAC subsidiary;

(g)     Merrill Lynch employees were relocated to the "Bank of America Tower" in New York, New York;

(h)     Merrill Lynch sold Merrill Lynch Bank USA ("MLBUSA") and Merrill Lynch Bank & Trust Co., FSB ("MLBT-FSB") to a subsidiary of BAC, and MLBUSA and BLBT-FSB were thereafter merged into BANA;

(i)     Banc of America Investment Services, Inc., a wholly-owned broker-dealer subsidiary of BAC, was merged into MLPFS, with MLPFS continuing as the surviving corporation;

(j)     Merrill Lynch merged with Banc of America Securities Holdings Corporation ("BASH"), a wholly owned subsidiary of BAC, with Merrill Lynch continuing as the surviving corporation.  As a result of this merger, Banc of America

14

**SECOND AMENDED COMPLAINT**

1 Securities LLC ("BAS"), a wholly owned broker-dealer subsidiary of BASH, became

2 a wholly owned broker-dealer subsidiary of Merrill Lynch, and BAS then merged into

3 MLPFS, with MLPFS continuing as the surviving corporation;

4        (k)   BAC's credit ratings became the major driver of Merrill Lynch's

5 credit ratings; and

6        (l)   Merrill Lynch and BAC established intercompany lending and

7 borrowing arrangements "to facilitate centralized liquidity management."

8 **F.    BAC Absorbs and Becomes Successor-in-Interest to Merrill Lynch.**

9      52.    In October 2013, Merrill Lynch was absorbed into BAC, with

10 Merrill Lynch ceasing to exist as a separate legal entity.  Upon completion of the

11 merger, BAC assumed all of Merrill Lynch's obligations and liabilities and became

12 the successor-in-interest to Merrill Lynch, and MLPFS became a wholly owned direct

13 subsidiary of BAC.  BAC retained the Merrill Lynch brand name for its retail

14 brokerage and investment bank.  All federally registered "Merrill Lynch" trademarks

15 and service marks were assigned to BAC.

16      53.    As stated in a BAC press release:  "Subsidiaries of Merrill Lynch & Co.,

17 Inc., a holding company, will continue to operate under the Merrill Lynch name and

18 brand.  Bank of America's primary broker-dealer, Merrill Lynch, Pierce, Fenner &

19 Smith, and its non-U.S. broker-dealer entities will continue to operate under their

20 current names and brands.  [¶]  As of October 1, 2013, in connection with the merger,

21 Bank of America Corp. assumed all of Merrill Lynch & Co., Inc.'s obligations . . . .

22 Also, as a result of the merger, Merrill Lynch & Co., Inc. will cease to separately file

23 reports with the U.S. Securities and Exchange Commission."

24 **G.    BAC Creates the Global Wealth & Investment Management Division and**

25        **the Merrill Lynch Global Wealth Management Subdivision.**

26      54.    One objective of the restructuring described above was to consolidate

27 wealth management services in a new BAC division named "Global Wealth &

28 Investment Management" ("GWIM"), which included placing MLPFS registered

**SECOND AMENDED COMPLAINT**

broker-dealers ("brokers") and investment advisors ("advisors") under the control and direction of GWIM.

55.     According to a BAC press release, GWIM was designed to provide "comprehensive wealth management to affluent and high-net-worth clients," "retirement and benefit plan services," "philanthropic management" and "asset management to individuals and institutions."  BAC's 2010 Annual Report described GWIM as follows:

> *GWIM* consists of three primary businesses:  *Merrill Lynch Global Wealth Management (MLGWM), U.S. Trust, Bank of America Private Wealth Management (U.S. Trust)* and *Retirement Services*.
>
> *MLGWM*'s advisory business provides a high-touch client experience through a network of approximately 15,500 financial advisors focused on clients with more than $250,000 in total investable assets.  *MLGWM* also includes Merrill Edge, a new integrated investing and banking service which is targeted at clients with less than $250,000 in total assets.  Merrill Edge provides team-based investment advice and guidance, brokerage services, a self-directed online investing platform and key banking capabilities including access to the Corporation's branch network and ATMs.  In addition, *MLGWM* includes the Private Banking & Investments Group.
>
> *U.S. Trust*, together with *MLGWM*'s Private Banking & Investments Group, provides comprehensive wealth management solutions targeted at wealthy and ultra-wealthy clients with investable assets of more than $5 million, as well as customized solutions to meet clients' wealth structuring, investment management, trust and banking needs, including specialty asset management services.

* * *

56.     GWIM operates using employees from subsidiaries of BAC and Merrill Lynch, including principally: (a) MLGWM, a network of approximately 15,000 financial advisors focused on clients with over $250,000 in total investable assets; and (b) U.S. Trust, Bank of America Private Wealth Management ("U.S. Trust"), a firm with 4,400 associates that provides private banking, investment

16

**SECOND AMENDED COMPLAINT**

management and specialty asset management services to high net worth and ultra-high net worth clients.

57.    BAC's 2010 Annual Report gave the following description of the interrelationships between BAC, GWIM, its subdivisions, BANA and MLPFS, evidencing that while MLPFS may still be a separate corporation, its employees are under the control and direction of BAC:

- "Bank of America Corporation ('Bank of America') is a financial holding company that, through its subsidiaries and affiliated companies, provides banking and nonbanking financial services."

- "Global Wealth & Investment Management is a division of Bank of America Corporation ('BAC')."

- "Merrill Lynch Wealth Management, Merrill Edge$^{TM}$, U.S. Trust, Bank of America Merrill Lynch and BofA$^{TM}$ Global Capital Management are affiliated sub-divisions within Global Wealth & Investment Management."

- "Merrill Lynch Wealth Management makes available products and services offered by Merrill Lynch, Pierce, Fenner & Smith Incorporated ('MLPF&S') and other subsidiaries of BAC."

- "Merrill Edge$^{TM}$ is the marketing name for two businesses: Merrill Edge Advisory Center, which offers team-based advice and guidance brokerage services; and a self-directed online investing platform."

- "U.S. Trust, Bank of America Private Wealth Management operates through Bank of America, N.A., and other subsidiaries of BAC."

- "Bank of America Merrill Lynch is a marketing name for the Retirement & Philanthropic Services businesses of BAC."

- "BofA Global Capital Management Group, LLC (BofA Global Capital Management), is an asset management division of BAC.  BofA Global Capital Management entities furnish investment management services for institutional and individual investors."

- "Banking products are provided by Bank of America, N.A., and affiliated banks . . . ."

17

**SECOND AMENDED COMPLAINT**

- "MLPF&S is a registered broker-dealer, . . . and a wholly owned subsidiary of BAC."

58.    Thus, as of January 2010, when Mr. Freeney became a client of BofA/Merril Lynch, BAC's corporate structure for providing wealth management products and services appeared as follows:



"Bank of America"/"BofA"
[Trademarks]

**BAC**
[Bank and Financial Holding Company]

**BANA**
[wholly owned BAC banking subsidiary]

**GWIM**
[BAC Division]

GWIM subdivisions:
- Merrill Lynch Wealth Management
- Merrill Edge
- U.S. Trust
- Bank of America  Merrill Lynch
- BofA Global Capital Management

**Merrill Lynch**
[wholly owned BAC subsidiary; no longer exists]

**MLPFS**
[wholly owned indirect BAC brokerage subsidiary]

**U.S. Trust**

59.    As a BAC division, all of GWIM's executive management is appointed by BAC.  In August 2009, BAC appointed Sallie Krawcheck, a member of the BAC executive team, to head GWIM.  In February 2010, BAC appointed Kunai Kamlani to head Global Investment Solutions (a subdivision within GWIM), and appointed Chris Dupuy to head Institutional Investments and Philanthropic Solutions (another subdivision within GWIM).  In July 2010, BAC appointed Lisa Shalett as Chief

18

**SECOND AMENDED COMPLAINT**

183128.11

1   Investment Officer of GWIM.  In September 2011, BAC announced that Krawcheck

2   would leave GWIM, as part of a reorganization and de-layering of operations.

3          60.    As a result of the BAC/Merrill Lynch corporate restructuring and the

4   formation of GWIM and MLGWM, MLPFS brokers, advisors and staff came under

5   the control and direction of BAC.  For example:

6          (a)    BAC has the authority to hire, fire, or lay-off MLPFS brokers,

7   advisors and staff;

8          (b)    BAC sets the compensation and incentive payment structures for

9   MLPFS brokers and advisors;

10         (c)    Only BAC had the authority to approve the $3.6 billion in year-

11  end bonuses for MLPFS brokers and advisors for 2008;

12         (d)    BAC assumed responsibility for administering the pension and

13  other benefit plans of MLPFS brokers and advisors;

14         (e)    MLPFS brokers and advisors work out of BAC offices;

15         (f)    BAC required MLPFS brokers, advisors and associates to comply

16  with BAC's policies and procedures and the BAC code of ethics;

17         (g)    As of January 1, 2009, all Merrill Lynch employees were required

18  to report complaints or possible ethical violations to the "Bank of America Ethics and

19  Compliance Hotline," and the "Merrill Lynch Ethics Hotline" was discontinued;

20         (h)    BAC and GWIM executive management speak publicly of

21  MLPFS brokers and advisors as if they are employed by, part of, or take their

22  direction from GWIM;

23         (i)    MLPFS brokers and advisors believe and/or represent that they

24  are jointly employed by "Global Wealth & Investment Management," "Merrill Lynch

25  Global Wealth Management," or "Merrill Lynch Bank of America";

26         (j)    BAC controls the details of brokers and advisors' work, as

27  evidenced by a 2011 *Forbes* article reporting that one MLPFS broker complained that

28  he had to "wait[ ] months for BofA to approve material for an upcoming marketing

19

**SECOND AMENDED COMPLAINT**

event," and "[w]hen BofA finally got back to him a week before the event they wanted him to make changes to the materials which took hours for his team to fix";

      (k)     BAC requires MLPFS brokers and advisors to cross-market BANA banking products and services to their brokerage clients, such as debit cards, online bill pay and credit cards; and

      (l)     Many BANA ATMs are now configured to transfer money in and out of Merrill Lynch brokerage accounts.

61.     In sum, MLPFS brokers and advisors who provide wealth management services have effectively been loaned indefinitely to GWIM and MLGWM, and are under the joint, if not primary, control and direction of BAC.

**H.**    **Michael Stern (aka Michael Millar, David Michael Millar).**

62.     Stern grew up in the Miami area, never completed high school, holds no professional licenses and has no formal training in any professional field.

63.     In the early 2000s, Stern became involved in the construction industry, and then in both residential and commercial real estate development.  Between 2003 and 2006, he acquired controlling ownership interests in a number of properties in the Miami and Miami Beach areas.  He acquired these interests principally using funds borrowed from banks, mortgage lenders and investors using the properties as security.  As later revealed in litigation, in many instances, he obtained this financing by fraud, including the forging and falsifying of title, loan and corporate documents.

64.     In 2004, Stern was caught paying thousands of dollars in bribes to Miami Beach city officials to obtain demolition and construction permits for properties he was developing.  As later publicly reported, in 2003 and 2004, Stern made at least $110,000 in secret cash payments to three city planning officials.  He admitted to bribing the city officials, but received immunity from prosecution by cooperating with the State Attorney's Office and the Florida Department of Law Enforcement.  Stern's bribery and work as a government informer were publicly revealed in 2008, including in March 2008 articles in the *Miami Herald* and *SunPost*.  Three Miami Beach city

**SECOND AMENDED COMPLAINT**

officials later pleaded guilty to bribery and racketeering charges for accepting illegal payments from Stern, which was reported by the *Miami Herald*.  A February 2010 article, for example, highlighted that:

> Before his 2008 arrest, [Andres] Villarreal accepted more than $100,000 from developer Michael Stern, who sought Villarreal's approval of plans to demolish a historic coral rock house at 900 Collins Ave. to make way for an office building, prosecutors say.

> Stern cooperated in the investigation, wearing a wire to gather evidence against Villarreal.  In one taped conversation, the pair discussed using fake receipts or phony loan documents to conceal the payoffs.

65.    In 2008, Stern began "flipping mortgages" to keep current with his ever increasing loan payment obligations on the properties he had fraudulently acquired.  As part of this scheme, he obtained millions of dollars in new mortgages and loans by pledging already over-encumbered properties as security, fraudulently diverting the loan proceeds to himself, and then using a portion of those proceeds to make payments on earlier obtained mortgages and loans.  In furtherance of this scheme, he issued hundreds of thousands of dollars in worthless checks, forged documents, made misrepresentations to lenders and investors, and misapplied loan proceeds to himself and his co-schemers.

66.    This scheme began to unravel in late 2008, when Stern was unable to keep current on some of his payment obligations, resulting in a cascade of foreclosure actions and lawsuits.  As reported in a September 2008 *Miami Herald* article:

> In recent years, Stern has become one of Miami Beach's most prolific real-estate investors, buying and redeveloping several apartments, condos and a hotel – sometimes by himself, sometimes with partners.

> His portfolio rests on a stack of three dozen loans totaling nearly $52 million, county records show.  Stern mortgaged his Collins

21

**SECOND AMENDED COMPLAINT**

Avenue office condo four times in a 12-day span last May, and he used a liquor license as collateral for a $225,000 loan, now in default, according to one lawsuit.

67.    Those who were defrauded by Stern and filed legal actions against him included not only individual investors and small mortgage lenders, but also large financial institutions, such as Citibank, Colonial Bank, Countrywide Home, HSBC Bank, Ocean Bank and U.S. Bank.

68.    In 2008, ten civil actions were filed against Stern in the Miami-Dade County Circuit Court.  In 2009, 25 more lawsuits followed.  These lawsuits produced overwhelming evidence of Stern's fraudulent practices, including, in particular, his issuance of worthless checks; forgery of title, loan and corporate records; falsification of closing documents; and theft of loan proceeds.

69.    College Health II GP Inc. ("College Health") and Esther Burstyn-Spero filed a civil action against Stern in March 2008, for his failure to repay $4.0 million in loans and forging Burstyn-Spero's signatures on two loan forgiveness documents in 2006 and 2007 (the "*College Health* Case").  Stern signed a settlement agreement in that case in January 2009, agreeing to repay College Health more than $6.0 million.

70.    In the course of the settlement negotiations, Stern admitted to forging Burstyn-Spero's signature on the loan forgiveness documents.  This admission was made in the presence of Burstyn-Spero's counsel and Stern's lawyer.  In a publicly-filed declaration, Burstyn-Spero's attorney, current Miami-Dade Circuit Court Judge Miguel de la O, attested that "Mr. Stern admitted to me, in the presence of his counsel, that the Subordination Agreement . . . and the Partial Release of Mortgage . . . were not signed by Esther Burstyn Spero," and he further "admitted to me, in the presence of his counsel, that he forged Ms. Spero's name on both documents and filed the documents with the forged signatures."

71.    In October 2008, Colonial Bank filed a civil action against Stern for failing to repay $17.8 million in loans that the bank had made to him in 2005 and

**SECOND AMENDED COMPLAINT**

183128.11

2006 (the "*Colonial Bank* Case").  In November and December 2008, based on evidence that Stern was wasting and mismanaging corporate assets, the court appointed a receiver over two of his businesses that had been named as defendants, 750 Jefferson Avenue LLC ("750 Jefferson"), which owned apartment buildings in Miami Beach that Stern was attempting to convert into condominiums, and South Beach Atrium, Inc., which owned a three-story commercial complex in Miami Beach that included shops, offices and a nightclub.

72.     Ivor Rose and Rita Starr ("the Roses"), an elderly Florida couple, were named as co-defendants in the *Colonial Bank* Case.  To obtain the $17.8 million in loans from Colonial Bank, Stern had provided the bank with guarantees purportedly signed by the Roses that pledged many of their properties as security for their guarantees.  As was later revealed in litigation, the Roses' signatures on the guarantees had either been forged or fraudulently obtained by Stern.

73.     In February 2009, Stern and his wife at the time, Layne Harris Stern, filed for personal bankruptcy protection in the Southern District of Florida.  In March 2009, Stern placed his real estate holding company, 750 Jefferson, into bankruptcy.  In April 2009, he placed another of his companies, Beach Hotel, Inc. ("Beach Hotel"), which owned the Beach Place Hotel in Miami Beach, into bankruptcy.

74.     In his financial disclosures to the Bankruptcy Court, Stern declared liabilities totaling $67.1 million and assets totaling *negative* $2.4 million; that his bank balances totaled *negative* $22,697; and that he was a defendant in 19 pending civil suits.  More than 220 creditors filed claims in Stern's personal bankruptcy alone.  The bankruptcies were publicized in the *Miami Herald,* in articles appearing in 2009, 2010 and 2011.

75.     In May 2009, the receiver for 750 Jefferson in the *Colonial Bank* Case filed for a restraining order against Stern, alleging that Stern had threatened him outside court.

76.     With his legal problems mounting and creditors and litigants demanding

**SECOND AMENDED COMPLAINT**

documents and testimony about the state of his financial affairs, Stern fled to Uruguay in May 2009, where he lived with his stepson for several months.  Plaintiffs are informed and believe, and on that basis allege, that Stern left the country to evade process and avoid being further examined under oath concerning his real estate dealings and personal finances.

77.    In or about August 2009, with Stern in Uruguay, Bankruptcy Judge Robert Mark issued an Order of Contempt against him.  In his publicly reported order, Judge Mark found that:

> Mr. Stern has willfully refused to cooperate in the administration of this bankruptcy case which he voluntarily filed and he has willfully, without just cause, failed to comply with several Orders of this Court, including, in particular, the August 7th Order. Mr. Stern's personal interest in the welfare of his stepson in South America, and his most recent claim of a medical problem preventing his return, do not justify his several month absence from the jurisdiction which has caused significant delay in the administration of this case and substantial fees and costs to the Trustee and to creditors.

78.    Stern's conduct in the bankruptcy proceedings and the allegations of having defrauded investors and lenders were publicized in an August 2009 *Miami Herald* article:

> Developer Michael Stern – the chief witness in a Miami Beach City Hall bribery probe – has repeatedly refused to return from Uruguay for hearings in his bankruptcy case, prompting a judge to threaten him with arrest.
>
> *          *          *
>
> Stern is the owner or co-owner of more than a dozen Miami Beach properties, including the Beach Place Hotel and the coral rock house.  But he's been pummeled by a series of foreclosure suits and other claims from lenders, forcing Stern and his wife to seek bankruptcy protection in February.

**SECOND AMENDED COMPLAINT**

183128.11

*     *     *

His debts include $6 million Stern owes to a Miami Beach woman, Esther Burstyn Spero, who filed a lawsuit last year accusing Stern of duping her into real-estate deals with phony mortgages and forged records.  Stern agreed to settle the suit without admitting wrongdoing.

*     *     *

Stern's former business partners, Ivor Rose and Rita Starr, have also accused Stern of fraud, saying Stern secretly arranged a $4.2 million mortgage on a Collins Avenue building the three owned together.  In court papers, Rose and Starr said they never received any money from the loan and said their signatures were forged on loan documents.

79.     In December 2009, Stern failed to appear for scheduled depositions and hearings in the *Colonial Bank* Case, instead remaining in Uruguay.  In response, the judge in that case found Stern in contempt, ordered him to appear before the Court and issued a Writ of Bodily Attachment, directing the Sheriff of Miami-Dade County to arrest him.

80.     The *South Florida Business Journal* interviewed Stern and published an article about him in January 2010, just before BofA/Merrill Lynch introduced him to Mr. Freeney as "Michael Millar."  The article detailed his bankruptcies and legal problems, including the issuance of the writ of bodily attachment and the allegations of fraud against him.  (The *South Florida Business Journal* did two follow-up articles about Stern's bankruptcies and legal problems in 2011.)

I.     **Michael BOCK and Eva Weinberg.**

1.     ***Professional Backgrounds and Relationships to Stern.***

81.     BOCK has been a broker and advisor for more than 30 years.  He holds Series 3, 7, 63 and 65 licenses, which allow him to buy and sell securities on behalf of his clients and give them financial advice.

82.     BOCK has been registered in the State of California under the broker-dealer license of MLPFS since April 2009.  Since 2011, BOCK has also been licensed

25

**SECOND AMENDED COMPLAINT**

as an insurance producer in the State of California, where he is authorized to transact insurance business on behalf of Merrill Lynch Life Agency, Inc., Lincoln National Life Insurance Company and Nationwide Life Insurance Company.

83.    Weinberg graduated from Boston University with a degree in finance in 1984.  She then attended Hofstra Law School, from which she graduated in 1987, but never practiced law.  Weinberg worked for Lehman Brothers in New York as a "money manager" from 1987 to 1995.  After moving to South Florida, she worked for Prudential Securities from 1995 to 2000, and for Morgan Stanley from 2000 until 2005.  In 2005, Weinberg stopped working in the financial services industry and allowed all of her securities licenses to lapse.

84.    BOCK married Weinberg for the first time in 1998.  They divorced in 2006, then remarried later that year.  BOCK and Weinberg purportedly divorced a second time in or about June 2009, via a religious edict.

85.    BOCK and Weinberg's relationship with Stern dates back to 2004, when they hired him to build a house for them in Boca Raton.  Between in or about July 2004 and February 2009, Weinberg worked for Stern Development, one of Stern's real estate companies.

86.    In 2008, BOCK, Weinberg and Weinberg's brother loaned Stern $350,000, which was secured by a promissory note.  The loan was to enable Stern to make payments that were due under the College Health settlement agreement.  At Weinberg's urging, her father, mother and brother-in-law also loaned Stern several hundred thousand dollars.  In total, BOCK, Weinberg and the Weinberg family loaned Stern approximately $1.0 million.  Plaintiffs are informed and believe, and on that basis allege, that Stern never repaid these loans.  Stern later listed BOCK as a creditor in the Beach Hotel bankruptcy in the amount of $500,000.

87.    In 2008, BOCK and Weinberg assisted Stern in finding investors for his distressed properties.  Among other things, they introduced Stern to two New Jersey investors from whom Stern unsuccessfully sought $2.25 million in financing in or

**SECOND AMENDED COMPLAINT**

183128.11

1    about October 2008.

2        88.    In December 2008, Weinberg began meeting with Ahron Farache, who

3    had previously loaned Stern $410,000 that he had not repaid.  Weinberg met with

4    Farache in an attempt to obtain additional financing for Stern.  Weinberg offered to

5    personally guarantee Stern's debt and falsely told Farache that she would be receiving

6    a $2.0 million signing bonus from a new job.

7        89.    Plaintiffs are informed and believe, and on that basis allege, that in or

8    about January 2009, Weinberg and Stern became romantically involved.  They were

9    both married at the time, Weinberg to BOCK and Stern to Layne Harris Stern.

10       90.    In addition to the loans to Stern, BOCK and Weinberg paid for the

11   caterer at the bar mitzvah of Stern's son in January 2009.  When Stern flew to

12   Uruguay following his son's bar mitzvah, Weinberg flew there and stayed with him

13   for two days, purportedly because she and her mother were concerned that Stern was

14   "suicidal."  While in Uruguay, Weinberg gave Stern $1,500.

15       91.    With Stern in Uruguay, Weinberg took over management of the Beach

16   Place Hotel, together with Stern's business associate Lester Jaggernauth.  Weinberg

17   opened a new bank account to receive the hotel's revenue because its existing

18   accounts had tax liens against them for Stern's failure to pay more than $63,000 in

19   "resort taxes" to the City of Miami Beach.  The U.S. Trustee later reported to the

20   Bankruptcy Court that neither that account nor the deposits to it had been disclosed in

21   the Beach Hotel's bankruptcy schedules and statements.

22       92.    In February 2009, Weinberg gave two post-dated checks, each in the

23   amount of $200,000, to Farache and his wife Monika ("the Faraches") to guarantee

24   Stern's debt and forestall them from initiating a collection action against him, which

25   could have exposed his fraudulent real estate dealings.  When the Faraches deposited

26   these checks in June 2009, after Stern again failed to repay his debt, they were advised

27   by the bank that the checks had been dishonored because Weinberg had previously

28   closed the bank account upon which they had been drawn.  In August 2009, the

**SECOND AMENDED COMPLAINT**

Faraches filed a suit against Weinberg for passing worthless checks and breach of an oral contract of guarantee, seeking damages in excess of $1.6 million.

93.     During 2009, BOCK and Weinberg sought to assist Stern in the *Colonial Bank* Case by pressuring Esther Burstyn-Spero to recant her testimony that Stern had forged her signature on the two loan forgiveness documents.  Both BOCK and Weinberg later testified in the *Colonial Bank* Case that they had contacted Burstyn-Spero and her husband, both of whom they knew socially, to urge her to change her testimony.

94.     During 2009, BOCK and Weinberg made payments to Stern's bankruptcy and civil lawyers totaling more than $25,000.

95.     Between in or about March and June 2009, Weinberg leased an apartment in the affluent Miami enclave of Fisher Island, moving out of the house she had been living in with BOCK.  While living on Fisher Island, she arranged for meetings between Stern and potential purchasers of his distressed real estate holdings.

96.     In November 2009, Weinberg was deposed in the *Colonial Bank* Case, during which she acknowledged that she, BOCK and her family had loaned Stern nearly $1.0 million.  She also admitted knowledge of Stern's legal problems and bankruptcies.

97.     In December 2009, BOCK was deposed in the *Colonial Bank* Case, during which he acknowledged that he and Weinberg had loaned Stern money and had attempted to find investors for his real estate holdings.  BOCK further stated that he knew that Stern had filed for bankruptcy and had listed BOCK as a creditor.

### 2.     *Employment with BAC, BANA and MLFPS.*

98.     In April 2009, BOCK joined the Coral Gables, Florida office of Merrill Lynch.  According to public records and his own representations, BOCK was jointly employed by BAC, BANA and MLPFS during the time relevant to this Second Amended Complaint.

99.     BOCK's FINRA Report states that he has been employed by

**SECOND AMENDED COMPLAINT**

"Merrill Lynch, Pierce, Fenner & Smith Incorpora[ted]" from "4/2009 – present," and by "Bank of America, NA" from "12/2009 – present."  Similarly, BOCK's SEC Report lists him as employed by "Merrill Lynch, Pierce, Fenner & Smith Incorporated" from "4/2009 – present," and by "Bank of America, NA" from "12/2009 – present."

100.    According to BOCK's official "Merrill Lynch Financial Advisor" profile, he was (and remains) a "Senior Vice President – Wealth Management" and a "Senior Financial Advisor" of "Global Wealth Management," a subdivision of BAC.

101.    In a March 2012 interview with the FBI, BOCK described himself as employed by "Merrill Lynch Bank of America."

102.    At all times relevant hereto, BOCK was registered as a broker-dealer and an investment adviser, and owed his clients and prospective clients the fiduciary duties described above.

103.    Weinberg joined the Merrill Lynch Coral Gables office together with BOCK in or about April 2009, with BOCK becoming her superior.  Weinberg was employed by BAC and (Defendants assert) MLPFS through July 2010.

104.    Weinberg's FINRA Report shows her as having been employed by "Merrill Lynch" from "04/2009-Present."  (She has no SEC Report because she was not a registered investment adviser.)

105.    Weinberg was hired as an "Investment Associate."  Her supervisors, however, allowed her to represent herself as a "Senior Financial Advisor" for "Merrill Lynch Global Wealth Management," a subdivision of BAC; a "Vice President of Private Wealth Management at Merrill Lynch"; a "Financial Consultant" with "Merrill Lynch Wealth Management"; and a "Senior Vice President" with "Global Wealth Management."

106.    In addition, Plaintiffs are informed and believe, and on that basis allege, that Weinberg's compensation was set and paid by BANA.

107.    As part of the BAC/Merrill Lynch corporate restructuring, in or about

**SECOND AMENDED COMPLAINT**

183128.11

December 2009 or January 2010, BAC relocated both BOCK and Weinberg from the Merrill Lynch Coral Gables office to the BofA Brickell Avenue branch in Miami Beach, Florida.

**J.    David Sugarman.**

108.    Sugarman joined the Coral Gables office of Merrill Lynch as a broker and advisor from Laidlaw & Company ("Laidlaw") in or about October 2009.  He was recruited by BOCK.

109.    From December 2009 until he was terminated in January 2011, Sugarman was employed by BAC, BANA and MLPFS.  His FINRA and SEC Reports showed him as jointly employed by both BANA and MLPFS.  Both reports stated that he was employed by "Merrill Lynch, Pierce, Fenner & Smith Incorporated" from "10/2009-Present," and by "Bank of America, N.A." from "12/2009-Present."

110.    Sugarman's title during his tenure at BofA/Merrill Lynch was "Assistant Vice President – Investments" and "Senior Financial Advisor" of "Merrill Lynch Global Wealth Management," a subdivision of BAC.

111.    Upon joining Merrill Lynch, Sugarman formed a GWIM financial advisory team with BOCK and Weinberg that they named the "MSE Group"; "MSE" standing for Michael, Sugarman and Eva.

112.    In or about December 2009 or January 2010, BAC relocated Sugarman from the Merrill Lynch Coral Gables office to the BofA Brickell Avenue branch along with BOCK and Weinberg.

113.    In a May 2012 interview with the FBI, Sugarman stated that he had been employed by "Merrill Lynch/Bank of America."

**K.    Matthew Liebman.**

114.    Liebman joined Merrill Lynch in July 2008 as a broker and advisor, and became the Branch Manager of the Coral Gables office.

115.    From December 2009 until the present, he has been jointly employed by BAC, BANA and MLPFS.  His SEC Report states that he has been employed by

1    "Merrill Lynch, Pierce, Fenner & Smith Incorporated" from "11/99- Present," and by
2    "Bank of America, N.A." from "12/2009-Present."  His FINRA Report states that he
3    has been employed by "Merrill Lynch" from "07/2008–Present."

4         116.   Liebman's titles during the time relevant to this Second Amended
5    Complaint have included "Senior Vice-President – Wealth Management," a
6    subdivision of BAC; "Wealth Management Advisor"; "Resident Director"; and
7    "Portfolio Manager."

8         117.   Plaintiffs are informed and believe, and on that basis allege, that Liebman
9    was the supervisor for BOCK, Weinberg and Sugarman.  He was relocated with them
10   from the Merrill Lynch Coral Gables office to the BofA Brickell Avenue branch in or
11   about December 2009 or January 2010.

12        118.   At all times relevant hereto, Liebman was registered as a broker-dealer
13   and investment adviser, and owed his clients the fiduciary duties described above.

14   **L.    Jodi Del Campo.**

15        119.   Del Campo was an employee of BANA and MLFPS during the relevant
16   time period.  She worked at the BofA Brickell Avenue branch during this time, with
17   the titles "Assistant Vice President" and "Wealth Management Banker" for "Wealth
18   Management Banking" at "Bank of America, N.A."

19        120.   Del Campo's FINRA Report states that she was employed by "Bank
20   America" from "11/1993 – 10/2003"; by "Merrill Lynch, Pierce, Fenner & Smith
21   Incorpora[ted]" from "10/2009 – Present"; and by "Bank of America, NA" from
22   "06/2011 – Present."  Her SEC Report likewise states that she was employed by
23   "Bank America" from "11/1993 – 10/2003;" by "Merrill Lynch, Pierce, Fenner &
24   Smith Incorporated" from "10/2009 – Present"; and by Bank of America, NA" from
25   "06/2011 – Present."

26        121.   Del Campo was not a member of the MSE Group, but cross-marketed
27   BANA products and services to their clients.

28        122.   At all times relevant hereto, Del Campo was a registered broker-dealer

31

**SECOND AMENDED COMPLAINT**

183128.11

and investment adviser, and owed her clients the fiduciary duties discussed above.

**M.    Weinberg's Brother.**

123.    Weinberg's brother is a New Jersey resident.  He obtained a license to sell life insurance in New Jersey in May 2010, shortly after Mr. Freeney became a BofA/Merrill Lynch client.  He obtained a license to sell life insurance in Indiana in June 2010, just so he could receive the commissions from the sale of $55 million in life insurance to Mr. Freeney.  (He thereafter allowed that license to lapse in June 2012.)

124.    As an insurance advisor, under New Jersey and Indiana law, Weinberg's brother owed fiduciary duties to his clients, including: (a) the duty of undivided loyalty; (b) the duty to disclose all material information concerning the suitability, terms, costs and benefits of the insurance products he was recommending; (c) the duty to provide competent services and advice; and (d) the duty to keep his clients informed of the status of their investments.

**N.    The Florida Attorney and the Florida Law Firm.**

125.    At all relevant times, the Florida attorney (the "Florida Attorney") was licensed to practice law in the State of Florida and only in Florida.  The Florida law firm (the "Florida Law Firm"), of which he is a partner, is located in Miami.

126.    The Florida Attorney represented Stern in over 20 civil actions between 2000 and 2012.  He also represented Weinberg in two civil cases, both of which arose from her relationship with Stern.  As a result of his prior representation of Stern in those cases, as well as press reports and other publicly available information about Stern, the Florida Attorney was well aware of Stern's habitual dishonesty and fraudulent business practices, including his proclivity to lie, issue bad checks, forge others' signatures, falsify documents and misappropriate investor funds and mortgage proceeds.

127.    In or about July 2009, the Florida Attorney and the Florida Law Firm both filed claims in Stern's personal bankruptcy for $100,000 for unpaid legal fees.

**SECOND AMENDED COMPLAINT**

183128.11

128.   As an attorney licensed to practice law in the State of Florida, the Florida Attorney was obligated to obey the Florida Rules of Professional Conduct (the "Florida Rules"), which required him to, among other things: (a) disclose material information (Florida Rule 4-1.4); (b) act with care, competence and diligence (Florida Rules 4-1.1 and 4-1.3); (c) communicate with his clients with candor (Florida Rule 4-2.1); and (d) act with loyalty (Florida Rule 4-1.7).

129.   Plaintiffs are informed and believe, and on that basis allege, that in his representation of Mr. Freeney and Roof Group (described further below), the Florida Attorney was also engaged in the practice of law in California, but without a license, which is a violation of California Business and Professions Code section 6125 and a criminal offense.  By practicing law in California, the Florida Attorney and the Florida Law Firm became subject to the ethical rules governing all California lawyers.  Those rules are set forth in the California Rules of Professional Conduct (the "California Rules"), and include: (a) the duty to disclose material information (California Rule 3-500); (b) the duty to act with care, competence and diligence (California Rule 3-110(A) and (B)); (c) the duty to communicate with candor (California Rule 5-200); and (d) the duty to act with loyalty (California Rule 3-310(A) and (B)).

## V.   THE SCHEME TO DEFRAUD.

**A.   Sugarman Recruits Mr. Freeney as a Client.**

130.   While still at Laidlaw, Sugarman began recruiting Mr. Freeney as a prospective client.  At the time, Mr. Freeney had no interest in becoming a client of Laidlaw because he was unfamiliar with the firm and uninterested in having another small, unknown firm as his financial manager and investment advisor.

131.   When he joined BofA/Merrill Lynch, Sugarman renewed his efforts to recruit Mr. Freeney as a client, emphasizing to him that BofA/Merrill Lynch was one of the largest and most well established financial institutions in the world; that it offered the safety, soundness and protections that he was looking for; and that it could provide a full range of wealth management services, from paying his bills and

**SECOND AMENDED COMPLAINT**

1  preparing his tax returns to securing financing for his business ventures and finding

2  him better investment opportunities.

3  **B.     BOCK and Weinberg Recruit Mr. Freeney as a Client.**

4       132.   Prior to January 2010, Mr. Freeney had never met or spoken with BOCK,

5  Weinberg, or anyone else associated with BofA/Merrill Lynch other than Sugarman.

6  In January 2010, Sugarman introduced Mr. Freeney's friend and associate Aaron West

7  to BOCK and Weinberg, and Sugarman and Mr. West thereafter introduced Mr.

8  Freeney to Weinberg.

9       133.   Soon after being introduced to Mr. Freeney, Weinberg, with the approval

10 of BOCK and Liebman, supplanted Sugarman as Mr. Freeney's principal contact at

11 the bank.  As Sugarman later told the FBI:

12
   - "[O]nce he introduced WEINBERG to FREENEY, she wanted
13        to take control of the relationship right away, even though
14        FREENEY was not an official client yet."

15
   - "[T]he minute WEINBERG met FREENEY, she just took
16        over."

17
   - "WEINBERG treated FREENEY's account like her own baby.
18        WEINBERG even went as far as to tell SUGARMAN not to
19        contact or call FREENEY, saying that FREENEY was her guy.
         WEINBERG said that she was going to handle all of
20        FREENEY's bill pay, his portfolio, money and the restaurant."

21      134.   In the course of recruiting Mr. Freeney to become a BofA/Merrill Lynch

22 client, BOCK and Weinberg made and caused others to make the following false and

23 misleading representations and false promises, among others, to Mr. Freeney, directly

24 and through his friends and associates, including Mr. West:

25      (a)      Weinberg was a Senior Investment Advisor with BofA/Merrill

26 Lynch, when, in fact, she was not a registered investment adviser and not licensed to

27 provide investment advice to clients;

28

---

34

**SECOND AMENDED COMPLAINT**

(b)     BOCK's team had the qualifications, expertise and experience to competently manage Mr. Freeney's assets, investments and income, when, in fact, they were not true financial managers or planners and their expertise and experience involved principally the purchase and sale of conventional investments, such as publicly traded securities;

(c)     BOCK's team could and would assist Mr. Freeney in finding new investors or obtaining loan financing for RSLA, when, in fact, they had no such ability or intent;

(d)     BOCK's team could and would assist Mr. Freeney in disposing of non-performing or otherwise unsuitable investments, such as undeveloped land he owned in North Carolina and investments he had made in two unlisted companies in return for unsecured, interest bearing promissory notes, when, in fact, they had no such ability or intent; and

(e)     BOCK's team could and would assist Mr. Freeney in obtaining the return of a $1.2 million deposit he had made toward the purchase of a condominium unit in the new W Hotel in South Beach for investment purposes or arrange for loan financing to close on the unit, when, in fact, they had no such ability or intent.

135.   In the course of recruiting Mr. Freeney to become a BofA/Merrill Lynch client, and continuing throughout the course of the scheme to defraud, BOCK and Weinberg concealed and caused others to conceal the following material facts, among others, from Mr. Freeney, his business associates and his professional advisors:

(a)     Weinberg was only a part-time BofA/Merrill Lynch employee;

(b)     Weinberg was not a registered investment adviser and was not licensed to give investment advice to clients;

(c)     Weinberg had been out of the financial services industry for a number of years prior to joining BofA/Merrill Lynch and had just joined BofA/Merrill Lynch a few months earlier;

**SECOND AMENDED COMPLAINT**

1          (d)    Weinberg was unfit and not competent to manage Mr. Freeney's

2  assets, investments, or income;

3          (e)    Weinberg had been twice married to and twice divorced from

4  BOCK and they had a tumultuous and at times acrimonious working relationship;

5          (f)    Weinberg's deposition testimony in the *Colonial Bank* Case

6  revealed that she had been assisting Stern in committing bankruptcy fraud, finding

7  new victims and intimidating a key witness;

8          (g)    Weinberg had no expertise or experience in the management or

9  operation of a restaurant;

10         (h)    Weinberg had no ability to maintain the books and records or

11  prepare budgets or financial projections for a restaurant; and

12         (i)    Weinberg had no experience in supervising the build out, staffing,

13  opening, or operations of a restaurant.

14     136.   If Mr. Freeney had been advised of the true facts concerning

15  BofA/Merrill Lynch, BOCK and Weinberg at the time, he would never have agreed to

16  become or remain a BofA/Merrill Lynch client or have entrusted management of his

17  assets, investments and income and his financial future to BofA/Merrill Lynch,

18  BOCK, or Weinberg.

19     137.   In making these representations and concealing these facts, BOCK and

20  Weinberg were acting in their capacities as employees, actual agents and/or ostensible

21  agents of BofA/Merrill Lynch.

22  **C.    Weinberg Refers Mr. Freeney to "Michael Millar" for Consulting**

23        **Services and as a Potential Investor in RSLA.**

24     138.   In the course of recruiting Mr. Freeney to become a BofA/Merrill Lynch

25  client, Weinberg introduced him to "Michael Millar."  Mr. Freeney was told that

26  Millar was a wealthy and successful Miami Beach businessman who did consulting

27  work for BofA/Merrill Lynch.  He was also told that Millar might be interested in

28  investing in RSLA and could assist Mr. Freeney in disposing of his non-performing

**SECOND AMENDED COMPLAINT**

and unsuitable existing investments.

139.   In the course of recruiting Mr. Freeney, Weinberg made and caused other to make the following false and misleading representations, among others, to Mr. Freeney, directly and through his friends and associates, including Mr. West and Jason Edmonds, about Stern:

(a)     Stern's name was "Michael Millar," when, in fact, it was Michael Alan Stern;

(b)     Millar was a wealthy businessman, when, in fact, Stern and his then wife had filed for personal bankruptcy a year earlier with reported liabilities in excess of $65 million and assets valued at *negative* $2.4 million;

(c)     Millar was a successful Miami Beach real estate developer, when, in fact, all of Stern's principal real estate holdings were over-encumbered and in bankruptcy, receivership, or foreclosure;

(d)     Millar had $30 million on deposit at BofA/Merrill Lynch, when, in fact, Stern's bankruptcy schedules stated that his bank account balances totaled *negative* $23,000;

(e)     Millar was a real estate consultant for BofA/Merrill Lynch, when, in fact, Stern was not and never had been a consultant of any kind for BofA/Merrill Lynch;

(f)     Millar lived in the Bahamas, when, in fact, Stern lived in Miami Beach and was under court order to remain in Miami-Dade County or face arrest;

(g)     Millar owned a private jet, when, in fact, Stern did not own and lacked the funds to purchase any aircraft;

(h)     Millar was the grandson of pharmaceutical mogul Dr. Phillip Frost, the Chairman of Teva Pharmaceuticals, when, in fact, Dr. Frost was one of Stern's victims, having lost $1.6 million investing in one of Stern's fraudulent real estate ventures;

**SECOND AMENDED COMPLAINT**

(i)     Millar intended to invest $7.0 million in RSLA, when, in fact, Stern had neither the means nor the intention to invest one penny in RSLA;

(j)     Millar could assist in overseeing the build out, staffing and opening of RSLA, when, in fact, Stern saw RSLA not as a viable investment, but as an opportunity to steal from Mr. Freeney; and

(k)     Millar was a man of his word who wanted nothing more than to show Mr. Freeney how to become a successful business owner, when, in fact, Stern was a notorious swindler and financial predator who was targeting Mr. Freeney as his next prey.

140.   In the course of recruiting Mr. Freeney to become a BofA/Merrill Lynch client, and throughout the course of the scheme to defraud, BOCK and Weinberg concealed the following material facts, among others, from Mr. Freeney, his business associates and his professional advisors about Stern:

(a)     Stern and his then wife had declared personal bankruptcy just a year prior to Mr. Freeney becoming a BofA/Merrill Lynch client, with reported debts exceeding $65 million and assets of a negative value;

(b)     Stern's real estate assets were over-encumbered, in receivership, in bankruptcy and/or the subject of foreclosure proceedings or other lawsuits;

(c)     Stern had been found in contempt by the Bankruptcy Court for willfully violating court orders requiring him to produce documents and appear to provide testimony;

(d)     Stern was a defendant in more than 20 civil lawsuits brought by defrauded partners, investors, mortgage lenders and financial institutions;

(e)     Evidence introduced in those lawsuits established that Stern had forged documents, falsified loan applications, misappropriated over $20 million in loan proceeds, and engaged in witness tampering and intimidation;

(f)     A writ of bodily attachment had issued for Stern's arrest in one of the Florida lawsuits;

**SECOND AMENDED COMPLAINT**

183128.11

1      (g)    Stern had fled to Uruguay to evade process and avoid being

2  deposed, and, while there, cheated his stepson out of a large inheritance;

3      (h)    Stern had previously been caught paying over $100,000 in bribes

4  to Miami Beach city officials;

5      (i)    Stern had substantial gambling debts;

6      (j)    Stern had not paid any income taxes in years, although he reported

7  in his bankruptcy schedules having earned $500,000 in both 2007 and 2008;

8      (k)    Stern had neither the intent nor the ability to invest any funds in

9  RSLA or to attract other investors to do so; and

10      (l)    Stern was addicted to the prescription drug Oxycodone.

11      141.    In the course of recruiting Mr. Freeney to become a BofA/Merrill Lynch

12  client, and throughout the course of the scheme to defraud, BOCK and Weinberg

13  concealed and caused others to conceal the following material facts, among others,

14  from Mr. Freeney, his associates and his professional advisors concerning BOCK and

15  Weinberg's relationships with Stern, including that:

16      (a)    BOCK, Weinberg and the Weinberg family had loaned more than

17  $1.0 million to Stern in the past;

18      (b)    Stern had not repaid most of those loans;

19      (c)    BOCK was listed as a creditor for $500,000 in one of Stern's

20  bankruptcies;

21      (d)    Weinberg had previously worked for one of Stern's companies

22  and managed the Beach Place Hotel for Stern while he was Uruguay;

23      (e)    Both BOCK and Weinberg had previously attempted to find

24  investors for Stern's distressed real estate holdings;

25      (f)    BOCK and Weinberg had paid Stern's attorneys in his

26  bankruptcies and civil litigation;

27      (g)    BOCK and Weinberg had assisted Stern in the *Colonial Bank*

28  *Case* by pressuring Esther Burstyn-Spero to recant her testimony that Stern had forged

**SECOND AMENDED COMPLAINT**

1   her signature;

2          (h)     Both BOCK and Weinberg had been deposed in the *Colonial*

3   *Bank* Case in which Stern was alleged to have committed fraud involving $17.8

4   million in real estate loans;

5          (i)     Weinberg had guaranteed Stern's debt to the Faraches by giving

6   them $400,000 in bad checks; and

7          (j)     Weinberg was romantically involved with Stern.

8       142.   In addition, Stern (posing as Millar) made the following false and

9   misleading representations and false promises, among others, to Mr. Freeney, directly

10  and through his friends and associates, including Mr. West:

11         (a)     His name was "Michael Millar," "David Millar," or "David

12  Michael Millar";

13         (b)     He was a wealthy and successful businessman who had made his

14  money in real estate development and the petroleum industry;

15         (c)     He was sometimes asked to perform consulting services for BofA;

16         (d)     His primary residence was in the Bahamas, but he also had a

17  residence in Florida;

18         (e)     He owned a private jet and a private yacht;

19         (f)     He had the financial resources to invest in RSLA, and was

20  interested in investing in RSLA; and

21         (g)     He could and would recover Mr. Freeney's $1.2 million deposit

22  on the W Hotel condominium unit.

23      143.   If Mr. Freeney had been advised of the true facts concerning Stern, and

24  BOCK and Weinberg's involvement with Stern, he would never have agreed to

25  become or remain a BofA/Merrill Lynch client or have entrusted management of his

26  assets, investments and income and his financial future to BofA/Merrill Lynch,

27  BOCK, or Weinberg.

28      144.   In referring Mr. Freeney to Stern (posing as Millar) and vouching for his

40

**SECOND AMENDED COMPLAINT**

1  bona fides, and in making the aforementioned representations and concealing the

2  aforementioned facts, BOCK and Weinberg were acting in their capacities as

3  employees, actual agents and/or ostensible agents of BofA/Merrill Lynch.

4  **D.      Liebman and BOCK Give Weinberg Exclusive Authority to Serve as**

5  **         Mr. Freeney's Wealth Manager.**

6       145.   Following Weinberg's introduction to Mr. Freeney and his associates,

7  Liebman and BOCK approved, authorized and ratified Weinberg serving as

8  Mr. Freeney's private banker, financial manager and investment advisor.  Weinberg's

9  authority included, among other things:

10              (a)    Serving as the principal point of contact between Mr. Freeney and

11  BofA/Merrill Lynch;

12              (b)    Opening bank and brokerage accounts for Mr. Freeney;

13              (c)    Arranging for the transfer of Mr. Freeney's assets and existing

14  investments from his prior financial manager to BofA/Merrill Lynch;

15              (d)    Referring Mr. Freeney to bank outsiders for consulting, insurance

16  and legal services;

17              (e)    Selling Mr. Freeney insurance products;

18              (f)    Giving Mr. Freeney investment advice;

19              (g)    Liquidating Mr. Freeney's existing investments;

20              (h)    Managing Mr. Freeney's income from his Colts contract,

21  endorsements and other sources;

22              (i)    Paying Mr. Freeney's bills and personal expenses;

23              (j)    Transferring funds from Mr. Freeney's bank and brokerage

24  accounts without his express authorization;

25              (k)    Managing Roof Group's finances;

26              (l)    Overseeing the build out, staffing and public opening of RSLA;

27              (m)    Paying invoices from Brodin Design, subcontractors, vendors and

28  others involved in the build out of RSLA;

**SECOND AMENDED COMPLAINT**

1             (n)     Arranging for the preparation of Mr. Freeney's tax returns and

2  managing the funds from his tax refunds; and

3             (o)     Administering and operating Mr. Freeney's charitable foundation.

4       146.   In giving and permitting Weinberg to exercise this authority, Liebman

5  and BOCK were acting in their capacities as employees and actual agents of

6  BofA/Merrill Lynch and Liebman was acting as Weinberg's supervisor.

7  **E.     Mr. Freeney Becomes a BofA/Merrill Lynch Client and Transfers**

8            **Management of His Assets, Investments and Income to BAC and MLPFS.**

9       147.   Mr. Freeney agreed to become a BofA/Merrill Lynch client and transfer

10  management of his assets, investments, income and other financial affairs to

11  BofA/Merrill Lynch in or about late January or early February 2010.

12       148.   As BofA/Merrill Lynch recognized, the benefits of having Mr. Freeney

13  as a client included: (a) the immediate transfer and deposit of approximately $3.0

14  million in cash; (b) control and management of assets, investments and present and

15  future income exceeding $40 million in value; (c) the generation of sizable

16  commissions and fees; (d) potential profits from making loans and providing other

17  extensions of credit; and (e) the prestige and marketing opportunities from having one

18  of the highest paid and well respected players in the NFL as a client.

19       149.   Weinberg, as Mr. Freeney's assigned banker, oversaw the transfer of his

20  assets and investments from his prior financial manager and investment advisor to

21  BofA/Merrill Lynch.  The assets, investments and income streams that Mr. Freeney

22  transferred to BofA/Merrill Lynch's control included:

23             (a)     Approximately $3.0 million in cash;

24             (b)     A life insurance annuity worth a little over $1.5 million;

25             (c)     $1,750,000 invested with CFP Group, Inc. ("CFP"), in the form of

26  loans, which was returning a little more than $26,000 in monthly interest income;

27             (d)     $1,500,000 invested with Success Trade, Inc. ("Success Trade"),

28  in the form of loans, which was returning approximately $15,600 in monthly interest

42

**SECOND AMENDED COMPLAINT**

1 income;

2         (e)    $500,000 invested in Advisors Disciplined municipal bonds,

3 which was returning slightly more than $2,000 in monthly interest income, tax free;

4         (f)    $200,000 invested in an American Realty Capital Trust REIT,

5 which was returning approximately $1,100 in monthly interest income, tax free;

6         (g)    His investment and ownership interest in Roof Group and RSLA;

7         (h)    A contract to purchase a condominium unit in the W Hotel

8 pursuant to which he had previously paid a $1.2 million deposit (the "W Hotel

9 Investment");

10         (i)    8.5 acres of undeveloped land in Mecklenburg County,

11 North Carolina, which he had purchased for $1,530,000 in or about December 2004

12 (the "North Carolina Land Investment");

13         (j)    The three years remaining on his contract with the Colts, which

14 guaranteed him, before taxes, a total of $34,280,000; and

15         (k)    Income tax refunds due him for the 2009 tax year, which totaled

16 over $1.0 million.

17     150.   All of these assets, investments and income came under the management

18 and control of BOCK's team at the BofA Brickell Avenue branch.

19     151.   As part of the management of Mr. Freeney's assets, investments and

20 income, BofA/Merrill Lynch agreed that it would handle Mr. Freeney's bill payments,

21 including payment of his credit card bills, insurance premiums, home mortgage,

22 property taxes, home owners' association dues, car payments, telephone bills and

23 home utility bills.

24     152.   BofA/Merrill Lynch also agreed that it would handle the preparation and

25 filing of Mr. Freeney's federal and state tax returns; provide periodic snapshots of his

26 financial condition; dispose of the North Carolina Land Investment; pursue the return

27 of his deposit with the W Hotel or provide loan financing to purchase the unit; and

28 research and recommend new investment opportunities.

**SECOND AMENDED COMPLAINT**

183128.11

153.   BofA/Merrill Lynch further agreed to manage his investment in Roof Group, which included handling payments to Brodin Design and other vendors for the build out; the preparation and filing of Roof Group's federal and state tax returns; and finding additional investors and/or loan financing for RSLA so that Mr. Freeney would not be the sole source of funds.

154.   As a result of BofA/Merrill Lynch becoming Mr. Freeney's new financial manager, all of his bank and brokerage account statements, credit card statements, bills and correspondence regarding his investments, including RSLA, were forwarded to BOCK's team.

155.   Based on their representations, promises and withholding of material information, Mr. Freeney came to repose his trust and confidence in BofA/Merrill Lynch, BOCK and Weinberg to honestly, loyally, competently and diligently do what they had represented and promised, including to manage his assets, investments and income; pay his bills; make investment recommendations; give financial advice; and generally protect his financial interests and future.  At all times relevant hereto, BofA/Merrill Lynch, BOCK and Weinberg, and each of them, encouraged, assumed and voluntarily accepted such trust and confidence, creating a fiduciary relationship with Mr. Freeney.

156.   At the urging of BofA/Merrill Lynch, and in reliance upon BOCK, Weinberg and Stern's misrepresentations, false promises and concealment of material facts, Mr. Freeney authorized Stern (posing as Millar) to work with BOCK's team to, among other things:

    (a)    Negotiate the return of his $1.5 million in loans to Success Trade;

    (b)    Negotiate the return of his $1.75 million in loans to CFP;

    (c)    Negotiate the return of his $1.2 million deposit with the W Hotel;

    (d)    Dispose of the North Carolina Land Investment;

    (e)    Increase his ownership interest in and control of Roof Group; and

    (f)    Oversee the build out, renegotiate the lease, obtain the liquor

44

**SECOND AMENDED COMPLAINT**

1  license and hire new managers for RSLA.

2         157.   Based on these representations, promises and undisclosed facts,

3  Mr. Freeney came to repose his trust and confidence in Stern (posing as Millar) to

4  honestly, loyally, competently and diligently do what he had represented and

5  promised.  At all times relevant hereto, Stern (posing as Millar) encouraged, accepted

6  and voluntarily assumed such trust and confidence, creating a fiduciary relationship

7  with Mr. Freeney.

8         158.   In arranging for and transferring these assets, investments and income

9  streams to BofA/Merrill Lynch's control, agreeing to provide the aforementioned

10  services to Mr. Freeney and delegating the aforementioned responsibilities to Stern,

11  BOCK and Weinberg were acting in their capacities as employees, actual agents

12  and/or ostensible agents of BofA/Merrill Lynch.

13  **F.     The Creation of Arms Reach Consulting LLC.**

14         159.   A few days after being introduced to Mr. Freeney, Stern directed his

15  associate Lester Jaggernauth to incorporate Arms Reach Consulting LLC ("ARC") in

16  Delaware and open a business checking account for ARC.  As Jaggernauth later stated

17  to the FBI:

18         •   "[O]ne day, STERN told him that he was going to open a
19             company, and put in it JAGGERNAUTH's name.
20             JAGGERNAUTH said he didn't feel good about this at first
             and was unsure about this, but ultimately, STERN opened
21             Arm's Reach Consulting in JAGGERNAUTH's name."

22         •   "[H]e and STERN saw the name, Arm's Reach Consulting
23             (ARC) from the back of a yacht owned by a VP of
             Coca Cola . . . .   JAGGERNAUTH said that he did not know
24             what ARC did for sure . . . ."
25

26         160.   Jaggernauth further stated to the FBI that "STERN told

27  JAGGERNAUTH that he was just using JAGGERNAUTH's name to open the bank

28  account because of STERN's bankruptcy.  STERN said that he couldn't have any

45

**SECOND AMENDED COMPLAINT**

1   bank accounts in STERN's name because the bankruptcy trustee had seized all of

2   STERN's other bank accounts, so he had to use JAGGERNAUTH's name to get

3   around this."

4   161.   Plaintiffs are informed and believe, and on that basis allege, that on or

5   about February 18, 2010, BOCK and Weinberg paid an organization called the

6   Incorporating Company LLC to incorporate ARC in Delaware for Stern.

7   162.   On or about that same day, Stern established two email accounts with

8   Yahoo that he could use to communicate with Mr. Freeney and his associates under

9   the false identify David Michael Millar: davidmichaelmillar@yahoo.com and

10   armsreachconsultingllc@yahoo.com.

11   163.   On or about February 27, 2010, Jaggernauth opened a business checking

12   account for ARC at Wachovia Bank, which subsequently became a Wells Fargo Bank

13   account when Wells Fargo acquired Wachovia.

14   164.   ARC was created as an instrumentality to carry out the scheme to

15   defraud: it had no assets, employees, clients, or legitimate business operations.  Stern

16   established ARC for the sole or primary purpose of concealing his theft and

17   conversion of Mr. Freeney and Roof Group's fund and assets from Mr. Freeney, the

18   Bankruptcy Court, the bankruptcy trustee, the U.S. Trustee, his creditors in his

19   bankruptcy proceedings and the defrauded victims who had sued him.  In fact, during

20   the course of the scheme, more than $2.2 million in funds Weinberg and Stern had

21   misappropriated from a Roof Group account at BANA would be laundered through

22   the ARC bank account.

23   **G.      Weinberg Refers Mr. Freeney to Her Brother for Insurance Services.**

24   165.   In or about March 2010, Weinberg advised Mr. Freeney that he should

25   obtain whole life insurance as part of his overall investment portfolio.

26   166.   At the time, Mr. Freeney already owned and was making premium

27   payments on a $10 million life insurance policy issued by Minnesota Mutual Life

28   Insurance Company ("Minnesota Mutual") and a $3.0 million life insurance policy

46

**SECOND AMENDED COMPLAINT**

issued by Lincoln Financial Life Insurance Company ("Lincoln Financial"). BofA/Merrill Lynch was aware of these policies, having received requests for premium payments from Minnesota Mutual and Lincoln Financial.

167.   In or about March 2010, Weinberg introduced Mr. Freeney to her brother.  Weinberg falsely represented to Mr. Freeney that her brother had extensive knowledge and experience concerning the purchase of life insurance products for investment purposes.  In fact, Weinberg's brother was not even licensed to sell life or any insurance at the time.

168.   In or about March 2010, Weinberg's brother offered and agreed to act as Mr. Freeney's advisor in his purchase of suitable whole life insurance for investment purposes, concealing from Mr. Freeney his lack of qualifications, expertise and experience in the purchase of life insurance products generally and for investment purposes specifically.

169.   Weinberg and Weinberg's brother encouraged and convinced Mr. Freeney to purchase up to $60 million in whole life insurance, claiming that this was a suitable, prudent and beneficial long-term investment for him.  Trusting in the honesty, loyalty, competence and candor of BofA/Merrill Lynch, Weinberg and Weinberg's brother, Mr. Freeney accepted their recommendations and agreed that they should select the insurance policies to be purchased and complete the purchases on his behalf.

170.   Unbeknownst to Mr. Freeney, Weinberg and her brother had agreed to split the commissions from Mr. Freeney's purchase of the life insurance policies, which would be a substantial payment given the amount of insurance involved.

171.   Weinberg and her brother used a senior life insurance agent who was a friend of their father to find insurance companies willing to issue $60 million in whole life insurance to Mr. Freeney.  Weinberg and her brother instructed the senior life insurance agent to structure the purchase of the life insurance to include multiple policies, rather than a single, high-dollar policy.

**SECOND AMENDED COMPLAINT**

183128.11

172.   Because a single policy would have had a higher cash surrender value, it would have been a much better investment for Mr. Freeney.  Weinberg and her brother instructed the senior life insurance agent to obtain multiple policies for the sole or primary purpose of maximizing the sales commissions Weinberg's brother would receive, and thus the amount of money he could kick back to Weinberg.

173.   Based on these representations and undisclosed facts, Mr. Freeney came to repose his trust and confidence in BofA/Merrill Lynch, Weinberg and Weinberg's brother to honestly, loyally, competently and diligently advise, counsel and assist him in the purchase of as much as $60 million in life insurance for investment purposes.  At all times relevant hereto, BofA/Merrill Lynch, Weinberg and Weinberg's brother, and each of them, encouraged, accepted and voluntarily assumed such trust and confidence, creating a fiduciary relationship with Mr. Freeney relating to the purchase of such insurance.

174.   In referring Mr. Freeney to her brother and vouching for his bona fides, in advising and encouraging Mr. Freeney to purchase up to $60 million in life insurance, and in making the aforementioned representations and concealing the aforementioned facts, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BofA/Merrill Lynch.

**H.    Weinberg Refers Mr. Freeney to the Florida Attorney and the Florida Law Firm for Legal Services.**

175.   Toward the end of March 2010, BofA/Merrill Lynch, Weinberg and Stern referred Mr. Freeney to the Florida Attorney and the Florida Law Firm for legal advice and services relating to Roof Group and RSLA.  The Florida Attorney met Mr. Freeney for the first time on or about March 24, 2010, at or en route to a meeting in the Bahamas that included Weinberg, Stern (posing as Millar) and Jaggernauth to discuss certain issues relating to Roof Group and RSLA.

176.   In that meeting, and in subsequent communications with Mr. Freeney, the Florida Attorney was careful not to reveal that Millar's true name was Michael Stern,

48

**SECOND AMENDED COMPLAINT**

1    and made statements and withheld information that created the false and misleading

2    impression that Stern was, in fact, a wealthy and successful businessman; that both

3    Weinberg and Stern were professionals whom Mr. Freeney could trust; and that both

4    Weinberg and Stern had Mr. Freeney's best interests at heart and wanted to protect

5    him from those around him who would attempt to cheat or take unfair advantage of

6    him.

7        177.   Weinberg, Stern (posing as Millar) and the Florida Attorney made the

8    following false and misleading representations, among others, to Mr. Freeney, directly

9    and through his friends and associates, to induce Mr. Freeney to retain the Florida

10   Attorney:

11           (a)     The Florida Attorney had the expertise and experience to

12   competently provide legal advice and services to Roof Group and RSLA,

13   notwithstanding that Roof Group was a California limited liability company, RSLA

14   was located in Los Angeles and neither of them had any ongoing connections to

15   Florida;

16           (b)     The Florida Attorney could be trusted to provide loyal services

17   and candid legal advice to Mr. Freeney regarding Roof Group, RSLA and related legal

18   matters; and

19           (c)     The Florida Attorney had no conflicts of interest arising from any

20   past attorney-client relationship with Millar.

21       178.   Additionally, Weinberg, Stern (posing as Millar) and the Florida

22   Attorney concealed and caused others to conceal the following material facts, among

23   others, from Mr. Freeney and his friends and associates concerning the Florida

24   Attorney's relationships with Stern and Weinberg:

25           (a)     The Florida Attorney had represented Stern in 20 or more civil

26   lawsuits prior to being introduced to Mr. Freeney, in which Stern had been sued for

27   fraud, issuing NSF checks, misappropriating loan proceeds and forging signatures on

28   loan and related documents;

49

**SECOND AMENDED COMPLAINT**

1  (b) In the *College Health* Case, the Florida attorney had negotiated a

2  settlement agreement on behalf of Stern that, within three months of signing, Stern

3  sought to invalidate based on false claims that he had been coerced into signing it by

4  threats against his life;

5  (c) The Florida Attorney was representing Weinberg in two civil

6  lawsuits in which she was sued for writing NSF checks totaling more than $400,000

7  and failing to pay a house painter;

8  (d) The Florida Attorney had prepared a promissory note securing a

9  $350,000 loan from BOCK, Weinberg and Weinberg's brother to Stern, which Stern

10  had never repaid;

11  (e) The Florida Attorney was present at a meeting in or about August

12  2009, at which Stern admitted that he had forged the signature of Esther Burstyn-

13  Spero to two loan forgiveness documents;

14  (f) Stern had failed to pay at least $100,000 in legal fees to the

15  Florida Attorney and the Florida Law Firm;

16  (g) The Florida Attorney and the Florida Law Firm had filed creditor

17  claims in Stern's bankruptcy in or about July 2009 for the $100,000 that they were

18  owed;

19  (h) The Florida Attorney had inserted a clause in a retainer agreement

20  that he had sent to Mr. Freeney for his signature, which stated that Mr. Freeney

21  "appoints Arms Reach Consulting LLC . . . ('ARC') as [his] agent to communicate

22  and deal directly with the Firm on the Client's behalf," and, "[u]nless otherwise

23  instructed by the Client in writing, the Firm will take direction from ARC";

24  (i) The Florida Attorney and Florida Law Firm could not ethically

25  represent Mr. Freeney because they had a disqualifying conflict of interest as a result

26  of their past representation of Stern, what they knew about Stern's dishonest character

27  and fraudulent and illegal practices from that representation, and the aforementioned

28  clause agreeing to take their direction from ARC; and

**SECOND AMENDED COMPLAINT**

183128.11

(j)     The Florida Attorney and Florida Law Firm could not ethically represent Mr. Freeney because they had a disqualifying conflict of interest as a result of their then current representation of Weinberg and what they knew about Weinberg's legal problems and current situation at BofA/Merrill Lynch.

179.   Based upon these false and misleading representations and undisclosed facts, Mr. Freeney agreed to retain the Florida Attorney in or about April 2010, to revise the Roof Group Operating Agreement to increase his ownership interest in and control of Roof Group and to negotiate with Altounian and Donnelly to purchase their interests in Roof Group.

180.   Based on the foregoing representations and undisclosed facts concerning the Florida Attorney, Mr. Freeney came to repose his trust and confidence in BofA/Merrill Lynch, Weinberg, Stern (posing as Millar), the Florida Attorney and the Florida Law Firm to act honestly, loyally, competently and diligently in providing legal advice and services concerning his ownership, control and management of Roof Group and RSLA.  At all times relevant hereto, BofA/Merrill Lynch, Weinberg, Stern, the Florida Attorney and the Florida Law Firm, and each of them, encouraged, accepted and voluntarily assumed such trust and confidence, creating a fiduciary relationship with Mr. Freeney relating to those matters.

181.   In referring Mr. Freeney to the Florida Attorney and his law firm and vouching for their bona fides, making the aforementioned representations and concealing the aforementioned facts, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BofA/Merrill Lynch.

## I.     Weinberg's Misappropriation of Funds from Mr. Freeney's Brokerage Account.

182.   Between in or about March 2010 and June 2010, Weinberg misappropriated over $160,000 from one of Mr. Freeney's brokerage accounts, personally directing that the funds be wire transferred to ARC without Mr. Freeney's authorization or knowledge.

**SECOND AMENDED COMPLAINT**

183.   All of the stated justifications Weinberg gave internally at the bank for these transfers were false and misleading.  None of the funds transferred to the ARC bank account were used for the purposes stated by Weinberg or to otherwise benefit Mr. Freeney.  Instead, they were all used by Stern for his personal benefit and as seed money for the scheme to defraud.

184.   In causing these transfers to be made, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BofA/Merrill Lynch.

**J.      BOCK's Unauthorized Purchases and Sales of Securities.**

185.   Plaintiffs are informed and believe, and on that basis allege, that between in or about February 2010 and April 2010, BOCK caused to be purchased approximately $890,000 in securities using Mr. Freeney's funds, which resulted in BOCK receiving large commissions.  These purchases were made without Mr. Freeney's authorization or knowledge.

186.   Plaintiffs are informed and believe, and on that basis allege, that on or about June 11, 2010, BOCK directed that almost all of these securities be sold, which resulted in losses to Mr. Freeney in excess of $45,000.  These sales were made without Mr. Freeney's authorization or knowledge, and Mr. Freeney was never advised of the losses he incurred from these sales.

187.   Plaintiffs are informed and believe, and on that basis allege, that BOCK sold these securities in furtherance of the scheme to defraud, and more specifically to conceal and cover up his involvement in the scheme and assist Weinberg in relocating the scheme from Florida to California (described below).  The proceeds from the securities sales, which totaled approximately $840,000, were initially deposited into one of Mr. Freeney's brokerage accounts.  As Weinberg was leaving BofA/Merrill Lynch, they were transferred to accounts outside of the bank that were controlled by Weinberg and Stern (as described below), and thereafter converted to their personal benefit and use.

188.   In making these purchases of securities, and a short time later selling

52

**SECOND AMENDED COMPLAINT**

183128.11

1   them at a significant loss to Mr. Freeney, BOCK was acting in his capacity as an

2   employee and/or actual agent of BofA/Merrill Lynch.

3   **K.     Stern and Weinberg's Use of a Private Jet in Furtherance of the**

4   **          Scheme to Defraud.**

5         189.   As part of the scheme to defraud, Stern (posing as Millar) flew in a

6   private jet, N900JF, which he claimed to own.  Stern allowed Mr. Freeney to use the

7   jet and only pay for the cost of fuel, purportedly as a token of his friendship and

8   generosity.  Stern paid professional pilots Edward Rennia and Dana Messier to fly the

9   plane.

10        190.   Stern's purported ownership of his own jet was an integral part of the

11  scheme to defraud: it served to outwardly validate his success and affluence as well as

12  to ingratiate himself to Mr. Freeney, who had to fly frequently and appreciated the use

13  of a private aircraft for only the cost of the fuel.  In fact, Weinberg had made a point

14  of representing to Mr. Freeney and his friends and associates that Millar owned his

15  own jet when introducing Stern to them.

16        191.   In reality, Stern did not own this aircraft, and had no money of his own

17  with which to purchase or operate it.  Initially, Stern leased and operated the aircraft

18  using some of the funds Weinberg had caused to be transferred from Mr. Freeney's

19  brokerage account to the ARC Wells Fargo account.  Later, he used money

20  misappropriated from a Roof Group BofA account to lease and maintain the plane and

21  to pay the pilots to fly it.

22        192.   As a further part of this charade, Stern asked the pilots to lie to at BANA

23  Mr. Freeney and tell him that Millar owned the jet, should Mr. Freeney ever ask.

24        193.   Between in or about June 2010 and October 2011, Stern used

25  approximately $750,000 in funds misappropriated from a Roof Group account at

26  BANA to lease the plane, to pay for its maintenance and hangar fees, to pay the pilots'

27  salaries and expenses, and toward its purchase in the name of ARC.

28        194.   In the course of the scheme to defraud, Weinberg and Stern made and

**SECOND AMENDED COMPLAINT**

1    caused others to make the following false representations, among others, to

2    Mr. Freeney and his friends and associates concerning the jet aircraft: (a) Stern

3    (posing as Millar) owned it; and (b) when he used it, Mr. Freeney only paid for the

4    cost of the jet fuel.

5         195.   In the course of the scheme to defraud, Weinberg and Stern concealed

6    and caused others to conceal the following material facts, among others, from

7    Mr. Freeney concerning the aircraft:

8              (a)     James Pelky, not Stern, owned it and was only leasing it to Stern

9    and ARC;

10             (b)     Stern was using funds misappropriated from Mr. Freeney and

11   Roof Group to pay to lease the aircraft;

12             (c)     Stern was also using funds misappropriated from Mr. Freeney and

13   Roof Group to pay to maintain the aircraft, pay the hangar fees and pay the salaries

14   and expenses of Rennia and Messier to fly it; and

15             (d)     Over $200,000 of the money Stern paid Pelky to lease the aircraft,

16   all of which were funds misappropriated from Mr. Freeney and Roof Group, had been

17   applied towards ARC's purchase of the aircraft.

18        196.   In transferring Mr. Freeney's funds to ARC and in making these

19   representations and concealing these facts, Weinberg was acting in her capacity as an

20   employee, actual agent and/or ostensible agent of BofA/Merrill Lynch.

21   **L.    Weinberg and Weinberg's Brother Fraudulently Induce Mr. Freeney to**

22        **Purchase $55 Million in Unsuitable and Worthless Life Insurance.**

23        197.   Between or about June 2010 and August 2010, Weinberg and Weinberg's

24   brother fraudulently induced Mr. Freeney to purchase whole life insurance policies

25   from three insurance companies with a total face value of $55 million.  Plaintiffs are

26   informed and believe, and on that basis allege, that Weinberg and Weinberg's brother

27   selected these policies because the sales commissions paid by the insurance

28   companies ranged from 80 percent to 90 percent of the first-year's premiums, which

**SECOND AMENDED COMPLAINT**

1   was a higher percentage than other available polices would have paid.

2        198.   The three policies that Mr. Freeney purchased required him to pay

3   approximately $500,000 in premiums each year until the policies "matured" far in the

4   future.  If Mr. Freeney stopped paying premiums before the maturity date, the policies

5   would lapse, and if he did not surrender them before they lapsed, they would become

6   worthless.  Moreover, the polices had no cash surrender value until the third year after

7   their issuance, and then their surrender value would be only a fraction of the amount

8   that Mr. Freeney had paid by that time in annual premiums.

9        199.   In the course of the scheme to defraud, Weinberg and Weinberg's brother

10   made and caused others to make the following false and misleading representations,

11   among others, to Mr. Freeney to induce him to purchase the three policies and pay the

12   approximately $500,000 in first-year premiums:

13            (a)   Weinberg's expertise and experience as Mr. Freeney's financial

14   manager and investment advisor included the purchase of insurance products for

15   investment purposes, when, in fact, she had little or no expertise or experience in the

16   analysis and selection of such insurance products;

17            (b)   Weinberg's brother had substantial expertise and experience in the

18   analysis, selection and purchase of insurance products for investment purposes, when,

19   in fact, he had little or no such expertise or experience;

20            (c)   It was in Mr. Freeney's financial interests, and consistent with his

21   financial objectives, to purchase $55 million in whole life insurance, when, in fact, it

22   was contrary to his financial interests and objectives to purchase such a large amount

23   of life insurance, considering that: (i) he already owned $13 million in life insurance

24   policies, which was more than enough life insurance coverage for someone of his age

25   and with his relatively limited financial responsibilities; (ii) he had just turned 30

26   years of age, was single, was in good health and his financial objective was growth

27   rather than estate planning; and (iii) because professional football players, on average,

28   retire by age 32, it was unlikely he would be able to continue to make the premium

55

**SECOND AMENDED COMPLAINT**

1   payments of approximately $500,000 per year for enough years for the policies to

2   have a sizeable cash surrender value; and

3          (d)   Weinberg and Weinberg's brother had selected the three policies

4   because they offered the best value compared to other available whole life policies,

5   when, in fact, they had selected the three policies for the sole or primary purpose of

6   maximizing the commissions Weinberg's brother would receive from their sale.

7          200.   In the course of the scheme to defraud, Weinberg and Weinberg's brother

8   also concealed and caused others to conceal the following material facts, among

9   others, from Mr. Freeney to induce him to purchase the three policies and pay the

10   approximately $500,000 in first-year premiums:

11          (a)   Weinberg was not qualified or licensed to sell life insurance and

12   had little or no expertise or experience in the purchase of insurance products for

13   investment purposes;

14          (b)   Weinberg's brother had only become licensed to sell life

15   insurance in or about May 2010, and had only become licensed to sell life insurance in

16   Indiana in or about June 2010, and then only so he could sell life insurance to

17   Mr. Freeney;

18          (c)   The policies were particularly unsuitable for Mr. Freeney,

19   considering that he already owned two life insurance policies with face values totaling

20   $13 million;

21          (d)   Even if some form of additional life insurance was suitable, other

22   life insurance products were readily available that were less expensive and better

23   suited to Mr. Freeney's insurance needs;

24          (e)   Weinberg and Weinberg's brother planned that he would kick

25   back to her approximately half of the commissions that he received from the sale of

26   the policies;

27          (f)   As a result of this kickback agreement, Weinberg had a serious

28   conflict of interest in acting as Mr. Freeney's financial manager and investment

56

**SECOND AMENDED COMPLAINT**

183128.11

advisor in the purchase of the policies;

(g)    Weinberg and her brother had structured the transaction based on the amount of commissions her brother would receive, rather than on the prices, surrender values and other costs and benefits of the policies;

(h)    To prevent the policies from lapsing, Mr. Freeney would have to pay premiums totaling approximately $500,000 per year for a period of 15 years;

(i)    Weinberg and her brother intended to allow the policies to lapse after the first year, unless further premium payments would produce additional commissions that they could split; and

(j)    The policies would have no cash surrender value and would be entirely worthless if they were allowed to lapse after the first year.

201.   In or about June 2010, Weinberg and Weinberg's brother caused Mr. Freeney to pay a total of approximately $510,000 in first year premiums to the three insurance companies.

202.   Of this amount, the insurance companies paid a total of approximately $450,000 in commissions, 99 percent of which was paid to Weinberg's brother.  Upon receiving those commission payments, Weinberg's brother paid kickbacks to Weinberg totaling in excess of $200,000.

203.   Weinberg and Weinberg's brother did not make the 2011 premium payments on behalf of Mr. Freeney, and instead allowed the policies to lapse, when they learned that further premium payments would not result in additional commission payments to Weinberg's brother.

204.   The policies lapsed in or about September 2011 and October 2011.  The policies had no cash surrender value and became entirely worthless when they lapsed. Weinberg and Weinberg's brother concealed from Mr. Freeney that the policies had lapsed and become worthless.

205.   In making the aforementioned representations and concealing the aforementioned facts, Weinberg was acting in her capacity as an employee, actual

57

**SECOND AMENDED COMPLAINT**

1    agent and/or ostensible agent of BofA/Merrill Lynch.

2    **M.    Weinberg Fraudulently Assumes Management Control of RSLA.**

3        206.    Beginning in or about March 2010, Weinberg and Stern (posing as

4    Millar) made and caused others to make the following false and misleading

5    representations and false promises, among others, to induce Mr. Freeney to allow

6    Weinberg to assume management control of RSLA and become the de facto Chief

7    Financial Officer ("CFO") of Roof Group:

8                (a)    Millar intended to invest $7.0 million in Roof Group, when, in

9    fact, Stern had neither the funds nor the intention to invest any money in Roof Group;

10               (b)    Millar would oversee the build out of RSLA, including payments

11   to Brodin Design, when, in fact, Stern had no intention to oversee the build out

12   beyond using it as an opportunity to misappropriate funds from Mr. Freeney and

13   Roof Group;

14               (c)    Millar would assist in obtaining the liquor license from the State

15   of California for RSLA, when, in fact, Stern had neither the ability nor the intention

16   to obtain a liquor license for the restaurant;

17               (d)    Weinberg would handle the bill payments for RSLA, when, in

18   fact, she intended to pay only those bills that absolutely needed to be paid, and only

19   when she could not delay their payment further;

20               (e)    Weinberg and Stern (posing as Millar) together would renegotiate

21   the unfavorable terms in the lease with CIM, when, in fact, neither intended to

22   renegotiate the lease terms;

23               (f)    Weinberg would implement cost and accounting controls for

24   RSLA, when, in fact, she lacked the skills, knowledge and experience to implement

25   such controls, and, in fact, made sure that no such controls were ever implemented at

26   RSLA; and

27               (g)    Weinberg and Stern's only interest was to make sure RSLA

28   succeeded and to protect Mr. Freeney from those around him who would seek to cheat

58

**SECOND AMENDED COMPLAINT**

183128.11

1   or take unfair advantage of him, when, in fact, their sole or primary interest in

2   obtaining control of RSLA was to use it as a vehicle for misappropriating

3   Mr. Freeney's funds and to conceal and disguise those thefts from Mr. Freeney and

4   others.

5         207.   To induce Mr. Freeney to allow Weinberg to assume management

6   control of RSLA's operations and finances, and for Weinberg to become the de facto

7   CFO of Roof Group, Weinberg and Stern (posing as Millar) concealed and caused

8   others to conceal the following material facts, among others, from Mr. Freeney, his

9   associates and his professional advisors:

10         (a)   Weinberg lacked: (i) the necessary qualifications, expertise and

11   experience to manage and operate RSLA; (ii) the ability to maintain books and

12   records and prepare financial reports, budgets and projections for RSLA; and (iii) the

13   supervisory skills and experience to oversee the build out, staffing, opening and

14   operations of RSLA;

15         (b)   Weinberg and Stern were using RSLA as a vehicle for

16   misappropriating funds from a Roof Group account at BANA and to conceal and

17   disguise those thefts from Mr. Freeney and others;

18         (c)   Weinberg rarely, if ever, paid vendor bills on time;

19         (d)   Stern was in bankruptcy and entirely without the financial means

20   to invest in RSLA;

21         (e)   Stern's sole or primary interest in overseeing the build out of

22   RSLA was to be able to continue to misappropriate funds from Mr. Freeney and

23   Roof Group undetected;

24         (f)   Weinberg was not paying RSLA's federal and state payroll taxes;

25         (g)   Weinberg was not paying RSLA's California sales taxes;

26         (h)   Weinberg was not timely paying RSLA staff and management,

27   and when she paid them, she was not paying them the correct amounts they were

28   owed;

**SECOND AMENDED COMPLAINT**

1          (i)     Weinberg had not obtained adequate general liability and other

2    insurance for RSLA;

3          (j)     Weinberg was not maintaining anything resembling a set of books

4    and records for RSLA;

5          (k)     Weinberg was not preparing financial reports or statements for

6    RSLA;

7          (l)     Weinberg was not preparing budgets or projections for RSLA;

8          (m)     Weinberg and Stern were not engaged in discussions with CIM to

9    renegotiate the lease terms; and

10         (n)     Stern was not in the process of obtaining a liquor license for

11   RSLA.

12       208.   Based on the foregoing representations, promises and undisclosed facts,

13   Mr. Freeney and Roof Group came to repose their trust and confidence in

14   BofA/Merrill Lynch, Weinberg and Stern (posing as Millar) to act honestly, loyally,

15   competently and diligently in overseeing and managing the build-out, staffing,

16   opening, operations and finances of RSLA.  At all times relevant hereto,

17   BofA/Merrill Lynch, Weinberg and Stern, and each of them, encouraged, accepted

18   and voluntarily assumed that trust and confidence, creating a fiduciary relationship

19   with Mr. Freeney and Roof Group relating to such matters.

20       209.   In making the aforementioned representations and promises, concealing

21   the aforementioned facts and assuming control of the operations and finances of

22   RSLA, Weinberg was acting in her capacity as an employee, actual agent and/or

23   ostensible agent of BofA/Merrill Lynch.

24   **N.    Weinberg and Stern Fraudulently Induce Mr. Freeney to**

25       **Buy Out Altounian and Donnelly's Worthless Interests in**

26       **Roof Group for $1.1 Million.**

27       210.   After Mr. Freeney became a BofA/Merrill Lynch client, Weinberg and

28   Stern (posing as Millar) urged him to purchase Joe Altounian and Niall Donnelly's

60

**SECOND AMENDED COMPLAINT**

interests in Roof Group.  They advised Mr. Freeney that he needed to acquire Altounian and Donnelly's interests so that Millar could invest in Roof Group and become Mr. Freeney's new partner in RSLA, and because Altounian and Donnelly were misusing company funds.  Stern (posing as Millar) offered to negotiate these buy outs.  Having been lead to believe by Weinberg and Stern (posing as Millar) that Millar was preparing to invest several million dollars in Roof Group, was acting to protect Mr. Freeney's investment in RSLA and had substantial experience and success in negotiating such matters, Mr. Freeney authorized Stern (posing as Millar) to undertake the negotiations with the assistance of the Florida Attorney and Law Firm.

211.   Although Mr. Freeney remained the sole source of financing for the build out and operations of RSLA – Altounian and Donnelly having invested none of their own money in the venture – Stern and the Florida Attorney negotiated agreements with Altounian and Donnelly whereby Mr. Freeney was required to pay them more than $1.1 million for their interests in Roof Group.  Weinberg, Stern and the Florida Attorney convinced Mr. Freeney to sign these agreements and pay this money, notwithstanding that the restaurant had yet to open, had no liquor license, had dwindling capital and had not been reliably valued.

212.   Mr. Freeney signed the agreement to purchase Altounian's shares in Roof Group in or about November 2010, agreeing to pay Altounian $325,000 for his 24.5 percent interest in Roof Group.  Mr. Freeney completed making payments to Altounian pursuant to this agreement in or about November 2011.

213.   Mr. Freeney signed the agreement to purchase Donnelly's shares in Roof Group in or about May 2011, agreeing to pay Donnelly $550,000 for his 24.5 percent interest in Roof Group.  Mr. Freeney completed making payments to Donnelly pursuant to this agreement in or about January 2012.

214.   The Florida Attorney billed, and Mr. Freeney paid him, approximately $140,000 in legal fees for assisting Stern in negotiating these agreements.

215.   In convincing Mr. Freeney to agree to purchase Altounian and

**SECOND AMENDED COMPLAINT**

183128.11

Donnelly's interests in Roof Group for these amounts, Weinberg, Stern and the Florida Attorney concealed and caused others to conceal the following material facts, among others, from Mr. Freeney:

(a)     RSLA was critically underfunded, burning through cash and at risk of defaulting on various obligations.  Accordingly, without Mr. Freeney's continued capital contributions to Roof Group, Altounian and Donnelly's shares in the company were effectively worthless;

(b)     As members of a limited liability company, Altounian and Donnelly were responsible for losses in proportion to their ownership interests (24.5 percent each).  Based on RSLA's significant operating losses and the fact that neither Altounian nor Donnelly were contributing any cash to Roof Group, their capital accounts were negative at the time of the buy outs, which would have reduced the value of their shares to zero or close thereto;

(c)     There was no valuable premium or other significant intangible value associated with Mr. Freeney's purchase of Altounian and Donnelly's shares in Roof Group (such as minimizing their participation in the operations, management, or direction of RSLA) to justify paying them $1.1 million for their shares.  To the contrary, at the time Mr. Freeney agreed to purchase their shares, their roles in RSLA had diminished to the point of insignificance; and

(d)     Plaintiffs are informed and believe, and on that basis allege, that Weinberg and Stern's sole or primary motivation for convincing Mr. Freeney to pay $1.1 million to buy out Altounian and Donnelly was to oust them from the day-to-day operations of RSLA, and thus prevent them from discovering that Weinberg and Stern were using RSLA to misappropriate funds from Mr. Freeney and Roof Group.

216.   In convincing Mr. Freeney to purchase Altounian and Donnelly's interests in Roof Group for approximately $1.1 million and to allow Stern (posing as Millar) and the Florida Attorney to negotiate those purchases, and in concealing the aforementioned facts, Weinberg was acting in her capacity as an employee, actual

**SECOND AMENDED COMPLAINT**

1  agent and/or ostensible agent of BofA/Merrill Lynch.

2  **O.     The Hiring and Termination of Sal and Stacy Feli.**

3          217.   The ouster of Altounian and Donnelly from daily involvement in the

4  build out, management and operations of RSLA required Mr. Freeney to find a new

5  Director of Operations to open and operate the restaurant.  While falsely holding

6  himself out as Mr. Freeney's new partner in RSLA and a major investor in

7  Roof Group, in or about May 2010, Stern (posing as Millar) signed a "Term Sheet" on

8  behalf of Roof Group with Salvatore ("Sal") Feli, his wife Stacy Feli and their

9  company, SalandStacy Corp. (collectively, the "Felis"), to "manage and operate"

10  RSLA.

11          218.   Stern (posing as Millar) and the Florida Attorney negotiated the Term

12  Sheet with the Felis and their attorney.  Stern signed the Term Sheet as

13  "David M. Millar" on behalf of Roof Group, without any written or other express

14  corporate authorization.  The Term Sheet outlined a five-year arrangement between

15  Roof Group and the Felis that Roof Group could not afford.  It provided, among other

16  things, that:

17                  (a)     The Felis would be paid a fee of $350,000 per year for each of the

18  five years;

19                  (b)     They would also receive housing, rental car and health care

20  allowances totaling $70,000;

21                  (c)     They would also receive two percent of the gross revenue of

22  RSLA;

23                  (d)     They could only be terminated for cause, and, if so terminated,

24  they would be entitled to six months of severance pay, or $175,000;

25                  (e)     They were to receive a two percent ownership interest in Roof

26  Group if certain conditions were satisfied; and

27                  (f)     The parties would undertake to negotiate a long-form contract

28  within the next 30 days.

**SECOND AMENDED COMPLAINT**

219.   In entering into the Term Sheet, Stern, together with Weinberg and the Florida Attorney, concealed and caused others to conceal the following material facts, among others, from Mr. Freeney:

(a)   David M. Millar was a false name;

(b)   Roof Group could not afford to pay the Felis the compensation outlined in the Term Sheet;

(c)   Plaintiffs are informed and believe, and or that basis allege, that Sal Feli's compensation under the Term Sheet was well above the industry standard for a Director of Operations with his limited qualifications, experience and track record; and

(d)   Plaintiffs are informed and believe, and on that basis allege, that Weinberg and Stern's sole or primary motivation in hiring the Felis was their belief that the Felis would be easier to manipulate and less of a threat to uncover the scheme to defraud than Altounian and Donnelly, both of whom disliked and distrusted Stern deeply.

220.   After learning of what Stern had done, Mr. Freeney's legal counsel sought to reduce the Felis' compensation package in the course of negotiating the long-form contract.  When the Felis appeared to balk at any such reduction, in December 2010, Roof Group terminated their services.

221.   The decision to terminate the Felis' services was made at the insistence of Weinberg, who had begun her campaign to have the Felis fired in or about September 2010, shortly after Sal Feli recommended having an outside accounting firm perform an audit of RSLA's finances.

222.   In insisting that Mr. Freeney must terminate the Felis, Weinberg concealed and caused others to conceal the following material facts, among others, from Mr. Freeney:

(a)   Plaintiffs are informed and believe, and on that basis allege, that Weinberg and Stern had hired the Felis, and agreed on behalf of Roof Group to pay

64

**SECOND AMENDED COMPLAINT**

1   them excessive compensation, because they believed that the Felis would be easier to

2   manipulate and less of a threat to uncover the scheme to defraud than Altounian and

3   Donnelly;

4               (b)     Plaintiffs are informed and believe, and or that basis allege, that

5   Weinberg's sole or primary motivation for insisting that Mr. Freeney terminate the

6   Felis' services was her concern that they would uncover her and Stern's use of RSLA

7   as a vehicle for misappropriating and converting funds belonging to Mr. Freeney and

8   Roof Group; and

9               (c)     Weinberg had ignored Mr. Freeney's instruction to pay the Felis

10  the severance pay they had requested.

11      223.  In or about April 2011, the Felis filed suit against Roof Group,

12  Mr. Freeney, Mr. West, Weinberg, Millar and others (the "*Feli* Case").  The Felis'

13  complaint alleged claims for breach of contract, fraud, conversion, breach of fiduciary

14  duty, tortious interference with contract and an accounting.  The Felis sought $5.0

15  million in damages.  All of these claims arose from Weinberg and Stern's conduct in

16  the hiring and termination of the Felis.

17      224.  Roof Group and Mr. Freeney vigorously defended against the allegations

18  in the *Feli* Case.  In or about August 2012, the court dismissed the fraud, conversion,

19  breach of fiduciary duty and accounting claims against Mr. Freeney, Mr. West and

20  Roof Group as being legally insufficient.  In December 2012, the case settled shortly

21  before trial was to commence.  Mr. Freeney and Roof Group paid more than $825,000

22  in defending and settling the *Feli* Case.

23      225.  At all relevant times, Mr. Freeney and Roof Group reposed their trust and

24  confidence in BofA/Merrill Lynch, Weinberg and Stern to act honestly, loyally,

25  competently and diligently in the hiring and termination of the Felis.  At all relevant

26  times, BofA/Merrill Lynch, Weinberg and Stern, and each of them, encouraged,

27  accepted and voluntarily assumed that trust and confidence, thereby creating a

28  fiduciary relationship with Mr. Freeney and Roof Group relating to such matters.

**SECOND AMENDED COMPLAINT**

1    226.   In concealing the aforementioned facts relating to the Felis' hiring and

2   termination, and in convincing Mr. Freeney to terminate the Felis' services, Weinberg

3   was acting in her capacity as an employee, actual and/or ostensible agent of

4   BofA/Merrill Lynch.

5   **P.      Weinberg and Del Campo Open the BofA Roof Group Account.**

6    227.   In or about late May 2010, Weinberg asked Del Campo to open a BANA

7   business checking account in the name of Roof Group (the "BofA Roof Group

8   account"). Del Campo opened the account without the required documentation,

9   appropriate authorization, or sufficient due diligence.

10    228.   This account was opened in the course of Mr. Freeney's relationship with

11  BofA/Merrill Lynch, purportedly to protect funds he was investing in Roof Group

12  from misuse by Altounian and Donnelly.

13    229.   In opening the BofA Roof Group account, Weinberg falsely represented

14  to Mr. Freeney that it was only a temporary account needed to pay invoices for the

15  RSLA build out until permanent accounts could be opened in Los Angeles. As a

16  result, Mr. Freeney only authorized BofA to transfer $200,000 from his brokerage

17  accounts to the BofA Roof Group account. This authorization was given in a

18  notarized writing and was the only authorization Mr. Freeney gave

19  BofA/Merrill Lynch and Weinberg to transfer funds to this account.

20    230.   Del Campo later made the following statements to the FBI concerning

21  her opening of the BofA Roof Group account:

22
23  •      "DEL CAMPO remembered setting up the bank account for
        Roof Group LLC at Bank of America for DWIGHT
24      FREENEY. DEL CAMPO said that EVA WEINBERG came
        to her while WEINBERG was still employed at Merrill Lynch
25      Bank of America (MBOA) in Miami, Florida."

26
27  •      "[S]he remembered that Weinberg went to her in person to ask
        her to open this particular account. DEL CAMPO said that it
28      was not a phone call, nor was it a conversation in passing that

66

**SECOND AMENDED COMPLAINT**

183128.11

she had with WEINBERG to request to open this account."

- "Weinberg had a conversation with her about the restaurant and how this account would be used to conduct the business transactions of the restaurant."

- "[B]ecause this was a new account, there was a standard 90 day security hold on the account, to make sure that no fraudulent activity was occurring within the account."

- "[F]rom her perspective, it seemed that WEINBERG was doing online banking, because after the account was set up, WEINBERG would call DEL CAMPO to request that the holds on electronic payments she was attempting to make would be taken off.  DEL CAMPO said that this was a feature of the 90 day security hold on the account."

- "[T]he password and information could have been emailed to [Del Campo], which she would then give directly to the Financial Advisor, in this case WEINBERG . . . ."

- "FREENEY was not involved with the setup of the bank account."

231.   After opening the BofA Roof Group account, Del Campo allowed the account to remain open and active notwithstanding concerns expressed by other BANA employees that the account access documentation was not sufficient or in order.

232.   After opening the BofA Roof Group account, Del Campo gave Weinberg the confidential account access information, including the pass code for the account, although Weinberg was not a signatory on the account.  Weinberg then gave this information to Stern, so that he could access the BofA Roof Group account remotely online and transfer funds to and from it without Mr. Freeney's authorization or knowledge.

233.   After BANA opened the BofA Roof Group account, Weinberg asked Del Campo from time-to-time to override the security hold on wire transfers from the

**SECOND AMENDED COMPLAINT**

account, allowing Stern to transfer millions of dollars from the account online, using the confidential account access information that Del Campo had provided to Weinberg and Weinberg had provided to Stern.

234.   BANA and Del Campo allowed the BofA Roof Group account to remain open during the course of the scheme to defraud, notwithstanding the following highly suspicious circumstances: (a) the account was supposed to be only temporary; (b) the account was opened in Miami for a Los Angeles based business; (c) the account was opened at Weinberg's request shortly before she resigned from and left BofA/Merrill Lynch; (d) hundreds of transfers involving millions of dollars were made to and from the account, all initiated remotely online; and (e) many of these transfers were to unknown recipients or recipients having no apparent relationship to RSLA.

235.   Plaintiffs are informed and believe, and on that basis allege, that despite these highly suspicious circumstances, BANA did not investigate any of the transfers to or from the BofA Roof Group account, file any Suspicious Activity Reports, or telephonically notify federal authorities of these transactions, as required by the Bank Secrecy Act.

236.   In opening the BofA Roof Group account, and allowing it to remain open, BANA, Weinberg and Del Campo concealed and caused others to conceal the following material facts, among others, from Mr. Freeney and Roof Group:

(a)     The account was not a temporary account, and it remained open and active long after operating, payroll and tax accounts for RSLA were opened in Los Angeles at the Larchmont Branch of Wells Fargo Bank;

(b)     The purpose of the account was to conceal the proceeds of the scheme to defraud from Mr. Freeney, the Bankruptcy Court, the bankruptcy trustee, the U.S. Trustee, creditors in Stern's bankruptcies and the plaintiffs in the many civil actions pending against Stern;

(c)     At the time the account was opened, Mr. Freeney lacked the

68

**SECOND AMENDED COMPLAINT**

1    necessary corporate authority to open the account on behalf of Roof Group;

2             (d)     The account was opened, and was allowed to remain open,

3 without the documentation, authorization, or due diligence ordinarily required to open

4 such an account, and despite concerns expressed by BANA employees about those

5 deficiencies;

6             (e)     Weinberg had kept the existence of the account secret from

7 RSLA's management, accountants and consultants;

8             (f)     Del Campo had given the confidential account access information

9 to Weinberg; and

10             (g)     Weinberg had given Stern the confidential account access

11 information to Stern, to enable him to access the account online and transfer funds to

12 and from it without Mr. Freeney's authorization or knowledge.

13       237.   In causing BANA to open the BofA Roof Group account without the

14 required documentation, appropriate authorization and sufficient due diligence; in

15 permitting the account to remain open, notwithstanding concerns expressed by other

16 BANA employees that the account documentation was deficient and despite the

17 hundreds of highly suspicious transfers to and from the account; in giving the

18 confidential account access information to Weinberg; in repeatedly overriding the

19 account's security features at Weinberg's request; and in concealing the

20 aforementioned facts, Del Campo was acting in her capacity as a BofA/Merrill Lynch

21 employee and agent.

22       238.   In asking Del Campo to open the BofA Roof Group account and to

23 repeatedly override the account's security features, and in providing the confidential

24 account access information to Stern, making the aforementioned representations and

25 concealing the aforementioned facts, Weinberg was acting in her capacity as an

26 employee, actual agent and/or ostensible agent of BofA/Merrill Lynch.

27 **Q.**     **Weinberg Opens the Citibank Accounts.**

28       239.   In or about June 2010, Weinberg caused two accounts at a Citibank

69

**SECOND AMENDED COMPLAINT**

branch in Miami Beach to be opened in the name of Mr. Freeney.  She opened the accounts by presenting a power of attorney form purportedly signed by Mr. Freeney. In or about July 2010, Weinberg added herself as a signatory to these accounts.

240.   When opening these accounts, Weinberg obtained the confidential account access information, including the pass codes, for the accounts, which she then gave to Stern.  Weinberg gave Stern this highly confidential information so that he could access the Citibank accounts remotely online and transfer funds to, from and between them without Mr. Freeney's authorization or knowledge.

241.   In a June 2012 post-arrest interview by the FBI and USAO, Weinberg made the following statements concerning the opening of the Citibank accounts:

- "[S]he opened [the Citibank] account in Miami Beach.  Only she and FREENEY were on the account, no one else."

- "STERN got access to the Citigold account sometime in early June or perhaps July [2010]."

- "[I]t's possible that she could have provided FREENEY's personal information to STERN to open the online banking, but STERN already had FREENEY's credit card numbers and his social security account numbers.  STERN knew almost everything about FREENEY."

242.   In causing the Citibank accounts to be open and giving Stern the confidential account access information, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BofA/Merrill Lynch.

**R.     Weinberg and Stern's Mounting Legal Problems in Florida.**

243.   Many of the legal proceedings initiated against Stern and Weinberg in 2008 and 2009 (as described earlier) continued and intensified after Mr. Freeney became a BofA/Merrill Lynch client.

244.   In March 2010, the Faraches obtained a final judgement in their passing NSF checks lawsuit against Weinberg for approximately $1.7 million.  They then

**SECOND AMENDED COMPLAINT**

183128.11

obtained writs of garnishment against Weinberg, which they served on a number of financial institutions, including MLPFS and BANA.  MLPFS answered the writ on or about March 29, 2010.   BANA answered the writ on or about April 8, 2010, indicating that, for the most recent two-week pay period, BANA had paid Weinberg "gross earnings" of only $1,041 and "disposable earnings" of only $885.

245.   Weinberg hired the Florida Attorney to represent her in challenging the judgement and writs.  In a motion he filed on Weinberg's behalf on or about March 26, 2010, he wrote:

> The Defendant [Eva Weinberg] has just learned that all of her bank accounts are the subjects of writs of garnishment, which have effectively frozen all of her money . . . .  The only reason Ms. Weinberg learned about all of the freezing of her money by reason of a writ of garnishment is because she happens to be a Vice President of Private Wealth Management at Merrill Lynch, and obtained a copy of the writ of garnishment from her employer . . . .

246.   Meanwhile, on or about March 12, 2010, Stern was arrested pursuant to the earlier issued writ of bodily attachment in the *Colonia Bank Case*.  In an order of the same date, the judge in that case directed that he was "not to leave Miami Dade County during the pendency of the case or until further order of this Court."

247.   On or about April 21, 2010, the U.S. Trustee in Stern's bankruptcy cases filed an Adversary Complaint Objecting to Entry of Discharge in Stern's bankruptcy proceedings.  In that 27-page publicly filed pleading, the U.S. Trustee detailed numerous instances of bankruptcy fraud by Stern during the course of his bankruptcy proceedings, including:

(a)     Disobeying a court order to provide an accounting or the ledger for the so-called "Stern Master Account," through which millions of dollars in proceeds from Stern's businesses passed without being accounted for;

(b)     Violating numerous court orders requiring the production of documents to the bankruptcy trustee and U.S. Trustee;

(c)     Not disclosing his ownership of a yacht brokerage in his bankruptcy schedules;

71

**SECOND AMENDED COMPLAINT**

1    (d)    Giving false testimony about pawning his wife's jewelry;

2    (e)    Giving inconsistent testimony concerning two unsecured and

3 undocumented loans that he had received, one for $6.5 million and the other for

4 $1.6 million;

5    (f)    Concealing bank account and financial information relating to the

6 Beach Place Hotel;

7    (g)    Submitting forged and falsified Certificates of Insurance for the

8 Beach Place Hotel; and

9    (h)    Not disclosing transfers to third parties totaling more than $1.0

10 million just prior to filing for bankruptcy.

11    248.   BofA/Merrill Lynch and Weinberg concealed all of this information from

12 Mr. Freeney.  Furthermore, BofA/Merrill Lynch failed to amend Weinberg's FINRA

13 Report to reflect the entry of the $1.7 million judgment against her for passing

14 $400,000 in worthless checks.

15 **S.    Weinberg, with BOCK's Advice and Encouragement, Creates**

16 **Global Wealth Management LLC.**

17    249.   Plaintiffs are informed and believe, and on that basis allege, that in or

18 about May 2010, BOCK began encouraging Weinberg to leave BofA/Merrill Lynch;

19 move to California; start her own company with a name similar to "Global Wealth &

20 Investment Management" and "Merrill Lynch Wealth Management"; and take

21 Mr. Freeney with her as a client.

22    250.   In publicly filed court papers in BOCK and Weinberg's divorce

23 proceedings, Weinberg stated in August 2010 that:

24    •    "The Mother's relocation to Los Angeles was carefully planned

25      with major input from the Father [BOCK] as the Mother is a

26      stock broker and was working for Merrill Lynch in Florida with

27      [BOCK].  The Mother previously gave [BOCK] her entire

28      client base during their marriage so that he could maintain her

      four million dollar portfolio . . . .  [BOCK] encouraged the

72

**SECOND AMENDED COMPLAINT**

Mother once she went back to work at Merrill Lynch to service her largest client [Mr. Freeney/Roof Group] who reside in Los Angeles, California."

- "[BOCK] was also instrumental in the Mother's resignation from Merrill [sic] Lynch and start-up of her own company because he stressed to her that relocating to Los Angeles would be good for her business as there are great business opportunities to be found there."

- "In fact [BOCK] repeatedly stated that he would likely move to Los Angeles as well as there were good business opportunities for him there as well.  He further told her that because he is a stock broker at Merrill Lynch, he can work out of any office so he would be in Los Angeles, California at least once a month."

- "[BOCK] also helped the Mother design her business plan /strategize the Mother's future business goals for her in California."

- The Mother will lose this major client, which [BOCK] encouraged her to take, if she is unable to physically move to California."

- "[T]he Mother has signed a contract with Global Wealth Management to be the Head Portfolio Manager for a high-profile client, which if unable to move will cause her to lose the only employment she has now."

251.  Although BOCK initially opposed Weinberg relocating their children to California, he did not dispute any of these statements in the responsive papers that he filed in the divorce proceedings.

252.  BofA/Merrill Lynch, BOCK and Weinberg concealed all of this information from Mr. Freeney.

253.  Plaintiffs are informed and believe, and on that basis allege, that: (a) Weinberg's relocation to Los Angeles was carefully planned with input from BOCK; (b) BOCK encouraged Weinberg to take Mr. Freeney as her client when she

73

**SECOND AMENDED COMPLAINT**

relocated; (c) BOCK was instrumental in Weinberg resigning from BofA/Merrill Lynch and forming her own company in Los Angeles; (d) in the course of encouraging Weinberg to relocate to Los Angeles, BOCK informed her that he would likely move to Los Angeles, that he would be in Los Angeles at least once a month and that, when in Los Angeles, he would work from Merrill Lynch's Los Angeles office; and (e) BOCK wanted Weinberg to move to Los Angeles and take Mr. Freeney with her as a client to conceal and cover up his own wrongdoing involving Mr. Freeney's brokerage accounts.

254.   On or about June 2, 2010, Weinberg incorporated Global Wealth Management, LLC ("GWM") in Delaware.

255.   GWM was created as an instrumentality to continue to carry out the scheme to defraud: it had no assets, employees, or legitimate business operations, and no clients aside from Mr. Freeney.

256.   On or about June 2, 2010, Weinberg opened a business checking account in GWM's name at the Larchmont Branch of Wells Fargo Bank in Los Angeles.

257.   On or about June 9, 2010, Weinberg signed a lease for a "virtual office" in the name of GWM at 8484 Wilshire Boulevard, contracting for telephone answering and mail receiving, sorting and forwarding services.  From in or about June 2010 forward, Weinberg gave the 8484 Wilshire address as GWM's office address. She also directed that all of Mr. Freeney's mail, including his weekly paychecks from the Colts during the NFL season, be sent to that address.

258.   Plaintiffs are informed and believe, and on that basis allege, that BOCK and Weinberg selected the name "Global Wealth Management" because it was the same as or remarkably similar to GWIM and/or MLGWM, and because they wanted to create the false impression that Weinberg was still affiliated with BofA/Merrill Lynch.  Plaintiffs are further informed and believe, and on that basis allege, that BofA/Merrill Lynch was well aware of Weinberg's creation of GWM.

259.   In creating GWM, BOCK and Weinberg concealed and caused others to

74

**SECOND AMENDED COMPLAINT**

conceal the following material facts, among others, from Mr. Freeney: (a) GWM was not the same as GWIM or MLGWM and was not a division of BAC; (b) GWM was effectively a sham entity created to promote and conceal the scheme to defraud; (c) GWM had no employees and Mr. Freeney was its only client; and (d) Stern had access to all of Mr. Freeney's mail that was being forwarded to the 8484 Wilshire address.

260.   In advising and encouraging Weinberg to create GWM, relocate to Los Angeles and take Mr. Freeney as a client, BOCK was acting in his capacity as an employee and/or agent of BofA/Merrill Lynch.

**T.      Weinberg and Stern Relocate the Scheme from Miami to Los Angeles.**

261.   Because of their escalating legal problems in Florida, in or about June 2010, Weinberg and Stern moved from Miami Beach to Los Angeles, from where they could (and did) continue to carry out the scheme to defraud Mr. Freeney.

262.   In or about June 2010, Weinberg leased a house in the Hancock Park neighborhood of Los Angeles for $8,250 per month (the "Hancock Park house").  In the lease application forms, she represented that she would be living at the house with her three children and "Michael Stern," her "Fiancé."

263.   In the lease application, Weinberg falsely represented that since April 2009, she had been employed as a "Financial consultant" at "Merrill Lynch Wealth Management" earning "8,000" per month in "comm + salary"; that Stern lived at 2 Harriman Drive, Sands Point, N.Y. 11576; that he had been employed by "ARC Consulting" from "5/96 – present," earning "$25,000" per month; and that his supervisor was Lester Jaggernauth, who was also listed as one of Stern's personal references as was Weinberg's brother.

264.   Plaintiffs are informed and believe, and on that basis allege, that Weinberg and Stern moved into the Hancock Park house in or about mid-June 2010.

265.   The Hancock Park house quickly became Weinberg and Stern's new base of operations.  Weinberg and Stern maintained a room in the house in which Stern hid

**SECOND AMENDED COMPLAINT**

whenever anyone would come to the door, to conceal the fact that he and Weinberg were living together.  This room was where Stern kept the computers that he used to access Mr. Freeney's accounts online and transfer funds to and from them without Mr. Freeney's knowledge or authorization.

**U.     Weinberg's Secret Resignation from BofA/Merrill Lynch.**

266.   On or about June 10, 2010, Weinberg faxed a short handwritten note to Liebman and others resigning from BofA/Merrill Lynch.  Weinberg's resignation became effective on or about July 3, 2010.

267.   At the time Weinberg's resignation became effective, all of the key components of the scheme to defraud had been implemented and execution of the scheme was well underway, including, among other things:

(a)     Liebman and BOCK had appointed Weinberg to be the principal point of contact between Mr. Freeney and BofA/Merrill Lynch;

(b)     Liebman and BOCK had allowed Weinberg to falsely represent herself to Mr. Freeney as a "Senior Financial Advisor";

(c)     Liebman and BOCK had authorized and permitted Weinberg to serve as Mr. Freeney's private banker, financial manager and investment advisor with virtually total control of Mr. Freeney's assets, investments and income, while under little or no supervision;

(d)     BofA/Merrill Lynch had referred Mr. Freeney to Stern (posing as Millar) for consulting services and as a potential investor in RSLA, and vouched for his bona fides, honesty and intentions;

(e)     Stern had been introduced to Mr. Freeney and his associates as Michael Millar, a wealthy and successful Miami Beach businessman;

(f)     Stern had formed ARC, opened a bank account at Wells Fargo Bank in ARC's name and opened email accounts in the names of David Michael Millar and ARC for use in communicating with Mr. Freeney;

**SECOND AMENDED COMPLAINT**

183128.11

1     (g)    Stern was using Mr. Freeney's funds to lease and operate the

2  private jet to lend credibility to his fictitious persona;

3     (h)    Weinberg had transferred more than $160,000 from  Mr. Freeney's

4  brokerage account to ARC, without authorization, as seed money for the scheme;

5     (i)    BofA/Merrill Lynch had referred Mr. Freeney to Weinberg's

6  brother for insurance consulting services;

7     (j)    Weinberg and her brother had convinced Mr. Freeney to purchase

8  as much as $60 million in life insurance as an investment;

9     (k)    Weinberg's brother had become licensed to sell insurance in

10  New Jersey and licensed to sell insurance in Indiana, so that he could receive the

11  commissions from the sale of the life insurance policies to Mr. Freeney;

12     (l)    Weinberg and her brother had Mr. Freeney complete applications

13  to purchase $60 million in life insurance;

14     (m)    Mr. Freeney had begun paying the more than $500,000 in

15  premiums to purchase the $55 million in life insurance for one year that Weinberg and

16  her brother had convinced him to purchase;

17     (n)    Weinberg and her brother had agreed that of the over $450,000 in

18  commissions Weinberg's brother would receive, he would kick back more than half

19  that amount to Weinberg;

20     (o)    Weinberg had been introduced to the executives at *Rolling Stone* as

21  Mr. Freeney's BofA/Merrill Lynch financial advisor, and Stern (posing as Millar) had

22  been introduced to them as a wealthy businessman who was prepared to invest $7.0

23  million in RSLA;

24     (p)    At the urging of Weinberg and Stern (posing as Millar),

25  Mr. Freeney had increased his ownership interest in Roof Group to 51 percent by

26  doubling the amount of his investment in RSLA from $1.6 million to $3.2 million,

27  thus giving him the power to make Weinberg the de facto CFO of Roof Group;

28

**SECOND AMENDED COMPLAINT**

1        (q)   Weinberg and Stern had convinced Mr. Freeney that he needed to

2 buy out Altounian and Donnelly's remaining interests in Roof Group for in excess of

3 $1.1 million;

4        (r)   BofA/Merrill Lynch had referred Mr. Freeney to the Florida

5 Attorney for legal services relating to the buy outs of Altounian and Donnelly and

6 other matters, and the Florida Attorney and Stern had begun negotiating for

7 Mr. Freeney to make those purchases;

8        (s)   The Florida attorney had agreed that he would keep Stern's true

9 identity and unsavory past secret from Mr. Freeney and his associates and professional

10 advisors, and would go along with the charade that Stern (posing as Millar) was a

11 successful and wealthy businessman;

12        (t)   Weinberg had obtained all of Mr. Freeney's private and

13 confidential personal and financial information and records and shared it with Stern;

14        (u)   Weinberg had incorporated GWM and leased a virtual office in its

15 name;

16        (v)   Weinberg had assumed management control of RSLA;

17        (w)   Del Campo had opened the BofA Roof Group account and

18 provided the confidential access account information to Weinberg;

19        (x)   Weinberg had provided that information to Stern;

20        (y)   Weinberg had opened the Citibank accounts and made herself a

21 signatory on the accounts, and had provided the confidential account access

22 information for those accounts to Stern;

23        (z)   Weinberg had opened accounts for Roof Group at Wells Fargo

24 Bank in Los Angeles, which she controlled;

25        (aa)   BOCK, Weinberg and Stern had begun liquidating Mr. Freeney's

26 existing investments, and BOCK had sold all of the securities he had purchased with

27 Mr. Freeney's funds just a few weeks earlier, to fund the Citibank accounts; and

28

**SECOND AMENDED COMPLAINT**

183128.11

1    (bb)   Weinberg and Stern had begun misappropriating Mr. Freeney's

2  funds from the Citibank accounts and laundering them through the BofA Roof Group

3  account.

4    268.   BofA/Merrill Lynch, Liebman and BOCK concealed Weinberg's

5  resignation from Mr. Freeney.  They never formally or informally notified him of

6  Weinberg's resignation and departure.  Nor did they make any effort to transition

7  Mr. Freeney to another investment advisor; ensure that his funds were safe; take steps

8  to protect and secure his private and confidential financial information; or see that his

9  continuing wealth management needs were being met.

10    269.   Plaintiffs are informed and believe, and on that basis allege, that

11  BofA/Merrill Lynch, Liebman and BOCK never conducted an exit interview of

12  Weinberg; documented why she was leaving; inquired what she would be doing; or

13  required her to sign a non-disclosure agreement of any kind.

14    270.   Plaintiffs are further informed and believe, and on that basis allege, that

15  BofA/Merrill Lynch, Liebman and BOCK authorized and permitted Weinberg to take

16  with her, without Mr. Freeney's authorization or knowledge, several boxes containing

17  private and confidential documents relating to virtually every aspect of Mr. Freeney's

18  financial life, including his Colts contract, tax returns, financial statements, bank and

19  credit card records, contracts with his sports agent and prior financial managers,

20  mortgage and loan documents, and promissory notes and other documents of legal

21  significance.

22    271.   In connection with Weinberg moving to Los Angeles, she and BOCK

23  agreed, as part of their Martial Settlement Agreement, how to allocate funds received

24  from Stern as repayment of their loans to him.  Their agreement, entered into in or

25  about February 2011, provided:  "In the event [Weinberg] recovers any money from

26  Michael Stern or others arising from the money loaned to Michael Stern, [BOCK]

27  shall receive the first One Hundred Thousand Dollars ($100,000.00).  The balance

28  shall be split between the parties."

**SECOND AMENDED COMPLAINT**

183128.11

272.   BOCK and Weinberg concealed the existence of this agreement, as well as their relationship to Stern and each other, from Mr. Freeney.

273.   In concealing Weinberg's resignation and the other aforementioned facts, and in failing to safeguard Mr. Freeney's private and confidential personal and financial information and records, Liebman and BOCK were acting in their capacities as employees and agents of BofA/Merrill Lynch and Liebman as Weinberg's supervisor.

**V.      Mr. Freeney and Roof Group Continue as Clients of BofA/Merrill Lynch.**

274.   Both Mr. Freeney and Roof Group remained clients of BofA/Merrill Lynch after Weinberg's departure.  As a result, BofA/Merrill Lynch and BOCK continued to owe fiduciary duties and the duty of due care to Mr. Freeney and Roof Group.  In addition, BofA/Merrill Lynch remained legally obligated to monitor and promptly report to federal authorities any suspicious activity involving Mr. Freeney's bank or brokerage accounts, including the BofA Roof Group account.

275.   Following Weinberg's resignation from BofA/Merrill Lynch, BofA/Merrill Lynch, Liebman and BOCK permitted Weinberg to continue to function as Mr. Freeney's private banker, financial manager and investment advisor, as if she were still employed by BofA/Merrill Lynch.  They permitted her to, among other things:

(a)      Continue to serve as the principal contact between Mr. Freeney and BofA/Merrill Lynch;

(b)      Access the BofA Roof Group account and request that the account's security features be overriden;

(c)      Liquidate investments under BofA/Merrill Lynch's management and control;

(d)      Have access to and use private and confidential personal and financial information and records that Mr. Freeney had entrusted to BofA/Merrill Lynch; and

80

**SECOND AMENDED COMPLAINT**

(e)     Represent herself to be a "Senior Vice President" of "Global Wealth Management."

276.    Additionally, BofA/Merrill Lynch, Liebman and BOCK never warned Mr. Freeney that Weinberg was not registered as an investment adviser; that her registration as a broker-dealer would lapse once she left BofA/Merrill Lynch; that she lacked the qualifications, expertise and experience to manage his personal finances or serve as the de facto CFO of RSLA; or about her relationships with BOCK and Stern and the serious conflicts of interest those relationships created.

277.    Because BofA/Merrill Lynch would later refuse to provide Plaintiffs or their counsel with banking and brokerage records to which Plaintiffs were entitled as former clients of BofA/Merrill Lynch, Mr. Freeney and his counsel have not been able to ascertain when, precisely, he and Roof Group ceased being clients of BofA/Merrill Lynch.  Plaintiffs are informed and believe, and on that basis allege, that Mr. Freeney's brokerage accounts remained open through at least November 2011, and that the BofA Roof Group account remained open through at least April 2014.

**W.     Fraudulent and Unauthorized Transfers of Mr. Freeney and Roof Group's Funds to and from the BofA Roof Group Account.**

278.    Beginning in or about June 2010 (while Weinberg was still employed at BofA/Merrill Lynch), and continuing through at least October 2011, Weinberg, as Mr. Freeney's financial manager, deposited approximately ***$15.7 million*** to his Citibank accounts.  These deposits consisted mostly of Mr. Freeney's weekly paychecks from the Colts during the 2010 and 2011 NFL seasons.

279.    Pursuant to Weinberg's instructions, the checks were sent by the Colts to GWM at the 8484 Wilshire address.  Weinberg would then deposit them at the Citibank branch across the street.

280.    Deposits to the Citibank accounts also included Mr. Freeney's income tax refunds, which exceeded $1.0 million for 2010, and proceeds from the liquidation of his existing investments (discussed below).

**SECOND AMENDED COMPLAINT**

183128.11

281.   During this same time period, Stern, using the confidential account information provided by Weinberg, accessed Mr. Freeney's Citibank accounts online to wire transfer approximately ***$9.3 million*** from the Citibank accounts to the BofA Roof Group account.  He also wire transferred $80,000 to GWM directly. These transfers constituted thefts and conversions of funds belonging to Mr. Freeney.

282.   During this same time period, Stern, using the confidential account access information provided by BofA/Merrill Lynch, Del Campo and Weinberg, accessed the BofA Roof Group account online hundreds of times to make the following unauthorized and fraudulent wire transfers, among others:

(a)   147 wire transfers to ARC totaling more than $2.2 million;

(b)   Five wire transfers to GWM totaling more than $320,000;

(c)   78 wire transfers totaling approximately $750,000 to lease and pay expenses relating to the private jet;

(d)   Seven wire transfers totaling more than $90,000 to pay the rent on the Hancock Park house;

(e)   79 wire transfers totaling more than $5.0 million to continue to fund the build out and operations of RSLA, in order to keep the scheme operating and from being discovered; and

(f)   13 wire transfers totaling $88,000 for other unauthorized purposes.

283.   Altogether, BANA executed wire transfers totaling approximately ***$8.5 million*** from the BofA Roof Group account in furtherance of, to promote and to conceal the scheme to defraud.  All of these transfers constituted thefts and conversions of funds belonging to Mr. Freeney and Roof Group.

284.   The cost of these fraudulent and unauthorized wire transfers totaled in excess of $8,000 and was charged to Mr. Freeney and Roof Group.

285.   Weinberg and Stern frequently used RSLA to conceal and disguise the actual purpose of the wire transfers Stern was initiating on an almost daily basis from the BofA Roof Group account to ARC.  In particular, they would often include a false

**SECOND AMENDED COMPLAINT**

notation in the wiring instructions they sent BANA online, falsely indicating that the transfer was RSLA related.  The following are several such examples:

| Date of Wire | Amount | Stated Justification |
| --- | --- | --- |
| 11/18/2010 | $76,540 | "Rolling Stone Construction" |
| 01/18/2011 | $39,450 | "Kevin McReary" |
| 01/28/2011 | $39,400 | "Kevin McReary Settlement" |
| 02/02/2011 | $68,465 | "Kevin McReary Sai" |
| 04/14/2011 | $25,000 | "Niall Donnally" |
| 05/09/2011 | $31,000 | "Settlement Nial Donnelly" |
| 06/03/2011 | $26,000 | "Rsla Nial Donnelly" |
| 09/26/2011 | $26,740 | "Niall Donnally" |

286.   In fact, none of the funds transferred in these transactions were used for the purposes stated, or otherwise to benefit Mr. Freeney or Roof Group. Kevin McVearry (misspelled "McReary") was the original Director of Operations for RSLA, who was terminated at Weinberg and Stern's insistence in 2010.  He was paid $38,000 in settlement from the BofA Roof Group account; he never received any payments from ARC.  Niall Donnelly was paid $550,000 by Mr. Freeney for his interest in RSLA between May 2010 and January 2012.  None of those funds originated from ARC, and none of them were paid on the dates listed above. Similarly, ARC paid none of the construction costs associated with the build out of RSLA.

287.   In a June 2012 post-arrest interview by the Federal Bureau of Investigation ("FBI") and the United States Attorney's Office ("USAO"), Weinberg made the following statements concerning the movement of funds between and amongst the Citibank, BofA Roof Group and ARC accounts:

- "WEINBERG said that it was STERN who was making the

183128.11

transfers from FREENEY's Citibank account to the BofA Roof Group account."

- "STERN had access to all of FREENEY's accounts. Furthermore, he was the one doing the transactions in these accounts.  Specifically, WEINBERG said that STERN was involved with FREENEY's accounts and had access and was the one wiring money in and out of the accounts."

- "STERN would sometimes be doing a wire and there would be a security hold on the account and STERN would ask WEINBERG to call DEL CAMPO to release the wire. WEINBERG said that she basically mechanically checked with DEL CAMPO about the wire."

- "[S]he never looked at the Roof Group bank statements . . . . WEINBERG said that she didn't even believe that the statements existed."

- "[S]he didn't think that FREENEY knew that STERN was doing his personal billpay."

## X.    BOCK and Weinberg, Acting in Concert with Stern, Liquidate Mr. Freeney's Existing Investments to Generate Additional Funds to Misappropriate.

288.   To successfully misappropriate and convert the hundreds of thousands of dollars of Mr. Freeney's funds that Weinberg and Stern took each month without raising Mr. Freeney's suspicions, it was necessary that they have sufficient funds under their control, above the amounts they were stealing, to continue to pay Mr. Freeney's monthly living and personal expenses and the costs associated with the build out and operations of RSLA.

289.   Accordingly, beginning in or about March 2010, BOCK, Weinberg and Stern began liquidating all of Mr. Freeney's existing investments to free up additional funds to misappropriate and convert.

**SECOND AMENDED COMPLAINT**

183128.11

*1.* *Advisors Disciplined.*

290.   In or about March 2010, BOCK and Weinberg caused BofA/Merrill Lynch to sell Mr. Freeney's Advisors Disciplined municipal bonds for approximately $490,000.  The proceeds were deposited to Mr. Freeney's brokerage accounts.  Liebman and BOCK subsequently authorized and permitted Weinberg to transfer approximately $160,000 of those funds to ARC without Mr. Freeney's authorization or knowledge.

291.   In liquidating this investment, BOCK and Weinberg were acting in their capacities as employees and agents of BofA/Merrill Lynch.  In permitting Weinberg to transfer the proceeds from the sale of this investment to ARC, BOCK was acting in his capacity as an employee and agent of BofA/Merrill Lynch and Liebman was acting as Weinberg's supervisor.

*2.* *Success Trade.*

292.   In or about March 2010, Weinberg and Stern began negotiating with Success Trade for the return of Mr. Freeney's $1.5 million in principal.  In or about September 2010, Success Trade returned $441,000 to Mr. Freeney, which was deposited by Weinberg into the Citibank accounts.  During the course of the next month, a total of approximately $720,000 of the funds in the Citibank accounts were wire transferred to the BofA Roof Group account.  During this same time period, BANA executed wire transfers of approximately $190,000 of those funds from the BofA Roof Group account to ARC.

293.   In negotiating the return of Mr. Freeney's funds from Success Trade, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BofA/Merrill Lynch.

*3.* *CFP.*

294.   In or about May 2010, Weinberg and Stern began negotiating with CFP for the return of Mr. Freeney's $1.75 million in principal.  Between in or about September 2010 and February 2012, Mr. Freeney received approximately $1.6 million

85

**SECOND AMENDED COMPLAINT**

183128.11

from CFP in several separate payments.  All of these funds, with the exception of $20,000, were deposited to the Citibank accounts.  A portion of the $1.6 million was then wire transferred over time to ARC, to GWM, to pay expenses related to the private jet and to pay Stern's personal debts.

295.   The agreement that Weinberg and Stern negotiated with CFP discounted significantly the amount of principal CFP was required to return to Mr. Freeney.  As a result of this agreement, Mr. Freeney lost a total of approximately $260,000 in unreturned principal and unrealized interest income.

296.   In negotiating the return of Mr. Freeney's funds from CFP, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BofA/Merrill Lynch.

### 4.   Pacific Life Annuity.

297.   In or about June 2010, BOCK and Weinberg caused Mr. Freeney to surrender his Pacific Life annuity, which had a cash value of approximately $1.5 million.  Because Mr. Freeney surrendered the annuity early, he had to pay a penalty of approximately $50,000.

298.   The proceeds from the surrender of the annuity were deposited by Weinberg to the Citibank accounts.  Over the next month, $850,000 was wire transferred from these accounts to the BofA Roof Group account.  In this same time period, BANA executed wire transfers from the BofA Roof Group account of approximately $87,000 to ARC; $69,000 to pay expenses related to the private jet; and another approximately $21,000 to pay Stern's personal debts and expenses.

299.   In causing Mr. Freeney to liquidate his Pacific Life annuity, BOCK and Weinberg were acting in their capacities as employees and agents of BofA/Merrill Lynch.

### 5.   American Realty.

300.   In or about April 2011, BOCK and Weinberg liquidated Mr. Freeney's investment in American Realty, which resulted in $195,000 in proceeds that Weinberg

**SECOND AMENDED COMPLAINT**

183128.11

1  deposited to the Citibank accounts.  During the course of the next month,

2  approximately $178,000 was wire transferred from these accounts to the

3  BofA Roof Group account.  From there, Stern wire transferred a total of $154,000 in

4  thirteen separate wirings to ARC and another approximately $29,000 for expenses

5  related to the private jet.

6      301.   In liquidating Mr. Freeney's investment in American Realty, BOCK and

7  Weinberg were acting in their capacities as employees and agents of

8  BofA/Merrill Lynch.

9  **Y.    The Snap Advances Transactions.**

10     302.   By in or about August 2011, BOCK, Weinberg and Stern had liquidated

11  almost all of Mr. Freeney's investments that could be redeemed, and Weinberg and

12  Stern had depleted almost all of his available cash.  As a result, Weinberg and Stern

13  had no money remaining with which to pay Mr. Freeney's living and personal

14  expenses and continue to fund the operations of RSLA, while at the same time

15  misappropriating the funds that they needed to maintain their own extravagant

16  lifestyles.

17     303.   To keep RSLA afloat and prevent the scheme to defraud from being

18  discovered, in or about August 2011, Weinberg negotiated a $300,000 credit facility

19  for Roof Group from a small factoring company in Queens, New York named

20  Snap Advances.  The credit facility was secured by RSLA's credit card receivables

21  and personally guaranteed by Mr. Freeney, who, at Weinberg's urging, agreed to

22  pledge his guaranteed income under his Colts contract as security for his personal

23  guarantee.

24     304.   Under the factoring agreement, in return for the $300,000 credit facility,

25  Mr. Freeney was required to repay Snap Advances a total of $435,000, which equated

26  to 45 percent interest per year.

27     305.   At the time, Mr. Freeney was in training camp and had no real

28  opportunity to question whether or why RSLA needed this credit facility.

87

**SECOND AMENDED COMPLAINT**

306.   In or about September 2011, Weinberg negotiated a second such credit facility from Snap Advances to Roof Group under the same terms.  This time, the credit facility was for $150,000, and the factoring agreement required Mr. Freeney to pay Snap Advances a total of approximately $220,000.

307.   Mr. Freeney did not complete repaying Snap Advances, with interest, until in or about September 2012.  Altogether, these transactions required him to pay approximately $215,000 in interest and costs.

308.   In convincing Mr. Freeney to agree to the terms of the two Snap Advances factoring agreements, Weinberg concealed and caused others to conceal the following material facts, among others, from Mr. Freeney:

(a)   The credit facilities were only necessary because BofA/Merrill Lynch, Weinberg and Stern had depleted almost all of Mr. Freeney's available cash and liquid assets;

(b)   If Roof Group defaulted on the credit facilities, Mr. Freeney could lose more than $25 million in guaranteed salary under his Colts contract;

(c)   Mr. Freeney was paying interest at the shocking rate of 45 percent per annum for the two credit facilities; and

(d)   Weinberg and Stern were planning to (and did) misappropriate a portion of the advances RSLA received under the factoring agreements.

**Z.   The W Hotel Investment.**

309.   In or about January 2006, Mr. Freeney, on the advice of a former financial manager, entered into a Purchase and Sale Agreement with 2201 Collins Fee LLC ("2201 Collins") to purchase a penthouse condominium unit in the new W Hotel to be constructed in South Beach.  The purchase price was $6.0 million.  As required by the contract, Mr. Freeney made a deposit of 20 percent of the purchase price, or $1.2 million.  The balance would be due within 10 days of notification of completion of construction, which was to occur no later than December 31, 2010.  If Mr. Freeney was unable to close at that time, the contract provided that 25 percent of

**SECOND AMENDED COMPLAINT**

his deposit ($300,000) would be returned to him and that the remaining amount ($900,000) would be forfeited as liquidated damages.

310.   Mr. Freeney entered into this contract primarily for investment purposes. Under the contract, the W Hotel would rent his unit for him when he was not using it, and he would receive the rental payments, less management fees.

311.   In June 2009, Mr. Freeney received notice that construction had been completed ahead of schedule, and that he needed to pay the remaining $4.8 million of the purchase price to close on his purchase.  It emerged, however, that 2201 Collins was not able to convey marketable title at that time, and that there were a number of other irregularities in the manner in which the developer had marketed the project, escrowed deposited amounts and amended the purchase agreement.

312.   Subsequently, Mr. Freeney retained a Miami lawyer to represent him in resolving these issues with the developer.  At the time Mr. Freeney became a BofA/Merrill Lynch client in January or February 2010, the matter was still unresolved, but, as a result of negotiations between Mr. Freeney's lawyer and 2201 Collins, the developer had preliminarily agreed to: (a) reduce the purchase price of Mr. Freeney's unit to $5.4 million; (b) apply the full amount of the $1.2 million deposit toward the purchase of a lesser unit for $1.75 million; or (c) return $450,000 of Mr. Freeney's deposit.

313.   In recruiting Mr. Freeney to become a BofA/Merrill Lynch client, Weinberg and Stern (posing as Millar) promised to intervene in this transaction, to assist Mr. Freeney in either obtaining the financing to complete the purchase of his unit or to negotiate the return of his $1.2 million deposit.

314.   These promises were false.  In fact, after Mr. Freeney became a BofA/Merrill Lynch client, Weinberg and Stern did virtually nothing to help Mr. Freeney close on the purchase of the unit or obtain return of his deposit.  As a result of their inaction, Mr. Freeney never completed the purchase of the unit and remained without use of any portion of the $1.2 million deposit held by 2201 Collins

**SECOND AMENDED COMPLAINT**

183128.11

1   until recently.

2   315.   Based on these promises, Mr. Freeney had come to repose his trust and

3   confidence in BofA/Merrill Lynch, Weinberg and Stern to act honestly, loyally,

4   competently and diligently in obtaining the return of his $1.2 million deposit.  At all

5   times relevant hereto, BofA/Merrill Lynch, Weinberg and Stern, and each of them,

6   encouraged, accepted and voluntarily assumed such trust and confidence, thereby

7   creating a fiduciary relationship with Mr. Freeney relating to this matter.

8   316.   In promising to intervene in this transaction and then doing nothing to

9   assist Mr. Freeney to close on the purchase of his unit or recoup his deposit, Weinberg

10  was acting in her capacity as an employee, actual agent and/or ostensible agent of

11  BofA/Merrill Lynch.

12  **AA.   The North Carolina Land Investment.**

13  317.   In or about December 2004, Mr. Freeney, on the advice of a former

14  financial manager, purchased 8.5 acres of undeveloped lakefront land in Mecklenburg

15  County, North Carolina.  This property is located outside of Charlotte, North Carolina

16  and is part of a development known as the Sanctuary at Lake Wylie.  Mr. Freeney still

17  owns this land, which remains undeveloped.

18  318.   Mr. Freeney paid $1,530,000 for the land, which he purchased for

19  investment purposes.  The purchase was financed by a mortgage loan from

20  First Charter Bank, which later merged with Fifth Third Bank.  The Fifth Third

21  mortgage was extended in January 2008, and again in January 2010.  Mr. Freeney

22  repaid the mortgage in full in December 2013.

23  319.   At the time Mr. Freeney became a BofA/Merrill Lynch client in January

24  2010, he was making mortgage payments of approximately $9,500 per month to Fifth

25  Third Bank.  Because North Carolina is not an antideficiency state, a reasonably

26  competent financial manager would have advised Mr. Freeney that his best (if not

27  only) option was to sell the property as soon as possible to stop his ongoing and

28  mounting losses.

**SECOND AMENDED COMPLAINT**

320.   In recruiting Mr. Freeney to become a BofA/Merrill Lynch client, Weinberg and Stern (posing as Millar) advised Mr. Freeney (correctly) that the investment was a losing proposition and promised to dispose of it for him.  Based on this promise, Weinberg convinced Mr. Freeney to give Stern (posing as Millar) written authorization to negotiate a workout of the existing mortgage with Fifth Third Bank on his behalf, which Mr. Freeney did.

321.   These promises to dispose of the property were false.  In fact, after Mr. Freeney became a BofA/Merrill Lynch client, Weinberg and Stern did virtually nothing toward disposing of the property or negotiating a loan modification with Fifth Third Bank.  As a result, Mr. Freeney was required to continue to make the monthly mortgage payments over the next three years, which totaled more than $430,000, as well as pay property taxes totaling more than $18,000, while the value of the land continued to decline.

322.   In addition, although BofA/Merrill Lynch was responsible for Mr. Freeney's bill payments, it failed to pay the quarterly homeowner association ("HOA") dues on his behalf, which eventually led to the HOA foreclosing on the property.  As a consequence, Mr. Freeney had to pay the HOA over $12,000 and more than $5,500 in attorney's fees and costs to reacquire the property.

323.   Based on the foregoing promises, Mr. Freeney had come to repose his trust and confidence in BofA/Merrill Lynch, Weinberg and Stern to act honestly, loyally, competently and diligently in disposing of the North Carolina Land Investment for the greatest value reasonably obtainable.  At all relevant times, BofA/Merrill Lynch, Weinberg and Stern, and each of them, encouraged, accepted and voluntarily assumed that trust and confidence, thereby creating a fiduciary relationship with Mr. Freeney with respect to the disposition of the North Carolina Land Investment.

324.   In making these promises and then doing nothing to dispose of this property, and in failing to ensure that the HOA dues were timely paid, Weinberg was

91

**SECOND AMENDED COMPLAINT**

1   acting in her capacity as an employee, actual agent and/or ostensible agent of

2   BofA/Merrill Lynch.

3   **BB.    Efforts at Cover Up and to Obstruct Justice.**

4           325.   Beginning in or about 2011, BofA/Merrill Lynch, Weinberg and Stern,

5   aided and abetted by others, engaged in the following acts, among others, to conceal

6   and cover up their involvement in the scheme to defraud Mr. Freeney.

7           *1.      **Weinberg and Stern Secretly Marry.***

8           326.   Weinberg and Stern were secretly married in Los Angeles on or about

9   February 25, 2011.

10          327.   Weinberg and Stern recorded their Marriage License and Certificate as

11  confidential.  Although Weinberg would tell the FBI following her arrest that she

12  believed Stern had previously legally changed his last name to "David Michael

13  Millar," the marriage license listed Stern's name as "Michael Alan Stern," and further

14  indicated that Weinberg had elected to change her name to "Eva Danielle Stern."

15          328.   At the time they wed, Stern was still married to Layne Harris Stern.

16  (They were not divorced until two years later, in April 2012.)

17          329.   This marriage was a sham.  Plaintiffs are informed and believe, and on

18  that basis allege, that Stern secretly wed Weinberg, while still married to Layne Harris

19  Stern, so that Weinberg could assert the spousal and marital communication privileges

20  to refuse to testify against Stern in the Florida bankruptcy proceedings and in the

21  various lawsuits pending against him in Florida, or in the event the scheme to defraud

22  Mr. Freeney was discovered and Stern was sued or criminally prosecuted as a result.

23          *2.      **Weinberg and Stern's Efforts to Misdirect Scrutiny.***

24          330.   In or about November 2011, Weinberg and Stern became concerned that

25  Mr. Freeney had discovered their fraud and that they were under investigation by

26  federal authorities.  In an effort to conceal their criminal activities, they attempted to

27  misdirect scrutiny away from themselves by falsely accusing others, including, in

28  particular, Mr. Freeney's friend and business associate Aaron West, of having stolen

92

**SECOND AMENDED COMPLAINT**

183128.11

from Mr. Freeney.

331.   In or about November 2011, Stern composed a letter on his computer, "To whom it may concern," falsely claiming that he "did make cash deposits to the account of Aaron Oneil West"; that Mr. West "had asked to borrow funds that would be reimbursed by Roof Group"; and that "monies were also given to Aaron west [sic] in hand in cash . . . ."  The letter was recovered from Stern's computer by the FBI following his arrest.

332.   During this same period, Weinberg viciously slandered Mr. West to RSLA managers and staff and to Mr. Freeney's mother, falsely accusing him of stealing from Mr. Freeney and seeking to blame him for RSLA's deteriorating financial condition.

333.   Weinberg and Stern also attempted to misdirect scrutiny by creating fictitious account statements to show Mr. Freeney.  In or about December 2011, Weinberg and Stern paid an accountant to prepare phony account statements for Mr. Freeney that Weinberg could show to him.  The phony statements purported to have been issued by GWM, listed Weinberg as the Senior Vice President of GWM, and falsely reported that Mr. Freeney still had over $1.3 million in cash on deposit and owned assets valued at close to $14 million.

### 3.   Weinberg and Stern's Creation of False and Forged Documents.

334.   In or about November 2011, Stern composed a false exculpatory statement on his computer that he fraudulently backdated to August 3, 2010.  The letter was purportedly authored by Mr. Freeney.  In it, Stern had Mr. Freeney "agree[ing] to pay the cost per hour plus fuel and pilot expenses [of the private jet] to Arms Reach Consulting or its suppliers," and that the "fees will be paid by Roof Group LLC."  This letter was also recovered by the FBI from Stern's computer following his arrest.

335.   In or about December 2011, Stern composed a letter on his computer that included a confession of sorts.  Plaintiffs are informed and believe, and on that basis

**SECOND AMENDED COMPLAINT**

allege, that Stern created this document for Weinberg to use to exonerate herself should she be arrested by federal authorities.  The letter was addressed, "To whom it may concern," and was prepared on or about December 21, 2011.  In it, Stern admitted that, "I have been using the name or I have been known as or under the A/K/A David Michael Millar, Michael Millar"; that "[f]rom day one I was transferring funds and taking monies that did not belong to me"; and that "I took those funds without anyone's knowledge and transferred funds without the knowledge and or consent of the owner of the account or his financial advisors."

336.   Plaintiffs are informed and believe, and on that basis allege, that sometime between in or about December 2011 and March 2012, Stern fabricated a "Business Management Engagement Letter" purportedly between GWM and Mr. Freeney (the "Fabricated Engagement Letter").  The document was fraudulently backdated to June 11, 2010, the day after Weinberg sent her resignation note to BofA/Merrill Lynch.  The document purported to be signed by Mr. Freeney, but either Weinberg or Stern forged Mr. Freeney's signature to it or obtained his signature by deception.

337.   The document recited the terms of a supposed agreement by which Mr. Freeney was to pay GWM five percent of his total assets annually, including five percent of the value of Roof Group, in return for GWM managing his finances.  No such agreement existed.  In fact, in a telephone conversation that the FBI recorded between Mr. Freeney and Weinberg on or about December 16, 2011, Weinberg admitted that, "you don't owe me anything."

338.   This telephone conversation followed Mr. Freeney's receipt earlier that day of an anonymous fax, which stated, in part:

- "You signed an asset management contract.  The contract was signed by yourself in June 2010, however, [Weinberg] was managing them since February 2010.  The contract was signed by you . . . ."

**SECOND AMENDED COMPLAINT**

- "You will be provided with an additional copy of all agreements you signed including the authorizations . . . ."

- "The total fees are $2,731,375.  Without the bill pay . . . ."

339.   Weinberg later claimed her mother sent this fax without her knowledge, but, in reality, either Weinberg or Stern sent it.  The fax represented the first time the existence of an "asset management contract" between Mr. Freeney and GWM was mentioned to him.  Moreover, although the fax stated that "[y]ou will be provided with an additional copy of all agreements you signed," no such agreements were ever sent to Mr. Freeney by Weinberg or anyone else.  In fact, Mr. Freeney first saw the Fabricated Engagement Letter in or about April 2012, when the FBI showed it to him, following the arrests of Weinberg and Stern in March 2012.

**4.      *Weinberg and Stern's Attempted Destruction and Secreting of Evidence*.**

340.   In or about March 2012, Stern returned to Miami to collect money that he was owed and needed, now that he had exhausted Mr. Freeney's available cash and liquid assets.  While there, he had a number of conversations with an associate who was actually a paid Confidential Informant ("CI") working with the FBI.  (Some of those conversations were surreptitiously recorded by the CI and others were documented by the FBI in Forms 1023.)

341.   On or about March 17, 2012, Stern told the CI that he had intercepted a letter from the FBI intended for Mr. Freeney, indicating that an investigation was underway.  Stern advised the CI that he was able to intercept the letter because all of Mr. Freeney's mail was still being forwarded to Weinberg's office in California.

342.   On or about March 18, 2012, Stern admitted to the CI that he had used the name "David Michael Millar" in his dealings with Mr. Freeney.  He also told the CI that he was considering leaving the country because of the FBI investigation.

343.   On or about March 21, 2012, Stern instructed the CI to fly from Miami to Los Angeles to destroy the hard drive of a laptop computer that had been left in a

95

**SECOND AMENDED COMPLAINT**

SUV parked at Los Angeles International Airport, which contained evidence incriminating of him and Weinberg.  Stern described to the CI how he could locate the car, gave him the keys to the car and gave him money to buy a plane ticket to Los Angeles.  Stern also instructed the CI to retrieve documents from the SUV and a box of documents from Weinberg's home and destroy them as well.  Later, Stern told the CI that Weinberg had already taken care of the box of documents.

344.   The CI flew to Los Angeles that same day, March 21, 2012.  Based on the information provided by the CI, the FBI recovered the laptop from the SUV.

345.   On March 23, 2012, Stern was driven to Miami International Airport by Carl Brown, another business associate, to catch a flight to Los Angeles to reunite with Weinberg.

346.   En route to the airport, Stern and Brown stopped at a check cashing store where Stern unsuccessfully attempted to cash a Colts check made payable to Mr. Freeney, which was dated February 7, 2012, and in the amount of $31,785.

347.   Before arriving at the airport, Stern and Brown also stopped at the house Brown was living in, which Stern owned and was renovating.  As Brown would tell the FBI, Stern was carrying "a bag full of paperwork with him," and he "witnessed STERN get up on a ladder and put the paperwork inside the ceiling trusses that were exposed due to drywall cutout in the ceiling."  Brown stated that he "held the plastic bag while STERN took paperwork from inside the bag and placed it between the trusses," and then "STERN told BROWN to have the ceiling covered up as soon as possible."

348.   The FBI later recovered the "paperwork" Stern had stashed between the ceiling trusses.  The documents recovered included exemplars of Mr. Freeney's signature and a series of forged and fraudulent documents purportedly authorizing Citibank to transfer funds to the BofA Roof Group account in 2010 and 2011.

**SECOND AMENDED COMPLAINT**

183128.11

# VI.   AFTERMATH OF THE SCHEME.

## A.   Weinberg and Stern's Arrests.

349.   Weinberg and Stern were arrested by the FBI on March 23, 2012, based on information provided by Mr. Freeney and a confidential informant and developed by the FBI with virtually no assistance from BofA/Merrill Lynch.  They were arrested on a federal criminal complaint charging them with wire fraud for misappropriating funds from Mr. Freeney.

350.   Stern was arrested at Miami International Airport, as he was about to board a flight to Los Angeles.  At the time, he had on his person the check from the Colts to Mr. Freeney for $31,785; another check from the NFL Players Association to one of Mr. Freeney's companies for $2,270.52; a BofA Visa card in Mr. Freeney's name; temporary checks for a newly opened account at First Bank in Beverly Hills; and a number of documents relating to the scheme, including multiple copies of another version of the Fabricated Engagement Letter and handwritten notes and materials printed from the Internet that Stern apparently used to draft the Fabricated Engagement Letter.

351.   Weinberg was arrested at her residence in Los Angeles on the same day. In an interview by the FBI on the day of her arrest, Weinberg falsely stated, among other things, that:

(a)   Aaron West had introduced Mr. Freeney to Stern;

(b)   She was afraid of Mr. West because he had threatened her life;

(c)   Mr. Freeney paid a consulting fee to ARC, recalling one payment of $100,000;

(d)   She and Stern had become romantically involved only at the end of 2010;

(e)   She first discovered that Stern was not divorced from his prior wife soon after they were married; and

(f)   She had told Mr. West in December 2011 about Stern's

**SECOND AMENDED COMPLAINT**

183128.11

unauthorized use of a Roof Group credit card.

**B.      The Criminal Prosecutions.**

352.   In May 2012, a grand jury in the Central District of California indicted Stern for wire fraud and obstruction of justice relating to the scheme to defraud Mr. Freeney.  In August 2012, the grand jury returned a superseding indictment that added transactional money laundering and access device fraud charges.

353.   In January 2013, U.S. District Judge Stephen V. Wilson accepted Stern's guilty plea to access device fraud.  In pleading guilty, Stern admitted that he had acted "knowingly and with the intent to defraud" Mr. Freeney and Roof Group.

354.   In October 2013, Judge Wilson sentenced Stern to 60-months imprisonment and three-years supervised release for his role in defrauding Mr. Freeney.  In imposing this sentence, Judge Wilson found that "Mr. Stern [is] totally uncredible"; "[h]e is a person worthy of no credibility"; "[t]he crime is serious, so the sentence is necessary to promote respect for the law and to provide just punishment for the offense"; "[i]t is also necessary to protect the public from further crimes of this defendant"; and "given [his] overall history and the endemic way in which he carried out his scheme against the victim here, there is concern that without a serious sentence, he would be inclined to do this again."

355.   In June 2013, Judge Wilson accepted Weinberg's guilty plea to an information charging her with being an accessory after the fact to access device fraud. In pleading guilty, Weinberg admitted that she had "assisted STERN with the specific purpose or design to hinder or prevent STERN's apprehension, trial, or punishment," and that "it was reasonably foreseeable to [her] that STERN may have stolen additional funds from other Roof Group, LLC bank accounts," including "approximately $2,235,137.97 in unauthorized and fraudulent transfers from Roof Group, LLC's Bank of America account to a Wells Fargo bank account . . . that was controlled by STERN."

356.   In December 2013, Judge Wilson sentenced Weinberg to six-months

**SECOND AMENDED COMPLAINT**

1   imprisonment and three years of supervised release.  In imposing sentence, Judge

2   Wilson stated: "[i]t's clear to me . . . she abused a position of trust"; "as criminal

3   fraudsters go, she is pretty sophisticated"; "[s]he is an intelligent woman with

4   financial sophistication much beyond the norm"; "she misled [Mr. Freeney] when she

5   introduced him to Stern, who was a major factor in all the mischief of criminal

6   conduct that followed"; "her introduction [of] Freeney to Stern was what set in motion

7   this entire sordid scheme"; "[s]he knew full well what Stern was"; "she engaged in a

8   fraud and therefore deserves the sentence"; and "had the case been further developed

9   [by the prosecutor], it would have been much worse for her."

10        357.   Additionally, in September 2012, Stern was charged in an indictment in

11  the Southern District of Florida with conspiracy, mail fraud and aggravated identity

12  theft relating to a $20 million mortgage fraud scheme that pre-dated his introduction

13  to Mr. Freeney.  Although Weinberg was peripherally involved in that scheme, she

14  was not charged.

15        358.   In June 2014, Stern pleaded guilty to mail fraud in that case, admitting

16  that he had unlawfully used the names and social security numbers and forged the

17  signatures of an elderly Florida couple (Ivor Rose and Rita Starr) and had diverted

18  loan proceeds to himself, causing them losses of between $7.0 million and

19  $20 million.  In September 2014, Stern was sentenced in that case by U.S. District

20  Judge William J. Zloch to 96 months imprisonment, to run concurrently with the

21  60-month sentence Judge Wilson had imposed.

22  **C.   Mr. Freeney's Discovery of Weinberg and Stern's Thefts From the**

23         **BofA Roof Group Account.**

24        359.   Previously, in or about November 2011, Mr. Freeney became concerned

25  that Weinberg was misusing funds in the Roof Group bank accounts at Wells Fargo

26  Bank that had been opened in June 2010.  However, it was not until shortly before

27  Weinberg and Stern's arrests on March 23, 2012, when he was shown account

28  statements for the BofA Roof Group account that the FBI had subpoenaed from

99

**SECOND AMENDED COMPLAINT**

1    BofA/Merrill Lynch, that he first learned of Weinberg and Stern's misappropriation of

2    funds from that account.

3         360.   In or about January 2012, Mr. Freeney hired certified public accountants

4    to examine the books and records and handle the tax preparation, accounting and bill

5    payment for Roof Group and RSLA.  The accountants soon discovered that Weinberg

6    had failed to maintain books and records for Roof Group and RSLA; had failed to file

7    federal and state income tax returns on behalf of Roof Group; and had failed to pay

8    payroll, sales and business taxes due and owing by Roof Group.

9         361.   Following Weinberg and Stern's arrests in March 2012, Mr. Freeney

10   hired the same accountants to handle his personal tax preparation, accounting and bill

11   payment needs.

12        362.   Because of the absence of books, records and other rudimentary financial

13   information, the new accountants had to reconstruct Roof Group and RSLA's books

14   and records and Mr. Freeney's personal financial history for the past two years from

15   scratch.  This required the accountants to gather, analyze and reconcile financial

16   records from all available sources, a project which proved arduous and costly and took

17   more than two years to substantially complete.  Even today, however, many essential

18   financial records remain missing, as a result of which several million dollars of

19   Mr. Freeney's funds that passed through the BofA Roof Group and other accounts that

20   Weinberg and Stern controlled remain unaccounted for.

21        363.   In or about April 2012, Mr. Freeney retained counsel to investigate

22   BofA/Merrill Lynch's role in the scheme to defraud.  Working with the new

23   accountants, counsel conducted an extensive investigation to determine the amount

24   and disposition of funds stolen from Mr. Freeney, and the nature and extent of the

25   losses he and Roof Group had suffered as a result of the scheme.  Counsel, however,

26   were hampered in their investigation by BofA/Merrill Lynch's lack of cooperation

27   (described further below).

28        364.   Meanwhile, at Mr. Freeney's direction, counsel shared with

**SECOND AMENDED COMPLAINT**

183128.11

1  BofA/Merrill Lynch, both in writing, and verbally, the findings, analysis and

2  conclusions of their pre-filing investigation, along with more than 5,000 pages of

3  relevant documents.  In response, BofA/Merrill Lynch effectively provided nothing.

4  **D.  BofA/Merrill Lynch's Attempts to Cover Up Their Employees'**

5  **Wrongdoing.**

6  365.  Plaintiffs are informed and believe, and on that basis allege, that

7  notwithstanding the hundreds of suspicious wire transfers of more than ***$17 million*** to

8  and from the BofA Roof Group account during 2010 and 2011, BofA/Merrill Lynch

9  *never* filed a Suspicious Activity Report or otherwise notified federal authorities of

10  these highly suspicious banking transactions, as required by the Bank Secrecy Act.

11  Plaintiffs are further informed and believe, and on that basis allege, that

12  notwithstanding the apparent illegal and fraudulent activities of BOCK, Weinberg and

13  Stern involving Mr. Freeney and Roof Group's accounts, and Weinberg and Stern's

14  publicly reported arrests and prosecutions, BofA/Merrill Lynch *never* filed a SAR

15  reporting such activities.

16  366.  Plaintiffs are also informed and believe, and on that basis allege, that

17  BofA/Merrill Lynch violated its FINRA reporting obligations by deliberately delaying

18  the filing of a Form U4 reporting Mr. Freeney's complaints of wrongdoing against

19  BOCK, Liebman and Del Campo made two years earlier.  Plaintiffs are further

20  informed and believe, and on that basis allege, that BofA/Merrill Lynch only reported

21  Mr. Freeney's allegations to FINRA just prior to the filing of this lawsuit and only

22  because it anticipated that, with the filing of this lawsuit, those allegations would

23  become public.

24  367.  Plaintiffs are also informed and believe, and on that basis allege, that the

25  updated Forms U4 BofA/Merrill Lynch filed for BOCK, Liebman, Del Campo and

26  Weinberg were in furtherance of its efforts to cover up their illegal and fraudulent

27  activities and its failure to responsibly address those activities.  In particular, Plaintiffs

28  are informed and believe, and on that basis allege, that these updated forms were false

**SECOND AMENDED COMPLAINT**

and misleading in that they reported that BofA/Merrill Lynch had investigated

Mr. Freeney's allegations, and that it had determined that the allegations were

"unfounded and without merit," when, in fact, BofA/Merrill Lynch conducted no

meaningful investigation of Mr. Freeney's allegations and altogether ignored the

voluminous evidence of its present and former employees' illegal conduct that

Mr. Freeney had previously shared with BofA/Merrill Lynch.

**E.    BofA/Merrill Lynch's Ratification of the Conduct of Their**
**Present and Former Employees and Agents.**

368.   If, or to the extent, the conduct of BOCK, Weinberg, Liebman, or

Del Campo described herein exceeded the scope of their employment, actual agency,

or ostensible agency, BofA/Merrill Lynch ratified and adopted that conduct by, among

other things:

(a)    Failing to accept any degree of responsibility for Weinberg's

criminal activities or publicly renounce her conduct;

(b)    Not investigating or renouncing the conduct of any of its current

employees, including BOCK, Liebman and Del Campo;

(c)    Not terminating or taking any disciplinary action against any of its

current employees, including BOCK, Liebman and Del Campo;

(d)    Not investigating the transactions at issue;

(e)    Not self-reporting to its regulators, including the Office of the

Comptroller of Currency and the SEC, as required by law;

(f)    Not filing any Suspicious Activity Reports with the U.S. Treasury

Department, as required by law;

(g)    Remaining altogether silent in the criminal proceedings against

Weinberg and Stern and doing virtually nothing to assist the FBI, USAO, or

Mr. Freeney in those proceedings;

(h)    Retaining the benefits it had received from the scheme, including

fees and commissions;

**SECOND AMENDED COMPLAINT**

1       (i)    Not returning, and never offering to return, any of the funds

2   Weinberg had misappropriated from one of Mr. Freeney's brokerage accounts;

3       (j)    Not restoring, and never offering to restore, any of the trading

4   losses Mr. Freeney sustained or commissions BOCK had received from his

5   unauthorized purchases and sales of securities using Mr. Freeney's funds;

6       (k)    Ignoring requests from Mr. Freeney's attorneys and accountants

7   for copies of records to which Mr. Freeney was entitled as a BofA/Merrill Lynch

8   client;

9       (l)    Ignoring requests from Mr. Freeney personally for copies of those

10   records;

11       (m)    Filing false reports exonerating itself with the FINRA; and

12       (n)    Withholding and failing to produce documents to the FBI and

13   USAO in response to a federal grand jury subpoena.

14   **F.**    **Mitigation of Losses.**

15       *1.*    *The Closure of RSLA.*

16   369.    Following the discovery of the scheme to defraud, Mr. Freeney invested

17   another approximately $3.4 million in RSLA in 2012, in an effort to save the

18   restaurant from bankruptcy and turn it around.  The $3.4 million was used to fund

19   further operating losses; pay bills that BofA/Merrill Lynch and Weinberg had failed to

20   pay; settle lawsuits arising from BofA/Merrill Lynch and Weinberg's failure to pay

21   vendors and RSLA employees; pay sales and payroll taxes that BofA/Merrill Lynch

22   and Weinberg also failed to pay and the interest and penalties that were imposed for

23   their failure to timely pay those taxes; bring in new management and accountants; and

24   retain a top hospitality expert to evaluate RSLA's continuing viability and make

25   recommendations to turn it around, if feasible.

26   370.    Ultimately, Mr. Freeney's efforts to save RSLA proved unavailing.  As a

27   result of the financial, operational and reputational harm caused by the scheme to

28   defraud, the restaurant had been sustaining heavy losses and could not continue to

**SECOND AMENDED COMPLAINT**

operate without a massive capital infusion.  Mr. Freeney was in no position to make a further investment of that magnitude and extensive efforts to attract new investors proved unsuccessful.

371.   RSLA was forced to close in February 2013, at a further cost to Mr. Freeney of $1.1 million and the loss of 68 jobs.  The closure of RSLA, and the additional funds that Mr. Freeney spent to mitigate his losses from that closure, were the natural, reasonable and proximate result of the wrongful acts of Defendants and their co-schemers.

### 2.   *Settlement of the W Hotel Dispute.*

372.   In or about May 2013, Mr. Freeney retained new counsel in Florida to assist him in negotiating with 2201 Collins for return of his deposit.  In or about July 2014, 2201 Collins agreed to return $575,000 of Mr. Freeney's $1.2 million deposit.  Because of BofA/Merrill Lynch's broken promise to obtain return of Mr. Freeney's deposit in 2010, Mr. Freeney had been without the use of the funds he eventually recovered for four years.

### 3.   *Repayment of the North Carolina Loan.*

373.   In or about December 2013, Mr. Freeney repaid the Fifth Third Bank mortgage on the North Carolina property at a cost to him of over $1.4 million. Mr. Freeney is currently seeking to sell the property.  The market value of this land, however, has continued to plummet over the past five years, since Mr. Freeney became a BofA/Merrill Lynch client, such that any future sale of the property will be at only a fraction of the price Mr. Freeney would have received in 2010, when BofA/Merrill Lynch promised to dispose of this investment for him.

## G.   Tolling of the Statute of Limitations.

### 1.   *The Tolling Agreements.*

374.   Prior to the filing of this action, the parties entered into a series of tolling agreements, whereby they agreed that the statute of limitations for the claims asserted in this action were tolled during the period September 19, 2013 through and including

**SECOND AMENDED COMPLAINT**

1    January 30, 2015.

2         2.      **Delayed Discovery and Active Concealment.**

3         375.    Significant aspects of the scheme to defraud – including, in particular, the

4    participation of BAC, BANA, MLPFS, BOCK, Del Campo and others, the extent of

5    the relationships between BOCK, Weinberg, Stern, Weinberg's brother and the

6    Florida Attorney, and the nature and extent of the harm to Roof Group and RSLA –

7    remained unknown to Mr. Freeney and his counsel following Weinberg and Stern's

8    arrests in March 2012, due to the efforts of Defendants and their co-schemers to

9    actively conceal their wrongdoing.  As part of these efforts:

10             (a)     While detained following his arrest, Stern sent Weinberg a letter

11   dated May 15, 2012.  Disguised as a suicide note, the letter outlined for Weinberg the

12   false exculpatory story she should tell the prosecutor when next interviewed.  Amidst

13   expressions of regret and sorrow, Stern wrote that:

- "Aaron [West] made the call to the bank and got me the passcodes on a recorded call.  He also instructed me to wire money on hundreds of occasions not only to others but to him as well."

- "You must try and remember how it all started as Aaron introduced me to Dwight not you."

- "I spoke to [Dwight at his hotel] and discussed his financials on Feb 2010.  He advised me about his investments and I tried to stop him from putting in additional monies until I checked things out.  He agreed and I started working on taking the DF restaurant and the studio under control."

- "It was always my belief that the contract between Global Wealth and DF could protect me."

             (b)     In an interview with the FBI and the prosecutor two days later, on

27   or about May 17, 2012, Weinberg falsely stated, among other things, that: (i) she only

28   referred to Stern as "Mike" or "Michael" to Mr. Freeney, never as Millar; (ii) she had

105

**SECOND AMENDED COMPLAINT**

"never worked side-by-side with Stern" prior to meeting Mr. Freeney; (iii) Stern had legally changed his name to "David Michael Millar" in Trinidad, in an effort to "start over"; (iv) she had discussed her leaving BofA with Mr. Freeney, and had described her compensation requirements to him; (v) she and Freeney had discussed the Fabricated Engagement Letter previously; (vi) she "never really took her fees from Freeney"; (vii) she never accessed Mr. Freeney's bank accounts online and did not know their balances; and (viii) she did not know that $2.2 million had been transferred from the BofA Roof Group account to ARC until she and Stern were arrested.

(c)     In a third interview with the FBI and the prosecutor on or about June 5, 2012, Weinberg falsely stated, among other things, that: (i) Mr. Freeney knew that Stern was doing the bill pay for RSLA; (ii) it was Stern and Mr. Freeney who had decided to open the BofA Roof Group account, not her; (iii) she never saw statements for the BofA Roof Group account, never checked the account balances and did not know that the account was still open and; and (iv) when, in December 2011, she discovered that Stern had used a Roof Group credit card without authorization to pay personal expenses, she did not tell anyone because she wanted "to give Stern the benefit of clearing things up."

(d)     Plaintiffs are informed and believe, and on that basis allege, that in response to a grand jury subpoena issued to BofA/Merrill Lynch in the course of the Criminal Investigation, BofA/Merrill Lynch withheld and failed to produce responsive documents, including complete records for the BofA Roof Group account and for BOCK's unauthorized purchases and sales of securities.

(e)     On or about August 17, 2012, a private investigator retained by Mr. Freeney's counsel attempted to interview BOCK (before he was represented by counsel) at Weinberg's residence in Los Angeles, but he refused to answer any questions.

(f)     On or about August 28, 2012, an investigator attempted to interview Del Campo at the BofA Brickell Avenue branch where she worked, but she

**SECOND AMENDED COMPLAINT**

183128.11

1    refused to answer any questions and referred the investigator to her counsel, who

2    refused to allow her to be interviewed.

3          (g)    On or about September 6, 2012, the investigator attempted to

4    interview Weinberg's brother telephonically, but he refused to answer any questions

5    concerning Mr. Freeney or Weinberg.

6          (h)    In or about April 2012, Mr. Freeney's new accountants contacted

7    BofA/Merrill Lynch telephonically to request copies of Mr. Freeney's bank and

8    brokerage records to which he was entitled as a former client, but BofA/Merrill Lynch

9    refused to provide them unless Mr. Freeney personally requested them.

10          (i)    Approximately a week later, Mr. Freeney and his accountants,

11   together, contacted BofA/Merrill Lynch telephonically, so that he could personally

12   request copies of his bank and brokerage records, but BofA/Merrill Lynch again

13   refused to provide them.

14          (j)    On or about October 30, 2012, Mr. Freeney's counsel provided

15   counsel for BofA/Merrill Lynch, at his request, with a letter detailing the findings of

16   counsel's investigation to date, and reiterating Mr. Freeney's request for copies of his

17   bank and brokerage records.  In the letter, Mr. Freeney's counsel also requested the

18   opportunity to interview BOCK, Liebman and Del Campo, to complete their

19   investigation.  BofA/Merrill Lynch ignored the letter and Mr. Freeney's requests.

20          (k)    Having received no response to their October 2012 letter, on or

21   about September 9, 2013, Mr. Freeney's counsel wrote a second letter which (based

22   largely on the materials produced in the interim by the USAO, as discussed below)

23   detailed BofA/Merrill Lynch's knowing participation in the scheme to defraud and

24   documented Mr. Freeney and Roof Group's resulting losses.  BofA/Merrill Lynch

25   never responded in writing to this second letter; never offered any explanation or

26   justification for its conduct or that of its present or former employees; never provided

27   Mr. Freeney with the account records he, his accountants and his attorneys had

28   repeatedly requested; and never made any of its employees available for an interview.

107

**SECOND AMENDED COMPLAINT**

(l)     In or about July 2013, in the *Feli* Case, Weinberg refused to produce any documents in response to a subpoena that had been duly served upon her.

(m)     In or about November 2013, also in the *Feli* Case, Mr. Freeney's counsel served Weinberg's brother with a subpoena to produce records relating to his sale of the $55 million in life insurance to Mr. Freeney and payment of kickbacks to Weinberg, but he refused to produce any documents in response.

(n)     In or about July 2015, in a related case in which Mr. Freeney was suing Weinberg, she twice refused to appear for her deposition, which had been duly noticed.

376.   To this day, Mr. Freeney has never received a copy of any of his bank, brokerage, or credit card records from BofA/Merrill Lynch, despite his entitlement to them and his, his counsel's and his accountant's numerous requests.  Moreover, the BofA Roof Group account records his counsel obtained from the USAO, which the USAO had subpoenaed from BofA/Merrill Lynch, are incomplete, as are the records pertaining to BOCK's unauthorized purchases and sales of securities.

377.   In or about May 2013, in the criminal cases, Judge Wilson ordered the USAO to produce a significant portion of its investigative files to Mr. Freeney and his counsel, which resulted in Mr. Freeney obtaining bank, financial and Internet provider records; Weinberg's BofA/Merrill Lynch personnel file; search warrant affidavits; some of the materials seized in those searches; FBI 302 witness interview reports; Weinberg's post-arrest statements to the FBI and proffers to the prosecutor; FBI 1023 forms documenting reports by an FBI confidential source who had secretly recorded conversations with Stern; and forensic analysis of encrypted computer files seized from Weinberg and Stern's computers.

378.   It was not until Mr. Freeney and his counsel had obtained access to and had had an opportunity to examine and analyze these materials that they discovered the facts giving rise to this action.

**SECOND AMENDED COMPLAINT**

183128.11

1

## FIRST CAUSE OF ACTION

2

### (For Conspiracy to Defraud)

3

### (By Plaintiffs Freeney and Roof Group

4

### Against Defendants BAC, BANA, MLPFS and BOCK)

5      379.   Plaintiffs repeat and reallege paragraphs 1 through 378 of this

6   Second Amended Complaint as if fully alleged herein.

7   **A.      Formation and Operation of the Conspiracy.**

8      380.   Beginning in or about January 2010, BAC, BANA, MLPFS and BOCK,

9   together with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the

10   Florida Law Firm, and each of them, conspired and agreed to:

11           (a)      Make misrepresentations to Mr. Freeney and Roof Group, directly

12   and through Mr. Freeney's friends, family and associates, regarding important facts,

13   as described further in paragraphs 130 through 348 and 386 of this Second Amended

14   Complaint, knowing that the representations were false or misleading, and intending

15   that Mr. Freeney and Roof Group would rely upon them;

16           (b)      Make false promises to Mr. Freeney and Roof Group, directly and

17   through Mr. Freeney's friends, family and associates, regarding important matters, as

18   described further in paragraphs 130 through 348 and 386 of this Second Amended

19   Complaint, with no intention of performing those promises, and intending that

20   Mr. Freeney and Roof Group would rely upon them; and

21           (c)      Conceal and withhold from Mr. Freeney and Roof Group

22   important facts that Defendants had a duty to disclose to them, as described further in

23   paragraphs 130 through 348 and 390 of this Second Amended Complaint, knowingly

24   and with the intent to deceive them.

25      381.   Mr. Freeney and Roof Group acted reasonably in relying upon these false

26   and misleading representations, false promises and undisclosed facts in, among other

27   things:

28           (a)      Becoming BofA/Merrill Lynch clients;

**SECOND AMENDED COMPLAINT**

1         (b)    Transferring management and control of Mr. Freeney's assets and
2 investments to BofA/Merrill Lynch;

3         (c)    Authorizing BofA/Merrill Lynch, BOCK and Weinberg to
4 manage Mr. Freeney's income, including his salary from the Colts, and to pay his
5 bills;

6         (d)    Trusting BofA/Merrill Lynch to obtain the return of Mr. Freeney's
7 $1.2 million deposit with 2201 Collins, and to dispose of the North Carolina Land
8 Investment;

9         (e)    Entrusting management of the build out, opening, operations and
10 finances of RSLA to BofA/Merrill Lynch, Weinberg and Stern (posing as Millar);

11         (f)    Retaining and paying the Florida Attorney more than $140,000 to
12 negotiate and document the purchases of Altounian and Donnelly's interests in
13 Roof Group;

14         (g)    Agreeing to purchase Altounian and Donnelly's interests in
15 Roof Group for more than $1.1 million;

16         (h)    Agreeing to purchase $55 million in unsuitable and worthless life
17 insurance;

18         (i)    Agreeing to hire the Felis under the terms set forth in the Term
19 Sheet and then terminating their services seven months later;

20         (j)    Agreeing to borrow $450,000 from Snap Advances at an effective
21 annual interest rate of 45 percent;

22         (k)    Authorizing Stern (posing as Millar) to negotiate return of
23 Mr. Freeney's investments in Success Trade and CFP; and

24         (l)    Accepting Stern's offer (posing as Millar) to use his private jet for
25 only the cost of the fuel.

26 **B.**    **Wrongful Acts in Furtherance of the Conspiracy.**

27       382.   On or about the dates indicated below, BAC, BANA, MLPFS and
28 BOCK, together with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney

**SECOND AMENDED COMPLAINT**

and the Florida Law Firm, and each of them, committed, caused and aided and abetted the following wrongful acts, among others, in furtherance of and to accomplish the objectives of the conspiracy:

Act No. 1:    On or about January 19, 2010, Weinberg sent a text message to Mr. West requesting the W Hotel contract so that BofA/Merrill Lynch's "consultant" could review it.

Act No. 2:    On or about January 24, 2010, Weinberg sent a text message to Mr. West stating that BofA/Merrill Lynch's "real estate consultant" would help resolve Mr. Freeney's issues with the W Hotel.

Act No. 3:    On or about January 27, 2010, Weinberg requested that Mr. West send her the lease and other documents for RSLA.

Act No. 4:    On or about February 2, 2010, Mr. West met with BOCK, Weinberg and Sugarman at the BofA Brickell Avenue branch to discuss Mr. Freeney's financial situation and needs and how BofA/Merrill Lynch could assist him.  During this meeting, BOCK, Weinberg and Sugarman made the following false and misleading representations, among others: (a) they had the qualifications, expertise and experience to competently manage Mr. Freeney's assets, investments and income; (b) they could and would assist Mr. Freeney in finding new investors and/or obtaining loan financing for his business ventures, including RSLA; (c) they could and would assist Mr. Freeney in disposing of his non-performing and under-performing investments, including the North Carolina Land Investment; and (d) they could and would assist Mr. Freeney in obtaining return of his $1.2 million deposit with 2201 Collins.

Act No. 5:    On or about February 5, 2010, Weinberg sent an email to V. Brown & Co. requesting copies of all of Mr. Freeney's financial records.

Act No. 6:    On or about February 5, 2010, Weinberg, Sugarman and Stern (posing as Millar) met with Mr. West and others at a restaurant in Miami Beach, at which Stern was introduced as "Michael Millar."  Weinberg made the following

**SECOND AMENDED COMPLAINT**

misrepresentations, among others: (a) Millar was a wealthy real estate developer; (b) Millar was a real estate consultant for BofA/Merrill Lynch; (c) Millar had $30 million on deposit with BofA/Merrill Lynch; (d) Millar owned a private plane; (e) Millar lived in the Bahamas; and (f) Millar was the grandson of pharmaceutical mogul Dr. Phillip Frost, the Chairman of Teva Pharmaceuticals; Stern (posing as Millar) made the following additional misrepresentations, among others: (a) he would obtain financing for RSLA; and (b) he would recover all of Mr. Freeney's investment in the W Hotel.

Act No. 7:      On or about February 6, 2010, Stern (posing as Millar) met with Mr. West and others in Miami Beach, during which Stern made the following misrepresentations, among others: (a) he lived in the Bahamas; (b) he also had a home in Florida; (c) he owned a private plane; and (d) he would obtain funding for RSLA.

Act No. 8:      On or about February 6, 2010, Stern (posing as Millar) requested that Mr. West send him the profit and loss statements for RSLA.

Act No. 9:      On or about February 8, 2010, at Weinberg's request, Mr. Freeney' former financial manager, Vernon Brown, sent Weinberg Mr. Freeney's financial records.

Act No. 10:      On or about February 9, 2010 Stern (posing as Millar) sent a text message to Mr. West, stating, "I am certain that I can get Merrill boa [sic] to guarantee [Mr. Freeney] a minimum of 10 percent return on investment with no risk."

Act No. 11:      On or about February 10, 2010, Weinberg sent a text message to Mr. West, stating, "Michael wants Dwight to understand that we will do everything possible to protect him."

Act No. 12:      On or about February 10, 2010, Stern (posing as Millar) sent a text message to Mr. West, falsely representing that he owned a yacht that Mr. Freeney could use.

Act No. 13:      On or about February 10, 2010, Weinberg sent a text message to Mr. West, falsely stating that Stern's full name was "David Michael Millar."

**SECOND AMENDED COMPLAINT**

Act No. 14:    On or about February 11, 2010, Weinberg and Stern (posing as Millar) participated in a telephonic conference with Mr. Freeney and Mr. West during which they discussed transferring control of Mr. Freeney's assets and investments to BofA/Merrill Lynch.

Act No. 15:    On or about February 11, 2010, Mr. Freeney met with Weinberg at the BofA Brickell Avenue branch and completed paperwork to begin transferring his assets and investments to BofA/Merrill Lynch's control.

Act No. 16:    On or about February 12, 2010, Stern (posing as Millar) sent a text message to Mr. West, stating that his email address was "Davidmichaelmillar@yahoo.com," and asking Mr. West not to share it with anyone at "Merrill."

Act No. 17:    On or about February 16, 2010, Weinberg had a telephonic conference with V. Brown & Co to arrange for the transfer of control of Mr. Freeney's assets and investments to BofA/Merrill Lynch, as well as responsibility for paying Mr. Freeney's bills.

Act No. 18:    On or about February 17, 2010, Weinberg sent Mr. Freeney an email in which she falsely represented that she is a "Senior Financial Advisor" with "Merrill Lynch Global Wealth Management."

Act No. 19:    On or about February 17, 2010, BofA/Merrill Lynch emailed Mr. Freeney a form letter for him to sign, authorizing the Colts to mail his paychecks to for deposit to his BofA account.

Act No. 20:    On or about February 17, 2010, Mr. Freeney authorized transfer of his assets and investments to BofA/Merrill Lynch's control.

Act No. 21:    On or about February 18, 2010, Stern and Jaggernauth incorporated ARC in Delaware.

Act No. 22:    On or about February 18, 2010, BOCK and Weinberg paid the fees for incorporating ARC in Delaware.

Act No. 23:    On or about February 18, 2010, Stern and Jaggernauth

**SECOND AMENDED COMPLAINT**

183128.11

established two email accounts with Yahoo for use in communicating with Mr. Freeney: davidmichaelmillar@yahoo.com and armsreachconsultingllc@yahoo.com.

Act No. 24:    Between on or about February 26, 2010 and April 16, 2010, BOCK used approximately $890,000 of Mr. Freeney's funds to purchase securities without Mr. Freeney's authorization or knowledge.

Act No. 25:    On or about February 27, 2010, Stern and Jaggernauth opened a business checking account for ARC at Wachovia Bank.

Act No. 26:    On or about March 8, 2010, Stern (posing as Millar) sent an email to V. Brown & Co. requesting their file on the North Carolina Land Investment, and stating, "I am trying to get it sold" and "every day that goes by is costing Dwight money!!!!"

Act No. 27:    On or about March 9, 2010, Stern (posing as Millar) sent a text message to Mr. West, stating, "I am going to make it so you guys will never have to work again within 4 years.  If Dwight understands and gives me the reins it will be done.  I assure you and guarantee you it will be done."

Act No. 28:    On or about March 16, 2010, Stern (posing as Millar) sent an email to Mr. Freeney, stating, among other things, that "you will never be without money as I will make sure that this never happens"; "I am never going to allow you to even speak to people who are interested in only . . . how to take your money"; "I will recover the funds for you to the best of my ability and i [sic] assure you that there is no one better at doing it"; "I am prepared to help you but it has to be my way"; and "I am happy to deliver you to the promised land but i [sic] need unequivocal trust and approval."

Act No. 29:    In or about March 2010, Weinberg assumed management control of Roof Group and RSLA's finances and became the de facto CFO of RSLA.

Act No. 30:    In or about March 2010, Weinberg referred Mr. Freeney to her brother and encouraged Mr. Freeney to purchase life insurance for investment purposes from him.

**SECOND AMENDED COMPLAINT**

Act No. 31:    In or about March 2010, Weinberg and her brother made the following misrepresentations, among others, to Mr. Freeney: (a) Weinberg's brother was licensed to sell life insurance and had extensive knowledge and experience in the purchase and sale of life insurance products for investment purposes; and (b) the purchase of $60 million in whole life insurance was a suitable, prudent and beneficial long-term investment for Mr. Freeney.

Act No. 32:    In or about March 2010, Weinberg and her brother used a senior life insurance agent who was a friend of their father to find insurance companies willing to issue $60 million in whole life insurance policies to Mr. Freeney.

Act No. 33:    In or about March 2010, Weinberg and her brother instructed the senior life insurance agent to structure the purchase of life insurance for Mr. Freeney to include multiple policies, rather than in a single, high-dollar policy.

Act No. 34:    In or about March 2010, Weinberg and her brother agreed to split the commissions resulting from the sale of the $60 million in life insurance to Mr. Freeney.

Act No. 35:    In or about March 2010, BOCK and Weinberg caused Mr. Freeney's Advisors Disciplined municipal bonds to be sold for approximately $490,000, and the resulting funds to be deposited to one of Mr. Freeney's brokerage accounts.

Act No. 36:    In or about March 2010, Weinberg and Stern (posing as Millar) began negotiating with Success Trade for the return of Mr. Freeney's $1.5 million in principal.

Act No. 37:    On or about March 15, 2010, Liebman and BOCK authorized and permitted Weinberg to transfer $24,467 from one of Mr. Freeney's brokerage accounts to the ARC Wells Fargo account, without Mr. Freeney's authorization or knowledge.

Act No. 38:    On or about March 23, 2010, Mr. Freeney, Mr. West and others flew from Florida to the Bahamas on the private jet to attend a meeting called by Stern

115

**SECOND AMENDED COMPLAINT**

1    (posing as Millar) concerning Roof Group and RSLA.

2           Act No. 39:    On or about March 24, 2010, Weinberg, Stern (posing as Millar),

3    Jaggernauth and the Florida Attorney participated in a meeting in the Bahamas with

4    Mr. Freeney, Mr. West and others during which Weinberg and Stern urged

5    Mr. Freeney to retain the Florida Attorney and his law firm to amend Roof Group's

6    Operating Agreement to increase his ownership and control of Roof Group.

7           Act No. 40:     On or about March 25, 2010, the Florida Attorney sent an email

8    to Mr. Freeney, Weinberg and Stern (referred to as "Michael"), thanking them for

9    bringing him into the "circle of trust," and requesting certain documents relating to

10   Roof Group and RSLA.

11          Act No. 41:    On or about March 29, 2010, the Florida Attorney emailed

12   Mr. Freeney and offered to assist him with recovering his investment in the W Hotel,

13   stating, "I'm an expert in real estate law and handle disputes with developers and

14   condominiums on a regular basis," and "make sure you let me see any and all

15   documents that you signed, including the contract to purchase, sooner rather than

16   latter [sic]."

17          Act No. 42:    In or about April 2010, Weinberg and Stern directed the Florida

18   Attorney to include a provision in the retainer agreement purporting to authorize the

19   Florida Attorney to take direction from ARC.

20          Act No. 43:    In or about April 2010, the Florida Attorney drafted a retainer

21   agreement that included a clause purporting to authorize him to take direction from

22   ARC.

23          Act No. 44:    On or about April 13, 2010, Mr. Freeney, Weinberg, Stern

24   (posing as Millar) and others attended a meeting in New York City with *Rolling Stone*

25   executives, at which Weinberg introduced herself as Mr. Freeney's

26   BofA/Merrill Lynch financial advisor and Stern falsely represented that he was

27   prepared to fund RSLA with sufficient capital for it to open and operate.

28          Act No. 45:    On or about April 21, 2010, Liebman and BOCK authorized and

116

**SECOND AMENDED COMPLAINT**

183128.11

1    permitted Weinberg to transfer $25,000 from one of Mr. Freeney's brokerage

2    accounts to the ARC Wells Fargo, without Mr. Freeney's authorization or knowledge.

3        Act No. 46:    On or about April 28, 2010, Weinberg met with Mr. Freeney and

4    the senior life insurance agent at Mr. Freeney's home in Indiana and completed

5    applications for several life insurance policies.

6        Act No. 47:    In or about May 2010, Mr. Freeney, at the urging of Weinberg,

7    Stern (posing as Millar) and the Florida Attorney, signed an Amended and Restated

8    Limited Liability Company Operating Agreement for Roof Group, drafted by the

9    Florida Attorney and the Florida Law Firm, increasing Mr. Freeney's ownership

10   interest in Roof Group to 51 percent, decreasing Altounian and Donnelly's combined

11   ownership interests to 49 percent, and obligating Mr. Freeney to make an additional

12   $1.6 million capital contribution to Roof Group and, in a hidden footnote, to "further

13   contribute such funds as are necessary to cover the costs incurred in opening the

14   Rolling Stone Café Lounge."

15       Act No. 48:    On or about May 6, 2010, Weinberg's brother became licensed in

16   New Jersey to sell insurance.

17       Act No. 49:    On or about May 12, 2010, the Florida Attorney sent an email to

18   Mr. Freeney, Weinberg and "David Millar" attaching two invoices for the Florida

19   Attorney's legal services and asking "Michael" to review and approve the invoices.

20       Act No. 50:    On or about May 13, 2010, Stern (posing as Millar) emailed the

21   Felis, describing himself as a consultant hired by Mr. Freeney and Mr. West, and

22   offering the Felis a compensation package to manage RSLA that included a combined

23   base salary of $300,000 and one percent of RSLA's gross revenue.

24       Act No. 51:    On or about May 17, 2010, Weinberg and her brother caused a

25   letter to be mailed to a life insurance company falsely identifying Weinberg as

26   Mr. Freeney's "attorney" and Weinberg's brother as Mr. Freeney's "investment and

27   financial advisor."

28       Act No. 52:    On or about May 18, 2010, Liebman and BOCK authorized and

117

**SECOND AMENDED COMPLAINT**

permitted Weinberg to transfer $45,000 from one of Mr. Freeney's brokerage accounts to the ARC Wells Fargo account, without Mr. Freeney's authorization or knowledge.

Act No. 53:    On or about May 20, 2010, Stern signed the Term Sheet with the Felis as "David M. Millar" on behalf of Roof Group, without any written or other express corporate authorization.

Act No. 54:    On or about May 26, 2010, Liebman and BOCK authorized and permitted Weinberg to transfer $35,000 from one of Mr. Freeney's brokerage accounts to the ARC Wells Fargo account, without Mr. Freeney's authorization or knowledge.

Act No. 55:    On or about May 27, 2010, Liebman and BOCK authorized and permitted Weinberg to transfer $20,000 from one of Mr. Freeney's brokerage accounts to the ARC Wells Fargo account, without Mr. Freeney's authorization or knowledge.

Act No. 56:    In or about May 2010, Weinberg and Stern (posing as Millar) began negotiating with CFP for the return of Mr. Freeney's $1.75 million investment.

Act No. 57:    In or about late May 2010, Weinberg asked Del Campo to open a business checking account for Roof Group.

Act No. 58:    In or about late May 2010, Weinberg told Mr. Freeney that the BofA Roof Group account was only a temporary account that was needed to pay invoices for the RSLA build out, until permanent accounts could be opened in Los Angeles.

Act No. 59:    On or about May 28, 2010, BANA wire transferred $200,000 from the BofA Roof Group account, purportedly to pay for expenses related to the RSLA build out.

Act No. 60:    Beginning in or about late May 2010, and continuing until in or about October 2011, BANA charged Mr. Freeney and Roof Group $8,050 in wire transfer charges for 322 fraudulent and unauthorized wire transfers made from the

**SECOND AMENDED COMPLAINT**

BofA Roof Group account.

Act No. 61:    Beginning in or about late May 2010, BOCK encouraged Weinberg to move to Los Angeles, create a company with a name similar to the "Global Wealth & Investment Management" division and the "Merrill Lynch Global Wealth Management" subdivision of BAC, and take Mr. Freeney with her as a client.

Act No. 62:    Plaintiffs are informed and believe, and on that basis allege, that between in or about June 2010 and October 2011, BAC and BANA willfully failed to file Suspicious Activity Reports for hundreds of highly suspicious wire transfers from the BofA Roof Group account to unknown recipients, all originating on-line, in violation of the Bank Secrecy Act.

Act No. 63:    Between in or about June 2010 and April 2014, BANA allowed the BofA Roof Group account to remain open, despite concerns expressed by BANA employees that the account documentation was deficient, and notwithstanding hundreds of highly suspicious wire transfers from the account to unknown recipients, all originating online.

Act No. 64:    On or about June 1, 2010, Weinberg leased the Hancock Park house for $8,250 per month, representing in the lease application forms that she would be living at the house with her three children and "Michael Stern," her "Fiancé."

Act No. 65:    On or about June 2, 2010, Weinberg incorporated Global Wealth Management, LLC ("GWM") in Delaware.

Act No. 66:    On or about June 2, 2010, Weinberg opened a business checking account in GWM's name at the Larchmont Branch of Wells Fargo Bank in Los Angeles.

Act No. 67:    On or about June 4, 2010, Liebman and BOCK authorized and permitted Weinberg to transfer $11,880 from one of Mr. Freeney's brokerage accounts to the ARC Wells Fargo account, without Mr. Freeney's authorization or knowledge.

Act No. 68:    Between on or about June 8, 2010 and June 15, 2010, BOCK

119

**SECOND AMENDED COMPLAINT**

1  caused the vast majority of the securities that he had purchased just a few weeks

2  earlier with Mr. Freeney's funds to be sold without Mr. Freeney's authorization or

3  knowledge, at a considerable loss to Mr. Freeney.

4      Act No. 69:    On or about June 9, 2010, Weinberg signed a lease for a "virtual

5  office" in the name of GWM at 8484 Wilshire Boulevard, contracting for telephone

6  answering and mail receiving, sorting and forwarding services.

7      Act No. 70:    On or about June 9, 2010, Weinberg's brother became licensed to

8  sell insurance in Indiana.

9      Act No. 71:    On or about June 10, 2010, Weinberg faxed a short handwritten

10  note to Liebman and others resigning her position at BofA/Merrill Lynch.

11      Act No. 72:    In or about June 2010, Weinberg opened two accounts at a

12  Citibank branch in Miami Beach in the name of Mr. Freeney.

13      Act No. 73:    In or about June 2010, BOCK and Weinberg caused Mr. Freeney

14  to surrender his Pacific Life annuity, which had a cash value of approximately $1.5

15  million, and deposited the proceeds to Mr. Freeney's Citibank accounts.

16      Act No. 74:    In or about mid-June 2010, Weinberg and Stern moved into the

17  Hancock Park house and made it their new base of operations for continuing to carry

18  out the scheme to defraud Mr. Freeney.

19      Act No. 75:    Between on or about June 8, 2010 and November 16, 2010, to

20  conceal his unauthorized sale of securities, BOCK blocked the trade confirmations for

21  these sales from being mailed to Mr. Freeney's home in Indiana.

22      Act No. 76:    On or about June 18, 2010, Weinberg requested that Del Campo

23  mail signature cards for the BofA Roof Group account to her in California.

24      Act No. 77:    On or about June 21, 2010, BANA executed a wire transfer of

25  $5,000 from the BofA Roof Group account to pay one of Stern's gambling debts.

26      Act No. 78:    On or about June 21, 2010, BANA executed a wire transfer of

27  $5,000 from the BofA Roof Group account to pay for Stern's use of a private yacht.

28      Act No. 79:    On or about June 22, 2010, BANA executed a wire transfer of

**SECOND AMENDED COMPLAINT**

$16,300 from the BofA Roof Group account to Dynamic Aviation to pay expenses associated with the operation of the private jet.

Act No. 80:    On or about June 23, 2010, Weinberg and her brother mailed an application and a check from Mr. Freeney for $186,850 to a life insurance company for the purchase of a $20 million life insurance policy on Mr. Freeney's behalf.

Act No. 81:    On or about June 29, 2010, Stern caused Citibank to execute a wire transfer of $250,000 from one of Mr. Freeney's Citibank accounts to the BofA Roof Group account.

Act No. 82:    In or about July 2010, Weinberg added herself as a signatory to Mr. Freeney's Citibank accounts.

Act No. 83:    In or about July 2010, Weinberg and her brother mailed an application and a check from Mr. Freeney for $141,200 to a second life insurance company to purchase a $15 million life insurance policy on Mr. Freeney's behalf.

Act No. 84:    On or about July 27, 2010, BANA executed a wire transfer of $8,250 from the BofA Roof Group account to pay one of Stern's business associates.

Act No. 85:    On or about July 30, 2010, Del Campo exchanged emails and participated in telephonic conferences with BANA's Wealth Management Banking Support office and other departments at BANA to remove the security hold on the BofA Roof Group account.

Act No. 86:    On or about August 2, 2010, Weinberg sent an email to Del Campo asking her to ensure that wire transfers from the BofA Roof Group account are processed.

Act No. 87:    On or about August 3, 2010, Weinberg and GWM mailed instructions to the Colts to forward Mr. Freeney's paychecks to GWM's offices.

Act No. 88:    In or about August 2010, Weinberg and her brother mailed an application and a check from Mr. Freeney for $181,300 to a third life insurance company to purchase a $20 million life insurance policy on Mr. Freeney's behalf.

Act No. 89:    On or about August 17, 2010, Weinberg's brother deposited a

**SECOND AMENDED COMPLAINT**

check for $101,000 in GWM's account at Wells Fargo Bank, which represented the first installment of the kickback he had agreed to pay Weinberg.

Act No. 90:    On or about August 19, 2010, BANA executed a wire transfer of $21,520 from the BofA Roof Group account to Edward Rennia, to pay to lease and operate the private jet.

Act No. 91:    On or about August 23, 2010, Weinberg's brother deposited a check for $123,906 in GWM's account at Wells Fargo Bank, which represented the second installment of the kickback he had agreed to pay Weinberg.

Act No. 92:    On or about August 25, 2010, Stern (posing as Millar) sent an email to Mr. West requesting that he not sign the Term Sheet with the Felis and that Stern be allowed to continue negotiating with the Felis.

Act No. 93:    On or about August 25, 2010, Stern (posing as Millar) sent a six-page letter to Mr. Freeney, accusing the Felis, Mr. West and others of acting contrary to Mr. Freeney's interest, and stating, among other things, that "you need to tell Aaron that he must work with me whether he likes it or not"; "he does not have the experience of dealing with what he is currently trying to handle"; "I would love to be partners with you on so many levels and I believe we make a great team"; "please understand my consistent hesitation in the finance side because of how heavily Aaron's involvement [sic] is"; and "I want to invest in YOU AND YOUR DREAM."

Act No. 94:    On or about August 30, 2010, Weinberg sent a text message to Del Campo asking her to assist with an overdrawn check in the amount of $14,000.

Act No. 95:    On or about September 21, 2010, Weinberg deposited Mr. Freeney's paycheck from the Colts at the Citibank branch across the street from the 8484 Wilshire address.

Act No. 96:    In or about November 2010, Mr. Freeney, at the urging of Weinberg, Stern (posing as Millar) and the Florida Attorney, signed a Purchase and Sale Agreement, drafted by the Florida Attorney, agreeing to purchase Altounian's shares of Roof Group for $325,000.

**SECOND AMENDED COMPLAINT**

**Act No. 97:**    On or about November 10, 2010, Weinberg sent an email to Mr. Freeney complaining about the Felis, stating, among other things, "[f]or months I have sat back and watched Sal and Stacy act solely in their own best interests with absolutely no regard to the 'team'"; "[t]hey have cost the project in excess of $700,00 and think only of how they can angle things to the detriment of the project"; "[t]hey are self-serving and show absolutely no regard for Aaron or anyone else"'; and "I have nothing personal against Sal except to the extent that he can harm you."

**Act No. 98:**    On or about November 12, 2010, BANA executed a wire transfer of $25,000 from the BofA Roof Group account to GWM.

**Act No. 99:**    On or about November 18, 2010, Weinberg emailed Del Campo asking her to release a security hold on a $49,875 wire transfer from the BofA Roof Group account.

**Act No. 100:**   On or about December 1, 2010, Weinberg sent an email to Roof Group's accountant and legal counsel stating that "Michael Millar" was acting as a "troubleshooter" and had "no official capacity" with Roof Group when he signed the Term Sheet with the Felis.

**Act No. 101:**   On or about December 22, 2010, at Weinberg's insistence, Roof Group terminated the Felis' services.

**Act No. 102:**   On or about January 18, 2011, BANA executed a wire transfer of $17,820 from the BofA Roof Group account to pay Weinberg's rent on the Hancock Park house.

**Act No. 103:**   On or about February 16, 2011, Weinberg sent an email to Mr. West stating: "You cannot unilaterally approve changes that require any more expenditures.  Dwight is bleeding money.  What do I need to show you that helps you grasp this."

**Act No. 104:**   On or about February 25, 2011, Weinberg and Stern secretly married in Los Angeles, even though Stern was still married to Layne Harris Stern.

**Act No. 105:**   On or about March 14, 2011, BOCK and Weinberg entered into a

123

**SECOND AMENDED COMPLAINT**

First Amendment to Martial Settlement Agreement, which stated, in part: "In the event [Weinberg] recovers any money from Michael Stern or others arising from the money loaned to Michael Stern, [BOCK] shall receive the first One Hundred Thousand Dollars ($100,000.00).  The balance shall be split between the parties."

Act No. 106:  On or about March 24, 2011, Stern (posing as Millar) sent an email to the Florida Attorney, Weinberg and Mr. West providing a status report on his negotiations for the purchase of Donnelly's ownership interest in Roof Group.

Act No. 107:  On or about March 28, 2011, and again on or about April 1, 2011, Weinberg sent a fax to her tax accountant in New York with false financial information to use in preparing Mr. Freeney's 2010 income tax returns.

Act No. 108:  In or about April 2011, BOCK and Weinberg caused Mr. Freeney's investment in American Realty to be liquidated, and Weinberg deposited the $195,000 in proceeds to Mr. Freeney's Citibank accounts.

Act No. 109:  In or about May 2011, Mr. Freeney, at the urging of Weinberg, Stern (posing as Millar) and the Florida Attorney, signed a Membership Interest Purchase and Sale Agreement to purchase Donnelly's shares in Roof Group for $550,000.

Act No. 110:  In or about August 2011, Weinberg negotiated with Snap Advances for a $300,000 credit facility for Roof Group, which required Mr. Freeney to repay Snap Advances a total of $435,000.

Act No. 111:  In or about September 2011, Weinberg negotiated with Snap Advances for a second credit facility for $150,000, which required Mr. Freeney to repay Snap Advances a total of $220,000.

Act No. 112:  In or about November 2011, Mr. Freeney, on the advice of Weinberg, Stern (posing as Millar) and the Florida Attorney, completed the purchase of Altounian's shares of Roof Group.

Act No. 113:  On or about November 11, 2011, Weinberg texted and called Del Campo to make sure Mr. Freeney's account statements were being sent to the

**SECOND AMENDED COMPLAINT**

8484 Wilshire Boulevard address.

Act No. 114:  In or about December 2011, Weinberg and Stern paid an accountant to prepare phony account statements that Weinberg could show Mr. Freeney, which purported to have been issued by GWM, listed Weinberg as the Senior Vice President of GWM and falsely reported that Mr. Freeney still had over $1.3 million in cash on deposit and owned assets valued at close to $14 million.

Act No. 115:  Sometime between in or about December 2011 and in or about March 2012, Weinberg and Stern created the Fabricated Engagement Letter purportedly between GWM and Mr. Freeney, which Weinberg and Stern fraudulently backdated to June 11, 2010.

Act No. 116:  In or about January 2012, Mr. Freeney, on the advice of Weinberg and the Florida Attorney, completed the purchase of Donnelly's shares of Roof Group, becoming the 100 percent owner of the company.

Act No. 117:  On or about March 23, 2012, on the way to Miami International Airport to catch a flight to Los Angeles to reunite with Weinberg, Stern stopped at a check cashing store where he unsuccessfully attempted to cash a Colts paycheck to Mr. Freeney for $31,785.

Act No. 118:  On or about March 23, 2012, on the way to the airport, Stern stopped at a house he was renovating and hid "paperwork" in the ceiling trusses, including exemplars of Mr. Freeney's signature and a series of forged and fabricated authorizations for Citibank to transfer funds to the BofA Roof Group account.

Act No. 119:  On or about March 23, 2012, Stern, having been arrested at Miami International Airport as he was about to board a flight to Los Angeles to reunite with Weinberg, was found to be carrying on his person a paycheck from the Colts to Mr. Freeney for $31,785; another check from the NFL Players Association to one of Mr. Freeney's companies for $2,270.52; a BofA Visa card in Mr. Freeney's name; a check book of temporary checks for First Bank in Beverly Hills; multiple copies of the other version of the Fabricated Engagement Letter; and handwritten

125

**SECOND AMENDED COMPLAINT**

1   notes and materials printed from the Internet that Stern had apparently used to draft
2   the Fabricated Engagement Letter.

3   **Act No. 120:**   In or about September 7, 2012, Weinberg fraudulently conveyed
4   the house she owned in Miami Beach to BOCK.

5   **Act No. 121:**   On or about September 13, 2013, Mr. Freeney made the final
6   payment to Snap Advances in the amount of $131,985, as repayment of the advances
7   made to Roof Group in August and September 2010.

8   **Act No. 122:**   On or about December 30, 2013, Mr. Freeney made a $100,000
9   payment to the Felis pursuant to the Settlement Agreement in the *Feli* Case.

10   **Act No. 123:**   On or about May 29, 2014, BofA/Merrill Lynch filed U4 Forms
11   with FINRA for BOCK, Weinberg, Liebman and Del Campo, falsely representing that
12   BofA/Merrill Lynch had conducted an investigation of Mr. Freeney's allegations
13   against them, and further falsely representing that it had found that his allegations
14   were "unfounded and without merit."

15   **Act No. 124:**   On or about September 10, 2014, Mr. Freeney made a $30,000
16   payment to the Felis pursuant to the Settlement Agreement in the *Feli* Case.

17   **C.   Resulting Damages.**

18   383.   As a direct and proximate result of the conspiracy to defraud,
19   Mr. Freeney and Roof Group were damaged in an amount to be determined at trial,
20   but which is estimated to be in excess of $20 million, including in the following
21   respects, among others:

22           (a)   Losses due to theft and misapplication of Mr. Freeney and
23   Roof Group's funds;

24           (b)   Losses from fraud involving the funding of the RSLA build out,
25   its operations and its closure;

26           (c)   Losses from the needless purchases of Altounian and Donnelly's
27   interests in Roof Group;

28           (d)   Losses from having to defend against and the settlement of the

**SECOND AMENDED COMPLAINT**

1  Felis' $5.0 million lawsuit;

2          (e)      Losses from the purchase of $55 million in unsuitable and

3  worthless life insurance;

4          (f)      Losses from the liquidation of assets used to generate additional

5  funds to misappropriate; and

6          (g)      Losses from false and unfulfilled promises involving the W Hotel

7  and North Carolina Land Investments.

8          384.   In engaging in the conspiracy to defraud Mr. Freeney and Roof Group,

9  BAC, BANA, MLPFS and BOCK, and each of them, acted fraudulently, oppressively,

10  maliciously and with a willful and conscious disregard of Plaintiffs' rights.

11  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to

12  California Civil Code section 3294.

13                  **SECOND CAUSE OF ACTION**

14                          **(For Fraud)**

15              **(By Plaintiffs Freeney and Roof Group**

16          **Against Defendants BAC, BANA, MLPFS and BOCK)**

17          385.   Plaintiffs repeat and reallege paragraphs 1 through 384 of this Second

18  Amended Complaint as if fully alleged herein.

19  **A.    False and Misleading Representations and False Promises.**

20          386.   Beginning in or about January 2010, BAC, BANA, MLPFS and BOCK,

21  and each of them, made and caused others to make the following false and misleading

22  representations and false promises, among others, to Mr. Freeney, directly and

23  through his family, friends and associates, and to Roof Group, knowing that they were

24  false and with the intention that Mr. Freeney and Roof Group would rely upon them:

25                  ***Recruitment of Mr. Freeney to Become a BofA Client***

26          (1)     Weinberg was a "Senior Financial Advisor";

27          (2)     BOCK, Weinberg and Sugarman had the expertise, qualifications and

28  experience to competently manage Mr. Freeney's assets and income;

                  **SECOND AMENDED COMPLAINT**

183128.11

1     (3)     BOCK, Weinberg and Sugarman could and would assist Mr. Freeney in

2  finding new investors and/or obtaining loan financing for RSLA;

3     (4)     BOCK, Weinberg and Sugarman could and would assist Mr. Freeney in

4  disposing of his non-performing and under-performing investments, such as the North

5  Carolina Land Investment;

6     (5)     BOCK, Weinberg and Sugarman could and would assist Mr. Freeney in

7  obtaining return of his $1.2 million deposit with the W Hotel;

8                    ***Referral of Mr. Freeney to "Michael Millar"***

9     (6)     Stern's name was "David Michael Millar";

10    (7)     Millar was a wealthy businessman;

11    (8)     Millar was a successful Miami Beach real estate developer;

12    (9)     Millar had $30 million on deposit at BofA/Merrill Lynch;

13    (10)    Millar was a real estate consultant for BofA/Merrill Lynch;

14    (11)    Millar lived in the Bahamas;

15    (12)    Millar owned a private jet;

16    (13)    Millar was the grandson of pharmaceutical mogul Dr. Phillip Frost, the

17  Chairman of Teva Pharmaceuticals;

18    (14)    Millar intended to invest $7.0 million in RSLA;

19    (15)    Millar could and would assist in managing the build out, staffing and

20  opening of RSLA;

21    (16)    Millar was a man of his word who wanted nothing more than to show

22  Mr. Freeney how to become a successful business owner;

23                    ***Referral of Mr. Freeney to Weinberg's Brother***

24    (17)    Weinberg's brother had extensive knowledge and experience in the

25  purchase of life insurance products for investment purposes;

26    (18)    Purchasing $60 million in whole life insurance was a suitable, prudent

27  and beneficial long-term investment for Mr. Freeney;

28

**SECOND AMENDED COMPLAINT**

183128.11

### *Referral of Mr. Freeney to the Florida Attorney and Florida Law Firm*

(19)   The Florida Attorney had the expertise and experience to competently provide legal advice and services to Roof Group, a California limited liability company, and RSLA, a business located in Los Angeles with no connections to Florida;

(20)   The Florida Attorney could be trusted to provide loyal services and candid legal advice to Mr. Freeney regarding Roof Group, RSLA and related legal matters;

(21)   The Florida Attorney had no conflicts of interest arising from any past or present attorney-client relationship with Stern or Weinberg;

### *Stern's Use of a Private Jet*

(22)   Stern owned the private jet, N900JF;

(23)   When using the private jet, Mr. Freeney was only paying for the cost of the fuel;

(24)   Stern or ARC paid professional pilots Edward Rennia and Dana Messier to fly the private jet;

(25)   Stern or ARC paid the maintenance costs and hangar fees for the private jet;

### *Mr. Freeney's Purchase of $55 Million in Worthless Life Insurance*

(26)   Weinberg's expertise and experience as Mr. Freeney's financial manager and investment advisor included the purchase of insurance products for investment purposes;

(27)   Weinberg's brother had substantial expertise and experience in the analysis, selection and purchase of insurance products for investment purposes;

(28)   It was in Mr. Freeney's financial interests, and consistent with his financial objectives, to purchase $55 million in whole life insurance;

(29)   Weinberg and Weinberg's brother had selected the three policies they were recommending Mr. Freeney purchase because they offered the best value to Mr.

**SECOND AMENDED COMPLAINT**

1    Freeney compared to other available whole life policies;

2    //

3                    ***Roof Group and RSLA***

4          (30)    Millar was prepared to invest $7.0 million dollars in RSLA once

5    Mr. Freeney had acquired Altounian and Donnelly's ownership interests in

6    Roof Group;

7          (31)    Millar would oversee  the build out of RSLA and had the skills, expertise

8    and experience to do so;

9          (32)    Millar would assist in obtaining the liquor license for RSLA and had the

10   skills, expertise and experience to do so;

11         (33)    Weinberg and Millar together would renegotiate the unfavorable lease

12   terms with CIM;

13         (34)    BofA/Merrill Lynch would handle the bill payments for RSLA;

14         (35)    BofA/Merrill Lynch would develop and implement cost and accounting

15   controls for RSLA;

16         (36)    Millar had authority to bind Roof Group to the Term Sheet between

17   Roof Group and the Felis;

18                 ***The Opening of the BofA Roof Group Account***

19         (37)    The BofA Roof Group account was only a temporary account needed to

20   pay invoices associated with the RSLA build out until permanent accounts could be

21   opened in Los Angeles;

22                    ***The W Hotel Investment***

23         (38)    BofA/Merrill Lynch would intervene in the W Hotel Investment, by

24   either obtaining financing to complete the purchase of Mr. Freeney's condominium

25   unit or negotiating the return of his $1.2 million investment;

26                 ***The North Carolina Land Investment***

27         (39)    BofA/Merrill Lynch would assist Mr. Freeney in disposing of the North

28   Carolina Land Investment;

130

**SECOND AMENDED COMPLAINT**

*Cover Up and Obstruction of Justice*

(40)   Mr. West was stealing from Mr. Freeney and was responsible for RSLA's deteriorating financial condition;

(41)   Mr. Freeney had entered into an "asset management contract" with GWM in June 2010; and

(42)   Weinberg had not taken any fees from Mr. Freeney.

387.   All of these representations and promises, and each of them, were important because they would have influenced a reasonable person's judgment or conduct, or Defendants knew that they were likely to have influenced Plaintiffs' judgment or conduct.

388.   BAC, BANA and MLPFS, and each of them, are liable for all of Weinberg's false and misleading representations and false promises to Mr. Freeney and Roof Group following her resignation from BofA/Merrill Lynch (effective July 3, 2010) for each of the following reasons, among others:

(a)   BAC, BANA and MLPFS authorized and/or permitted Weinberg to continue to act as their actual and/or ostensible agent after her resignation in all matters involving Mr. Freeney and Roof Group;

(b)   BAC, BANA and MLPFS adopted and ratified Weinberg's conduct as that of their actual and/or ostensible agent in all matters involving Mr. Freeney and Roof Group; and

(c)   BAC, BANA and MLPFS created a situation that afforded Weinberg the opportunity to continue to make false and misleading representations and false promises to Mr. Freeney and Roof Group, and BAC, BANA and MLPFS realized or should have realized the likelihood that Weinberg would avail herself of that opportunity following her resignation.

**B.     Concealment of Material Facts.**

389.   At all times relevant hereto, BAC, BANA, MLPFS and BOCK, and each of them, owed Mr. Freeney and Roof Group a duty of disclosure by virtue of the

**SECOND AMENDED COMPLAINT**

1   existence of one or more of the following circumstances:

2         (a)     BAC, BANA, MLPFS and BOCK were in a fiduciary or similar

3   relationship of trust and confidence with Mr. Freeney;

4         (b)     To the extent BAC, BANA, MLPFS or BOCK made any

5   disclosures to Mr. Freeney, they disclosed only some facts, but intentionally withheld

6   or caused others to withhold other facts, making the disclosures misleading;

7         (c)     BAC, BANA, MLPFS and BOCK intentionally failed or caused

8   others to fail to disclose important facts to Mr. Freeney that were known to them, and

9   which Mr. Freeney could not have discovered on his own; and

10        (d)     BAC, BANA, MLPFS and BOCK actively concealed and caused

11  others to conceal important facts from Mr. Freeney or acted to prevent him from

12  discovering such facts.

13      390.   Beginning in or about January 2010, BAC, BANA MLPFS and BOCK,

14  and each of them, intentionally concealed, withheld and failed to disclose, and caused

15  others to conceal, withhold and fail to disclose, the following facts, with the intent to

16  deceive Mr. Freeney and Roof Group:

17               ***Recruitment of Mr. Freeney***

18      (1)    Weinberg was only a part-time BofA/Merrill Lynch employee;

19      (2)    Weinberg was not licensed to give investment advice to clients;

20      (3)    Weinberg was unfit and not competent to manage Mr. Freeney's assets,

21  investments and income;

22      (4)    Weinberg had been twice married to and twice divorced from BOCK and

23  they had a tumultuous and at times acrimonious working relationship;

24      (5)    BOCK was listed as a creditor for $500,000 in one of Stern's

25  bankruptcies;

26      (6)    Weinberg was romantically involved with Stern;

27      (7)    Weinberg had a $1.6 million judgment outstanding against her for having

28  issued $400,000 in worthless checks to the Faraches to secure Stern's debt to them;

**SECOND AMENDED COMPLAINT**

1    (8)    The Faraches had served BofA/Merrill Lynch with a petition to garnish

2    Weinberg's wages and savings;

3    (9)    Weinberg's deposition testimony in the *Colonial Bank* Case revealed that

4    she had been assisting Stern in committing bankruptcy fraud, finding new victims and

5    intimidating a key witness;

6    (10)    Weinberg had no expertise or experience in the management or

7    operations of a restaurant;

8    (11)    Weinberg had no ability to maintain the books and records or prepare

9    budgets or financial projections for a restaurant;

10    (12)    Weinberg had no experience supervising the build out, staffing, opening,

11    or operations of a restaurant;

12    ***Referral of Mr. Freeney to "Michael Millar"***

13    (13)    Stern and his then wife had declared personal bankruptcy just a year prior

14    to Mr. Freeney becoming a BofA/Merrill Lynch client, with reported debts exceeding

15    $65 million and assets of a negative value;

16    (14)    Stern's real estate assets were over-encumbered, in receivership, in

17    bankruptcy and/or the subject of foreclosure proceedings or other lawsuits;

18    (15)    Stern had been found in contempt by the Bankruptcy Court for willfully

19    violating court orders requiring him to produce documents and appear to provide

20    testimony;

21    (16)    The U.S. Trustee was opposing Stern's discharge from bankruptcy on the

22    grounds that he had engaged in numerous instances of bankruptcy fraud;

23    (17)    Stern was a defendant in more than 20 civil lawsuits brought by

24    defrauded partners, investors, mortgage lenders and financial institutions;

25    (18)    Evidence introduced in those lawsuits established that Stern had forged

26    documents, falsified loan applications, misappropriated over $20 million in loan

27    proceeds, and engaged in witness tampering and intimidation;

28    (19)    A writ of bodily attachment had issued for Stern's arrest in the

133

**SECOND AMENDED COMPLAINT**

183128.11

*Colonial Bank* Case;

(20)   Stern had fled to Uruguay to evade process and avoid being deposed, and, while there, cheated his stepson out of a large inheritance;

(21)   Stern had previously been caught paying over $100,000 in bribes to Miami Beach city officials;

(22)   The money Stern was using to lease and operate the private jet that he purportedly owned had been misappropriated from Mr. Freeney and Roof Group's brokerage and bank accounts with Weinberg's assistance;

(23)   Stern had substantial gambling debts;

(24)   Stern had not paid any income taxes in years, notwithstanding having reported in his bankruptcy schedules having earned $500,000 in both 2007 and 2008;

(25)   Stern had neither the intent nor the means to invest any funds in RSLA or the ability to attract other investors;

(26)   Stern was addicted to the prescription drug Oxycodone;

### The Creation of ARC

(27)   Stern and Jaggernauth created ARC and opened the ARC bank account within days of being introduced to Mr. Freeney;

(28)   ARC was a sham entity created to promote and conceal the scheme to defraud;

(29)   Stern created ARC for the sole or primary purpose of concealing his theft and conversion of Mr. Freeney's funds from Mr. Freeney, the Bankruptcy Court, the bankruptcy trustee, the U.S. Trustee, his creditors in the bankruptcy proceedings and defrauded victims who had sued him;

(30)   During the course of the scheme, more than $2.2 million in funds misappropriated from the BofA Roof Group account would be laundered through the ARC bank account;

### Misappropriation of Brokerage Account Funds

(31)   Weinberg caused more than $160,000 of Mr. Freeney's funds to be

**SECOND AMENDED COMPLAINT**

183128.11

transferred from one of his brokerage accounts to the ARC Wells Fargo account, to pay Stern's personal expenses and to use as seed money for the scheme to defraud;

### Unauthorized Purchases of Securities

(32)   BOCK used more than $890,000 of Mr. Freeney's funds to purchase securities, which generated large commissions for BOCK;

(33)   BOCK was not authorized to make these purchases;

### Referral of Mr. Freeney to Weinberg's Brother

(34)   Weinberg and her brother had agreed to split the commissions from Mr. Freeney's purchase of the $55 million in life insurance policies;

(35)   Weinberg and her brother had instructed a senior life insurance agent to structure the purchase of life insurance for Mr. Freeney to include multiple policies to maximize the sales commissions Weinberg's brother would receive, rather than in a single, high-dollar policy, which would have had a higher cash surrender value;

### Referral of Mr. Freeney to the Florida Attorney and the Florida Law Firm

(36)   The Florida Attorney had represented Stern in 20 or more civil lawsuits prior to being introduced to Mr. Freeney in which Stern had been sued for fraud, theft, issuing NSF checks and forging others' signatures;

(37)   In the *College Health* Case, the Florida attorney had negotiated a settlement on behalf of Stern that, within three months of signing, Stern sought to void based on false claims that he had been coerced into signing it by threats against his life;

(38)   The Florida Attorney was representing Weinberg in two civil lawsuits in which she was sued for writing NSF checks totaling $400,000 and failing to pay a house painter;

(39)   The Florida Attorney had prepared a promissory note securing a $350,000 loan from BOCK, Weinberg and Weinberg's brother to Stern, which Stern had never repaid;

(40)   The Florida Attorney was present at a meeting in or about August 2009,

135

**SECOND AMENDED COMPLAINT**

1    at which Stern admitted that he had forged the signature of Esther Burstyn-Spero to

2    two loan forgiveness documents;

3        (41)   Stern had failed to pay at least $100,000 in legal fees that he owed to the

4    Florida Attorney and the Florida Law Firm;

5        (42)   The Florida Attorney and the Florida Law Firm had filed creditor claims

6    in Stern's bankruptcy in or about July 2009 for the $100,000 that they were owed;

7        (43)   The Florida Attorney had inserted a clause in a retainer agreement that he

8    had sent to Mr. Freeney for his signature, which stated that Mr. Freeney "appoints

9    Arms Reach Consulting LLC . . . as [his] agent to communicate and deal directly with

10   the Firm on the Client's behalf," and, "[u]nless otherwise instructed by the Client in

11   writing, the Firm will take direction from ARC";

12       (44)   The Florida Attorney and Florida Law Firm could not ethically represent

13   Mr. Freeney because they had a disqualifying conflict of interest as a result of their

14   past representation of Stern and what they knew about Stern's dishonest character and

15   fraudulent and illegal activities as a result of that representation;

16       (45)   The Florida Attorney and Florida Law Firm could not ethically represent

17   Mr. Freeney because they had a disqualifying conflict of interest as a result of their

18   ongoing representation of Weinberg and what they knew about Weinberg's legal

19   problems and current situation at BofA/Merrill Lynch;

20                     ***Stern's Use of a Private Jet***

21       (46)   James Pelky, not Stern, owned the private jet and Pelky was only leasing

22   it to Stern and ARC;

23       (47)   Stern was using funds misappropriated from Mr. Freeney and

24   Roof Group's brokerage and bank accounts to pay to lease the aircraft;

25       (48)   Stern was also using funds misappropriated from Mr. Freeney and

26   Roof Group's brokerage and bank accounts to pay to maintain the aircraft, pay the

27   hangar fees and pay the salaries and expenses of the pilots Rennia and Messier;

28       (49)   Over $200,000 of the money Stern paid Pelky to lease the aircraft had

**SECOND AMENDED COMPLAINT**

1   been applied towards ARC's purchase of the aircraft;

2   ***Mr. Freeney's Purchase of $55 Million in Unsuitable and Worthless Life Insurance***

3   (50)   Weinberg was not qualified or licensed to sell life insurance and had little
4   or no expertise or experience in the purchase of insurance products for investment
5   purposes;

6   (51)   Weinberg's brother had only become a licensed insurance agent in or
7   about May 2010, and had only become a licensed insurance agent in Indiana in or
8   about June 2010, and then only to sell life insurance to Mr. Freeney;

9   (52)   The policies that Weinberg and her brother recommended to Mr. Freeney
10   were unsuitable, considering that Mr. Freeney already owned two life insurance
11   policies with face values totaling $13 million;

12   (53)   Even if some form of additional life insurance was suitable, other life
13   insurance products were readily available that were less expensive and better suited to
14   Mr. Freeney's insurance needs;

15   (54)   Weinberg and her brother planned that he would kick back to Weinberg
16   approximately half of the commissions he received from the sale of the policies;

17   (55)   As a result of this kickback agreement, Weinberg had a serious conflict
18   of interest in acting as Mr. Freeney's financial manager and investment advisor in the
19   purchase of the policies;

20   (56)   Weinberg and her brother had structured the transaction based on the
21   amount of commissions her brother would receive, rather than on the prices, surrender
22   values and other costs and benefits of the policies;

23   (57)   To prevent the policies from lapsing, Mr. Freeney would have to pay
24   premiums totaling approximately $500,000 per year for a period of 15 years;

25   (58)   Weinberg and her brother intended to allow the policies to lapse after the
26   first year, unless further premium payments would generate additional commissions
27   that they could split;

28   (59)   The policies would have no cash surrender value and would be worthless

137

**SECOND AMENDED COMPLAINT**

1   if they were allowed to lapse after the first year;

2   (60)   Weinberg and her bother allowed the policies to lapse in or about

3   September 2011 and October 2011, as a result of which, the policies had no cash

4   surrender value and became worthless;

5   ***Roof Group and RSLA***

6   (61)   Weinberg and Stern were using RSLA as a vehicle for misappropriating

7   and converting funds in the BofA Roof Group account and to conceal and disguise

8   those thefts from Mr. Freeney and others;

9   (62)   Weinberg rarely, if ever, paid vendor bills on time;

10  (63)   Stern was in bankruptcy and entirely without the financial means to

11  invest in RSLA;

12  (64)   Weinberg and Stern's sole or primary interest in overseeing the build out

13  of RSLA was to be able to continue to misappropriate funds from Mr. Freeney and

14  Roof Group undetected;

15  (65)   Weinberg was not paying RSLA's federal and state payroll taxes.

16  (66)   Weinberg was not paying RSLA's California sales taxes;

17  (67)   Weinberg was not timely paying RSLA staff and management, and when

18  she paid them, she was not paying them the correct amounts they were owed;

19  (68)   Weinberg had not obtained adequate general liability and other

20  insurance for RSLA;

21  (69)   Weinberg was not maintaining anything resembling a set of books and

22  records for RSLA;

23  (70)   Weinberg was not preparing financial reports or statements for RSLA;

24  (71)   Weinberg was not preparing budgets or projections for RSLA;

25  (72)   Weinberg and Stern were not engaged in discussions with CIM to

26  renegotiate the lease terms;

27  (73)   Stern was not attempting to obtain a liquor license for RSLA;

28  (74)   Without Mr. Freeney's continued capital contributions to Roof Group,

**SECOND AMENDED COMPLAINT**

Altounian and Donnelly's shares in the company were effectively worthless;

(75)   As members of a limited liability corporation, Altounian and Donnelly were responsible for losses in proportion to their ownership interests;

(76)   Based on RSLA's significant operating losses and the fact that neither Altounian nor Donnelly were contributing any cash to Roof Group, their capital accounts were negative at the time of the buy outs, which would have reduced the value of their shares to zero or close thereto;

(77)   There was no valuable premium or other significant intangible value associated with Mr. Freeney's purchase of Altounian and Donnelly's Roof Group shares (such as minimizing their participation in the operations, management, or direction of RSLA) to justify paying them $1.1 million for those shares;

(78)   Weinberg and Stern's sole or primary motivation for convincing Mr. Freeney to pay $1.1 million to buy out Altounian and Donnelly was to oust them from the day-to-day operations of RSLA, to prevent them from discovering that Weinberg and Stern were using RSLA as a vehicle to misappropriate and convert funds in the BofA Roof Group account and to conceal and disguise those thefts from Mr. Freeney and others;

(79)   Roof Group could not afford to pay the Felis the compensation negotiated by Stern and specified in the Term Sheet;

(80)   Sal Feli's compensation under the Term Sheet was well above the industry standard for a Director of Operations with his limited qualifications, experience and track record;

(81)   Stern's sole or primary motivation in hiring the Felis was his belief that they would be easier to manipulate and less of a threat to uncover the scheme to defraud than Altounian and Donnelly;

(82)   After the Felis were terminated, in or about February 2012, Weinberg failed to make the severance payment to the Felis that Mr. Freeney had directed her to make;

**SECOND AMENDED COMPLAINT**

### *The Opening of the BofA Roof Group Account*

(83)   The BofA Roof Group account remained open and active long after operating, payroll and tax accounts for RSLA were opened at Wells Fargo Bank;

(84)   The purpose of the BofA Roof Group account was to conceal the proceeds of the scheme to defraud from Mr. Freeney, RSLA management, the Bankruptcy Court, the bankruptcy trustee, the U.S. Trustee, the creditors in Stern's bankruptcies, and the plaintiffs in the many civil actions pending against Stern;

(85)   At the time the BofA Roof Group account was opened, Mr. Freeney lacked the necessary corporate authority to open the account on behalf of Roof Group;

(86)   The BofA Roof Group account was opened, and was allowed to remain open, without the documentation, authorization, or due diligence ordinarily required to open such an account, and despite concerns expressed internally at BANA regarding those irregularities;

(87)   Weinberg kept the existence of the BofA Roof Group account secret from RSLA's management, accountants and consultants;

(88)   Weinberg had given Stern the confidential account access information for the BofA Roof Group account to enable him to access the account remotely online and transfer funds to and from it without Mr. Freeney's knowledge or authorization;

### *The Opening of the Citibank Accounts*

(89)   Weinberg had given Stern the confidential account access information to the Citibank accounts to enable him to access the accounts remotely online and transfer funds to, from and between them without Mr. Freeney's knowledge or authorization;

### *The Creation of GWM*

(90)   GWM was not the same as GWIM or MLGWM and was not a division or subdivision of BAC;

(91)   GWM was a sham entity created to promote and conceal the scheme to defraud;

140

**SECOND AMENDED COMPLAINT**

(92)    GWM had no employees and Mr. Freeney was its only client;

(93)    Stern had access to all of Mr. Freeney's mail that was being forwarded to GWM at the 8484 Wilshire address;

### Relocation of the Scheme from Miami to Los Angeles

(94)    Weinberg and Stern lived together in the Hancock Park house;

(95)    Weinberg and Stern were using the Hancock Park house as a base of operations and maintained a room in the house where Stern hid whenever people came to the door and in which Stern kept the computers that he used to access Mr. Freeney's accounts online and transfer funds to and from them without Mr. Freeney's knowledge or authorization;

(96)    Weinberg resigned from BofA/Merrill Lynch, effective July 3, 2012;

(97)    Weinberg and Stern were secretly married in Los Angeles on or about February 25, 2011;

(98)    Weinberg and Stern's marriage license listed Stern's name as "Michael Alan Stern," and further indicated that Weinberg had elected to change her name to "Eva Danielle Stern";

(99)    BOCK and Weinberg had agreed, as part of their Martial Settlement Agreement, that BOCK would receive the first $100,000 of loan funds repaid by Stern and would split an additional amounts repaid;

### Fraudulent and Unauthorized
### Transfers to and from the BofA Roof Group Account

(100)  Stern used the confidential account information provided by Weinberg to access Mr. Freeney's Citibank accounts online to wire transfer approximately $9.3 million to the BofA Roof Group account;

(101)  Stern used the confidential account information provided by Weinberg to access the BofA Roof Group account to make over 300 unauthorized wire transfers;

(102)  BANA executed wire transfers totaling approximately $8.5 million from the BofA Roof Group account in furtherance of, to promote and to conceal the scheme

**SECOND AMENDED COMPLAINT**

to defraud;

### *Sale of Securities*

(103)  BOCK caused the securities that he had purchased just a few weeks earlier, for approximately $890,000, to be sold at a loss of more than $45,000 to Mr. Freeney;

(104)  A large portion of the proceeds that resulted from these sales were eventually transferred to the BofA Roof Group account, and from there to ARC, GWM and other unauthorized recipients;

### *Liquidation of Mr. Freeney's Existing Investments*

(105)  A large portion of the $441,000 that Success Trade returned to Mr. Freeney in or about September 2010 was eventually transferred to the ARC Wells Fargo account;

(106)  A large portion of the $1.6 million that CFP returned to Mr. Freeney between in or about September 2010 and February 2012 was eventually transferred to ARC, to GWM, to pay for expenses related to the private jet and to pay Stern's personal debts and expenses;

(107)  A large portion of the $1.5 million that resulted from the surrender of Mr. Freeney's Pacific Life annuity was eventually transferred to ARC to pay for expenses related to the private jet and to pay Stern's personal debts and expenses;

(108)  A large portion of the $195,000 that resulted from the liquidation of Mr. Freeney's investment in American Realty was eventually transferred to ARC to pay for expenses related to the private jet;

### *Snap Advances*

(109)  The Snap Advances credit facilities, totaling $450,000, were only necessary because BOCK, Weinberg and Stern had depleted almost all of Mr. Freeney's available cash and liquid assets;

(110)  Mr. Freeney was paying interest at the rate of 45 percent per annum;

(111)  Weinberg and Stern were planning to (and did) misappropriate a portion

142

**SECOND AMENDED COMPLAINT**

1   of the advances RSLA received from Snap Advances.

2       391.   All of these facts, and each of them, were important in that they would

3   have influenced a reasonable person's judgment or conduct, or Defendants knew that

4   their disclosure was likely to have influenced Mr. Freeney and Roof Group's

5   judgment or conduct.

6       392.   Mr. Freeney and Roof Group would have acted differently if they had

7   known of these undisclosed facts.

8       393.   BAC, BANA and MLPFS, and each of them, are liable for all of

9   Weinberg's acts of concealment following her resignation from BofA/Merrill Lynch

10  (effective July 3, 2010) for each of the following reasons, among others:

11       (a)   BAC, BANA and MLPFS authorized and/or permitted Weinberg

12  to continue to act as its actual and/or ostensible agent after her resignation in all

13  matters involving Mr. Freeney and Roof Group;

14       (b)   BAC, BANA and MLPFS adopted and ratified Weinberg's

15  conduct as that of its actual and/or ostensible agent in all matters involving

16  Mr. Freeney and Roof Group; and

17       (c)   BAC, BANA and MLPFS created a situation that afforded

18  Weinberg the opportunity to continue to conceal material facts from Mr. Freeney and

19  Roof Group, and BAC, BANA and MLPFS realized or should have realized the

20  likelihood that Weinberg would avail herself of that opportunity following her

21  resignation.

22  **C.   Resulting Damages.**

23       394.   As a direct and proximate result of BAC, BANA MLPFS and BOCK's

24  false and misleading representations, false promises and concealment and withholding

25  of important information, Mr. Freeney and Roof Group were damaged in an amount to

26  be determined at trial, but which is estimated to be in excess of $20 million.

27       395.   In making these false and misleading representations and false promises,

28  and in concealing, withholding and not disclosing these facts, BAC, BANA, MLPFS

**SECOND AMENDED COMPLAINT**

1   and BOCK acted fraudulently, oppressively, maliciously and with a willful disregard

2   of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive

3   damages pursuant to California Civil Code section 3294.

**THIRD CAUSE OF ACTION**

**(Civil RICO in Violation of**

**Title 18, United States Code, Sections 1962(c) and 1964(c))**

**(By Plaintiffs Freeney and Roof Group**

**Against Defendants BAC, BANA and MLPFS)**

9   396.   Plaintiffs repeat and reallege paragraphs 1 through 364 of this Second

10  Amended Complaint as if fully alleged herein.

11  397.   Title 18, United Sates Code, section 1962(c) provides, in relevant part,

12  that "[i]t shall be unlawful for any person employed by or associated with any

13  enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such

14  enterprise's affairs through a pattern of racketeering activity."

15  398.   Title 18, United States Code, section 1961(4) defines the term

16  "enterprise" to include "any individual, partnership, or other legal entity, and any . . .

17  group of individuals associated in fact although not a legal entity."

18  399.   Title 18, United States Code, section 1964(c), provides, in relevant part,

19  that "[a]ny person injured in his business or property be reason of a violation of

20  section 1962 of this chapter may sue thereafter . . . and shall recover threefold the

21  damages he sustains and the cost of the suit, including a reasonable attorney's

22  fee . . . ."

23  **A.   The "Criminal Enterprise."**

24  400.   At all times relevant hereto, Mr. Freeney and Roof Group were each a

25  "person" within the meaning of Title 18, United States Code, sections 1961(3) and

26  1964(c).

27  401.   At all times relevant hereto, BAC, BANA, MLPFS, GWM, Stern, ARC,

28  Weinberg's brother, the Florida Attorney and the Florida Law Firm were each a

144

**SECOND AMENDED COMPLAINT**

183128.11

1  "person" within the meaning of Title 18, United States Code, section 1961(3).

2  402.   At all times relevant hereto, BAC, BANA, MLPFS, GWM, Stern, ARC,

3  Weinberg's brother, the Florida Attorney and the Florida Law Firm were a group of

4  persons associated for the common purpose of devising, carrying out and aiding and

5  abetting the scheme to defraud Mr. Freeney, and constituted an association-in-fact

6  enterprise within the meaning of Title 18, United States Code, section 1961(4) (the

7  "Criminal Enterprise").

8  403.   At all times relevant hereto, the Criminal Enterprise was engaged in, and

9  its activities affected, interstate commerce in that among other things, it was involved

10  in acts, transactions and events occurring in, among other places, California, Florida

11  and Indiana, and used the interstate banking facilities of BANA and other financial

12  institutions.

13  **B.     The Racketeering Acts.**

14  404.   Beginning in or about January 2010, BAC, BANA and MLPFS, together

15  with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida

16  Law Firm, being employed by or associated with the Criminal Enterprise, conducted

17  and participated in the conduct of the affairs of the Criminal Enterprise, directly and

18  indirectly, through the pattern of racketeering activity described below, in violation of

19  Title 18, United States Code, section 1962(c).

20  ***1.     Wire Fraud.***

21  405.   Beginning in or about January 2010, BAC, BANA and MLPFS, together

22  with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida

23  Law Firm, and each of them, knowingly and with  intent to defraud, devised,

24  participated in and executed a scheme and artifice to defraud Mr. Freeney and

25  Roof Group and to obtain money and property from them by means of false and

26  fraudulent pretenses, representations and promises and the concealment of material

27  facts, as described further in paragraphs 130 through 348 and 382, 386 and 390 of this

28  Second Amended Complaint.

**SECOND AMENDED COMPLAINT**

406.   On or about the dates set forth below, for purposes of carrying out such scheme or artifice, BAC, BANA and MLPFS, together with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida Law Firm, caused the following transmissions by wire or radio communication in interstate commerce, among others, in violation of Title 18, United States Code, sections 1343 and 2:

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **1.A** | Feb. 8, 2010 | At Weinberg's request, Mr. Freeney's former financial manager, Vernon Brown, sends Weinberg Mr. Freeney's financial records. |
| **1.B** | Feb. 12, 2010 | Stern, posing as "David Michael Millar," sends text message from Florida to Mr. West in California stating that his email address is davidmichaelmillar@yahoo.com. |
| **1.C** | Feb. 12, 2010 | Stern, posing as "David Michael Millar" and using the email address amsreachconsultingllc@yahoo.com, sends email from Florida to Mr. Freeney in Indiana encouraging him to increase his ownership interest in Roof Group and RSLA. |
| **1.D** | Feb. 17, 2010 | Weinberg sends Mr. Freeney an email in which she falsely represents that she is a "Senior Financial Advisor" with "Merrill Lynch Global Wealth Management." |
| **1.E** | May 12, 2010 | The Florida Attorney sends an email from Florida to Mr. Freeney in Indianapolis, copying Weinberg and "David Millar," attaching two invoices for the Florida Attorney's legal services and asking "Michael" to review and approve the invoices. |
| **1.F** | May 31, 2010 | Stern, posing as "David Millar" and using the email address amsreachconsultingllc@yahoo.com, sends email from Florida to CFP in Virginia demanding repayment of Mr. Freeney's loans to CFP. |
| **1.G** | Jul. 30, 2010 | Del Campo sends an email from Florida to BANA's Wealth Management Banking Support office in Arizona requesting that they remove the security hold on the BofA Roof Group account. |

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **1.H** | Aug. 2, 2010 | Weinberg sends an email from California to Del Campo in Florida asking her to ensure that wire transfers from the BofA Roof Group account are processed. |
| **1.I** | Aug. 25, 2010 | Stern, posing as "David Millar" and using the email address amsreachconsultingllc@yahoo.com, sends email from Florida to Mr. West in California requesting that Mr. West not sign the Term Sheet with the Felis and that Stern be allowed to continue negotiating with the Felis. |
| **1.J** | Sep. 21, 2010 | Citibank credits the deposit of Mr. Freeney's Colts paycheck for $300,633.78 in California to his account in Florida. |
| **1.K** | Oct. 7, 2010 | Citibank credits the deposit of Mr. Freeney's Colts paycheck for $562,657.61 in California to his account in Florida. |
| **1.L** | Oct. 21, 2010 | Citibank credits the deposit of Mr. Freeney's Colts paycheck for $598,311.70 in California to his account in Florida. |
| **1.M** | Mar. 24, 2011 | Stern, posing as "David Millar" and using the email address amsreachconsultingllc@yahoo.com, sends email from California to the Florida Attorney in Florida, and to Mr. West providing a status report on his negotiations to purchase Donnelly's ownership interest in Roof Group on behalf of Mr. Freeney. |
| **1.N** | Mar. 28, 2011 | Weinberg sends a fax from California to her tax accountant in New York with false financial information to use in preparing Mr. Freeney's 2010 income tax returns. |
| **1.O** | Apr. 1, 2011 | Weinberg sends a fax from California to her tax accountant in New York with additional false financial information to use in preparing Mr. Freeney's 2010 income tax returns. |
| **1.P** | Aug. 10, 2011 | Pursuant to Weinberg's instructions, Snap Advances wire transfers $300,000 advance from account in New York to Roof Group account at Wells Fargo Bank in California. |

147

**SECOND AMENDED COMPLAINT**

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **1.Q** | Sep. 19, 2011 | Weinberg sends a fax from California to Mr. Freeney in Indiana requesting Mr. Freeney's signature to approve second Snap Advances credit facility. |
| **1.R** | Sep. 20, 2011 | Weinberg sends a fax from California to Snap Advances in New York with signed Continuing Payment Guarantee for Mr. Freeney to pay $222,000 to Snap Advances for $150,000 advance for RSLA. |
| **1.S** | Sep. 20, 2011 | Pursuant to Weinberg's instructions, Snap Advances wire transfers $150,000 advance from account in New York to Roof Group account at Wells Fargo Bank in California. |
| **1.T** | Oct. 12, 2011 | Citibank credits the deposit of Mr. Freeney's Colts paycheck for $392,916.06 in California to his account in Florida. |
| **1.U** | Oct. 19, 2011 | Citibank credits the deposit of Mr. Freeney's Colts paycheck for $392,315.27 in California to his account in Florida. |
| **1.V** | Nov. 18, 2010 | Weinberg sends Del Campo an email asking her to release a security hold on a $49,875 wire transfer from the BofA Roof Group account. |
| **1.W** | Dec. 16, 2011 | Stern and Weinberg send an anonymous fax from California to Mr. Freeney in Indiana falsely claiming that Mr. Freeney had signed an "asset management contact" with GWM in June 2010. |
| **1.X** | Jan. 17, 2012 | Weinberg sends an email from California to Mr. Freeney in Indiana with wiring instructions for final payment to Donnelly pursuant to Membership Interest Purchase and Sale Agreement. |
| **1.Y** | Jan. 30, 2012 | Weinberg sends a fax from California to CFP in Virginia advising CFP that its final payment is due to Mr. Freeney and threatening legal action if payment is not made. |
| **1.Z** | Mar. 2, 2012 | Weinberg sends an email from California to Mr. Freeney in Indiana confirming that all the CFP funds have been received. |

//

**SECOND AMENDED COMPLAINT**

## 2.    Mail Fraud.

407.   Beginning in or about, January 2010, BAC, BANA and MLPFS, together with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida Law Firm, and each of them, knowingly and with intent to defraud, devised, participated in and executed a scheme or artifice to defraud Mr. Freeney and Roof Group and to obtain money and property from them by means of false and fraudulent pretenses, representations and promises and the concealment of material facts, as described further in paragraphs 130 through 348 and 382, 386 and 390 of this Second Amended Complaint.

408.   On or about the dates set forth below, for purposes of carrying out such scheme or artifice, BAC, BANA and MLPFS, together with GWM, Stern, ARC, Weinberg's brother, the Florida attorney and the Florida Law Firm caused the following items, among others, to be sent and delivered through the U.S. mail, in violation of Title 18, United States Code, sections 1341 and 2:

| Racketeering Act | Date | Description of Mailing |
|---|---|---|
| **2.A** | Feb. 2010 | At Weinberg's request, V. Brown & Co. mails Mr. Freeney's books and records to BofA/Merrill Lynch. |
| **2.B** | Jun. 18, 2010 | At Weinberg's request, BANA mails signature cards for the BofA Roof Group account. |
| **2.C** | Jun. 23, 2010 | Weinberg mails application to first insurance company on behalf of Mr. Freeney for a $20 million life insurance policy. |
| **2.D** | Jul. 1, 2010 | Weinberg mails application to second insurance company on behalf of Mr. Freeney for a $15 million life insurance policy. |
| **2.E** | Jul. 1, 2010 | Weinberg mails application to third insurance company on behalf of Mr. Freeney for a $20 million life insurance policy. |
| **2.F** | Aug. 3, 2010 | GWM mails instructions to the Indianapolis Colts to send Mr. Freeney's paychecks to GWM's office in California. |

**SECOND AMENDED COMPLAINT**

183128.11

| Racketeering Act | Date | Description of Mailing |
|---|---|---|
| **2.G** | Sep. 19, 2010 | Colts mail Mr. Freeney's paycheck in the amount of $226,902.58 to GWM in accordance with Weinberg's direction. |
| **2.H** | Sep. 26, 2010 | Colts mail Mr. Freeney's paycheck in the amount of $252,203.88 to GWM in accordance with Weinberg's direction. |
| **2.I** | Oct. 24, 2010 | Colts mail Mr. Freeney's paycheck in the amount of $302,951.09 to GWM in accordance with Weinberg's direction. |
| **2.J** | Nov. 7, 2010 | Colts mail Mr. Freeney's paycheck in the amount of $303,128.93 to GWM in accordance with Weinberg's direction. |
| **2.K** | Oct. 2, 2011 | Colts mail Mr. Freeney's paycheck in the amount of $398.449.20 to GWM in accordance with Weinberg's direction. |
| **2.L** | Oct. 9, 2011 | Colts mail Mr. Freeney's paycheck in the amount of $392,916.06 to GWM in accordance with Weinberg's direction. |
| **2.M** | Feb. 8, 2012 | Colts mail Mr. Freeney's paycheck in the amount of $31,785 to GWM in accordance with Weinberg's direction (which is later found on Stern's person when he is arrested on March 23, 2012). |

### 3.  *Access Device Fraud.*

409.   As part of the scheme to defraud, and as described further in paragraphs 130 through 348 and 382 of this Second Amended Complaint:

(a)   In or about May 2010, Del Campo gave Weinberg confidential account access information for the BofA Roof Group account, even though Weinberg was not authorized to receive such information, was not a signatory on the account and was preparing to leave the bank and relocate to California with Stern.

(b)   Weinberg thereafter (while still employed by BofA/Merrill Lynch) gave Stern this confidential information, knowing and intending that he would use it to conduct fraudulent and unauthorized wire transfers from the BofA Roof Group account;

**SECOND AMENDED COMPLAINT**

(c)   In or about June 2010, Weinberg (while still employed by BofA/Merrill Lynch) gave Stern confidential access account access information for the Citibank accounts, knowing and intending that he would use it to conduct fraudulent and unauthorized wire transfers from those accounts; and

410.   During the periods set forth below, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, knowingly, with intent to defraud and without authorization, used and caused the use of one or more access devices within the meaning of Title 18, United States Code, section 1029(e)(1) and (e)(3), including, without limitation, codes, account numbers, personal identification numbers and other means of account access, which conduct affected interstate commerce.

411.   By such conduct, Weinberg and Stern obtained something of value aggregating to $1,000 or more during a one-year period, in violation of Title 18, United States Code, sections 1029(a)(2) and 2, as described below:

| Racketeering Act | Time Period | Unauthorized Access Device Use |
|---|---|---|
| **3.A** | Jun 29, 2010 – Jun. 28, 2011 | Stern accesses Mr. Freeney's Citibank account online using confidential account information provided by Weinberg (while employed by BofA/Merrill Lynch), and, without authorization, initiates 94 wire transfers totaling $8,458,295 to the BofA Roof Group account. |
| **3.B** | Jun 30, 2011 – Oct. 18, 2011 | Stern accesses Mr. Freeney's Citibank account online using confidential account information provided by  (while employed by BofA/Merrill Lynch), and, without authorization, initiates 29 wire transfers totaling $632,957 to the BofA Roof Group account. |
| **3.C** | Jun. 18, 2010 – Jun. 17, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 104 wire transfers totaling $1,935,851 to ARC. |

**SECOND AMENDED COMPLAINT**

| Racketeering Act | Time Period | Unauthorized Access Device Use |
|---|---|---|
| **3.D** | Jun. 21, 2011 – Oct. 18, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 36 wire transfers totaling $299,287 to ARC. |
| **3.E** | May 28, 2010 – May 13, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 66 wire transfers totaling $4,873,203 purportedly to fund the build out of RSLA. |
| **3.F** | May 31, 2011 – Oct. 31, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 13 wire transfers totaling $161,437 purportedly to fund RSLA operating deficits. |
| **3.G** | Nov. 12, 2010 – Sep. 14, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates five wire transfers totaling $322,000 to GWM. |
| **3.H** | Jun. 18, 2010 – May 31, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 64 wire transfers totaling $677,743 to pay costs associated with the leasing and operation of the private jet. |
| **3.I** | Jun. 21, 2011 – Oct. 14, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 14 wire transfers totaling $75,120 to pay costs associated with the leasing and operation of the private jet. |
| **3.J** | Jun. 21, 2010 – Jul. 2, 2010 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates two wire transfers totaling $15,000 to pay to charter a yacht. |

**SECOND AMENDED COMPLAINT**

183128.11

| Racketeering Act | Time Period | Unauthorized Access Device Use |
|---|---|---|
| **3.K** | Jun. 21, 2010 – Oct. 12, 2010 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates three wire transfers totaling $17,000 to pay his gambling debts. |
| **3.L** | Jan. 18, 2011 – Oct 3, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates seven wire transfers totaling $89,115 to pay rent on the Hancock Park house. |
| **3.M** | Aug. 18, 2010 – Jan. 20, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates eight wire transfers totaling $55,810 to pay his business associates and personal expenses. |

### 4.     *Transactional Money Laundering*

412.   On or about the dates set forth below, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, knowingly engaged in, attempted to engage in and caused the following monetary transactions in criminally derived property, among others, of a value greater than $10,000, which property was derived from Specified Unlawful Activity as defined below and which monetary transactions were in or affected interstate commerce and were by, though, or to a financial institution, in violation of Title 18, United States Code, sections 1957 and 2, as described further in paragraphs 130 through 348 and 382 of this Second Amended Complaint.

413.   As used in this Complaint, "Specified Unlawful Activity" means: mail fraud, in violation of Title 18, United States Code, section 1341; wire fraud, in violation of Title 18, United States Code, section 1343; interstate transportation of money obtained by fraud, in violation of Title 18, United States Code, section 2314; and bankruptcy fraud, in violation of Title 18, United States Code, section 152.

| Racketeering Act | Date | Description of Monetary Transaction |
|---|---|---|
| **4.A** | Jun. 18, 2010 | BANA executes a wire transfer for $13,480 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |
| **4.B** | Jul. 13, 2010 | BANA executes a wire transfer for $250,000 in criminally derived property from Mr. Freeney's Citibank account to the BofA Roof Group account. |
| **4.C** | Jul. 16, 2010 | BANA executes a wire transfer for $15,470 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |
| **4.D** | Aug. 10, 2010 | BANA executes a wire transfer for $247,162 in criminally derived property from the BofA Roof Group account to pay Brodin Design for build out of RSLA. |
| **4.E** | Aug. 19, 2010 | BANA executes a wire transfer for $21,520 in criminally derived property from the BofA Roof Group account to pay Dynamic Aviation for expenses related to the operation of the private jet. |
| **4.F** | Nov. 16, 2010 | BANA executes a wire transfer for $64,500 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |
| **4.G** | Nov. 18, 2010 | BANA executes a wire transfer for $76,540 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |
| **4.H** | Dec. 16, 2010 | BANA executes a wire transfer for $26,000 in criminally derived property from the BofA Roof Group account to pay Rennia for expenses related to the private jet. |
| **4.I** | Jan. 18, 2011 | BANA executes a wire transfer for $17,820 in criminally derived property from the BofA Roof Group account to pay rent on the Hancock Park house. |

**SECOND AMENDED COMPLAINT**

183128.11

| Racketeering Act | Date | Description of Monetary Transaction |
|---|---|---|
| **4.J** | Feb. 1, 2011 | BANA executes a wire transfer for $26,000 in criminally derived property from the BofA Roof Group account to pay Rennia for expenses related to the private jet. |
| **4.K** | Feb. 28, 2011 | BANA executes a wire transfer for $353,374 in criminally derived property from the BofA Roof Group account to fund RSLA operating deficits. |
| **4.L** | May 31, 2011 | BANA executes a wire transfer for $45,260 in criminally derived property from the BofA Roof Group account to fund RSLA operating deficits. |
| **4.M** | Oct. 14, 2011 | BANA executes a wire transfer for $15,000 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |
| **4.N** | Oct. 18, 2011 | BANA executes a wire transfer for $20,000 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |

**5.    *Concealment Money Laundering.***

414.    On or about the dates set forth below, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, conducted, attempted to conduct and conspired to conduct the following financial transactions, among others, that affected interstate commerce or involved the use of a financial institution that was engaged in or the activities of which affected interstate commerce, in violation of Title 18, United States Code, section 1956(a)(1)(B), as described further in paragraphs 130 through 348 and 382 of this Second Amended Complaint.

415.    BAC, BANA, and MLPFS, together with GWM, Stern and ARC, and each of them, conducted, attempted to conduct and conspired to conduct these transactions knowing that they involved the proceeds of some form of unlawful activity constituting a felony under federal or state law, though not necessarily which form, and knowing that they were designed, in whole or in part, to conceal or disguise

1  the nature, location, source, ownership, or control of the proceeds of Specified

2  Unlawful Activity, as described further below:

| Racketeering Act | Time Period | Financial Transactions | Concealment |
|---|---|---|---|
| **5.A** | Jun. 29, 2010 – Oct. 18, 2011 | Stern causes Citibank to execute 123 wire transfers totaling $9,143,870 from Mr. Freeney's Citibank accounts to the BofA Roof Group account. | Concealed and disguised Stern and ARC's ownership and control of misappropriated funds from Mr. Freeney, courts, trustees, creditors and other fraud victims. |
| **5.B** | Jun. 18, 2010 – Oct. 18, 2011 | BANA executes 140 wire transfer totaling $2,235,183 from BofA Roof Group account to ARC account at Wells Fargo Bank. | Concealed and disguised Stern and ARC's ownership and control of misappropriated funds from Mr. Freeney, courts, trustees, creditors and other fraud victims. |
| **5.C** | Nov. 12, 2010 – Sep. 14, 2011 | BANA executes five wire transfer totaling $322,000 from BofA Roof Group account to GWM at Wells Fargo Bank. | Concealed and disguised Weinberg and GWM's ownership and control of funds misappropriated from Mr. Freeney. |

### 6. *Promotional Money Laundering.*

416.   On or about the dates set forth below, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, knowingly conducted, attempted to conduct and conspired to conduct the following financial transactions, among others, that affected interstate commerce or involved the use of a financial institution that was engaged in or the activities of which affected interstate commerce, in violation of Title 18, United States Code, section 1956(a)(1)(A), as described further in paragraphs 130 through 348 and 382 of this Second Amended Complaint.

417.   BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, conducted, attempted to conduct and conspired to conduct these

**SECOND AMENDED COMPLAINT**

transactions, knowing that the transactions involved the proceeds of some form of unlawful activity constituting a felony under federal or state law, though not necessarily which form, and with the intent to promote the carrying on of Specified Unlawful Activity, as described further below:

| Racketeering Act | Time Period | Financial Transactions | Promotion |
|---|---|---|---|
| **6.A** | May 28, 2010 – Feb. 17, 2011 | BANA executes 33 wire transfers totaling $2,776,942 in proceeds of Specified Unlawful Activity from BofA Roof Group account to Brodin Design. | Created and maintained false appearance that Stern (posing as Millar) could be trusted to competently supervise RSLA build out and afforded Stern and Weinberg opportunity to misappropriate monies belonging to Mr. Freeney undetected. |
| **6.B** | May 31, 2010 – Oct. 31, 2011 | BANA executes 46 wire transfers totaling $1,480,227 in proceeds of Specified Unlawful Activity from BofA Roof Group account to pay for RSLA operations. | Created and maintained false appearance that Stern (posing as Millar) could be trusted to competently supervise RSLA build out and afforded Stern and Weinberg opportunity to misappropriate monies belonging to Mr. Freeney undetected. |
| **6.C** | Jul. 14, 2010 – Oct. 14, 2011 | BANA executes 16 wire transfers totaling $130,410 in proceeds of Specified Unlawful Activity from BofA Roof Group account to Dynamic Aviation to pay to lease and operate private jet. | Created and maintained false appearance that Stern (posing as Millar) owned a private jet, was a successful and wealthy businessman and was allowing Mr. Freeney to use the jet for only the cost of fuel. |

**SECOND AMENDED COMPLAINT**

183128.11

| Racketeering Act | Time Period | Financial Transactions | Promotion |
|---|---|---|---|
| **6.D** | Jun. 18, 2010 – Dec. 7, 2010 | BANA executes 60 wire transfers totaling $599,858 in proceeds of Specified Unlawful Activity from BofA Roof Group account to Rennia to pay to lease and for Rennia to pilot private jet. | Created and maintained false appearance that Stern (posing as Millar) owned a private jet, was a successful and wealthy businessman and was allowing Mr. Freeney to use the jet for only the cost of fuel. |
| **6.E** | Jun. 22, 2010 | BANA executes wire transfer for $16,475 in proceeds of Specified Unlawful Activity from BofA Roof Group account to Aviation Management to pay expenses associated with private jet. | Created and maintained false appearance that Stern (posing as Millar) owned a private jet, was a successful and wealthy businessman and was allowing Mr. Freeney to use the jet for only the cost of fuel. |
| **6.F** | Jul. 26, 2010 | BANA executes wire transfer for $6,120 in proceeds of Specified Unlawful Activity from BofA Roof Group account to JMI Aviation Inc. to pay expenses associated with private jet. | Created and maintained false appearance that Stern (posing as Millar) owned a private jet, was a successful and wealthy businessman and was allowing Mr. Freeney to use the jet for only the cost of fuel. |
| **6.G** | Jun. 21, 2010– Jul. 2, 2010 | BANA executes two wire transfers totaling $15,000 in proceeds of Specified Unlawful Activity from BofA Roof Group account to pay for chartered yacht. | Created and maintained false appearance that Stern (posing as Millar) owned a private yacht and was a successful and wealthy businessman. |

**SECOND AMENDED COMPLAINT**

183128.11

| Racketeering Act | Time Period | Financial Transactions | Promotion |
|---|---|---|---|
| **6.H** | Jan. 18, 2011–Oct 3, 2011 | BANA executes seven wire transfers totaling $89,115 in proceeds of Specified Unlawful Activity from BofA Roof Group account to pay rent on Hancock Park house. | Created and maintained false appearance that Weinberg was a successful financial manager and investment advisor and provided a base of operations for Stern and Weinberg to continue to carry out the scheme to defraud. |

### 7. *Obstruction of Justice.*

418.   Plaintiffs are informed and believe, and on that basis allege, that in or about December 2011, the FBI, USAO and a federal grand jury sitting in the Central District of California began a criminal investigation of the activities of Weinberg and others relating to the scheme to defraud Mr. Freeney (the "Criminal Investigation").

419.   On or about March 22, 2012, the United States filed a Criminal Complaint against Weinberg and Stern in the Central District of California, in the case entitled, *United States v. Eva D. Weinberg and Michael A. Stern*, Case No. 12-0694M, charging them with wire fraud.

420.   On or about March 23, 2012, the FBI arrested Weinberg and Stern on the charges in the Criminal Complaint.

421.   On or about May 25, 2012, a grand jury in the Central District of California returned an Indictment against Stern in the case entitled, *United States v. Michael A. Stern*, Case No. 12-508(A)-SVW, charging Stern with wire fraud and obstruction of justice.

422.   On or about August 31, 2012, a grand jury in the Central District of California returned a First Superseding Indictment in the criminal case against Stern, charging him with wire fraud, access device fraud, transactional money laundering and obstruction of justice.

423.   On or about the dates set forth below, BAC, BANA and MLPFS,

159

**SECOND AMENDED COMPLAINT**

together with GWM, Stern and ARC, and each of them, knowingly and corruptly

engaged in and aided and abetted the following endeavors to obstruct, impede and

influence the due administration of justice in the Criminal Investigation and the

criminal cases against Weinberg and Stern, in violation of Title 18, United States

Code, sections 1503 and 2, as described below:

| Racketeering Act | Date | Description of Obstruction of Justice |
|---|---|---|
| **7.A** | Dec. 16, 2011 | Weinberg and Stern send an anonymous fax to Mr. Freeney's home, in which they falsely claim that Mr. Freeney had signed an "asset management contact" in June 2010. |
| **7.B** | Dec. 2011 | Weinberg and Stern pay an accountant to prepare phony GWM account statements that Weinberg can show Mr. Freeney. |
| **7.C** | Dec. 2011 – Mar. 2012 | Stern and Weinberg create the Fabricated Engagement Letter and fraudulently backdate it to June 11, 2010. |
| **7.D** | Mar. 2012 – Aug. 2012 | Plaintiffs are informed and believe, and on that basis allege, that BAC, BANA and MLPFS withhold documents required to be produced by a grand jury subpoena. |
| **7.E** | Mar. 20 & 21, 2012 | Stern arranges for the CI to fly from Miami to Los Angeles to destroy the hard drive of a computer and documents containing evidence incriminating of Stern and Weinberg. |
| **7.F** | Mar. 22, 2012 | Stern places "paperwork" in the ceiling trusses of a house that he was renovating, including forged and fabricated wire transfer authorizations, and instructs his associate to cover them with drywall as soon as possible. |
| **7.G** | Mar. 23, 2012 | Weinberg makes false and misleading statements to the FBI and USAO. |
| **7.H** | May 15, 2012 | Stern sends a letter, while detained at the Metropolitan Detention Center in Los Angeles, to Weinberg, suggesting a false exculpatory story for her to tell the prosecutor when she is next interviewed by the FBI and USAO. |

**SECOND AMENDED COMPLAINT**

183128.11

| Racketeering Act | Date | Description of Obstruction of Justice |
|---|---|---|
| 7.I | May 17, 2012 | Weinberg makes false and misleading statements to the FBI and USAO. |

**C. Injury to Business and Property.**

424. By reason of the foregoing violations of Title 18, United States Code, section 1962(c), Mr. Freeney and Roof Group have been injured in their business and property in an amount to be determined at trial, but estimated to be in excess of $20 million, as described further in paragraphs 130 through 348 and 382 and 383 of this Second Amended Complaint.

**FOURTH CAUSE OF ACTION**

**(For Civil RICO Conspiracy in Violation of**

**Title 18, United States Code, Sections 1962(d) and 1964(c))**

**(By Plaintiffs Freeney and Roof Group**

**Against Defendants BAC, BANA and MLPFS)**

425. Plaintiffs repeat and reallege paragraphs 1 through 424 of this Second Amended Complaint as if fully alleged herein.

426. Title 18, United States Code, section 1962(d) provides, in relevant part, that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections . . . (b) or (c) of this section [1962]."

427. Beginning in or about January 2010, BAC, BANA and MLPFS, together with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida Law Firm, and each of them, knowingly and willfully conspired and agreed to violate Title 18, United States Code, section 1962(c), by conducting the affairs and participating in the conduct of the affairs of the Criminal Enterprise, directly and indirectly, through the pattern of racketeering activity described in the Third Cause of Action, in violation of Title 18, United States Code, section 1962(d).

428. By reason of the foregoing violations of Title 18, United States Code, section 1962(d), Mr. Freeney and Roof Group have been injured in their business and

property in an amount to be determined at trial, but estimated to be in excess of $20 million, as described further in paragraphs 130 through 348 and 382 and 383 of this Second Amended Complaint.

**FIFTH CAUSE OF ACTION**

**(For Civil RICO in Violation of**

**Title 18, United States Code, Sections 1962(b) and 1964(c))**

**(By Plaintiffs Freeney and Roof Group**

**Against Defendants BAC, BANA and MLPFS)**

429.   Plaintiffs repeat and reallege paragraphs 1 through 428 of this Second Amended Complaint as if fully alleged herein.

430.   Title 18, United States Code, section 1962(b) provides, in relevant part, that "[i]t shall be unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise . . . ."

**A.     The "Victim Enterprise."**

431.   At all relevant times, Mr. Freeney, in his capacity as a professional athlete, and Roof Group, as the owner and operator of RSLA, were a group of persons associated together for the common purpose of generating legitimate income, revenue and profits, and constituted an association-in-fact enterprise within the meaning of Title 18, United States Code, section 1961(4) (the "Victim Enterprise").

432.   At all relevant times, the Victim Enterprise was engaged in, and its activities affected, interstate commerce and described in the First Cause of Action.

**B.     The Racketeering Acts.**

433.   Beginning in or about January 2010, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, acquired and maintained, directly and indirectly, an interest in and/or control of the Victim Enterprise through the pattern of racketeering activity described in the Third Cause of Action, in violation of Title 18, United States Code, section 1962(b).  That racketeering activity included the above

162

**SECOND AMENDED COMPLAINT**

described acts of wire fraud, mail fraud, access device fraud, transactional money laundering, concealment money laundering and promotional money laundering.

**C.   Injury to Business and Property.**

434.   By reason of the foregoing violations of Title 18, United States Code, section 1962(b), Mr. Freeney and Roof Group have been injured in their business and property in an amount to be determined at trial, but estimated to be in excess of $20 million, as described further in paragraphs 130 through 348 and 382 and 383 of this Second Amended Complaint.

**SIXTH CAUSE OF ACTION**

**(For Civil RICO in Violation of**

**Title 18, United States Code, Sections 1962(c) and 1964(c))**

**(By Plaintiffs Freeney and Roof Group**

**Against Defendants BAC, BANA and MLPFS)**

435.   Plaintiffs repeat and reallege paragraphs 1 through 434 of this Second Amended Complaint as if fully alleged herein.

436.   Beginning in or about January 2010, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, being associated with the Victim Enterprise, conducted and participated in the conduct of the affairs of the Victim Enterprise, directly and indirectly, through the pattern of racketeering activity described in the Third Cause of Action, in violation of Title 18, United States Code, section 1962(c).

437.   By reason of the foregoing violation of Title 18, United States Code, section 1962(c), Mr. Freeney and Roof Group have been injured in their business and property in an amount to be determined at trial, but estimated to be in excess of $20 million, as described further in paragraphs 130 through 348 and 382 and 383 of this Second Amended Complaint.

//

//

**SECOND AMENDED COMPLAINT**

## SEVENTH CAUSE OF ACTION

### (For Civil RICO Conspiracy in Violation of

### Title 18, United States Code, Sections 1962(d) and 1964(c))

### (By Plaintiffs Freeney and Roof Group

### Against Defendants BAC, BANA and MLPFS)

438.   Plaintiffs repeat and reallege paragraphs 1 through 437 of this Second Amended Complaint as if fully alleged herein.

439.   Beginning in or about January 2010, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, knowingly and willfully conspired and agreed to: (a) violate Title 18, United States Code, section 1962(b), by acquiring and maintaining, directly and indirectly, an interest in or control of the Victim Enterprise through the pattern of racketeering activity described in the Third Cause of Action; and (b) violate Title 18, United States Code, section 1962(c), by being employed by or associated with the Victim Enterprise, and conducting and participating in the conduct of the affairs of the Victim Enterprise, directly and indirectly, through the pattern of racketeering activity described in the Third Cause of Action.

440.   By reason of the foregoing violations of Title 18, United States Code, section 1962(d), Mr. Freeney and Roof Group have been injured in their business and property in an amount to be determined at trial, but estimated to be in excess of $20 million, as described further in paragraphs 130 through348 and 3852 and 383 of this Second Amended Complaint.

## EIGHTH CAUSE OF ACTION

### (For Aiding and Abetting Conversion)

### (By Plaintiffs Freeney and Roof Group

### Against Defendant BANA)

441.   Plaintiffs repeat and reallege paragraphs 1 through 440 of this Second Amended Complaint as if fully alleged herein.

**A.      The Conversions.**

442.    At all times relevant hereto, Mr. Freeney owned all of the funds that were deposited to the Citibank accounts, and all of the funds that were transferred from the Citibank accounts to the BofA Roof Group account.

443.    At all times relevant hereto, Mr. Freeney and Roof Group owned all of the funds that were deposited to the BofA Roof Group account and all of the funds that were transferred from that account.

444.    Beginning in or about June 2010, Stern, and following her resignation (effective July 3, 2010), Weinberg:

(a)      Converted all of the funds that were deposited to the Citibank accounts, and all of the funds transferred from the Citibank accounts to the BofA Roof Group account and to GWM, by interfering with Mr. Freeney's lawful rights and ownership interests in those funds by, among other things, wrongfully exercising dominion and control over those funds and preventing Mr. Freeney from gaining access to them; and

(b)      Converted all of the funds in the BofA Roof Group account, all of the funds transferred from that account to ARC and GWM, and all of the funds transferred from that account to fund the build out and operations of RSLA, lease and operate the private jet, charter a private yacht, pay rent for the Hancock Park house, satisfy Stern's gambling debts and pay Stern's other personal expenses, by interfering with Mr. Freeney and Roof Group's lawful rights and ownership interests in those funds by, among other things, wrongfully exercising dominion and control over those funds and preventing Mr. Freeney and Roof Group from gaining access to them.

445.    As a direct and proximate result of these conversions, Mr. Freeney and Roof Group were damaged in an amount to be determined at trial, but which is estimated to be in excess of $8.5 million.

**B.      Aiding and Abetting.**

446.    Prior to Weinberg's resignation from BofA/Merrill Lynch, BANA aided

and abetted Stern in committing these conversions by knowingly giving substantial assistance and encouragement to him, knowing that his conduct constituted breaches of his legal duties to Mr. Freeney and Roof Group not to interfere with their lawful rights and ownership interests in the funds in the Citibank and BofA Roof Group accounts and not to deceive, defraud, or deal unfairly with them.

447.   Prior to Weinberg's resignation, BANA also aided and abetted Stern in committing these conversions by knowingly giving substantial assistance to him toward accomplishing the conversions, which conduct itself constituted breaches of BANA's legal duties to Mr. Freeney and Roof Group, as clients, not to interfere with their lawful rights and ownership interests in the funds in the Citibank and BofA Roof Group accounts and not to deceive, defraud, or deal unfairly with them.

448.   Following Weinberg's resignation, BANA aided and abetted Stern and Weinberg in committing these conversions by knowingly giving substantial assistance and encouragement to them, knowing that their conduct constituted breaches of their legal duties to Mr. Freeney and Roof Group not to interfere with Mr. Freeney and Roof Group's lawful rights and ownership interests in the funds in the Citibank and BofA Roof Group accounts and not to deceive, defraud, or deal unfairly with them.

449.   Following Weinberg's resignation, BANA also aided and abetted Stern and Weinberg in committing these conversions by knowingly giving substantial assistance to them toward accomplishing the conversions, which conduct itself constituted breaches of BANA's legal duties to Mr. Freeney and Roof Group, as clients, not to interfere with their lawful rights and ownership interests in the funds in the Citibank and BofA Roof Group accounts and not to defraud, deceive, or deal unfairly with them.

450.   Such substantial assistance and encouragement included, among other things:

(a)   Opening the BofA Roof Group account under false pretenses;

(b)   Opening the BofA Roof Group account without the required

**SECOND AMENDED COMPLAINT**

1   documentation, appropriate authorization, or sufficient due diligence;

2         (c)   Allowing the BofA Roof Group account to remain open,

3   notwithstanding concerns expressed by BANA employees that the documentation for

4   the account was not sufficient or in order;

5         (d)   Giving Weinberg the confidential account access information, even

6   though she was not a signatory on the account;

7         (e)   Giving Stern the confidential account access information;

8         (f)   Allowing the account to remain open and not changing the pass

9   code for it after Weinberg resigned from the bank and relocated with Stern to

10   California;

11         (g)   Continuing to permit Weinberg to access the account after her

12   resignation;

13         (h)   Repeatedly overriding the account's security features at

14   Weinberg's request, including after her departure from the bank;

15         (i)   Executing hundreds of highly suspicious wire transfers, totaling

16   millions of dollars, from the account to unknown recipients and recipients with no

17   apparent relationship to Roof Group, all originating online;

18         (j)   Ensuring that neither Mr. Freeney nor RSLA management received

19   account statements or copies of wire transfer requests for the account;

20         (k)   Not investigating the numerous highly suspicious transactions in

21   the account; and

22         (l)   Not filing nay Suspicious Activity Reports or otherwise notifying

23   federal authorities of highly suspicious transactions in the account, in violation of the

24   Bank Secrecy Act.

25       451.   Pursuant to California Civil Code section 3336, Mr. Freeney and

26   Roof Group are entitled to fair compensation for the time and money they have

27   expended in pursuing the return and recovery of their converted funds.

28       452.   In aiding and abetting these conversions, BANA acted fraudulently,

**SECOND AMENDED COMPLAINT**

1    oppressively, maliciously and with a willful and conscious disregard of Plaintiffs'

2    rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages

3    pursuant to California Civil Code section 3294.

**NINTH CAUSE OF ACTION**

**(For Violation of California Penal Code section 496)**

**(By Plaintiffs Freeney and Roof Group**

**Against Defendant BANA)**

8    453.   Plaintiffs repeat and reallege paragraphs 1 through 452 of this Second

9    Amended Complaint as if fully alleged herein.

10    454.   California Penal Code section 496(c) provides, in relevant part, that

11   "[a]ny person who has been injured by a violation of subdivision (a) . . . may bring an

12   action for three times the amount of the actual damages, if any, sustained by the

13   plaintiff, cost of suit, and reasonable attorney's fees."

14    455.   California Penal Code section 496(a) provides, in relevant part, that

15   "[e]very person who receives any property that has been stolen or that has been

16   obtained in any manner constituting theft . . . knowing the property to be so stolen or

17   obtained, or who conceals, . . . withholds, or aids in concealing . . . or withholding any

18   property from the owner, knowing the property to be so stolen or obtained, [is guilty

19   of a criminal offense]."

20    456.   California Penal Code section 484 defines "theft" to include: (a) theft by

21   trick, which involves obtaining possession of another's property with his consent by

22   fraud or deceit; (b) theft by false pretenses, which involves obtaining possession and

23   ownership of another's property by false or fraudulent representations or promise; and

24   (c) theft by embezzlement, which involves converting another's property that has been

25   entrusted to one's care.

26    457.   Beginning in or about March 2010, BOCK and Weinberg, together with

27   Stern, began liquidating Mr. Freeney's existing investments, including, but not

28   necessarily limited to, his investments in the Advisors Disciplined municipal bonds,

168

**SECOND AMENDED COMPLAINT**

1  Success Trade, CFP, the Pacific Life annuity and American Realty. The bulk of the

2  proceeds from these transactions were eventually deposited to the Citibank accounts.

3  All of these funds belonged to and were the property of Mr. Freeney.

4  458.  Beginning in or about June 2010, BOCK caused the majority of the

5  securities he had previously purchased without Mr. Freeney's authorization or

6  knowledge to be sold, also without Mr. Freeney's authorization or knowledge. The

7  bulk of the proceeds from these sales were eventually transferred to the Citibank

8  accounts. All of these funds belonged to and were the property of Mr. Freeney.

9  459.  Between in or about September 2010 and January 2011, and between in

10  or about September 2011 and February 2012, at Weinberg's direction, Mr. Freeney's

11  paychecks from the Colts were sent to GWM at the 8484 Wilshire address. Weinberg

12  then deposited those checks at the Citibank branch across the street, to be credited to

13  Mr. Freeney's Citibank accounts. All of the deposited funds belonged to and were the

14  property of Mr. Freeney.

15  460.  Beginning in or about June 2010, Stern initiated wire transfers online,

16  typically from Los Angeles, using the confidential account access information that Del

17  Campo had provided to Weinberg, and that Weinberg (while still employed by

18  BofA/Merrill Lynch) had provided to Stern, enabling Stern to transfer Mr. Freeney's

19  funds: (a) from the Citibank accounts to the BofA Roof Group account and GWM;

20  and (b) from the BofA Roof Group account to, among others, ARC, GWM, Pelky,

21  Rennia, the landlord of the Hancock Park house, the holders of Stern's gambling debts

22  and various persons involved in the build out and operations of RSLA.

23  461.  All of the funds that Stern caused to be transferred from the Citibank

24  accounts to the BofA Roof Group account were stolen and obtained by theft from

25  Mr. Freeney in that:

26  (a)  Weinberg and Stern had obtained possession of the funds in the

27  Citibank accounts through fraud and deceit, knowing that the funds belonged to

28  Mr. Freeney and intending to deprive him of their use permanently;

169

**SECOND AMENDED COMPLAINT**

183128.11

(b)      Weinberg and Stern had knowingly and intentionally caused Mr. Freeney to transfer possession and ownership of the funds in the Citibank accounts to them in reliance upon false and fraudulent representations and pretenses; and/or

(c)      Weinberg had been entrusted with care of the funds in the Citibank accounts, and, together with Stern, fraudulently converted them to her and Stern's personal benefit, intending to deprive Mr. Freeney of their use.

462.   Beginning in or about June 2010, BANA received the stolen funds transferred from the Citibank accounts and deposited them to the BofA Roof Group account, knowing that the funds had been stolen and obtained by theft, in violation of California Penal Code section 496(a).

463.   Beginning in or about June 2010, BANA, having received the stolen funds transferred from the Citibank accounts, thereafter knowingly concealed, withheld and aided and abetted the concealment and withholding of those funds by, among other things, executing the fraudulent and unauthorized wire transfers described in this Second Amended Complaint, in further violation of California Penal Code section 496(a).

464.   As a direct and proximate result of these violations of California Penal Code section 496(a), Mr. Freeney and Roof Group have been injured in an amount to be determined at trial, but estimated to be in excess of $8.5 million.

## TENTH CAUSE OF ACTION
### (For Breach of Fiduciary Duty)
### (By Plaintiff Freeney Against Defendants BAC, BANA, MLPFS and BOCK)

465.   Plaintiffs repeat and reallege paragraphs 1 through 464 of this Second Amended Complaint as if fully alleged herein.

466.   During the times relevant hereto, BAC, BANA, MLPFS and BOCK, and each of them, owed Mr. Freeney fiduciary duties, including: (a) the duty of undivided loyalty; (b) the duty to exercise due care; (c) the duty to make full disclosure; and (d)

**SECOND AMENDED COMPLAINT**

1   the duty to maintain client confidences.

2       467.   Beginning in or about January 2010, BAC, BANA, MLPFS and BOCK, and each of them, breached their fiduciary duties to Mr. Freeney by, among other things:

         (a)   Making false and misleading representations and false promises, as described further in paragraph 386 of this Second Amended Complaint;

         (b)   Concealing, withholding and failing to disclose material facts, as described further in paragraph 389 of this Second Amended Complaint;

         (c)   Introducing Mr. Freeney, who had virtually no first-hand business or investment experience, to Stern (posing as Millar), knowing that Stern was a bankrupt and desperate financial predator who was on the prowl for new victims;

         (d)   Placing Weinberg in charge of managing Mr. Freeney's assets, investments, income and financial affairs, including his cash savings, business ventures and guaranteed income under his Colts contract, knowing that she was not licensed to give investment advice and lacked the skills, learning, expertise and experience necessary to perform such services competently;

         (e)   Improperly delegating their duties and responsibilities as Mr. Freeney's bankers, brokers, financial managers and investment advisors to Stern, who was not licensed or otherwise qualified to perform any of these functions;

         (f)   Authorizing and permitting Weinberg to transfer funds from one of Mr. Freeney's brokerage accounts to the ARC Wells Fargo account without Mr. Freeney's authorization or knowledge;

         (g)   Purchasing securities using approximately $890,000 of Mr. Freeney's funds without his authorization or knowledge;

         (h)   Selling those securities a short time later, also without Mr. Freeney's authorization or knowledge, and incurring substantial losses from those sales without advising Mr. Freeney;

         (i)   Opening the BofA Roof Group account without required

**SECOND AMENDED COMPLAINT**

documentation, appropriate authorization, or sufficient due diligence, and allowing the account to remain open notwithstanding expressions of concern by BANA employees that the documentation for the account was deficient;

(j) Disclosing Mr. Freeney's private and confidential personal and financial information and records to Stern, including Mr. Freeney's social security number, date of birth, home address, credit card numbers, tax returns, Colts contract and account and credit card information;

(k) Disclosing to Stern confidential account access information for Mr. Freeney's Citibank accounts and the BofA Roof Group account;

(l) Executing hundreds of highly suspicious wire transfers from the BofA Roof Group account, all originating on-line, without investigating or filing Suspicious Activity Reports, which allowed Weinberg and Stern to misappropriate and launder millions of dollars of misappropriated funds over a 16-month period;

(m) Referring Mr. Freeney to the Florida Attorney to assist in negotiating and documenting the buy outs of Altounian and Donnelly without first (or ever) disclosing the Florida Attorney's actual conflicts of interest in representing Mr. Freeney and Roof Group based on the Florida Attorney's past and current representations of Stern and Weinberg and the fact that he and the Florida Law Firm were listed as creditors in Stern's bankruptcies in the amount of $100,000;

(n) Convincing Mr. Freeney to liquidate the Pacific Life annuity, which had a cash value of approximately $1.5 million, at a cost to him of approximately $50,000, for the sole or primary purpose of freeing up additional funds for Weinberg and Stern to misappropriate;

(o) Convincing Mr. Freeney to authorize Stern (posing as Millar) to negotiate the return of Mr. Freeney's $1.5 million investment in Success Trade, for the sole or primary purpose of freeing up additional funds for Weinberg and Stern to misappropriate;

(p) Convincing Mr. Freeney to authorize Stern (posing as Millar) to

172

**SECOND AMENDED COMPLAINT**

1  negotiate the return of Mr. Freeney's $1.75 million investment in CFP, for the sole or

2  primary purpose of freeing up additional funds for Weinberg and Stern to

3  misappropriate;

4         (q)    Failing to pay the quarterly HOA dues on the North Carolina Land

5  Investment, as a result of which the HOA foreclosed on the property and Mr. Freeney

6  was required to retain North Carolina counsel to unwind the foreclosure;

7         (r)    Keeping Weinberg's resignation secret from Mr. Freeney; and

8         (s)    Following Weinberg's resignation, making no effort to transition

9  Mr. Freeney to a qualified investment advisor; ensure that his funds were safe; protect

10  and secure his private and confidential personal and financial information and records;

11  or make sure that his financial management needs were being met.

12      468.   As a direct and proximate result of these breaches of fiduciary duty,

13  Mr. Freeney was damaged in an amount to be determined at trial, but which is

14  estimated to be in excess of $20 million.

15      469.   In committing these breaches of fiduciary duty, BAC, BANA, MLPFS

16  and BOCK acted fraudulently, oppressively, maliciously and with a willful and

17  conscious disregard of Mr. Freeney's rights.  Accordingly, Mr. Freeney is entitled to

18  exemplary and punitive damages pursuant to California Civil Code section 3294.

19                    **ELEVENTH CAUSE OF ACTION**

20    **(For Aiding and Abetting Breach of Fiduciary Duty by Weinberg)**

21       **(By Plaintiffs Freeney and Roof Group Against**

22         **Defendants BAC, BANA, MLPFS and BOCK)**

23      470.   Plaintiffs repeat and reallege paragraphs 1 through 469 of this Second

24  Amended Complaint as if fully alleged herein.

25      471.   At all times relevant hereto, Mr. Freeney and Roof Group reposed their

26  trust and confidence in Weinberg, and Weinberg encouraged, accepted and voluntarily

27  assumed such trust and confidence, as a result of which she owed Mr. Freeney and

28  Roof Group certain fiduciary duties, including: (a) the duty of undivided loyalty; (b)

**SECOND AMENDED COMPLAINT**

1   the duty to exercise due care; (c) the duty to make full disclosure; and (d) the duty to

2   maintain client confidences.

3       472.   Beginning in or about January 2010, Weinberg breached these fiduciary

4   duties, as described further in paragraphs 130 through 348 of this Second Amended

5   Complaint.

6       473.   If, or to the extent, Weinberg was not acting as an actual and/or

7   ostensible agent of BAC, BANA, or MLPFS prior to or following her resignation

8   from BofA/Merrill Lynch (effective July 3, 2010), BAC, BANA, MLPFS and BOCK,

9   and each of them, aided and abetted her breach of her fiduciary duties to Mr. Freeney

10  and Roof Group by knowingly:

11          (a)   Giving her substantial assistance and encouragement, knowing that

12  her conduct constituted breaches of her fiduciary duties to Mr. Freeney and

13  Roof Group; and

14          (b)   Giving her substantial assistance in breaching her fiduciary duties

15  to Mr. Freeney and Roof Group, which conduct itself constituted breaches of BAC,

16  BANA, MLPFS and BOCK's legal duties to Mr. Freeney and Roof Group not to

17  deceive, defraud, or deal unfairly with them.

18      474.   Such substantial assistance and encouragement included, among other

19  things:

20          (1)   Introducing Weinberg to Mr. Freeney and having her supplant Sugarman

21  as Mr. Freeney's principal contact with BofA/Merrill Lynch;

22          (2)   Falsely vouching for Weinberg's qualifications, expertise, experience and

23  competence;

24          (3)   Concealing that Weinberg was not a registered investment advisor and

25  therefore could not lawfully give investment advice to Mr. Freeney;

26          (4)   Authorizing and permitting Weinberg to use various false titles, including

27  "Senior Financial Advisor" for "Merrill Lynch Global Wealth Management," "Vice

28  President of Private Wealth Management at Merrill Lynch," "Financial Consultant,"

**SECOND AMENDED COMPLAINT**

183128.11

for "Merrill Lynch Wealth Management" and "Senior Vice President" with "Global Wealth Management";

(5)     Appointing Weinberg to serve as Mr. Freeney's private banker, financial manager and investment advisor when she was not licensed, qualified, or competent to perform such functions;

(6)     Concealing her relationship to BOCK;

(7)     Concealing her relationship to Stern;

(8)     Authorizing and permitting her to refer Mr. Freeney to Stern (posing as Millar), purportedly for consulting services;

(9)     Concealing Stern's true identity, background, financial condition, legal problems and criminal past;

(10)    Concealing Weinberg's prior involvement in Stern's criminal schemes;

(11)    Concealing that ARC was a sham entity of Stern's recent creation;

(12)    Allowing her to sell life insurance to Mr. Freeney without an insurance producer's license;

(13)    Concealing that she had no qualifications, expertise, or experience in operating a restaurant;

(14)    Authorizing and permitting her to serve as the de facto CFO of RSLA while employed by BofA/Merrill Lynch;

(15)    Authorizing and permitting her to transfer funds from Mr. Freeney's brokerage accounts without his express authorization;

(16)    Giving her unfettered access to Mr. Freeney's private and confidential personal, financial and medical information and records;

(17)    Opening the BofA Roof Group account at her request;

(18)    Opening the BofA Roof Group account, and allowing it to remain open, without the required documentation, appropriate authorization, or sufficient due diligence;

(19)    Opening the BofA Roof Group account, and allowing it to remain open,

175

**SECOND AMENDED COMPLAINT**

183128.11

1   even though Mr. Freeney lacked the necessary corporate authority to open it;

2   (20)   Allowing the BofA Roof Group account to remain open notwithstanding

3   concerns expressed by BANA employees that the documentation for the account was

4   deficient;

5   (21)   Giving her the confidential account access information for the BofA Roof

6   Group account;

7   (22)   Allowing the account to remain open, and not changing the pass code,

8   after her resigned from the bank and relocated to California with Stern;

9   (23)   Repeatedly overriding the account's security features at Weinberg's

10  request, even after she had left the bank;

11  (24)   Executing hundreds of highly suspicious wire transfers from the BofA

12  Roof Group account, all originating online, without investigating them and without

13  ever filing a Suspicious Activity Report or notifying federal authorities, as required by

14  law;

15  (25)   Liquidating Mr. Freeney's existing investments to generate additional

16  funds to misappropriate;

17  (26)   Selling the securities BOCK had previously purchased without

18  Mr. Freeney's authorization or knowledge to generate additional funds to

19  misappropriate;

20  (27)   Concealing Weinberg's resignation from Mr. Freeney;

21  (28)   Encouraging and allowing her to take Mr. Freeney with her as a client

22  upon resigning her position at the bank;

23  (29)   Authorizing and permitting her to continue to serve as Mr. Freeney's

24  principal contact with BofA/Merrill Lynch and as his private banker, financial

25  manager and investment advisor after departing the bank;

26  (30)   Authorizing and permitting her to create a company, GWM, with a name

27  confusingly similar to that of GWIM and MLGWM; and

28  (31)   Allowing her to take with her, upon leaving the bank, all of

176

**SECOND AMENDED COMPLAINT**

1    Mr. Freeney's private and confidential personal, financial and medical records that he

2    had entrusted to the care of BofA/Merrill Lynch.

3        475.   As a direct and proximate result of BAC, BANA, MLPFS and BOCK

4    aiding and abetting these breaches of fiduciary duty, Mr. Freeney and Roof Group

5    were damaged in an amount to be determined at trial, but which is estimated to be in

6    excess of $20 million.

7        476.   In aiding and abetting these breaches of fiduciary duty, BAC, BANA,

8    MLPFS and BOCK acted fraudulently, oppressively, maliciously and with a willful

9    and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to

10   exemplary and punitive damages pursuant to California Civil Code section 3294.

11                     **TWELFTH CAUSE OF ACTION**

12       **(For Aiding and Abetting Breach of Fiduciary Duty by Stern)**

13               **(By Plaintiffs Freeney and Roof Group Against**

14                  **Defendants BAC, BANA and MLPFS)**

15       477.   Plaintiffs repeat and reallege paragraphs 1 through 476 of this Second

16   Amended Complaint as if fully alleged herein.

17       478.   At all times relevant hereto, Mr. Freeney and Roof Group reposed their

18   trust and confidence in Stern (posing as Millar), and Stern encouraged, accepted and

19   voluntarily assumed such trust and confidence, as a result of which he owed Mr.

20   Freeney and Roof Group certain fiduciary duties, including: (a) the duty of undivided

21   loyalty; (b) the duty to exercise due care; (c) the duty to make full disclosure; and (d)

22   the duty to maintain client confidences.

23       479.   Beginning in or about February 2010, Stern breached these fiduciary

24   duties, as described further in paragraphs 130 through 348 of this Second Amended

25   Complaint.

26       480.   Beginning in or about February 2010, BAC, BANA and MLPFS, and

27   each of them, aided and abetted Stern in breaching his fiduciary duties to Mr. Freeney

28   and Roof Group by knowingly:

**SECOND AMENDED COMPLAINT**

183128.11

(a)     Giving him substantial assistance and encouragement, knowing that his conduct constituted a breach of his fiduciary duties to Mr. Freeney and Roof Group; and

(b)     Giving him substantial assistance in breaching his fiduciary duties to Mr. Freeney and Roof Group, which conduct itself constituted breaches of BAC, BANA and MLPFS' legal duties to Mr. Freeney and Roof Group not to deceive, defraud, or deal unfairly with them.

481.    Such assistance and encouragement included, among other things:

(1)     Referring Stern to Mr. Freeney as a consultant and potential investor in Mr. Freeney's business ventures;

(2)     Introducing Stern to Mr. Freeney and his friends and associates under the false names "Michael Millar," "David Millar" and "David Michael Millar";

(3)     Falsely representing that Stern was a wealthy and successful Miami Beach businessman;

(4)     Falsely representing that Stern was the grandson of pharmaceutical mogul Dr. Phillip Frost;

(5)     Falsely representing that Stern was a consultant for BofA/Merrill Lynch;

(6)     Falsely representing that Stern had $30 million on deposit at BofA/Merrill Lynch;

(7)     Falsely representing that Stern owned a private jet and a private yacht;

(8)     Falsely representing that Stern lived in the Bahamas;

(9)     Falsely representing that Stern intended to invest $7.0 million in Roof Group;

(10)    Falsely representing that Stern had the experience to oversee the build out of RSLA;

(11)    Concealing Stern's relationship with Weinberg;

(12)    Concealing that Stern had borrowed substantial sums from BOCK, Weinberg and Weinberg's family and not repaid most of those loans;

**SECOND AMENDED COMPLAINT**

183128.11

(13)   Concealing that all of Stern's real estate assets were in bankruptcy, receivership, foreclosure, or over-encumbered;

(14)   Concealing that Stern and his wife had declared personal bankruptcy with reported debts of $65 million and assets having a negative value;

(15)   Concealing that BOCK was a creditor in one of Stern's bankruptcies in the amount of $500,000;

(16)   Concealing that Stern had substantial gambling debts;

(17)   Concealing that Stern had not paid his income taxes in many years;

(18)   Concealing Stern's many legal problems, including that he was a defendant in more than 20 civil lawsuits brought against him by defrauded partners, investors and banks, that a writ for his arrest had issued in one of those actions, and that he had been held in contempt in the bankruptcy proceedings;

(19)   Concealing that Stern had a long history of criminal conduct that included bribery of public officials, forgery, theft of loan proceeds, passing worthless checks and witness tampering;

(20)   Paying to incorporate ARC;

(21)   Concealing that ARC was a sham company that was formed just shortly after Stern had been introduced to Mr. Freeney;

(22)   Improperly delegating responsibility to Stern for negotiating the return of Mr. Freeney's deposit with the W Hotel, disposal of the North Carolina Land Investment, return of Mr. Freeney's investments in Success Trade and CFP, and the purchases of Altounian and Donnelly's interests in Roof Group;

(23)   Transferring more than $160,000 from one of Mr. Freeney's brokerage accounts to ARC without Mr. Freeney's authorization or knowledge;

(24)   Falsely representing that Stern would obtain the liquor license for RSLA;

(25)   Falsely representing that Stern would negotiate with CIM for better lease terms and a lower rent;

(26)   Giving Stern access to Mr. Freeney's private and confidential personal

179

**SECOND AMENDED COMPLAINT**

1  and financial information and records;

2      (27)   Opening the BofA Roof Group account under false pretenses;

3      (28)   Giving Stern the confidential account access information for the

4  BofA Roof Group account;

5      (29)   Executing hundreds of suspicious wire transfers from this account that

6  Stern had originated online;

7      (30)   Repeatedly overriding the account's security features to permit Stern to

8  make these wire transfers;

9      (31)   Not investigating highly suspicious transactions in the BofA Roof Group

10  account and not filing Suspicious Activity Reports or notifying the federal authorities

11  of these transactions, in violation of the Bank Secrecy Act;

12      (32)   Allowing the BofA Roof Group account to remain open despite concerns

13  expressed by BANA employees that the account documentation was deficient;

14      (33)   Assisting in the liquidation of Mr. Freeney's existing investments to

15  generate additional funds to misappropriate; and

16      (34)   Selling the securities that BOCK had purchased without Mr. Freeney's

17  authorization or knowledge a few weeks earlier, at a significant loss to Mr. Freeney, to

18  generate additional funds to misappropriate.

19      482.   As a direct and proximate result of BAC, BANA and MLPFS aiding and

20  abetting these breaches of fiduciary duty, Mr. Freeney and Roof Group were damaged

21  in an amount to be determined at trial, but estimated to be in excess of $20 million.

22      483.   In aiding and abetting these breaches of fiduciary duty, BAC, BANA and

23  MLPFS acted fraudulently, oppressively, maliciously and with a willful and conscious

24  disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and

25  punitive damages pursuant to California Civil Code section 3294.

26  //

27  //

28  //

**SECOND AMENDED COMPLAINT**

183128.11

## THIRTEENTH CAUSE OF ACTION

### (For Negligent Misrepresentation)

### (By Plaintiffs Freeney and Roof Group

### Against Defendants BAC, BANA and MLPFS)

484.   Plaintiffs repeat and reallege paragraphs 1 through 483 of this Second Amended Complaint as if fully alleged herein.

485.   Beginning in or about January 2010, BAC, BANA and MLPFS, and each of them, made and caused others to make the following false representations concerning important facts, intending that Mr. Freeney and Roof Group would rely upon those representations, but without reasonable grounds for believing the representations to be true:

(a)   Stern's name was "Michael Millar," "David Millar," or "David Michael Millar";

(b)   Stern was a wealthy and successful real estate developer and businessman;

(c)   Stern owned a private jet;

(d)   Stern owned a private yacht;

(e)   Stern was a consultant for BofA;

(f)   Stern had $30 million on deposit at BofA;

(g)   Stern was the grandson of pharmaceutical mogul Dr. Phillip Frost, the Chairman of Teva Pharmaceuticals; and

(h)   Stern had the financial wherewithal to invest $7.0 million in RSLA.

486.   Mr. Freeney and Roof Group reasonably relied upon these false representations.

487.   As a direct and proximate result of these false representations, Mr. Freeney and Roof Group were damaged in an amount to be determined at trial, but which is estimated to be in excess of $20 million.

181

**SECOND AMENDED COMPLAINT**

183128.11

## FOURTEENTH CAUSE OF ACTION

### (For Professional Negligence)

### (By Plaintiffs Freeney and Roof Group Against

### Defendants BAC, BANA, MLPFS and BOCK)

488.   Plaintiffs repeat and reallege paragraphs 1 through 487 of this Second Amended Complaint as if fully alleged herein.

489.   At all times relevant hereto, BAC, BANA, MLPFS and BOCK, and each of them, owed Mr. Freeney a duty to use such skills, learning, prudence and diligence as a reasonable professional would use under like circumstances (the "duty of due care").

490.   Beginning in or about January 2010, BAC, BANA, MLPFS and BOCK, and each of them, breached this duty of due care to Mr. Freeney by, among other things:

(1)   Appointing Weinberg as Mr. Freeney's principal contact with BofA/Merrill Lynch, and authorizing and permitting her to serve as his private banker, financial manager and investment advisor;

(2)   Authorizing and permitting Weinberg to falsely represent herself as a "Senior Financial Advisor" for "Merrill Lynch Global Wealth Management," a "Vice President of Private Wealth Management at Merrill Lynch," a "Financial Consultant" for "Merrill Lynch Wealth Management," and a "Senior Vice President" with "Global Wealth Management";

(3)   Referring Mr. Freeney to Stern (posing as Michael Millar) for consulting services and as a potential investor in Mr. Freeney's business ventures;

(4)   Referring Mr. Freeney to Weinberg's brother for insurance services;

(5)   Referring Mr. Freeney to the Florida Attorney for legal services;

(6)   Failing to protect and maintain the privacy and confidentiality of Mr. Freeney's personal, identifying, financial and medical information and records;

(7)   Authorizing and permitting Weinberg to transfer funds from one of

183128.11

Mr. Freeney's brokerage accounts without his authorization or knowledge;

(8)     Authorizing and permitting Weinberg to transfer over $160,000 from one of Mr. Freeney's brokerage accounts to ARC;

(9)     Authorizing and permitting BOCK to purchase securities with approximately $890,000 of Mr. Freeney's funds, without Mr. Freeney's authorization or knowledge, and to sell those securities at a substantial loss to Mr. Freeney a short time later, also without his authorization or knowledge;

(10)    Convincing Mr. Freeney to purchase $55 million in unsuitable and worthless life insurance;

(11)    Convincing Mr. Freeney to increase his ownership interest in Roof Group to 51 percent by doubling his investment in RSLA;

(12)    Convincing Mr. Freeney to purchase Altounian and Donnelly's interests in Roof Group for more than $1.1 million, even though those interests were virtually worthless;

(13)    Not reporting the entry of the Faraches' $1.7 million judgment against Weinberg to FINRA and the SEC;

(14)    Doing nothing to assist Mr. Freeney close on his W Hotel condominium unit or obtain return of his $1.2 million deposit;

(15)    Doing nothing to dispose of the North Carolina Land Investment and failing to pay the HOA dues;

(16)    Opening the BofA Roof Group account at Weinberg's request;

(17)    Opening the BofA Roof Group account, and allowing it to remain open, without required documentation, appropriate authorization, or sufficient due diligence;

(18)    Giving Weinberg and Stern the confidential account access information for the BofA Roof Group account;

(19)    Executing hundreds of highly suspicious wire transfers from the BofA Roof Group account to unknown recipients and recipients with no apparent relationship to RSLA;

**SECOND AMENDED COMPLAINT**

(20)   Not investigating any of these highly suspicious wire transfers;

(21)   Allowing the BofA Roof Group account to remain open and not changing the account access information following Weinberg's departure from the bank;

(22)   Repeatedly overriding the account's security features, at Weinberg's request, to allow wire transfers from the account originating online; and

(23)   Failing to prevent Stern and Weinberg from using the BofA Roof Group account to misappropriate and launder millions of dollars of Mr. Freeney and Roof Group's funds.

491.   As a direct and proximate result of these breaches of the duty of due care, Mr. Freeney was damaged in an amount to be determined at trial.

## FIFTEENTH CAUSE OF ACTION

### (For Negligent Hiring, Retention and Supervision of Weinberg)

### (By Plaintiffs Freeney and Roof Group Against

### Defendants BAC, BANA and MLPFS)

492.   Plaintiffs repeat and reallege paragraphs 1 through 491 of this Second Amended Complaint as if fully alleged herein.

493.   At all times relevant hereto, Weinberg was unfit and incompetent to serve as Mr. Freeney's private banker, financial manager and investment advisor and Roof Group and RSLA's de facto CFO, and had a propensity to engage in criminal schemes with Stern that cheated and defrauded others, as described further in paragraphs 62 through 358 of this Second Amended Complaint.

494.   In hiring, retaining and supervising Weinberg, BAC, BANA and MLPFS knew, or should have known, of Weinberg's unfitness, incompetence and propensity to engage in criminal conduct with Stern.  In particular, BAC, BANA and MLPFS knew, or should have known, that, among other things:

(1)   Weinberg had been out of the financial services industry for several years and all of her registrations and licenses had lapsed;

(2)   Weinberg was not a registered broker-dealer or investment adviser, and

**SECOND AMENDED COMPLAINT**

1    she had not taken any of the examinations to become registered;

2    (3)    Weinberg had a close relationship with Stern, who had been exposed as a

3    criminal and a financial predator;

4    (4)    Weinberg had been employed by Stern Realty prior to joining

5    BofA/Merrill;

6    (5)    BOCK, Weinberg, and her family had loaned Stern over $1.0 million,

7    most of which he had not repaid;

8    (6)    Weinberg had helped Stern operate his Beach Place Hotel, which was in

9    bankruptcy;

10    (7)    Weinberg and BOCK were helping Stern find new investors for his

11    distressed real estate holdings, all of which were in bankruptcy, receivership,

12    foreclosure, or over-encumbered;

13    (8)    BOCK, was a creditor in one of Stern's bankruptcies in the amount of

14    $500,000;

15    (9)    Weinberg was accused of aiding and abetting Stern in committing

16    bankruptcy fraud and intimidating a witness who had alleged that Stern had forged her

17    signature to loan forgiveness documents;

18    (10)    Weinberg had guaranteed one of Stern's debts by issuing NSF checks

19    totaling over $400,000;

20    (11)    A judgment had been entered against Weinberg for approximately $1.7

21    million for issuing those checks;

22    (12)    The judgment debtors in that case were seeking to garnish Weinberg's

23    wages and bank accounts;

24    (13)    Weinberg and BOCK were involved in an acrimonious divorce, in which

25    she was alleging that he owed her more than $1.0 million in unpaid alimony and child

26    support;

27    (14)    Weinberg was romantically involved with Stern, who was married at the

28    time;

**SECOND AMENDED COMPLAINT**

183128.11

(15)   Weinberg had stayed with Stern in Uruguay, to which he had fled to avoid process and being deposed;

(16)   Weinberg and BOCK had paid for Stern's bankruptcy attorneys;

(17)   Weinberg considered Stern her fiancé;

(18)   Weinberg was falsely representing herself as a "Senior Financial Advisor" for "Merrill Lynch Global Wealth Management," a "Vice President of Private Wealth Management at Merrill Lynch," and a "Financial Consultant" with "Merrill Lynch Wealth Management";

(19)   Weinberg had referred Mr. Freeney to Stern for consulting services;

(20)   Weinberg had falsely represented that Stern was a consultant for BofA/Merrill Lynch;

(21)   Weinberg had falsely represented that Stern's name was Michael Millar, that he was a wealthy and successful Miami Beach businessman, that he owned a private jet and a private yacht, that he had $30 million on deposit with BofA/Merrill Lynch, and that he was interested in investing in Mr. Freeney's business ventures;

(22)   Weinberg helped Stern incorporate ARC;

(23)   Weinberg referred Mr. Freeney to her brother for insurance services, who, at the time, was not licensed to sell insurance;

(24)   Weinberg had convinced Mr. Freeney to purchase $55 million in life insurance, notwithstanding that he already had $13 million in life insurance policies;

(25)   Weinberg had referred Mr. Freeney to the Florida Attorney, whom Stern owed $100,000;

(26)   Weinberg transferred more than $160,000 from one of Mr. Freeney's brokerage accounts to ARC without Mr. Freeney's authorization or knowledge and using false justifications for the transfers;

(27)   Weinberg shared with Stern Mr. Freeney's private and confidential personal, identifying financial and account information and records;

(28)   Weinberg had no qualifications, expertise, or experience to oversee the

186

**SECOND AMENDED COMPLAINT**

183128.11

1   build out, staffing, opening or operations of RSLA;

2        (29)   Weinberg had become the de facto CFO of Roof Group and RSLA even

3   though she had no ability to maintain the books and records or prepare financial

4   statements, budgets and projections for a restaurant;

5        (30)   Weinberg, together with Stern, had convinced Mr. Freeney that he

6   needed to oust Altounian and Donnelly as the managing members of Roof Group and

7   to purchase their interests in the company for approximately $1.1 million, even though

8   their interests were virtually worthless;

9        (31)   Weinberg had requested that Del Campo open a BANA account in the

10   name of Roof Group and to give her the confidential account access information, even

11   though she was not a signatory on the account;

12        (32)   Weinberg gave the confidential account access information for the

13   BofA Roof Group account to Stern;

14        (33)   Weinberg had repeatedly requested that Del Campo override the security

15   hold on the account;

16        (34)   Weinberg was opening accounts at others banks in the name of

17   Mr. Freeney and Roof Group and making herself a signatory on those accounts;

18        (35)   Weinberg had formed her own company, GWM, with a name

19   confusingly similar to that of GWIM and MLGWM;

20        (36)   When she left the bank, Weinberg took with her all of Mr. Freeney's

21   private and confidential personal, financial, account and medical records; and

22        (37)   During her tenure at BofA/Merrill Lynch, Weinberg entirely disregarded

23   BAC's policies, procedures and code of ethics.

24        495.   At all times relevant hereto, BAC, BANA and MLPFS knew, or should

25   have known, that Weinberg's unfitness, incompetence and propensity to engage in

26   criminal conduct with Stern created particular risks for Mr. Freeney and Roof Group,

27   including that she would engage in a criminal scheme with Stern to cheat and defraud

28   them, misappropriate their funds, convert their assets and mismanage their finances,

**SECOND AMENDED COMPLAINT**

1  which, as described in detail in this Second Amended Complaint, is exactly what she

2  did.

3      496.   As a direct and proximate result of Weinberg's unfitness, incompetence

4  and propensity to engage in criminal conduct with Stern, and BAC, BANA and

5  MLPFS' negligence in hiring, retaining and supervising her, Mr. Freeney and

6  Roof Group were damaged in an amount to be determined at trial, but which is

7  estimated to be in excess of $20 million.

8                     **SIXTEENTH CAUSE OF ACTION**

9                      **(For Negligent Referral of Stern)**

10                **(By Plaintiffs Freeney and Roof Group**

11              **Against Defendants BAC, BANA and MLPFS)**

12     497.   Plaintiffs repeat and reallege paragraphs 1 through 496 of this Second

13  Amended Complaint as if fully alleged herein.

14     498.   At all times relevant hereto, BAC, BANA and MLPFS owed Mr. Freeney

15  and Roof Group the duty not to refer them to third parties who BAC, BANA and

16  MLPFS knew, or should have known, had a propensity to engage in criminal conduct

17  that could cause harm to Mr. Freeney and Roof Group.

18     499.   At all times relevant hereto, Stern had a propensity to engage in criminal

19  schemes to cheat and defraud others by gaining their trust and confidence and then,

20  among other things, misappropriating their funds, converting their assets, making false

21  representations and promises, concealing material facts, forging and falsifying

22  documents and using false identities, as described further in paragraphs 62 through

23  358 of this Second Amended Complaint.

24     500.   In referring Stern (posing as Millar) to Mr. Freeney and Roof Group to

25  provide consulting services and as a potential investor in Mr. Freeney's business

26  ventures, BAC, BANA and MLPFS knew, or should have known, that Stern was a

27  financial predator who had a propensity to engage in criminal schemes that cheated

28  and defrauded others.  In particular, BAC, BANA and MLPFS knew, or should have

**SECOND AMENDED COMPLAINT**

183128.11

known that, among other things:

(1)     Stern and his then wife had declared personal bankruptcy just a year prior to Mr. Freeney becoming a BofA/Merrill Lynch client, with reported debts exceeding $65 million and assets having a negative value;

(2)     Stern had been found in contempt by the Bankruptcy Court for willfully violating court orders requiring him to produce documents and appear to provide testimony;

(3)     Stern was a defendant in more than 20 civil lawsuits brought by defrauded partners, investors and banks;

(4)     Evidence introduced in those lawsuits established that Stern had forged documents, falsified loan applications, misappropriated millions of dollars in loan proceeds, and engaged in witness tampering and intimidation;

(5)     A writ of bodily attachment had issued for Stern's arrest in one of those lawsuits for repeatedly failing to appear at his deposition;

(6)     Stern had fled to Uruguay to evade process and avoid being deposed, and, while there, cheated his stepson out of a large inheritance;

(7)     Stern had defrauded an elderly Florida couple, Rita Star and Ivar Rose, out of more than $20 million by, among other things, forging their names to dozens of documents;

(8)     Stern had previously been caught paying over $100,000 in bribes to Miami Beach city officials and only escaped prosecution by cooperating with the State Attorney;

(9)     Stern had sizeable gambling debts;

(10)    Stern had not paid any income taxes in years;

(11)    Stern was romantically involved with Weinberg, although he was still married;

(12)    Stern had borrowed more than $1.0 million from BOCK, Weinberg and her family and had not repaid most of those loans;

**SECOND AMENDED COMPLAINT**

183128.11

1      (13)   Stern had listed BOCK as a creditor in one of his bankruptcies in the

2  amount of $500,000;

3      (14)   Stern was using the false names "Michael Millar," "David Millar" and

4  "David Michael Millar";

5      (15)   Stern was falsely representing himself to be a wealthy and successful

6  Miami Beach businessman who wanted to help Mr. Freeney get his financial affairs in

7  order and who was interested in investing $7.0 million in Roof Group and RSLA;

8      (16)   Stern was falsely representing that he owned a private jet and that

9  Mr. Freeney could use it for only the cost of the fuel;

10      (17)   Stern formed ARC, a sham company, within just a few days of meeting

11  Mr. Freeney;

12      (18)   Stern had obtained access to all of Mr. Freeney's private and confidential

13  personal, identifying and financial information and records;

14      (19)   Stern was falsely representing that he had the qualifications, expertise

15  and experience to assist Weinberg in overseeing the build out, staffing, opening and

16  operations of RSLA;

17      (20)   Stern had no ability to help Mr. Freeney recoup his $1.2 million deposit

18  from the W Hotel or dispose of the North Carolina Land Investment; and

19      (21)   Stern was in desperate financial straits and would naturally view

20  someone like Mr. Freeney – young, wealthy, trusting and financially naïve – as a

21  prospective target.

22      501.   At all times relevant hereto, BAC, BANA and MLPFS knew, or should

23  have known, that Stern's propensity to engage in criminal conduct created particular

24  risks for Mr. Freeney and Roof Group, including that he would engage in a criminal

25  scheme to cheat and defraud them, misappropriate their funds and convert their assets,

26  which, as described in detail in this Second Amended Complaint, is exactly what he

27  did.

28      502.   As a direct and proximate result of BAC, BANA and MLPFS' negligent

**SECOND AMENDED COMPLAINT**

183128.11

1  referral of Stern to Mr. Freeney and Roof Group, they were damaged in an amount to
2  be determined at trial, but which is estimated to be in excess of $20 million.

### SEVENTHEETH CAUSE OF ACTION

### (For an Accounting by BAC, BANA and MLPFS)

### (By Plaintiffs Freeney and Roof Group Against BAC, BANA and MLPFS)

6  503.   Plaintiffs repeat and reallege paragraphs 1 through 502 of this Second
7  Amended Complaint.

8  504.   The amount of funds transferred, deposited, credited and/or debited to
9  accounts opened and maintained by BAC, BANA and/or MLPFS in the name, on
10  behalf, or for the benefit of Mr. Freeney, including, without limitation, brokerage,
11  bank and credit card accounts, and the disposition of those funds, is unknown at this
12  time by Mr. Freeney and can only be determined with certainty by BAC, BANA and
13  MLPFS.

14  505.   The amount of funds transferred, deposited, credited and/or or debited to
15  accounts opened and maintained by BAC, BANA and MLPFS in the name, on behalf,
16  or for the benefit of Roof Group, including, without limitation, checking, savings and
17  credit card accounts, and the disposition of those funds, is unknown at this time by
18  Roof Group and can only be determined with certainty by BAC, BANA and MLPFS.

19  506.   The disposition of any securities and other investments, transferred,
20  purchased, sold, or otherwise liquidated by BAC, BANA or MLPFS in the name, on
21  behalf, or for the benefit of Mr. Freeney, and the disposition of the proceeds of any
22  such sale or other liquidation, is unknown at this time by Mr. Freeney and can only be
23  determined with certainty by BAC, BANA and MLPFS.

24  507.   Therefore, the Court should order BAC, BANA and MLPFS to provide
25  Mr. Freeney with a complete and accurate accounting of all of the aforementioned
26  accounts, securities and other investments.

27  //
28  //

**SECOND AMENDED COMPLAINT**

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

**As to the First Cause of Action for Conspiracy to Defraud:**

    1.    For compensatory and special damages; and

    2.    For punitive and exemplary damages.

**As to the Second Cause of Action for Fraud:**

    1.    For compensatory and special damages; and

    2.    For punitive and exemplary damages.

**As to the Third Cause of Action for Civil RICO – Criminal Enterprise:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages;

    3.    For punitive and exemplary damages; and

    4.    For Plaintiffs' reasonable attorney's fees.

**As to the Fourth Cause of Action RICO Conspiracy – Criminal Enterprise:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages;

    3.    For punitive and exemplary damages; and

    4.    For Plaintiffs' reasonable attorney's fees.

**As to the Fifth Cause of Action for Civil RICO – Victim Enterprise:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages;

    3.    For punitive and exemplary damages; and

    4.    For Plaintiffs' reasonable attorney's fees.

**As to the Sixth Cause of Action for Civil RICO – Victim Enterprise:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages;

    3.    For punitive and exemplary damages; and

**SECOND AMENDED COMPLAINT**

183128.11

1    4.    For Plaintiffs' reasonable attorney's fees.

2    **As to the Seventh Cause of Action for RICO Conspiracy – Victim Enterprise:**

3    1.    For compensatory and special damages;

4    2.    For the trebling of those damages;

5    3.    For punitive and exemplary damages; and

6    4.    For Plaintiffs' reasonable attorney's fees.

7    **As to the Eighth Cause of Action for Aiding and Abetting Conversion:**

8    1.    The value of the funds converted with interest from that time, or, if

9         greater, an amount sufficient to compensate Mr. Freeney and Roof Group

10        for the losses that were the natural, reasonable and proximate result of

11        BANA's wrongful acts;

12   2.    For punitive and exemplary damages; and

13   3.    For fair compensation for the time and money Mr. Freeney and

14        Roof Group have expended in pursuing the return and recovery of their

15        converted funds.

16   **As to the Ninth Cause of Action for Violation of California – Penal Code**

17   **Section 496:**

18   1.    For compensatory and special damages;

19   2.    For the trebling of those damages; and

20   3.    For Plaintiffs' reasonable attorney's fees.

21   **As to the Tenth Cause of Action for Breach of Fiduciary Duty:**

22   1.    For compensatory and special damages;

23   2.    For compounding of prejudgment interest; and

24   3.    For punitive and exemplary damages.

25   **As to the Eleventh Cause of Action for Aiding and Abetting Breach of**

26   **Fiduciary Duty by Weinberg:**

27   1.    For compensatory and special damages;

28   2.    For compounding of prejudgment interest; and

**SECOND AMENDED COMPLAINT**

1    3.     For punitive and exemplary damages.

2  **As to the Twelfth Cause of Action for Aiding and Abetting Breach of**

3  **Fiduciary Duty by Stern:**

4    1.     For compensatory and special damages;

5    2.     For compounding of prejudgment interest; and

6    3.     For punitive and exemplary damages.

7  **As to the Thirteenth Cause of Action for Negligent Misrepresentation:**

8    1.     For compensatory and special damages.

9  **As to the Fourteenth Cause of Action for Professional Negligence:**

10    1.     For compensatory and special damages.

11  **As to the Fifteenth Cause of Action for Negligent Hiring,**

12  **Retention and Supervision of Weinberg:**

13    1.     For compensatory and special damages.

14  **As to the Sixteenth Cause of Action for Negligent Referral of Stern:**

15    1.     For compensatory and special damages.

16  **As to the Seventeenth Cause of Action for an Accounting:**

17    1.     For an order requiring the accountings as described in the Seventeenth

18         Cause of Action.

19  **For All Causes of Action:**

20    1.     For prejudgment interest at the maximum rate permitted by law;

21    2.     For costs of suit; and

22    3.     For such other and further relief as the Court may deem just and proper.

23

24  Dated:  August 28, 2015          **ISAACS FRIEDBERG & LABATON LLP**

25

26         By:  */s/ Jeffrey Isaacs*
                 _____
                 JEFFREY B. ISAACS, ESQ.

27         *Attorneys for Plaintiffs Dwight J. Freeney and Roof Group LLC*

28

194
**SECOND AMENDED COMPLAINT**

183128.11

# DEMAND FOR JURY TRIAL

Plaintiffs Dwight J. Freeney and Roof Group LLC hereby request a jury trial on all issues properly triable to a jury.

Dated:  August 28, 2015          **ISAACS FRIEDBERG & LABATON LLP**

By:  */s/ Jeffrey Isaacs*
_____
JEFFREY B. ISAACS, ESQ.

*Attorneys for Plaintiffs Dwight J. Freeney and Roof Group LLC*

**SECOND AMENDED COMPLAINT**

183128.11