Jeffrey B. Isaacs, Esq., SBN 117104
Jerome H. Friedberg, Esq., SBN 125663
Adam S. Kargman, Esq., SBN 212109
Oren Rosenthal, Esq., SBN 243110
**ISAACS | FRIEDBERG LLP**
555 South Flower Street, Suite 4250
Los Angeles, California 90071
Telephone: (213) 929-5550/Facsimile: (213) 955-5794
Email:  jisaacs@ifcounsel.com
            jfriedberg@ifcounsel.com
            akargman@ifcounsel.com
            orosenthal@ifcounsel.com

*Attorneys for Plaintiffs Dwight J. Freeney and Roof Group LLC*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DWIGHT J. FREENEY,<br>    an individual;<br>ROOF GROUP LLC,<br>    a California limited liability company;<br><br>              Plaintiffs,<br><br>         vs.<br><br>BANK OF AMERICA CORPORATION,<br>    a Delaware corporation;<br>BANK OF AMERICA, NATIONAL ASSOCIATION,<br>    a nationally chartered banking association;<br>MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,<br>    a Delaware corporation; and<br>MICHAEL J. BOCK,<br>    an individual,<br><br>              Defendants. | Case No. 2:15-CV-02376-JGB-PJW<br><br>**THIRD AMENDED COMPLAINT FOR MONETARY AND OTHER RELIEF FOR:**<br><br>1)  **CONSPIRACY TO DEFRAUD;**<br><br>2)  **FRAUD;**<br><br>3)  **AIDING AND ABETTING CONVERSION;**<br><br>4)  **VIOLATION OF CALIFORNIA PENAL CODE SECTION 496;**<br><br>5)  **VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1962(b), (c) & (d));**<br><br>6)  **BREACH OF FIDUCIARY DUTY;**<br><br>7)  **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br><br>8)  **NEGLIGENT MISREPRESENTATION;** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**9)  PROFESSIONAL NEGLIGENCE;**

**10)  NEGLIGENT HIRING, RETENTION AND SUPERVISION;**

**11)  NEGLIGENT REFERRAL; and**

**12)  AN ACCOUNTING.**

**DEMAND FOR JURY TRIAL**

Complaint Filed:     Feb. 23, 2015
FAC Filed:              Aug. 14, 2015
SAC Filed:             Sep. 10, 2015
Trial Date:             None Set

---

**THIRD AMENDED COMPLAINT**

188650.4

# TABLE OF CONTENTS

**PAGE**

I.   PRELIMINARY STATEMENT ........................................................ 1

II.   THE PARTIES .................................................................. 5

III.   JURISDICTION AND VENUE ....................................................... 6

IV.   BACKGROUND ................................................................. 7

  A.   Relevant Laws and Reporting Requirements....................................7

  B.   Dwight Freeney............................................................. 9

  C.   Roof Group and RSLA. ..................................................... 10

  D.   BofA, BAC, BANA and MLPFS. .............................................. 12

  E.   BAC's Acquisition of Merrill Lynch and the Ensuing Corporate Restructuring....................................... 13

  F.   BAC Absorbs and Becomes Successor-in-Interest to Merrill Lynch............. 15

  G.   BAC Creates the Global Wealth & Investment Management Division and the Merrill Lynch Global Wealth Management Subdivision. ............................................................. 15

  H.   Michael Stern (aka Michael Millar, David Michael Millar)......................... 20

  I.   Michael BOCK and Eva Weinberg. .......................................... 26

    1.   Professional Backgrounds and Relationships to Stern. ...................... 26

    2.   BOCK's Employment with BAC, BANA and MLFPS. ..................... 29

    3.   Weinberg's Employment with BAC, BANA and MLPFS. .................. 29

  J.   David Sugarman............................................................. 31

  K.   Matthew Liebman. ......................................................... 32

  L.   Jodi Del Campo (nka Jodi Bowles). .......................................... 33

  M.   Weinberg's Brother. ....................................................... 33

  N.   The Florida Attorney and the Florida Law Firm. ............................. 34

V.   THE SCHEME TO DEFRAUD ...................................................... 35

  A.   Sugarman Recruits Mr. Freeney as a Client. ................................. 35

  B.   BOCK and Weinberg Recruit Mr. Freeney as a Client................................ 36

i

**THIRD AMENDED COMPLAINT**

188650.4

C.  Weinberg Refers Mr. Freeney to "Michael Millar" for Consulting Services and as a Potential Investor in RSLA. ............................... 38

D.  Liebman and BOCK Give Weinberg Exclusive Authority to Serve as Mr. Freeney's Wealth Manager. ....................................... 43

E.  Mr. Freeney Becomes a BofA/Merrill Lynch Client and Transfers Management of His Assets, Investments and Income to BAC and MLPFS. ................................................................................. 44

F.  The Creation of Arms Reach Consulting LLC. ................................ 47

G.  Weinberg Refers Mr. Freeney to Her Brother for Insurance Services. ........... 48

H.  Weinberg Refers Mr. Freeney to the Florida Attorney and the Florida Law Firm for Legal Services ............................................... 50

I.  Weinberg's Misappropriation of Funds from Mr. Freeney's Brokerage Account. ........................................................................ 53

J.  BOCK's Unauthorized Purchases of Securities. ............................... 55

K.  Stern and Weinberg's Use of a Private Jet in Furtherance of the Scheme to Defraud. ............................................................... 56

L.  Weinberg and Weinberg's Brother Fraudulently Induce Mr. Freeney to  Purchase $55 Million in Unsuitable and Worthless Life Insurance. ......................................................................................... 58

M.  Weinberg, Aided and Abetted by Stern, Fraudulently Assumes Management Control of Roof Group and RSLA's Finances. ...................... 61

N.  Weinberg and Stern Fraudulently Induce Mr. Freeney to Agree to Buy Out Altounian and Donnelly's Worthless Interests in Roof Group for $1.1 Million. .......................................................... 63

O.  The Hiring of Sal and Stacy Feli. ...................................................... 65

P.   BANA Opens the BofA Roof Group Account. ................................. 67

Q.  Weinberg Opens the Citibank Accounts. ........................................ 72

R.  Weinberg Opens the Wells Fargo Roof Group Accounts. ............... 73

S.  Weinberg and Stern's Mounting Legal Problems in Florida. ........... 74

T.  Weinberg and Stern, Aided and Abetted by BOCK, Relocate the Scheme from Florida to California. ................................................... 76

    1.   *BOCK Assists Weinberg in Relocating to California and Taking Mr. Freeney as a Client.* ........................................... 76

    2.   *Weinberg Creates Global Wealth Management LLC.* ......... 77

ii

**THIRD AMENDED COMPLAINT**

188650.4

3.   *Weinberg and Stern Lease the Hancock Park House from Which They Carry On the Scheme.* ...................................... 79

4.   *BOCK's Sales of the Securities He Had Previously Purchased Without Mr. Freeney's Knowledge.* ....................................... 80

5.   *Weinberg's Secret Resignation from BofA/Merrill Lynch.* .................. 81

6.   *Mr. Freeney and Roof Group Continue as Clients of BofA/Merrill Lynch.* ............................................................. 85

U.   Weinberg Assumes Day-to-Day Operational Control of RSLA. ................... 86

V.   Fraudulent and Unauthorized Transfers of Mr. Freeney and Roof Group's Funds to and from the BofA Roof Group Account. .............. 91

W.   Stern's Use of RSLA to Disquise Wire Transfers to ARC. ........................... 94

X.   BOCK and Weinberg, Acting in Concert with Stern, Liquidate Mr. Freeney's Existing Investments to Generate Additional Funds to Misappropriate. ................................................................. 95

1.   *Advisors Disciplined.* ......................................................... 96

2.   *Success Trade.* ................................................................. 96

3.   *CFP.* ............................................................................. 97

4.   *Pacific Life Annuity.* ....................................................... 97

5.   *American Realty.* ............................................................. 98

Y.   Weinberg and Stern Secretly Marry. ........................................... 98

Z.   Weinberg and Stern's Thefts From the Wells Fargo Roof Group Accounts. .............................................................. 99

AA.   The Termination of the Felis' Employment and Their $5.0 Million Lawsuit Against Roof Group and Others ....................... 99

BB.   Mr. Freeney Completes the Buy Outs of Altounian and Donnelly's Interests in Roof Group .............................................. 100

CC.   The Snap Advances Transactions. ............................................. 101

DD.   The W Hotel Investment. ..................................................... 103

EE.   The North Carolina Land Investment ....................................... 104

FF.   Efforts at Cover Up and to Obstruct Justice. .............................. 106

1.   *Weinberg and Stern's Efforts to Misdirect Scrutiny.* ....................... 106

2.   *Weinberg and Stern's Creation of False and Forged Documents.* ......................................................... 107

iii

**THIRD AMENDED COMPLAINT**

3.   *Weinberg and Stern's Attempted Destruction and Secreting of Evidence.* ........................................................................ 109

VI.   **AFTERMATH OF THE SCHEME.** ........................................................................ 110

A.   Weinberg and Stern's Arrests. ........................................................................ 110

B.   The Criminal Prosecutions. ........................................................................ 111

C.   Mr. Freeney's Discovery of Weinberg and Stern's Thefts From the BofA Roof Group Account. ........................................................................ 113

D.   Weinberg's Fraudulent Conveyance of Her House to BOCK. ........................................................................ 114

E.   BofA/Merrill Lynch's Attempts to Cover Up Their Employees' Wrongdoing. ........................................................................ 115

F.   BAC, BANA and MLPFS' Ratification of the Conduct of Their Present and Former Employees and Agents. ........................................................................ 116

G.   Mitigation of Losses. ........................................................................ 118

1.   *The Closure of RSLA.* ........................................................................ 118

2.   *Settlement of the W Hotel Dispute.* ........................................................................ 118

3.   *Repayment of the North Carolina Loan.* ........................................................................ 119

H.   Tolling of the Statute of Limitations ........................................................................ 119

1.   *The Tolling Agreements.* ........................................................................ 119

2.   *Delayed Discovery and Fraudulent Concealment.* ........................................................................ 119

VII.   **THE COURT HAS PERSONAL JURISDICTION OVER BOCK.** ........................................................................ 123

A.   BOCK Has Been Registered in California as a Broker-Dealer for 30 Years and Does Business in California ........................................................................ 110

B.   BOCK Aided and Abetted Weinberg and Stern in Relocating the Scheme From Florida to California. ........................................................................ 111

C.   BOCK'S Continued Participation in the Scheme After It Was Relocated to California ........................................................................ 128

D.   BOCK's California Contacts After Aiding and Abetting Weinberg and Stern in Relocating the Scheme to California. ........................................................................ 114

E.   BOCK's Conduct Directed at Roof Group and RSLA in California. ........................................................................ 115

**THIRD AMENDED COMPLAINT**

**FIRST CAUSE OF ACTION**
**(For Conspiracy to Defraud)**
(By Plaintiffs Freeney and Roof Group Against

Defendants BAC, BANA, MLPFS and BOCK).........................................133

    A.    Formation and Operation of the Conspiracy..................................133

    B.    Wrongful Acts in Furtherance of the Conspiracy...........................134

    C.    Resulting Damages. ....................................................................150

**SECOND CAUSE OF ACTION**
**(For Fraud)**
(By Plaintiffs Freeney and Roof Group Against

Defendants BAC, BANA, MLPFS and BOCK).........................................151

    A.    False and Misleading Representations and False Promises...........151

    B.    Concealment of Material Facts. ...................................................156

    C.    Resulting Damages. ....................................................................168

**THIRD CAUSE OF ACTION**
**(For Aiding and Abetting Conversion)**
(By Plaintiffs Freeney and Roof Group Against

Defendant BANA) ...................................................................................177

    A.    The Conversions. ......................................................................168

    B.    Aiding and Abetting. ..................................................................169

**FOURTH CAUSE OF ACTION**
**(For Violation of California Penal Code section 496)**
(By Plaintiffs Freeney and Roof Group Against Defendant BANA).......................174

**FIFTH CAUSE OF ACTION**
**(For Cvil RICO in Violation of Title 18, United States Code,**
**Sections 1962(c) and 1964(c))**
(By Plaintiffs Freeney and Roof Group Against

Defendants BAC, BANA and MLPFS).....................................................197

    A.    The "Criminal Enterprise." ........................................................178

    B.    The Racketeering Acts. ..............................................................178

        1.    *Wire Fraud.* ...................................................................180

**THIRD AMENDED COMPLAINT**

188650.4

2.    *Mail Fraud.* .................................................................... 183

3.    *Access Device Fraud.* ....................................................... 185

4.    *Transactional Money Laundering* ...................................... 188

5.    *Concealment Money Laundering.* ...................................... 190

6.    *Promotional Money Laundering.* ....................................... 191

7.    *Obstruction of Justice.* ........................................................ 194

C.    Injury to Business and Property. .................................................. 196

**SIXTH CAUSE OF ACTION**
**(For Cvil RICO Conspiracy in Violation of Title 18, United States Code, Sections 1962(c) and 1964(c))**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS) .................................................. 199

**SEVENTH CAUSE OF ACTION**
**(For Civil RICO IN Violation of Title 18, United States Code, Sections 1962(d) and 1964(c))**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS) .................................................. 197

A.    The "Victim Enterprise." .................................................. 197

B.    The Racketeering Acts. .................................................... 198

C.    Injury to Business and Property. ....................................... 198

**EIGHT CAUSE OF ACTION**
**(For Cvil RICO Conspiracy in Violation of Title 18, United States Code, Sections 1962(c) and 1964(c))**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS) .................................................. 199

**NINTH CAUSE OF ACTION**
**(For Civil RICO Conspiracy in Violation of Title 18, United States Code, Sections 1962(c) and 1964(c))**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS) .................................................. 199

**THIRD AMENDED COMPLAINT**

188650.4

**TENTH CAUSE OF ACTION**
**(For Breach of Fiduciary Duty)**
(By Plaintiff Freeney Against
Defendants BAC, BANA, MLPFS and BOCK)........................................................200

**ELEVENTH CAUSE OF ACTION**
**(For Aiding and Abetting Breach of Fiduciary Duty by Weinberg)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA, MLPFS and BOCK)........................................................204

**TWELFTH CAUSE OF ACTION**
**(For Aiding and Abetting Breach of Fiduciary Duty by Stern)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)....................................................................208

**THIRTEENTH CAUSE OF ACTION**
**(For Negligent Misrepresentation)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)....................................................................211

**FOURTEENTH CAUSE OF ACTION**
**(For Professional Negligence)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA, MLPFS and BOCK)........................................................212

**FIFTEENTH CAUSE OF ACTION**
**(For Negligent Hiring, Retention and Supervision of Weinberg)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)....................................................................215

**SIXTEENTH CAUSE OF ACTION**
**(For Negligent Referral Stern)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)....................................................................219

**SEVENTHEETH CAUSE OF ACTION**
**(For an Accounting by BAC, BANA and MLPFS)**
(By Plaintiffs Freeney and Roof Group Against
Defendants BAC, BANA and MLPFS)....................................................................221

**PRAYER FOR RELIEF** ...........................................................................................223

**DEMAND FOR JURY TRIAL**...................................................................................223

**THIRD AMENDED COMPLAINT**

Plaintiffs Dwight J. Freeney and Roof Group LLC (collectively, "Plaintiffs"), complaining of the above-named Defendants, allege as follows, which allegations are based upon information and belief insofar as they pertain to the Defendants' identities and conduct:

## I.   PRELIMINARY STATEMENT.

1.     This is a case of conspiracy, criminal fraud, theft and breach of trust in which the nation's second largest bank, Bank of America, participated in and aided and abetted a scheme to defraud one of its clients, causing him more than $20 million in out-of-pocket losses and leading to the closure of his business.

2.     The plaintiffs in this case are Dwight J. Freeney and his company, Roof Group LLC ("Roof Group").

3.     Defendants are (a) Bank of America Corporation ("BAC"), acting through its Global Wealth & Investment Management division ("GWIM") and its Merrill Lynch Global Wealth Management subdivision ("MLGWM"), and as successor-in-interest to Merrill Lynch & Co., Inc. ("Merrill Lynch"); (b) Bank of America, N.A. ("BANA"), a wholly owned direct subsidiary of BAC; (c) Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"), also a wholly owned direct subsidiary of BAC; and (d) Michael J. Bock ("BOCK"), a Senior Vice President – Wealth Management and Senior Financial Advisor of Global Wealth Management, a subdivision of BAC, and the head of Mr. Freeney's BofA/Merrill Lynch financial advisory team.  BAC, BANA and MLPFS are more commonly known as "Bank of America" or "BofA," the registered trademarks of BAC, and collectively are referred to herein as "BofA/Merrill Lynch."

4.     Mr. Freeney is an accomplished and highly respected professional athlete.  He played college football for Syracuse University, where he was an All-American defensive end.  He entered the NFL in 2002 as the Indianapolis Colts' first-round draft pick and played defense for the Colts for eleven seasons and then the San Diego Chargers for two seasons.  This past season, he played for the Arizona

1

**THIRD AMENDED COMPLAINT**

188650.4

1    Cardinals.

2         5.    Mr. Freeney's company Roof Group owned and operated the

3    *Rolling Stone Los Angeles* restaurant, café and lounge ("RSLA") in the popular

4    Hollywood and Highland complex in Los Angeles.  Roof Group had a licensing

5    agreement with *Rolling Stone* Magazine to open several additional theme restaurants

6    in New York and other cities.  RSLA was forced to close its doors in February 2013,

7    due to the irreparable financial damage to both the restaurant and Mr. Freeney

8    resulting from the fraudulent scheme described below.

9         6.    In January 2010, at the height of his NFL career, and having just played

10   in his second Super Bowl, Mr. Freeney made the fateful decision to entrust

11   management of his finances to BofA/Merrill Lynch.  Over the next two years,

12   Mr. Freeney became the victim of an elaborate and malevolent scheme to defraud.

13        7.    The scheme was devised, implemented and executed by present and

14   former BofA/Merrill Lynch insiders acting in concert with a number of bank outsiders

15   to whom BofA/Merrill Lynch had referred Mr. Freeney.  The scheme involved three

16   parts: *first*, to gain control of Mr. Freeney's assets, investments and income, valued at

17   over $40 million at the time, by means of false and fraudulent pretenses,

18   representations and promises and the concealment of material facts; *second*, to

19   misappropriate and convert as much of Mr. Freeney's funds as possible while

20   avoiding detection; and, *third,* to cover up the thefts and other wrongdoing to

21   minimize the civil and criminal liability of Defendants and their co-schemers.

22        8.    The scheme began in January 2010, when Mr. Freeney became a client of

23   BofA/Merrill Lynch.  It continued through March 2012, when Eva Weinberg and

24   Michael Stern, two of the principal co-schemers, were arrested by federal authorities.

25        9.    The scheme involved, among other things: misrepresentations and false

26   promises; the concealment of material facts; engendering false trust and confidence;

27   use of false identities; conflicts of interest; breaches of fiduciary duty; the

28   unauthorized purchase and sale of securities; the sale of worthless life insurance;

2

**THIRD AMENDED COMPLAINT**

kickback payments; the misappropriation of funds and conversion of assets; access device fraud; money laundering; creation of forged and falsified documents; and obstruction of a federal investigation.

10.     BAC, BANA and MLPFS participated in and aided and abetted the scheme through the negligent, wrongful and, in some instances, criminal conduct of its employees and agents, including BOCK, Eva Weinberg, Matthew Liebman and Josephine (Jodi) Del Campo (nka Jodi Bowles).  Through them and others:

(a)     BAC, BANA and MLPFS referred Mr. Freeney, who was only 29-years-old at the time, to Michael Stern for consulting services, knowing him to be a financial predator with a past steeped in fraud that included personal and corporate bankruptcies, mortgage fraud, theft of loan proceeds, passing worthless checks, bribery, forgery, violation of court orders and witness tampering.

(b)     BAC, BANA and MLPFS introduced Mr. Freeney to Stern as "Michael Millar," which was a false identity that Stern and the co-schemers used to conceal his past as a bankrupt swindler from Mr. Freeney.

(c)     BAC, BANA and MLPFS used misrepresentations, false promises and the concealment of material facts to convince Mr. Freeney to become a BofA/Merrill Lynch client and to induce him to transfer management of his assets, investments and income to their exclusive control.

(d)     Having fraudulently induced Mr. Freeney to repose his trust and confidence in them, BAC, BANA and MLPFS committed numerous and flagrant breaches of fiduciary duty, including disclosing Mr. Freeney's private and confidential personal and financial information to Stern.

(e)     BAC, BANA and MLPFS purchased $890,000 in securities using Mr. Freeney's funds without his authorization and knowledge, generating large commissions for BOCK, and then sold them all a few weeks later, again without Mr. Freeney's authorization or knowledge, at a $45,000 loss to Mr. Freeney, which they also concealed from him.

**THIRD AMENDED COMPLAINT**

188650.4

1    (f)    BAC, BANA and MLPFS referred Mr. Freeney to Weinberg's

2    brother, who, together with Weinberg, fraudulently convinced Mr. Freeney to

3    purchase        $55 million in unsuitable and worthless life insurance, and then

4    secretly paid Weinberg approximately half of the $450,000 in commissions he

5    received as a      kick back.

6    (g)    BAC, BANA and MLPFS opened an account in the name of

7    Roof Group and then gave the confidential account access information to Weinberg,

8    even though she was not a signatory on the account, who gave it to Stern, who used it

9    to misappropriate more than $8.5 million of Mr. Freeney's funds.

10   (h)    To aid and abet these misappropriations, BAC, BANA and

11   MLPFS opened this account under false pretenses and without the necessary

12   documentation, appropriate authorization, or required due diligence; overrode the

13   account's security features on repeated occasions at Weinberg's request; executed

14   hundreds of wire transfers totaling millions of dollars from the account without

15   Mr. Freeney's authorization; and refrained from filing suspicious activity reports with

16   federal regulators, as required by federal banking law, notwithstanding the hundreds

17   of highly suspicious wire transfers from the account to unknown recipients, all

18   originating online by Stern using the stolen account access information.

19   (i)    To further aid and abet these misappropriations, BAC, BANA and

20   MLPFS liquidated Mr. Freeney's existing investments, at substantial and unnecessary

21   losses to him, to generate additional funds to misappropriate and to keep the scheme

22   from being discovered.

23   (j)    To conceal and cover up their involvement in the scheme, and

24   thus avoid potential civil and criminal liability for their participation in and abetting

25   and abetting the fraud, BAC, BANA and MLPFS withheld documents from

26   Mr. Freeney, his accountants and his legal counsel that he had requested and was

27   entitled to receive as a client of BofA/Merrill Lynch; withheld documents from federal

28   law enforcement authorities; failed to make required regulatory filings; made false and

**THIRD AMENDED COMPLAINT**

188650.4

misleading statements in regulatory filings; and sought to mislead the public concerning their responsibility for Mr. Freeney's losses.

11.    BOCK participated in and aided and abetted the scheme by, among other things: (a) making and causing others to make false representations and promises; (b) concealing and causing others to conceal material facts; (c) breaching his fiduciary duties to Mr. Freeney; (d) purchasing investments without Mr. Freeney's authorization or knowledge; (e) churning Mr. Freeney's brokerage account; (f) assisting in relocating the scheme from Florida to California to avoid discovery; (g) helping his ex-wife, Eva Weinberg, to carry on the scheme from California; and (h) liquidating Mr. Freeney's existing investments, unnecessarily and at a loss to Mr. Freeney, to generate additional funds to keep the scheme operating and to replenish misappropriated funds.

12.    The scheme reached virtually every aspect of Mr. Freeney's financial life.  It resulted in out-of-pocket losses to him and Roof Group of more than $20 million; brought him to the verge of personal bankruptcy; caused the eventual closure of RSLA; and deprived him and his family of the financial security that he had worked so hard to attain during his thirteen-year NFL career and which was the reason he became a BofA/Merrill Lynch client in the first place.

## II.    THE PARTIES

13.    At the time this action was commenced, Plaintiff Dwight J. Freeney was a resident of San Diego County, California.

14.    Plaintiff Roof Group LLC ("Roof Group") is a limited liability company organized and existing under the laws of the State of California with its principal place of business located in Torrance, California.

15.    Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Charlotte, North Carolina.  BAC is sued here both for its own acts and omissions giving rise to this action and for such acts and omissions of Merrill Lynch

1  & Co., Inc. ("Merrill Lynch") as the successor-in-interest to Merrill Lynch.  As

2  described further below, in or about January 2009, BAC acquired Merrill Lynch,

3  which was merged into BAC and became a wholly owned subsidiary of BAC.

4  Thereafter, in or about October 2013, BAC absorbed Merrill Lynch, assumed all of its

5  obligations and liabilities, and became the successor-in-interest to Merrill Lynch.

6  Therefore, all references in this Third Amended Complaint to BAC include BAC as

7  the successor-in-interest to Merrill Lynch.

8       16.    Defendant Bank of America, National Association ("BANA") is a

9  federally chartered national banking association headquartered in Charlotte,

10  North Carolina, which is, and at all relevant times was, a wholly-owned direct

11  subsidiary of BAC.

12       17.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated

13  ("MLPFS") is a corporation organized and existing under the laws of the State of

14  Delaware with its principal place of business in New York, New York.  Prior to

15  October 2013, MLPFS was a wholly owned indirect subsidiary of BAC; in

16  October 2013, it became a wholly owned direct subsidiary of BAC.

17       18.    Defendant Michael J. Bock ("BOCK") is a resident of the State of

18  Florida.  He is registered as a broker-dealer agent in the State of California under the

19  broker-dealer license of MLPFS.  He is also licensed as an insurance producer in the

20  State of California.

21       19.    References in this Third Amended Complaint to "BofA/Merrill Lynch"

22  are to BAC, GWIM, MLGWM, BAC as successor-in-interest to Merrill Lynch,

23  BANA and MLPFS.

24       **III.   JURISDICTION AND VENUE.**

25       20.    This Court has subject matter jurisdiction over this matter pursuant to

26  Title 28, United States Code, section 1331, in that it arises under the laws of the

27  United States, and pursuant to Title 28, United States Code, section 1332, in that there

28  is a complete diversity of citizenship between all of the Plaintiffs and all of the

**THIRD AMENDED COMPLAINT**

1  Defendants.

2       21.     This Court has personal jurisdiction over BAC, BANA and MLPFS in

3  this action pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and California Code

4  of Civil Procedure section 410.10, in that BAC, BANA and MLPFS have offices and

5  branches and do substantial business within the State of California.

6       22.     This Court has personal jurisdiction over BOCK pursuant to Federal Rule

7  of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure section 410.10,

8  for the reasons set forth in Section VII, below, of this Third Amended Complaint.

9       23.     Venue for this matter properly lies within the Central District of

10  California pursuant to Title 18, United States Code, section 1391(b)(2), in that a

11  substantial part of the events and omissions giving rise to Plaintiffs' claims occurred

12  in this district.

13                           **IV.    BACKGROUND.**

14  **A.     Relevant Laws and Reporting Requirements.**

15       24.     At all relevant times, BofA/Merrill Lynch was under mandatory reporting

16  requirements to the Financial Industry Regulatory Authority ("FINRA").  FINRA

17  provides information on all current, and many former, registered broker-dealers.

18  When a firm hires a broker-dealer, an investment advisor, or an associate, it is

19  required to file a Form U4 with FINRA ("FINRA Report"), disclosing a variety of

20  information about the new hire, including pending criminal, regulatory, or civil

21  actions; customer complaints; employment history; adverse employment actions; and

22  financial problems, such as bankruptcies or unsatisfied judgments.  Firms are under a

23  continuing duty to file an updated Form U4 whenever they become aware of any such

24  events involving their broker-dealers, investment advisors, or associates.

25  Additionally, firms are required to file a Form U5 with FINRA when a broker-dealer,

26  investment advisor, or associate ends his or her employment with the firm.

27       25.     At all relevant times, BofA/Merrill Lynch was also under mandatory

28  reporting requirements to the U.S. Securities and Exchange Commission ("SEC").

**THIRD AMENDED COMPLAINT**

1   The SEC requires that a person or firm meeting the definition of "investment adviser"

2   under the Investment Advisers Act of 1940 (Title 15, United States Code,

3   sections 80b-1 *et seq.*) register with it, disclosing information about the adviser's

4   business, ownership, clients, employees, business practices, affiliations and any

5   disciplinary events involving the adviser or its employees.  Advisers must file a Form

6   ADV ("SEC Report") and keep it current by filing annual and periodic amendments.

7        26.    At all relevant times, the federal law known as the Bank Secrecy Act

8   (Title 31, United States Code, section 5311 *et seq.*) required BofA/Merrill Lynch to

9   file a Suspicious Activity Report ("SAR") with the Financial Crimes Enforcement

10  Network ("FinCEN") of the U.S. Department of the Treasury whenever it suspected

11  fraud, money laundering, or other criminal activity involving any of its clients, any

12  client accounts, or any of its employees and agents.  The regulations promulgated

13  under this law explain that the types of "suspicious activity" that trigger the filing

14  requirement include: (a) apparent bogus business accounts; (b) abnormal transactions

15  based on a client's history; and (c) multiple transactions for amounts smaller than

16  $10,000, seemingly designed to avoid reporting requirements.  *See* Title 12, Code of

17  Federal Regulations, section 21.11.  The Bank Secrecy Act applies to banks, bank

18  holding companies, their subsidiaries and brokerage firms.  *See* Title 17, Code of

19  Federal Regulations, section 240.17a-8.

20       27.    Under the Bank Secrecy Act, the institution or firm is "required to file a

21  SAR no later than 30 calendar days after the date of initial detection of facts that may

22  constitute a basis for filing a SAR," but "in situations involving violations requiring

23  immediate attention, such as when a reportable violation is on-going, the financial

24  institution shall immediately notify, by telephone, an appropriate law enforcement

25  authority and the [Office of the Comptroller of Currency] in addition to filing a timely

26  SAR."  *Id.*, sections 21.11(d) and 208.62(d).

27       28.    At all times relevant hereto, the Investments Advisors Act of 1940 (the

28  "IAA") defined an "investment adviser" as a firm or individual "who, for

8

**THIRD AMENDED COMPLAINT**

1   compensation, engages in the business of advising others . . . as to the value of

2   securities or as to the advisability of investing in, purchasing, or selling securities."

3   Title 15, United States Code, section 80b-2(a)(11) and (16).  The IAA makes it

4   unlawful for "any investment adviser . . . to employ any device, scheme, or artifice to

5   defraud . . . [or] to engage in any transaction, practice, or course of business which

6   operates as a fraud or deceit upon any client or prospective client . . . ."  *Id*.,

7   section 80b-6.

8          29.    Under the IAA, both individuals and firms registered with the SEC as

9   investment advisers owe their clients the full panoply of fiduciary duties, including the

10  duty to avoid conflicts of interest; exercise good faith; fully and fairly disclose all

11  material facts; and use reasonable care to avoid misleading clients.

12         30.    At all times relevant hereto, both California and Florida common law

13  also imposed fiduciary duties on individuals and firms registered with the SEC as

14  broker-dealers, including, for example, the duty to avoid making materially false or

15  misleading statements to convince a client to make an investment; placing a client in

16  an unsuitable investment; churning a client's account; engaging in transactions

17  without the client's permission; or failing to advise a client of substantial losses.

18  **B.     Dwight Freeney.**

19         31.    Mr. Freeney is a highly accomplished and well respected NFL player

20  who played the 2015 season for the Arizona Cardinals and the 2013 and 2014 seasons

21  for the San Diego Chargers.  Prior to joining the Chargers, he played eleven seasons

22  with the Indianapolis Colts.  His many achievements as an NFL player include:

23         •      Seven-time Pro-Bowl selection;

24         •      Three-time First Team All-Pro;

25         •      Member 2006 and 2009 AFC Championship Teams;

26         •      Member 2007 Super Bowl Championship Team; and

27         •      Chosen to NFL All-Decade Team.

28         32.    In 2007, Mr. Freeney entered into a six-year contract with the Colts,

9

**THIRD AMENDED COMPLAINT**

1   which, at the time, was one of the largest contracts for a defensive player in NFL

2   history.  When Mr. Freeney became a BofA/Merrill Lynch client in or about

3   January 2010, he still had three years remaining on his Colts contract, which

4   guaranteed him income, before taxes, of $8,825,000 for the 2010 season, $11,420,000

5   for the 2011 season, and $14,035,000 for the 2012 season, for a total of $34,280,000.

6   As is typical with NFL contracts, Mr. Freeney was paid his entire annual salary over

7   the course of the 17-week regular season, between roughly the beginning of

8   September and ending the first week of the following January.

9        33.   When Mr. Freeney became a BofA/Merrill Lynch client in or about

10   January or February 2010, he was 29-years-old and had no expertise in financial

11   matters and very limited investment experience.  Moreover, during the 17-week

12   regular season when Mr. Freeney received his entire annual salary, and in the two

13   months leading up to the start of the season, his time and attention was devoted

14   exclusively to football.  As a result, like many professional athletes, he relied upon

15   professional financial managers and investment advisors to manage his assets and

16   income, pay his bills, prepare and file his tax returns and recommend and manage his

17   investments.

18        34.   Before becoming a BofA/Merrill Lynch client, Mr. Freeney had a

19   number of bad experiences with prior financial managers and investment advisors,

20   which gave him reason to doubt their honesty and the wisdom of some of the

21   investments they had made on his behalf.  As a result, in 2009, Mr. Freeney began

22   searching for a new financial manager/investment advisor.  Because of these past

23   problems, Mr. Freeney focused his search on large, well-established financial

24   institutions, having decided not to entrust his financial affairs and future to another

25   small firm that purported to cater to professional athletes.

26   **C.    Roof Group and RSLA.**

27        35.   Roof Group is a California limited liability company that owned and

28   operated the now-closed RSLA in Hollywood.

**THIRD AMENDED COMPLAINT**

36.     Roof Group was founded in 2009 by two hospitality industry entrepreneurs, Joe Altounian ("Altounian") and Niall Donnelly ("Donnelly").  In or about September 2009, Roof Group entered into a licensing agreement with *Rolling Stone* Magazine, which granted it the right to construct and operate a *Rolling Stone*-themed restaurant in Los Angeles and an option to do the same in New York and other cities.  It also entered into a lease with the real estate company CIM for a 10,400 square foot space in the Hollywood and Highland complex in which to build out the restaurant.

37.     The build out of RSLA began in late 2009.  The general contractor for the build out was Brodin Design.  The restaurant opened briefly in November 2010 to host the American Music Awards after-party, and then opened to the public in February 2011.

38.     Mr. Freeney became a member of Roof Group in or about September 2009, acquiring a 20 percent ownership interest in return for investing approximately $1.5 million, which was supposed to fund the beginning of the build out of RSLA.  At BofA/Merrill Lynch's urging, he increased his ownership interest to 51 percent, becoming the managing member in May 2010 by committing to invest at least an additional $1.6 million.  Thereafter, also at BofA/Merrill Lynch's urging, he increased his ownership interest to 100 percent, completing the purchases of Altounian and Donnelly's shares in Roof Group in January 2012 for approximately $1.1 million.

39.     Mr. Freeney, through Roof Group, invested approximately $4.2 million of his own money in RSLA in 2010, most of which was intended to pay for completion of the build out, and an additional approximately $3.7 million in 2011, most of which was intended to fund operating deficits (which, as is now known, were largely caused by Weinberg and Stern's misappropriation of funds in a Roof Group BofA account belonging to Mr. Freeney).

40.     After the scheme to defraud began to unravel in or about December 2011, Mr. Freeney infused another approximately $3.4 million of his own money into RSLA

11

**THIRD AMENDED COMPLAINT**

188650.4

1   in an effort to undo the harm caused by the scheme and to keep the restaurant open.

2   Ultimately, those efforts proved unavailing.  Although Roof Group was able to avert

3   bankruptcy, the damage to Mr. Freeney and RSLA financially was too great, and the

4   restaurant was forced to close in February 2013.

5        41.    RSLA was more than a financial investment for Mr. Freeney.  The

6   opportunity to own and operate a series of theme restaurants associated with the music

7   industry appealed to his desire to own his own business and to promote young,

8   undiscovered music talent.  As a result, the collapse of RSLA because of the criminal

9   actions of BofA/Merrill Lynch, a seemingly well-heeled financial institution to which

10  Mr. Freeney had entrusted his financial future, was devastating to him, not only

11  financially, but also emotionally.

12  **D.    BofA, BAC, BANA and MLPFS.**

13       42.    "Bank of America" and "BofA" are registered trademarks that BAC uses

14  in marketing the banking, brokerage, advisory and other products and services BAC

15  and its various subsidiaries and affiliates offer.

16       43.    BAC is a Delaware corporation, a bank holding company and a financial

17  holding company.  As described in BAC's 2010 Annual Report:  "Through our

18  banking and various non-banking subsidiaries throughout the United States and in

19  certain international markets, we provide a diversified range of banking and

20  nonbanking financial services and products through six business segments:  *Deposits,*

21  *Global Card Services, Home Loans & Insurance, Global Commercial Banking,*

22  *Global Banking and Markets (GBAM)* and *Global Wealth & Investment Management*

23  *(GWIM)*."  (Italics in original.)

24       44.    BANA is a federally chartered, national banking association and the

25  primary banking subsidiary of BAC.  As described in a BAC report to its regulator,

26  the Board of Governors of the Federal Reserve System, "Bank of America, N.A.

27  ('BANA') is the flagship national full-service commercial bank and primary bank

28  subsidiary of Bank of America Corporation."

**THIRD AMENDED COMPLAINT**

188650.4

45.     MLPFS is a registered broker-dealer and a registered investment adviser with the SEC, and a member firm of FINRA.  Prior to October 2013, it was a wholly owned direct subsidiary of Merrill Lynch, and a wholly owned indirect subsidiary of BAC.  With BAC's absorption of Merrill Lynch in October 2013 (described further below), MLPFS became a wholly owned direct subsidiary of BAC.

**E.     BAC's Acquisition of Merrill Lynch and the Ensuing Corporate Restructuring.**

46.     Merrill Lynch is the former holding company for various Merrill Lynch subsidiaries and affiliates, including MLPFS.

47.     In January 2009, BAC acquired Merrill Lynch and its operating subsidiaries and affiliates.  Merrill Lynch was merged with a wholly owned subsidiary of BAC, with Merrill Lynch continuing as the surviving corporation and a wholly owned subsidiary of BAC.  MLPFS remained a subsidiary of Merrill Lynch and became a wholly owned indirect subsidiary of BAC.

48.     In a news release accompanying the merger, BAC's Chairman and Chief Executive Officer at the time, Ken Lewis, described the merger as resulting in a "new organization," created "because we believe that wealth management and corporate and investment banking represent significant growth opportunities, especially when combined with our leading capabilities in consumer and commercial banking."

49.     In its 2010 Annual Report, BAC reported:  "On January 1, 2009, we acquired Merrill Lynch & Co., Inc. (Merrill Lynch) and, as a result, we now have one of the largest wealth management businesses in the world with nearly 17,000 wealth advisors, an additional 3,000 client-facing professionals and more than $2.2 trillion in client assets."

50.     Following the acquisition and merger, BAC engaged in a massive corporate restructuring aimed at integrating Merrill Lynch and its operations into BAC.  As part of this restructuring:

**THIRD AMENDED COMPLAINT**

188650.4

(a)     Merrill Lynch adopted BAC's risk management and governance practices "to maintain consistent risk measurement and disciplined risk taking";

(b)     The BAC Corporate Benefits Committee assumed overall responsibility for the administration of all of Merrill Lynch's employee benefit plans;

(c)     Merrill Lynch's qualified retirement and defined contribution plans were closed to new participants and newly hired Merrill Lynch employees who were eligible participated in BAC plans;

(d)     BAC assumed Merrill Lynch's stock-based compensation plans, and awards under those plans became payable in BAC common stock;

(e)     BAC began rebranding all of its corporate and investment banking activities under the marketing name "Bank of America Merrill Lynch";

(f)     Merrill Lynch's principal executive offices were moved to the Bank of America Corporate Center in Charlotte, North Carolina, which is owned by a BAC subsidiary;

(g)     Merrill Lynch employees were relocated to the "Bank of America Tower" in New York, New York;

(h)     Merrill Lynch sold Merrill Lynch Bank USA ("MLBUSA") and Merrill Lynch Bank & Trust Co., FSB ("MLBT-FSB") to a subsidiary of BAC, and MLBUSA and BLBT-FSB were thereafter merged into BANA;

(i)     Banc of America Investment Services, Inc., a wholly-owned broker-dealer subsidiary of BAC, was merged into MLPFS, with MLPFS continuing as the surviving corporation;

(j)     Merrill Lynch merged with Banc of America Securities Holdings Corporation ("BASH"), a wholly owned subsidiary of BAC, with Merrill Lynch continuing as the surviving corporation.  As a result of this merger, Banc of America Securities LLC ("BAS"), a wholly owned broker-dealer subsidiary of BASH, became a wholly owned broker-dealer subsidiary of Merrill Lynch, and BAS then merged into MLPFS, with MLPFS continuing as the surviving corporation;

14

**THIRD AMENDED COMPLAINT**

(k)   BAC's credit ratings became the major driver of Merrill Lynch's credit ratings; and

(l)   Merrill Lynch and BAC established intercompany lending and borrowing arrangements "to facilitate centralized liquidity management."

**F.   BAC Absorbs and Becomes Successor-in-Interest to Merrill Lynch.**

51.   In October 2013, Merrill Lynch was absorbed into BAC, with Merrill Lynch ceasing to exist as a separate legal entity.  Upon completion of the merger, BAC assumed all of Merrill Lynch's obligations and liabilities and became the successor-in-interest to Merrill Lynch, and MLPFS became a wholly owned direct subsidiary of BAC.  BAC retained the Merrill Lynch brand name for its retail brokerage and investment bank.  All federally registered "Merrill Lynch" trademarks and service marks were assigned to BAC.

52.   As stated in a BAC press release:  "Subsidiaries of Merrill Lynch & Co., Inc., a holding company, will continue to operate under the Merrill Lynch name and brand.  Bank of America's primary broker-dealer, Merrill Lynch, Pierce, Fenner & Smith, and its non-U.S. broker-dealer entities will continue to operate under their current names and brands.  [¶]  As of October 1, 2013, in connection with the merger, Bank of America Corp. assumed all of Merrill Lynch & Co., Inc.'s obligations . . . . Also, as a result of the merger, Merrill Lynch & Co., Inc. will cease to separately file reports with the U.S. Securities and Exchange Commission."

**G.   BAC Creates the Global Wealth & Investment Management Division and the Merrill Lynch Global Wealth Management Subdivision.**

53.   One objective of the restructuring described above was to consolidate wealth management services in a new BAC division named "Global Wealth & Investment Management" ("GWIM"), which included placing MLPFS registered broker-dealers ("brokers") and investment advisors ("advisors") under the control and direction of GWIM.

54.     According to a BAC press release, GWIM was designed to provide "comprehensive wealth management to affluent and high-net-worth clients," "retirement and benefit plan services," "philanthropic management" and "asset management to individuals and institutions."  BAC's 2010 Annual Report described GWIM as follows:

> *GWIM* consists of three primary businesses:  *Merrill Lynch Global Wealth Management (MLGWM), U.S. Trust, Bank of America Private Wealth Management (U.S. Trust)* and *Retirement Services*.

> *MLGWM*'s advisory business provides a high-touch client experience through a network of approximately 15,500 financial advisors focused on clients with more than $250,000 in total investable assets.  *MLGWM* also includes Merrill Edge, a new integrated investing and banking service which is targeted at clients with less than $250,000 in total assets.  Merrill Edge provides team-based investment advice and guidance, brokerage services, a self-directed online investing platform and key banking capabilities including access to the Corporation's branch network and ATMs.  In addition, *MLGWM* includes the Private Banking & Investments Group.

> *U.S. Trust*, together with *MLGWM*'s Private Banking & Investments Group, provides comprehensive wealth management solutions targeted at wealthy and ultra-wealthy clients with investable assets of more than $5 million, as well as customized solutions to meet clients' wealth structuring, investment management, trust and banking needs, including specialty asset management services.

> *  *  *

55.     GWIM operates using employees from subsidiaries of BAC and Merrill Lynch, including principally: (a) MLGWM, a network of approximately 15,000 financial advisors focused on clients with over $250,000 in total investable assets; and (b) U.S. Trust, Bank of America Private Wealth Management ("U.S. Trust"), a firm with 4,400 associates that provides private banking, investment management and specialty asset management services to high net worth and ultra-high net worth clients.

16

**THIRD AMENDED COMPLAINT**

56.     BAC's 2010 Annual Report gave the following description of the interrelationships between BAC, GWIM, its subdivisions, BANA and MLPFS, evidencing that while MLPFS may still be a separate corporation, its employees are under the control and direction of BAC:

- "Bank of America Corporation ('Bank of America') is a financial holding company that, through its subsidiaries and affiliated companies, provides banking and nonbanking financial services."

- "Global Wealth & Investment Management is a division of Bank of America Corporation ('BAC')."

- "Merrill Lynch Wealth Management, Merrill Edge$^{TM}$, U.S. Trust, Bank of America Merrill Lynch and BofA$^{TM}$ Global Capital Management are affiliated sub-divisions within Global Wealth & Investment Management."

- "Merrill Lynch Wealth Management makes available products and services offered by Merrill Lynch, Pierce, Fenner & Smith Incorporated ('MLPF&S') and other subsidiaries of BAC."

- "Merrill Edge$^{TM}$ is the marketing name for two businesses: Merrill Edge Advisory Center, which offers team-based advice and guidance brokerage services; and a self-directed online investing platform."

- "U.S. Trust, Bank of America Private Wealth Management operates through Bank of America, N.A., and other subsidiaries of BAC."

- "Bank of America Merrill Lynch is a marketing name for the Retirement & Philanthropic Services businesses of BAC."

- "BofA Global Capital Management Group, LLC (BofA Global Capital Management), is an asset management division of BAC.  BofA Global Capital Management entities furnish investment management services for institutional and individual investors."

- "Banking products are provided by Bank of America, N.A., and affiliated banks . . . ."

- "MLPF&S is a registered broker-dealer, . . . and a wholly owned subsidiary of BAC."

17

**THIRD AMENDED COMPLAINT**

57.     Thus, as of January 2010, when Mr. Freeney became a client of BofA/Merril Lynch, BAC's corporate structure for providing wealth management products and services appeared as follows:



"Bank of America"/"BofA"
[Trademarks]

**BAC**
[Bank and Financial Holding Company]

**BANA**
[wholly owned BAC banking subsidiary]

**GWIM**
[BAC Division]

GWIM subdivisions:
- Merrill Lynch Wealth Management
- Merrill Edge
- U.S. Trust
- Bank of America  Merrill Lynch
- BofA Global Capital Management

**Merrill Lynch**
[wholly owned BAC subsidiary; no longer exists]

**MLPFS**
[wholly owned indirect BAC brokerage subsidiary]

**U.S. Trust**

58.     As a BAC division, all of GWIM's executive management is appointed by BAC.  In August 2009, BAC appointed Sallie Krawcheck, a member of the BAC executive team, to head GWIM.  In February 2010, BAC appointed Kunai Kamlani to head Global Investment Solutions (a subdivision within GWIM), and appointed Chris Dupuy to head Institutional Investments and Philanthropic Solutions (another subdivision within GWIM).  In July 2010, BAC appointed Lisa Shalett as Chief Investment Officer of GWIM.  In September 2011, BAC announced that Krawcheck would leave GWIM, as part of a reorganization and de-layering of operations.

**THIRD AMENDED COMPLAINT**

188650.4

59.     As a result of the BAC/Merrill Lynch corporate restructuring and the formation of GWIM and MLGWM, MLPFS brokers, advisors and staff came under the control and direction of BAC.  For example:

(a)     BAC has the authority to hire, fire, or lay-off MLPFS brokers, advisors and staff;

(b)     BAC sets the compensation and incentive payment structures for MLPFS brokers and advisors;

(c)     Only BAC had the authority to approve the $3.6 billion in year-end bonuses for MLPFS brokers and advisors for 2008;

(d)     BAC assumed responsibility for administering the pension and other benefit plans of MLPFS brokers and advisors;

(e)     MLPFS brokers and advisors work out of BAC offices;

(f)     BAC required MLPFS brokers, advisors and associates to comply with BAC's policies and procedures and the BAC code of ethics;

(g)     As of January 1, 2009, all Merrill Lynch employees were required to report complaints or possible ethical violations to the "Bank of America Ethics and Compliance Hotline," and the "Merrill Lynch Ethics Hotline" was discontinued;

(h)     BAC and GWIM executive management speak publicly of MLPFS brokers and advisors as if they are employed by, part of, or take their direction from GWIM;

(i)     MLPFS brokers and advisors believe and/or represent that they are jointly employed by "Global Wealth & Investment Management," "Merrill Lynch Global Wealth Management," or "Merrill Lynch Bank of America";

(j)     BAC controls the details of brokers and advisors' work, as evidenced by a 2011 *Forbes* article reporting that one MLPFS broker complained that he had to "wait[ ] months for BofA to approve material for an upcoming marketing event," and "[w]hen BofA finally got back to him a week before the event they wanted him to make changes to the materials which took hours for his team to fix";

19

**THIRD AMENDED COMPLAINT**

(k)      BAC requires MLPFS brokers and advisors to cross-market BANA banking products and services to their brokerage clients, such as debit cards, online bill pay and credit cards; and

(l)      Many BANA ATMs are now configured to transfer money in and out of Merrill Lynch brokerage accounts.

60.      Furthermore, at all times relevant hereto, GWIM, MLGWM, MLPFS and BANA have presented and marketed themselves collectively to the public, and offered and provided their products and services to their customers, as "Bank of America" or "BofA" and under the Bank of America logo.  As a result, there is little or no public awareness that GWIM, MLGWM, MLPFS and BANA are different divisions, subdivisions and subsidiaries of BAC.

61.      In sum, MLPFS brokers and advisors who provide wealth management services have effectively been loaned indefinitely to GWIM and MLGWM, and are under the joint, if not primary, control and direction of BAC, making them general, joint, or special employees of BAC.

**H.      Michael Stern (aka Michael Millar, David Michael Millar).**

62.      Stern grew up in the Miami area, never completed high school, holds no professional licenses and has no formal training in any professional field.

63.      In the early 2000s, Stern became involved in the construction industry, and then in both residential and commercial real estate development.  Between 2003 and 2006, he acquired controlling ownership interests in a number of properties in the Miami and Miami Beach areas.  He acquired these interests principally using funds borrowed from banks, mortgage lenders and investors using the properties as security.  As later revealed in litigation, in many instances, he obtained this financing by fraud, including the forging and falsifying of title, loan and corporate documents.

64.      In 2004, Stern was caught paying thousands of dollars in bribes to Miami Beach city officials to obtain demolition and construction permits for properties he was developing.  As later publicly reported, in 2003 and 2004, Stern made at least

**THIRD AMENDED COMPLAINT**

$110,000 in secret cash payments to three city planning officials.  He admitted to bribing the city officials, but received immunity from prosecution by cooperating with the State Attorney's Office and the Florida Department of Law Enforcement.  Stern's bribery and work as a government informer were publicly revealed in 2008, including in March 2008 articles in the *Miami Herald* and *SunPost*.  Three Miami Beach city officials later pleaded guilty to bribery and racketeering charges for accepting illegal payments from Stern, which was reported by the *Miami Herald*.  A February 2010 article, for example, highlighted that:

> Before his 2008 arrest, [Andres] Villarreal accepted more than $100,000 from developer Michael Stern, who sought Villarreal's approval of plans to demolish a historic coral rock house at 900 Collins Ave. to make way for an office building, prosecutors say.
>
> Stern cooperated in the investigation, wearing a wire to gather evidence against Villarreal.  In one taped conversation, the pair discussed using fake receipts or phony loan documents to conceal the payoffs.

65.    In 2008, Stern began "flipping mortgages" to keep current with his ever increasing loan payment obligations on the properties he had fraudulently acquired.  As part of this scheme, he obtained millions of dollars in new mortgages and loans by pledging already over-encumbered properties as security, fraudulently diverting the loan proceeds to himself, and then using a portion of those proceeds to make payments on earlier obtained mortgages and loans.  In furtherance of this scheme, he issued hundreds of thousands of dollars in worthless checks, forged documents, made misrepresentations to lenders and investors, and misapplied loan proceeds to himself and his co-schemers.

66.    This scheme began to unravel in late 2008, when Stern was unable to keep current on some of his payment obligations, resulting in a cascade of foreclosure actions and lawsuits.  As reported in a September 2008 *Miami Herald* article:

**THIRD AMENDED COMPLAINT**

    In recent years, Stern has become one of Miami Beach's most prolific real-estate investors, buying and redeveloping several apartments, condos and a hotel – sometimes by himself, sometimes with partners.

    His portfolio rests on a stack of three dozen loans totaling nearly $52 million, county records show.  Stern mortgaged his Collins Avenue office condo four times in a 12-day span last May, and he used a liquor license as collateral for a $225,000 loan, now in default, according to one lawsuit.

67.     Those who were defrauded by Stern and filed legal actions against him included not only individual investors and small mortgage lenders, but also large financial institutions, such as Citibank, Colonial Bank, Countrywide Home, HSBC Bank, Ocean Bank and U.S. Bank.

68.     In 2008, ten civil actions were filed against Stern in the Miami-Dade County Circuit Court.  In 2009, 25 more lawsuits followed.  These lawsuits produced overwhelming evidence of Stern's fraudulent practices, including, in particular, his issuance of worthless checks; forgery of title, loan and corporate records; falsification of closing documents; and theft of loan proceeds.

69.     College Health II GP Inc. ("College Health") and Esther Burstyn-Spero filed a civil action against Stern in March 2008, for his failure to repay $4.0 million in loans and forging Burstyn-Spero's signatures on two loan forgiveness documents in 2006 and 2007 (the "*College Health* Case").  Stern signed a settlement agreement in that case in January 2009, agreeing to repay College Health more than $6.0 million.

70.     In the course of the settlement negotiations, Stern admitted to forging Burstyn-Spero's signature on the loan forgiveness documents.  This admission was made in the presence of Burstyn-Spero's counsel and Stern's lawyer.  In a publicly-filed declaration, Burstyn-Spero's attorney, current Miami-Dade Circuit Court Judge Miguel de la O, attested that "Mr. Stern admitted to me, in the presence of his counsel, that the Subordination Agreement . . . and the Partial Release of Mortgage . . . were

188650.4

not signed by Esther Burstyn Spero," and he further "admitted to me, in the presence of his counsel, that he forged Ms. Spero's name on both documents and filed the documents with the forged signatures."

71.     In October 2008, Colonial Bank filed a civil action against Stern for failing to repay $17.8 million in loans that the bank had made to him in 2005 and 2006 (the "*Colonial Bank* Case").  In November and December 2008, based on evidence that Stern was wasting and mismanaging corporate assets, the court appointed a receiver over two of his businesses that had been named as defendants, 750 Jefferson Avenue LLC ("750 Jefferson"), which owned apartment buildings in Miami Beach that Stern was attempting to convert into condominiums, and South Beach Atrium, Inc., which owned a three-story commercial complex in Miami Beach that included shops, offices and a nightclub.

72.     Ivor Rose and Rita Starr ("the Roses"), an elderly Florida couple, were named as co-defendants in the *Colonial Bank* Case.  To obtain the $17.8 million in loans from Colonial Bank, Stern had provided the bank with guarantees purportedly signed by the Roses that pledged many of their properties as security for their guarantees.  As was later revealed in litigation, the Roses' signatures on the guarantees had either been forged or fraudulently obtained by Stern.

73.     In February 2009, Stern and his wife at the time, Layne Harris Stern, filed for personal bankruptcy protection in the Southern District of Florida.  In March 2009, Stern placed his real estate holding company, 750 Jefferson, into bankruptcy.  In April 2009, he placed another of his companies, Beach Hotel, Inc. ("Beach Hotel"), which owned the Beach Place Hotel in Miami Beach, into bankruptcy.

74.     In his financial disclosures to the Bankruptcy Court, Stern declared liabilities totaling $67.1 million and assets totaling *negative* $2.4 million; that his bank balances totaled *negative* $22,697; and that he was a defendant in 19 pending civil suits.  More than 220 creditors filed claims in Stern's personal bankruptcy alone.  The bankruptcies were publicized in the *Miami Herald,* in articles appearing in 2009, 2010

**THIRD AMENDED COMPLAINT**

1    and 2011.

2          75.    In May 2009, the receiver for 750 Jefferson in the *Colonial Bank* Case

3    filed for a restraining order against Stern, alleging that Stern had threatened him

4    outside court.

5          76.    With his legal problems mounting and creditors and litigants demanding

6    documents and testimony about the state of his financial affairs, Stern fled to Uruguay

7    in May 2009, where he lived with his stepson for several months.  Plaintiffs are

8    informed and believe, and on that basis allege, that Stern left the country to evade

9    process and avoid being further examined under oath concerning his real estate

10   dealings and personal finances.

11         77.    In or about August 2009, with Stern in Uruguay, Bankruptcy Judge

12   Robert Mark issued an Order of Contempt against him.  In his publicly reported order,

13   Judge Mark found that:

14
15         Mr. Stern has willfully refused to cooperate in the
           administration of this bankruptcy case which he voluntarily filed and
16         he has willfully, without just cause, failed to comply with several
           Orders of this Court, including, in particular, the August 7th Order.
17         Mr. Stern's personal interest in the welfare of his stepson in South
           America, and his most recent claim of a medical problem preventing
18         his return, do not justify his several month absence from the
           jurisdiction which has caused significant delay in the administration
19         of this case and substantial fees and costs to the Trustee and to
           creditors.
20

21

22         78.    Stern's conduct in the bankruptcy proceedings and the allegations of

23   having defrauded investors and lenders were publicized in an August 2009 *Miami*

24   *Herald* article:

25
           Developer Michael Stern – the chief witness in a Miami Beach
26         City Hall bribery probe – has repeatedly refused to return from
           Uruguay for hearings in his bankruptcy case, prompting a judge to
27         threaten him with arrest.

28

---

24

**THIRD AMENDED COMPLAINT**

\*       \*       \*

Stern is the owner or co-owner of more than a dozen Miami Beach properties, including the Beach Place Hotel and the coral rock house.  But he's been pummeled by a series of foreclosure suits and other claims from lenders, forcing Stern and his wife to seek bankruptcy protection in February.

\*       \*       \*

His debts include $6 million Stern owes to a Miami Beach woman, Esther Burstyn Spero, who filed a lawsuit last year accusing Stern of duping her into real-estate deals with phony mortgages and forged records.  Stern agreed to settle the suit without admitting wrongdoing.

\*       \*       \*

Stern's former business partners, Ivor Rose and Rita Starr, have also accused Stern of fraud, saying Stern secretly arranged a $4.2 million mortgage on a Collins Avenue building the three owned together.  In court papers, Rose and Starr said they never received any money from the loan and said their signatures were forged on loan documents.

79.     In December 2009, Stern failed to appear for scheduled depositions and hearings in the *Colonial Bank* Case, instead remaining in Uruguay.  In response, the judge in that case found Stern in contempt, ordered him to appear before the Court and issued a Writ of Bodily Attachment, directing the Sheriff of Miami-Dade County to arrest him.

80.     The *South Florida Business Journal* interviewed Stern and published an article about him in January 2010, just before BofA/Merrill Lynch introduced him to Mr. Freeney as "Michael Millar."  The article detailed his bankruptcies and legal problems, including the issuance of the writ of bodily attachment and the allegations of fraud against him.  (The *South Florida Business Journal* did two follow-up articles about Stern's bankruptcies and legal problems in 2011.)

/ / /

/ / /

**THIRD AMENDED COMPLAINT**

**I.   Michael BOCK and Eva Weinberg.**

>   **1.   *Professional Backgrounds and Relationships to Stern.***

81.     BOCK has been a broker and advisor for more than 30 years.  He holds Series 3, 7, 63 and 65 licenses, which allow him to buy and sell securities on behalf of his clients and give them financial advice.

82.     BOCK has been registered in the State of California under the broker-dealer license of MLPFS since April 2009.  Since 2011, BOCK has also been licensed as an insurance producer in the State of California, where he is authorized to transact insurance business on behalf of Merrill Lynch Life Agency, Inc., Lincoln National Life Insurance Company and Nationwide Life Insurance Company.

83.     Weinberg graduated from Boston University with a degree in finance in 1984.  She then attended Hofstra Law School, from which she graduated in 1987, but never practiced law.  Weinberg worked for Lehman Brothers in New York as a "money manager" from 1987 to 1995.  After moving to South Florida, she worked for Prudential Securities from 1995 to 2000, and for Morgan Stanley from 2000 until 2005.  In 2005, Weinberg stopped working in the financial services industry and allowed all of her securities licenses to lapse.

84.     BOCK married Weinberg for the first time in 1998.  They divorced in 2006, then remarried later that year.  BOCK and Weinberg purportedly divorced a second time in or about June 2009, via a religious edict.

85.     BOCK and Weinberg's relationship with Stern dates back to 2004, when they hired him to build a house for them in Boca Raton.  Between in or about July 2004 and February 2009, Weinberg worked for Stern Development, one of Stern's real estate companies.

86.     In 2008, BOCK, Weinberg and Weinberg's brother loaned Stern $350,000, which was secured by a promissory note.  The loan was to enable Stern to make payments that were due under the College Health settlement agreement.  At Weinberg's urging, her father, mother and brother-in-law also loaned Stern several

**THIRD AMENDED COMPLAINT**

hundred thousand dollars. In total, BOCK, Weinberg and the Weinberg family loaned Stern approximately $1.0 million. Plaintiffs are informed and believe, and on that basis allege, that Stern never repaid these loans. Stern later listed BOCK as a creditor in the Beach Hotel bankruptcy in the amount of $500,000.

87. In 2008, BOCK and Weinberg assisted Stern in finding investors for his distressed properties. Among other things, they introduced Stern to two New Jersey investors from whom Stern unsuccessfully sought $2.25 million in financing in or about October 2008.

88. In December 2008, Weinberg began meeting with Ahron Farache, who had previously loaned Stern $410,000 that he had not repaid. Weinberg met with Farache in an attempt to obtain additional financing for Stern. Weinberg offered to personally guarantee Stern's debt and falsely told Farache that she would be receiving a $2.0 million signing bonus from a new job.

89. Plaintiffs are informed and believe, and on that basis allege, that in or about January 2009, Weinberg and Stern became romantically involved. They were both married at the time, Weinberg to BOCK and Stern to Layne Harris Stern.

90. In addition to the loans to Stern, BOCK and Weinberg paid for the caterer at the bar mitzvah of Stern's son in January 2009. When Stern flew to Uruguay following his son's bar mitzvah, Weinberg flew there and stayed with him for two days, purportedly because she and her mother were concerned that Stern was "suicidal." While in Uruguay, Weinberg gave Stern $1,500.

91. With Stern in Uruguay, Weinberg took over management of the Beach Place Hotel, together with Stern's business associate Lester Jaggernauth. Weinberg opened a new bank account to receive the hotel's revenue because its existing accounts had tax liens against them for Stern's failure to pay more than $63,000 in "resort taxes" to the City of Miami Beach. The U.S. Trustee later reported to the Bankruptcy Court that neither that account nor the deposits to it had been disclosed in the Beach Hotel's bankruptcy schedules and statements.

**THIRD AMENDED COMPLAINT**

188650.4

92.     In February 2009, Weinberg gave two post-dated checks, each in the amount of $200,000, to Farache and his wife Monika ("the Faraches") to guarantee Stern's debt and forestall them from initiating a collection action against him, which could have exposed his fraudulent real estate dealings.  When the Faraches deposited these checks in June 2009, after Stern again failed to repay his debt, they were advised by the bank that the checks had been dishonored because Weinberg had previously closed the bank account upon which they had been drawn.  In August 2009, the Faraches filed a suit against Weinberg for passing worthless checks and breach of an oral contract of guarantee, seeking damages in excess of $1.6 million.

93.     During 2009, BOCK and Weinberg sought to assist Stern in the *Colonial Bank* Case by pressuring Esther Burstyn-Spero to recant her testimony that Stern had forged her signature on the two loan forgiveness documents.  Both BOCK and Weinberg later testified in the *Colonial Bank* Case that they had contacted Burstyn-Spero and her husband, both of whom they knew socially, to urge her to change her testimony.

94.     During 2009, BOCK and Weinberg made payments to Stern's bankruptcy and civil lawyers totaling more than $25,000.

95.     Between in or about March and June 2009, Weinberg leased an apartment in the affluent Miami enclave of Fisher Island, moving out of the house she had been living in with BOCK.  While living on Fisher Island, she arranged for meetings between Stern and potential purchasers of his distressed real estate holdings.

96.     In November 2009, Weinberg was deposed in the *Colonial Bank* Case, during which she acknowledged that she, BOCK and her family had loaned Stern nearly $1.0 million.  She also admitted knowledge of Stern's legal problems and bankruptcies.

97.     In December 2009, BOCK was deposed in the *Colonial Bank* Case, during which he acknowledged that he and Weinberg had loaned Stern money and had attempted to find investors for his real estate holdings.  BOCK further stated that he

28

**THIRD AMENDED COMPLAINT**

knew that Stern had filed for bankruptcy and had listed BOCK as a creditor.

**2.    *BOCK's Employment with BAC, BANA and MLFPS.***

98.    In April 2009, BOCK joined the Coral Gables, Florida office of Merrill Lynch.  According to public records and his own representations, BOCK was jointly employed by BAC, BANA and MLPFS during the time relevant to this Third Amended Complaint.

99.    BOCK's FINRA and SEC Reports show him as jointly employed as a financial advisor by MLPFS and BANA at all times relevant hereto:

| Time Period | Employer | Position |
|---|---|---|
| 4/2009-present | "Merrill Lynch, Pierce, Fenner & Smith, Incorporated" | "Financial Advisor" |
| 12/2009-present | "Bank of America, N.A." | "Financial Advisor" |

100.    According to BOCK's official "Merrill Lynch Financial Advisor" profile, he was (and remains) a "Senior Vice President – Wealth Management" and a "Senior Financial Advisor" of "Global Wealth Management," a subdivision of BAC.

101.    As part of the BofA/Merrill Lynch corporate restructuring, in or about December 2009 or January 2010, BAC relocated both BOCK from the Merrill Lynch Coral Gables office to the BofA Brickell Avenue branch in Miami Beach, Florida.

102.    In a March 2012 interview with the Federal Bureau of Investigation ("FBI"), BOCK described himself as employed by "Merrill Lynch Bank of America."

103.    At all times relevant hereto, BOCK was registered as a broker-dealer and an investment adviser, and owed his clients and prospective clients the fiduciary duties described above.

**3.    *Weinberg's Employment with BAC, BANA and MLPFS.***

104.    Weinberg joined the Merrill Lynch Coral Gables office together with BOCK in or about April 2009, with BOCK becoming her superior.  Weinberg was

29

**THIRD AMENDED COMPLAINT**

188650.4

1  employed by BAC and (Defendants assert) MLPFS through July 2010.

2      105.   Weinberg's FINRA Report (she has no SEC Report because she was not

3  a registered investment adviser) shows her employment as follows:

| Time Period | Employer | Position |
|---|---|---|
|  | "Stern Development, Inc." |  |
| 4/2009-present | "Merrill Lynch" |  |

8      106.   Weinberg was hired as an "Investment Associate."  Her supervisors,

9  however, allowed her to represent herself as a "Senior Financial Advisor" for

10  "Merrill Lynch Global Wealth Management," a subdivision of BAC; a

11  "Vice President of Private Wealth Management at Merrill Lynch"; a

12  "Financial Consultant" with "Merrill Lynch Wealth Management"; and a

13  "Senior Vice President" with "Global Wealth Management."

14      107.   In or about December 2009 or January 2010, BAC relocated Weinberg

15  from the Merrill Lynch Coral Gables offices to the BofA Brickell Avenue branch

16  together with BOCK.

17      108.   Plaintiffs are informed and believe, and on that basis allege, Weinberg

18  was also a joint employee, actual agent and/or ostensible agent of BANA during the

19  time relevant to this Third Amended Complaint.  Plaintiffs' information and belief is

20  based upon the following facts, among others:

21          (a)   When the Faraches sought to garnish Weinberg's wages in their

22  lawsuit against her in or about March 2010, BANA responded as her employer;

23          (b)   BANA opened a bank account in the name of Roof Group (the

24  "BofA Roof Group account") at Weinberg's request in or about May 2010;

25          (c)   BANA delegated to Weinberg responsibility for obtaining Mr.

26  Freeney's signature on the signature card for the BofA Roof Group account in or

27  about June 2010;

28          (d)   BANA gave Weinberg the confidential account access

---

30

**THIRD AMENDED COMPLAINT**

1   information, including the secret pass code, for the BofA Roof Group account, even

2   though she was not a signatory on the account;

3         (e)   At Weinberg's request, BANA repeatedly overrode the security

4   hold on the BofA Roof Group account; and

5         (f)   BANA permitted Weinberg to originate hundreds of wire transfers

6   totaling millions of dollars from the BofA Roof Group account, without first obtaining

7   Mr. Freeney's authorization for any of these transfers.

8       109.   Plaintiff's believe that BAC, BANA and MLPFS possess additional

9   documents and information demonstrating that Weinberg was a joint employee, actual

10   agent and/or ostensible agent of BANA, but have refused to produce those documents

11   or provide that information in response to Plaintiffs' written discovery requests in this

12   action.

13   **J.    David Sugarman.**

14       110.   Sugarman joined the Coral Gables office of Merrill Lynch as a broker

15   and advisor from Laidlaw & Company ("Laidlaw") in or about October 2009.  He was

16   recruited by BOCK.

17       111.   From December 2009 until he was terminated in January 2011,

18   Sugarman was employed by BANA and MLPFS.  His FINRA and SEC Reports

19   reflect his employment during this period as follows:

20

| Time Period | Employer | Position |
|---|---|---|
| 10/2009-present | "Merrill Lynch, Pierce, Fenner & Smith, Incorporated" | "Financial Advisor" |
| 12/2009-present | "Bank of America, N.A." | "Financial Advisor" |

26       112.   Sugarman's title during his tenure at BofA/Merrill Lynch was "Assistant

27   Vice President – Investments" and "Senior Financial Advisor" of "Merrill Lynch

28   Global Wealth Management," a subdivision of BAC.

**THIRD AMENDED COMPLAINT**

188650.4

113.   Upon joining Merrill Lynch, Sugarman formed a GWIM financial advisory team with BOCK and Weinberg that they named the "MSE Group"; "MSE" standing for Michael, Sugarman and Eva.

114.   In or about December 2009 or January 2010, BAC relocated Sugarman from the Merrill Lynch Coral Gables office to the BofA Brickell Avenue branch along with BOCK and Weinberg.

115.   In a May 2012 interview with the FBI, Sugarman stated that he had been employed by "Merrill Lynch/Bank of America."

**K.     Matthew Liebman.**

116.   Liebman joined Merrill Lynch in July 2008 as a broker and advisor, and became the Branch Manager of the Coral Gables office.

117.   According to Liebman's SEC Report, from December 2009 until the present, he has been jointly employed by BANA and MLPFS:

| Time Period | Employer | Position |
|---|---|---|
| 10/2009-present | "Merrill Lynch, Pierce, Fenner & Smith, Incorporated" | Not listed |
| 12/2009-present | "Bank of America, N.A." | Not listed |

118.   Liebman's FINRA Report states that he has been employed by "Merrill Lynch" from "07/2008–Present."

119.   Liebman's titles during the time relevant to this Third Amended Complaint have included "Senior Vice-President – Wealth Management," a subdivision of BAC; "Wealth Management Advisor"; "Resident Director"; and "Portfolio Manager."

120.   Plaintiffs are informed and believe, and on that basis allege, that Liebman was the supervisor for BOCK, Weinberg and Sugarman.  He was relocated with them

from the Merrill Lynch Coral Gables office to the BofA Brickell Avenue branch in or about December 2009 or January 2010.

121.   At all times relevant hereto, Liebman was registered as a broker-dealer and investment adviser, and owed his clients the fiduciary duties described above.

**L.     Jodi Del Campo (nka Jodi Bowles).**

122.   Del Campo was an employee of BANA and MLFPS during the relevant time period.  She worked at the BofA Brickell Avenue branch during this time, with the titles "Assistant Vice President" and "Wealth Management Banker" for "Wealth Management Banking" at "Bank of America, N.A."

123.   Del Campo's FINRA and SEC Reports show her as jointly employed by BANA and MLPFS during the time relevant hereto:

| Time Period | Employer | Position |
| --- | --- | --- |
| 11/1993-present | "Bank of America, N.A." | "Administrative" |
| 05/2007-present | "Bank of America Investments Services, Inc." | "Premier client manager" |
| 10/2009-present | "Merrill Lynch, Pierce, Fenner & Smith, Incorporated" | "VP; Private client manager II" |
| 06/2011-present | "Bank of America, N.A." | "VP; Private client manager II" |

124.   Del Campo was not a member of the MSE Group, but cross-marketed BANA products and services to their clients.

125.   At all times relevant hereto, Del Campo was a registered broker-dealer and investment adviser, and owed her clients the fiduciary duties discussed above.

**M.     Weinberg's Brother.**

126.   Weinberg's brother is a New Jersey resident.  He obtained a license to sell life insurance in New Jersey in May 2010, shortly after Mr. Freeney became a

**THIRD AMENDED COMPLAINT**

BofA/Merrill Lynch client.  He obtained a license to sell life insurance in Indiana in June 2010, just so he could receive the commissions from the sale of $55 million in life insurance to Mr. Freeney.  (He thereafter allowed that license to lapse in June 2012.)

127.   As an insurance advisor, under New Jersey and Indiana law, Weinberg's brother owed fiduciary duties to his clients, including: (a) the duty of undivided loyalty; (b) the duty to disclose all material information concerning the suitability, terms, costs and benefits of the insurance products he was recommending; (c) the duty to provide competent services and advice; and (d) the duty to keep his clients informed of the status of their investments.

**N.     The Florida Attorney and the Florida Law Firm.**

128.   At all relevant times, the Florida attorney (the "Florida Attorney") was licensed to practice law in the State of Florida and only in Florida.  The Florida law firm (the "Florida Law Firm"), of which he is a partner, is located in Miami.

129.   The Florida Attorney represented Stern in over 20 civil actions between 2000 and 2012.  He also represented Weinberg in two civil cases, both of which arose from her relationship with Stern.  As a result of his prior representation of Stern in those cases, as well as press reports and other publicly available information about Stern, the Florida Attorney was well aware of Stern's habitual dishonesty and fraudulent business practices, including his proclivity to lie, issue bad checks, forge others' signatures, falsify documents and misappropriate investor funds and mortgage proceeds.

130.   In or about July 2009, the Florida Attorney and the Florida Law Firm both filed claims in Stern's personal bankruptcy for $100,000 for unpaid legal fees.

131.   As an attorney licensed to practice law in the State of Florida, the Florida Attorney was obligated to obey the Florida Rules of Professional Conduct (the "Florida Rules"), which required him to, among other things: (a) disclose material information (Florida Rule 4-1.4); (b) act with care, competence and diligence (Florida

1    Rules 4-1.1 and 4-1.3); (c) communicate with his clients with candor (Florida

2    Rule 4-2.1); and (d) act with loyalty (Florida Rule 4-1.7).

3         132.   In his representation of Mr. Freeney and Roof Group (described further

4    below), the Florida Attorney was also engaged in the practice of law in California, but

5    without a license, which is a violation of California Business and Professions Code

6    section 6125 and a criminal offense.  By practicing law in California, the Florida

7    Attorney and the Florida Law Firm became subject to the ethical rules governing all

8    California lawyers.  Those rules are set forth in the California Rules of Professional

9    Conduct (the "California Rules"), and include: (a) the duty to disclose material

10   information (California Rule 3-500); (b) the duty to act with care, competence and

11   diligence (California Rule 3-110(A) and (B)); (c) the duty to communicate with

12   candor (California Rule 5-200); and (d) the duty to act with loyalty (California

13   Rule 3-310(A) and (B)).

## V.      THE SCHEME TO DEFRAUD.

### A.    Sugarman Recruits Mr. Freeney as a Client.

16        133.   While still at Laidlaw, Sugarman began recruiting Mr. Freeney as a

17   prospective client.  At the time, Mr. Freeney had no interest in becoming a client of

18   Laidlaw because he was unfamiliar with the firm and uninterested in having another

19   small, unknown firm as his financial manager and investment advisor.

20        134.   When he joined BofA/Merrill Lynch, Sugarman renewed his efforts to

21   recruit Mr. Freeney as a client, emphasizing to him that BofA/Merrill Lynch was one

22   of the largest and most well established financial institutions in the world; that it

23   offered the safety, soundness and protections that he was looking for; and that it could

24   provide a full range of wealth management services, from paying his bills and

25   preparing his tax returns to securing financing for his business ventures and finding

26   him better investment opportunities.

27        135.   Sugarman recruited Mr. Freeney to become a client of the "Bank of

28   America" and "BofA" group that specialized in managing the finances of high net

**THIRD AMENDED COMPLAINT**

188650.4

1   worth individuals.  Mr. Freeney understood that he was being recruited to become a

2   client of "Bank of America" and not a particular subsidiary, division, or subdivision of

3   the bank.

4   **B.      BOCK and Weinberg Recruit Mr. Freeney as a Client.**

5          136.   Prior to January 2010, Mr. Freeney had never met or spoken with BOCK,

6   Weinberg, or anyone else associated with BofA/Merrill Lynch other than Sugarman.

7   In January 2010, Sugarman introduced Mr. Freeney's friend and associate Aaron West

8   to BOCK and Weinberg, and Sugarman and Mr. West thereafter introduced

9   Mr. Freeney to Weinberg.

10         137.   Soon after being introduced to Mr. Freeney, Weinberg, with the approval

11   and encouragement of BOCK and Liebman, supplanted Sugarman as Mr. Freeney's

12   principal contact at the bank.  As Sugarman later told the FBI:

13       •      "[O]nce he introduced WEINBERG to FREENEY, she wanted
14              to take control of the relationship right away, even though
15              FREENEY was not an official client yet."

16       •      "[T]he minute WEINBERG met FREENEY, she just took
17              over."

18       •      "WEINBERG treated FREENEY's account like her own baby.
19              WEINBERG even went as far as to tell SUGARMAN not to
             contact or call FREENEY, saying that FREENEY was her guy.
20              WEINBERG said that she was going to handle all of
21              FREENEY's bill pay, his portfolio, money and the restaurant."

22         138.   In the course of recruiting Mr. Freeney to become a BofA/Merrill Lynch

23   client, BOCK and Weinberg made and caused others to make the following

24   misrepresentations and false promises, among others, to Mr. Freeney, directly and

25   through his friends and associates, including Mr. West:

26             (a)      Weinberg was a Senior Investment Advisor with BofA/Merrill

27   Lynch, when, in fact, she was not a registered investment adviser and not licensed to

28

---

36

**THIRD AMENDED COMPLAINT**

1  provide investment advice to clients;

2          (b)      BOCK's team had the qualifications, expertise and experience to

3  competently manage Mr. Freeney's assets, investments and income, when, in fact,

4  they were not true financial managers or planners and their expertise and experience

5  involved principally the purchase and sale of conventional investments, such as

6  publicly traded securities;

7          (c)      BOCK's team could and would assist Mr. Freeney in finding new

8  investors or obtaining loan financing for RSLA, when, in fact, they had no such ability

9  or intent;

10          (d)      BOCK's team could and would assist Mr. Freeney in disposing of

11  non-performing or otherwise unsuitable investments, such as undeveloped land he

12  owned in North Carolina and investments he had made in two unlisted companies in

13  return for unsecured, interest bearing promissory notes, when, in fact, they had no

14  such ability or intent; and

15          (e)      BOCK's team could and would assist Mr. Freeney in obtaining

16  the return of a $1.2 million deposit he had made toward the purchase of a

17  condominium unit in the new W Hotel in South Beach for investment purposes or

18  arrange for loan financing to close on the unit, when, in fact, they had no such ability

19  or intent.

20          139.   In the course of recruiting Mr. Freeney to become a BofA/Merrill Lynch

21  client, and continuing throughout the course of the scheme to defraud, BOCK and

22  Weinberg concealed and caused others to conceal the following material facts, among

23  others, from Mr. Freeney, his business associates and his professional advisors:

24          (a)      Weinberg was only a part-time BofA/Merrill Lynch employee;

25          (b)      Weinberg was not a registered investment adviser and was not

26  licensed to give investment advice to clients;

27          (c)      Weinberg had been out of the financial services industry for a

28  number of years prior to joining BofA/Merrill Lynch and had just joined

37

**THIRD AMENDED COMPLAINT**

1    BofA/Merrill Lynch a few months earlier;

2            (d)    Weinberg was unfit and not competent to manage Mr. Freeney's

3    assets, investments, or income;

4            (e)    Weinberg had been twice married to and twice divorced from

5    BOCK and they had a tumultuous and at times acrimonious working relationship;

6            (f)    Weinberg's deposition testimony in the *Colonial Bank* Case

7    revealed that she had been assisting Stern in committing bankruptcy fraud, finding

8    new victims and intimidating a key witness;

9            (g)    Weinberg had no expertise or experience in the management or

10   operation of a restaurant;

11           (h)    Weinberg had no ability to maintain the books and records or

12   prepare budgets or financial projections for a restaurant; and

13           (i)    Weinberg had no experience in supervising the build out, staffing,

14   opening, or operations of a restaurant.

15       140.   If Mr. Freeney had been advised of the true facts concerning

16   BofA/Merrill Lynch, BOCK and Weinberg at the time, he would never have agreed to

17   become or remain a BofA/Merrill Lynch client or have entrusted management of his

18   assets, investments and income and his financial future to BofA/Merrill Lynch,

19   BOCK, or Weinberg.

20       141.   In making these representations and concealing these facts, BOCK and

21   Weinberg were acting in their capacities as employees, actual agents and/or ostensible

22   agents of BAC, BANA and MLPFS.

23   **C.    Weinberg Refers Mr. Freeney to "Michael Millar" for Consulting**

24        **Services and as a Potential Investor in RSLA.**

25       142.   In the course of recruiting Mr. Freeney to become a BofA/Merrill Lynch

26   client, Weinberg introduced Mr. Freeney to "Michael Millar."  Mr. Freeney was told

27   that Millar was a wealthy and successful Miami Beach businessman who did

28   consulting work for BofA/Merrill Lynch.  He was also told that Millar might be

**THIRD AMENDED COMPLAINT**

1   interested in investing in RSLA and could assist Mr. Freeney in disposing of his non-

2   performing and unsuitable existing investments.

3       143.   In the course of recruiting Mr. Freeney, Weinberg made and caused other

4   to make the following false and misleading representations, among others, to

5   Mr. Freeney, directly and through his friends and associates, including Mr. West and

6   Jason Edmonds, about Stern:

7         (a)   Stern's name was "Michael Millar," when, in fact, it was

8   Michael Alan Stern;

9         (b)   Millar was a wealthy businessman, when, in fact, Stern and his

10  then wife had filed for personal bankruptcy a year earlier with reported liabilities in

11  excess of $65 million and assets valued at *negative* $2.4 million;

12        (c)   Millar was a successful Miami Beach real estate developer, when,

13  in fact, all of Stern's principal real estate holdings were over-encumbered and in

14  bankruptcy, receivership, or foreclosure;

15        (d)   Millar had $30 million on deposit at BofA/Merrill Lynch, when,

16  in fact, Stern's bankruptcy schedules stated that his bank account balances totaled

17  *negative* $23,000;

18        (e)   Millar was a real estate consultant for BofA/Merrill Lynch, when,

19  in fact, Stern was not and never had been a consultant of any kind for

20  BofA/Merrill Lynch;

21        (f)   Millar lived in the Bahamas, when, in fact, Stern lived in

22  Miami Beach and was under court order to remain in Miami-Dade County or face

23  arrest;

24        (g)   Millar owned a private jet, when, in fact, Stern did not own and

25  lacked the funds to purchase any aircraft;

26        (h)   Millar was the grandson of pharmaceutical mogul Dr. Phillip

27  Frost, the Chairman of Teva Pharmaceuticals, when, in fact, Dr. Frost was one of

28  Stern's victims, having lost $1.6 million investing in one of Stern's fraudulent real

estate ventures;

(i)     Millar intended to invest $7.0 million in RSLA, when, in fact, Stern had neither the means nor the intention to invest one penny in RSLA;

(j)     Millar could assist in overseeing the build out, staffing and opening of RSLA, when, in fact, Stern saw RSLA not as a viable investment, but as an opportunity to steal from Mr. Freeney; and

(k)     Millar was a man of his word who wanted nothing more than to show Mr. Freeney how to become a successful business owner, when, in fact, Stern was a notorious swindler and financial predator who was targeting Mr. Freeney as his next prey.

144.   In the course of recruiting Mr. Freeney to become a BofA/Merrill Lynch client, and throughout the course of the scheme to defraud, BOCK and Weinberg concealed the following material facts, among others, from Mr. Freeney, his business associates and his professional advisors about Stern:

(a)     Stern and his then wife had declared personal bankruptcy just a year prior to Mr. Freeney becoming a BofA/Merrill Lynch client, with reported debts exceeding $65 million and assets of a negative value;

(b)     Stern's real estate assets were over-encumbered, in receivership, in bankruptcy and/or the subject of foreclosure proceedings or other lawsuits;

(c)     Stern had been found in contempt by the Bankruptcy Court for willfully violating court orders requiring him to produce documents and appear to provide testimony;

(d)     Stern was a defendant in more than 20 civil lawsuits brought by defrauded partners, investors, mortgage lenders and financial institutions;

(e)     Evidence introduced in those lawsuits established that Stern had forged documents, falsified loan applications, misappropriated over $20 million in loan proceeds, and engaged in witness tampering and intimidation;

(f)     A writ of bodily attachment had issued for Stern's arrest in one of

**THIRD AMENDED COMPLAINT**

1    the Florida lawsuits;

2              (g)    Stern had fled to Uruguay to evade process and avoid being

3    deposed, and, while there, cheated his stepson out of a large inheritance;

4              (h)    Stern had previously been caught paying over $100,000 in bribes

5    to Miami Beach city officials;

6              (i)    Stern had substantial gambling debts;

7              (j)    Stern had not paid any income taxes in years, although he reported

8    in his bankruptcy schedules having earned $500,000 in both 2007 and 2008;

9              (k)    Stern had neither the intent nor the ability to invest any funds in

10   RSLA or to attract other investors to do so; and

11             (l)    Stern was addicted to the prescription drug Oxycodone.

12       145.   In the course of recruiting Mr. Freeney to become a BofA/Merrill Lynch

13   client, and throughout the course of the scheme to defraud, BOCK and Weinberg

14   concealed and caused others to conceal the following material facts, among others,

15   from Mr. Freeney, his associates and his professional advisors concerning BOCK and

16   Weinberg's relationships with Stern, including that:

17             (a)    BOCK, Weinberg and the Weinberg family had loaned more than

18   $1.0 million to Stern in the past;

19             (b)    Stern had not repaid most of those loans;

20             (c)    BOCK was listed as a creditor for $500,000 in one of Stern's

21   bankruptcies;

22             (d)    Weinberg had previously worked for one of Stern's companies

23   and managed the Beach Place Hotel for Stern while he was Uruguay;

24             (e)    Both BOCK and Weinberg had previously attempted to find

25   investors for Stern's distressed real estate holdings;

26             (f)    BOCK and Weinberg had paid Stern's attorneys in his

27   bankruptcies and civil litigation;

28             (g)    BOCK and Weinberg had assisted Stern in the *Colonial Bank*

41

**THIRD AMENDED COMPLAINT**

188650.4

1  Case by pressuring Esther Burstyn-Spero to recant her testimony that Stern had forged

2  her signature;

3          (h)     Both BOCK and Weinberg had been deposed in the *Colonial*

4  *Bank* Case in which Stern was alleged to have committed fraud involving $17.8

5  million in real estate loans;

6          (i)     Weinberg had guaranteed Stern's debt to the Faraches by giving

7  them $400,000 in bad checks; and

8          (j)     Weinberg was romantically involved with Stern.

9      146.   In addition, Stern (posing as Millar) made the following

10  misrepresentations and false promises, among others, to Mr. Freeney, directly and

11  through his friends and associates, including Mr. West:

12          (a)     His name was "Michael Millar," "David Millar," or "David

13  Michael Millar";

14          (b)     He was a wealthy and successful businessman who had made his

15  money in real estate development and the petroleum industry;

16          (c)     He was sometimes asked to perform consulting services for BofA;

17          (d)     His primary residence was in the Bahamas, but he also had a

18  residence in Florida;

19          (e)     He owned a private jet and a private yacht;

20          (f)     He had the financial resources to invest in RSLA, and was

21  interested in investing in RSLA; and

22          (g)     He could and would recover Mr. Freeney's $1.2 million deposit

23  on the W Hotel condominium unit.

24      147.   If Mr. Freeney had been advised of the true facts concerning Stern, and

25  BOCK and Weinberg's involvement with Stern, he would never have agreed to

26  become or remain a BofA/Merrill Lynch client or have entrusted management of his

27  assets, investments and income and his financial future to BofA/Merrill Lynch,

28  BOCK, or Weinberg.

42

**THIRD AMENDED COMPLAINT**

148.   In referring Mr. Freeney to Stern (posing as Millar) and vouching for his bona fides, and in making the aforementioned representations and concealing the aforementioned facts, BOCK and Weinberg were acting in their capacities as employees, actual agents and/or ostensible agents of BAC, BANA and MLPFS.

**D.     Liebman and BOCK Give Weinberg Exclusive Authority to Serve as Mr. Freeney's Wealth Manager.**

149.   Following Weinberg's introduction to Mr. Freeney and his associates, Liebman and BOCK approved, authorized and ratified Weinberg serving as Mr. Freeney's private banker, financial manager and investment advisor.  Weinberg's authority included, among other things:

(a)     Serving as the principal point of contact between Mr. Freeney and BofA/Merrill Lynch;

(b)     Opening bank and brokerage accounts for Mr. Freeney;

(c)     Arranging for the transfer of Mr. Freeney's assets and existing investments from his prior financial manager to BofA/Merrill Lynch;

(d)     Referring Mr. Freeney to bank outsiders for consulting, insurance and legal services;

(e)     Selling Mr. Freeney insurance products;

(f)     Giving Mr. Freeney investment advice;

(g)     Liquidating Mr. Freeney's existing investments;

(h)     Managing Mr. Freeney's income from his Colts contract, endorsements and other sources;

(i)     Paying Mr. Freeney's bills and personal expenses;

(j)     Transferring funds from Mr. Freeney's bank and brokerage accounts without his express authorization;

(k)     Managing Roof Group's finances;

(l)     Overseeing the build out, staffing and public opening of RSLA;

(m)     Paying invoices from Brodin Design, subcontractors, vendors and

43

**THIRD AMENDED COMPLAINT**

188650.4

1   others involved in the build out of RSLA;

2             (n)    Arranging for the preparation of Mr. Freeney's tax returns and

3   managing the funds from his tax refunds; and

4             (o)    Administering and operating Mr. Freeney's charitable foundation.

5        150.   In giving and permitting Weinberg to exercise this authority, Liebman

6   and BOCK were acting in their capacities as employees and agents of BAC, BANA

7   and MLPFS and Liebman was acting as Weinberg's supervisor.

8   **E.    Mr. Freeney Becomes a BofA/Merrill Lynch Client and Transfers**

9   **       Management of His Assets, Investments and Income to BAC and MLPFS.**

10       151.   Mr. Freeney agreed to become a BofA/Merrill Lynch client and transfer

11  management of his assets, investments, income and other financial affairs to

12  BofA/Merrill Lynch in or about late January or early February 2010.

13       152.   As BofA/Merrill Lynch recognized, the benefits of having Mr. Freeney

14  as a client included: (a) the immediate transfer and deposit of approximately $3.0

15  million in cash; (b) management of assets, investments and present and future

16  guaranteed income exceeding $40 million in value; (c) the generation of sizable

17  commissions and fees; (d) potential profits from real estate and business loans and

18  other extensions of credit; and (e) the prestige and marketing opportunities from

19  having one of the highest paid and most well respected players in the NFL as a client.

20       153.   Weinberg, as Mr. Freeney's assigned banker, oversaw the transfer of his

21  assets and investments from his prior financial manager and investment advisor to

22  BofA/Merrill Lynch.  The assets, investments and income streams that Mr. Freeney

23  transferred to BofA/Merrill Lynch's control included:

24            (a)    Approximately $3.0 million in cash;

25            (b)    A life insurance annuity worth a little over $1.5 million;

26            (c)    $1,750,000 invested with CFP Group, Inc. ("CFP"), in the form of

27  loans, which was returning a little more than $26,000 in monthly interest income;

28            (d)    $1,500,000 invested with Success Trade, Inc. ("Success Trade"),

**THIRD AMENDED COMPLAINT**

1  in the form of loans, which was returning approximately $15,600 in monthly interest

2  income;

3          (e)     $500,000 invested in Advisors Disciplined municipal bonds,

4  which was returning slightly more than $2,000 in monthly interest income, tax free;

5          (f)     $200,000 invested in an American Realty Capital Trust REIT,

6  which was returning approximately $1,100 in monthly interest income, tax free;

7          (g)     His investment and ownership interest in Roof Group and RSLA;

8          (h)     A contract to purchase a condominium unit in the W Hotel

9  pursuant to which he had previously paid a $1.2 million deposit (the "W Hotel

10  Investment");

11          (i)     8.5 acres of undeveloped land in Mecklenburg County,

12  North Carolina, which he had purchased for $1,530,000 in or about December 2004

13  (the "North Carolina Land Investment");

14          (j)     The three years remaining on his Colts contract, which guaranteed

15  him income, before taxes, totaling $34,280,000; and

16          (k)     Income tax refunds due him for the 2009 tax year, which totaled

17  over $1.0 million.

18      154.   All of these assets, investments and income came under the management

19  and control of BOCK's team at the BofA Brickell Avenue branch.

20      155.   As part of the management of Mr. Freeney's assets, investments and

21  income, BofA/Merrill Lynch agreed that it would handle Mr. Freeney's bill payments,

22  including payment of his credit card bills, insurance premiums, home mortgage,

23  property taxes, home owners' association dues, car payments, telephone bills and

24  home utility bills.

25      156.   BofA/Merrill Lynch also agreed that it would handle the preparation and

26  filing of Mr. Freeney's federal and state tax returns; provide periodic snapshots of his

27  financial condition; dispose of the North Carolina Land Investment; pursue the return

28  of his deposit with the W Hotel or provide loan financing to purchase the unit; and

**THIRD AMENDED COMPLAINT**

188650.4

1  research and recommend new investment opportunities.

2      157.  BofA/Merrill Lynch further agreed to manage his investment in

3  Roof Group, which included handling payments to Brodin Design and other vendors

4  for the build out; the preparation and filing of Roof Group's federal and state tax

5  returns; and finding additional investors and/or loan financing for RSLA so that

6  Mr. Freeney would not be the sole source of funds.

7      158.  As a result of BofA/Merrill Lynch becoming Mr. Freeney's new financial

8  manager, all of his bank and brokerage account statements, credit card statements,

9  bills and correspondence regarding his investments, including RSLA, were forwarded

10  to BOCK's team.

11      159.  Based on their representations, promises and withholding of material

12  information, Mr. Freeney came to repose his trust and confidence in

13  BofA/Merrill Lynch, BOCK and Weinberg to honestly, loyally, competently and

14  diligently do what they had represented and promised, including to manage his assets,

15  investments and income; pay his bills; make investment recommendations; give

16  financial advice; and generally protect his financial interests and future.  At all times

17  relevant hereto, BofA/Merrill Lynch, BOCK and Weinberg, and each of them,

18  encouraged, assumed and voluntarily accepted such trust and confidence, creating a

19  fiduciary relationship with Mr. Freeney.

20      160.  At the urging of BofA/Merrill Lynch, and in reliance upon BOCK,

21  Weinberg and Stern's misrepresentations, false promises and concealment of material

22  facts, Mr. Freeney authorized Stern (posing as Millar) to work with BOCK's team to,

23  among other things:

24          (a)  Negotiate the return of his $1.5 million in loans to Success Trade;

25          (b)  Negotiate the return of his $1.75 million in loans to CFP;

26          (c)  Negotiate the return of his $1.2 million deposit with the W Hotel;

27          (d)  Dispose of the North Carolina Land Investment;

28          (e)  Increase his ownership interest in and control of Roof Group; and

46

**THIRD AMENDED COMPLAINT**

188650.4

1        (f)      Oversee the build out, renegotiate the lease, obtain the liquor

2 license and hire new managers for RSLA.

3      161.   Based on these representations, promises and undisclosed facts,

4 Mr. Freeney came to repose his trust and confidence in Stern (posing as Millar) to

5 honestly, loyally, competently and diligently do what he had represented and

6 promised.  At all times relevant hereto, Stern (posing as Millar) encouraged, accepted

7 and voluntarily assumed such trust and confidence, creating a fiduciary relationship

8 with Mr. Freeney.

9      162.   In arranging for and transferring these assets, investments and income

10 streams to BofA/Merrill Lynch's control, agreeing to provide the aforementioned

11 services to Mr. Freeney and delegating the aforementioned responsibilities to Stern,

12 BOCK and Weinberg were acting in their capacities as employees, actual agents

13 and/or ostensible agents of BAC, BANA and MLPFS.

14 **F.**     **The Creation of Arms Reach Consulting LLC.**

15      163.   A few days after being introduced to Mr. Freeney, Stern directed his

16 associate Lester Jaggernauth to incorporate Arms Reach Consulting LLC ("ARC") in

17 Delaware and open a business checking account for ARC.  As Jaggernauth later stated

18 to the FBI:

19          •     "[O]ne day, STERN told him that he was going to open a

20                company, and put in it JAGGERNAUTH's name.

21                JAGGERNAUTH said he didn't feel good about this at first
                   and was unsure about this, but ultimately, STERN opened

22                Arm's Reach Consulting in JAGGERNAUTH's name."

23
          •     "[H]e and STERN saw the name, Arm's Reach Consulting

24                (ARC) from the back of a yacht owned by a VP of
                Coca Cola . . . .  JAGGERNAUTH said that he did not know

25                what ARC did for sure . . . ."

26

27      164.   Jaggernauth further stated to the FBI that "STERN told

28 JAGGERNAUTH that he was just using JAGGERNAUTH's name to open the bank

**THIRD AMENDED COMPLAINT**

188650.4

1   account because of STERN's bankruptcy.  STERN said that he couldn't have any

2   bank accounts in STERN's name because the bankruptcy trustee had seized all of

3   STERN's other bank accounts, so he had to use JAGGERNAUTH's name to get

4   around this."

5       165.   Plaintiffs are informed and believe, and on that basis allege, that on or

6   about February 18, 2010, BOCK and Weinberg paid an organization called the

7   Incorporating Company LLC to incorporate ARC in Delaware for Stern.

8       166.   On or about that same day, Stern established two email accounts with

9   Yahoo that he could use to communicate with Mr. Freeney and his associates under

10  the false identify David Michael Millar: davidmichaelmillar@yahoo.com and

11  armsreachconsultingllc@yahoo.com.

12      167.   On or about February 27, 2010, Jaggernauth opened a business checking

13  account for ARC at Wachovia Bank, which subsequently became a Wells Fargo Bank

14  account when Wells Fargo acquired Wachovia.

15      168.   ARC was created as an instrumentality to carry out the scheme to

16  defraud: it had no assets, employees, clients, or legitimate business operations.  Stern

17  established ARC for the sole or primary purpose of concealing his theft and

18  conversion of Mr. Freeney and Roof Group's fund and assets from Mr. Freeney, the

19  Bankruptcy Court, the bankruptcy trustee, the U.S. Trustee, his creditors in his

20  bankruptcy proceedings and the defrauded victims who had sued him.  In fact, during

21  the course of the scheme, more than $2.2 million in funds Weinberg and Stern had

22  misappropriated using the BofA Roof Group account at BANA would be laundered

23  through the ARC bank account.

24  **G.    Weinberg Refers Mr. Freeney to Her Brother for Insurance Services.**

25      169.   In or about March 2010, Weinberg advised Mr. Freeney that he should

26  obtain whole life insurance as part of his overall investment portfolio.

27      170.   At the time, Mr. Freeney already owned and was making premium

28  payments on a $10 million life insurance policy issued by Minnesota Mutual Life

**THIRD AMENDED COMPLAINT**

1    Insurance Company ("Minnesota Mutual") and a $3.0 million life insurance policy

2    issued by Lincoln Financial Life Insurance Company ("Lincoln Financial").

3    BofA/Merrill Lynch was aware of these policies, having received requests for

4    premium payments from Minnesota Mutual and Lincoln Financial.

5         171.   In or about March 2010, Weinberg introduced Mr. Freeney to her

6    brother.  Weinberg falsely represented to Mr. Freeney that her brother had extensive

7    knowledge and experience concerning the purchase of life insurance products for

8    investment purposes.  In fact, Weinberg's brother was not even licensed to sell life or

9    any insurance at the time.

10        172.   In or about March 2010, Weinberg's brother offered and agreed to act as

11   Mr. Freeney's advisor in his purchase of suitable whole life insurance for investment

12   purposes, concealing from Mr. Freeney his lack of qualifications, expertise and

13   experience in the purchase of life insurance products generally and for investment

14   purposes specifically.

15        173.   Weinberg and Weinberg's brother encouraged and convinced

16   Mr. Freeney to purchase up to $60 million in whole life insurance, claiming that this

17   was a suitable, prudent and beneficial long-term investment for him.  Trusting in the

18   honesty, loyalty, competence and candor of BofA/Merrill Lynch, Weinberg and

19   Weinberg's brother, Mr. Freeney accepted their recommendations and agreed that

20   they should select the insurance policies to be purchased and complete the purchases

21   on his behalf.

22        174.   Unbeknownst to Mr. Freeney, Weinberg and her brother had agreed to

23   split the commissions from Mr. Freeney's purchase of the life insurance policies,

24   which would be a substantial payment given the amount of insurance involved.

25        175.   Weinberg and her brother used a senior life insurance agent who was a

26   friend of their father to find insurance companies willing to issue $60 million in whole

27   life insurance to Mr. Freeney.  Weinberg and her brother instructed the senior life

28   insurance agent to structure the purchase of the life insurance to include multiple

49

**THIRD AMENDED COMPLAINT**

policies, rather than a single, high-dollar policy.

176.   Because a single policy would have had a higher cash surrender value, it would have been a much better investment for Mr. Freeney.  Weinberg and her brother instructed the senior life insurance agent to obtain multiple policies for the sole or primary purpose of maximizing the sales commissions Weinberg's brother would receive, and thus the amount of money he could kick back to Weinberg.

177.   Based on these representations and undisclosed facts, Mr. Freeney came to repose his trust and confidence in BofA/Merrill Lynch, Weinberg and Weinberg's brother to honestly, loyally, competently and diligently advise, counsel and assist him in the purchase of as much as $60 million in life insurance for investment purposes.  At all times relevant hereto, BofA/Merrill Lynch, Weinberg and Weinberg's brother, and each of them, encouraged, accepted and voluntarily assumed such trust and confidence, creating a fiduciary relationship with Mr. Freeney relating to the purchase of such insurance.

178.   In referring Mr. Freeney to her brother and vouching for his bona fides, in advising and encouraging Mr. Freeney to purchase up to $60 million in life insurance, and in making the aforementioned representations and concealing the aforementioned facts, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BAC, BANA and MLPFS.

**H.     Weinberg Refers Mr. Freeney to the Florida Attorney and the Florida Law Firm for Legal Services.**

179.   Toward the end of March 2010, BofA/Merrill Lynch, Weinberg and Stern referred Mr. Freeney to the Florida Attorney and the Florida Law Firm for legal advice and services relating to Roof Group and RSLA.  The Florida Attorney met Mr. Freeney for the first time on or about March 24, 2010, at or en route to a meeting in the Bahamas that included Weinberg, Stern (posing as Millar) and Jaggernauth to discuss certain issues relating to Roof Group and RSLA.

180.   In that meeting, and in subsequent communications with Mr. Freeney, the

50

**THIRD AMENDED COMPLAINT**

188650.4

1   Florida Attorney was careful not to reveal that Millar's true name was Michael Stern,

2   and made statements and withheld information that created the false and misleading

3   impression that Stern was, in fact, a wealthy and successful businessman; that both

4   Weinberg and Stern were professionals whom Mr. Freeney could trust; and that both

5   Weinberg and Stern had Mr. Freeney's best interests at heart and wanted to protect

6   him from those around him who would attempt to cheat or take unfair advantage of

7   him.

8       181.   Weinberg, Stern (posing as Millar) and the Florida Attorney made the

9   following false and misleading representations, among others, to Mr. Freeney, directly

10  and through his friends and associates, to induce Mr. Freeney to retain the Florida

11  Attorney:

12          (a)     The Florida Attorney had the expertise and experience to

13  competently provide legal advice and services to Roof Group and RSLA,

14  notwithstanding that Roof Group was a California limited liability company, RSLA

15  was located in Los Angeles and neither of them had any ongoing connections to

16  Florida;

17          (b)     The Florida Attorney could be trusted to provide loyal services

18  and candid legal advice to Mr. Freeney regarding Roof Group, RSLA and related legal

19  matters; and

20          (c)     The Florida Attorney had no conflicts of interest arising from any

21  past attorney-client relationship with Millar.

22      182.   Additionally, Weinberg, Stern (posing as Millar) and the Florida

23  Attorney concealed and caused others to conceal the following material facts, among

24  others, from Mr. Freeney and his friends and associates concerning the Florida

25  Attorney's relationships with Stern and Weinberg:

26          (a)     The Florida Attorney had represented Stern in 20 or more civil

27  lawsuits prior to being introduced to Mr. Freeney, in which Stern had been sued for

28  fraud, issuing NSF checks, misappropriating loan proceeds and forging signatures on

1   loan and related documents;

2   (b)    In the *College Health* Case, the Florida attorney had negotiated a

3   settlement agreement on behalf of Stern that, within three months of signing, Stern

4   sought to invalidate based on false claims that he had been coerced into signing it by

5   threats against his life;

6   (c)    The Florida Attorney was representing Weinberg in two civil

7   lawsuits in which she was sued for writing NSF checks totaling more than $400,000

8   and failing to pay a house painter;

9   (d)    The Florida Attorney had prepared a promissory note securing a

10  $350,000 loan from BOCK, Weinberg and Weinberg's brother to Stern, which Stern

11  had never repaid;

12  (e)    The Florida Attorney was present at a meeting in or about August

13  2009, at which Stern admitted that he had forged the signature of Esther Burstyn-

14  Spero to two loan forgiveness documents;

15  (f)    Stern had failed to pay at least $100,000 in legal fees to the

16  Florida Attorney and the Florida Law Firm;

17  (g)    The Florida Attorney and the Florida Law Firm had filed creditor

18  claims in Stern's bankruptcy in or about July 2009 for the $100,000 that they were

19  owed;

20  (h)    The Florida Attorney had inserted a clause in a retainer agreement

21  that he had sent to Mr. Freeney for his signature, which stated that Mr. Freeney

22  "appoints Arms Reach Consulting LLC . . . ('ARC') as [his] agent to communicate

23  and deal directly with the Firm on the Client's behalf," and, "[u]nless otherwise

24  instructed by the Client in writing, the Firm will take direction from ARC";

25  (i)    The Florida Attorney and Florida Law Firm could not ethically

26  represent Mr. Freeney because they had a disqualifying conflict of interest as a result

27  of their past representation of Stern, what they knew about Stern's dishonest character

28  and fraudulent and illegal practices from that representation, and the aforementioned

52

**THIRD AMENDED COMPLAINT**

1    clause agreeing to take their direction from ARC; and

2             (j)    The Florida Attorney and Florida Law Firm could not ethically

3    represent Mr. Freeney because they had a disqualifying conflict of interest as a result

4    of their then current representation of Weinberg and what they knew about

5    Weinberg's legal problems and current situation at BofA/Merrill Lynch.

6        183.   Based upon these false and misleading representations and undisclosed

7    facts, Mr. Freeney agreed to retain the Florida Attorney in or about April 2010, to

8    revise the Roof Group Operating Agreement to increase his ownership interest in and

9    control of Roof Group and to negotiate with Altounian and Donnelly to purchase their

10   interests in Roof Group.

11       184.   Based on the foregoing representations and undisclosed facts concerning

12   the Florida Attorney, Mr. Freeney came to repose his trust and confidence in

13   BofA/Merrill Lynch, Weinberg, Stern (posing as Millar), the Florida Attorney and the

14   Florida Law Firm to act honestly, loyally, competently and diligently in providing

15   legal advice and services concerning his ownership, control and management of

16   Roof Group and RSLA.  At all times relevant hereto, BofA/Merrill Lynch, Weinberg,

17   Stern, the Florida Attorney and the Florida Law Firm, and each of them, encouraged,

18   accepted and voluntarily assumed such trust and confidence, creating a fiduciary

19   relationship with Mr. Freeney relating to those matters.

20       185.   In referring Mr. Freeney to the Florida Attorney and his law firm and

21   vouching for their bona fides, making the aforementioned representations and

22   concealing the aforementioned facts, Weinberg was acting in her capacity as an

23   employee, actual agent and/or ostensible agent of BAC, BANA and MLPFS.

24   **I.    Weinberg's Misappropriation of Funds from Mr. Freeney's**

25        **Brokerage Account.**

26       186.   Between in or about March 2010 and June 2010, Weinberg

27   misappropriated over $160,000 from one of Mr. Freeney's brokerage accounts,

28   personally directing that the funds be wire transferred to ARC without Mr. Freeney's

**THIRD AMENDED COMPLAINT**

authorization or knowledge.  The following is a summary of those misappropriations:

| Date of Transfer | Amount Transferred |
|---|---|
| 03/15/2010 | $24,467 |
| 04/21/2010 | $25,000 |
| 05/18/2010 | $45,000 |
| 05/26/2010 | $35,000 |
| 05/27/2010 | $20,000 |
| 06/04/2010 | $11,880 |
| **Total:** | **$161,347** |

187.   Plaintiffs' information and belief is based upon account records Plaintiffs obtained, from the United States Attorney's Office ("USAO"), as crime victims, in connection with criminal proceedings against Weinberg and Stern; documents and information their counsel acquired in the course of counsel's independent investigation; and analysis performed by forensic accountants retained by Plaintiffs' counsel.  To date, BAC, BANA and MLPFS have refused, and continue to refuse, to provide records relating to Mr. Freeney's accounts, including records to which he is entitled as a former BofA/Merrill Lynch client and that he has requested repeatedly.  To date, BAC, BANA and MLPFS have also failed to produce records, correspondence and other documents relating to Mr. Freeney's accounts in response to Plaintiffs' written discovery requests in this action.

188.   None of the funds Weinberg transferred to the ARC bank account were used for the purposes stated by Weinberg or to otherwise benefit Mr. Freeney.  Instead, they were all used by Stern for his personal benefit and as seed money for the scheme to defraud.

189.   Plaintiffs are further informed and believe, and on that basis allege, that

**THIRD AMENDED COMPLAINT**

Weinberg misappropriated additional funds from Mr. Freeney's brokerage accounts, but remain without the records and other information from BAC, BANA and MLPFS to determine the extent of those additional misappropriations.

190.   In causing these transfers to be made, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BAC, BANA and MLPFS.

**J.    BOCK's Unauthorized Purchases of Securities.**

191.   Plaintiffs are informed and believe, and on that basis allege, that between in or about February 2010 and April 2010, BOCK directed the following purchases to of securities to be made using approximately $890,000 of Mr. Freeney's funds:

| Date of Purchase | Security | Purchase Price |
|---|---|---|
| 02/26/2010 | Western Asset MTG Define | $400,000 |
| 03/08/2010 | Hartford Balance Income | $200,000 |
| 03/08/2010 | Goldman Sachs Group Inc. | $193,998 |
| 03/30/2010 | Hartford Balance Income | $1,552 |
| 04/16/2010 | Citigroup Inc. | $2,381 |
| 04/16/2010 | Citigroup Inc. | $10,933 |
| 04/16/2010 | Citigroup Inc. | $10,935 |
| 04/16/2010 | Citigroup Inc. | $42,796 |
| 04/16/2010 | Citigroup Inc. | $28,056 |
| | **Total:** | $890,655 |

192.    These purchases were made without Mr. Freeney's authorization or knowledge.

193.   Plaintiffs are informed and believe, and on that basis allege, that these transactions generated large commissions for BOCK.

194.   Plaintiffs information and belief is based upon account records Plaintiffs obtained from the USAO, as crime victims, in connection with criminal proceedings against Weinberg and Stern; documents and information their counsel acquired in the course of consel's independent investigation; and analysis performed by forensic

1   accountants retained by Plaintiffs' counsel.  To date, BAC, BANA and MLPFS have

2   refused, and continue to refuse, to provide records relating to Mr. Freeney's accounts,

3   including records to which he is entitled as a former BofA/Merrill Lynch client and

4   that he has requested repeatedly.  To date, BAC, BANA and MLPFS have also failed

5   to produce records, correspondence and other documents relating to Mr. Freeney's

6   accounts in response to Plaintiffs' written discovery requests in this action.

7   195.   In making these unauthorized purchases of securities, BOCK was acting

8   in his capacity as an employee and agent of BAC, BANA and MLPFS.

9   **K.   Stern and Weinberg's Use of a Private Jet in Furtherance of the**

10      **Scheme to Defraud.**

11   196.   As part of the scheme to defraud, Stern (posing as Millar) flew in a

12   private jet, N900JF, which he claimed to own.  Stern allowed Mr. Freeney to use the

13   jet and only pay for the cost of fuel, purportedly as a token of his friendship and

14   generosity.  Stern paid professional pilots Edward Rennia and Dana Messier to fly the

15   plane.

16   197.   Stern's purported ownership of his own jet was an integral part of the

17   scheme to defraud: it served to outwardly validate his success and affluence as well as

18   to ingratiate himself to Mr. Freeney, who had to fly frequently and appreciated the use

19   of a private aircraft for only the cost of the fuel.  In fact, Weinberg had made a point

20   of representing to Mr. Freeney and his friends and associates that Millar owned his

21   own jet when introducing Stern to them.

22   198.   In reality, Stern did not own this aircraft, and had no money of his own

23   with which to purchase or operate it.  Initially, Stern leased and operated the aircraft

24   using some of the funds Weinberg had caused to be transferred from Mr. Freeney's

25   brokerage account to the ARC Wells Fargo account.  Later, he used money

26   misappropriated from a Roof Group BofA account to lease and maintain the plane and

27   to pay the pilots to fly it.

28   199.   As a further part of this charade, Stern asked the pilots to lie to

56

**THIRD AMENDED COMPLAINT**

1    Mr. Freeney and tell him that Millar owned the jet, should Mr. Freeney ever ask.

2        200.   Between in or about June 2010 and October 2011, Stern used

3    approximately $750,000 in funds misappropriated from a Roof Group account at

4    BANA to lease the plane, to pay for its maintenance and hangar fees, to pay the pilots'

5    salaries and expenses, and toward its purchase in the name of ARC.

6        201.   In the course of the scheme to defraud, Weinberg and Stern made and

7    caused others to make the following false representations, among others, to

8    Mr. Freeney and his friends and associates concerning the jet aircraft: (a) Stern

9    (posing as Millar) owned it; and (b) when he used it, Mr. Freeney only paid for the

10   cost of the jet fuel.

11       202.   In the course of the scheme to defraud, Weinberg and Stern concealed

12   and caused others to conceal the following material facts, among others, from

13   Mr. Freeney concerning the aircraft:

14           (a)      James Pelky, not Stern, owned it and was only leasing it to Stern

15   and ARC;

16           (b)      Stern was using funds misappropriated from Mr. Freeney and

17   Roof Group to pay to lease the aircraft;

18           (c)      Stern was also using funds misappropriated from Mr. Freeney and

19   Roof Group to pay to maintain the aircraft, pay the hangar fees and pay the salaries

20   and expenses of Rennia and Messier to fly it; and

21           (d)      Over $200,000 of the money Stern paid Pelky to lease the aircraft,

22   all of which were funds misappropriated from Mr. Freeney and Roof Group, had been

23   applied towards ARC's purchase of the aircraft.

24       203.   In transferring Mr. Freeney's funds to ARC and in making these

25   representations and concealing these facts, Weinberg was acting in her capacity as an

26   employee, actual agent and/or ostensible agent of BAC, BANA and MLPFS.

27   / / /

28   / / /

---

57

**THIRD AMENDED COMPLAINT**

188650.4

**L.     Weinberg and Weinberg's Brother Fraudulently Induce Mr. Freeney to Purchase $55 Million in Unsuitable and Worthless Life Insurance.**

204.   Between or about June 2010 and August 2010, Weinberg and Weinberg's brother fraudulently induced Mr. Freeney to purchase whole life insurance policies from three insurance companies with a total face value of $55 million.  Plaintiffs are informed and believe, and on that basis allege, that Weinberg and Weinberg's brother selected these policies because the sales commissions paid by the insurance companies ranged from 80 percent to 90 percent of the first-year's premiums, which was a higher percentage than other available polices would have paid.

205.   The three policies that Mr. Freeney purchased required him to pay approximately $500,000 in premiums each year until the policies "matured" far in the future.  If Mr. Freeney stopped paying premiums before the maturity date, the policies would lapse, and if he did not surrender them before they lapsed, they would become worthless.  Moreover, the polices had no cash surrender value until the third year after their issuance, and then their surrender value would be only a fraction of the amount that Mr. Freeney had paid by that time in annual premiums.

206.   In the course of the scheme to defraud, Weinberg and Weinberg's brother made and caused others to make the following false and misleading representations, among others, to Mr. Freeney to induce him to purchase the three policies and pay the approximately $500,000 in first-year premiums:

(a)     Weinberg's expertise and experience as Mr. Freeney's financial manager and investment advisor included the purchase of insurance products for investment purposes, when, in fact, she had little or no expertise or experience in the analysis and selection of such insurance products;

(b)     Weinberg's brother had substantial expertise and experience in the analysis, selection and purchase of insurance products for investment purposes, when, in fact, he had little or no such expertise or experience;

(c)     It was in Mr. Freeney's financial interests, and consistent with his

58

**THIRD AMENDED COMPLAINT**

financial objectives, to purchase $55 million in whole life insurance, when, in fact, it was contrary to his financial interests and objectives to purchase such a large amount of life insurance, considering that: (i) he already owned $13 million in life insurance policies, which was more than enough life insurance coverage for someone of his age and with his relatively limited financial responsibilities; (ii) he had just turned 30 years of age, was single, was in good health and his financial objective was growth rather than estate planning; and (iii) because professional football players, on average, retire by age 32, it was unlikely he would be able to continue to make the premium payments of approximately $500,000 per year for enough years for the policies to have a sizeable cash surrender value; and

(d)     Weinberg and Weinberg's brother had selected the three policies because they offered the best value compared to other available whole life policies, when, in fact, they had selected the three policies for the sole or primary purpose of maximizing the commissions Weinberg's brother would receive from their sale.

207.   In the course of the scheme to defraud, Weinberg and Weinberg's brother also concealed and caused others to conceal the following material facts, among others, from Mr. Freeney to induce him to purchase the three policies and pay the approximately $500,000 in first-year premiums:

(a)     Weinberg was not qualified or licensed to sell life insurance and had little or no expertise or experience in the purchase of insurance products for investment purposes;

(b)     Weinberg's brother had only become licensed to sell life insurance in or about May 2010, and had only become licensed to sell life insurance in Indiana in or about June 2010, and then only so he could sell life insurance to Mr. Freeney;

(c)     The policies were particularly unsuitable for Mr. Freeney, considering that he already owned two life insurance policies with face values totaling $13 million;

**THIRD AMENDED COMPLAINT**

(d)   Even if some form of additional life insurance was suitable, other life insurance products were readily available that were less expensive and better suited to Mr. Freeney's insurance needs;

(e)   Weinberg and Weinberg's brother planned that he would kick back to her approximately half of the commissions that he received from the sale of the policies;

(f)   As a result of this kickback agreement, Weinberg had a serious conflict of interest in acting as Mr. Freeney's financial manager and investment advisor in the purchase of the policies;

(g)   Weinberg and her brother had structured the transaction based on the amount of commissions her brother would receive, rather than on the prices, surrender values and other costs and benefits of the policies;

(h)   To prevent the policies from lapsing, Mr. Freeney would have to pay premiums totaling approximately $500,000 per year for a period of 15 years;

(i)   Weinberg and her brother intended to allow the policies to lapse after the first year, unless further premium payments would produce additional commissions that they could split; and

(j)   The policies would have no cash surrender value and would be entirely worthless if they were allowed to lapse after the first year.

208.   In or about June 2010, Weinberg and Weinberg's brother caused Mr. Freeney to pay a total of approximately $510,000 in first year premiums to the three insurance companies.

209.   Of this amount, the insurance companies paid a total of approximately $450,000 in commissions, 99 percent of which was paid to Weinberg's brother.  Upon receiving those commission payments, Weinberg's brother paid kickbacks to Weinberg totaling in excess of $200,000.

210.   Weinberg and Weinberg's brother did not make the 2011 premium payments on behalf of Mr. Freeney, and instead allowed the policies to lapse, when

**THIRD AMENDED COMPLAINT**

1    they learned that further premium payments would not result in additional commission

2    payments to Weinberg's brother.

3         211.   The policies lapsed in or about September 2011 and October 2011.  The

4    policies had no cash surrender value and became entirely worthless when they lapsed.

5    Weinberg and Weinberg's brother concealed from Mr. Freeney that the policies had

6    lapsed and become worthless.

7         212.   In making the aforementioned representations and concealing the

8    aforementioned facts, Weinberg was acting in her capacity as an employee, actual

9    agent and/or ostensible agent of BAC, BANA and MLPFS.

10   **M.     Weinberg, Aided and Abetted by Stern, Fraudulently Assumes**

11   **        Management Control of Roof Group and RSLA's Finances.**

12        213.   Beginning in or about March 2010, Weinberg and Stern (posing as

13   Millar) made and caused others to make the following misrepresentations and false

14   promises, among others, to induce Mr. Freeney to allow Weinberg to assume

15   management control of Roof Group and RSLA's finances and become the de facto

16   Chief Financial Officer ("CFO") of Roof Group:

17           (a)      Millar intended to invest $7.0 million in Roof Group, when, in

18   fact, Stern had neither the funds nor the intention to invest any money in Roof Group;

19           (b)      Millar would oversee the build out of RSLA, including payments

20   to Brodin Design, when, in fact, Stern had no intention to oversee the build out

21   beyond using it as an opportunity to misappropriate funds from Mr. Freeney and

22   Roof Group;

23           (c)      Millar would assist in obtaining the liquor license from the State

24   of California for RSLA, when, in fact, Stern had neither the ability nor the intention to

25   obtain a liquor license for the restaurant;

26           (d)      Weinberg would handle the bill payments for RSLA, when, in

27   fact, she intended to pay only those bills that absolutely needed to be paid, and only

28   when she could not delay their payment further;

**THIRD AMENDED COMPLAINT**

188650.4

1      (e)    Weinberg and Stern (posing as Millar) together would renegotiate

2 the unfavorable terms in the CIM lease, when, in fact, neither intended to renegotiate

3 the lease terms;

4      (f)    Weinberg would implement cost and accounting controls for

5 RSLA, when, in fact, she lacked the skills, knowledge and experience to implement

6 such controls, and, in fact had no intention of implementing such controls; and

7      (g)    Weinberg and Stern's only interest was to make sure RSLA

8 succeeded and to protect Mr. Freeney from those around him who would seek to cheat

9 or take unfair advantage of him, when, in fact, their sole or primary interest in

10 obtaining control of RSLA was to use it as a vehicle for misappropriating funds and to

11 conceal and disguise those thefts from Mr. Freeney and others.

12     214.   To induce Mr. Freeney to allow Weinberg to assume management

13 control of Roof Group and RSLA's finances, and for Weinberg to become the de facto

14 CFO of Roof Group, Weinberg and Stern (posing as Millar) concealed and caused

15 others to conceal the following material facts, among others, from Mr. Freeney, his

16 associates and his professional advisors:

17      (a)    Weinberg lacked the necessary qualifications, expertise and

18 experience to manage and operate RSLA, and the supervisory skills and experience to

19 oversee the build out, staffing, opening and operations of RSLA;

20      (b)    Weinberg and Stern intended to use RSLA as an instrumentality

21 for misappropriating funds using the BofA Roof Group account at BANA and to

22 conceal and disguise those thefts from Mr. Freeney and others;

23      (c)    Stern was in bankruptcy and entirely without the financial means

24 to invest in RSLA;

25      (d)    Stern's sole or primary interest in overseeing the build out of

26 RSLA was to be able to misappropriate funds from Mr. Freeney and Roof Group

27 undetected;

28      (e)    Weinberg was not maintaining anything resembling a set of books

**THIRD AMENDED COMPLAINT**

188650.4

1   and records for Roof Group or RSLA;

2               (f)      Weinberg was incapable and had no intention of preparing

3   financial reports or statements for Roof Group and RSLA;

4               (g)      Weinberg was incapable and had no intention of preparing

5   budgets or projections for Roof Group and RSLA;

6               (h)      Weinberg and Stern were not capable and no intention of

7   engaging CIM in discussions to renegotiate the lease terms; and

8               (i)      Stern was not capable of and had no intention of obtaining a

9   liquor license for RSLA.

10      215.   Based on the foregoing representations, promises and undisclosed facts,

11  Mr. Freeney and Roof Group came to repose their trust and confidence in

12  BofA/Merrill Lynch, Weinberg and Stern (posing as Millar) to act honestly, loyally,

13  competently and diligently in overseeing and managing the build-out, staffing,

14  opening, operations and finances of RSLA.  At all times relevant hereto,

15  BofA/Merrill Lynch, Weinberg and Stern, and each of them, encouraged, accepted

16  and voluntarily assumed that trust and confidence, creating a fiduciary relationship

17  with Mr. Freeney and Roof Group relating to such matters.

18      216.   In making the aforementioned representations and promises, concealing

19  the aforementioned facts and assuming control of the operations and finances of

20  RSLA, Weinberg was acting in her capacity as an employee, actual agent and/or

21  ostensible agent of BAC, BANA and MLPFS.

22  **N.   Weinberg and Stern Fraudulently Induce Mr. Freeney to**

23  **Agree to Buy Out Altounian and Donnelly's Worthless Interests in**

24  **Roof Group for $1.1 Million.**

25      217.   After Mr. Freeney became a BofA/Merrill Lynch client, Weinberg and

26  Stern (posing as Millar) urged him to purchase Joe Altounian and Niall Donnelly's

27  interests in Roof Group.  They advised Mr. Freeney that he needed to acquire

28  Altounian and Donnelly's interests so that Millar could invest in Roof Group and

**THIRD AMENDED COMPLAINT**

become Mr. Freeney's new partner in RSLA, and because Altounian and Donnelly were misusing company funds.  Stern (posing as Millar) offered to negotiate these buy outs.  Having been lead to believe by Weinberg and Stern (posing as Millar) that Millar was preparing to invest several million dollars in Roof Group, was acting to protect Mr. Freeney's investment in RSLA and had substantial experience and success in negotiating such matters, Mr. Freeney authorized Stern (posing as Millar) to undertake the negotiations with the assistance of the Florida Attorney and Law Firm.

218.   Although Mr. Freeney remained the sole source of financing for the build out and operations of RSLA – Altounian and Donnelly having invested none of their own money in the venture – Stern and the Florida Attorney negotiated agreements with Altounian and Donnelly whereby Mr. Freeney was required to pay them more than $1.1 million for their interests in Roof Group.  Weinberg, Stern and the Florida Attorney convinced Mr. Freeney to sign these agreements and pay this money, notwithstanding that the restaurant had yet to open, had no liquor license, had dwindling capital and had not been reliably valued.

219.   Mr. Freeney signed the agreement to purchase Altounian's shares in Roof Group in or about November 2010, agreeing to pay Altounian $325,000 for his 24.5 percent interest in Roof Group.

220.   Mr. Freeney signed the agreement to purchase Donnelly's shares in Roof Group in or about May 2011, agreeing to pay Donnelly $550,000 for his 24.5 percent interest in Roof Group.

221.   The Florida Attorney billed, and Mr. Freeney paid him, approximately $140,000 in legal fees for assisting Stern in negotiating these agreements.

222.   In convincing Mr. Freeney to agree to purchase Altounian and Donnelly's interests in Roof Group for these amounts, Weinberg, Stern and the Florida Attorney concealed and caused others to conceal the following material facts, among others, from Mr. Freeney:

(a)    RSLA was critically underfunded, burning through cash and at

**THIRD AMENDED COMPLAINT**

1  risk of defaulting on various obligations.  Accordingly, without Mr. Freeney's

2  continued capital contributions to Roof Group, Altounian and Donnelly's shares in the

3  company were effectively worthless.

4            (b)      As members of a limited liability company, Altounian and

5  Donnelly were responsible for losses in proportion to their ownership interests (24.5

6  percent each).  Based on RSLA's significant operating losses and the fact that neither

7  Altounian nor Donnelly were contributing any cash to Roof Group, their capital

8  accounts were negative at the time of the buy outs, which would have reduced the

9  value of their shares to zero or close thereto.

10            (c)      There was no valuable premium or other significant intangible

11  value associated with Mr. Freeney's purchase of Altounian and Donnelly's shares in

12  Roof Group (such as minimizing their participation in the operations, management, or

13  direction of RSLA) to justify paying them $1.1 million for their shares.  To the

14  contrary, at the time Mr. Freeney agreed to purchase their shares, their roles in RSLA

15  had diminished to the point of insignificance.

16            (d)      Plaintiffs are informed and believe, and on that basis allege, that

17  Weinberg and Stern's sole or primary motivation for convincing Mr. Freeney to pay

18  $1.1 million to buy out Altounian and Donnelly was to oust them from the day-to-day

19  management and operations of RSLA, before they could discover that Weinberg and

20  Stern were using RSLA to steal funds from Mr. Freeney and Roof Group.

21        223.   In convincing Mr. Freeney to purchase Altounian and Donnelly's

22  interests in Roof Group for approximately $1.1 million and to allow Stern (posing as

23  Millar) and the Florida Attorney to negotiate those purchases, and in concealing the

24  aforementioned facts, Weinberg was acting in her capacity as an employee, actual

25  agent and/or ostensible agent of BAC, BANA and MLPFS.

26  **O.      The Hiring of Sal and Stacy Feli.**

27        224.   The ouster of Altounian and Donnelly from daily involvement in the

28  build out, management and operations of RSLA required Mr. Freeney to find a new

**THIRD AMENDED COMPLAINT**

Director of Operations to open and operate the restaurant.  While falsely holding himself out as Mr. Freeney's new partner in RSLA and a major investor in Roof Group, in or about May 2010, Stern (posing as Millar) signed a "Term Sheet" on behalf of Roof Group with Salvatore ("Sal") Feli, his wife Stacy Feli and their company, SalandStacy Corp. (collectively, the "Felis"), to "manage and operate" RSLA.

225.   Stern (posing as Millar) and the Florida Attorney negotiated the Term Sheet with the Felis and their attorney.  Stern signed the Term Sheet as "David M. Millar" on behalf of Roof Group, without any written or other express corporate authorization.  The Term Sheet outlined a five-year arrangement between Roof Group and the Felis that Roof Group could not afford.  It provided, among other things, that:

(a)     The Felis would be paid a fee of $350,000 per year for each of the five years;

(b)     They would also receive housing, rental car and health care allowances totaling $70,000;

(c)     They would also receive two percent of the gross revenue of RSLA;

(d)     They could only be terminated for cause, and, if so terminated, they would be entitled to six months of severance pay, or $175,000;

(e)     They were to receive a two percent ownership interest in Roof Group if certain conditions were satisfied; and

(f)     The parties would undertake to negotiate a long-form contract within the next 30 days.

226.   In entering into the Term Sheet, Stern, together with Weinberg and the Florida Attorney, concealed and caused others to conceal the following material facts, among others, from Mr. Freeney:

(a)     David M. Millar was a false name;

**THIRD AMENDED COMPLAINT**

188650.4

(b)      Roof Group could not afford to pay the Felis the compensation outlined in the Term Sheet;

(c)      Plaintiffs are informed and believe, and or that basis allege, that Sal Feli's compensation under the Term Sheet was well above the industry standard for a Director of Operations with his limited qualifications, experience and track record; and

(d)      Plaintiffs are informed and believe, and on that basis allege, that Weinberg and Stern's sole or primary motivation in hiring the Felis was their belief that the Felis would be easier to manipulate and less of a threat to uncover the scheme to defraud than Altounian and Donnelly, both of whom disliked and distrusted Stern deeply.

227.   At all relevant times, Mr. Freeney and Roof Group reposed their trust and confidence in BofA/Merrill Lynch, Weinberg and Stern to act honestly, loyally, competently and diligently in the hiring of the Felis.  At all relevant times, BofA/Merrill Lynch, Weinberg and Stern, and each of them, encouraged, accepted and voluntarily assumed that trust and confidence, thereby creating a fiduciary relationship with Mr. Freeney and Roof Group relating to such matters.

228.   In concealing the aforementioned facts relating to the Felis' hiring, Weinberg was acting in her capacity as an employee, actual and/or ostensible agent of BAC, BANA and MLPFS.

**P.      BANA Opens the BofA Roof Group Account.**

229.   In or about late May 2010, Weinberg asked Del Campo to open a BANA business checking account in the name of Roof Group (the "BofA Roof Group account").  Del Campo opened the account without the required documentation, appropriate authorization, or sufficient due diligence.

230.   This account was opened in the course of Mr. Freeney's relationship with BofA/Merrill Lynch and as a client of BAC, GWIM, MLGWM and MLPFS, purportedly to protect funds he was investing in Roof Group from misuse by

**THIRD AMENDED COMPLAINT**

188650.4

1   Altounian and Donnelly.

2       231.   In opening the BofA Roof Group account, Weinberg falsely represented

3   to Mr. Freeney that it was only a temporary account needed to pay invoices for the

4   RSLA build out until permanent accounts could be opened in Los Angeles.  As a

5   result, Mr. Freeney only authorized BofA to transfer $200,000 from his brokerage

6   accounts to the BofA Roof Group account.  This authorization was given in a

7   notarized writing and was the only authorization Mr. Freeney gave

8   BofA/Merrill Lynch and Weinberg to transfer funds to this account.

9       232.   Del Campo later made the following statements to the FBI concerning

10  her opening of the BofA Roof Group account:

- "DEL CAMPO remembered setting up the bank account for Roof Group LLC at Bank of America for DWIGHT FREENEY.  DEL CAMPO said that EVA WEINBERG came to her while WEINBERG was still employed at Merrill Lynch Bank of America (MBOA) in Miami, Florida."

- "[S]he remembered that Weinberg went to her in person to ask her to open this particular account.  DEL CAMPO said that it was not a phone call, nor was it a conversation in passing that she had with WEINBERG to request to open this account."

- "Weinberg had a conversation with her about the restaurant and how this account would be used to conduct the business transactions of the restaurant."

- "[B]ecause this was a new account, there was a standard 90 day security hold on the account, to make sure that no fraudulent activity was occurring within the account."

- "[F]rom her perspective, it seemed that WEINBERG was doing online banking, because after the account was set up, WEINBERG would call DEL CAMPO to request that the holds on electronic payments she was attempting to make would be taken off.  DEL CAMPO said that this was a feature of the 90 day security hold on the account."

68

**THIRD AMENDED COMPLAINT**

- "[T]he password and information could have been emailed to [Del Campo], which she would then give directly to the Financial Advisor, in this case WEINBERG . . . ."

- "FREENEY was not involved with the setup of the bank account."

233.   After opening the BofA Roof Group account, Del Campo gave Weinberg the confidential account access information, including the secret pass code for the account.  Del Campo gave Weinberg this information even though Weinberg was not a signatory on the account, and without first determining from Mr. Freeney whether Weinberg was authorized to receive or use this information.  Weinberg then gave this information to Stern, so that he could access the BofA Roof Group account remotely online and transfer funds to and from it without Mr. Freeney's authorization or knowledge.

234.   After opening the BofA Roof Group account, Weinberg asked Del Campo from time-to-time to override the security hold on wire transfers from the account, and Del Campo complied, even after Weinberg had deported the bank.  By lifting the security hold when requested, Del Campo allowed Stern to transfer millions of dollars from the account online, using the confidential account access information that Del Campo had given to Weinberg and Weinberg had communicated to Stern.

235.   Plaintiffs are informed and believe, and on that basis allege, that Weinberg and Del Campo arranged that neither Mr. Freeney nor RSLA's managers, accountants, or consultants would receive account statements or copies of wire transfer requests for the BofA Roof Group account.

236.   After opening the BofA Roof Group account, Del Campo allowed it to remain open, and for BANA to execute hundreds of wire transfers totaling millions of dollars from the account over a sixteen-month period, notwithstanding the following facts and circumstances:

(a)    The account had been opened without the necessary documentation, appropriate authorizations, or required due diligence;

**THIRD AMENDED COMPLAINT**

188650.4

(b)     The account had been opened and wire transfers from the account executed without a completed or signed account opening document or signature card;

(c)     Mr. Freeney lacked the corporate authority to open the account;

(d)     Roof Group was a California corporation and RSLA was a California based business with no apparent relationship to Florida;

(e)     Concerns expressed by other BANA employees that the documentation for the account was not sufficient or in order;

(f)     The account was supposed to be temporary;

(g)     There was no need for the account with the opening of operating, payroll and tax accounts for RSLA in Los Angeles;

(h)     Weinberg resigned from the bank and relocated with Stern to California;

(i)     All of the numerous deposits to the account were by wire transfer – none were by check or other monetary instrument signed by Mr. Freeney;

(j)     All of the hundreds of wire transfers from the account were by wire transfer originating online – none were by check or other monetary instrument signed by Mr. Freeney;

(k)     Mr. Freeney never gave express authorization for any of the wire transfers;

(l)     The deposits to and wire transfers from the account greatly exceeded the $200,000 limit Mr. Freeney had imposed in writing;

(m)     Many of the wire transfers were to unknown recipients or recipients having no apparent relationship to Roof Group or RSLA; and

(n)     On many occasions, funds deposited to the account via wire transfer were withdrawn from the account via wire transfer that same day or shortly after their receipt.

237.   Plaintiffs are informed and believe, and on that basis allege, that despite these highly suspicious circumstances, neither BAC, nor BANA, nor MLPFS

**THIRD AMENDED COMPLAINT**

188650.4

1   investigated any of the transfers to or from the BofA Roof Group account, filed any

2   Suspicious Activity Reports, or telephonically notified federal authorities of these

3   transactions, as required by the Bank Secrecy Act.

4       238.   In opening the BofA Roof Group account, and allowing it to remain

5   open, BAC, BANA, MLPFS, Weinberg and Del Campo concealed, and caused others

6   to conceal, the following material facts, among others, from Mr. Freeney and

7   Roof Group:

8           (a)     The account was not a temporary account, and it remained open

9   and active long after operating, payroll and tax accounts for RSLA were opened in

10  Los Angeles;

11          (b)     The purpose of the account was to conceal the proceeds of the

12  scheme to defraud from Mr. Freeney, the Bankruptcy Court, the bankruptcy trustee,

13  the U.S. Trustee, creditors in Stern's bankruptcies and the plaintiffs in the many civil

14  actions pending against Stern;

15          (c)     At the time the account was opened, Mr. Freeney lacked the

16  necessary corporate authority to open the account on behalf of Roof Group;

17          (d)     The account was opened, and was allowed to remain open,

18  without the documentation, authorization, or due diligence ordinarily required to open

19  such an account, and despite concerns expressed by BANA employees about those

20  deficiencies;

21          (e)     Weinberg had kept the existence of the account secret from

22  RSLA's management, accountants and consultants;

23          (f)     Del Campo had given the confidential account access information

24  to Weinberg; and

25          (g)     Weinberg had given the confidential account access information

26  to Stern, to enable him to access the account online and transfer funds to and from it

27  without Mr. Freeney's authorization or knowledge.

28      239.   In causing BANA to open the BofA Roof Group account without the

71

**THIRD AMENDED COMPLAINT**

necessary documentation, appropriate authorization, or required due diligence; in permitting the account to remain open notwithstanding concerns expressed by other BANA employees that the account documentation was deficient and despite the hundreds of highly suspicious transfers to and from the account; in giving the confidential account access information to Weinberg; in repeatedly overriding the account's security features at Weinberg's request; and in concealing the aforementioned facts, Del Campo was acting in her capacity as a BAC, BANA and MLPFS employee and agent.

240.   In asking Del Campo to open the BofA Roof Group account and to repeatedly override the account's security features, in providing the confidential account access information to Stern, and when making the aforementioned representations and concealing the aforementioned facts, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BAC, BANA and MLPFS.

**Q.   Weinberg Opens the Citibank Accounts.**

241.   In or about June 2010, Weinberg caused two accounts at a Citibank branch in Miami Beach to be opened in the name of Mr. Freeney.  She opened the accounts by presenting a power of attorney form purportedly signed by Mr. Freeney.  In or about July 2010, Weinberg added herself as a signatory to these accounts.

242.   When opening these accounts, Weinberg obtained the confidential account access information, including the pass codes, for the accounts, which she then gave to Stern.  Weinberg gave Stern this highly confidential information so that he could access the Citibank accounts remotely online and transfer funds to, from and between them without Mr. Freeney's authorization or knowledge.

243.   In a June 2012 post-arrest interview by the FBI and USAO, Weinberg made the following statements concerning the opening of the Citibank accounts:

- "[S]he opened [the Citibank] account in Miami Beach.  Only she and FREENEY were on the account, no one else."

**THIRD AMENDED COMPLAINT**

188650.4

- "STERN got access to the Citigold account sometime in early June or perhaps July [2010]."

- "[I]t's possible that she could have provided FREENEY's personal information to STERN to open the online banking, but STERN already had FREENEY's credit card numbers and his social security account numbers.  STERN knew almost everything about FREENEY."

244.   In causing the Citibank accounts to be open and giving Stern the confidential account access information, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BAC, BANA and MLPFS.

**R.      Weinberg Opens the Wells Fargo Roof Group Accounts.**

245.   In or about June 2010, Weinberg opened three business accounts in the name of Roof Group at the Hollywood, California branch of Wells Fargo Bank (the "Wells Fargo Roof Group accounts").  Administration of these accounts was subsequently transferred to the Larchmont, California branch.

246.   These accounts were opened as purported operating, payroll and tax accounts for RSLA.  The authorized signatories on the accounts were Mr. Freeney, Mr. West, and Weinberg.  Weinberg, however, arranged that only she could view the account balances and statements online.

247.   After opening the Wells Fargo Roof Group accounts, Weinberg gave Stern one or more Roof Group debit/credit cards linked to the accounts, so that he could access the accounts and withdraw funds from them or charge good and services to them without Mr. Freeney's authorization or knowledge.

248.   When asked about the opening of these accounts in a June 5, 2012 post-arrest interview, Weinberg told the FBI and USAO:

- "[T]he Roof Group WFB accounts were set up in June or July 2010 and it was STERN's idea to have the WFB accounts local . . . ."

- "STERN was never a signatory on the Roof Group WFB account."

- "[S]he didn't think that STERN himself had a [Roof Group credit] card.

**THIRD AMENDED COMPLAINT**

Rather, WEINBERG said that STERN had access to where the cards and the card numbers were kept, but she never thought that STERN would intentionally use the cards."

- "[T]here was no legitimate reason for STERN to use the Roof Group WFB card to make personal charges."

249.    In opening the Wells Fargo Roof Group accounts, and in giving Stern one or more Roof Group debt/credit cards with which to access the accounts, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BAC, BANA and MLPFS.

**S.      Weinberg and Stern's Mounting Legal Problems in Florida.**

250.    Many of the legal proceedings initiated against Stern and Weinberg in 2008 and 2009 (as described earlier) continued and intensified after Mr. Freeney became a BofA/Merrill Lynch client.

251.    In March 2010, the Faraches obtained a final judgement in their passing NSF checks lawsuit against Weinberg for approximately $1.7 million.  They then obtained writs of garnishment against Weinberg, which they served on a number of financial institutions, including MLPFS and BANA.  MLPFS answered the writ on or about March 29, 2010.   BANA answered the writ on or about April 8, 2010, indicating that, for the most recent two-week pay period, BANA had paid Weinberg "gross earnings" of only $1,041 and "disposable earnings" of only $885.

252.    Weinberg hired the Florida Attorney to represent her in challenging the judgement and writs.  In a motion he filed on Weinberg's behalf on or about March 26, 2010, he wrote:

> The Defendant [Eva Weinberg] has just learned that all of her bank accounts are the subjects of writs of garnishment, which have effectively frozen all of her money . . . .  The only reason Ms. Weinberg learned about all of the freezing of her money by reason of a writ of garnishment is because she happens to be a Vice President of Private Wealth Management at Merrill Lynch, and obtained a copy of the writ of garnishment from her employer . . . .

253.    Meanwhile, on or about March 12, 2010, Stern was arrested pursuant to the earlier issued writ of bodily attachment in the *Colonia Bank Case*.  In an order of

**THIRD AMENDED COMPLAINT**

1  the same date, the judge in that case directed that he was "not to leave Miami Dade

2  County during the pendency of the case or until further order of this Court."

3      254.   On or about April 21, 2010, the U.S. Trustee in Stern's bankruptcy cases

4  filed an Adversary Complaint Objecting to Entry of Discharge in Stern's bankruptcy

5  proceedings.  In that 27-page publicly filed pleading, the U.S. Trustee detailed

6  numerous instances of bankruptcy fraud by Stern during the course of his bankruptcy

7  proceedings, including:

8          (a)      Disobeying a court order to provide an accounting or the ledger

9  for the so-called "Stern Master Account," through which millions of dollars in

10  proceeds from Stern's businesses passed without being accounted for;

11         (b)      Violating numerous court orders requiring the production of

12  documents to the bankruptcy trustee and U.S. Trustee;

13         (c)      Not disclosing his ownership of a yacht brokerage in his

14  bankruptcy schedules;

15         (d)      Giving false testimony about pawning his wife's jewelry;

16         (e)      Giving inconsistent testimony concerning two unsecured and

17  undocumented loans that he had received, one for $6.5 million and the other for

18  $1.6 million;

19         (f)      Concealing bank account and financial information relating to the

20  Beach Place Hotel;

21         (g)      Submitting forged and falsified Certificates of Insurance for the

22  Beach Place Hotel; and

23         (h)      Not disclosing transfers to third parties totaling more than $1.0

24  million just prior to filing for bankruptcy.

25      255.   BofA/Merrill Lynch and Weinberg concealed all of this information from

26  Mr. Freeney.  Furthermore, BofA/Merrill Lynch failed to amend Weinberg's FINRA

27  Report to reflect the entry of the $1.7 million judgment against her for passing

28  $400,000 in worthless checks.

**THIRD AMENDED COMPLAINT**

**T.**     **Weinberg and Stern, Aided and Abetted by BOCK, Relocate the Scheme from Florida to California.**

256.   Because of their escalating legal problems in Florida, in or about June 2010, Weinberg and Stern prepared to move from Miami Beach to Los Angeles, from where they could (and did) continue to carry out the scheme to defraud Mr. Freeney.

**1.**     *BOCK Assists Weinberg in Relocating to California and Taking Mr. Freeney as a Client.*

257.   Plaintiffs are informed and believe, and on that basis allege, that in or about May 2010, BOCK began encouraging Weinberg to leave BofA/Merrill Lynch; move to California; start her own company with a name similar to "Global Wealth & Investment Management" and "Merrill Lynch Wealth Management"; and take Mr. Freeney with her as a client.

258.   Plaintiffs are informed and believe, and on that basis allege, that: (a) Weinberg's relocation to Los Angeles was carefully planned with input from BOCK; (b) BOCK encouraged Weinberg to take Mr. Freeney as her client when she relocated; (c) BOCK was instrumental in Weinberg resigning from BofA/Merrill Lynch and forming her own company in Los Angeles; (d) in the course of encouraging Weinberg to relocate to Los Angeles, BOCK informed her that he would likely move to Los Angeles, that he would be in Los Angeles at least once a month, and that, when in Los Angeles, he would work from Merrill Lynch's Los Angeles office; and (e) BOCK wanted Weinberg to move to Los Angeles and take Mr. Freeney with her as a client to conceal and cover up his own wrongdoing involving Mr. Freeney's brokerage accounts.

259.   Publicly filed court papers in BOCK and Weinberg's divorce proceedings reflect the key role BOCK played in Weinberg's relocation to Los Angeles and his intent that Weinberg take Mr. Freeney and Roof Group with her as clients (albeit without Mr. Freeney's knowledge):

**THIRD AMENDED COMPLAINT**

188650.4

- "The Mother's relocation to Los Angeles was carefully planned with major input from the Father [BOCK] as the Mother is a stock broker and was working for Merrill Lynch in Florida with [BOCK].  The Mother previously gave [BOCK] her entire client base during their marriage so that he could maintain her four million dollar portfolio . . . .  [BOCK] encouraged the Mother once she went back to work at Merrill Lynch to service her largest client [Mr. Freeney/Roof Group] who reside in Los Angeles, California."

- "[BOCK] was also instrumental in the Mother's resignation from Merrill [sic] Lynch and start-up of her own company because he stressed to her that relocating to Los Angeles would be good for her business as there are great business opportunities to be found there."

- "In fact [BOCK] repeatedly stated that he would likely move to Los Angeles as well as there were good business opportunities for him there as well.  He further told her that because he is a stock broker at Merrill Lynch, he can work out of any office so he would be in Los Angeles, California at least once a month."

- "[BOCK] also helped the Mother design her business plan /strategize the Mother's future business goals for her in California."

- The Mother will lose this major client, which [BOCK] encouraged her to take, if she is unable to physically move to California."

- "[T]he Mother has signed a contract with Global Wealth Management to be the Head Portfolio Manager for a high-profile client, which if unable to move will cause her to lose the only employment she has now."

260.   BofA/Merrill Lynch, BOCK and Weinberg concealed all of this information from Mr. Freeney.

### 2.   *Weinberg Creates Global Wealth Management LLC.*

261.   In connection with relocating the scheme from Florida to California, on

**THIRD AMENDED COMPLAINT**

188650.4

1 or about June 2, 2010, Weinberg incorporated Global Wealth Management, LLC

2 ("GWM") in Delaware.

3       262.   GWM was created as an instrumentality for continuing to carry out the

4 scheme to defraud: it had no assets, employees, or legitimate business operations, and

5 no clients aside from Mr. Freeney.

6       263.   On or about June 2, 2010, Weinberg opened a business checking account

7 in GWM's name at the Larchmont Branch of Wells Fargo Bank in Los Angeles.

8       264.   On or about June 9, 2010, Weinberg signed a lease for a "virtual office"

9 in the name of GWM at 8484 Wilshire Boulevard, contracting for telephone

10 answering and mail receiving, sorting and forwarding services.  From in or about June

11 2010 forward, Weinberg gave the 8484 Wilshire address as GWM's office address.

12 She also directed that all of Mr. Freeney's mail, including his weekly paychecks from

13 the Colts during the NFL season, be sent to that address.

14       265.   Plaintiffs are informed and believe, and on that basis allege, that BOCK

15 and Weinberg selected the name "Global Wealth Management" because it was the

16 same as or remarkably similar to GWIM and/or MLGWM, and because they wanted

17 to create the false impression that Weinberg was still affiliated with

18 BofA/Merrill Lynch.  Plaintiffs are further informed and believe, and on that basis

19 allege, that BofA/Merrill Lynch was well aware of Weinberg's creation of GWM.

20       266.   In creating GWM, BOCK and Weinberg concealed and caused others to

21 conceal the following material facts, among others, from Mr. Freeney: (a) GWM was

22 not the same as GWIM or MLGWM and was not a division of BAC; (b) GWM was

23 effectively a sham entity created to promote and conceal the scheme to defraud;

24 (c) GWM had no employees and Mr. Freeney was its only client; and (d) Stern had

25 access to all of Mr. Freeney's mail that was being forwarded to the 8484 Wilshire

26 address.

27       267.   In advising and encouraging Weinberg to create GWM, relocate to

28 Los Angeles and take Mr. Freeney with her as a client, BOCK was acting in his

**THIRD AMENDED COMPLAINT**

188650.4

1    capacity as an employee and/or agent of BAC, BANA and MLPFS.

2        **3.    *Weinberg and Stern Lease the Hancock Park House from***

3            ***Which They Carry On the Scheme.***

4        268.   In or about June 2010, Weinberg leased a house in the Hancock Park

5    neighborhood of Los Angeles for $8,250 per month (the "Hancock Park house").  In

6    the lease application forms, she represented that she would be living at the house with

7    her three children and "Michael Stern," her "Fiancé."

8        269.   In the lease application, Weinberg falsely represented that since

9    April 2009, she had been employed as a "Financial consultant" at "Merrill Lynch

10   Wealth Management" earning "8,000" per month in "comm + salary"; that Stern lived

11   at 2 Harriman Drive, Sands Point, N.Y. 11576; that he had been employed by "ARC

12   Consulting" from "5/96 – present," earning "$25,000" per month; and that his

13   supervisor was Lester Jaggernauth, who was also listed as one of Stern's personal

14   references as was Weinberg's brother.

15       270.   Plaintiffs are informed and believe, and on that basis allege, that

16   Weinberg and Stern began moving into the Hancock Park house in or about mid-June

17   2010.

18       271.   The Hancock Park house quickly became Weinberg and Stern's new base

19   of operations.  Weinberg and Stern maintained a room in the house in which Stern hid

20   whenever anyone would come to the door, to conceal the fact that he and Weinberg

21   were living together.  This room was where Stern kept the computers that he used to

22   access Mr. Freeney's accounts online and transfer funds to and from them without

23   Mr. Freeney's knowledge or authorization.

24       272.   Neither Weinberg nor Stern had the funds to pay the $8,250 monthly rent

25   for the Hancock Park house, and would use funds misappropriated from Mr. Freeney

26   to make the monthly lease payments.  Plaintiffs are informed and believe, and on the

27   basis allege, that BOCK knew or must have known that Weinberg could not afford the

28   monthly rent for the Hancock Park House and that her only source of funds were those

**THIRD AMENDED COMPLAINT**

of Mr. Freeney and Roof Group.

**4.**   ***BOCK's Sales of the Securities He Had Previously Purchased Without Mr. Freeney's Knowledge.***

273.   Plaintiffs are informed and believe, and on that basis allege, that to assist in relocating the scheme to California and conceal his own involvement in it, in or about June 2010, BOCK directed that almost all of the securities he had purchased a few months earlier using Mr. Freeney's funds be sold.  The sales are summarized below:

| Date of Sale | Security | Sales Price | Gain/(Loss) |
|---|---|---|---|
| 06/08/2010 | Western Asset MTG Define | $7,788 | ($211) |
| 06/08/2010 | Western Asset MTG Define | $89,333 | ($2,667) |
| 06/08/2010 | Western Asset MTG Define | $44,194 | ($1,086) |
| 06/08/2010 | Western Asset MTG Define | $24,648 | ($612) |
| 06/08/2010 | Western Asset MTG Define | $93,457 | ($2,543) |
| 06/08/2010 | Western Asset MTG Define | $3,898 | ($101) |
| 06/08/2010 | Hartford Balance Income | $188,651 | ($11,348) |
| 06/08/2010 | Hartford Balance Income | $1,505 | ($46) |
| 06/09/2010 | Western Asset MTG Define | $36,453 | ($1,007) |
| 06/09/2010 | Western Asset MTG Define | $80,534 | $1,466 |
| 06/09/2010 | Western Asset MTG Define | $9,731 | ($269) |
| 06/09/2010 | Goldman Sachs | $184,400 | ($9,597) |
| 06/15/2010 | Citigroup | $1,954 | ($426) |
| 06/15/2010 | Citigroup | $8,992 | ($1,941) |
| 06/15/2010 | Citigroup | $35,187 | ($7,609) |
| 06/15/2010 | Citigroup | $24,058 | ($3,998) |
| | **TOTALS:** | $843,778 | (46,877) |

274.   These sales resulted in losses to Mr. Freeney in excess of $45,000.  They were made without his authorization or knowledge, and he was never advised of the losses he incurred from the sales.

275.   Plaintiffs' information and belief is based upon account records Plaintiffs obtained from the USAO, as crime victims, in connection with criminal proceedings against Weinberg and Stern; documents and information their counsel acquired in the course of counsel's independent investigation; and analysis performed by forensic

80

**THIRD AMENDED COMPLAINT**

accountants retained by Plaintiffs' counsel.  To date, BAC, BANA and MLPFS have refused to provide records relating to Mr. Freeney's accounts, including records to which he is entitled as a former BofA/Merrill Lynch client and that he has requested repeatedly.  To date, BAC, BANA and MLPFS have also failed to produce records, correspondence and other documents relating to Mr. Freeney's accounts that they were required to produce in response to Plaintiffs' written discovery requests in this action.

276.   The proceeds from the securities sales, which totaled approximately $840,000, were initially deposited into one of Mr. Freeney's brokerage accounts.  As Weinberg was leaving BofA/Merrill Lynch, they were transferred to accounts outside of the bank that were controlled by Weinberg and Stern (as described further below).

### 5. *Weinberg's Secret Resignation from BofA/Merrill Lynch.*

277.   On or about June 10, 2010, Weinberg faxed a short handwritten note to Liebman and others resigning from BofA/Merrill Lynch.  Plaintiffs are informed and believe, and on that basis allege, that Weinberg's resignation became effective no earlier than on or about July 2, 2010.

278.   At the time Weinberg's resignation became effective, all of the key components of the scheme to defraud had been implemented and execution of the scheme had begun.  Among other things:

(a)    Liebman and BOCK had appointed Weinberg to be the principal point of contact between Mr. Freeney and BofA/Merrill Lynch;

(b)    Liebman and BOCK had allowed Weinberg to falsely represent herself to Mr. Freeney as a "Senior Financial Advisor";

(c)    Liebman and BOCK had authorized and permitted Weinberg to serve as Mr. Freeney's private banker, financial manager and investment advisor with virtually total control of Mr. Freeney's assets, investments and income, while under little or no supervision;

81

**THIRD AMENDED COMPLAINT**

188650.4

1    (d)    BofA/Merrill Lynch had referred Mr. Freeney to Stern (posing as

2    Millar) for consulting services and as a potential investor in RSLA, and vouched for

3    his bona fides, honesty and intentions;

4    (e)    Stern had been introduced to Mr. Freeney and his associates as

5    Michael Millar, a wealthy and successful Miami Beach businessman;

6    (f)    Stern had formed ARC, opened a bank account at Wells Fargo

7    Bank in ARC's name and opened email accounts in the names of David Michael

8    Millar and ARC for use in communicating with Mr. Freeney;

9    (g)    Stern was using Mr. Freeney's funds to lease and operate the

10   private jet to lend credibility to his fictitious persona;

11   (h)    Weinberg had transferred more than $160,000 from Mr. Freeney's

12   brokerage account to ARC, without authorization, as seed money for the scheme;

13   (i)    BofA/Merrill Lynch had referred Mr. Freeney to Weinberg's

14   brother for insurance consulting services;

15   (j)    Weinberg and her brother had convinced Mr. Freeney to purchase

16   as much as $60 million in life insurance as an investment;

17   (k)    Weinberg's brother had become licensed to sell insurance in in

18   New Jersey and licensed to sell insurance in Indiana, so that he could receive the

19   commissions from the sale of the life insurance policies to Mr. Freeney;

20   (l)    Weinberg and her brother had Mr. Freeney complete applications

21   to purchase $60 million in life insurance;

22   (m)    Mr. Freeney had begun paying the more than $500,000 in

23   premiums to purchase the $55 million in life insurance for one year that Weinberg and

24   her brother had convinced him to purchase;

25   (n)    Weinberg and her brother had agreed that of the over $450,000 in

26   commissions Weinberg's brother would receive, he would kick back more than half

27   that amount to Weinberg;

28

---

82

**THIRD AMENDED COMPLAINT**

1    (o)    Weinberg had been introduced to the executives at *Rolling Stone* as

2  Mr. Freeney's BofA/Merrill Lynch financial advisor, and Stern (posing as Millar) had

3  been introduced to them as a wealthy businessman who was prepared to invest $7.0

4  million in RSLA;

5    (p)    At the urging of Weinberg and Stern (posing as Millar),

6  Mr. Freeney had increased his ownership interest in Roof Group to 51 percent by

7  doubling the amount of his investment in RSLA from $1.6 million to $3.2 million,

8  thus giving him the power to make Weinberg the de facto CFO of Roof Group;

9    (q)    Weinberg and Stern had convinced Mr. Freeney that he needed to

10  buy out Altounian and Donnelly's remaining interests in Roof Group for in excess of

11  $1.1 million;

12    (r)    BofA/Merrill Lynch had referred Mr. Freeney to the Florida

13  Attorney for legal services relating to the buy outs of Altounian and Donnelly and

14  other matters, and the Florida Attorney and Stern had begun negotiating for

15  Mr. Freeney to make those purchases;

16    (s)    The Florida attorney had agreed that he would keep Stern's true

17  identity and unsavory past secret from Mr. Freeney and his associates and professional

18  advisors, and would go along with the charade that Stern (posing as Millar) was a

19  successful and wealthy businessman;

20    (t)    Weinberg had obtained all of Mr. Freeney's private and

21  confidential personal and financial information and records and shared it with Stern;

22    (u)    Weinberg had incorporated GWM and leased a virtual office in its

23  name;

24    (v)    Weinberg had assumed management control of RSLA;

25    (w)    Del Campo had opened the BofA Roof Group account and

26  provided the confidential access account information to Weinberg;

27    (x)    Weinberg had provided that information to Stern;

28

**THIRD AMENDED COMPLAINT**

188650.4

1        (y)    Weinberg had opened the Citibank accounts and made herself a

2 signatory on the accounts, and had provided the confidential account access

3 information for those accounts to Stern;

4        (z)    Weinberg had opened accounts for Roof Group at Wells Fargo

5 Bank in Los Angeles, which she controlled;

6        (aa)   BOCK, Weinberg and Stern had begun liquidating Mr. Freeney's

7 existing investments, and BOCK had sold all of the securities he had purchased with

8 Mr. Freeney's funds just a few weeks earlier, to fund the Citibank accounts; and

9        (bb)   Weinberg and Stern had begun misappropriating Mr. Freeney's

10 funds from the Citibank accounts and laundering them through the BofA Roof Group

11 account.

12    279.   BofA/Merrill Lynch, Liebman and BOCK concealed Weinberg's

13 resignation from Mr. Freeney.  They never formally or informally notified him of

14 Weinberg's resignation and departure.  Nor did they make any effort to transition

15 Mr. Freeney to another investment advisor; ensure that his funds were safe; take steps

16 to protect and secure his private and confidential financial information; or see that his

17 continuing wealth management needs were being met.

18    280.   Plaintiffs are informed and believe, and on that basis allege, that

19 BofA/Merrill Lynch, Liebman and BOCK never conducted an exit interview of

20 Weinberg; documented why she was leaving; inquired what she would be doing; or

21 requested that she sign a non-disclosure agreement of some kind.

22    281.   Plaintiffs are further informed and believe, and on that basis allege, that

23 BofA/Merrill Lynch, Liebman and BOCK authorized and permitted Weinberg to take

24 with her, without Mr. Freeney's authorization or knowledge, several boxes containing

25 private and confidential documents relating to virtually every aspect of Mr. Freeney's

26 financial life, including his Colts contract, tax returns, financial statements, bank and

27 credit card records, contracts with his sports agent and prior financial managers,

28 mortgage and loan documents, and promissory notes and other documents of legal

**THIRD AMENDED COMPLAINT**

188650.4

1   significance.

2       282.   In concealing Weinberg's resignation and the other aforementioned facts,

3   and in failing to safeguard Mr. Freeney's private and confidential personal and

4   financial information and records, Liebman and BOCK were acting in their capacities

5   as employees and agents of BAC, BANA and MLPFS and Liebman as Weinberg's

6   supervisor.

7       ***6.***     ***Mr. Freeney and Roof Group Continue as Clients of***

8               ***BofA/Merrill Lynch.***

9       283.   Both Mr. Freeney and Roof Group remained clients of

10   BofA/Merrill Lynch after Weinberg's departure from the bank.  As a result,

11   BofA/Merrill Lynch and BOCK continued to owe fiduciary duties and the duty of due

12   care to Mr. Freeney and Roof Group.  In addition, BofA/Merrill Lynch remained

13   legally obligated to monitor and promptly report to federal authorities any suspicious

14   activity involving Mr. Freeney's bank or brokerage accounts, including the BofA

15   Roof Group account.

16       284.   Following Weinberg's resignation from BofA/Merrill Lynch,

17   BofA/Merrill Lynch, Liebman and BOCK permitted Weinberg to continue to function

18   as Mr. Freeney's private banker, financial manager and investment advisor, as if she

19   were still employed by BofA/Merrill Lynch.  They permitted her to, among other

20   things:

21         (a)    Continue to serve as the principal contact between Mr. Freeney

22   and BofA/Merrill Lynch;

23         (b)    Access the BofA Roof Group account and request that the

24   account's security features be overriden;

25         (c)    Liquidate investments under BofA/Merrill Lynch's management

26   and control;conc

27         (d)    Have access to and use private and confidential personal and

28   financial information and records that Mr. Freeney had entrusted to

**THIRD AMENDED COMPLAINT**

1  BofA/Merrill Lynch; and

2          (e)      Represent herself to be a "Senior Vice President" of "Global

3  Wealth Management."

4          285.   Additionally, BofA/Merrill Lynch, Liebman and BOCK never warned

5  Mr. Freeney that Weinberg was not registered as an investment adviser; that her

6  registration as a broker-dealer would lapse once she left BofA/Merrill Lynch; that she

7  lacked the qualifications, expertise and experience to manage his personal finances or

8  serve as the de facto CFO of RSLA; or about her relationships with BOCK and Stern

9  and the serious conflicts of interest those relationships created.  Mr. Freeney was

10  never advised by BOA/Merrill Lynch that he was no longer a BofA/Merrill Lynch

11  client.

12          286.   Because BofA/Merrill Lynch would later refuse to provide Plaintiffs or

13  their counsel with banking and brokerage records to which Plaintiffs were entitled as

14  former clients of BofA/Merrill Lynch, Mr. Freeney and his counsel have not been able

15  to ascertain when, precisely, he and Roof Group ceased being clients of

16  BofA/Merrill Lynch.  Plaintiffs are informed and believe, and on that basis allege, that

17  Mr. Freeney's brokerage accounts remained open through at least November 2011,

18  and that the BofA Roof Group account remained open through at least April 2014.

19  **U.      Weinberg Assumes Day-to-Day Operational Control of RSLA.**

20          287.   Following her move to Los Angeles, Weinberg, with Stern's behind the

21  scenes assistance, assumed day-to-day operational control of RSLA.  Together with

22  Stern, she operated RSLA not as a restaurant, but as an instrumentality with which to

23  misappropriate and launder funds.  As a result:

24          (a)      She rarely, if ever, paid vendor bills on time;

25          (b)      She failed to pay RSLA's federal and state payroll taxes;

26          (c)      She failed to pay RSLA's California sales taxes;

27          (d)      She did not timely pay RSLA's staff and managers, and when she

28  paid them, she did not pay them the correct amounts they were owed;

86

**THIRD AMENDED COMPLAINT**

1          (e)     She did not obtain adequate general liability and other insurance

2  for RSLA;

3          (f)     She did not maintain anything resembling a set of books and

4  records for Roof Group or RSLA;

5          (g)    She did not prepare financial reports or statements for Roof Group

6  or RSLA;

7          (h)    She did not prepare budgets or projections for Roof Group or

8  RSLA;

9          (i)     She never implemented any cost controls, as promised; and

10         (j)     She never engaged CIM in discussions to renegotiate the lease

11  terms, as promised.

12     288.   After moving to Los Angeles, Weinberg and Stern kept their relationship

13  and the nature and extent of Stern's involvement in the daily operations of RSLA

14  secret from Mr. Freeney, his associates and professional advisors, and the RSLA

15  management team.

16     289.   Weinberg's gross mismanagement of RSLA is well documented:

17          (a)    Gregory Kniss is a certified public accountant and a principal in

18  the accounting and consultancy firm Krost, Baumgarten, Kniss & Guerrero, Inc.

19  ("KBKG"), which has specific expertise in the restaurant industry.  KBKG provided

20  consulting services to RSLA between approximately September 2010 and June 2011.

21  Kniss stated to the FBI:

22

23       •    "[T]here was a long list of things that WEINBERG wouldn't do,
           including not handling over the accounting books or funding the
24           accounts."

25
       •    [I]t was his understanding that WEINBERG had her own set of
26           accounting books.  KNISS thought that because WEINBERG was a
           financial planner, she would know what she [was] doing and that she
27           must have had another CPA doing the books for RSLA prior to KBKG
28           getting involved."

**THIRD AMENDED COMPLAINT**

188650.4

- "WEINBERG never got KBKG the books, never produced any documents or one financial statement. . . .  KBKG never got anything that they would get from a normal client."

- "WEINBERG cause a lot of grief at the restaurant and there are numerous labor lawsuits that can be pointed to her."

- "WEINBERG would . . . not fund the payroll for RSLA's employees. Many people did not get paid on time and one manager was not even on the payroll."

- "By the end, WEINBERG seemed to be the source of all the problems with the operations of RSLA and getting things going . . . .  WEINBERG pointed the finger at [Aaron] WEST the whole time, but it wasn't WEST at all."

(b)     Jean Hagen is a KBKG employee who worked with Mr. Kniss on the RSLA account.  She told the FBI:

- "WEINBERG was a nightmare and [she] had a very difficult time working with her."

- "WEINBERG consistently refused to provide KBKG information to do its job."

- "KBKG could not get access to RSLA's books or construction [cost records].  WEINBERG refused to provide KBKG with anything."

- "[T]he RSLA bank accounts constantly had money being transferred out and there was no accounting being done to the accounts."

- "WEINBERG would not approve things for payment and HAGEN was constantly arguing with WEINBERG regarding sales tax, rent and other utilities that had to be paid."

(c)     Gilbert Nesbitt was RSLA's Manager of Operations from approximately June 2010 through March 2012.  He recounted to the FBI:

88
**THIRD AMENDED COMPLAINT**

188650.4

- "[W]orking with WEINBERG on a daily basis was very difficult."

- "WEINBERG controlled all of the finances for RSLA."

- "WEINBERG would control the flow of all the money for RSLA because she had access to all of RSLA's bank accounts."

- "[H]e did not know how much money was in the restaurant bank accounts because he did not have access to the bank accounts," and "he had no idea how much money was available for use because he never, ever saw the restaurant bank accounts."

- "[O]ften times, WEINBERG would refuse to pay promoters who would run events at the nightclub portion of the restaurant . . . .  [O]n serveral occasions promoters have sued RSLA for failure to pay on their event . . . .  [A]s a result, RSLA actually had a bad reputation amongst promoters because of their failure to pay promoters for holding events at RSLA."

- "[B]ecause he didn't had access to RSLA's bank accounts, he never really knew how much money the restaurant was making or losing."

- "[T]he most WEINBERG said about MILLAR was that he was a business partner who worked with her."

- "There was no appearance that someone other than WEINBERG, to include MILLAR, was in control of the finances for RSLA."

- "[T]here is no reason why MILLAR would have access to the RSLA bank accounts kept at Wells Fargo Bank . . . .  [T]here is no reason why MILLAR would ever have been granted access to the RSLA bank accounts."

(d)     Aaron Revoir worked at RSLA from approximately January through June 2011 as the Human Resources Manager.  He provided the following information to the FBI:

- "WEINBERG controlled the purse strings of RSLA . . . ."

- "[E]ven RSLA's accounting firm, KBKG, could not get documents and

89

**THIRD AMENDED COMPLAINT**

188650.4

the bookkeeping from WEINBERG that they needed for RSLA.  As a result, KBKG said that they were not going to work further for RSLA and left as the restaurant's accountants."

- "[M]any times, it appeared that WEINBERG did not want people to know her schedule, or where she was or what she was doing."

- "[A]t times, WEINBERG would have to tell REVOIR where she was or what time she was going to be at the restaurant, but WEINBERG would ask REVOIR not to disclose her whereabouts to other people," which "seemed to be very strange."

- "[H]e met STERN/MILLAR once in the beginning of his tenure at RSLA, and did not see STERN/MILLAR until just before REVOIR left RSLA."

- "REVOIR said that he did not know that STERN and WEINBERG were romantically involved . . . .  [He] did not remember seeing the two of them together."

(e)     Erica Nassar succeeded Revoir as the Human Resources Manager and also served as Interim Controller for RSLA from June 2011 through July 2012. She informed the FBI:

- "WEINBERG was in charge of all the money for RSLA.  WEINBERG would dictate which promoters or vendors RSLA would pay or not pay during the course of a given week."

- "[T]here were times [when] WEINBERG would ask [her] to hold the paychecks for the management staff so RSLA would have enough money in the bank to make it through the weekend."

- "ADP processed employee pay checks and payroll taxes.  However, RSLA ended up bouncing several payroll checks and ADP thus stopped processing payroll taxes for RSLA . . . .  WEINBERG said that this mistake was ADP's fault and blamed ADP."

- "NASSAR . . . had never heard of the name Arms Reach Consulting (ARC)."

- "WEINBERG never said that MILLAR/STERN was ever doing any

90

**THIRD AMENDED COMPLAINT**

188650.4

work for RSLA," and "there was no reason why RSLA would ever pay either ARC or MILLAR/STERN for any reason at all."

290.  In fact, Weinberg's apparent gross mismanagement of RSLA was reflective of the fact that, in reality, she and Stern were operating RSLA as a front to misappropriate and launder Mr. Freeney's funds, a key element of which was the use of the BofA Roof Group account at BANA (as described below).

## V.  Fraudulent and Unauthorized Transfers of Mr. Freeney and Roof Group's Funds to and from the BofA Roof Group Account.

291.  Beginning in or about June 2010 (while Weinberg was still employed at BofA/Merrill Lynch), and continuing through at least October 2011, Weinberg, as Mr. Freeney's financial manager, deposited approximately ***$15.7 million*** to his Citibank accounts.  These deposits consisted mostly of Mr. Freeney's weekly paychecks from the Colts during the 2010 and 2011 NFL seasons, but also included his income tax refunds, which exceeded $1.0 million for 2010, and proceeds from the liquidation of his existing investments (described below).

292.  Pursuant to Weinberg's instructions, the checks were sent by the Colts to GWM at the 8484 Wilshire address.  Weinberg would then deposit them at the Citibank branch across the street.

293.  During this same time period, Stern, using the confidential account information provided by Weinberg, accessed Mr. Freeney's Citibank accounts online to wire transfer approximately ***$9.3 million*** from the Citibank accounts to the BofA Roof Group account.  He also wire transferred $80,000 to GWM directly. These transfers constituted thefts and conversions of funds belonging to Mr. Freeney.

294.  During this same time period, Stern, using the confidential account access information provided by BofA/Merrill Lynch, Del Campo and Weinberg, accessed the BofA Roof Group account online hundreds of times to make the following unauthorized and fraudulent wire transfers, among others:

(a)  147 wire transfers to ARC totaling more than $2.2 million;

**THIRD AMENDED COMPLAINT**

1          (b)     Five wire transfers to GWM totaling more than $320,000;

2          (c)     78 wire transfers totaling approximately $750,000 to lease and pay

3 expenses relating to the private jet;

4          (d)     Seven wire transfers totaling more than $90,000 to pay the rent on

5 the Hancock Park house;

6          (e)     79 wire transfers totaling more than $5.0 million to continue to

7 fund the build out and operations of RSLA, in order to keep the scheme operating and

8 from being discovered; and

9          (f)     13 wire transfers totaling $88,000 for other unauthorized purposes.

10     295.   Altogether, BANA executed wire transfers totaling approximately

11 ***$8.5 million*** from the BofA Roof Group account in furtherance of, to promote and to

12 conceal the scheme to defraud.  All of these transfers constituted thefts and

13 conversions of funds belonging to Mr. Freeney and Roof Group.

14     296.   The cost of these fraudulent and unauthorized wire transfers totaled in

15 excess of $8,000 and was charged to Mr. Freeney and Roof Group.

16     297.   In a June 2012 post-arrest interview by the FBI and USAO, Weinberg

17 made the following statements concerning the movement of funds between and

18 amongst the Citibank, BofA Roof Group and ARC accounts:

- "WEINBERG said that it was STERN who was making the transfers from FREENEY's Citibank account to the BofA Roof Group account."

- "STERN had access to all of FREENEY's accounts. Furthermore, he was the one doing the transactions in these accounts.  Specifically, WEINBERG said that STERN was involved with FREENEY's accounts and had access and was the one wiring money in and out of the accounts."

- "STERN would sometimes be doing a wire and there would be a security hold on the account and STERN would ask WEINBERG to call DEL CAMPO to release the wire.

**THIRD AMENDED COMPLAINT**

WEINBERG said that she basically mechanically checked with DEL CAMPO about the wire."

- "[S]he never looked at the Roof Group bank statements . . . . WEINBERG said that she didn't even believe that the statements existed."

- "[S]he didn't think that FREENEY knew that STERN was doing his personal billpay."

298.   Candi Pettie (nka Candi-Pettie-Onuoha) worked for Weinberg and Stern as an hourly employee at the Hankcock Park house from April 2011 through December 2011, helping to organize and file documents and recording in Quickbooks receipts, payment and banking transactions for the Freeney and RSLA accounts.  She told the FBI:

- "[I]t appeared that STERN was trying very hard to conceal the fact that he was involved in the finances of RSLA and FREENEY.  It appeared that STERN did not want anyone to know that he was involved."

- "Freeney had no idea that STERN was as involved as he was in FREENEY's finances."

- "[W]hile working with STERN, she would notice STERN using the name MICHAEL MILLAR as well as DAVID MICHAEL MILLAR."

- "PETTIE never heard WEINBERG mention STERN's name while on the phone."

- "[W]hen the restaurant would call and say that there was not enough money in the account, STERN would tell WEINBERG to call the restaurant back and would tell WEINBERG who the restaurant could pay and who the restaurant couldn't pay."

- "STERN never spoke to FREENEY.  Rather, STERN would tell WEINBERG what to say to FREENEY."

- "[S]he noticed that there were a lot of wires coming out of FREENEY's accounts.  PETTIE noticed amounts of $10,000, $30,000 and $90,000 in wire transfers leaving FREENEY's accounts."

- "[M]any of the wire transfers were unaccounted for and PETTIE said that she told STERN this was not the correct way to do things."

- "[S]he estimated that she saw approximately $9-11 million dollars move through the RG BOA account."

93

**THIRD AMENDED COMPLAINT**

- • "STERN would often tell PETTIE not to account for certain wire transfers that STERN said WEINBERG did.  PETTIE said this was not the correct way to do things in accounting and bookkeeping."
- • "STERN had access to FREENEY's personal bank accounts as well as the RG bank accounts."
- • "[S]he observed STERN logging on to the Bank of America online banking website."
- • "PETTIE would see STERN logging into the RG BOA account on the MAC computer . . . ."
- • "STERN knew everything; he knew FREENEY's account numbers and credit card numbers."
- • "STERN appeared to have all the login names and passwords for all of [Freeney's] accounts."
- • "[S]he saw STERN print out bank statements for FREENEY's Citibank account, WFB account as well as FREENEY's Huntington National Bank account.  PETTIE said that she did not see a statement for BOA."
- • "[S]he remembered STERN having to call WFB and verify FREENEY's personal information to get into FREENEY's account."
- • "[S]he also noticed that there was a lot of money leaving the accounts and no money coming in.  PETTIE said that she eventually noticed that FREENEY's Citibank account was funding everything . . . ."
- • "[S]he would also come across checks written to WEINBERG or GWM and STERN would want PETTIE to label these checks as other things such as financial services or professional fees or something else that didn't make sense."
- • "PETTIE saw a lot of checks just written to 'cash.'"
- • "STERN would have WEINBERG sign blank checks and at times, STERN would even sign checks in WEINBERG's name."
- • "[E]ventually she expressed her frustrations to WEINBERG.  PETTIE told WEINBERG that money was missing."

**W.  Stern's Use of RSLA to Disquise Wire Transfers to ARC.**

299.   Stern used RSLA to conceal and disguise the actual purpose of the wire transfers he was initiating from the BofA Roof Group account to ARC.  In particular, he would often include a false notation in the wiring instructions he sent BANA online, falsely indicating that the transfer to ARC was RSLA related.  The following are several such examples:

/ / /

/ / /

**THIRD AMENDED COMPLAINT**

| Date of Wire | Amount | Stated Justification |
|---|---|---|
| 11/18/2010 | $76,540 | "Rolling Stone Construction" |
| 01/18/2011 | $39,450 | "Kevin McReary" |
| 01/28/2011 | $39,400 | "Kevin McReary Settlement" |
| 02/02/2011 | $68,465 | "Kevin McReary Sai" |
| 04/14/2011 | $25,000 | "Niall Donnally" |
| 05/09/2011 | $31,000 | "Settlement Nial Donnelly" |
| 06/03/2011 | $26,000 | "Rsla Nial Donnelly" |
| 09/26/2011 | $26,740 | "Niall Donnally" |

300.   In fact, none of the funds transferred to ARC in these transactions were used for the purposes stated, or otherwise to benefit Mr. Freeney or Roof Group. Kevin McVearry (misspelled "McReary") was the original Director of Operations for RSLA, who was terminated at Weinberg and Stern's insistence in 2010.  He was paid $38,000 in settlement from the BofA Roof Group account; he never received any payments from ARC.  Niall Donnelly was paid $550,000 by Mr. Freeney for his interest in RSLA between May 2010 and January 2012.  None of those funds originated from ARC, and none of them were paid on the dates listed above. Similarly, ARC paid none of the construction costs associated with the build out of RSLA.

**X.   BOCK and Weinberg, Acting in Concert with Stern, Liquidate Mr. Freeney's Existing Investments to Generate Additional Funds to Misappropriate.**

301.   To successfully misappropriate and convert the hundreds of thousands of dollars of Mr. Freeney's funds that Weinberg and Stern took each month without raising Mr. Freeney's suspicions, it was necessary that they have sufficient funds under their control, above the amounts they were stealing, to continue to pay Mr. Freeney's monthly living and personal expenses and the costs associated with the

95

**THIRD AMENDED COMPLAINT**

1    build out and operations of RSLA.

2       302.   Accordingly, beginning in or about March 2010, BOCK, Weinberg and

3 Stern began liquidating all of Mr. Freeney's existing investments to free up additional

4 funds to misappropriate and convert.

5       **1.**     ***Advisors Disciplined.***

6       303.   In or about March 2010, BOCK and Weinberg caused

7 BofA/Merrill Lynch to sell Mr. Freeney's Advisors Disciplined municipal bonds for

8 approximately $490,000. The proceeds were deposited to Mr. Freeney's brokerage

9 accounts. Liebman and BOCK subsequently authorized and permitted Weinberg to

10 transfer at least $160,000 of those funds to ARC without Mr. Freeney's authorization

11 or knowledge.

12       304.   In liquidating this investment, BOCK and Weinberg were acting in their

13 capacities as employees and agents of BAC, BANA and MLPFS. In permitting

14 Weinberg to transfer the proceeds from the sale of this investment to ARC, BOCK

15 was acting in his capacity as an employee and agent of BAC, BANA, MLPFS and

16 Liebman was acting as Weinberg's supervisor.

17       **2.**     ***Success Trade.***

18       305.   In or about March 2010, Weinberg and Stern began negotiating with

19 Success Trade for the return of Mr. Freeney's $1.5 million in principal. In or about

20 September 2010, Success Trade returned $441,000 to Mr. Freeney, which was

21 deposited by Weinberg into the Citibank accounts. During the course of the next

22 month, a total of approximately $720,000 of the funds in the Citibank accounts were

23 wire transferred to the BofA Roof Group account. During this same time period,

24 BANA executed wire transfers of approximately $190,000 of those funds from the

25 BofA Roof Group account to ARC.

26       306.   In negotiating the return of Mr. Freeney's funds from Success Trade,

27 Weinberg was acting in her capacity as an employee, actual agent and/or ostensible

28 agent of BAC, BANA and MLPFS.

**THIRD AMENDED COMPLAINT**

188650.4

### 3.    CFP.

307.   In or about May 2010, Weinberg and Stern began negotiating with CFP for the return of Mr. Freeney's $1.75 million in principal.  Between in or about September 2010 and February 2012, Mr. Freeney received approximately $1.6 million from CFP in several separate payments.  All of these funds, with the exception of $20,000, were deposited to the Citibank accounts.  A portion of the $1.6 million was then wire transferred over time to ARC, to GWM, to pay expenses related to the private jet and to pay Stern's personal debts.

308.   The agreement that Weinberg and Stern negotiated with CFP discounted significantly the amount of principal CFP was required to return to Mr. Freeney.  As a result of this agreement, Mr. Freeney lost a total of approximately $260,000 in unreturned principal and unrealized interest income.

309.   In negotiating the return of Mr. Freeney's funds from CFP, Weinberg was acting in her capacity as an employee, actual agent and/or ostensible agent of BAC, BANA and MLPFS.

### 4.    Pacific Life Annuity.

310.   In or about June 2010, BOCK and Weinberg caused Mr. Freeney to surrender his Pacific Life annuity, which had a cash value of approximately $1.5 million.  Because Mr. Freeney surrendered the annuity early, he had to pay a penalty of approximately $50,000.

311.   The proceeds from the surrender of the annuity were deposited by Weinberg to the Citibank accounts.  Over the next month, $850,000 was wire transferred from these accounts to the BofA Roof Group account.  In this same time period, BANA executed wire transfers from the BofA Roof Group account of approximately $87,000 to ARC; $69,000 to pay expenses related to the private jet; and another approximately $21,000 to pay Stern's personal debts and expenses.

312.   In causing Mr. Freeney to liquidate his Pacific Life annuity, BOCK and Weinberg were acting in their capacities as employees and agents of BAC, BANA and

97

**THIRD AMENDED COMPLAINT**

188650.4

MLPFS.

    **5.**    ***American Realty.***

    313.   In or about April 2011, BOCK and Weinberg liquidated Mr. Freeney's investment in American Realty, which resulted in $195,000 in proceeds that Weinberg deposited to the Citibank accounts.  During the course of the next month, approximately $178,000 was wire transferred from these accounts to the BofA Roof Group account.  From there, Stern wire transferred a total of $154,000 in thirteen separate wirings to ARC and another approximately $29,000 for expenses related to the private jet.

    314.   In liquidating Mr. Freeney's investment in American Realty, BOCK and Weinberg were acting in their capacities as employees and agents of BAC, BANA and MLPFS**.**

**Y.**    **Weinberg and Stern Secretly Marry.**

    315.   Weinberg and Stern were secretly married in Los Angeles on or about February 25, 2011.

    316.   Weinberg and Stern recorded their Marriage License and Certificate as confidential.  Although Weinberg would tell the FBI following her arrest that she believed Stern had previously legally changed his last name to "David Michael Millar," the marriage license listed Stern's name as "Michael Alan Stern," and further indicated that Weinberg had elected to change her name to "Eva Danielle Stern."

    317.   At the time they wed, Stern was still married to Layne Harris Stern. (They were not divorced until two years later, in April 2012.)

    318.   This marriage was a sham.  Plaintiffs are informed and believe, and on that basis allege, that Stern secretly wed Weinberg, while still married to Layne Harris Stern, so that Weinberg could assert the spousal and marital communication privileges to refuse to testify against Stern in the Florida bankruptcy proceedings and in the various lawsuits pending against him in Florida, or in the event the scheme to defraud Mr. Freeney was discovered and Stern was sued or criminally prosecuted as a result.

**THIRD AMENDED COMPLAINT**

188650.4

**Z.      Weinberg and Stern's Thefts From the Wells Fargo Roof Group Accounts.**

319.   In addition to their thefts using the Citibank and BofA Roof Group accounts, Weinberg and Stern misappropriated over $100,000 from the Wells Fargo Roof Group accounts.

320.   Weinberg signed at least two checks made payable to "Cash" and totaling $9,000 drawn on these accounts, which were deposited to the ARC account at Wells Fargo.  She also signed two checks totaling $14,800, made payable to Stein Diamonds, which Stern used to purchase a Rolex watch.

321.   In addition, Stern obtained a Roof Group debit card from Weinberg, which he used for unauthorized purposes, including to withdraw cash, pay for a trip to New York and Italy, buy flowers, pay for meals at expensive restaurants, purchase beauty supplies, and pay his and Weinberg's daily living expenses.

**AA.    The Termination of the Felis' Employment and Their $5.0 Million Lawsuit Against Roof group and Others**

322.   After learning of Stern's hiring of the Felis under terms that Roof Group could not afford, Mr. Freeney's legal counsel sought to reduce the Felis' compensation package in the course of negotiating a long-form employment contract. When the Felis appeared to balk at any such reduction, in December 2010, Roof Group terminated their services.

323.   The decision to terminate the Felis' services was made at the insistence of Weinberg, who had begun her campaign to have the Felis fired in or about September 2010, shortly after Sal Feli recommended having an outside accounting firm perform an audit of RSLA's finances.

324.   In insisting that Mr. Freeney must terminate the Felis, Weinberg concealed and caused others to conceal the following material facts, among others, from Mr. Freeney:

(a)      Plaintiffs are informed and believe, and on that basis allege, that Weinberg and Stern had hired the Felis, and agreed on behalf of Roof Group to pay

**THIRD AMENDED COMPLAINT**

188650.4

1  them excessive compensation, because they believed that the Felis would be easier to

2  manipulate and less of a threat to uncover the scheme to defraud than Altounian and

3  Donnelly;

4    (b)    Plaintiffs are informed and believe, and or that basis allege, that

5  Weinberg's sole or primary motivation for insisting that Mr. Freeney terminate the

6  Felis' services was her concern that they would uncover her and Stern's use of RSLA

7  as a vehicle for misappropriating and converting funds belonging to Mr. Freeney and

8  Roof Group; and

9    (c)    Weinberg had ignored Mr. Freeney's instruction to pay the Felis

10  the severance pay they had requested.

11    325.   In or about April 2011, the Felis filed suit against Roof Group,

12  Mr. Freeney, Mr. West, Weinberg, Millar and others (the "*Feli* Case").  The Felis'

13  complaint alleged claims for breach of contract, fraud, conversion, breach of fiduciary

14  duty, tortious interference with contract and an accounting.  The Felis sought $5.0

15  million in damages.  All of these claims arose from Weinberg and Stern's conduct in

16  the hiring and termination of the Felis.

17    326.   Roof Group and Mr. Freeney vigorously defended against the allegations

18  in the *Feli* Case.  In or about August 2012, the court dismissed the fraud, conversion,

19  breach of fiduciary duty and accounting claims against Mr. Freeney, Mr. West and

20  Roof Group as being legally insufficient.  In December 2012, the case settled shortly

21  before trial was to commence.  Mr. Freeney and Roof Group paid more than $825,000

22  in defending and settling the *Feli* Case.

23  **BB.   Mr. Freeney Completes the Buy Outs of Altounian and Donnelly's**

24  **Interests in Roof Group.**

25    327.   As noted above, Mr. Freeney signed the agreement to purchase

26  Altounian's shares in Roof Group for $325,000 in or about November 2010, acting in

27  reliance upon Weinberg, Stern and the Florida Attorney's fraudulent advice and their

28  concealment of material information concerning the value of Altounian's 24.5 percent

**THIRD AMENDED COMPLAINT**

188650.4

1 | interest in Roof Group, which was nominal at the time.  At Weinberg and the
2 | Florida Attorney's urging, Mr. Freeney completed making the $325,000 in payments
3 | to Altounian in or about November 2011.

4 |      328.   As also noted above, Mr. Freeney signed the agreement to purchase
5 | Donnelly's shares in Roof group for $550,000 in or about May 2011, acting in
6 | reliance upon Weinberg, Stern and the Florida Attorney's fraudulent advice and
7 | concealment of material information concerning the value of Donnelly's 24.5 percent
8 | interest in Roof Group, which likewise was nominal at the time.  At Weinberg and the
9 | Florida Attorney's urging, Mr. Freeney completed making payments to Donnelly
10 | pursuant to this agreement in or about January 2012.

11 |      329.   Plaintiffs are informed and believe, and on that basis allege, that
12 | Weinberg and Stern's sole or primary motivation for convincing Mr. Freeney to make
13 | these payments and complete these purchases was to oust Altounian and Donnelly
14 | from the day-to-day management and operations of RSLA, before they discovered that
15 | Weinberg and Stern were using RSLA as a cover to steal funds from Mr. Freeney and
16 | Roof Group.

17 | **CC.   The Snap Advances Transactions.**

18 |      330.   By in or about August 2011, BOCK, Weinberg and Stern had liquidated
19 | almost all of Mr. Freeney's investments that could be redeemed, and Weinberg and
20 | Stern had depleted almost all of Mr. Freeney's available cash.  As a result, Weinberg
21 | and Stern had no money remaining with which to pay Mr. Freeney's living and
22 | personal expenses and continue to fund the operations of RSLA, while at the same
23 | time misappropriating the funds that they needed to maintain their own extravagant
24 | lifestyles.

25 |      331.   To keep RSLA afloat and prevent the scheme to defraud from being
26 | discovered, in or about August 2011, Weinberg negotiated a $300,000 credit facility
27 | for Roof Group from a small factoring company in Queens, New York named
28 | Snap Advances.  The credit facility was secured by RSLA's credit card receivables

**THIRD AMENDED COMPLAINT**

1    and personally guaranteed by Mr. Freeney, who, at Weinberg's urging, agreed to

2    pledge his guaranteed income under his Colts contract as security for his personal

3    guarantee.

4        332.   Under the factoring agreement, in return for the $300,000 credit facility,

5    Mr. Freeney was required to repay Snap Advances a total of $435,000, which equated

6    to 45 percent interest per year.

7        333.   At the time, Mr. Freeney was in training camp and had no real

8    opportunity to question whether or why RSLA needed this credit facility.  He

9    therefore had to trust and rely upon Weinberg's advice in agreeing to Snap Advances'

10   terms.

11       334.   In or about September 2011, Weinberg negotiated a second such credit

12   facility from Snap Advances to Roof Group under the same terms.  This time, the

13   credit facility was for $150,000, and the factoring agreement required Mr. Freeney to

14   pay Snap Advances a total of approximately $220,000.

15       335.   Mr. Freeney did not complete repaying Snap Advances, with interest,

16   until in or about September 2012.  Altogether, these transactions required him to pay

17   approximately $215,000 in interest and costs.

18       336.   In convincing Mr. Freeney to agree to the terms of the two Snap

19   Advances factoring agreements, Weinberg concealed and caused others to conceal the

20   following material facts, among others, from Mr. Freeney:

21           (a)    The credit facilities were only necessary because

22   BofA/Merrill Lynch, Weinberg and Stern had depleted almost all of Mr. Freeney's

23   available cash and liquid assets;

24           (b)    If Roof Group defaulted on the credit facilities, Mr. Freeney could

25   lose more than $25 million in guaranteed salary under his Colts contract;

26           (c)    Mr. Freeney was paying interest at the shocking rate of 45 percent

27   per annum for the two credit facilities; and

28           (d)    Weinberg and Stern were planning to (and did) misappropriate a

102

**THIRD AMENDED COMPLAINT**

portion of the advances RSLA received under the factoring agreements.

**DD.   The W Hotel Investment.**

337.   In or about January 2006, Mr. Freeney, on the advice of a former financial manager, entered into a Purchase and Sale Agreement with 2201 Collins Fee LLC ("2201 Collins") to purchase a penthouse condominium unit in the new W Hotel to be constructed in South Beach.  The purchase price was $6.0 million.  As required by the contract, Mr. Freeney made a deposit of 20 percent of the purchase price, or $1.2 million.  The balance would be due within 10 days of notification of completion of construction, which was to occur no later than December 31, 2010.  If Mr. Freeney was unable to close at that time, the contract provided that 25 percent of his deposit ($300,000) would be returned to him and that the remaining amount ($900,000) would be forfeited as liquidated damages.

338.   Mr. Freeney entered into this contract primarily for investment purposes.  Under the contract, the W Hotel would rent his unit for him when he was not using it, and he would receive the rental payments, less management fees.

339.   In June 2009, Mr. Freeney received notice that construction had been completed ahead of schedule, and that he needed to pay the remaining $4.8 million of the purchase price to close on his purchase.  It emerged, however, that 2201 Collins was not able to convey marketable title at that time, and that there were a number of other irregularities in the manner in which the developer had marketed the project, escrowed deposited amounts and amended the purchase agreement.

340.   Subsequently, Mr. Freeney retained a Miami lawyer to represent him in resolving these issues with the developer.  At the time Mr. Freeney became a BofA/Merrill Lynch client in January or February 2010, the matter was still unresolved, but, as a result of negotiations between Mr. Freeney's lawyer and 2201 Collins, the developer had preliminarily agreed to: (a) reduce the purchase price of Mr. Freeney's unit to $5.4 million; (b) apply the full amount of the $1.2 million deposit toward the purchase of a lesser unit for $1.75 million; or (c) return $450,000

**THIRD AMENDED COMPLAINT**

1    of Mr. Freeney's deposit.

2        341.   In recruiting Mr. Freeney to become a BofA/Merrill Lynch client,

3    Weinberg and Stern (posing as Millar) promised to intervene in this transaction, to

4    assist Mr. Freeney in either obtaining the financing to complete the purchase of his

5    unit or to negotiate the return of his $1.2 million deposit.

6        342.   These promises were false.  In fact, after Mr. Freeney became a

7    BofA/Merrill Lynch client, Weinberg and Stern did virtually nothing to help

8    Mr. Freeney close on the purchase of the unit or obtain return of his deposit.  As a

9    result of their inaction, Mr. Freeney never completed the purchase of the unit and

10   remained without use of any portion of the $1.2 million deposit held by 2201 Collins

11   until recently.

12       343.   Based on these promises, Mr. Freeney had come to repose his trust and

13   confidence in BofA/Merrill Lynch, Weinberg and Stern to act honestly, loyally,

14   competently and diligently in obtaining the return of his $1.2 million deposit.  At all

15   times relevant hereto, BofA/Merrill Lynch, Weinberg and Stern, and each of them,

16   encouraged, accepted and voluntarily assumed such trust and confidence, thereby

17   creating a fiduciary relationship with Mr. Freeney relating to this matter.

18       344.   In promising to intervene in this transaction and then doing nothing to

19   assist Mr. Freeney to close on the purchase of his unit or recoup his deposit, Weinberg

20   was acting in her capacity as an employee, actual agent and/or ostensible agent of

21   BAC, BANA and MLPFS.

22   **EE.    The North Carolina Land Investment.**

23       345.   In or about December 2004, Mr. Freeney, on the advice of a former

24   financial manager, purchased 8.5 acres of undeveloped lakefront land in Mecklenburg

25   County, North Carolina.  This property is located outside of Charlotte, North Carolina

26   and is part of a development known as the Sanctuary at Lake Wylie.

27       346.   Mr. Freeney paid $1,530,000 for the land, which he purchased for

28   investment purposes.  The purchase was financed by a mortgage loan from

104

**THIRD AMENDED COMPLAINT**

First Charter Bank, which later merged with Fifth Third Bank.  The Fifth Third mortgage was extended in January 2008, and again in January 2010.  Mr. Freeney repaid the mortgage in full in December 2013.

347.   At the time Mr. Freeney became a BofA/Merrill Lynch client in January 2010, he was making mortgage payments of approximately $9,500 per month to Fifth Third Bank.  Because North Carolina is not an antideficiency state, a reasonably competent financial manager would have advised Mr. Freeney that his best (if not only) option was to sell the property as soon as possible to stop his ongoing and mounting losses.

348.   In recruiting Mr. Freeney to become a BofA/Merrill Lynch client, Weinberg and Stern (posing as Millar) advised Mr. Freeney (correctly) that the investment was a losing proposition and promised to dispose of it for him.  Based on this promise, Weinberg convinced Mr. Freeney to give Stern (posing as Millar) written authorization to negotiate a workout of the existing mortgage with Fifth Third Bank on his behalf, which Mr. Freeney did.

349.   These promises to dispose of the property were false.  In fact, after Mr. Freeney became a BofA/Merrill Lynch client, Weinberg and Stern did virtually nothing toward disposing of the property or negotiating a loan modification with Fifth Third Bank.  As a result, Mr. Freeney was required to continue to make the monthly mortgage payments over the next three years, which totaled more than $430,000, as well as pay property taxes totaling more than $18,000, while the value of the land continued to decline.

350.   In addition, although BofA/Merrill Lynch was responsible for Mr. Freeney's bill payments, it failed to pay the quarterly homeowner association ("HOA") dues on his behalf, which eventually led to the HOA foreclosing on the property.  As a consequence, Mr. Freeney had to pay the HOA over $12,000 and more than $5,500 in attorney's fees and costs to reacquire the property.

351.   Based on the foregoing promises, Mr. Freeney had come to repose his

105

**THIRD AMENDED COMPLAINT**

1   trust and confidence in BofA/Merrill Lynch, Weinberg and Stern to act honestly,

2   loyally, competently and diligently in disposing of the North Carolina Land

3   Investment for the greatest value reasonably obtainable.  At all relevant times,

4   BofA/Merrill Lynch, Weinberg and Stern, and each of them, encouraged, accepted

5   and voluntarily assumed that trust and confidence, thereby creating a fiduciary

6   relationship with Mr. Freeney with respect to the disposition of the North Carolina

7   Land Investment.

8   　　　352.   In making these promises and then doing nothing to dispose of this

9   property, and in failing to ensure that the HOA dues were timely paid, Weinberg was

10   acting in her capacity as an employee, actual agent and/or ostensible agent of BAC,

11   BANA and MLPFS.

12   **FF.   Efforts at Cover Up and to Obstruct Justice.**

13   　　　353.   Beginning in or about 2011, BAC, BANA, MLPFS, Weinberg and Stern,

14   aided and abetted by others, engaged in the following acts, among others, to conceal

15   and cover up their involvement in the scheme to defraud Mr. Freeney and Roof

16   Group.

17   　　　*1.   Weinberg and Stern's Efforts to Misdirect Scrutiny.*

18   　　　354.   In or about November 2011, Weinberg and Stern became concerned that

19   Mr. Freeney had discovered their fraud and that they were under investigation by

20   federal authorities.  In an effort to conceal their criminal activities, they attempted to

21   misdirect scrutiny away from themselves by falsely accusing others, including, in

22   particular, Mr. Freeney's friend and business associate Mr. West, of having stolen

23   from Mr. Freeney.

24   　　　355.   In or about November 2011, Stern composed a letter on his computer,

25   "To whom it may concern," falsely claiming that he "did make cash deposits to the

26   account of Aaron Oneil West"; that Mr. West "had asked to borrow funds that would

27   be reimbursed by Roof Group"; and that "monies were also given to Aaron west [sic]

28   in hand in cash . . . ."  The letter was recovered from Stern's computer by the FBI

**THIRD AMENDED COMPLAINT**

1  following his arrest.

2      356.   During this same period, Weinberg viciously slandered Mr. West to

3  RSLA managers and staff and to Mr. Freeney's mother, falsely accusing him of

4  stealing from Mr. Freeney and seeking to blame him for RSLA's deteriorating

5  financial condition.

6      357.   Weinberg and Stern also attempted to misdirect scrutiny by creating

7  fictitious account statements to show Mr. Freeney.  In or about December 2011,

8  Weinberg and Stern paid an accountant to prepare phony account statements for

9  Mr. Freeney that Weinberg could show to him.  The phony statements purported to

10 have been issued by GWM, listed Weinberg as the Senior Vice President of GWM,

11 and falsely reported that Mr. Freeney still had over $1.3 million in cash on deposit and

12 owned assets valued at close to $14 million.

13     **2.   *Weinberg and Stern's Creation of False and Forged Documents.***

14     358.   In or about November 2011, Stern composed a false exculpatory

15 statement on his computer that he fraudulently backdated to August 3, 2010.  The

16 letter was purportedly authored by Mr. Freeney.  In it, Stern had Mr. Freeney

17 "agree[ing] to pay the cost per hour plus fuel and pilot expenses [of the private jet] to

18 Arms Reach Consulting or its suppliers," and that the "fees will be paid by

19 Roof Group LLC."  This letter was also recovered by the FBI from Stern's computer

20 following his arrest.

21     359.   In or about December 2011, Stern composed a letter on his computer that

22 included a confession of sorts.  Plaintiffs are informed and believe, and on that basis

23 allege, that Stern created this document for Weinberg to use to exonerate herself

24 should she be arrested by federal authorities.  The letter was addressed, "To whom it

25 may concern," and was prepared on or about December 21, 2011.  In it, Stern

26 admitted that, "I have been using the name or I have been known as or under the

27 A/K/A David Michael Millar, Michael Millar"; that "[f]rom day one I was transferring

28 funds and taking monies that did not belong to me"; and that "I took those funds

**THIRD AMENDED COMPLAINT**

without anyone's knowledge and transferred funds without the knowledge and or consent of the owner of the account or his financial advisors."

360.  Plaintiffs are informed and believe, and on that basis allege, that sometime between in or about December 2011 and March 2012, Stern fabricated a "Business Management Engagement Letter" purportedly between GWM and Mr. Freeney (the "Fabricated Engagement Letter").  The document was fraudulently backdated to June 11, 2010, the day after Weinberg sent her resignation note to BofA/Merrill Lynch.  The document purported to be signed by Mr. Freeney, but either Weinberg or Stern forged Mr. Freeney's signature to it or obtained his signature by deception.

361.  The document recited the terms of a supposed agreement by which Mr. Freeney was to pay GWM five percent of his total assets annually, including five percent of the value of Roof Group, in return for GWM managing his finances.  No such agreement existed.  In fact, in a telephone conversation that the FBI recorded between Mr. Freeney and Weinberg on or about December 16, 2011, Weinberg admitted that, "you don't owe me anything."

362.  This telephone conversation followed Mr. Freeney's receipt earlier that day of an anonymous fax, which stated, in part:

- "You signed an asset management contract.  The contract was signed by yourself in June 2010, however, [Weinberg] was managing them since February 2010.  The contract was signed by you . . . ."

- "You will be provided with an additional copy of all agreements you signed including the authorizations . . . ."

- "The total fees are $2,731,375.  Without the bill pay . . . ."

363.  All of these representations were false and fraudulent:  Mr. Freeney did not sign any such agreement, at least not knowingly; he had not been and never was provided a copy of any such agreement; and Weinberg had no claim to fees totaling

1   more than $2.7 million, or any other amount.

2       364.   Weinberg later claimed her mother sent this fax without her knowledge,

3   but, in reality, either Weinberg or Stern sent it.  The fax represented the first time the

4   existence of an "asset management contract" between Mr. Freeney and GWM was

5   mentioned to him.  In fact, Mr. Freeney first saw the Fabricated Engagement Letter in

6   or about April 2012, when the FBI showed it to him, following the arrests of

7   Weinberg and Stern in March 2012.

8       ***3.      Weinberg and Stern's Attempted Destruction and***

9       ***Secreting of Evidence.***

10      365.   In or about March 2012, Stern returned to Miami to collect money that he

11  was owed and needed, now that he had exhausted Mr. Freeney's available cash and

12  liquid assets.  While there, he had a number of conversations with an associate who

13  was actually a paid Confidential Informant ("CI") working with the FBI.  (Some of

14  those conversations were surreptitiously recorded by the CI and others were

15  documented by the FBI in Forms 1023.)

16      366.   On or about March 17, 2012, Stern told the CI that he had intercepted a

17  letter from the FBI intended for Mr. Freeney, indicating that an investigation was

18  underway.  Stern advised the CI that he was able to intercept the letter because all of

19  Mr. Freeney's mail was still being forwarded to Weinberg's office in California.

20      367.   On or about March 18, 2012, Stern admitted to the CI that he had used

21  the name "David Michael Millar" in his dealings with Mr. Freeney.  He also told the

22  CI that he was considering leaving the country because of the FBI investigation.

23      368.   On or about March 21, 2012, Stern instructed the CI to fly from Miami to

24  Los Angeles to destroy the hard drive of a laptop computer that had been left in a

25  SUV parked at Los Angeles International Airport, which contained evidence

26  incriminating of him and Weinberg.  Stern described to the CI how he could locate the

27  car, gave him the keys to the car and gave him money to buy a plane ticket to

28  Los Angeles.  Stern also instructed the CI to retrieve documents from the SUV and a

**THIRD AMENDED COMPLAINT**

box of documents from Weinberg's home and destroy them as well.  Later, Stern told the CI that Weinberg had already taken care of the box of documents.

369.   The CI flew to Los Angeles that same day, March 21, 2012.  Based on the information provided by the CI, the FBI recovered the laptop from the SUV.

370.   On March 23, 2012, Stern was driven to Miami International Airport by Carl Brown, another business associate, to catch a flight to Los Angeles to reunite with Weinberg.

371.   En route to the airport, Stern and Brown stopped at a check cashing store where Stern unsuccessfully attempted to cash a Colts check made payable to Mr. Freeney, which was dated February 7, 2012, and in the amount of $31,785.

372.   Before arriving at the airport, Stern and Brown also stopped at the house Brown was living in, which Stern owned and was renovating.  As Brown would tell the FBI, Stern was carrying "a bag full of paperwork with him," and he "witnessed STERN get up on a ladder and put the paperwork inside the ceiling trusses that were exposed due to drywall cutout in the ceiling."  Brown stated that he "held the plastic bag while STERN took paperwork from inside the bag and placed it between the trusses," and then "STERN told BROWN to have the ceiling covered up as soon as possible."

373.   The FBI later recovered the "paperwork" Stern had stashed between the ceiling trusses.  The documents recovered included exemplars of Mr. Freeney's signature and a series of forged and fraudulent documents purportedly authorizing Citibank to transfer funds to the BofA Roof Group account in 2010 and 2011.

## VI.   AFTERMATH OF THE SCHEME.

**A.   Weinberg and Stern's Arrests.**

374.   Weinberg and Stern were arrested by the FBI on March 23, 2012, based on information provided by Mr. Freeney and a confidential informant and developed by the FBI with virtually no assistance from BofA/Merrill Lynch.  They were arrested on a federal criminal complaint charging them with wire fraud for misappropriating

**THIRD AMENDED COMPLAINT**

188650.4

1    funds from Mr. Freeney.

2          375.   Stern was arrested at Miami International Airport, as he was about to

3    board a flight to Los Angeles.  At the time, he had on his person the check from the

4    Colts to Mr. Freeney for $31,785; another check from the NFL Players Association to

5    one of Mr. Freeney's companies for $2,270.52; a BofA Visa card in Mr. Freeney's

6    name; temporary checks for a newly opened account at First Bank in Beverly Hills;

7    and a number of documents relating to the scheme, including multiple copies of

8    another version of the Fabricated Engagement Letter and handwritten notes and

9    materials printed from the Internet that Stern apparently used to draft the Fabricated

10   Engagement Letter.

11         376.   Weinberg was arrested at her residence in Los Angeles on the same day.

12   In an interview by the FBI on the day of her arrest, Weinberg falsely stated, among

13   other things, that:

14              (a)    Aaron West had introduced Mr. Freeney to Stern;

15              (b)    She was afraid of Mr. West because he had threatened her life;

16              (c)    Mr. Freeney paid a consulting fee to ARC, recalling one payment

17   of $100,000;

18              (d)    She and Stern had become romantically involved only at the end

19   of 2010;

20              (e)    She first discovered that Stern was not divorced from his prior

21   wife soon after they were married; and

22              (f)    She had told Mr. West in December 2011 about Stern's

23   unauthorized use of a Roof Group credit card.

24   **B.    The Criminal Prosecutions.**

25         377.   In May 2012, a grand jury in the Central District of California indicted

26   Stern for wire fraud and obstruction of justice relating to the scheme to defraud

27   Mr. Freeney.  In August 2012, the grand jury returned a superseding indictment that

28   added transactional money laundering and access device fraud charges.

**THIRD AMENDED COMPLAINT**

378.   In January 2013, U.S. District Judge Stephen V. Wilson accepted Stern's guilty plea to access device fraud.  In pleading guilty, Stern admitted that he had acted "knowingly and with the intent to defraud" Mr. Freeney and Roof Group.

379.   In October 2013, Judge Wilson sentenced Stern to 60-months imprisonment and three-years supervised release for his role in defrauding Mr. Freeney.  In imposing this sentence, Judge Wilson found that "Mr. Stern [is] totally uncredible"; "[h]e is a person worthy of no credibility"; "[t]he crime is serious, so the sentence is necessary to promote respect for the law and to provide just punishment for the offense"; "[i]t is also necessary to protect the public from further crimes of this defendant"; and "given [his] overall history and the endemic way in which he carried out his scheme against the victim here, there is concern that without a serious sentence, he would be inclined to do this again."

380.   In June 2013, Judge Wilson accepted Weinberg's guilty plea to an information charging her with being an accessory after the fact to access device fraud. In pleading guilty, Weinberg admitted that she had "assisted STERN with the specific purpose or design to hinder or prevent STERN's apprehension, trial, or punishment," and that "it was reasonably foreseeable to [her] that STERN may have stolen additional funds from other Roof Group, LLC bank accounts," including "approximately $2,235,137.97 in unauthorized and fraudulent transfers from Roof Group, LLC's Bank of America account to a Wells Fargo bank account . . . that was controlled by STERN."

381.   In December 2013, Judge Wilson sentenced Weinberg to six-months imprisonment and three years of supervised release.  In imposing sentence, Judge Wilson stated: "[i]t's clear to me . . . she abused a position of trust"; "as criminal fraudsters go, she is pretty sophisticated"; "[s]he is an intelligent woman with financial sophistication much beyond the norm"; "she misled [Mr. Freeney] when she introduced him to Stern, who was a major factor in all the mischief of criminal conduct that followed"; "her introduction [of] Freeney to Stern was what set in motion

**THIRD AMENDED COMPLAINT**

188650.4

1   this entire sordid scheme"; "[s]he knew full well what Stern was"; "she engaged in a

2   fraud and therefore deserves the sentence"; and "had the case been further developed

3   [by the prosecutor], it would have been much worse for her."

4       382.   Additionally, in September 2012, Stern was charged in an indictment in

5   the Southern District of Florida with conspiracy, mail fraud and aggravated identity

6   theft relating to a $20 million mortgage fraud scheme that pre-dated his introduction

7   to Mr. Freeney.  Although Weinberg was peripherally involved in that scheme, she

8   was not charged.

9       383.   In June 2014, Stern pleaded guilty to mail fraud in that case, admitting

10  that he had unlawfully used the names and social security numbers and forged the

11  signatures of an elderly Florida couple (Ivor Rose and Rita Starr) and had diverted

12  loan proceeds to himself, causing them losses of between $7.0 million and

13  $20 million.  In September 2014, Stern was sentenced in that case by U.S. District

14  Judge William J. Zloch to 96 months imprisonment, to run concurrently with the

15  60-month sentence Judge Wilson had imposed.

16  **C.    Mr. Freeney's Discovery of Weinberg and Stern's**

17  **Thefts From the BofA Roof Group Account.**

18      384.   Previously, in or about November 2011, Mr. Freeney became concerned

19  that Weinberg was misusing funds in the Roof Group bank accounts at Wells Fargo

20  Bank that had been opened in June 2010.  However, it was not until shortly before

21  Weinberg and Stern's arrests on March 23, 2012, when he was shown account

22  statements for the BofA Roof Group account that the FBI had subpoenaed from

23  BofA/Merrill Lynch, that he first learned of Weinberg and Stern's misappropriation of

24  funds from that account.

25      385.   In or about January 2012, Mr. Freeney hired certified public accountants

26  to examine the books and records and handle the tax preparation, accounting and bill

27  payment for Roof Group and RSLA.  The accountants soon discovered that Weinberg

28  had failed to maintain books and records for Roof Group and RSLA; had failed to file

113

**THIRD AMENDED COMPLAINT**

1   federal and state income tax returns on behalf of Roof Group; and had failed to pay

2   payroll, sales and business taxes due and owing by Roof Group.

3       386.   Following Weinberg and Stern's arrests in March 2012, Mr. Freeney

4   hired the same accountants to handle his personal tax preparation, accounting and bill

5   payment needs.

6       387.   Because of the absence of books, records and other rudimentary financial

7   information, the new accountants had to reconstruct Roof Group and RSLA's books

8   and records and Mr. Freeney's personal financial history for the past two years from

9   scratch.  This required the accountants to gather, analyze and reconcile financial

10   records from all available sources, a project which proved arduous and costly and took

11   more than two years to substantially complete.  Even today, however, many essential

12   financial records remain missing, as a result of which several million dollars of

13   Mr. Freeney's funds that passed through the BofA Roof Group and other accounts that

14   Weinberg and Stern controlled remain unaccounted for.

15       388.   In or about April 2012, Mr. Freeney retained counsel to investigate

16   BofA/Merrill Lynch's role in the scheme to defraud.  Working with the new

17   accountants, counsel conducted an extensive investigation to determine the amount

18   and disposition of funds stolen from Mr. Freeney, and the nature and extent of the

19   losses he and Roof Group had suffered as a result of the scheme.  Counsel, however,

20   were hampered in their investigation by BofA/Merrill Lynch's lack of cooperation

21   (described further below).

22       389.   Meanwhile, at the request of BofA/Merrill Lynch's counsel, Plaintiffs'

23   counsel shared with BofA/Merrill Lynch, both in writing and verbally, the findings,

24   analysis and conclusions of their pre-filing investigation, along with more than 5,000

25   pages of relevant documents.  In response, BofA/Merrill Lynch provided nothing: no

26   documents and no relevant information.

27   **D.   Weinberg's Fraudulent Conveyance of Her House to BOCK.**

28       390.   During the course of her criminal prosecution, Weinberg fraudulently

**THIRD AMENDED COMPLAINT**

188650.4

1    conveyed the house she owned in Miami Beach to BOCK for no consideration.

2        391.   On or about August 24, 2012, BOCK and Weinberg executed a document

3    entitled "Amendment to Marital Settlement Agreement," which was signed and

4    notarized by both of them in Los Angeles.  The Amendment provided that Weinberg

5    would execute a Quit Claim Deed transferring her interest in the property to BOCK

6    for no stated consideration.

7        392.   According to public records, the house, which sits on an 11,828 lot, has

8    two stories, six bedrooms and six and a half bathrooms, a gourmet kitchen, a 30-foot

9    pool, and more than 5,300 square feet of interior living space.  The house is currently

10   listed for sale by BOCK for $2,749,000.

11       393.   Plaintiffs are informed and believe, and on that basis allege, that BOCK

12   and Weinberg agreed to this fraudulent conveyance to prevent the house from being

13   seized by federal authorities or used to satisfy a judgment Plaintiffs could in the

14   future seek against Weinberg.

15   **E.    BofA/Merrill Lynch's Attempts to Cover**

16   **      Up Their Employees' Wrongdoing.**

17       394.   Plaintiffs are informed and believe, and on that basis allege, that

18   notwithstanding the hundreds of suspicious wire transfers of more than ***$17 million*** to

19   and from the BofA Roof Group account during 2010 and 2011, neither BAC, nor

20   BANA, nor MLPFS filed a Suspicious Activity Report or otherwise notified federal

21   authorities of these highly suspicious banking transactions, as required by the Bank

22   Secrecy Act.  Plaintiffs are further informed and believe, and on that basis allege, that

23   notwithstanding the apparent illegal and fraudulent activities of BOCK, Weinberg and

24   Stern involving Mr. Freeney and Roof Group's accounts, and Weinberg and Stern's

25   publicly reported arrests and prosecutions, neither BAC, nor BANA, nor MLPFS filed

26   a SAR reporting such activities.  Plaintiffs' information and belief is based, in part, on

27   statements by BofA/Merrill Lynch's counsel prior to the filing of this action,

28   confirming that no such reports had been filed.

**THIRD AMENDED COMPLAINT**

395.   Plaintiffs are also informed and believe, and on that basis allege, that MLPFS violated its FINRA reporting obligations by deliberately delaying the filing of Forms U4 reporting Mr. Freeney's complaints of wrongdoing against BOCK, Liebman and Del Campo made two years earlier.  Plaintiffs are informed and believe, and on that basis allege, that MLPFS only reported Mr. Freeney's allegations to FINRA just prior to the filing of this lawsuit, and only because it anticipated that, with the filing of this lawsuit, those allegations would become public.

396.   Plaintiffs are also informed and believe, and on that basis allege, that the updated Forms U4 MLPFS filed for BOCK, Liebman, Del Campo and Weinberg were in furtherance of its efforts to cover up their illegal and fraudulent activities and its failure to responsibly address those activities.  In particular, Plaintiffs are informed and believe, and on that basis allege, that these updated forms were false and misleading in that they reported that MLPFS had investigated Mr. Freeney's allegations, and that it had determined that the allegations were "unfounded and without merit," when, in fact, it had conducted no meaningful investigation of Mr. Freeney's allegations and altogether ignored the voluminous evidence of its present and former employees' illegal conduct that Mr. Freeney had previously shared with BofA/Merrill Lynch's counsel.

**F.    BAC, BANA and MLPFS' Ratification of the Conduct of**
**        Their Present and Former Employees and Agents.**

397.   If, or to the extent, the conduct of BOCK, Weinberg, Liebman, or Del Campo described herein exceeded the scope of their employment, actual agency, or ostensible agency, BofA/Merrill Lynch ratified and adopted that conduct by, among other things:

(a)     Failing to accept any degree of responsibility for Weinberg's criminal activities or publicly renounce her conduct;

(b)     Not investigating or renouncing the conduct of any of its current employees, including BOCK, Liebman and Del Campo;

**THIRD AMENDED COMPLAINT**

1          (c)     Not terminating or taking any disciplinary action against any of its

2 current employees, including BOCK, Liebman and Del Campo;

3          (d)     Not investigating the transactions at issue;

4          (e)     Not self-reporting to its regulators, including the Office of the

5 Comptroller of Currency and the SEC, as required by law;

6          (f)     Not filing any Suspicious Activity Reports with the U.S. Treasury

7 Department, as required by law;

8          (g)     Remaining altogether silent in the criminal proceedings against

9 Weinberg and Stern and doing virtually nothing to assist the FBI, USAO, or

10 Mr. Freeney in those proceedings;

11         (h)     Retaining the benefits it had received from the scheme, including

12 fees and commissions;

13         (i)     Not returning, and never offering to return, any of the funds

14 Weinberg had misappropriated from one of Mr. Freeney's brokerage accounts;

15         (j)     Not restoring, and never offering to restore, any of the trading

16 losses Mr. Freeney sustained or commissions BOCK had received from his

17 unauthorized purchases and sales of securities using Mr. Freeney's funds;

18         (k)     Ignoring requests from Mr. Freeney's attorneys and accountants

19 for copies of records to which Mr. Freeney was entitled as a BofA/Merrill Lynch

20 client;

21         (l)     Ignoring requests from Mr. Freeney personally for copies of those

22 records;

23         (m)     Filing false reports exonerating itself with FINRA;

24         (n)     Withholding and failing to produce documents to the FBI and

25 USAO in response to a federal grand jury subpoena; and

26         (o)     Making false and misleading public statements following the

27 filing of this lawsuit, including that, "[a]lthough we sympathize with Mr. Freeney as

28 the victim of a crime, the bank had nothing to do with the scheme," and that Weinberg

117

**THIRD AMENDED COMPLAINT**

188650.4

1    "committed her criminal conduct after she left Merrill Lynch in 2010."

2    **G.    Mitigation of Losses.**

3        *1.    The Closure of RSLA.*

4        398.   Following the discovery of the scheme to defraud, Mr. Freeney invested

5    another approximately $3.4 million in RSLA in 2012, in an effort to save the

6    restaurant from bankruptcy and turn it around.  The $3.4 million was used to fund

7    further operating losses; pay bills that BofA/Merrill Lynch and Weinberg had failed to

8    pay; settle lawsuits arising from BofA/Merrill Lynch and Weinberg's failure to pay

9    vendors and RSLA employees; pay sales and payroll taxes that BofA/Merrill Lynch

10   and Weinberg also failed to pay and the interest and penalties that were imposed for

11   their failure to timely pay those taxes; bring in new management and accountants; and

12   retain a top hospitality expert to evaluate RSLA's continuing viability and make

13   recommendations to turn it around, if feasible.

14       399.   Ultimately, Mr. Freeney's efforts to save RSLA proved unavailing.  As a

15   result of the financial, operational and reputational harm caused by the scheme to

16   defraud, the restaurant had been sustaining heavy losses and could not continue to

17   operate without a massive capital infusion.  Mr. Freeney was in no position to make a

18   further investment of that magnitude and extensive efforts to attract new investors

19   proved unsuccessful.

20       400.   RSLA was forced to close in February 2013, at a further cost to

21   Mr. Freeney of $1.1 million and the loss of 68 jobs.  The closure of RSLA, and the

22   additional funds that Mr. Freeney spent to mitigate his losses from that closure, were

23   the natural, reasonable and proximate result of the wrongful acts of Defendants and

24   their co-schemers.

25       *2.    Settlement of the W Hotel Dispute.*

26       401.   In or about May 2013, Mr. Freeney retained new counsel in Florida to

27   assist him in negotiating with 2201 Collins for return of his deposit.  In or about

28   July 2014, 2201 Collins agreed to return $575,000 of Mr. Freeney's $1.2 million

118

**THIRD AMENDED COMPLAINT**

1  deposit.  Because of BofA/Merrill Lynch's broken promise to obtain return of

2  Mr. Freeney's deposit in 2010, Mr. Freeney had been without the use of the funds he

3  eventually recovered for four years.

4       **3.**    ***Repayment of the North Carolina Loan.***

5       402.   In or about December 2013, Mr. Freeney repaid the Fifth Third Bank

6  mortgage on the North Carolina property at a cost to him of over $1.4 million.  In or

7  about September 2015, Mr. Freeney was able to sell the North Carolina property for

8  approximately $400,000, which was substantially less than he would have received in

9  2010, when BofA/Merrill Lynch promised to dispose of it for him.

10  **H.**    **Tolling of the Statute of Limitations.**

11       **1.**    ***The Tolling Agreements.***

12       403.   Prior to the filing of this action, the parties entered into a series of tolling

13  agreements, whereby they agreed that the statute of limitations for the claims asserted

14  in this action were tolled during the period September 19, 2013 through and including

15  January 30, 2015.

16       **2.**    ***Delayed Discovery and Fraudulent Concealment.***

17       404.   Significant aspects of the scheme to defraud – including, in particular, the

18  participation of BAC, BANA, MLPFS, BOCK, Del Campo and others, the extent of

19  the relationships between BOCK, Weinberg, Stern, Weinberg's brother and the

20  Florida Attorney, and the nature and extent of the harm to Roof Group and RSLA –

21  remained unknown to Mr. Freeney and his counsel following Weinberg and Stern's

22  arrests in March 2012, due to the efforts of Defendants and their co-schemers to

23  actively conceal their wrongdoing.  As part of these efforts:

24          (a)    While detained following his arrest, Stern sent Weinberg a letter

25  dated May 15, 2012.  Disguised as a suicide note, the letter outlined for Weinberg the

26  false exculpatory story she should tell the prosecutor when next interviewed.  Amidst

27  expressions of regret and sorrow, Stern wrote that:

28

**THIRD AMENDED COMPLAINT**

188650.4

- "Aaron [West] made the call to the bank and got me the passcodes on a recorded call.  He also instructed me to wire money on hundreds of occasions not only to others but to him as well."

- "You must try and remember how it all started as Aaron introduced me to Dwight not you."

- "I spoke to [Dwight at his hotel] and discussed his financials on Feb 2010.  He advised me about his investments and I tried to stop him from putting in additional monies until I checked things out.  He agreed and I started working on taking the DF restaurant and the studio under control."

- "It was always my belief that the contract between Global Wealth and DF could protect me."

(b)     In an interview with the FBI and the prosecutor two days later, on or about May 17, 2012, Weinberg falsely stated, among other things, that: (i) she only referred to Stern as "Mike" or "Michael" to Mr. Freeney, never as Millar; (ii) she had "never worked side-by-side with Stern" prior to meeting Mr. Freeney; (iii) Stern had legally changed his name to "David Michael Millar" in Trinidad, in an effort to "start over"; (iv) she had discussed her leaving BofA with Mr. Freeney, and had described her compensation requirements to him; (v) she and Freeney had discussed the Fabricated Engagement Letter previously; (vi) she "never really took her fees from Freeney"; (vii) she never accessed Mr. Freeney's bank accounts online and did not know their balances; and (viii) she did not know that $2.2 million had been transferred from the BofA Roof Group account to ARC until she and Stern were arrested.

(c)     In a third interview with the FBI and the prosecutor on or about June 5, 2012, Weinberg falsely stated, among other things, that: (i) Mr. Freeney knew that Stern was doing the bill pay for RSLA; (ii) it was Stern and Mr. Freeney who had decided to open the BofA Roof Group account, not her; (iii) she never saw statements for the BofA Roof Group account, never checked the account balances and did not

**THIRD AMENDED COMPLAINT**

188650.4

1  know that the account was still open and; and (iv) when, in December 2011, she

2  discovered that Stern had used a Roof Group credit card without authorization to pay

3  personal expenses, she did not tell anyone because she wanted "to give Stern the

4  benefit of clearing things up."

5         (d)    Plaintiffs are informed and believe, and on that basis allege, that in

6  response to a grand jury subpoena issued to BofA/Merrill Lynch in the course of the

7  Criminal Investigation, BofA/Merrill Lynch withheld and failed to produce responsive

8  documents, including complete records for the BofA Roof Group account and for

9  BOCK's unauthorized purchases and sales of securities.

10         (e)    On or about August 17, 2012, a private investigator retained by

11  Mr. Freeney's counsel attempted to interview BOCK (before he was represented by

12  counsel) at Weinberg's residence in Los Angeles, but he refused to answer any

13  questions.

14         (f)    On or about August 28, 2012, an investigator attempted to

15  interview Del Campo at the BofA Brickell Avenue branch where she worked, but she

16  refused to answer any questions and referred the investigator to her counsel, who

17  refused to allow her to be interviewed.

18         (g)    On or about September 6, 2012, the investigator attempted to

19  interview Weinberg's brother telephonically, but he refused to answer any questions

20  concerning Mr. Freeney or Weinberg.

21         (h)    In or about April 2012, Mr. Freeney's new accountants contacted

22  BofA/Merrill Lynch telephonically to request copies of Mr. Freeney's bank and

23  brokerage records to which he was entitled as a former client, but BofA/Merrill Lynch

24  refused to provide them unless Mr. Freeney personally requested them.

25         (i)    Approximately a week later, Mr. Freeney and his accountants,

26  together, contacted BofA/Merrill Lynch telephonically, so that he could personally

27  request copies of his bank and brokerage records, but BofA/Merrill Lynch again

28  refused to provide them.

**THIRD AMENDED COMPLAINT**

188650.4

(j)     On or about October 30, 2012, Mr. Freeney's counsel provided counsel for BofA/Merrill Lynch, at his request, with a letter detailing the findings of counsel's investigation to date, and reiterating Mr. Freeney's request for copies of his bank and brokerage records.  In the letter, Mr. Freeney's counsel also requested the opportunity to interview BOCK, Liebman and Del Campo, to complete their investigation.  BofA/Merrill Lynch ignored the letter and Mr. Freeney's requests.

(k)     Having received no response to their October 2012 letter, on or about September 9, 2013, Mr. Freeney's counsel wrote a second letter which (based largely on the materials produced in the interim by the USAO, as discussed below) detailed BofA/Merrill Lynch's knowing participation in the scheme to defraud and documented Mr. Freeney and Roof Group's resulting losses.  BofA/Merrill Lynch never responded in writing to this second letter; never offered any explanation or justification for its conduct or that of its present or former employees; never provided Mr. Freeney with the account records he, his accountants and his attorneys had repeatedly requested; and never made any of its employees available for an interview.

(l)     In or about July 2013, in the *Feli* Case, Weinberg refused to produce any documents in response to a subpoena that had been duly served upon her.

(m)     In or about November 2013, also in the *Feli* Case, Mr. Freeney's counsel served Weinberg's brother with a subpoena to produce records relating to his sale of the $55 million in life insurance to Mr. Freeney and payment of kickbacks to Weinberg, but he refused to produce any documents in response.

(n)     In or about July 2015, in a related case in which Mr. Freeney was suing Weinberg, she twice refused to appear for her deposition, which had been duly noticed.

405.   To this day, Mr. Freeney has never received a copy of any of his bank, brokerage, or credit card records from BofA/Merrill Lynch, despite his entitlement to them as a former BofA/Merrill Lynch client and his, his counsel's and his accountant's numerous requests.  Moreover, the BofA Roof Group account records his

**THIRD AMENDED COMPLAINT**

1  counsel obtained from the USAO, which the USAO had subpoenaed from

2  BofA/Merrill Lynch, are incomplete, as are the records pertaining to BOCK's

3  unauthorized purchases and sales of securities.

4      406.   In or about May 2013, in the criminal cases, Judge Wilson ordered the

5  USAO to produce a significant portion of its investigative files to Mr. Freeney and his

6  counsel, which resulted in Mr. Freeney obtaining bank, financial and Internet provider

7  records; Weinberg's BofA/Merrill Lynch personnel file; search warrant affidavits;

8  some of the materials seized in those searches; FBI 302 witness interview reports;

9  Weinberg's post-arrest statements to the FBI and proffers to the prosecutor; FBI 1023

10  forms documenting reports by an FBI confidential source who had secretly recorded

11  conversations with Stern; and forensic analysis of encrypted computer files seized

12  from Weinberg and Stern's computers.

13      407.   It was not until Mr. Freeney and his counsel had obtained access to and

14  had had an opportunity to examine and analyze these materials that they discovered

15  the facts giving rise to this action.

16  **VII.   THE COURT HAS PERSONAL JURISDICTION OVER BOCK.**

17      408.   This Court has personal jurisdiction over BOCK in this action pursuant to

18  Federal Rule of Civil Procedure 4(k)(1)(A) and California Code of Civil Procedure

19  section 410.10, in that BOCK purposefully directed his activities toward,

20  consummated transactions within and/or purposefully availed himself of the privilege

21  of conducting business in the State of California; Plaintiffs' claims against him are

22  related to those activities, transactions and businesses; and the exercise of personal

23  jurisdiction over him is reasonable and comports with traditional notions of fair play

24  and substantial justice.

25  **A.   BOCK Has Been Registered in California as a Broker-Dealer for**

26      **30 Years and Does Business in California**

27      409.   During the past thirty years, BOCK has been continuously registered

28  with FINRA to conduct business as a stock broker in California, while employed by at

**THIRD AMENDED COMPLAINT**

1   least six major financial institutions that have conducted extensive business in

2   California.  In particular:

3         (a)   From April 2, 2009 to the present, BOCK has been registered with

4   FINRA as a broker-dealer agent in California while employed by MLPFS;

5         (b)   From July 16, 2004 through April 21, 2009, BOCK was registered

6   as a broker-dealer agent in California while employed by Citigroup Global

7   Markets Inc.;

8         (c)   From January 14, 1999 through July 19, 2004, BOCK was

9   registered as a broker-dealer agent in California, while employed by

10  Morgan Stanley DW, Inc.;

11        (d)   From October 17, 1994 through January 11, 1999, BOCK was

12  registered as a broker-dealer agent in California while employed by Prudential

13  Securities, Inc.;

14        (e)   From April 11, 1988 through September 15, 1994, BOCK was

15  registered as a broker-dealer agent in California while employed by

16  Lehman Brothers, Inc.;

17        (f)   From January 14, 1986 through April 11, 1988, BOCK was

18  registered as a broker-dealer agent in California while employed by E.F. Hutton.

19      410.   Official forms submitted by or on behalf of BOCK to FINRA contain an

20  acknowledgement and consent form under which BOCK agreed to submit to the

21  jurisdictions in which he was registered, including California.  Although the form

22  language has changed slightly over the years, the following is representative of

23  BOCK's affirmations:

> I apply for registration with the *jurisdictions* and *SROs* indicated in Section 4 (SRO REGISTRATION) and Section 5 (JURISDICTION REGISTRATION) as may be amended from time to time and, **in consideration of the *jurisdictions* and *SROs* receiving and considering my application, I submit to the authority of the jurisdictions** and SROs and agree to comply with all provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of the *jurisdictions* and *SROs* as they are or may be adopted, or amended from time to time. I further agree to be subject to

**THIRD AMENDED COMPLAINT**

and comply with all requirements, rulings, orders, directives and decisions of, and penalties, prohibitions and limitations imposed by the *jurisdictions* and *SROs*, subject to right of appeal or review as provided by law.

(Italics in original, emphasis added.)

411.   Official forms submitted by or on behalf of BOCK to FINRA also contain a provision pursuant to which BOCK agreed that the "administrator" for each jurisdiction or state in which he had registered, including California, was authorized to act as his "attorney" for accepting service of process:

For the purpose of complying with the laws relating to the offer or sale of securities or commodities or investment advisory activities, I irrevocably appoint the administrator of each *jurisdiction* indicated in Section 5 (JURISDICTIONAL REGISTRATION) as may be amended from time to time, or such other person designated by law, and the successors in such office, my attorney upon whom may be served any notice, process, pleading, subpoena or other document in any action or *proceeding* against me arising out of or in connection with the offer or sale of securities or commodities, or investment advisory activities or out of the violation or alleged violation of the laws of such *jurisdictions*. **I consent that any such action or *proceeding* against me may be commenced in any court of competent *jurisdiction* and proper venue by service of process upon the appointee as if I were a resident of, and had been lawfully served with process in the *jurisdiction*. . . .**

(Italics in original, emphasis added.)

412.   In California, the administrator is the California Department of Business Oversight (the "DBO").  The DBO was personally served with the Second Amended Complaint, and will be served with the Third Amended Complaint.

413.   In addition to being registered with FINRA, Bock is also registered as a broker-dealer agent with the DBO.

414.   Since 2011, BOCK has also been licensed as an insurance producer in California, and he is authorized to transact insurance business in California on behalf of Merrill Lynch Life Agency, Inc., Lincoln National Life Insurance Company and Nationwide Life Insurance Company.

415.   On January 22, 2016, BOCK was deposed in this action regarding jurisdictional issues, and made a limited production of documents in connection with his deposition.  He testified that he has had clients located in California, but refused to

125

**THIRD AMENDED COMPLAINT**

1   testify or produce documents regarding his California clients or his meetings in

2   California with actual or prospective customers (other than Mr. Freeney).  Plaintiffs

3   are informed and believe, and on that basis allege, that BOCK refused to provide this

4   discovery to conceal how extensive his business dealings in California have been.

5        416.   Plaintiffs are informed and believe, and on that basis allege, that as a

6   broker-dealer agent, insurance producer and investment advisor, BOCK has had

7   systemic and continuous business dealings in California for the past thirty years.

8   **B.**    **BOCK Aided and Abetted Weinberg and Stern in Relocating the**

9          **Scheme From Florida to California.**

10       417.   As alleged in paragraphs 256 through 282 above, BOCK helped

11   Weinberg and Stern relocate the fraud scheme from Florida to California in an attempt

12   to prevent the scheme, and BOCK's role in it, from being detected.  BOCK aided and

13   abetted Weinberg in relocating the scheme to California in numerous ways, including

14   the following:

15          (a)   BOCK agreed to let Weinberg relocate to Los Angeles with their

16   children;

17          (b)   To encourage Weinberg's move, BOCK informed Weinberg that

18   he would likely move to Los Angeles as well, that he would be in Los Angeles at least

19   once a month and that, when in Los Angeles, he would work from Merrill Lynch's

20   Los Angeles office;

21          (c)   BOCK encouraged Weinberg to take Mr. Freeney with her as a

22   client to Los Angeles;

23          (d)   BOCK assisted Weinberg in resigning from BofA/Merrill Lynch;

24          (e)   BOCK advised and encouraged Weinberg to create GWM;

25          (f)   BOCK assisted Weinberg in selecting the name "Global Wealth

26   Management" to create the false impression that Weinberg was still affiliated with

27   BofA/Merrill Lynch;

28          (g)   BOCK assisted Weinberg in designing a business plan and strategy

**THIRD AMENDED COMPLAINT**

1    for GWM; and

2           (h)     BOCK authorized and permitted Weinberg to take with her to

3    Los Angeles, without Mr. Freeney's authorization or knowledge, several boxes

4    containing private and confidential documents relating to virtually every aspect of Mr.

5    Freeney's financial life.

6        418.   BOCK provided financial assistance to Weinberg in order to help her

7    relocate the scheme to Los Angeles, and in so doing specifically directed his activities

8    at California.  For example, on or about June 28, 2010, BOCK facilitated Weinberg's

9    move to Los Angeles by paying for Weinberg and their children to fly from Miami to

10   Los Angeles.  BOCK charged these travel expenses to his Merrill Accolades

11   American Express card.  Earlier that month, BOCK had sold almost all of the

12   securities he had purchased for Mr. Freeney's brokerage accounts, to assist Weinberg

13   in relocating the scheme from Florida to California by liquidating Mr. Freeney's

14   assets.

15       419.   On January 15, 2016, Plaintiffs served BOCK with a deposition notice

16   which included requests for documents relating to Weinberg relocating from Florida

17   to Los Angeles and taking Mr. Freeney with her as a client.  BOCK generally objected

18   and refused to produce documents in response to these requests.  Plaintiffs are

19   informed and believe, and on that basis allege, that BOCK's involvement in assisting

20   Weinberg in relocating the fraud scheme to Los Angeles is more extensive than

21   alleged herein, and that BOCK's refusal to produce responsive documents was in

22   furtherance of his attempt to minimize his role in relocating the scheme to

23   Los Angeles.

24       420.   Plaintiffs are informed and believe, and on that basis allege, that BOCK

25   allowed Weinberg to relocate to Los Angeles with their children because he had

26   sufficiently extensive business in Los Angeles to (1) permit him to move to Los

27   Angeles if he chose to do so; and (2) enable him to charge his travel to Los Angeles as

28

**THIRD AMENDED COMPLAINT**

1    a business expense that could be paid from his Merrill Lynch Business

2    Development Account (the "Business Development Account").

3    **C.    BOCK's Continued Participation in the Scheme After It Was**

4    **Relocated to California.**

5        421.   As alleged in paragraphs 139, 266, 279 and 285 above, BOCK continued

6    to further the scheme after it was relocated to California through the following

7    conduct:

8        (a)    BOCK permitted Weinberg to continue to serve as the principal

9    contact between Mr. Freeney and BofA/Merrill Lynch after her resignation;

10       (b)    BOCK permitted Weinberg to access the BofA Roof Group

11   account after her resignation;

12       (c)    BOCK permitted Weinberg to liquidate investments under

13   BofA/Merrill Lynch's management and control;

14       (d)    BOCK concealed Weinberg's resignation from Mr. Freeney;

15       (e)    BOCK concealed from Mr. Freeney that GWM was not the same

16   as GWIM or MLGWM, and was not a division of BAC;

17       (f)    BOCK concealed from Mr. Freeney that GWM was effectively a

18   sham entity created to promote and conceal the scheme to defraud;

19       (g)    BOCK concealed from Mr. Freeney that GWM had no employees

20   and Mr. Freeney was its only client;

21       (h)    BOCK concealed from Mr. Freeney that Weinberg's registration as

22   a broker-dealer lapsed once she left BofA/Merrill Lynch;

23       (i)    BOCK concealed from Mr. Freeney that Weinberg was not

24   registered as an investment adviser;

25       (j)    BOCK concealed from Mr. Freeney that Weinberg lacked the

26   qualifications, expertise and experience to manage his personal finances or serve as

27   the de facto CFO of RSLA;

28

**THIRD AMENDED COMPLAINT**

(k)     BOCK concealed from Mr. Freeney that Mr. Freeney was no longer a BofA/Merrill Lynch client; and

(l)     BOCK concealed from Mr. Freeney that BOCK and Weinberg had been twice married and twice divorced, and that Weinberg's plan to take Mr. Freeney with her as a client to Los Angeles had been a major issue in their second divorce proceeding.

**D.     BOCK's California Contacts After Aiding and Abetting Weinberg and Stern in Relocating the Scheme to California**

422.   After he helped Weinberg relocate from Florida to California, BOCK's personal and business contacts with California increased significantly.  From August 2010 through December 2011, BOCK traveled to the Los Angeles area on more than ten occasions.  BOCK's expenses for this travel were, on each of these occasions, charged to the Business Development Account, and Plaintiffs are informed and believe, and on that basis allege, that BOCK undertook each of these trips in whole or in part in furtherance of his employment with BofA/Merrill Lynch.

423.   In the deposition notice and request for documents served on BOCK, Plaintiffs requested that BOCK produce his travel records from 2012.  BOCK promised to produce certain records through August 31, 2012, but failed and refused to do so.  Plaintiffs are informed and believe, and on that basis allege, that those records would demonstrate that in 2012 BOCK traveled to Los Angeles on numerous occasions, undertook each of these trips in whole or in part in furtherance of his employment with BofA/Merrill Lynch, and charged his travel expenses to the Business Development Account.

424.   As part of jurisdictional discovery, BOCK produced his credit card statements for the years 2010 through 2012 in response to the document requests accompanying his deposition notice.  BOCK failed and refused to produce a complete set of credit card statements.  However, the statements that he did produce showed

**THIRD AMENDED COMPLAINT**

188650.4

1   hundreds of California charges.  All of these charges were made on BOCK's

2   BofA/Merrill Lynch credit cards.

3       425.   BOCK's credit card statements show multiple charges for Experian credit

4   checks while he was in California.  Plaintiffs are informed and believe, and on that

5   basis allege, that BOCK performed these credit checks in Los Angeles in the course of

6   transacting business involving potential clients residing in California.

7       426.   BOCK credit card statements show that, between 2010 and 2012, BOCK

8   made purchases that were charged to his BofA/Merrill Lynch credit cards in each of

9   the following locations in California:

10      (1)    Agoura Hills, California;

11      (2)    Anaheim, California;

12      (3)    Barstow, California;

13      (4)    Beverly Hills, California;

14      (5)    Big Bear, California;

15      (6)    Big Bear Lake, California;

16      (7)    Calabasas, California;

17      (8)    Carson, California;

18      (9)    Coronado, California;

19      (10)   Folsom, California;

20      (11)   Gold River, California;

21      (12)   Hollywood, California;

22      (13)   Inglewood, California;

23      (14)   Irvine, California;

24      (15)   La Jolla, California;

25      (16)   Long Beach, California;

26      (17)   Los Angeles, California;

27      (18)   Los Gatos, California;

28      (19)   Malibu, California;

130

**THIRD AMENDED COMPLAINT**

1     (20)  North Hollywood, California;

2     (21)  Oxnard, California;

3     (22)  Rancho Mirage, California;

4     (23)  San Diego, California;

5     (24)  San Francisco, California;

6     (25)  San Mateo, California;

7     (26)  Santa Barbara, California;

8     (27)  Santa Clara, California;

9     (28)  Santa Monica, California;

10    (29)  Universal City, California;

11    (30)  Valencia, California;

12    (31)  West Hollywood, California; and

13    (32)  Westlake Village, California.

14    427.  BOCK redacted the prices of the items he purchased from the credit card records that he produced.  He also refused to produce the records relating to the Business Development Account, and BofA/Merrill Lynch has likewise failed and refused to produce those records.  However, the limited travel records that BOCK produced show BOCK incurring and charging to his business development account thousands of dollars in travel expenses for his trips to California, and, based on the volume and type of credit card expenses that BOCK incurred in California, Plaintiffs are informed and believe, and on that basis allege, that BOCK incurred and charged to the Business Development Account tens of thousands of dollars in additional expenses while he was in California during the period 2010 through 2012.

24    428.  In May, 2012 BOCK was interviewed about the fraud by the FBI.  The interview was conducted in Los Angeles, California.

26    429.  In August, 2012, Jacqui Ruiz, a retired FBI Special Agent and licensed Private Investigator retained by Plaintiffs' counsel to assist in investigating the fraud, attempted to interview Weinberg's mother, Norma Weinberg, at the house in

**THIRD AMENDED COMPLAINT**

1   Los Angeles where Eva and Norma Weinberg were residing.  BOCK was present at

2   the house when Ms. Ruiz arrived.  BOCK refused to be interviewed at that time.

3   430.   As alleged in paragraphs 390 through 393 above, on August 24, 2012,

4   BOCK and Weinberg entered into an Amendment to Marital Settlement Agreement

5   (the "Amendment") to permit Weinberg to fraudulently convey the house that she

6   owned to BOCK for no consideration.  BOCK and Weinberg entered into the

7   Amendment and had it notarized in Los Angeles, California.

8   431.   All of the acts of concealment by which BOCK furthered the scheme

9   after it was relocated to California were ongoing in nature and therefore were

10  committed not only while BOCK was residing in Florida, but also during the many

11  occasions in which BOCK traveled to and conducted business in California.

12  **E.   BOCK's Conduct Directed at Roof Group and RSLA in California.**

13  432.   Plaintiffs are informed and believe, and on that basis allege, that at all

14  relevant times BOCK knew that RSLA was a restaurant located in Los Angeles,

15  California and Roof Group's sole asset.  As alleged above, BOCK participated in and

16  aided and abetted the looting of RSLA's assets through the following conduct:

17      (a)   BOCK authorized Weinberg to serve as the de facto CFO of RSLA

18  while she was employed by BofA/Merrill Lynch;

19      (b)   BOCK concealed from Mr. Freeney that Weinberg lacked the

20  qualifications, expertise and experience to serve as the de facto CFO of RSLA; and

21      (c)   BOCK helped Weinberg relocate to Los Angeles during the build

22  out of RSLA, enabling her to exert greater control over the finances of RSLA and use

23  RSLA as an instrumentality by which she and Stern misappropriated funds from the

24  Plaintiffs.

25

26

27

28

**THIRD AMENDED COMPLAINT**

188650.4

# FIRST CAUSE OF ACTION

## (For Conspiracy to Defraud)

### (By Plaintiffs Freeney and Roof Group

### Against Defendants BAC, BANA, MLPFS and BOCK)

433.   Plaintiffs repeat and reallege paragraphs 1 through 432 of this Third Amended Complaint as if fully alleged herein.

**A.      Formation and Operation of the Conspiracy.**

434.   Beginning in or about January 2010, BAC, BANA, MLPFS and BOCK, together with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida Law Firm, and each of them, conspired and agreed to:

(a)      Make misrepresentations to Mr. Freeney and Roof Group, directly and through Mr. Freeney's friends, family and associates, regarding important facts, as described further in paragraphs 133 through 373 and 440 of this Third Amended Complaint, knowing that the representations were false or misleading, and intending that Mr. Freeney and Roof Group would rely upon them;

(b)      Make false promises to Mr. Freeney and Roof Group, directly and through Mr. Freeney's friends, family and associates, regarding important matters, as described further in paragraphs 133 through 373 and 440 of this Third Amended Complaint, with no intention of performing those promises, and intending that Mr. Freeney and Roof Group would rely upon them; and

(c)      Conceal and withhold from Mr. Freeney and Roof Group important facts that Defendants had a duty to disclose to them, as described further in paragraphs 133 through 373 and 444 of this Third Amended Complaint, knowingly and with the intent to deceive them.

435.   Mr. Freeney and Roof Group acted reasonably in relying upon these false and misleading representations, false promises and undisclosed facts in, among other things:

(a)      Becoming BofA/Merrill Lynch clients;

133

**THIRD AMENDED COMPLAINT**

188650.4

1     (b)     Transferring management and control of Mr. Freeney's assets and
2     investments to BofA/Merrill Lynch;

3     (c)     Authorizing BofA/Merrill Lynch, BOCK and Weinberg to
4     manage Mr. Freeney's income, including his salary from the Colts, and to pay his
5     bills;

6     (d)     Trusting BofA/Merrill Lynch to obtain the return of Mr. Freeney's
7     $1.2 million deposit with 2201 Collins, and to dispose of the North Carolina Land
8     Investment;

9     (e)     Entrusting management of the build out, opening, operations and
10    finances of RSLA to BofA/Merrill Lynch, Weinberg and Stern (posing as Millar);

11    (f)     Retaining and paying the Florida Attorney more than $140,000 to
12    negotiate and document the purchases of Altounian and Donnelly's interests in
13    Roof Group;

14    (g)     Agreeing to purchase Altounian and Donnelly's interests in
15    Roof Group for more than $1.1 million;

16    (h)     Agreeing to purchase $55 million in unsuitable and worthless life
17    insurance;

18    (i)     Agreeing to hire the Felis under the terms set forth in the Term
19    Sheet and then terminating their services seven months later;

20    (j)     Agreeing to borrow $450,000 from Snap Advances at an effective
21    annual interest rate of 45 percent;

22    (k)     Authorizing Stern (posing as Millar) to negotiate return of
23    Mr. Freeney's investments in Success Trade and CFP; and

24    (l)     Accepting Stern's offer (posing as Millar) to use his private jet for
25    only the cost of the fuel.

26    **B.     Wrongful Acts in Furtherance of the Conspiracy.**

27    436.     On or about the dates indicated below, BAC, BANA, MLPFS and
28    BOCK, together with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney

**THIRD AMENDED COMPLAINT**

and the Florida Law Firm, and each of them, committed, caused and aided and abetted the following wrongful acts, among others, in furtherance of and to accomplish the objectives of the conspiracy:

Act No. 1:    On or about January 19, 2010, Weinberg sent a text message to Mr. West requesting the W Hotel contract so that BofA/Merrill Lynch's "consultant" could review it.

Act No. 2:    On or about January 24, 2010, Weinberg sent a text message to Mr. West stating that BofA/Merrill Lynch's "real estate consultant" would help resolve Mr. Freeney's issues with the W Hotel.

Act No. 3:    On or about January 27, 2010, Weinberg requested that Mr. West send her the lease and other documents for RSLA.

Act No. 4:    On or about February 2, 2010, Mr. West met with BOCK, Weinberg and Sugarman at the BofA Brickell Avenue branch to discuss Mr. Freeney's financial situation and needs and how BofA/Merrill Lynch could assist him.  During this meeting, BOCK, Weinberg and Sugarman made the following false and misleading representations, among others: (a) they had the qualifications, expertise and experience to competently manage Mr. Freeney's assets, investments and income; (b) they could and would assist Mr. Freeney in finding new investors and/or obtaining loan financing for his business ventures, including RSLA; (c) they could and would assist Mr. Freeney in disposing of his non-performing and under-performing investments, including the North Carolina Land Investment; and (d) they could and would assist Mr. Freeney in obtaining return of his $1.2 million deposit with 2201 Collins.

Act No. 5:    On or about February 5, 2010, Weinberg sent an email to V. Brown & Co. requesting copies of all of Mr. Freeney's financial records.

Act No. 6:    On or about February 5, 2010, Weinberg, Sugarman and Stern (posing as Millar) met with Mr. West and others at a restaurant in Miami Beach, at which Stern was introduced as "Michael Millar."  Weinberg made the following

**THIRD AMENDED COMPLAINT**

188650.4

misrepresentations, among others: (a) Millar was a wealthy real estate developer; (b) Millar was a real estate consultant for BofA/Merrill Lynch; (c) Millar had $30 million on deposit with BofA/Merrill Lynch; (d) Millar owned a private plane; (e) Millar lived in the Bahamas; and (f) Millar was the grandson of pharmaceutical mogul Dr. Phillip Frost, the Chairman of Teva Pharmaceuticals; Stern (posing as Millar) made the following additional misrepresentations, among others: (a) he would obtain financing for RSLA; and (b) he would recover all of Mr. Freeney's investment in the W Hotel.

Act No. 7:     On or about February 6, 2010, Stern (posing as Millar) met with Mr. West and others in Miami Beach, during which Stern made the following misrepresentations, among others: (a) he lived in the Bahamas; (b) he also had a home in Florida; (c) he owned a private plane; and (d) he would obtain funding for RSLA.

Act No. 8:     On or about February 6, 2010, Stern (posing as Millar) requested that Mr. West send him the profit and loss statements for RSLA.

Act No. 9:     On or about February 8, 2010, at Weinberg's request, Mr. Freeney' former financial manager, Vernon Brown, sent Weinberg Mr. Freeney's financial records.

Act No. 10:     On or about February 9, 2010 Stern (posing as Millar) sent a text message to Mr. West, stating, "I am certain that I can get Merrill boa [sic] to guarantee [Mr. Freeney] a minimum of 10 percent return on investment with no risk."

Act No. 11:     On or about February 10, 2010, Weinberg sent a text message to Mr. West, stating, "Michael wants Dwight to understand that we will do everything possible to protect him."

Act No. 12:     On or about February 10, 2010, Stern (posing as Millar) sent a text message to Mr. West, falsely representing that he owned a yacht that Mr. Freeney could use.

Act No. 13:     On or about February 10, 2010, Weinberg sent a text message to Mr. West, falsely stating that Stern's full name was "David Michael Millar."

**THIRD AMENDED COMPLAINT**

188650.4

Act No. 14:     On or about February 11, 2010, Weinberg and Stern (posing as Millar) participated in a telephonic conference with Mr. Freeney and Mr. West during which they discussed transferring control of Mr. Freeney's assets and investments to BofA/Merrill Lynch.

Act No. 15:     On or about February 11, 2010, Mr. Freeney met with Weinberg at the BofA Brickell Avenue branch and completed paperwork to begin transferring his assets and investments to BofA/Merrill Lynch's control.

Act No. 16:     On or about February 12, 2010, Stern (posing as Millar) sent a text message to Mr. West, stating that his email address was "Davidmichaelmillar@yahoo.com," and asking Mr. West not to share it with anyone at "Merrill."

Act No. 17:     On or about February 16, 2010, Weinberg had a telephonic conference with V. Brown & Co to arrange for the transfer of control of Mr. Freeney's assets and investments to BofA/Merrill Lynch, as well as responsibility for paying Mr. Freeney's bills.

Act No. 18:     On or about February 17, 2010, Weinberg sent Mr. Freeney an email in which she falsely represented that she is a "Senior Financial Advisor" with "Merrill Lynch Global Wealth Management."

Act No. 19:     On or about February 17, 2010, BofA/Merrill Lynch emailed Mr. Freeney a form letter for him to sign, authorizing the Colts to mail his paychecks to for deposit to his BofA account.

Act No. 20:     On or about February 17, 2010, Mr. Freeney authorized transfer of his assets and investments to BofA/Merrill Lynch's control.

Act No. 21:     On or about February 18, 2010, Stern and Jaggernauth incorporated ARC in Delaware.

Act No. 22:     On or about February 18, 2010, BOCK and Weinberg paid the fees for incorporating ARC in Delaware.

Act No. 23:     On or about February 18, 2010, Stern and Jaggernauth

**THIRD AMENDED COMPLAINT**

188650.4

established two email accounts with Yahoo for use in communicating with Mr. Freeney: davidmichaelmillar@yahoo.com and armsreachconsultingllc@yahoo.com.

Act No. 24:    Between on or about February 26, 2010 and April 16, 2010, BOCK used approximately $890,000 of Mr. Freeney's funds to purchase securities without Mr. Freeney's authorization or knowledge.

Act No. 25:    On or about February 27, 2010, Stern and Jaggernauth opened a business checking account for ARC at Wachovia Bank.

Act No. 26:    On or about March 8, 2010, Stern (posing as Millar) sent an email to V. Brown & Co. requesting their file on the North Carolina Land Investment, and stating, "I am trying to get it sold" and "every day that goes by is costing Dwight money!!!!"

Act No. 27:    On or about March 9, 2010, Stern (posing as Millar) sent a text message to Mr. West, stating, "I am going to make it so you guys will never have to work again within 4 years.  If Dwight understands and gives me the reins it will be done.  I assure you and guarantee you it will be done."

Act No. 28:    On or about March 16, 2010, Stern (posing as Millar) sent an email to Mr. Freeney, stating, among other things, that "you will never be without money as I will make sure that this never happens"; "I am never going to allow you to even speak to people who are interested in only . . . how to take your money"; "I will recover the funds for you to the best of my ability and i [sic] assure you that there is no one better at doing it"; "I am prepared to help you but it has to be my way"; and "I am happy to deliver you to the promised land but i [sic] need unequivocal trust and approval."

Act No. 29:    In or about March 2010, Weinberg assumed management control of Roof Group and RSLA's finances and became the de facto CFO of RSLA.

Act No. 30:    In or about March 2010, Weinberg referred Mr. Freeney to her brother and encouraged Mr. Freeney to purchase life insurance for investment purposes from him.

**THIRD AMENDED COMPLAINT**

1    Act No. 31:    In or about March 2010, Weinberg and her brother made the

2    following misrepresentations, among others, to Mr. Freeney: (a) Weinberg's brother

3    was licensed to sell life insurance and had extensive knowledge and experience in the

4    purchase and sale of life insurance products for investment purposes; and (b) the

5    purchase of $60 million in whole life insurance was a suitable, prudent and beneficial

6    long-term investment for Mr. Freeney.

7    Act No. 32:    In or about March 2010, Weinberg and her brother used a senior

8    life insurance agent who was a friend of their father to find insurance companies

9    willing to issue $60 million in whole life insurance policies to Mr. Freeney.

10    Act No. 33:    In or about March 2010, Weinberg and her brother instructed the

11    senior life insurance agent to structure the purchase of life insurance for Mr. Freeney

12    to include multiple policies, rather than in a single, high-dollar policy.

13    Act No. 34:    In or about March 2010, Weinberg and her brother agreed to

14    split the commissions resulting from the sale of the $60 million in life insurance to

15    Mr. Freeney.

16    Act No. 35:    In or about March 2010, BOCK and Weinberg caused

17    Mr. Freeney's Advisors Disciplined municipal bonds to be sold for approximately

18    $490,000, and the resulting funds to be deposited to one of Mr. Freeney's brokerage

19    accounts.

20    Act No. 36:    In or about March 2010, Weinberg and Stern (posing as Millar)

21    began negotiating with Success Trade for the return of Mr. Freeney's $1.5 million in

22    principal.

23    Act No. 37:    On or about March 15, 2010, Liebman and BOCK authorized and

24    permitted Weinberg to transfer $24,467 from one of Mr. Freeney's brokerage

25    accounts to the ARC Wells Fargo account, without Mr. Freeney's authorization or

26    knowledge.

27    Act No. 38:    On or about March 23, 2010, Mr. Freeney, Mr. West and others

28    flew from Florida to the Bahamas on the private jet to attend a meeting called by Stern

139

**THIRD AMENDED COMPLAINT**

1  (posing as Millar) concerning Roof Group and RSLA.

2      <u>Act No. 39:</u>   On or about March 24, 2010, Weinberg, Stern (posing as Millar),

3  Jaggernauth and the Florida Attorney participated in a meeting in the Bahamas with

4  Mr. Freeney, Mr. West and others during which Weinberg and Stern urged

5  Mr. Freeney to retain the Florida Attorney and his law firm to amend Roof Group's

6  Operating Agreement to increase his ownership and control of Roof Group.

7      <u>Act No. 40:</u>   On or about March 25, 2010, the Florida Attorney sent an email

8  to Mr. Freeney, Weinberg and Stern (referred to as "Michael"), thanking them for

9  bringing him into the "circle of trust," and requesting certain documents relating to

10  Roof Group and RSLA.

11      <u>Act No. 41:</u>   On or about March 29, 2010, the Florida Attorney emailed

12  Mr. Freeney and offered to assist him with recovering his investment in the W Hotel,

13  stating, "I'm an expert in real estate law and handle disputes with developers and

14  condominiums on a regular basis," and "make sure you let me see any and all

15  documents that you signed, including the contract to purchase, sooner rather than

16  latter [sic]."

17      <u>Act No. 42:</u>   In or about April 2010, Weinberg and Stern directed the Florida

18  Attorney to include a provision in the retainer agreement purporting to authorize the

19  Florida Attorney to take direction from ARC.

20      <u>Act No. 43:</u>   In or about April 2010, the Florida Attorney drafted a retainer

21  agreement that included a clause purporting to authorize him to take direction from

22  ARC.

23      <u>Act No. 44:</u>   On or about April 13, 2010, Mr. Freeney, Weinberg, Stern

24  (posing as Millar) and others attended a meeting in New York City with *Rolling Stone*

25  executives, at which Weinberg introduced herself as Mr. Freeney's

26  BofA/Merrill Lynch financial advisor and Stern falsely represented that he was

27  prepared to fund RSLA with sufficient capital for it to open and operate.

28      <u>Act No. 45:</u>   On or about April 21, 2010, Liebman and BOCK authorized and

**THIRD AMENDED COMPLAINT**

1   permitted Weinberg to transfer $25,000 from one of Mr. Freeney's brokerage

2   accounts to the ARC Wells Fargo, without Mr. Freeney's authorization or knowledge.

3       Act No. 46:   On or about April 28, 2010, Weinberg met with Mr. Freeney and

4   the senior life insurance agent at Mr. Freeney's home in Indiana and completed

5   applications for several life insurance policies.

6       Act No. 47:   In or about May 2010, Mr. Freeney, at the urging of Weinberg,

7   Stern (posing as Millar) and the Florida Attorney, signed an Amended and Restated

8   Limited Liability Company Operating Agreement for Roof Group, drafted by the

9   Florida Attorney and the Florida Law Firm, increasing Mr. Freeney's ownership

10  interest in Roof Group to 51 percent, decreasing Altounian and Donnelly's combined

11  ownership interests to 49 percent, and obligating Mr. Freeney to make an additional

12  $1.6 million capital contribution to Roof Group and, in a hidden footnote, to "further

13  contribute such funds as are necessary to cover the costs incurred in opening the

14  Rolling Stone Café Lounge."

15      Act No. 48:   On or about May 6, 2010, Weinberg's brother became licensed in

16  New Jersey to sell insurance.

17      Act No. 49:   On or about May 12, 2010, the Florida Attorney sent an email to

18  Mr. Freeney, Weinberg and "David Millar" attaching two invoices for the Florida

19  Attorney's legal services and asking "Michael" to review and approve the invoices.

20      Act No. 50:   On or about May 13, 2010, Stern (posing as Millar) emailed the

21  Felis, describing himself as a consultant hired by Mr. Freeney and Mr. West, and

22  offering the Felis a compensation package to manage RSLA that included a combined

23  base salary of $300,000 and one percent of RSLA's gross revenue.

24      Act No. 51:   On or about May 17, 2010, Weinberg and her brother caused a

25  letter to be mailed to a life insurance company falsely identifying Weinberg as

26  Mr. Freeney's "attorney" and Weinberg's brother as Mr. Freeney's "investment and

27  financial advisor."

28      Act No. 52:   On or about May 18, 2010, Liebman and BOCK authorized and

**THIRD AMENDED COMPLAINT**

188650.4

1  permitted Weinberg to transfer $45,000 from one of Mr. Freeney's brokerage

2  accounts to the ARC Wells Fargo account, without Mr. Freeney's authorization or

3  knowledge.

4      Act No. 53:    On or about May 20, 2010, Stern signed the Term Sheet with the

5  Felis as "David M. Millar" on behalf of Roof Group, without any written or other

6  express corporate authorization.

7      Act No. 54:    On or about May 26, 2010, Liebman and BOCK authorized and

8  permitted Weinberg to transfer $35,000 from one of Mr. Freeney's brokerage

9  accounts to the ARC Wells Fargo account, without Mr. Freeney's authorization or

10  knowledge.

11      Act No. 55:    On or about May 27, 2010, Liebman and BOCK authorized and

12  permitted Weinberg to transfer $20,000 from one of Mr. Freeney's brokerage

13  accounts to the ARC Wells Fargo account, without Mr. Freeney's authorization or

14  knowledge.

15      Act No. 56:    In or about May 2010, Weinberg and Stern (posing as Millar)

16  began negotiating with CFP for the return of Mr. Freeney's $1.75 million investment.

17      Act No. 57:    In or about late May 2010, Weinberg asked Del Campo to open a

18  business checking account for Roof Group.

19      Act No. 58:    In or about late May 2010, Weinberg told Mr. Freeney that the

20  BofA Roof Group account was only a temporary account that was needed to pay

21  invoices for the RSLA build out, until permanent accounts could be opened in Los

22  Angeles.

23      Act No. 59:    On or about May 28, 2010, BANA wire transferred $200,000

24  from the BofA Roof Group account, purportedly to pay for expenses related to the

25  RSLA build out.

26      Act No. 60:    Beginning in or about late May 2010, and continuing until in or

27  about October 2011, BANA charged Mr. Freeney and Roof Group $8,050 in wire

28  transfer charges for 322 fraudulent and unauthorized wire transfers made from the

**THIRD AMENDED COMPLAINT**

BofA Roof Group account.

Act No. 61:    Beginning in or about late May 2010, BOCK encouraged Weinberg to move to Los Angeles, create a company with a name similar to the "Global Wealth & Investment Management" division and the "Merrill Lynch Global Wealth Management" subdivision of BAC, and take Mr. Freeney with her as a client.

Act No. 62:    Plaintiffs are informed and believe, and on that basis allege, that between in or about June 2010 and October 2011, BAC and BANA willfully failed to file Suspicious Activity Reports for hundreds of highly suspicious wire transfers from the BofA Roof Group account to unknown recipients, all originating on-line, in violation of the Bank Secrecy Act.

Act No. 63:    Between in or about June 2010 and April 2014, BANA allowed the BofA Roof Group account to remain open, despite concerns expressed by BANA employees that the account documentation was deficient, and notwithstanding hundreds of highly suspicious wire transfers from the account to unknown recipients, all originating online.

Act No. 64:    On or about June 1, 2010, Weinberg leased the Hancock Park house for $8,250 per month, representing in the lease application forms that she would be living at the house with her three children and "Michael Stern," her "Fiancé."

Act No. 65:    On or about June 2, 2010, Weinberg incorporated Global Wealth Management, LLC ("GWM") in Delaware.

Act No. 66:    On or about June 2, 2010, Weinberg opened a business checking account in GWM's name at the Larchmont Branch of Wells Fargo Bank in Los Angeles.

Act No. 67:    On or about June 4, 2010, Liebman and BOCK authorized and permitted Weinberg to transfer $11,880 from one of Mr. Freeney's brokerage accounts to the ARC Wells Fargo account, without Mr. Freeney's authorization or knowledge.

Act No. 68:    Between on or about June 8, 2010 and June 15, 2010, BOCK

143

**THIRD AMENDED COMPLAINT**

1  caused the vast majority of the securities that he had purchased just a few weeks

2  earlier with Mr. Freeney's funds to be sold without Mr. Freeney's authorization or

3  knowledge, at a considerable loss to Mr. Freeney.

4      Act No. 69:   On or about June 9, 2010, Weinberg signed a lease for a "virtual

5  office" in the name of GWM at 8484 Wilshire Boulevard, contracting for telephone

6  answering and mail receiving, sorting and forwarding services.

7      Act No. 70:   On or about June 9, 2010, Weinberg's brother became licensed to

8  sell insurance in Indiana.

9      Act No. 71:   On or about June 10, 2010, Weinberg faxed a short handwritten

10  note to Liebman and others resigning her position at BofA/Merrill Lynch.

11      Act No. 72:   In or about June 2010, Weinberg opened two accounts at a

12  Citibank branch in Miami Beach in the name of Mr. Freeney.

13      Act No. 73:   In or about June 2010, BOCK and Weinberg caused Mr. Freeney

14  to surrender his Pacific Life annuity, which had a cash value of approximately $1.5

15  million, and deposited the proceeds to Mr. Freeney's Citibank accounts.

16      Act No. 74:   In or about mid-June 2010, Weinberg and Stern moved into the

17  Hancock Park house and made it their new base of operations for continuing to carry

18  out the scheme to defraud Mr. Freeney.

19      Act No. 75:   Between on or about June 8, 2010 and November 16, 2010, to

20  conceal his unauthorized sale of securities, BOCK blocked the trade confirmations for

21  these sales from being mailed to Mr. Freeney's home in Indiana.

22      Act No. 76:   On or about June 18, 2010, Weinberg requested that Del Campo

23  mail signature cards for the BofA Roof Group account to her in California.

24      Act No. 77:   On or about June 21, 2010, BANA executed a wire transfer of

25  $5,000 from the BofA Roof Group account to pay one of Stern's gambling debts.

26      Act No. 78:   On or about June 21, 2010, BANA executed a wire transfer of

27  $5,000 from the BofA Roof Group account to pay for Stern's use of a private yacht.

28      Act No. 79:   On or about June 22, 2010, BANA executed a wire transfer of

**THIRD AMENDED COMPLAINT**

1   $16,300 from the BofA Roof Group account to Dynamic Aviation to pay expenses

2   associated with the operation of the private jet.

3       Act No. 80:   On or about June 23, 2010, Weinberg and her brother mailed an

4   application and a check from Mr. Freeney for $186,850 to a life insurance company

5   for the purchase of a $20 million life insurance policy on Mr. Freeney's behalf.

6       Act No. 81:   On or about June 29, 2010, Stern caused Citibank to execute a

7   wire transfer of $250,000 from one of Mr. Freeney's Citibank accounts to the

8   BofA Roof Group account.

9       Act No. 82:   In or about July 2010, Weinberg added herself as a signatory to

10  Mr. Freeney's Citibank accounts.

11      Act No. 83:   In or about July 2010, Weinberg and her brother mailed an

12  application and a check from Mr. Freeney for $141,200 to a second life insurance

13  company to purchase a $15 million life insurance policy on Mr. Freeney's behalf.

14      Act No. 84:   On or about July 27, 2010, BANA executed a wire transfer of

15  $8,250 from the BofA Roof Group account to pay one of Stern's business associates.

16      Act No. 85:   On or about July 30, 2010, Del Campo exchanged emails and

17  participated in telephonic conferences with BANA's Wealth Management Banking

18  Support office and other departments at BANA to remove the security hold on the

19  BofA Roof Group account.

20      Act No. 86:   On or about August 2, 2010, Weinberg sent an email to

21  Del Campo asking her to ensure that wire transfers from the BofA Roof Group

22  account are processed.

23      Act No. 87:   On or about August 3, 2010, Weinberg and GWM mailed

24  instructions to the Colts to forward Mr. Freeney's paychecks to GWM's offices.

25      Act No. 88:   In or about August 2010, Weinberg and her brother mailed an

26  application and a check from Mr. Freeney for $181,300 to a third life insurance

27  company to purchase a $20 million life insurance policy on Mr. Freeney's behalf.

28      Act No. 89:   On or about August 17, 2010, Weinberg's brother deposited a

**THIRD AMENDED COMPLAINT**

188650.4

1    check for $101,000 in GWM's account at Wells Fargo Bank, which represented the

2    first installment of the kickback he had agreed to pay Weinberg.

3        <u>Act No. 90:</u>    On or about August 19, 2010, BANA executed a wire transfer of

4    $21,520 from the BofA Roof Group account to Edward Rennia, to pay to lease and

5    operate the private jet.

6        <u>Act No. 91:</u>    On or about August 23, 2010, Weinberg's brother deposited a

7    check for $123,906 in GWM's account at Wells Fargo Bank, which represented the

8    second installment of the kickback he had agreed to pay Weinberg.

9        <u>Act No. 92:</u>    On or about August 25, 2010, Stern (posing as Millar) sent an

10   email to Mr. West requesting that he not sign the Term Sheet with the Felis and that

11   Stern be allowed to continue negotiating with the Felis.

12       <u>Act No. 93:</u>    On or about August 25, 2010, Stern (posing as Millar) sent a

13   six-page letter to Mr. Freeney, accusing the Felis, Mr. West and others of acting

14   contrary to Mr. Freeney's interest, and stating, among other things, that "you need to

15   tell Aaron that he must work with me whether he likes it or not"; "he does not have

16   the experience of dealing with what he is currently trying to handle"; "I would love to

17   be partners with you on so many levels and I believe we make a great team"; "please

18   understand my consistent hesitation in the finance side because of how heavily

19   Aaron's involvement [sic] is"; and "I want to invest in YOU AND YOUR DREAM."

20       <u>Act No. 94:</u>    On or about August 30, 2010, Weinberg sent a text message to

21   Del Campo asking her to assist with an overdrawn check in the amount of $14,000.

22       <u>Act No. 95:</u>    On or about September 21, 2010, Weinberg deposited

23   Mr. Freeney's paycheck from the Colts at the Citibank branch across the street from

24   the 8484 Wilshire address.

25       <u>Act No. 96:</u>    In or about November 2010, Mr. Freeney, at the urging of

26   Weinberg, Stern (posing as Millar) and the Florida Attorney, signed a Purchase and

27   Sale Agreement, drafted by the Florida Attorney, agreeing to purchase Altounian's

28   shares of Roof Group for $325,000.

**THIRD AMENDED COMPLAINT**

**Act No. 97:**   On or about November 10, 2010, Weinberg sent an email to Mr. Freeney complaining about the Felis, stating, among other things, "[f]or months I have sat back and watched Sal and Stacy act solely in their own best interests with absolutely no regard to the 'team'"; "[t]hey have cost the project in excess of $700,00 and think only of how they can angle things to the detriment of the project"; "[t]hey are self-serving and show absolutely no regard for Aaron or anyone else"'; and "I have nothing personal against Sal except to the extent that he can harm you."

**Act No. 98:**   On or about November 12, 2010, BANA executed a wire transfer of $25,000 from the BofA Roof Group account to GWM.

**Act No. 99:**   On or about November 18, 2010, Weinberg emailed Del Campo asking her to release a security hold on a $49,875 wire transfer from the BofA Roof Group account.

**Act No. 100:**   On or about December 1, 2010, Weinberg sent an email to Roof Group's accountant and legal counsel stating that "Michael Millar" was acting as a "troubleshooter" and had "no official capacity" with Roof Group when he signed the Term Sheet with the Felis.

**Act No. 101:**   On or about December 22, 2010, at Weinberg's insistence, Roof Group terminated the Felis' services.

**Act No. 102:**   On or about January 18, 2011, BANA executed a wire transfer of $17,820 from the BofA Roof Group account to pay Weinberg's rent on the Hancock Park house.

**Act No. 103:**   On or about February 16, 2011, Weinberg sent an email to Mr. West stating: "You cannot unilaterally approve changes that require any more expenditures.  Dwight is bleeding money.  What do I need to show you that helps you grasp this."

**Act No. 104:**   On or about February 25, 2011, Weinberg and Stern secretly married in Los Angeles, even though Stern was still married to Layne Harris Stern.

**Act No. 105:**   On or about March 14, 2011, BOCK and Weinberg entered into a

147

**THIRD AMENDED COMPLAINT**

First Amendment to Martial Settlement Agreement, which stated, in part: "In the event [Weinberg] recovers any money from Michael Stern or others arising from the money loaned to Michael Stern, [BOCK] shall receive the first One Hundred Thousand Dollars ($100,000.00).  The balance shall be split between the parties."

Act No. 106:  On or about March 24, 2011, Stern (posing as Millar) sent an email to the Florida Attorney, Weinberg and Mr. West providing a status report on his negotiations for the purchase of Donnelly's ownership interest in Roof Group.

Act No. 107:  On or about March 28, 2011, and again on or about April 1, 2011, Weinberg sent a fax to her tax accountant in New York with false financial information to use in preparing Mr. Freeney's 2010 income tax returns.

Act No. 108:  In or about April 2011, BOCK and Weinberg caused Mr. Freeney's investment in American Realty to be liquidated, and Weinberg deposited the $195,000 in proceeds to Mr. Freeney's Citibank accounts.

Act No. 109:  In or about May 2011, Mr. Freeney, at the urging of Weinberg, Stern (posing as Millar) and the Florida Attorney, signed a Membership Interest Purchase and Sale Agreement to purchase Donnelly's shares in Roof Group for $550,000.

Act No. 110:  In or about August 2011, Weinberg negotiated with Snap Advances for a $300,000 credit facility for Roof Group, which required Mr. Freeney to repay Snap Advances a total of $435,000.

Act No. 111:  In or about September 2011, Weinberg negotiated with Snap Advances for a second credit facility for $150,000, which required Mr. Freeney to repay Snap Advances a total of $220,000.

Act No. 112:  In or about November 2011, Mr. Freeney, on the advice of Weinberg, Stern (posing as Millar) and the Florida Attorney, completed the purchase of Altounian's shares of Roof Group.

Act No. 113:  On or about November 11, 2011, Weinberg texted and called Del Campo to make sure Mr. Freeney's account statements were being sent to the

148

**THIRD AMENDED COMPLAINT**

1  8484 Wilshire Boulevard address.

2      <u>Act No. 114:</u>  In or about December 2011, Weinberg and Stern paid an

3  accountant to prepare phony account statements that Weinberg could show

4  Mr. Freeney, which purported to have been issued by GWM, listed Weinberg as the

5  Senior Vice President of GWM and falsely reported that Mr. Freeney still had over

6  $1.3 million in cash on deposit and owned assets valued at close to $14 million.

7      <u>Act No. 115:</u>  Sometime between in or about December 2011 and in or about

8  March 2012, Weinberg and Stern created the Fabricated Engagement Letter

9  purportedly between GWM and Mr. Freeney, which Weinberg and Stern fraudulently

10  backdated to June 11, 2010.

11      <u>Act No. 116:</u>  In or about January 2012, Mr. Freeney, on the advice of

12  Weinberg and the Florida Attorney, completed the purchase of Donnelly's shares of

13  Roof Group, becoming the 100 percent owner of the company.

14      <u>Act No. 117:</u>  On or about March 23, 2012, on the way to Miami International

15  Airport to catch a flight to Los Angeles to reunite with Weinberg, Stern stopped at a

16  check cashing store where he unsuccessfully attempted to cash a Colts paycheck to

17  Mr. Freeney for $31,785.

18      <u>Act No. 118:</u>  On or about March 23, 2012, on the way to the airport, Stern

19  stopped at a house he was renovating and hid "paperwork" in the ceiling trusses,

20  including exemplars of Mr. Freeney's signature and a series of forged and fabricated

21  authorizations for Citibank to transfer funds to the BofA Roof Group account.

22      <u>Act No. 119:</u>  On or about March 23, 2012, Stern, having been arrested at

23  Miami International Airport as he was about to board a flight to Los Angeles to

24  reunite with Weinberg, was found to be carrying on his person a paycheck from the

25  Colts to Mr. Freeney for $31,785; another check from the NFL Players Association to

26  one of Mr. Freeney's companies for $2,270.52; a BofA Visa card in Mr. Freeney's

27  name; a check book of temporary checks for First Bank in Beverly Hills; multiple

28  copies of the other version of the Fabricated Engagement Letter; and handwritten

**THIRD AMENDED COMPLAINT**

188650.4

1   notes and materials printed from the Internet that Stern had apparently used to draft

2   the Fabricated Engagement Letter.

3   **Act No. 120:**   In or about September 7, 2012, Weinberg fraudulently conveyed

4   the house she owned in Miami Beach to BOCK.

5   **Act No. 121:**   On or about September 13, 2013, Mr. Freeney made the final

6   payment to Snap Advances in the amount of $131,985, as repayment of the advances

7   made to Roof Group in August and September 2010.

8   **Act No. 122:**   On or about December 30, 2013, Mr. Freeney made a $100,000

9   payment to the Felis pursuant to the Settlement Agreement in the *Feli* Case.

10  **Act No. 123:**   On or about May 29, 2014, MLPFS filed U4 Forms with FINRA

11  for BOCK, Weinberg, Liebman and Del Campo, falsely representing that

12  BofA/Merrill Lynch had conducted an investigation of Mr. Freeney's allegations

13  against them, and further falsely representing that it had found that his allegations

14  were "unfounded and without merit."

15  **Act No. 124:**   On or about September 10, 2014, Mr. Freeney made a $30,000

16  payment to the Felis pursuant to the Settlement Agreement in the *Feli* Case.

17  **Act No. 125:**   In or about March, 2015, in response to the filing of this lawsuit,

18  BAC and BANA issued false and misleading statements to the media that, "although

19  we sympathize with Mr. Freeney as the victim of a crime, the bank had nothing to do

20  with the criminal scheme," and Weinberg "committed her criminal conduct after she

21  left Merrill Lynch in 2010."

22  **C.      Resulting Damages.**

23          437.   As a direct and proximate result of the conspiracy to defraud,

24  Mr. Freeney and Roof Group were damaged in an amount to be determined at trial,

25  but which is estimated to be in excess of $20 million, including in the following

26  respects, among others:

27                  (a)      Losses due to theft and misapplication of Mr. Freeney and

28  Roof Group's funds;

**THIRD AMENDED COMPLAINT**

1          (b)     Losses from fraud involving the funding of the RSLA build out,

2    its operations and its closure;

3          (c)     Losses from the needless purchases of Altounian and Donnelly's

4    interests in Roof Group;

5          (d)     Losses from having to defend against and the settlement of the

6    Felis' $5.0 million lawsuit;

7          (e)     Losses from the purchase of $55 million in unsuitable and

8    worthless life insurance;

9          (f)     Losses from the liquidation of assets used to generate additional

10   funds to misappropriate; and

11         (g)     Losses from false and unfulfilled promises involving the W Hotel

12   and North Carolina Land Investments.

13         438.   In engaging in the conspiracy to defraud Mr. Freeney and Roof Group,

14   BAC, BANA, MLPFS and BOCK, and each of them, acted fraudulently, oppressively,

15   maliciously and with a willful and conscious disregard of Plaintiffs' rights.

16   Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to

17   California Civil Code section 3294.

18                    **SECOND CAUSE OF ACTION**

19                         **(For Fraud)**

20            **(By Plaintiffs Freeney and Roof Group**

21         **Against Defendants BAC, BANA, MLPFS and BOCK)**

22         439.   Plaintiffs repeat and reallege paragraphs 1 through 438 of this Third

23   Amended Complaint as if fully alleged herein.

24   **A.     False and Misleading Representations and False Promises.**

25         440.   Beginning in or about January 2010, BAC, BANA, MLPFS and BOCK,

26   and each of them, made and caused others to make the following false and misleading

27   representations and false promises, among others, to Mr. Freeney, directly and

28   through his family, friends and associates, and to Roof Group, knowing that they were

**THIRD AMENDED COMPLAINT**

188650.4

false and with the intention that Mr. Freeney and Roof Group would rely upon them:

### Recruitment of Mr. Freeney to Become a BofA Client

(1)     Weinberg was a "Senior Financial Advisor";

(2)     BOCK, Weinberg and Sugarman had the expertise, qualifications and experience to competently manage Mr. Freeney's assets and income;

(3)     BOCK, Weinberg and Sugarman could and would assist Mr. Freeney in finding new investors and/or obtaining loan financing for RSLA;

(4)     BOCK, Weinberg and Sugarman could and would assist Mr. Freeney in disposing of his non-performing and under-performing investments, such as the North Carolina Land Investment;

(5)     BOCK, Weinberg and Sugarman could and would assist Mr. Freeney in obtaining return of his $1.2 million deposit with the W Hotel;

### Referral of Mr. Freeney to "Michael Millar"

(6)     Stern's name was "David Michael Millar";

(7)     Millar was a wealthy businessman;

(8)     Millar was a successful Miami Beach real estate developer;

(9)     Millar had $30 million on deposit at BofA/Merrill Lynch;

(10)   Millar was a real estate consultant for BofA/Merrill Lynch;

(11)   Millar lived in the Bahamas;

(12)   Millar owned a private jet;

(13)   Millar was the grandson of pharmaceutical mogul Dr. Phillip Frost, the Chairman of Teva Pharmaceuticals;

(14)   Millar intended to invest $7.0 million in RSLA;

(15)   Millar could and would assist in managing the build out, staffing and opening of RSLA;

(16)   Millar was a man of his word who wanted nothing more than to show Mr. Freeney how to become a successful business owner;

**THIRD AMENDED COMPLAINT**

188650.4

1

### *Referral of Mr. Freeney to Weinberg's Brother*

2   (17)   Weinberg's brother had extensive knowledge and experience in the

3   purchase of life insurance products for investment purposes;

4   (18)   Purchasing $60 million in whole life insurance was a suitable, prudent

5   and beneficial long-term investment for Mr. Freeney;

6   ### *Referral of Mr. Freeney to the Florida Attorney and Florida Law Firm*

7   (19)   The Florida Attorney had the expertise and experience to competently

8   provide legal advice and services to Roof Group, a California limited liability

9   company, and RSLA, a business located in Los Angeles with no connections to

10  Florida;

11  (20)   The Florida Attorney could be trusted to provide loyal services and

12  candid legal advice to Mr. Freeney regarding Roof Group, RSLA and related legal

13  matters;

14  (21)   The Florida Attorney had no conflicts of interest arising from any past or

15  present attorney-client relationship with Stern or Weinberg;

16  ### *Stern's Use of a Private Jet*

17  (22)   Stern owned the private jet, N900JF;

18  (23)   When using the private jet, Mr. Freeney was only paying for the cost of

19  the fuel;

20  (24)   Stern or ARC paid professional pilots Edward Rennia and Dana Messier

21  to fly the private jet;

22  (25)   Stern or ARC paid the maintenance costs and hangar fees for the private

23  jet;

24  ### *Mr. Freeney's Purchase of $55 Million in Worthless Life Insurance*

25  (26)   Weinberg's expertise and experience as Mr. Freeney's financial manager

26  and investment advisor included the purchase of insurance products for investment

27  purposes;

28  (27)   Weinberg's brother had substantial expertise and experience in the

**THIRD AMENDED COMPLAINT**

1   analysis, selection and purchase of insurance products for investment purposes;

2   (28)   It was in Mr. Freeney's financial interests, and consistent with his

3   financial objectives, to purchase $55 million in whole life insurance;

4   (29)   Weinberg and Weinberg's brother had selected the three policies they

5   were recommending Mr. Freeney purchase because they offered the best value to Mr.

6   Freeney compared to other available whole life policies;

7                          ***Roof Group and RSLA***

8   (30)   Millar was prepared to invest $7.0 million dollars in RSLA once

9   Mr. Freeney had acquired Altounian and Donnelly's ownership interests in

10   Roof Group;

11   (31)   Millar would oversee  the build out of RSLA and had the skills, expertise

12   and experience to do so;

13   (32)   Millar would assist in obtaining the liquor license for RSLA and had the

14   skills, expertise and experience to do so;

15   (33)   Weinberg and Millar together would renegotiate the unfavorable lease

16   terms with CIM;

17   (34)   BofA/Merrill Lynch would handle the bill payments for RSLA;

18   (35)   BofA/Merrill Lynch would develop and implement cost and accounting

19   controls for RSLA;

20   (36)   Millar had authority to bind Roof Group to the Term Sheet between

21   Roof Group and the Felis;

22                 ***The Opening of the BofA Roof Group Account***

23   (37)   The BofA Roof Group account was only a temporary account needed to

24   pay invoices associated with the RSLA build out until permanent accounts could be

25   opened in Los Angeles;

26                          ***The W Hotel Investment***

27   (38)   BofA/Merrill Lynch would intervene in the W Hotel Investment, by

28   either obtaining financing to complete the purchase of Mr. Freeney's condominium

**THIRD AMENDED COMPLAINT**

1 unit or negotiating the return of his $1.2 million investment;

2 ### The North Carolina Land Investment

3 (39)   BofA/Merrill Lynch would assist Mr. Freeney in disposing of the North

4 Carolina Land Investment;

5 ### Cover Up and Obstruction of Justice

6 (40)   Mr. West was stealing from Mr. Freeney and was responsible for

7 RSLA's deteriorating financial condition;

8 (41)   Mr. Freeney had entered into an "asset management contract" with

9 GWM in June 2010; and

10 (42)   Weinberg had not taken any fees from Mr. Freeney.

11 441.   All of these representations and promises, and each of them, were

12 important because they would have influenced a reasonable person's judgment

13 or conduct, or Defendants knew that they were likely to have influenced

14 Plaintiffs' judgment or conduct.

15 442.   BAC, BANA and MLPFS, and each of them, are liable for all of

16 Weinberg's false and misleading representations and false promises to Mr.

17 Freeney and Roof Group following her resignation from BofA/Merrill Lynch

18 (effective July 3, 2010) for each of the following reasons, among others:

19 (a)   BAC, BANA and MLPFS authorized and/or permitted Weinberg

20 to continue to act as their actual and/or ostensible agent after her resignation in all

21 matters involving Mr. Freeney and Roof Group;

22 (b)   BAC, BANA and MLPFS adopted and ratified Weinberg's

23 conduct as that of their actual and/or ostensible agent in all matters involving

24 Mr. Freeney and Roof Group; and

25 (c)   BAC, BANA and MLPFS created a situation that afforded

26 Weinberg the opportunity to continue to make false and misleading representations

27 and false promises to Mr. Freeney and Roof Group, and BAC, BANA and MLPFS

28 realized or should have realized the likelihood that Weinberg would avail herself of

**THIRD AMENDED COMPLAINT**

that opportunity following her resignation.

**B.      Concealment of Material Facts.**

443.   At all times relevant hereto, BAC, BANA, MLPFS and BOCK, and each of them, owed Mr. Freeney and Roof Group a duty of disclosure by virtue of the existence of one or more of the following circumstances:

(a)      BAC, BANA, MLPFS and BOCK were in a fiduciary or similar relationship of trust and confidence with Mr. Freeney;

(b)      To the extent BAC, BANA, MLPFS or BOCK made any disclosures to Mr. Freeney, they disclosed only some facts, but intentionally withheld or caused others to withhold other facts, making the disclosures misleading;

(c)      BAC, BANA, MLPFS and BOCK intentionally failed or caused others to fail to disclose important facts to Mr. Freeney that were known to them, and which Mr. Freeney could not have discovered on his own; and

(d)      BAC, BANA, MLPFS and BOCK actively concealed and caused others to conceal important facts from Mr. Freeney or acted to prevent him from discovering such facts.

444.   Beginning in or about January 2010, BAC, BANA MLPFS and BOCK, and each of them, intentionally concealed, withheld and failed to disclose, and caused others to conceal, withhold and fail to disclose, the following facts, with the intent to deceive Mr. Freeney and Roof Group:

### *Recruitment of Mr. Freeney*

(1)      Weinberg was only a part-time BofA/Merrill Lynch employee;

(2)      Weinberg was not licensed to give investment advice to clients;

(3)      Weinberg was unfit and not competent to manage Mr. Freeney's assets, investments and income;

(4)      Weinberg had been twice married to and twice divorced from BOCK and they had a tumultuous and at times acrimonious working relationship;

(5)      BOCK was listed as a creditor for $500,000 in one of Stern's

**THIRD AMENDED COMPLAINT**

1  bankruptcies;

2      (6)    Weinberg was romantically involved with Stern;

3      (7)    Weinberg had a $1.6 million judgment outstanding against her for having

4  issued $400,000 in worthless checks to the Faraches to secure Stern's debt to them;

5      (8)    The Faraches had served BofA/Merrill Lynch with a petition to garnish

6  Weinberg's wages and savings;

7      (9)    Weinberg's deposition testimony in the *Colonial Bank* Case revealed that

8  she had been assisting Stern in committing bankruptcy fraud, finding new victims and

9  intimidating a key witness;

10     (10)   Weinberg had no expertise or experience in the management or

11  operations of a restaurant;

12     (11)   Weinberg had no ability to maintain the books and records or prepare

13  budgets or financial projections for a restaurant;

14     (12)   Weinberg had no experience supervising the build out, staffing, opening,

15  or operations of a restaurant;

16                  ***Referral of Mr. Freeney to "Michael Millar"***

17     (13)   Stern and his then wife had declared personal bankruptcy just a year prior

18  to Mr. Freeney becoming a BofA/Merrill Lynch client, with reported debts exceeding

19  $65 million and assets of a negative value;

20     (14)   Stern's real estate assets were over-encumbered, in receivership, in

21  bankruptcy and/or the subject of foreclosure proceedings or other lawsuits;

22     (15)   Stern had been found in contempt by the Bankruptcy Court for willfully

23  violating court orders requiring him to produce documents and appear to provide

24  testimony;

25     (16)   The U.S. Trustee was opposing Stern's discharge from bankruptcy on the

26  grounds that he had engaged in numerous instances of bankruptcy fraud;

27     (17)   Stern was a defendant in more than 20 civil lawsuits brought by

28  defrauded partners, investors, mortgage lenders and financial institutions;

**THIRD AMENDED COMPLAINT**

188650.4

(18)   Evidence introduced in those lawsuits established that Stern had forged documents, falsified loan applications, misappropriated over $20 million in loan proceeds, and engaged in witness tampering and intimidation;

(19)   A writ of bodily attachment had issued for Stern's arrest in the *Colonial Bank* Case;

(20)   Stern had fled to Uruguay to evade process and avoid being deposed, and, while there, cheated his stepson out of a large inheritance;

(21)   Stern had previously been caught paying over $100,000 in bribes to Miami Beach city officials;

(22)   The money Stern was using to lease and operate the private jet that he purportedly owned had been misappropriated from Mr. Freeney and Roof Group's brokerage and bank accounts with Weinberg's assistance;

(23)   Stern had substantial gambling debts;

(24)   Stern had not paid any income taxes in years, notwithstanding having reported in his bankruptcy schedules having earned $500,000 in both 2007 and 2008;

(25)   Stern had neither the intent nor the means to invest any funds in RSLA or the ability to attract other investors;

(26)   Stern was addicted to the prescription drug Oxycodone;

### *The Creation of ARC*

(27)   Stern and Jaggernauth created ARC and opened the ARC bank account within days of being introduced to Mr. Freeney;

(28)   ARC was a sham entity created to promote and conceal the scheme to defraud;

(29)   Stern created ARC for the sole or primary purpose of concealing his theft and conversion of Mr. Freeney's funds from Mr. Freeney, the Bankruptcy Court, the bankruptcy trustee, the U.S. Trustee, his creditors in the bankruptcy proceedings and defrauded victims who had sued him;

(30)   During the course of the scheme, more than $2.2 million in funds

**THIRD AMENDED COMPLAINT**

188650.4

misappropriated from the BofA Roof Group account would be laundered through the ARC bank account;

### Misappropriation of Brokerage Account Funds

(31)   Weinberg caused more than $160,000 of Mr. Freeney's funds to be transferred from one of his brokerage accounts to the ARC Wells Fargo account, to pay Stern's personal expenses and to use as seed money for the scheme to defraud;

### Unauthorized Purchases of Securities

(32)   BOCK used more than $890,000 of Mr. Freeney's funds to purchase securities, which generated large commissions for BOCK;

(33)   BOCK was not authorized to make these purchases;

### Referral of Mr. Freeney to Weinberg's Brother

(34)   Weinberg and her brother had agreed to split the commissions from Mr. Freeney's purchase of the $55 million in life insurance policies;

(35)   Weinberg and her brother had instructed a senior life insurance agent to structure the purchase of life insurance for Mr. Freeney to include multiple policies to maximize the sales commissions Weinberg's brother would receive, rather than in a single, high-dollar policy, which would have had a higher cash surrender value;

### Referral of Mr. Freeney to the Florida Attorney and the Florida Law Firm

(36)   The Florida Attorney had represented Stern in 20 or more civil lawsuits prior to being introduced to Mr. Freeney in which Stern had been sued for fraud, theft, issuing NSF checks and forging others' signatures;

(37)   In the *College Health* Case, the Florida attorney had negotiated a settlement on behalf of Stern that, within three months of signing, Stern sought to void based on false claims that he had been coerced into signing it by threats against his life;

(38)   The Florida Attorney was representing Weinberg in two civil lawsuits in which she was sued for writing NSF checks totaling $400,000 and failing to pay a house painter;

159

**THIRD AMENDED COMPLAINT**

(39)   The Florida Attorney had prepared a promissory note securing a $350,000 loan from BOCK, Weinberg and Weinberg's brother to Stern, which Stern had never repaid;

(40)   The Florida Attorney was present at a meeting in or about August 2009, at which Stern admitted that he had forged the signature of Esther Burstyn-Spero to two loan forgiveness documents;

(41)   Stern had failed to pay at least $100,000 in legal fees that he owed to the Florida Attorney and the Florida Law Firm;

(42)   The Florida Attorney and the Florida Law Firm had filed creditor claims in Stern's bankruptcy in or about July 2009 for the $100,000 that they were owed;

(43)   The Florida Attorney had inserted a clause in a retainer agreement that he had sent to Mr. Freeney for his signature, which stated that Mr. Freeney "appoints Arms Reach Consulting LLC . . . as [his] agent to communicate and deal directly with the Firm on the Client's behalf," and, "[u]nless otherwise instructed by the Client in writing, the Firm will take direction from ARC";

(44)   The Florida Attorney and Florida Law Firm could not ethically represent Mr. Freeney because they had a disqualifying conflict of interest as a result of their past representation of Stern and what they knew about Stern's dishonest character and fraudulent and illegal activities as a result of that representation;

(45)   The Florida Attorney and Florida Law Firm could not ethically represent Mr. Freeney because they had a disqualifying conflict of interest as a result of their ongoing representation of Weinberg and what they knew about Weinberg's legal problems and current situation at BofA/Merrill Lynch;

### Stern's Use of a Private Jet

(46)   James Pelky, not Stern, owned the private jet and Pelky was only leasing it to Stern and ARC;

(47)   Stern was using funds misappropriated from Mr. Freeney and Roof Group's brokerage and bank accounts to pay to lease the aircraft;

160

**THIRD AMENDED COMPLAINT**

188650.4

(48)   Stern was also using funds misappropriated from Mr. Freeney and Roof Group's brokerage and bank accounts to pay to maintain the aircraft, pay the hangar fees and pay the salaries and expenses of the pilots Rennia and Messier;

(49)   Over $200,000 of the money Stern paid Pelky to lease the aircraft had been applied towards ARC's purchase of the aircraft;

***Mr. Freeney's Purchase of $55 Million in Unsuitable and Worthless Life Insurance***

(50)   Weinberg was not qualified or licensed to sell life insurance and had little or no expertise or experience in the purchase of insurance products for investment purposes;

(51)   Weinberg's brother had only become a licensed insurance agent in or about May 2010, and had only become a licensed insurance agent in Indiana in or about June 2010, and then only to sell life insurance to Mr. Freeney;

(52)   The policies that Weinberg and her brother recommended to Mr. Freeney were unsuitable, considering that Mr. Freeney already owned two life insurance policies with face values totaling $13 million;

(53)   Even if some form of additional life insurance was suitable, other life insurance products were readily available that were less expensive and better suited to Mr. Freeney's insurance needs;

(54)   Weinberg and her brother planned that he would kick back to Weinberg approximately half of the commissions he received from the sale of the policies;

(55)   As a result of this kickback agreement, Weinberg had a serious conflict of interest in acting as Mr. Freeney's financial manager and investment advisor in the purchase of the policies;

(56)   Weinberg and her brother had structured the transaction based on the amount of commissions her brother would receive, rather than on the prices, surrender values and other costs and benefits of the policies;

(57)   To prevent the policies from lapsing, Mr. Freeney would have to pay premiums totaling approximately $500,000 per year for a period of 15 years;

**THIRD AMENDED COMPLAINT**

(58)   Weinberg and her brother intended to allow the policies to lapse after the first year, unless further premium payments would generate additional commissions that they could split;

(59)   The policies would have no cash surrender value and would be worthless if they were allowed to lapse after the first year;

(60)   Weinberg and her bother allowed the policies to lapse in or about September 2011 and October 2011, as a result of which, the policies had no cash surrender value and became worthless;

### *Roof Group and RSLA*

(61)   Weinberg and Stern were using RSLA as a vehicle for misappropriating and converting funds in the BofA Roof Group account and to conceal and disguise those thefts from Mr. Freeney and others;

(62)   Weinberg rarely, if ever, paid vendor bills on time;

(63)   Stern was in bankruptcy and entirely without the financial means to invest in RSLA;

(64)   Weinberg and Stern's sole or primary interest in overseeing the build out of RSLA was to be able to continue to misappropriate funds from Mr. Freeney and Roof Group undetected;

(65)   Weinberg was not paying RSLA's federal and state payroll taxes.

(66)   Weinberg was not paying RSLA's California sales taxes;

(67)   Weinberg was not timely paying RSLA staff and management, and when she paid them, she was not paying them the correct amounts they were owed;

(68)   Weinberg had not obtained adequate general liability and other insurance for RSLA;

(69)   Weinberg was not maintaining anything resembling a set of books and records for RSLA;

(70)   Weinberg was not preparing financial reports or statements for RSLA;

(71)   Weinberg was not preparing budgets or projections for RSLA;

**THIRD AMENDED COMPLAINT**

188650.4

(72)   Weinberg and Stern were not engaged in discussions with CIM to renegotiate the lease terms;

(73)   Stern was not attempting to obtain a liquor license for RSLA;

(74)   Without Mr. Freeney's continued capital contributions to Roof Group, Altounian and Donnelly's shares in the company were effectively worthless;

(75)   As members of a limited liability corporation, Altounian and Donnelly were responsible for losses in proportion to their ownership interests;

(76)   Based on RSLA's significant operating losses and the fact that neither Altounian nor Donnelly were contributing any cash to Roof Group, their capital accounts were negative at the time of the buy outs, which would have reduced the value of their shares to zero or close thereto;

(77)   There was no valuable premium or other significant intangible value associated with Mr. Freeney's purchase of Altounian and Donnelly's Roof Group shares (such as minimizing their participation in the operations, management, or direction of RSLA) to justify paying them $1.1 million for those shares;

(78)   Weinberg and Stern's sole or primary motivation for convincing Mr. Freeney to pay $1.1 million to buy out Altounian and Donnelly was to oust them from the day-to-day operations of RSLA, to prevent them from discovering that Weinberg and Stern were using RSLA as a vehicle to misappropriate and convert funds in the BofA Roof Group account and to conceal and disguise those thefts from Mr. Freeney and others;

(79)   Roof Group could not afford to pay the Felis the compensation negotiated by Stern and specified in the Term Sheet;

(80)   Sal Feli's compensation under the Term Sheet was well above the industry standard for a Director of Operations with his limited qualifications, experience and track record;

(81)   Stern's sole or primary motivation in hiring the Felis was his belief that they would be easier to manipulate and less of a threat to uncover the scheme to

**THIRD AMENDED COMPLAINT**

1  defraud than Altounian and Donnelly;

2  (82)   After the Felis were terminated, in or about February 2012, Weinberg

3  failed to make the severance payment to the Felis that Mr. Freeney had directed her to

4  make;

### The Opening of the BofA Roof Group Account

6  (83)   The BofA Roof Group account remained open and active long after

7  operating, payroll and tax accounts for RSLA were opened at Wells Fargo Bank;

8  (84)   The purpose of the BofA Roof Group account was to conceal the

9  proceeds of the scheme to defraud from Mr. Freeney, RSLA management, the

10  Bankruptcy Court, the bankruptcy trustee, the U.S. Trustee, the creditors in Stern's

11  bankruptcies, and the plaintiffs in the many civil actions pending against Stern;

12  (85)   At the time the BofA Roof Group account was opened, Mr. Freeney

13  lacked the necessary corporate authority to open the account on behalf of Roof Group;

14  (86)   The BofA Roof Group account was opened, and was allowed to remain

15  open, without the documentation, authorization, or due diligence ordinarily required to

16  open such an account, and despite concerns expressed internally at BANA regarding

17  those irregularities;

18  (87)   Weinberg kept the existence of the BofA Roof Group account secret

19  from RSLA's management, accountants and consultants;

20  (88)   Weinberg had given Stern the confidential account access information for

21  the BofA Roof Group account to enable him to access the account remotely online and

22  transfer funds to and from it without Mr. Freeney's knowledge or authorization;

### The Opening of the Citibank Accounts

24  (89)   Weinberg had given Stern the confidential account access information to

25  the Citibank accounts to enable him to access the accounts remotely online and

26  transfer funds to, from and between them without Mr. Freeney's knowledge or

27  authorization;

28

---

**THIRD AMENDED COMPLAINT**

### *The Creation of GWM*

(90)   GWM was not the same as GWIM or MLGWM and was not a division or subdivision of BAC;

(91)   GWM was a sham entity created to promote and conceal the scheme to defraud;

(92)   GWM had no employees and Mr. Freeney was its only client;

(93)   Stern had access to all of Mr. Freeney's mail that was being forwarded to GWM at the 8484 Wilshire address;

### *Relocation of the Scheme from Miami to Los Angeles*

(94)   Weinberg and Stern lived together in the Hancock Park house;

(95)   Weinberg and Stern were using the Hancock Park house as a base of operations and maintained a room in the house where Stern hid whenever people came to the door and in which Stern kept the computers that he used to access Mr. Freeney's accounts online and transfer funds to and from them without Mr. Freeney's knowledge or authorization;

(96)   Weinberg resigned from BofA/Merrill Lynch, effective July 3, 2012;

(97)   Weinberg and Stern were secretly married in Los Angeles on or about February 25, 2011;

(98)   Weinberg and Stern's marriage license listed Stern's name as "Michael Alan Stern," and further indicated that Weinberg had elected to change her name to "Eva Danielle Stern";

(99)   BOCK and Weinberg had agreed, as part of their Martial Settlement Agreement, that BOCK would receive the first $100,000 of loan funds repaid by Stern and would split an additional amounts repaid;

### *Fraudulent and Unauthorized*
### *Transfers to and from the BofA Roof Group Account*

(100)  Stern used the confidential account information provided by Weinberg to access Mr. Freeney's Citibank accounts online to wire transfer approximately $9.3

**THIRD AMENDED COMPLAINT**

1   million to the BofA Roof Group account;

2   (101)  Stern used the confidential account information provided by Weinberg to

3   access the BofA Roof Group account to make over 300 unauthorized wire transfers;

4   (102)  BANA executed wire transfers totaling approximately $8.5 million from

5   the BofA Roof Group account in furtherance of, to promote and to conceal the scheme

6   to defraud;

7   *Sale of Securities*

8   (103)  BOCK caused the securities that he had purchased just a few weeks

9   earlier, for approximately $890,000, to be sold at a loss of more than $45,000 to

10  Mr. Freeney;

11  (104)  A large portion of the proceeds that resulted from these sales were

12  eventually transferred to the BofA Roof Group account, and from there to ARC,

13  GWM and other unauthorized recipients;

14  *Liquidation of Mr. Freeney's Existing Investments*

15  (105)  A large portion of the $441,000 that Success Trade returned to

16  Mr. Freeney in or about September 2010 was eventually transferred to the ARC

17  Wells Fargo account;

18  (106)  A large portion of the $1.6 million that CFP returned to Mr. Freeney

19  between in or about September 2010 and February 2012 was eventually transferred to

20  ARC, to GWM, to pay for expenses related to the private jet and to pay Stern's

21  personal debts and expenses;

22  (107)  A large portion of the $1.5 million that resulted from the surrender of

23  Mr. Freeney's Pacific Life annuity was eventually transferred to ARC to pay for

24  expenses related to the private jet and to pay Stern's personal debts and expenses;

25  (108)  A large portion of the $195,000 that resulted from the liquidation of

26  Mr. Freeney's investment in American Realty was eventually transferred to ARC to

27  pay for expenses related to the private jet;

28

**THIRD AMENDED COMPLAINT**

188650.4

*Snap Advances*

(109)  The Snap Advances credit facilities, totaling $450,000, were only necessary because BOCK, Weinberg and Stern had depleted almost all of Mr. Freeney's available cash and liquid assets;

(110)  Mr. Freeney was paying interest at the rate of 45 percent per annum;

(111)  Weinberg and Stern were planning to (and did) misappropriate a portion of the advances RSLA received from Snap Advances.

445.    All of these facts, and each of them, were important in that they would have influenced a reasonable person's judgment or conduct, or Defendants knew that their disclosure was likely to have influenced Mr. Freeney and Roof Group's judgment or conduct.

446.    Mr. Freeney and Roof Group would have acted differently if they had known of these undisclosed facts.

447.    BAC, BANA and MLPFS, and each of them, are liable for all of Weinberg's acts of concealment following her resignation from BofA/Merrill Lynch (effective July 3, 2010) for each of the following reasons, among others:

(a)    BAC, BANA and MLPFS authorized and/or permitted Weinberg to continue to act as its actual and/or ostensible agent after her resignation in all matters involving Mr. Freeney and Roof Group;

(b)    BAC, BANA and MLPFS adopted and ratified Weinberg's conduct as that of its actual and/or ostensible agent in all matters involving Mr. Freeney and Roof Group; and

(c)    BAC, BANA and MLPFS created a situation that afforded Weinberg the opportunity to continue to conceal material facts from Mr. Freeney and Roof Group, and BAC, BANA and MLPFS realized or should have realized the likelihood that Weinberg would avail herself of that opportunity following her resignation.

**THIRD AMENDED COMPLAINT**

188650.4

**C.      Resulting Damages.**

448.    As a direct and proximate result of BAC, BANA MLPFS and BOCK's false and misleading representations, false promises and concealment and withholding of important information, Mr. Freeney and Roof Group were damaged in an amount to be determined at trial, but which is estimated to be in excess of $20 million.

449.    In making these false and misleading representations and false promises, and in concealing, withholding and not disclosing these facts, BAC, BANA, MLPFS and BOCK acted fraudulently, oppressively, maliciously and with a willful disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

**THIRD CAUSE OF ACTION**

**(For Aiding and Abetting Conversion)**

**(By Plaintiffs Freeney and Roof Group**

**Against Defendant BANA)**

450.    Plaintiffs repeat and reallege paragraphs 1 through 449 of this Third Amended Complaint as if fully alleged herein.

**A.      The Conversions.**

451.    At all times relevant hereto, Mr. Freeney owned all of the funds that were deposited to the Citibank accounts, and all of the funds that were transferred from the Citibank accounts to the BofA Roof Group account.

452.    At all times relevant hereto, Mr. Freeney and Roof Group owned all of the funds that were deposited to the BofA Roof Group account and all of the funds that were transferred from that account.

453.    Beginning in or about June 2010, Stern, and following her resignation (effective July 3, 2010), Weinberg:

(a)      Converted all of the funds that were deposited to the Citibank accounts, and all of the funds transferred from the Citibank accounts to the BofA Roof Group account and to GWM, by interfering with Mr. Freeney's lawful rights and

**THIRD AMENDED COMPLAINT**

188650.4

ownership interests in those funds by, among other things, wrongfully exercising dominion and control over those funds and preventing Mr. Freeney from gaining access to them; and

(b)     Converted all of the funds in the BofA Roof Group account, all of the funds transferred from that account to ARC and GWM, and all of the funds transferred from that account to fund the build out and operations of RSLA, lease and operate the private jet, charter a private yacht, pay rent for the Hancock Park house, satisfy Stern's gambling debts and pay Stern's other personal expenses, by interfering with Mr. Freeney and Roof Group's lawful rights and ownership interests in those funds by, among other things, wrongfully exercising dominion and control over those funds and preventing Mr. Freeney and Roof Group from gaining access to them.

454.   As a direct and proximate result of these conversions, Mr. Freeney and Roof Group were damaged in an amount to be determined at trial, but which is estimated to be in excess of $8.5 million.

**B.     Aiding and Abetting.**

455.   Prior to Weinberg's resignation from BofA/Merrill Lynch, BANA aided and abetted Stern in committing these conversions by knowingly giving substantial assistance and encouragement to him, knowing that his conduct constituted breaches of his legal duties to Mr. Freeney and Roof Group not to interfere with their lawful rights and ownership interests in the funds in the Citibank and BofA Roof Group accounts and not to deceive, defraud, or deal unfairly with them.

456.   Prior to Weinberg's resignation, BANA also aided and abetted Stern in committing these conversions by knowingly giving substantial assistance to him toward accomplishing the conversions, which conduct itself constituted breaches of BANA's legal duties to Mr. Freeney and Roof Group, as clients, not to interfere with their lawful rights and ownership interests in the funds in the Citibank and BofA Roof Group accounts and not to deceive, defraud, or deal unfairly with them.

457.   Following Weinberg's resignation, BANA aided and abetted Stern and

169

**THIRD AMENDED COMPLAINT**

1  Weinberg in committing these conversions by knowingly giving substantial assistance

2  and encouragement to them, knowing that their conduct constituted breaches of their

3  legal duties to Mr. Freeney and Roof Group not to interfere with Mr. Freeney and

4  Roof Group's lawful rights and ownership interests in the funds in the Citibank and

5  BofA Roof Group accounts and not to deceive, defraud, or deal unfairly with them.

6  458.   Following Weinberg's resignation, BANA also aided and abetted Stern

7  and Weinberg in committing these conversions by knowingly giving substantial

8  assistance to them toward accomplishing the conversions, which conduct itself

9  constituted breaches of BANA's legal duties to Mr. Freeney and Roof Group, as

10  clients, not to interfere with their lawful rights and ownership interests in the funds in

11  the Citibank and BofA Roof Group accounts and not to defraud, deceive, or deal

12  unfairly with them.

13  459.   In receiving millions of dollars in funds transferred from Mr. Freeney's

14  personal accounts at Citibank, permitting them to be deposited to the BofA Roof

15  Group account, and then executing hundreds of wire transfers totaling millions of

16  dollars from that account to largely unknown recipients, sometimes on the same day,

17  BANA knew that the BofA Roof Group account was being used to convert funds

18  belonging to Mr. Freeney and Roof Group, and, with that knowledge, substantially

19  assisted Stern, and later Stern and Weinberg, in converting those funds.  The facts

20  demonstrating BANA's knowledge include, but are not necessarily limited to, the

21  following:

22  (1)    The Citibank accounts were new accounts, opened by Weinberg shortly

23  before she left BofA/Merrill Lynch;

24  (2)    The Citibank accounts were located in Miami Beach, even though at the

25  time Mr. Freeney resided in Indianapolis, Indiana and was playing for and receiving

26  his paychecks from the Indianapolis Colts;

27  (3)    BANA opened the BofA Roof Group account under false pretenses,

28  including that it was only a temporary account and would be closed once bank

**THIRD AMENDED COMPLAINT**

188650.4

1   accounts for Roof Group were opened in Los Angeles;

2       (4)    BANA opened the BofA Roof Group account without the necessary

3   internal documentation, appropriate authorizations or required due diligence;

4       (5)    BANA opened the BofA Roof Group account and executed wire transfers

5   from the account without a completed or signed account opening document or

6   signature card;

7       (6)    BANA allowed the BofA Roof Group account to remain open,

8   notwithstanding concerns expressed by BANA employees that the documentation for

9   the account was not sufficient or in order;

10      (7)    BANA gave Weinberg the confidential account access information,

11  including the secret passcode, even though she was not a signatory on the account;

12      (8)    BANA did nothing to ensure that Weinberg maintained the

13  confidentiality of the account access information;

14      (9)    BANA gave Weinberg the confidential account access information

15  without first determining whether she was authorized to receive it or use it;

16      (10)    BANA allowed the BofA Roof Group account to remain open after the

17  Wells Fargo Roof Group accounts had been opened in Los Angeles, and thus its

18  purported temporary purpose had been completed and it was no longer needed;

19      (11)    BANA allowed the account to remain open and did not change the pass

20  code for it even after Weinberg resigned from the bank and relocated with Stern to

21  California;

22      (12)    BANA continued to permit Weinberg to access the account after her

23  resignation;

24      (13)    BANA repeatedly overrode the account's security features at Weinberg's

25  request, including after her departure from the bank;

26      (14)    BANA never questioned why millions of dollars originating from Mr.

27  Freeney's personal accounts at Citibank in Miami Beach would be flowing through a

28  business account purportedly opened by a California corporation to pay expenses

**THIRD AMENDED COMPLAINT**

related to the build out, opening and operations of a California restaurant;

(15)   BANA unquestioningly executed hundreds of highly suspicious wire transfers totaling millions of dollars from the account to unknown recipients and recipients with no apparent relationship to Roof Group;

(16)   All of the deposits to the account were by wire transfer – none were by check or other monetary instrument signed by Mr. Freeney;

(17)   All of the withdrawal from the accounts were by wire transfer originating online – none were by check or other monetary instrument signed by Mr. Freeney;

(18)   ARC, which was the recipient of over 140 wire transfers totaling more than $2.2 million, did not exist prior to Mr. Freeney becoming a client of BofA/Merrill Lynch, and was a classic sham entity with no offices, assets, clients, or business, all of which was information BANA could easily have determined for itself;

(19)   In executing hundreds of wire transfers from the account totaling millions of dollars, BANA acted well beyond the $200,000 limit Mr. Freeney had imposed in writing;

(20)   BANA executed hundreds of wire transfers totaling millions of dollars from the account without ever obtaining Mr. Freeney's express authorization for any of these transfers, and without ever contacting Mr. Freeney to determine whether he was aware of the transfers and approved them;

(21)   BANA arranged it so neither Mr. Freeney nor RSLA's management, accountants, or consultants would receive account statements or copies of wire transfer requests for the account;

(22)   As is a well-publicized fact, young professional athletes with large contracts and little or no pertinent experience or time to manage their own finances, such are Mr. Freeney, are vulnerable to and often the subject of fraud schemes, especially fraud schemes involving the theft of funds;

(23)   As BANA knew, one of the primary reasons Mr. Freeney agreed to entrust BofA/Merrill Lynch with management of his finances was because of a series

**THIRD AMENDED COMPLAINT**

188650.4

1   of bad experiences he had had with prior financial managers who did not appear to be

2   acting in his best interests and or dealing with him honestly;

3       (24)   BANA did nothing to investigate the numerous highly suspicious

4   transactions in the BofA Roof Group account;

5       (25)   Plaintiffs are informed and believe, and on that basis allege, that BANA

6   did not file any Suspicious Activity Reports or otherwise notify federal authorities of

7   highly suspicious transactions in the BofA Roof Group account, in violation of the

8   Bank Secrecy Act;

9       (26)   Plaintiff are informed and believe, and on that basis allege, that BANA

10   received numerous wire transfers totaling millions of dollars for deposit to the

11   account, and executed hundreds of wire transfers totaling millions of dollars from the

12   account, sometimes on the same day, in disregard of reasonable and customary

13   banking practices for ensuring compliance with the Bank Secrecy Act and other

14   consumer protection, anti-fraud and anti-money laundering laws and regulations;

15       (27)   Plaintiffs are informed and believe, and on that basis allege, that BANA

16   received numerous wire transfers totaling millions of dollars to the account, and

17   executed hundreds of wire transfers totaling millions of dollars from the account,

18   sometimes on the same day, in violation of internal BofA/Merrill Lynch anti-fraud

19   and anti-money laundering policies, procedures and protocols;

20       (28)   After the scheme to defraud was exposed, BANA refused to provide

21   Mr. Freeney with account records for the BofA Roof Group account to which he was

22   entitled as a former BofA/Merrill Lynch client, despite repeated requests by his

23   counsel and his accountants and Mr. Freeney personally;

24       (29)   Just prior to the filing of this lawsuit, MLPFS filed reports with FINRA,

25   in which it falsely represented that it had investigated Mr. Freeney's claims of

26   wrongdoing by BOCK, Liebman and Del Campo, including those involving the

27   BofA Roof Group account, and determined that they were "unfounded and without

28   merit"; and

**THIRD AMENDED COMPLAINT**

(30)   Following the filing of this lawsuit, BAC and BANA issued public statements in which they sought to exonerate themselves of wrongdoing by falsely stating that, "although we sympathize with Mr. Freeney as a victim of a crime, the bank had nothing to do with the criminal scheme."

460.   Pursuant to California Civil Code section 3336, Mr. Freeney and Roof Group are entitled to fair compensation for the time and money they have expended in pursuing the return and recovery of their converted funds.

461.   In aiding and abetting these conversions, BANA acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

**FOURTH CAUSE OF ACTION**

**(For Violation of California Penal Code section 496)**

**(By Plaintiffs Freeney and Roof Group**

**Against Defendant BANA)**

462.   Plaintiffs repeat and reallege paragraphs 1 through 461 of this Third Amended Complaint as if fully alleged herein.

463.   California Penal Code section 496(c) provides, in relevant part, that "[a]ny person who has been injured by a violation of subdivision (a) . . . may bring an action for three times the amount of the actual damages, if any, sustained by the plaintiff, cost of suit, and reasonable attorney's fees."

464.   California Penal Code section 496(a) provides, in relevant part, that "[e]very person who receives any property that has been stolen or that has been obtained in any manner constituting theft . . . knowing the property to be so stolen or obtained, or who conceals, . . . withholds, or aids in concealing . . . or withholding any property from the owner, knowing the property to be so stolen or obtained, [is guilty of a criminal offense]."

465.   California Penal Code section 484 defines "theft" to include: (a) theft by

174

**THIRD AMENDED COMPLAINT**

188650.4

1    trick, which involves obtaining possession of another's property with his consent by

2    fraud or deceit; (b) theft by false pretenses, which involves obtaining possession and

3    ownership of another's property by false or fraudulent representations or promise; and

4    (c) theft by embezzlement, which involves converting another's property that has been

5    entrusted to one's care.

6        466.    Beginning in or about March 2010, BOCK and Weinberg, together with

7    Stern, began liquidating Mr. Freeney's existing investments, including, but not

8    necessarily limited to, his investments in the Advisors Disciplined municipal bonds,

9    Success Trade, CFP, the Pacific Life annuity and American Realty.  The bulk of the

10   proceeds from these transactions were eventually deposited to the Citibank accounts.

11   All of these funds belonged to and were the property of Mr. Freeney.

12       467.    Beginning in or about June 2010, BOCK caused the majority of the

13   securities he had previously purchased without Mr. Freeney's authorization or

14   knowledge to be sold, also without Mr. Freeney's authorization or knowledge.  The

15   bulk of the proceeds from these sales were eventually transferred to the Citibank

16   accounts.  All of these funds belonged to and were the property of Mr. Freeney.

17       468.    Between in or about September 2010 and January 2011, and between in

18   or about September 2011 and February 2012, at Weinberg's direction, Mr. Freeney's

19   paychecks from the Colts were sent to GWM at the 8484 Wilshire address.  Weinberg

20   then deposited those checks at the Citibank branch across the street, to be credited to

21   Mr. Freeney's Citibank accounts.  All of the deposited funds belonged to and were the

22   property of Mr. Freeney.

23       469.    Beginning in or about June 2010, Stern initiated wire transfers online,

24   typically from Los Angeles, using the confidential account access information that Del

25   Campo had provided to Weinberg, and that Weinberg (while still employed by

26   BofA/Merrill Lynch) had provided to Stern, enabling Stern to transfer Mr. Freeney's

27   funds: (a) from the Citibank accounts to the BofA Roof Group account and GWM;

28   and (b) from the BofA Roof Group account to, among others, ARC, GWM, Pelky,

**THIRD AMENDED COMPLAINT**

188650.4

1   Rennia, the landlord of the Hancock Park house, the holders of Stern's gambling debts
2   and various persons involved in the build out and operations of RSLA.

3       470.   All of the funds that Stern caused to be transferred from the Citibank
4   accounts to the BofA Roof Group account were stolen and obtained by theft from
5   Mr. Freeney in that:

6          (a)   Weinberg and Stern had obtained possession of the funds in the
7   Citibank accounts through fraud and deceit, knowing that the funds belonged to
8   Mr. Freeney and intending to deprive him of their use permanently;

9          (b)   Weinberg and Stern had knowingly and intentionally caused
10  Mr. Freeney to transfer possession and ownership of the funds in the Citibank
11  accounts to them in reliance upon false and fraudulent representations and pretenses;
12  and/or

13         (c)   Weinberg had been entrusted with care of the funds in the
14  Citibank accounts, and, together with Stern, fraudulently converted them to her and
15  Stern's personal benefit, intending to deprive Mr. Freeney of their use.

16      471.   Beginning in or about June 2010, BANA received the stolen funds
17  transferred from the Citibank accounts and deposited them to the BofA Roof Group
18  account, knowing that the funds had been stolen and obtained by theft, in violation of
19  California Penal Code section 496(a).

20      472.   Beginning in or about June 2010, BANA, having received the stolen
21  funds transferred from the Citibank accounts, thereafter knowingly concealed,
22  withheld and aided and abetted the concealment and withholding of those funds by,
23  among other things, executing the fraudulent and unauthorized wire transfers
24  described in this Third Amended Complaint, in further violation of California Penal
25  Code section 496(a).

26      473.   In receiving stolen funds transferred from Mr. Freeney's personal
27  accounts at Citibank, permitting them to be deposited to the BofA Roof Group
28  account, and then executing hundreds of wire transfers totaling millions of dollars

**THIRD AMENDED COMPLAINT**

188650.4

1  from that account to largely unknown recipients, sometimes on the same day, BANA

2  acted knowing that the funds had been stolen and with the intent to receive stolen

3  funds, and to conceal, withhold, and aid and abet the concealment and withholding of

4  those funds from Mr. Freeney and Roof Group.  The facts demonstrating BANA's

5  knowledge and intent include, but are not limited to, those set forth in paragraph 459

6  above.

7      474.   As a direct and proximate result of these violations of California Penal

8  Code section 496(a), Mr. Freeney and Roof Group have been injured in an amount to

9  be determined at trial, but estimated to be in excess of $8.5 million.

10                        **FIFTH CAUSE OF ACTION**

11                        **(Civil RICO in Violation of**

12      **Title 18, United States Code, Sections 1962(c) and 1964(c))**

13                  **(By Plaintiffs Freeney and Roof Group**

14              **Against Defendants BAC, BANA and MLPFS)**

15      475.   Plaintiffs repeat and reallege paragraphs 1 through 474 of this

16  Third Amended Complaint as if fully alleged herein.

17      476.   Title 18, United Sates Code, section 1962(c) provides, in relevant part,

18  that "[i]t shall be unlawful for any person employed by or associated with any

19  enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such

20  enterprise's affairs through a pattern of racketeering activity."

21      477.   Title 18, United States Code, section 1961(4) defines the term

22  "enterprise" to include "any individual, partnership, or other legal entity, and any . . .

23  group of individuals associated in fact although not a legal entity."

24      478.   Title 18, United States Code, section 1964(c), provides, in relevant part,

25  that "[a]ny person injured in his business or property be reason of a violation of

26  section 1962 of this chapter may sue thereafter . . . and shall recover threefold the

27  damages he sustains and the cost of the suit, including a reasonable attorney's

28  fee . . . ."

---

**THIRD AMENDED COMPLAINT**

**A.    The "Criminal Enterprise."**

479.   At all times relevant hereto, Mr. Freeney and Roof Group were each a "person" within the meaning of Title 18, United States Code, sections 1961(3) and 1964(c).

480.   At all times relevant hereto, BAC, BANA, MLPFS, GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida Law Firm were each a "person" within the meaning of Title 18, United States Code, section 1961(3).

481.   At all times relevant hereto, BAC, BANA, MLPFS, GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida Law Firm were a group of persons associated for the common purpose of devising, carrying out and aiding and abetting the scheme to defraud Mr. Freeney, and constituted an association-in-fact enterprise within the meaning of Title 18, United States Code, section 1961(4) (the "Criminal Enterprise").

482.   At all times relevant hereto, the Criminal Enterprise was engaged in, and its activities affected, interstate commerce in that, among other things, it was involved in acts, transactions and events occurring in, among other places, California, Florida and Indiana, and used the interstate brokerage, banking and other facilities of BAC, BANA, MLPFS and other financial institutions.

**B.    The Racketeering Acts.**

483.   Beginning in or about January 2010, BAC, BANA and MLPFS, together with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida Law Firm, being employed by or associated with the Criminal Enterprise, conducted and participated in the conduct of the affairs of the Criminal Enterprise, directly and indirectly, through the pattern of racketeering activity described below, in violation of Title 18, United States Code, section 1962(c).

484.   In committing the racketeering acts described below, BOCK, Weinberg, Liebman and Del Campo, among others, were acting in their capacities as employees, actual agents and/or ostensible agents of BAC, BANA and MLPFS, with the intent to

178

**THIRD AMENDED COMPLAINT**

188650.4

1  benefit BAC, BANA and MLPFS, in whole or in part, and by their acts and omissions

2  did benefit BAC, BANA and MLPFS substantially, as follows:

3        (a)    In recruiting Mr. Freeney, convincing him to become a client of

4  BofA/Merrill Lynch and obtaining his agreement to transfer management of his

5  finances, including his assets, investments and guaranteed income from his Colts

6  Contract, to the BOCK team, BofA/Merrill Lynch received, among other things:

7  (i) the immediate deposit and use of approximately $3.0 million in cash; (ii) the

8  control of assets and investments with liquidation values totaling more than $4.5

9  million; (iii) the prospect of managing and investing guaranteed income during the

10  next three years totaling in excess of $34 million; (iv) the ability to generate sizeable

11  commissions and fees from opening accounts, buying and selling securities, selling

12  insurance products, paying bills and providing wealth management services; (v) the

13  opportunity for additional profits from real estate and business loans, credit lines,

14  credit cards and other extensions of credit; and (vi) the prestige and marketing

15  opportunities, especially for BofA/Merrill Lynch's fledging Pro Sports &

16  Entertainment Division, of having as a client one of the highest paid, well regarded

17  and most accomplished defensive players in the NFL;

18        (b)    In executing hundreds of wire transfers from the BofA Roof Group

19  account between June 2010 and October 2011, selling $890,000 of securities in

20  June 2010, and liquidating various investments in the course of the scheme to defraud,

21  BofA/Merrill Lynch received substantial commissions and fees, the exact amount of

22  which Plaintiffs cannot quantify at this time because of BAC, BANA and MLPFS's

23  refusal to provide account records to which Mr. Freeney and Roof Group are entitled

24  as former BofA/Merrill Lynch clients and as discovery in this action; and

25        (c)    In concealing and covering up their participation and complicity in

26  the scheme to defraud, BAC, BANA and MLPFS have sought to evade their liability

27  to Plaintiffs from the negligent, intentionally wrongful and criminal acts and

28  omissions of their employees and agents, including BOCK, Sugarman, Weinberg,

1  Liebman and Del Campo, which could expose BAC, BANA and MLPFS to actual

2  damages in excess of $20 million and punitive damages significantly greater than that

3  amount, and to avoid regulatory scrutiny of their conduct and public disdain for their

4  treatment of a client like Mr. Freeney.

5    **1.    *Wire Fraud.***

6    485.   Beginning in or about January 2010, BAC, BANA and MLPFS, together

7  with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida

8  Law Firm, and each of them, knowingly and with  intent to defraud, devised,

9  participated in and executed a scheme and artifice to defraud Mr. Freeney and

10  Roof Group and to obtain money and property from them by means of false and

11  fraudulent pretenses, representations and promises and the concealment of material

12  facts, as described further in paragraphs 133 through 373 and 436, 440 and 444 of this

13  Third Amended Complaint.

14    486.   On or about the dates set forth below, for purposes of carrying out such

15  scheme or artifice, BAC, BANA and MLPFS, together with GWM, Stern, ARC,

16  Weinberg's brother, the Florida Attorney and the Florida Law Firm, caused the

17  following transmissions by wire or radio communication in interstate commerce,

18  among others, in violation of Title 18, United States Code, sections 1343 and 2:

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **1.A** | Feb. 8, 2010 | At Weinberg's request, Mr. Freeney's former financial manager, Vernon Brown, sends Weinberg Mr. Freeney's financial records. |
| **1.B** | Feb. 12, 2010 | Stern, posing as "David Michael Millar," sends text message from Florida to Mr. West in California stating that his email address is davidmichaelmillar@yahoo.com. |

**THIRD AMENDED COMPLAINT**

188650.4

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| **1.C** | Feb. 12, 2010 | Stern, posing as "David Michael Millar" and using the email address amsreachconsultingllc@yahoo.com, sends email from Florida to Mr. Freeney in Indiana encouraging him to increase his ownership interest in Roof Group and RSLA. |
| **1.D** | Feb. 17, 2010 | Weinberg sends Mr. Freeney an email in which she falsely represents that she is a "Senior Financial Advisor" with "Merrill Lynch Global Wealth Management." |
| **1.E** | May 12, 2010 | The Florida Attorney sends an email from Florida to Mr. Freeney in Indianapolis, copying Weinberg and "David Millar," attaching two invoices for the Florida Attorney's legal services and asking "Michael" to review and approve the invoices. |
| **1.F** | May 31, 2010 | Stern, posing as "David Millar" and using the email address amsreachconsultingllc@yahoo.com, sends email from Florida to CFP in Virginia demanding repayment of Mr. Freeney's loans to CFP. |
| **1.G** | Jul. 30, 2010 | Del Campo sends an email from Florida to BANA's Wealth Management Banking Support office in Arizona requesting that they remove the security hold on the BofA Roof Group account. |
| **1.H** | Aug. 2, 2010 | Weinberg sends an email from California to Del Campo in Florida asking her to ensure that wire transfers from the BofA Roof Group account are processed. |
| **1.I** | Aug. 25, 2010 | Stern, posing as "David Millar" and using the email address amsreachconsultingllc@yahoo.com, sends email from Florida to Mr. West in California requesting that Mr. West not sign the Term Sheet with the Felis and that Stern be allowed to continue negotiating with the Felis. |
| **1.J** | Sep. 21, 2010 | Citibank credits the deposit of Mr. Freeney's Colts paycheck for $300,633.78 in California to his account in Florida. |
| **1.K** | Oct. 7, 2010 | Citibank credits the deposit of Mr. Freeney's Colts paycheck for $562,657.61 in California to his account in Florida. |

**THIRD AMENDED COMPLAINT**

188650.4

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| 1.L | Oct. 21, 2010 | Citibank credits the deposit of Mr. Freeney's Colts paycheck for $598,311.70 in California to his account in Florida. |
| 1.M | Mar. 24, 2011 | Stern, posing as "David Millar" and using the email address amsreachconsultingllc@yahoo.com, sends email from California to the Florida Attorney in Florida, and to Mr. West providing a status report on his negotiations to purchase Donnelly's ownership interest in Roof Group on behalf of Mr. Freeney. |
| 1.N | Mar. 28, 2011 | Weinberg sends a fax from California to her tax accountant in New York with false financial information to use in preparing Mr. Freeney's 2010 income tax returns. |
| 1.O | Apr. 1, 2011 | Weinberg sends a fax from California to her tax accountant in New York with additional false financial information to use in preparing Mr. Freeney's 2010 income tax returns. |
| 1.P | Aug. 10, 2011 | Pursuant to Weinberg's instructions, Snap Advances wire transfers $300,000 advance from account in New York to Roof Group account at Wells Fargo Bank in California. |
| 1.Q | Sep. 19, 2011 | Weinberg sends a fax from California to Mr. Freeney in Indiana requesting Mr. Freeney's signature to approve second Snap Advances credit facility. |
| 1.R | Sep. 20, 2011 | Weinberg sends a fax from California to Snap Advances in New York with signed Continuing Payment Guarantee for Mr. Freeney to pay $222,000 to Snap Advances for $150,000 advance for RSLA. |
| 1.S | Sep. 20, 2011 | Pursuant to Weinberg's instructions, Snap Advances wire transfers $150,000 advance from account in New York to Roof Group account at Wells Fargo Bank in California. |
| 1.T | Oct. 12, 2011 | Citibank credits the deposit of Mr. Freeney's Colts paycheck for $392,916.06 in California to his account in Florida. |

**THIRD AMENDED COMPLAINT**

188650.4

| Racketeering Act | Date | Description of Wire Transmission |
|---|---|---|
| 1.U | Oct. 19, 2011 | Citibank credits the deposit of Mr. Freeney's Colts paycheck for $392,315.27 in California to his account in Florida. |
| 1.V | Nov. 18, 2010 | Weinberg sends Del Campo an email asking her to release a security hold on a $49,875 wire transfer from the BofA Roof Group account. |
| 1.W | Dec. 16, 2011 | Stern and Weinberg send an anonymous fax from California to Mr. Freeney in Indiana falsely claiming that Mr. Freeney had signed an "asset management contact" with GWM in June 2010. |
| 1.X | Jan. 17, 2012 | Weinberg sends an email from California to Mr. Freeney in Indiana with wiring instructions for final payment to Donnelly pursuant to Membership Interest Purchase and Sale Agreement. |
| 1.Y | Jan. 30, 2012 | Weinberg sends a fax from California to CFP in Virginia advising CFP that its final payment is due to Mr. Freeney and threatening legal action if payment is not made. |
| 1.Z | Mar. 2, 2012 | Weinberg sends an email from California to Mr. Freeney in Indiana confirming that all the CFP funds have been received. |

## 2.  *Mail Fraud.*

487.  Beginning in or about, January 2010, BAC, BANA and MLPFS, together with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida Law Firm, and each of them, knowingly and with intent to defraud, devised, participated in and executed a scheme or artifice to defraud Mr. Freeney and Roof Group and to obtain money and property from them by means of false and fraudulent pretenses, representations and promises and the concealment of material facts, as described further in paragraphs 133 through 373 and 436, 440 and 444 of this Third Amended Complaint.

488.  On or about the dates set forth below, for purposes of carrying out such scheme or artifice, BAC, BANA and MLPFS, together with GWM, Stern, ARC, Weinberg's brother, the Florida attorney and the Florida Law Firm caused the

following items, among others, to be sent and delivered through the U.S. mail, in violation of Title 18, United States Code, sections 1341 and 2:

| Racketeering Act | Date | Description of Mailing |
|---|---|---|
| **2.A** | Feb. 2010 | At Weinberg's request, V. Brown & Co. mails Mr. Freeney's books and records to BofA/Merrill Lynch. |
| **2.B** | Jun. 18, 2010 | At Weinberg's request, BANA mails signature cards for the BofA Roof Group account. |
| **2.C** | Jun. 23, 2010 | Weinberg mails application to first insurance company on behalf of Mr. Freeney for a $20 million life insurance policy. |
| **2.D** | Jul. 1, 2010 | Weinberg mails application to second insurance company on behalf of Mr. Freeney for a $15 million life insurance policy. |
| **2.E** | Jul. 1, 2010 | Weinberg mails application to third insurance company on behalf of Mr. Freeney for a $20 million life insurance policy. |
| **2.F** | Aug. 3, 2010 | GWM mails instructions to the Indianapolis Colts to send Mr. Freeney's paychecks to GWM's office in California. |
| **2.G** | Sep. 19, 2010 | Colts mail Mr. Freeney's paycheck in the amount of $226,902.58 to GWM in accordance with Weinberg's direction. |
| **2.H** | Sep. 26, 2010 | Colts mail Mr. Freeney's paycheck in the amount of $252,203.88 to GWM in accordance with Weinberg's direction. |
| **2.I** | Oct. 24, 2010 | Colts mail Mr. Freeney's paycheck in the amount of $302,951.09 to GWM in accordance with Weinberg's direction. |
| **2.J** | Nov. 7, 2010 | Colts mail Mr. Freeney's paycheck in the amount of $303,128.93 to GWM in accordance with Weinberg's direction. |
| **2.K** | Oct. 2, 2011 | Colts mail Mr. Freeney's paycheck in the amount of $398.449.20 to GWM in accordance with Weinberg's direction. |
| **2.L** | Oct. 9, 2011 | Colts mail Mr. Freeney's paycheck in the amount of $392,916.06 to GWM in accordance with Weinberg's direction. |

**THIRD AMENDED COMPLAINT**

188650.4

| Racketeering Act | Date | Description of Mailing |
|---|---|---|
| **2.M** | Feb. 8, 2012 | Colts mail Mr. Freeney's paycheck in the amount of $31,785 to GWM in accordance with Weinberg's direction (which is later found on Stern's person when he is arrested on March 23, 2012). |

### 3.   *Access Device Fraud.*

489.   As part of the scheme to defraud, and as described further in paragraphs 133 through 373 and 436 of this Third Amended Complaint:

(a)   In or about May 2010, Del Campo gave Weinberg confidential account access information for the BofA Roof Group account, even though Weinberg was not authorized to receive such information, was not a signatory on the account and was preparing to leave the bank and relocate to California with Stern.

(b)   Weinberg thereafter (while still employed by BofA/Merrill Lynch) gave Stern this confidential information, knowing and intending that he would use it to conduct fraudulent and unauthorized wire transfers from the BofA Roof Group account;

(c)   In or about June 2010, Weinberg (while still employed by BofA/Merrill Lynch) gave Stern confidential access account access information for the Citibank accounts, knowing and intending that he would use it to conduct fraudulent and unauthorized wire transfers from those accounts; and

490.   During the periods set forth below, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, knowingly, with intent to defraud and without authorization, used and caused the use of one or more access devices within the meaning of Title 18, United States Code, section 1029(e)(1) and (e)(3), including, without limitation, codes, account numbers, personal identification numbers and other means of account access, which conduct affected interstate commerce.

491.   By such conduct, Weinberg and Stern obtained something of value aggregating to $1,000 or more during a one-year period, in violation of Title 18, United States Code, sections 1029(a)(2) and 2, as described below:

188650.4

| Racketeering Act | Time Period | Unauthorized Access Device Use |
|---|---|---|
| **3.A** | Jun 29, 2010 – Jun. 28, 2011 | Stern accesses Mr. Freeney's Citibank account online using confidential account information provided by Weinberg (while employed by BofA/Merrill Lynch), and, without authorization, initiates 94 wire transfers totaling $8,458,295 to the BofA Roof Group account. |
| **3.B** | Jun 30, 2011 – Oct. 18, 2011 | Stern accesses Mr. Freeney's Citibank account online using confidential account information provided by  (while employed by BofA/Merrill Lynch), and, without authorization, initiates 29 wire transfers totaling $632,957 to the BofA Roof Group account. |
| **3.C** | Jun. 18, 2010 – Jun. 17, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 104 wire transfers totaling $1,935,851 to ARC. |
| **3.D** | Jun. 21, 2011 – Oct. 18, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 36 wire transfers totaling $299,287 to ARC. |
| **3.E** | May 28, 2010 – May 13, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 66 wire transfers totaling $4,873,203 purportedly to fund the build out of RSLA. |
| **3.F** | May 31, 2011 – Oct. 31, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 13 wire transfers totaling $161,437 purportedly to fund RSLA operating deficits. |

**THIRD AMENDED COMPLAINT**

188650.4

| Racketeering Act | Time Period | Unauthorized Access Device Use |
|---|---|---|
| **3.G** | Nov. 12, 2010 – Sep. 14, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates five wire transfers totaling $322,000 to GWM. |
| **3.H** | Jun. 18, 2010 – May 31, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 64 wire transfers totaling $677,743 to pay costs associated with the leasing and operation of the private jet. |
| **3.I** | Jun. 21, 2011 – Oct. 14, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates 14 wire transfers totaling $75,120 to pay costs associated with the leasing and operation of the private jet. |
| **3.J** | Jun. 21, 2010 – Jul. 2, 2010 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates two wire transfers totaling $15,000 to pay to charter a yacht. |
| **3.K** | Jun. 21, 2010 – Oct. 12, 2010 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates three wire transfers totaling $17,000 to pay his gambling debts. |
| **3.L** | Jan. 18, 2011 – Oct 3, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates seven wire transfers totaling $89,115 to pay rent on the Hancock Park house. |
| **3.M** | Aug. 18, 2010 – Jan. 20, 2011 | Stern accesses the BofA Roof Group account online using confidential account information provided by BANA, and, without authorization, initiates eight wire transfers totaling $55,810 to pay his business associates and personal expenses. |

**THIRD AMENDED COMPLAINT**

188650.4

**4.   Transactional Money Laundering**

492.   On or about the dates set forth below, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, knowingly engaged in, attempted to engage in and caused the following monetary transactions in criminally derived property, among others, of a value greater than $10,000, which property was derived from Specified Unlawful Activity as defined below and which monetary transactions were in or affected interstate commerce and were by, though, or to a financial institution, in violation of Title 18, United States Code, sections 1957 and 2, as described further in paragraphs 133 through 373 and 436 of this Third Amended Complaint.

493.   As used in this Third Amended Complaint, "Specified Unlawful Activity" means: mail fraud, in violation of Title 18, United States Code, section 1341; wire fraud, in violation of Title 18, United States Code, section 1343; interstate transportation of money obtained by fraud, in violation of Title 18, United States Code, section 2314; and bankruptcy fraud, in violation of Title 18, United States Code, section 152.

| Racketeering Act | Date | Description of Monetary Transaction |
| --- | --- | --- |
| **4.A** | Jun. 18, 2010 | BANA executes a wire transfer for $13,480 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |
| **4.B** | Jul. 13, 2010 | BANA executes a wire transfer for $250,000 in criminally derived property from Mr. Freeney's Citibank account to the BofA Roof Group account. |
| **4.C** | Jul. 16, 2010 | BANA executes a wire transfer for $15,470 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |

**THIRD AMENDED COMPLAINT**

188650.4

| Racketeering Act | Date | Description of Monetary Transaction |
|---|---|---|
| **4.D** | Aug. 10, 2010 | BANA executes a wire transfer for $247,162 in criminally derived property from the BofA Roof Group account to pay Brodin Design for build out of RSLA. |
| **4.E** | Aug. 19, 2010 | BANA executes a wire transfer for $21,520 in criminally derived property from the BofA Roof Group account to pay Dynamic Aviation for expenses related to the operation of the private jet. |
| **4.F** | Nov. 16, 2010 | BANA executes a wire transfer for $64,500 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |
| **4.G** | Nov. 18, 2010 | BANA executes a wire transfer for $76,540 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |
| **4.H** | Dec. 16, 2010 | BANA executes a wire transfer for $26,000 in criminally derived property from the BofA Roof Group account to pay Rennia for expenses related to the private jet. |
| **4.I** | Jan. 18, 2011 | BANA executes a wire transfer for $17,820 in criminally derived property from the BofA Roof Group account to pay rent on the Hancock Park house. |
| **4.J** | Feb. 1, 2011 | BANA executes a wire transfer for $26,000 in criminally derived property from the BofA Roof Group account to pay Rennia for expenses related to the private jet. |
| **4.K** | Feb. 28, 2011 | BANA executes a wire transfer for $353,374 in criminally derived property from the BofA Roof Group account to fund RSLA operating deficits. |
| **4.L** | May 31, 2011 | BANA executes a wire transfer for $45,260 in criminally derived property from the BofA Roof Group account to fund RSLA operating deficits. |

**THIRD AMENDED COMPLAINT**

188650.4

| Racketeering Act | Date | Description of Monetary Transaction |
|---|---|---|
| **4.M** | Oct. 14, 2011 | BANA executes a wire transfer for $15,000 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |
| **4.N** | Oct. 18, 2011 | BANA executes a wire transfer for $20,000 in criminally derived property from the BofA Roof Group account to the ARC account at Wells Fargo Bank. |

**5.   *Concealment Money Laundering.***

494.   On or about the dates set forth below, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, conducted, attempted to conduct and conspired to conduct the following financial transactions, among others, that affected interstate commerce or involved the use of a financial institution that was engaged in or the activities of which affected interstate commerce, in violation of Title 18, United States Code, section 1956(a)(1)(B), as described further in paragraphs 133 through 373 and 436 of this Third Amended Complaint.

495.   BAC, BANA, and MLPFS, together with GWM, Stern and ARC, and each of them, conducted, attempted to conduct and conspired to conduct these transactions knowing that they involved the proceeds of some form of unlawful activity constituting a felony under federal or state law, though not necessarily which form, and knowing that they were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of Specified Unlawful Activity, as described further below:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**THIRD AMENDED COMPLAINT**

188650.4

| Racketeering Act | Time Period | Financial Transactions | Concealment |
|---|---|---|---|
| **5.A** | Jun. 29, 2010 – Oct. 18, 2011 | Stern causes Citibank to execute 123 wire transfers totaling $9,143,870 from Mr. Freeney's Citibank accounts to the BofA Roof Group account. | Concealed and disguised Stern and ARC's ownership and control of misappropriated funds from Mr. Freeney, courts, trustees, creditors and other fraud victims. |
| **5.B** | Jun. 18, 2010 – Oct. 18, 2011 | BANA executes 140 wire transfer totaling $2,235,183 from BofA Roof Group account to ARC account at Wells Fargo Bank. | Concealed and disguised Stern and ARC's ownership and control of misappropriated funds from Mr. Freeney, courts, trustees, creditors and other fraud victims. |
| **5.C** | Nov. 12, 2010 – Sep. 14, 2011 | BANA executes five wire transfer totaling $322,000 from BofA Roof Group account to GWM at Wells Fargo Bank. | Concealed and disguised Weinberg and GWM's ownership and control of funds misappropriated from Mr. Freeney. |

### 6.   *Promotional Money Laundering.*

496.   On or about the dates set forth below, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, knowingly conducted, attempted to conduct and conspired to conduct the following financial transactions, among others, that affected interstate commerce or involved the use of a financial institution that was engaged in or the activities of which affected interstate commerce, in violation of Title 18, United States Code, section 1956(a)(1)(A), as described further in paragraphs 133 through 373 and 436 of this Third Amended Complaint.

497.   BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, conducted, attempted to conduct and conspired to conduct these transactions, knowing that the transactions involved the proceeds of some form of unlawful activity constituting a felony under federal or state law, though not

necessarily which form, and with the intent to promote the carrying on of Specified Unlawful Activity, as described further below:

| Racketeering Act | Time Period | Financial Transactions | Promotion |
|---|---|---|---|
| **6.A** | May 28, 2010 – Feb. 17, 2011 | BANA executes 33 wire transfers totaling $2,776,942 in proceeds of Specified Unlawful Activity from BofA Roof Group account to Brodin Design. | Created and maintained false appearance that Stern (posing as Millar) could be trusted to competently supervise RSLA build out and afforded Stern and Weinberg opportunity to misappropriate monies belonging to Mr. Freeney undetected. |
| **6.B** | May 31, 2010 – Oct. 31, 2011 | BANA executes 46 wire transfers totaling $1,480,227 in proceeds of Specified Unlawful Activity from BofA Roof Group account to pay for RSLA operations. | Created and maintained false appearance that Stern (posing as Millar) could be trusted to competently supervise RSLA build out and afforded Stern and Weinberg opportunity to misappropriate monies belonging to Mr. Freeney undetected. |
| **6.C** | Jul. 14, 2010 – Oct. 14, 2011 | BANA executes 16 wire transfers totaling $130,410 in proceeds of Specified Unlawful Activity from BofA Roof Group account to Dynamic Aviation to pay to lease and operate private jet. | Created and maintained false appearance that Stern (posing as Millar) owned a private jet, was a successful and wealthy businessman and was allowing Mr. Freeney to use the jet for only the cost of fuel. |

**THIRD AMENDED COMPLAINT**

188650.4

| Racketeering Act | Time Period | Financial Transactions | Promotion |
|---|---|---|---|
| **6.D** | Jun. 18, 2010 – Dec. 7, 2010 | BANA executes 60 wire transfers totaling $599,858 in proceeds of Specified Unlawful Activity from BofA Roof Group account to Rennia to pay to lease and for Rennia to pilot private jet. | Created and maintained false appearance that Stern (posing as Millar) owned a private jet, was a successful and wealthy businessman and was allowing Mr. Freeney to use the jet for only the cost of fuel. |
| **6.E** | Jun. 22, 2010 | BANA executes wire transfer for $16,475 in proceeds of Specified Unlawful Activity from BofA Roof Group account to Aviation Management to pay expenses associated with private jet. | Created and maintained false appearance that Stern (posing as Millar) owned a private jet, was a successful and wealthy businessman and was allowing Mr. Freeney to use the jet for only the cost of fuel. |
| **6.F** | Jul. 26, 2010 | BANA executes wire transfer for $6,120 in proceeds of Specified Unlawful Activity from BofA Roof Group account to JMI Aviation Inc. to pay expenses associated with private jet. | Created and maintained false appearance that Stern (posing as Millar) owned a private jet, was a successful and wealthy businessman and was allowing Mr. Freeney to use the jet for only the cost of fuel. |
| **6.G** | Jun. 21, 2010– Jul. 2, 2010 | BANA executes two wire transfers totaling $15,000 in proceeds of Specified Unlawful Activity from BofA Roof Group account to pay for chartered yacht. | Created and maintained false appearance that Stern (posing as Millar) owned a private yacht and was a successful and wealthy businessman. |

**THIRD AMENDED COMPLAINT**

188650.4

| Racketeering Act | Time Period | Financial Transactions | Promotion |
|---|---|---|---|
| **6.H** | Jan. 18, 2011– Oct 3, 2011 | BANA executes seven wire transfers totaling $89,115 in proceeds of Specified Unlawful Activity from BofA Roof Group account to pay rent on Hancock Park house. | Created and maintained false appearance that Weinberg was a successful financial manager and investment advisor and provided a base of operations for Stern and Weinberg to continue to carry out the scheme to defraud. |

### 7. *Obstruction of Justice.*

498.  Plaintiffs are informed and believe, and on that basis allege, that in or about December 2011, the FBI, USAO and a federal grand jury sitting in the Central District of California began a criminal investigation of the activities of Weinberg and others relating to the scheme to defraud Mr. Freeney (the "Criminal Investigation").

499.  On or about March 22, 2012, the United States filed a Criminal Complaint against Weinberg and Stern in the Central District of California, in the case entitled, *United States v. Eva D. Weinberg and Michael A. Stern*, Case No. 12-0694M, charging them with wire fraud.

500.  On or about March 23, 2012, the FBI arrested Weinberg and Stern on the charges in the Criminal Complaint.

501.  On or about May 25, 2012, a grand jury in the Central District of California returned an Indictment against Stern in the case entitled, *United States v. Michael A. Stern*, Case No. 12-508(A)-SVW, charging Stern with wire fraud and obstruction of justice.

502.  On or about August 31, 2012, a grand jury in the Central District of California returned a First Superseding Indictment in the criminal case against Stern, charging him with wire fraud, access device fraud, transactional money laundering and obstruction of justice.

503.  On or about the dates set forth below, BAC, BANA and MLPFS,

**THIRD AMENDED COMPLAINT**

188650.4

together with GWM, Stern and ARC, and each of them, knowingly and corruptly engaged in and aided and abetted the following endeavors to obstruct, impede and influence the due administration of justice in the Criminal Investigation and the criminal cases against Weinberg and Stern, in violation of Title 18, United States Code, sections 1503 and 2, as described below:

| Racketeering Act | Date | Description of Obstruction of Justice |
|---|---|---|
| 7.A | Dec. 16, 2011 | Weinberg and Stern send an anonymous fax to Mr. Freeney's home, in which they falsely claim that Mr. Freeney had signed an "asset management contact" in June 2010. |
| 7.B | Dec. 2011 | Weinberg and Stern pay an accountant to prepare phony GWM account statements that Weinberg can show Mr. Freeney. |
| 7.C | Dec. 2011 – Mar. 2012 | Stern and Weinberg create the Fabricated Engagement Letter and fraudulently backdate it to June 11, 2010. |
| 7.D | Mar. 2012 – Aug. 2012 | Plaintiffs are informed and believe, and on that basis allege, that BAC, BANA and MLPFS withhold documents required to be produced by a grand jury subpoena. |
| 7.E | Mar. 20 & 21, 2012 | Stern arranges for the CI to fly from Miami to Los Angeles to destroy the hard drive of a computer and documents containing evidence incriminating of Stern and Weinberg. |
| 7.F | Mar. 22, 2012 | Stern places "paperwork" in the ceiling trusses of a house that he was renovating, including forged and fabricated wire transfer authorizations, and instructs his associate to cover them with drywall as soon as possible. |
| 7.G | Mar. 23, 2012 | Weinberg makes false and misleading statements to the FBI and USAO. |
| 7.H | May 15, 2012 | Stern sends a letter, while detained at the Metropolitan Detention Center in Los Angeles, to Weinberg, suggesting a false exculpatory story for her to tell the prosecutor when she is next interviewed by the FBI and USAO. |

**THIRD AMENDED COMPLAINT**

188650.4

| Racketeering Act | Date | Description of Obstruction of Justice |
|---|---|---|
| 7.I | May 17, 2012 | Weinberg makes false and misleading statements to the FBI and USAO. |

## C. Injury to Business and Property.

504.   By reason of the foregoing violations of Title 18, United States Code, section 1962(c), Mr. Freeney and Roof Group have been injured in their business and property in an amount to be determined at trial, but estimated to be in excess of $20 million, as described further in paragraphs 133 through 373 and 436 and 437 of this Third Amended Complaint.

**SIXTH CAUSE OF ACTION**

**(For Civil RICO Conspiracy in Violation of**

**Title 18, United States Code, Sections 1962(d) and 1964(c))**

**(By Plaintiffs Freeney and Roof Group**

**Against Defendants BAC, BANA and MLPFS)**

505.   Plaintiffs repeat and reallege paragraphs 1 through 504 of this Third Amended Complaint as if fully alleged herein.

506.   Title 18, United States Code, section 1962(d) provides, in relevant part, that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections . . . (b) or (c) of this section [1962]."

507.   In committing the racketeering acts described in the Fifth Cause of Action, BOCK, Weinberg, Liebman and Del Campo, among others, were acting in their capacities as employees, actual agents and/or ostensible agents of BAC, BANA and MLPFS, with the intent to benefit BAC, BANA and MLPFS, in whole or in part, and by their acts and omissions did benefit BAC, BANA and MLPFS substantially, as described in paragraph 484, above.

508.   Beginning in or about January 2010, BAC, BANA and MLPFS, together with GWM, Stern, ARC, Weinberg's brother, the Florida Attorney and the Florida Law Firm, and each of them, knowingly and willfully conspired and agreed to:

**THIRD AMENDED COMPLAINT**

188650.4

1    (a) Violate Title 18, United States Code, section 1962(c), by

2 conducting the affairs and participating in the conduct of the affairs of the Criminal

3 Enterprise, directly and indirectly, through the pattern of racketeering activity

4 described in the Fifth Cause of Action, in violation of Title 18, United States Code,

5 section 1962(d); and/or

6    (b) Commit two or more of the racketeering acts described in the

7 Fifth Cause of Action, knowing of the essential nature and scope of the Criminal

8 Enterprise and intending to participate in it.

9  509. By reason of the foregoing violations of Title 18, United States Code,

10 section 1962(d), Mr. Freeney and Roof Group have been injured in their business and

11 property in an amount to be determined at trial, but estimated to be in excess of $20

12 million, as described further in paragraphs 133 through 373 and 436 and 437 of this

13 Third Amended Complaint.

**SEVENTH CAUSE OF ACTION**

**(For Civil RICO in Violation of**

**Title 18, United States Code, Sections 1962(b) and 1964(c))**

**(By Plaintiffs Freeney and Roof Group**

**Against Defendants BAC, BANA and MLPFS)**

19  510. Plaintiffs repeat and reallege paragraphs 1 through 509 of this

20 Third Amended Complaint as if fully alleged herein.

21  511. Title 18, United States Code, section 1962(b) provides, in relevant part,

22 that "[i]t shall be unlawful for any person through a pattern of racketeering activity . . .

23 to acquire or maintain, directly or indirectly, any interest in or control of any

24 enterprise . . . ."

**A. The "Victim Enterprise."**

26  512. At all relevant times, Mr. Freeney, in his capacity as a professional

27 athlete, and Roof Group, as the owner and operator of RSLA, were a group of persons

28 associated together for the common purpose of generating legitimate income, revenue

**THIRD AMENDED COMPLAINT**

1  and profits, and constituted an association-in-fact enterprise within the meaning of

2  Title 18, United States Code, section 1961(4) (the "Victim Enterprise").

3      513.   At all relevant times, the Victim Enterprise was engaged in, and its

4  activities affected, interstate commerce and described in the First Cause of Action.

5  **B.**     **The Racketeering Acts.**

6      514.   In committing the racketeering acts described in the Fifth Cause of

7  Action, BOCK, Weinberg, Liebman and Del Campo, among others, were acting in

8  their capacities as employees, actual agents and/or ostensible agents of BAC, BANA

9  and MLPFS, with the intent to benefit BAC, BANA and MLPFS, in whole or in part,

10  and by their acts and omissions did benefit BAC, BANA and MLPFS substantially, as

11  described in paragraph 484, above.

12      515.   Beginning in or about January 2010, BAC, BANA and MLPFS, together

13  with GWM, Stern and ARC, and each of them, acquired and maintained, directly and

14  indirectly, an interest in and/or control of the Victim Enterprise through the pattern of

15  racketeering activity described in the Fifth Cause of Action, in violation of Title 18,

16  United States Code, section 1962(b).  That racketeering activity included the above

17  described acts of wire fraud, mail fraud, access device fraud, transactional money

18  laundering, concealment money laundering and promotional money laundering.

19  **C.**     **Injury to Business and Property.**

20      516.   By reason of the foregoing violations of Title 18, United States Code,

21  section 1962(b), Mr. Freeney and Roof Group have been injured in their business and

22  property in an amount to be determined at trial, but estimated to be in excess of $20

23  million, as described further in paragraphs 133 through 373 and 436 and 437 of this

24  Third Amended Complaint.

25  / / /

26  / / /

27  / / /

28

**THIRD AMENDED COMPLAINT**

188650.4

**EIGHTH CAUSE OF ACTION**

**(For Civil RICO in Violation of**

**Title 18, United States Code, Sections 1962(c) and 1964(c))**

**(By Plaintiffs Freeney and Roof Group**

**Against Defendants BAC, BANA and MLPFS)**

517.   Plaintiffs repeat and reallege paragraphs 1 through 516 of this Third Amended Complaint as if fully alleged herein.

518.   In committing the racketeering acts described in the Fifth Cause of Action, BOCK, Weinberg, Liebman and Del Campo, among others, were acting in their capacities as employees, actual agents and/or ostensible agents of BAC, BANA and MLPFS, with the intent to benefit BAC, BANA and MLPFS, in whole or in part, and by their acts and omissions did benefit BAC, BANA and MLPFS substantially, as described in paragraph 484, above.

519.   Beginning in or about January 2010, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, being associated with the Victim Enterprise, conducted and participated in the conduct of the affairs of the Victim Enterprise, directly and indirectly, through the pattern of racketeering activity described in the Fifth Cause of Action, in violation of Title 18, United States Code, section 1962(c).

520.   By reason of the foregoing violation of Title 18, United States Code, section 1962(c), Mr. Freeney and Roof Group have been injured in their business and property in an amount to be determined at trial, but estimated to be in excess of $20 million, as described further in paragraphs 133 through 373 and 436 and 437 of this Third Amended Complaint.

/ / /

/ / /

/ / /

**THIRD AMENDED COMPLAINT**

188650.4

**NINTH CAUSE OF ACTION**

**(For Civil RICO Conspiracy in Violation of**

**Title 18, United States Code, Sections 1962(d) and 1964(c))**

**(By Plaintiffs Freeney and Roof Group**

**Against Defendants BAC, BANA and MLPFS)**

521.   Plaintiffs repeat and reallege paragraphs 1 through 520 of this Third Amended Complaint as if fully alleged herein.

522.   In committing the racketeering acts described in the Third Cause of Action, BOCK, Weinberg, Liebman and Del Campo, among others, were acting in their capacities as employees, actual agents and/or ostensible agents of BAC, BANA and MLPFS, with the intent to benefit BAC, BANA and MLPFS, in whole or in part, and by their acts and omissions did benefit BAC, BANA and MLPFS substantially, as described in paragraph 484, above.

523.   Beginning in or about January 2010, BAC, BANA and MLPFS, together with GWM, Stern and ARC, and each of them, knowingly and willfully conspired and agreed to:

(a)   Violate Title 18, United States Code, section 1962(b), by acquiring and maintaining, directly and indirectly, an interest in or control of the Victim Enterprise through the pattern of racketeering activity described in the Fifth Cause of Action;

(b)   Violate Title 18, United States Code, section 1962(c), by being employed by or associated with the Victim Enterprise, and conducting and participating in the conduct of the affairs of the Victim Enterprise, directly and indirectly, through the pattern of racketeering activity described in the Fifth Cause of Action; and/or

(c)   Commit two or more of the racketeering acts of wire fraud, mail fraud, access device fraud, transactional money laundering, concealment money laundering and promotional money laundering as described in the Fifth Cause of

**THIRD AMENDED COMPLAINT**

1   Action, knowing of the essential nature and scope of the Victim Enterprise and

2   intending to participate in it.

3        524.   By reason of the foregoing violations of Title 18, United States Code,

4   section 1962(d), Mr. Freeney and Roof Group have been injured in their business and

5   property in an amount to be determined at trial, but estimated to be in excess of $20

6   million, as described further in paragraphs 133 through 373 and 436 and 437 of this

7   Third Amended Complaint.

8                          **TENTH CAUSE OF ACTION**

9                        **(For Breach of Fiduciary Duty)**

10   **(By Plaintiff Freeney Against Defendants BAC, BANA, MLPFS and BOCK)**

11        525.   Plaintiffs repeat and reallege paragraphs 1 through 524 of this

12   Third Amended Complaint as if fully alleged herein.

13        526.   During the times relevant hereto, BAC, BANA, MLPFS and BOCK, and

14   each of them, owed Mr. Freeney fiduciary duties, including: (a) the duty of undivided

15   loyalty; (b) the duty to exercise due care; (c) the duty to make full disclosure; and

16   (d) the duty to maintain client confidences.

17        527.   Beginning in or about January 2010, BAC, BANA, MLPFS and BOCK,

18   and each of them, breached their fiduciary duties to Mr. Freeney by, among other

19   things:

20            (a)   Making false and misleading representations and false promises, as

21   described further in paragraph 440 of this Third Amended Complaint;

22            (b)   Concealing, withholding and failing to disclose material facts, as

23   described further in paragraph 443 of this Third Amended Complaint;

24            (c)   Introducing Mr. Freeney, who had virtually no first-hand business

25   or investment experience, to Stern (posing as Millar), knowing that Stern was a

26   bankrupt and desperate financial predator who was on the prowl for new victims;

27            (d)   Placing Weinberg in charge of managing Mr. Freeney's assets,

28   investments, income and financial affairs, including his cash savings, business

201

**THIRD AMENDED COMPLAINT**

ventures and guaranteed income under his Colts contract, knowing that she was not licensed to give investment advice and lacked the skills, learning, expertise and experience necessary to perform such services competently;

(e)     Improperly delegating their duties and responsibilities as Mr. Freeney's bankers, brokers, financial managers and investment advisors to Stern, who was not licensed or otherwise qualified to perform any of these functions;

(f)     Authorizing and permitting Weinberg to transfer funds from one of Mr. Freeney's brokerage accounts to the ARC Wells Fargo account without Mr. Freeney's authorization or knowledge;

(g)     Purchasing securities using approximately $890,000 of Mr. Freeney's funds without his authorization or knowledge;

(h)     Selling those securities a short time later, also without Mr. Freeney's authorization or knowledge, and incurring substantial losses from those sales without advising Mr. Freeney;

(i)     Opening the BofA Roof Group account without required documentation, appropriate authorization, or sufficient due diligence, and allowing the account to remain open notwithstanding expressions of concern by BANA employees that the documentation for the account was deficient;

(j)     Disclosing Mr. Freeney's private and confidential personal and financial information and records to Stern, including Mr. Freeney's social security number, date of birth, home address, credit card numbers, tax returns, Colts contract and account and credit card information;

(k)     Disclosing to Stern confidential account access information for Mr. Freeney's Citibank accounts and the BofA Roof Group account;

(l)     Executing hundreds of highly suspicious wire transfers from the BofA Roof Group account, all originating on-line, without investigating or filing Suspicious Activity Reports, which allowed Weinberg and Stern to misappropriate and launder millions of dollars of misappropriated funds over a 16-month period;

**THIRD AMENDED COMPLAINT**

188650.4

(m)   Referring Mr. Freeney to the Florida Attorney to assist in negotiating and documenting the buy outs of Altounian and Donnelly without first (or ever) disclosing the Florida Attorney's actual conflicts of interest in representing Mr. Freeney and Roof Group based on the Florida Attorney's past and current representations of Stern and Weinberg and the fact that he and the Florida Law Firm were listed as creditors in Stern's bankruptcies in the amount of $100,000;

(n)   Convincing Mr. Freeney to liquidate the Pacific Life annuity, which had a cash value of approximately $1.5 million, at a cost to him of approximately $50,000, for the sole or primary purpose of freeing up additional funds for Weinberg and Stern to misappropriate;

(o)   Convincing Mr. Freeney to authorize Stern (posing as Millar) to negotiate the return of Mr. Freeney's $1.5 million investment in Success Trade, for the sole or primary purpose of freeing up additional funds for Weinberg and Stern to misappropriate;

(p)   Convincing Mr. Freeney to authorize Stern (posing as Millar) to negotiate the return of Mr. Freeney's $1.75 million investment in CFP, for the sole or primary purpose of freeing up additional funds for Weinberg and Stern to misappropriate;

(q)   Failing to pay the quarterly HOA dues on the North Carolina Land Investment, as a result of which the HOA foreclosed on the property and Mr. Freeney was required to retain North Carolina counsel to unwind the foreclosure;

(r)   Keeping Weinberg's resignation secret from Mr. Freeney; and

(s)   Following Weinberg's resignation, making no effort to transition Mr. Freeney to a qualified investment advisor; ensure that his funds were safe; protect and secure his private and confidential personal and financial information and records; or make sure that his financial management needs were being met.

528.   As a direct and proximate result of these breaches of fiduciary duty, Mr. Freeney was damaged in an amount to be determined at trial, but which is

**THIRD AMENDED COMPLAINT**

188650.4

1   estimated to be in excess of $20 million.

2      529.   In committing these breaches of fiduciary duty, BAC, BANA, MLPFS

3   and BOCK acted fraudulently, oppressively, maliciously and with a willful and

4   conscious disregard of Mr. Freeney's rights.  Accordingly, Mr. Freeney is entitled to

5   exemplary and punitive damages pursuant to California Civil Code section 3294.

**ELEVENTH CAUSE OF ACTION**

**(For Aiding and Abetting Breach of Fiduciary Duty by Weinberg)**

**(By Plaintiffs Freeney and Roof Group Against**

**Defendants BAC, BANA, MLPFS and BOCK)**

10      530.   Plaintiffs repeat and reallege paragraphs 1 through 529 of this

11   Third Amended Complaint as if fully alleged herein.

12      531.   At all times relevant hereto, Mr. Freeney and Roof Group reposed their

13   trust and confidence in Weinberg, and Weinberg encouraged, accepted and voluntarily

14   assumed such trust and confidence, as a result of which she owed Mr. Freeney and

15   Roof Group certain fiduciary duties, including: (a) the duty of undivided loyalty;

16   (b) the duty to exercise due care; (c) the duty to make full disclosure; and (d) the duty

17   to maintain client confidences.

18      532.   Beginning in or about January 2010, Weinberg breached these fiduciary

19   duties, as described further in paragraphs 133 through 373 of this Third Amended

20   Complaint.

21      533.   If, or to the extent, Weinberg was not acting as an actual and/or

22   ostensible agent of BAC, BANA, or MLPFS prior to or following her resignation

23   from BofA/Merrill Lynch (effective July 3, 2010), BAC, BANA, MLPFS and BOCK,

24   and each of them, aided and abetted her breach of her fiduciary duties to Mr. Freeney

25   and Roof Group by knowingly:

26         (a)   Giving her substantial assistance and encouragement, knowing that

27   her conduct constituted breaches of her fiduciary duties to Mr. Freeney and

28   Roof Group; and

204

**THIRD AMENDED COMPLAINT**

(b)     Giving her substantial assistance in breaching her fiduciary duties to Mr. Freeney and Roof Group, which conduct itself constituted breaches of BAC, BANA, MLPFS and BOCK's legal duties to Mr. Freeney and Roof Group not to deceive, defraud, or deal unfairly with them.

534.    Such substantial assistance and encouragement included, among other things:

(1)     Introducing Weinberg to Mr. Freeney and having her supplant Sugarman as Mr. Freeney's principal contact with BofA/Merrill Lynch;

(2)     Falsely vouching for Weinberg's qualifications, expertise, experience and competence;

(3)     Concealing that Weinberg was not a registered investment advisor and therefore could not lawfully give investment advice to Mr. Freeney;

(4)     Authorizing and permitting Weinberg to use various false titles, including "Senior Financial Advisor" for "Merrill Lynch Global Wealth Management," "Vice President of Private Wealth Management at Merrill Lynch," "Financial Consultant," for "Merrill Lynch Wealth Management" and "Senior Vice President" with "Global Wealth Management";

(5)     Appointing Weinberg to serve as Mr. Freeney's private banker, financial manager and investment advisor when she was not licensed, qualified, or competent to perform such functions;

(6)     Concealing her relationship to BOCK;

(7)     Concealing her relationship to Stern;

(8)     Authorizing and permitting her to refer Mr. Freeney to Stern (posing as Millar), purportedly for consulting services;

(9)     Concealing Stern's true identity, background, financial condition, legal problems and criminal past;

(10)    Concealing Weinberg's prior involvement in Stern's criminal schemes;

(11)    Concealing that ARC was a sham entity of Stern's recent creation;

**THIRD AMENDED COMPLAINT**

188650.4

(12)   Allowing her to sell life insurance to Mr. Freeney without an insurance producer's license;

(13)   Concealing that she had no qualifications, expertise, or experience in operating a restaurant;

(14)   Authorizing and permitting her to serve as the de facto CFO of RSLA while employed by BofA/Merrill Lynch;

(15)   Authorizing and permitting her to transfer funds from Mr. Freeney's brokerage accounts without his express authorization;

(16)   Giving her unfettered access to Mr. Freeney's private and confidential personal, financial and medical information and records;

(17)   Opening the BofA Roof Group account at her request;

(18)   Opening the BofA Roof Group account, and allowing it to remain open, without the required documentation, appropriate authorization, or sufficient due diligence;

(19)   Opening the BofA Roof Group account, and allowing it to remain open, even though Mr. Freeney lacked the necessary corporate authority to open it;

(20)   Allowing the BofA Roof Group account to remain open notwithstanding concerns expressed by BANA employees that the documentation for the account was deficient;

(21)   Giving her the confidential account access information for the BofA Roof Group account;

(22)   Allowing the account to remain open, and not changing the pass code, after her resigned from the bank and relocated to California with Stern;

(23)   Repeatedly overriding the account's security features at Weinberg's request, even after she had left the bank;

(24)   Executing hundreds of highly suspicious wire transfers from the BofA Roof Group account, all originating online, without investigating them and without ever filing a Suspicious Activity Report or notifying federal authorities, as required by

**THIRD AMENDED COMPLAINT**

law;

(25)    Liquidating Mr. Freeney's existing investments to generate additional funds to misappropriate;

(26)    Selling the securities BOCK had previously purchased without Mr. Freeney's authorization or knowledge to generate additional funds to misappropriate;

(27)    Concealing Weinberg's resignation from Mr. Freeney;

(28)    Encouraging and allowing her to take Mr. Freeney with her as a client upon resigning her position at the bank;

(29)    Authorizing and permitting her to continue to serve as Mr. Freeney's principal contact with BofA/Merrill Lynch and as his private banker, financial manager and investment advisor after departing the bank;

(30)    Authorizing and permitting her to create a company, GWM, with a name confusingly similar to that of GWIM and MLGWM; and

(31)    Allowing her to take with her, upon leaving the bank, all of Mr. Freeney's private and confidential personal, financial and medical records that he had entrusted to the care of BofA/Merrill Lynch.

535.    As a direct and proximate result of BAC, BANA, MLPFS and BOCK aiding and abetting these breaches of fiduciary duty, Mr. Freeney and Roof Group were damaged in an amount to be determined at trial, but which is estimated to be in excess of $20 million.

536.    In aiding and abetting these breaches of fiduciary duty, BAC, BANA, MLPFS and BOCK acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

/ / /

/ / /

**THIRD AMENDED COMPLAINT**

188650.4

**TWELFTH CAUSE OF ACTION**

**(For Aiding and Abetting Breach of Fiduciary Duty by Stern)**

**(By Plaintiffs Freeney and Roof Group Against**

**Defendants BAC, BANA and MLPFS)**

537.   Plaintiffs repeat and reallege paragraphs 1 through 536 of this Third Amended Complaint as if fully alleged herein.

538.   At all times relevant hereto, Mr. Freeney and Roof Group reposed their trust and confidence in Stern (posing as Millar), and Stern encouraged, accepted and voluntarily assumed such trust and confidence, as a result of which he owed Mr. Freeney and Roof Group certain fiduciary duties, including: (a) the duty of undivided loyalty; (b) the duty to exercise due care; (c) the duty to make full disclosure; and (d) the duty to maintain client confidences.

539.   Beginning in or about February 2010, Stern breached these fiduciary duties, as described further in paragraphs 133 through 373 of this Third Amended Complaint.

540.   Beginning in or about February 2010, BAC, BANA and MLPFS, and each of them, aided and abetted Stern in breaching his fiduciary duties to Mr. Freeney and Roof Group by knowingly:

(a)   Giving him substantial assistance and encouragement, knowing that his conduct constituted a breach of his fiduciary duties to Mr. Freeney and Roof Group; and

(b)   Giving him substantial assistance in breaching his fiduciary duties to Mr. Freeney and Roof Group, which conduct itself constituted breaches of BAC, BANA and MLPFS' legal duties to Mr. Freeney and Roof Group not to deceive, defraud, or deal unfairly with them.

541.   Such assistance and encouragement included, among other things:

(1)   Referring Stern to Mr. Freeney as a consultant and potential investor in Mr. Freeney's business ventures;

**THIRD AMENDED COMPLAINT**

188650.4

(2)     Introducing Stern to Mr. Freeney and his friends and associates under the false names "Michael Millar," "David Millar" and "David Michael Millar";

(3)     Falsely representing that Stern was a wealthy and successful Miami Beach businessman;

(4)     Falsely representing that Stern was the grandson of pharmaceutical mogul Dr. Phillip Frost;

(5)     Falsely representing that Stern was a consultant for BofA/Merrill Lynch;

(6)     Falsely representing that Stern had $30 million on deposit at BofA/Merrill Lynch;

(7)     Falsely representing that Stern owned a private jet and a private yacht;

(8)     Falsely representing that Stern lived in the Bahamas;

(9)     Falsely representing that Stern intended to invest $7.0 million in Roof Group;

(10)    Falsely representing that Stern had the experience to oversee the build out of RSLA;

(11)    Concealing Stern's relationship with Weinberg;

(12)    Concealing that Stern had borrowed substantial sums from BOCK, Weinberg and Weinberg's family and not repaid most of those loans;

(13)    Concealing that all of Stern's real estate assets were in bankruptcy, receivership, foreclosure, or over-encumbered;

(14)    Concealing that Stern and his wife had declared personal bankruptcy with reported debts of $65 million and assets having a negative value;

(15)    Concealing that BOCK was a creditor in one of Stern's bankruptcies in the amount of $500,000;

(16)    Concealing that Stern had substantial gambling debts;

(17)    Concealing that Stern had not paid his income taxes in many years;

(18)    Concealing Stern's many legal problems, including that he was a defendant in more than 20 civil lawsuits brought against him by defrauded partners,

**THIRD AMENDED COMPLAINT**

188650.4

1   investors and banks, that a writ for his arrest had issued in one of those actions, and

2   that he had been held in contempt in the bankruptcy proceedings;

3   (19)   Concealing that Stern had a long history of criminal conduct that

4   included bribery of public officials, forgery, theft of loan proceeds, passing worthless

5   checks and witness tampering;

6   (20)   Paying to incorporate ARC;

7   (21)   Concealing that ARC was a sham company that was formed just shortly

8   after Stern had been introduced to Mr. Freeney;

9   (22)   Improperly delegating responsibility to Stern for negotiating the return of

10   Mr. Freeney's deposit with the W Hotel, disposal of the North Carolina Land

11   Investment, return of Mr. Freeney's investments in Success Trade and CFP, and the

12   purchases of Altounian and Donnelly's interests in Roof Group;

13   (23)   Transferring more than $160,000 from one of Mr. Freeney's brokerage

14   accounts to ARC without Mr. Freeney's authorization or knowledge;

15   (24)   Falsely representing that Stern would obtain the liquor license for RSLA;

16   (25)   Falsely representing that Stern would negotiate with CIM for better lease

17   terms and a lower rent;

18   (26)   Giving Stern access to Mr. Freeney's private and confidential personal

19   and financial information and records;

20   (27)   Opening the BofA Roof Group account under false pretenses;

21   (28)   Giving Stern the confidential account access information for the

22   BofA Roof Group account;

23   (29)   Executing hundreds of suspicious wire transfers from this account that

24   Stern had originated online;

25   (30)   Repeatedly overriding the account's security features to permit Stern to

26   make these wire transfers;

27   (31)   Not investigating highly suspicious transactions in the BofA Roof Group

28   account and not filing Suspicious Activity Reports or notifying the federal authorities

**THIRD AMENDED COMPLAINT**

of these transactions, in violation of the Bank Secrecy Act;

(32)   Allowing the BofA Roof Group account to remain open despite concerns expressed by BANA employees that the account documentation was deficient;

(33)   Assisting in the liquidation of Mr. Freeney's existing investments to generate additional funds to misappropriate; and

(34)   Selling the securities that BOCK had purchased without Mr. Freeney's authorization or knowledge a few weeks earlier, at a significant loss to Mr. Freeney, to generate additional funds to misappropriate.

542.   As a direct and proximate result of BAC, BANA and MLPFS aiding and abetting these breaches of fiduciary duty, Mr. Freeney and Roof Group were damaged in an amount to be determined at trial, but estimated to be in excess of $20 million.

543.   In aiding and abetting these breaches of fiduciary duty, BAC, BANA and MLPFS acted fraudulently, oppressively, maliciously and with a willful and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to exemplary and punitive damages pursuant to California Civil Code section 3294.

## THIRTEENTH CAUSE OF ACTION
### (For Negligent Misrepresentation)
### (By Plaintiffs Freeney and Roof Group
### Against Defendants BAC, BANA and MLPFS)

544.   Plaintiffs repeat and reallege paragraphs 1 through 543 of this Third Amended Complaint as if fully alleged herein.

545.   Beginning in or about January 2010, BAC, BANA and MLPFS, and each of them, made and caused others to make the following false representations concerning important facts, intending that Mr. Freeney and Roof Group would rely upon those representations, but without reasonable grounds for believing the representations to be true:

(a)   Stern's name was "Michael Millar," "David Millar," or "David Michael Millar";

**THIRD AMENDED COMPLAINT**

1         (b)    Stern was a wealthy and successful real estate developer and

2    businessman;

3         (c)    Stern owned a private jet;

4         (d)    Stern owned a private yacht;

5         (e)    Stern was a consultant for BofA;

6         (f)    Stern had $30 million on deposit at BofA;

7         (g)    Stern was the grandson of pharmaceutical mogul Dr. Phillip Frost,

8    the Chairman of Teva Pharmaceuticals; and

9         (h)    Stern had the financial wherewithal to invest $7.0 million in

10   RSLA.

11       546.   Mr. Freeney and Roof Group reasonably relied upon these false

12   representations.

13       547.   As a direct and proximate result of these false representations,

14   Mr. Freeney and Roof Group were damaged in an amount to be determined at trial, but

15   which is estimated to be in excess of $20 million.

16   **FOURTEENTH CAUSE OF ACTION**

17   **(For Professional Negligence)**

18   **(By Plaintiffs Freeney and Roof Group Against**

19   **Defendants BAC, BANA, MLPFS and BOCK)**

20       548.   Plaintiffs repeat and reallege paragraphs 1 through 547 of this

21   Third Amended Complaint as if fully alleged herein.

22       549.   At all times relevant hereto, BAC, BANA, MLPFS and BOCK, and each

23   of them, owed Mr. Freeney a duty to use such skills, learning, prudence and diligence

24   as a reasonable professional would use under like circumstances (the "duty of due

25   care").

26       550.   Beginning in or about January 2010, BAC, BANA, MLPFS and BOCK,

27   and each of them, breached this duty of due care to Mr. Freeney by, among other

28   things:

**THIRD AMENDED COMPLAINT**

1     (1)    Appointing Weinberg as Mr. Freeney's principal contact with

2 BofA/Merrill Lynch, and authorizing and permitting her to serve as his private banker,

3 financial manager and investment advisor;

4     (2)    Authorizing and permitting Weinberg to falsely represent herself as a

5 "Senior Financial Advisor" for "Merrill Lynch Global Wealth Management," a "Vice

6 President of Private Wealth Management at Merrill Lynch," a "Financial Consultant"

7 for "Merrill Lynch Wealth Management," and a "Senior Vice President" with "Global

8 Wealth Management";

9     (3)    Referring Mr. Freeney to Stern (posing as Michael Millar) for consulting

10 services and as a potential investor in Mr. Freeney's business ventures;

11     (4)    Referring Mr. Freeney to Weinberg's brother for insurance services;

12     (5)    Referring Mr. Freeney to the Florida Attorney for legal services;

13     (6)    Failing to protect and maintain the privacy and confidentiality of

14 Mr. Freeney's personal, identifying, financial and medical information and records;

15     (7)    Authorizing and permitting Weinberg to transfer funds from one of

16 Mr. Freeney's brokerage accounts without his authorization or knowledge;

17     (8)    Authorizing and permitting Weinberg to transfer over $160,000 from one

18 of Mr. Feeney's brokerage accounts to ARC;

19     (9)    Authorizing and permitting BOCK to purchase securities with

20 approximately $890,000 of Mr. Freeney's funds, without Mr. Freeney's authorization

21 or knowledge, and to sell those securities at a substantial loss to Mr. Freeney a short

22 time later, also without his authorization or knowledge;

23     (10)    Convincing Mr. Freeney to purchase $55 million in unsuitable and

24 worthless life insurance;

25     (11)    Convincing Mr. Freeney to increase his ownership interest in Roof Group

26 to 51 percent by doubling his investment in RSLA;

27     (12)    Convincing Mr. Freeney to purchase Altounian and Donnelly's interests

28 in Roof Group for more than $1.1 million, even though those interests were virtually

**THIRD AMENDED COMPLAINT**

1  worthless;

2  (13)   Not reporting the entry of the Faraches' $1.7 million judgment against

3  Weinberg to FINRA and the SEC;

4  (14)   Doing nothing to assist Mr. Freeney close on his W Hotel condominium

5  unit or obtain return of his $1.2 million deposit;

6  (15)   Doing nothing to dispose of the North Carolina Land Investment and

7  failing to pay the HOA dues;

8  (16)   Opening the BofA Roof Group account at Weinberg's request;

9  (17)   Opening the BofA Roof Group account, and allowing it to remain open,

10  without required documentation, appropriate authorization, or sufficient due diligence;

11  (18)   Giving Weinberg and Stern the confidential account access information

12  for the BofA Roof Group account;

13  (19)   Executing hundreds of highly suspicious wire transfers from the BofA

14  Roof Group account to unknown recipients and recipients with no apparent

15  relationship to RSLA;

16  (20)   Not investigating any of these highly suspicious wire transfers;

17  (21)   Allowing the BofA Roof Group account to remain open and not changing

18  the account access information following Weinberg's departure from the bank;

19  (22)   Repeatedly overriding the account's security features, at Weinberg's

20  request, to allow wire transfers from the account originating online; and

21  (23)   Failing to prevent Stern and Weinberg from using the BofA Roof Group

22  account to misappropriate and launder millions of dollars of Mr. Freeney and

23  Roof Group's funds.

24  551.   As a direct and proximate result of these breaches of the duty of due care,

25  Mr. Freeney was damaged in an amount to be determined at trial.

26  / / /

27  / / /

28  / / /

214

**THIRD AMENDED COMPLAINT**

## FIFTEENTH CAUSE OF ACTION

**(For Negligent Hiring, Retention and Supervision of Weinberg)**

**(By Plaintiffs Freeney and Roof Group Against**

**Defendants BAC, BANA and MLPFS)**

552.   Plaintiffs repeat and reallege paragraphs 1 through 551 of this Third Amended Complaint as if fully alleged herein.

553.   At all times relevant hereto, Weinberg was unfit and incompetent to serve as Mr. Freeney's private banker, financial manager and investment advisor and Roof Group and RSLA's de facto CFO, and had a propensity to engage in criminal schemes with Stern that cheated and defrauded others, as described further in paragraphs 62 through 383 of this Third Amended Complaint.

554.   In hiring, retaining and supervising Weinberg, BAC, BANA and MLPFS knew, or should have known, of Weinberg's unfitness, incompetence and propensity to engage in criminal conduct with Stern.  In particular, BAC, BANA and MLPFS knew, or should have known, that, among other things:

(1)   Weinberg had been out of the financial services industry for several years and all of her registrations and licenses had lapsed;

(2)   Weinberg was not a registered broker-dealer or investment adviser, and she had not taken any of the examinations to become registered;

(3)   Weinberg had a close relationship with Stern, who had been exposed as a criminal and a financial predator;

(4)   Weinberg had been employed by Stern Realty prior to joining BofA/Merrill;

(5)   BOCK, Weinberg, and her family had loaned Stern over $1.0 million, most of which he had not repaid;

(6)   Weinberg had helped Stern operate his Beach Place Hotel, which was in bankruptcy;

(7)   Weinberg and BOCK were helping Stern find new investors for his

**THIRD AMENDED COMPLAINT**

distressed real estate holdings, all of which were in bankruptcy, receivership, foreclosure, or over-encumbered;

(8) BOCK, was a creditor in one of Stern's bankruptcies in the amount of $500,000;

(9) Weinberg was accused of aiding and abetting Stern in committing bankruptcy fraud and intimidating a witness who had alleged that Stern had forged her signature to loan forgiveness documents;

(10) Weinberg had guaranteed one of Stern's debts by issuing NSF checks totaling over $400,000;

(11) A judgment had been entered against Weinberg for approximately $1.7 million for issuing those checks;

(12) The judgment debtors in that case were seeking to garnish Weinberg's wages and bank accounts;

(13) Weinberg and BOCK were involved in an acrimonious divorce, in which she was alleging that he owed her more than $1.0 million in unpaid alimony and child support;

(14) Weinberg was romantically involved with Stern, who was married at the time;

(15) Weinberg had stayed with Stern in Uruguay, to which he had fled to avoid process and being deposed;

(16) Weinberg and BOCK had paid for Stern's bankruptcy attorneys;

(17) Weinberg considered Stern her fiancé;

(18) Weinberg was falsely representing herself as a "Senior Financial Advisor" for "Merrill Lynch Global Wealth Management," a "Vice President of Private Wealth Management at Merrill Lynch," and a "Financial Consultant" with "Merrill Lynch Wealth Management";

(19) Weinberg had referred Mr. Freeney to Stern for consulting services;

(20) Weinberg had falsely represented that Stern was a consultant for

216

**THIRD AMENDED COMPLAINT**

188650.4

1  BofA/Merrill Lynch;

2  (21)   Weinberg had falsely represented that Stern's name was Michael Millar,

3  that he was a wealthy and successful Miami Beach businessman, that he owned a

4  private jet and a private yacht, that he had $30 million on deposit with BofA/Merrill

5  Lynch, and that he was interested in investing in Mr. Freeney's business ventures;

6  (22)   Weinberg helped Stern incorporate ARC;

7  (23)   Weinberg referred Mr. Freeney to her brother for insurance services,

8  who, at the time, was not licensed to sell insurance;

9  (24)   Weinberg had convinced Mr. Freeney to purchase $55 million in life

10  insurance, notwithstanding that he already had $13 million in life insurance policies;

11  (25)   Weinberg had referred Mr. Freeney to the Florida Attorney, whom Stern

12  owed $100,000;

13  (26)   Weinberg transferred more than $160,000 from one of Mr. Freeney's

14  brokerage accounts to ARC without Mr. Freeney's authorization or knowledge and

15  using false justifications for the transfers;

16  (27)   Weinberg shared with Stern Mr. Freeney's private and confidential

17  personal, identifying financial and account information and records;

18  (28)   Weinberg had no qualifications, expertise, or experience to oversee the

19  build out, staffing, opening or operations of RSLA;

20  (29)   Weinberg had become the de facto CFO of Roof Group and RSLA even

21  though she had no ability to maintain the books and records or prepare financial

22  statements, budgets and projections for a restaurant;

23  (30)   Weinberg, together with Stern, had convinced Mr. Freeney that he

24  needed to oust Altounian and Donnelly as the managing members of Roof Group and

25  to purchase their interests in the company for approximately $1.1 million, even though

26  their interests were virtually worthless;

27  (31)   Weinberg had requested that Del Campo open a BANA account in the

28  name of Roof Group and to give her the confidential account access information, even

**THIRD AMENDED COMPLAINT**

1  though she was not a signatory on the account;

2      (32)   Weinberg gave the confidential account access information for the

3  BofA Roof Group account to Stern;

4      (33)   Weinberg had repeatedly requested that Del Campo override the security

5  hold on the account;

6      (34)   Weinberg was opening accounts at others banks in the name of

7  Mr. Freeney and Roof Group and making herself a signatory on those accounts;

8      (35)   Weinberg had formed her own company, GWM, with a name

9  confusingly similar to that of GWIM and MLGWM;

10      (36)   When she left the bank, Weinberg took with her all of Mr. Freeney's

11  private and confidential personal, financial, account and medical records; and

12      (37)   During her tenure at BofA/Merrill Lynch, Weinberg entirely disregarded

13  BAC's policies, procedures and code of ethics.

14      555.   At all times relevant hereto, BAC, BANA and MLPFS knew, or should

15  have known, that Weinberg's unfitness, incompetence and propensity to engage in

16  criminal conduct with Stern created particular risks for Mr. Freeney and Roof Group,

17  including that she would engage in a criminal scheme with Stern to cheat and defraud

18  them, misappropriate their funds, convert their assets and mismanage their finances,

19  which, as described in detail in this Third Amended Complaint, is exactly what she

20  did.

21      556.   As a direct and proximate result of Weinberg's unfitness, incompetence

22  and propensity to engage in criminal conduct with Stern, and BAC, BANA and

23  MLPFS' negligence in hiring, retaining and supervising her, Mr. Freeney and

24  Roof Group were damaged in an amount to be determined at trial, but which is

25  estimated to be in excess of $20 million.

26  / / /

27  / / /

28  / / /

<hr>

218

**THIRD AMENDED COMPLAINT**

### SIXTEENTH CAUSE OF ACTION

### (For Negligent Referral of Stern)

### (By Plaintiffs Freeney and Roof Group

### Against Defendants BAC, BANA and MLPFS)

557.   Plaintiffs repeat and reallege paragraphs 1 through 556 of this Third Amended Complaint as if fully alleged herein.

558.   At all times relevant hereto, BAC, BANA and MLPFS owed Mr. Freeney and Roof Group the duty not to refer them to third parties who BAC, BANA and MLPFS knew, or should have known, had a propensity to engage in criminal conduct that could cause harm to Mr. Freeney and Roof Group.

559.   At all times relevant hereto, Stern had a propensity to engage in criminal schemes to cheat and defraud others by gaining their trust and confidence and then, among other things, misappropriating their funds, converting their assets, making false representations and promises, concealing material facts, forging and falsifying documents and using false identities, as described further in paragraphs 62 through 383 of this Third Amended Complaint.

560.   In referring Stern (posing as Millar) to Mr. Freeney and Roof Group to provide consulting services and as a potential investor in Mr. Freeney's business ventures, BAC, BANA and MLPFS knew, or should have known, that Stern was a financial predator who had a propensity to engage in criminal schemes that cheated and defrauded others.  In particular, BAC, BANA and MLPFS knew, or should have known that, among other things:

(1)     Stern and his then wife had declared personal bankruptcy just a year prior to Mr. Freeney becoming a BofA/Merrill Lynch client, with reported debts exceeding $65 million and assets having a negative value;

(2)     Stern had been found in contempt by the Bankruptcy Court for willfully violating court orders requiring him to produce documents and appear to provide testimony;

### THIRD AMENDED COMPLAINT

188650.4

(3)     Stern was a defendant in more than 20 civil lawsuits brought by defrauded partners, investors and banks;

(4)     Evidence introduced in those lawsuits established that Stern had forged documents, falsified loan applications, misappropriated millions of dollars in loan proceeds, and engaged in witness tampering and intimidation;

(5)     A writ of bodily attachment had issued for Stern's arrest in one of those lawsuits for repeatedly failing to appear at his deposition;

(6)     Stern had fled to Uruguay to evade process and avoid being deposed, and, while there, cheated his stepson out of a large inheritance;

(7)     Stern had defrauded an elderly Florida couple, Rita Star and Ivar Rose, out of more than $20 million by, among other things, forging their names to dozens of documents;

(8)     Stern had previously been caught paying over $100,000 in bribes to Miami Beach city officials and only escaped prosecution by cooperating with the State Attorney;

(9)     Stern had sizeable gambling debts;

(10)    Stern had not paid any income taxes in years;

(11)    Stern was romantically involved with Weinberg, although he was still married;

(12)    Stern had borrowed more than $1.0 million from BOCK, Weinberg and her family and had not repaid most of those loans;

(13)    Stern had listed BOCK as a creditor in one of his bankruptcies in the amount of $500,000;

(14)    Stern was using the false names "Michael Millar," "David Millar" and "David Michael Millar";

(15)    Stern was falsely representing himself to be a wealthy and successful Miami Beach businessman who wanted to help Mr. Freeney get his financial affairs in order and who was interested in investing $7.0 million in Roof Group and RSLA;

**THIRD AMENDED COMPLAINT**

188650.4

(16)  Stern was falsely representing that he owned a private jet and that Mr. Freeney could use it for only the cost of the fuel;

(17)  Stern formed ARC, a sham company, within just a few days of meeting Mr. Freeney;

(18)  Stern had obtained access to all of Mr. Freeney's private and confidential personal, identifying and financial information and records;

(19)  Stern was falsely representing that he had the qualifications, expertise and experience to assist Weinberg in overseeing the build out, staffing, opening and operations of RSLA;

(20)  Stern had no ability to help Mr. Freeney recoup his $1.2 million deposit from the W Hotel or dispose of the North Carolina Land Investment; and

(21)  Stern was in desperate financial straits and would naturally view someone like Mr. Freeney – young, wealthy, trusting and financially naïve – as a prospective target.

561.  At all times relevant hereto, BAC, BANA and MLPFS knew, or should have known, that Stern's propensity to engage in criminal conduct created particular risks for Mr. Freeney and Roof Group, including that he would engage in a criminal scheme to cheat and defraud them, misappropriate their funds and convert their assets, which, as described in detail in this Third Amended Complaint, is exactly what he did.

562.  As a direct and proximate result of BAC, BANA and MLPFS' negligent referral of Stern to Mr. Freeney and Roof Group, they were damaged in an amount to be determined at trial, but which is estimated to be in excess of $20 million.

## SEVENTEENTH CAUSE OF ACTION

### (For an Accounting by BAC, BANA and MLPFS)

### (By Plaintiffs Freeney and Roof Group Against BAC, BANA and MLPFS)

563.  Plaintiffs repeat and reallege paragraphs 1 through 562 of this Third Amended Complaint.

564.  The amount of funds transferred, deposited, credited and/or debited to

**THIRD AMENDED COMPLAINT**

188650.4

accounts opened and maintained by BAC, BANA and/or MLPFS in the name, on behalf, or for the benefit of Mr. Freeney, including, without limitation, brokerage, bank and credit card accounts, and the disposition of those funds, is unknown at this time by Mr. Freeney and can only be determined with certainty by BAC, BANA and MLPFS.

565.   The amount of funds transferred, deposited, credited and/or or debited to accounts opened and maintained by BAC, BANA and MLPFS in the name, on behalf, or for the benefit of Roof Group, including, without limitation, checking, savings and credit card accounts, and the disposition of those funds, is unknown at this time by Roof Group and can only be determined with certainty by BAC, BANA and MLPFS.

566.   The disposition of any securities and other investments, transferred, purchased, sold, or otherwise liquidated by BAC, BANA or MLPFS in the name, on behalf, or for the benefit of Mr. Freeney, and the disposition of the proceeds of any such sale or other liquidation, is unknown at this time by Mr. Freeney and can only be determined with certainty by BAC, BANA and MLPFS.

567.   Therefore, the Court should order BAC, BANA and MLPFS to provide Mr. Freeney with a complete and accurate accounting of all of the aforementioned accounts, securities and other investments.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**THIRD AMENDED COMPLAINT**

188650.4

# PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

**As to the First Cause of Action for Conspiracy to Defraud:**

 1. For compensatory and special damages; and

 2. For punitive and exemplary damages.

**As to the Second Cause of Action for Fraud:**

 1. For compensatory and special damages; and

 2. For punitive and exemplary damages.

**As to the Third Cause of Action for Aiding and Abetting Conversion:**

 1. The value of the funds converted with interest from that time, or, if greater, an amount sufficient to compensate Mr. Freeney and Roof Group for the losses that were the natural, reasonable and proximate result of BANA's wrongful acts;

 2. For punitive and exemplary damages; and

 3. For fair compensation for the time and money Mr. Freeney and Roof Group have expended in pursuing the return and recovery of their converted funds.

**As to the Fourth Cause of Action for Violation of California – Penal Code Section 496:**

 1. For compensatory and special damages;

 2. For the trebling of those damages; and

 3. For Plaintiffs' reasonable attorney's fees.

**As to the Fifth Cause of Action for Civil RICO – Criminal Enterprise:**

 1. For compensatory and special damages;

 2. For the trebling of those damages;

 3. For punitive and exemplary damages; and

 4. For Plaintiffs' reasonable attorney's fees.

223

**THIRD AMENDED COMPLAINT**

188650.4

**As to the Sixth Cause of Action RICO Conspiracy – Criminal Enterprise:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages;

    3.    For punitive and exemplary damages; and

    4.    For Plaintiffs' reasonable attorney's fees.

**As to the Seventh Cause of Action for Civil RICO – Victim Enterprise:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages;

    3.    For punitive and exemplary damages; and

    4.    For Plaintiffs' reasonable attorney's fees.

**As to the Eighth Cause of Action for Civil RICO – Victim Enterprise:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages;

    3.    For punitive and exemplary damages; and

    4.    For Plaintiffs' reasonable attorney's fees.

**As to the Ninth Cause of Action for RICO Conspiracy – Victim Enterprise:**

    1.    For compensatory and special damages;

    2.    For the trebling of those damages;

    3.    For punitive and exemplary damages; and

    4.    For Plaintiffs' reasonable attorney's fees.

**As to the Tenth Cause of Action for Breach of Fiduciary Duty:**

    1.    For compensatory and special damages;

    2.    For compounding of prejudgment interest; and

    3.    For punitive and exemplary damages.

**As to the Eleventh Cause of Action for Aiding and Abetting**

**Breach of Fiduciary Duty by Weinberg:**

    1.    For compensatory and special damages;

    2.    For compounding of prejudgment interest; and

**THIRD AMENDED COMPLAINT**

188650.4

1    3.    For punitive and exemplary damages.

2    **As to the Twelfth Cause of Action for Aiding and Abetting**

3    **Breach of Fiduciary Duty by Stern:**

4    1.    For compensatory and special damages;

5    2.    For compounding of prejudgment interest; and

6    3.    For punitive and exemplary damages.

7    **As to the Thirteenth Cause of Action for Negligent Misrepresentation:**

8    1.    For compensatory and special damages.

9    **As to the Fourteenth Cause of Action for Professional Negligence:**

10   1.    For compensatory and special damages.

11   **As to the Fifteenth Cause of Action for Negligent Hiring,**

12   **Retention and Supervision of Weinberg:**

13   1.    For compensatory and special damages.

14   **As to the Sixteenth Cause of Action for Negligent Referral of Stern:**

15   1.    For compensatory and special damages.

16   **As to the Seventeenth Cause of Action for an Accounting:**

17   1.    For an order requiring the accountings as described in the Seventeenth

18   Cause of Action.

19   **For All Causes of Action:**

20   1.    For prejudgment interest at the maximum rate permitted by law;

21   2.    For costs of suit; and

22   3.    For such other and further relief as the Court may deem just and proper.

23

24   Dated:  February 16, 2016          **ISAACS | FRIEDBERG LLP**

25                                       By:   */s/ Jeffrey Isaacs*

26                                       JEFFREY B. ISAACS, ESQ.

27                                       *Attorneys for Plaintiffs Dwight J. Freeney and*
                                         *Roof Group LLC*

28

**THIRD AMENDED COMPLAINT**

188650.4

## DEMAND FOR JURY TRIAL

Plaintiffs Dwight J. Freeney and Roof Group LLC hereby request a jury trial on all issues properly triable to a jury.


Dated:  February 16, 2016                    **ISAACS | FRIEDBERG LLP**


By:  */s/ Jeffrey Isaacs*
_____
JEFFREY B. ISAACS, ESQ.

*Attorneys for Plaintiffs Dwight J. Freeney and Roof Group LLC*

226

**THIRD AMENDED COMPLAINT**

188650.4